IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| G.G., by his next friend and mother, DEIRDRE GRIMM, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. ___4:15cv54_____ |
| v. | ) ) | |
| GLOUCESTER COUNTY SCHOOL BOARD, | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT

### INTRODUCTION

1.      G.G. is a 16-year-old boy who recently completed his sophomore year at Gloucester High School.  He is a boy who is transgender, which means that he was designated female at birth but he has a male gender identity.  He has been diagnosed by medical professionals as having Gender Dysphoria, which is a serious medical condition characterized by clinically significant distress caused by an incongruence between a person's gender identity and the person's assigned sex at birth.

2.      Since the end of his freshman year, G.G. has undergone treatment for Gender Dysphoria, in accordance with the widely recognized standards of care for that condition. A critical element of that treatment is a "social transition" in which G.G. lives in accordance with his gender identity as a boy in all aspects of his life. As part of that process, G.G. has legally changed his name to "G.G." (a traditionally male name).

3.      Shortly before his sophomore year, G.G. and his mother informed school officials that G.G. is a transgender boy.  School officials immediately expressed support for G.G. and

took steps to ensure that he would be treated as a boy by teachers and staff.  Later in the school

year, at G.G.'s request, and consistent with recognized standards of care for transgender students,

school officials allowed him to use the boys' restroom.  He did so without incident for

approximately seven weeks.

4.      On December 9, 2014, the Gloucester County School Board, responding to

pressure from some parents – and other Gloucester County residents without school-age children

– enacted a policy that overruled the decision of school administrators and categorically barred

transgender students from using restrooms that correspond with their gender identity.  The policy

declared that access to the boys' and girls' restrooms would be limited to students of "the

corresponding biological genders," and also declared that students who are unable to use such

restrooms because of "gender identity issues" would be relegated to "an alternative appropriate

private facility."

5.      As a result of the School Board's transgender restroom policy, G.G. is currently

the only student in his school who must use separate private restrooms.  The distinction

stigmatizes G.G. and marks him as different from the other students; it isolates G.G. from his

peers; and it exposes him to serious psychological harm.  To avoid the stigma of having to use

separate restrooms, G.G. has tried to avoid using *any* restroom during the school day.

6.      The School Board's transgender restroom policy discriminates against G.G. on

the basis of gender and sex in violation of the Equal Protection Clause of the Fourteenth

Amendment and Title IX of the Education Amendments of 1972.G.G. seeks redress from this

Court.

**JURISDICTION AND VENUE**

7.      This action arises under Title IX of the Education Amendments of 1972, 20

U.S.C. § 1681, *et seq.*, the Constitution of the United States, and 42 U.S.C. § 1983.This Court

has jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §

1331.Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8.      Venue lies with this Court pursuant to 28 U.S.C. §§ 1391(b)(1)-(2), because the

defendant resides in this District and a substantial part of the events or omissions giving rise to

the claim occurred in this District.

**PARTIES**

9.      Plaintiff G.G. is sixteen years old and is a student at Gloucester High School

("GHS"), a public high school in Gloucester County.

10.     Deirdre Grimm is G.G.'s mother and sues as his next friend.

11.     The Gloucester County School Board (the "School Board") is an elected body

responsible for the operation of the Gloucester County Public Schools ("GCPS"), including the

promulgation of policies.  At all times relevant, the School Board has acted and continues to act

under color of state law.

**FACTUAL ALLEGATIONS**

12.     G.G. was born in Gloucester County on May 4, 1999, and has lived in Gloucester

County his entire life.  G.G. is a typical teenager who is articulate and intelligent, reads broadly,

loves his dog and cats, and enjoys hanging out with his friends.

13.     Photographs of G.G. taken over the past year are attached as Exhibit A.

14.     G.G. is also a transgender boy.  That is, his assigned sex at birth was female, but

that designation does not conform to his male gender identity.  G.G. has been diagnosed with

3

Gender Dysphoria, the medical diagnosis for individuals whose gender identity – their innate sense of being male or female – differs from the sex they were assigned at birth, which causes distress.

15.     Gender Dysphoria is a serious medical condition that if left untreated can lead to clinical distress, debilitating depression, and even suicidal thoughts and acts.

16.     At a very young age, G.G. was aware that he did not feel like a girl.

17.     G.G. has always felt uncomfortable wearing "girl" clothes, and by the age of six, he adamantly refused to do so. He soon insisted upon buying all of his clothes in the boys' department.

18.     At approximately age twelve, G.G. acknowledged his male gender identity to himself. He gradually began disclosing this fact to close friends. Since the reactions of his friends were generally positive and supportive, he disclosed his gender identity to more friends.

19.     In approximately ninth grade, most of G.G.'s friends were aware of his gender identity, and G.G. presented himself as a boy when he socialized with them away from home and school.

20.     During his freshman year, G.G. experienced severe depression and anxiety related to his untreated Gender Dysphoria and the stress of concealing his gender identity from his family. For this reason, he did not attend school during the spring semester of his freshman year. Instead, he took classes through a home-bound program that follows the public high school curriculum.

21.     In April 2014, G.G. told his parents that he is transgender. At his request, he began to see a psychologist who had experience with working with transgender patients. The psychologist diagnosed him with Gender Dysphoria.

22.     Mental health and medical professionals worldwide recognize and follow the evidence-based standards of care for the treatment of Gender Dysphoria developed by the World Professional Association for Transgender Health (WPATH).After diagnosing G.G. with Gender Dysphoria, his psychologist developed a course of treatment consistent with those standards. The goal of treatment is to alleviate distress by helping a person live congruently with the person's gender identity.

23.     A critical component of the WPATH Standards of Care is a social transition to living full-time consistently with the individual's gender identity.  Accordingly, G.G.'s psychologist recommended that he immediately begin living in accordance with his gender identity as a boy in all respects.  That included using a male name and pronouns and using boys' restrooms.  G.G.'s psychologist also provided him a "Treatment Documentation Letter" confirming that he was receiving treatment for Gender Dysphoria and that, as part of that treatment, he should be treated as a boy in all respects, including with respect to his use of the restroom.

24.     For transgender adolescents, it is critical that the social transition involve full transition at school, including with respect to restrooms.  Excluding a transgender boy from the restroom that corresponds to the student's gender identity, or forcing the student to use a separate facility from other boys, communicates to the entire school community that he should not be recognized as a boy and undermines the social transition process.

25.     Based on his psychologist's recommendation, in July 2014, G.G. petitioned the Circuit Court of Gloucester County to change his legal name to G.G., and the court granted the petition.  G.G. now uses that name for all purposes, and at his request, his friends and family

refer to him using male pronouns. G.G. also uses the boys' restrooms when out in public, e.g., at restaurants, libraries, shopping centers.

26.    Also consistent with the WPATH standards of care, G.G.'s psychologist recommended that he see an endocrinologist to begin hormone treatment. G.G. has been receiving hormone treatment since December 2014.Among other therapeutic benefits, the hormone treatment has deepened G.G.'s voice, increased his growth of facial hair, and given him a more masculine appearance.

27.    In August 2014, G.G. and his mother informed officials at Gloucester High School that G.G. is transgender and that he changed his name. The high school changed G.G.'s name in his official school records.

28.    Before the beginning of the 2014-15 school year, G.G. and his mother met with Gloucester High School Principal T. Nathan Collins and guidance counselor Tiffany Durr to discuss G.G.'s treatment for Gender Dysphoria and the need for him to socially transition at school as part of his medical treatment. Mr. Collins and Ms. Durr both expressed support for G.G. and a willingness to ensure a welcoming environment for him at school. Ms. Durr and G.G. agreed that G.G. would send an email to teachers explaining that he was to be addressed using the name G.G. and to be referred to using male pronouns. To the best of G.G.'s knowledge, no teachers, administrators, or staff at Gloucester High School expressed any resistance to these instructions.

29.    G.G. requested, and was permitted, to continue with the home-bound program only for his physical education requirement, while returning to school for the rest of his classes. For this reason, he has not and does not intend to use a locker room at school.

30.     G.G. initially agreed to use a separate restroom in the nurse's office because he was unsure how other students would react to his transition.

31.     When the 2014-15 school year began, G.G. was pleased to discover that his teachers and the vast majority of his peers respected the fact that he is a boy and treated him accordingly.  G.G. quickly determined that it was not necessary for his safety to continue to use the nurse's bathroom, and he found it stigmatizing to have to use a separate restroom.  The nurse's bathroom was also very inconvenient to G.G.'s classrooms, making it difficult to use the restroom between classes.  For these reasons, G.G. asked Mr. Collins to be allowed to use the boys' bathrooms.

32.     On or about October 20, 2014, Mr. Collins agreed that G.G. could use the boys' restrooms.  For approximately the next seven weeks, G.G. used the boys' restrooms without incident.

33.     Nevertheless, some adults in the community were angered when they came to learn that a transgender student had been allowed to use the restroom corresponding to the student's gender identity. Upon information and belief, those adults contacted members of the School Board to demand that the transgender student be barred from continuing to use the restroom at issue.

34.     Shortly before the School Board's meeting on November 11, 2014, Board member Carla B. Hook added an item to the agenda titled "Discussion of Use of Restrooms/Locker Room Facilities."  In advance of the meeting, Ms. Hook prepared to submit the following proposed resolution (hereinafter referred to as the "transgender restroom policy"):

Whereas the GCPS recognizes that some students question their gender identities, and

Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and

Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore

It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

35.     Through emails and online message boards, news circulated among certain Gloucester County residents that they should attend the School Board meeting on November 11, 2014, and speak in favor of Ms. Hook's proposed restroom policy.

36.     Neither G.G. nor his parents were informed by the School Board or any other school officials that the School Board would be considering a policy that would bar G.G. from using the boys' restroom. G.G. and his parents learned about the proposal for the first time on November 10 – the day before the School Board meeting was scheduled to take place – when they saw one of the messages posted by supporters of Ms. Hook's proposed restroom policy.

37.     Twenty-seven people spoke during the Citizens' Comment Period of the School Board meeting, the majority of whom opposed the school's decision to allow G.G. to use the boys' restrooms. The commenters displayed many misperceptions about transgender people and imagined dire consequences from allowing G.G. to use the boys' restrooms. Some speakers referred to G.G. as a "young lady."Some speakers claimed that transgender students' use of restrooms that match their gender identity would violate the privacy of other students and would lead to sexual assault in bathrooms. Another suggested that boys who are not transgender would come to school wearing a dress and demand to use the girls' restroom for nefarious purposes.

38.     G.G. and his parents also attended the meeting to speak against the policy. In doing so, G.G. was forced to identify himself to the entire community, including local press covering the meeting, as the transgender student whose restroom use was at issue. "All I want to

do is be a normal child and use the restroom in peace," G.G. said. "I did not ask to be this way, and it's one of the most difficult things anyone can face," he continued. "This could be your child . . . . I'm just a human. I'm just a boy."

39.     Later in the meeting, Board member Carla B. Hook moved to adopt her proposed transgender restroom policy. By a vote of 4-3, the School Board voted to defer a vote on the policy until its meeting on December 9, 2014.

40.     Between November 11, 2014, and December 9, 2014, the School Board was informed by many legal sources that the proposed restroom policy conflicted with guidance of the Department of Education's Office of Civil Rights (OCR) regarding Title IX and that adopting the policy would place the district's Title IX funding at risk. According to OCR guidance, transgender students are protected under Title IX from discrimination based on gender identity or gender nonconformity, and schools must respect students' gender identity for purposes of any sex-segregated programming. *See* U.S. Department of Education Office for Civil Rights, Questions & Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities (Dec. 1, 2014); U.S. Department of Education Office for Civil Rights, Questions & Answers on Title IX and Sexual Violence (Apr. 29, 2014).

41.      On December 3, 2014, the School Board issued a news release stating that regardless of the outcome of the upcoming meeting, the School Board intended to take measures to increase privacy in student bathrooms. According to the release:

> One positive outcome of all the discussion is that the District is planning to increase the privacy options for all students using school restrooms . . . Plans include adding or expanding partitions between urinals in male restrooms, and adding privacy strips to the doors of stalls in all restrooms. The District also plans to designate single-stall, unisex restrooms, similar to what's in many other public spaces, to give all students the option for even greater privacy.

42.     At the School Board's December 9, 2014 meeting, approximately 37 people spoke during the Citizens' Comment Period.  The majority of speakers opposed G.G.'s use of the boys' restrooms.  Several speakers threatened to vote the School Board members out of office if they did not adopt the transgender restroom policy.  Speakers again suggested that permitting G.G. to use the boys' bathroom would violate the privacy of other students, notwithstanding the School Board's announcement that bathrooms would be modified to allow more privacy. Some speakers said that allowing G.G. to use the boys' bathroom would make the bathrooms "coed." Speakers again referred to G.G. as a "girl" or "young lady."  One speaker called him a "freak" and compared him to a person who thinks he is a "dog" and wants to urinate on fire hydrants.

43.     Following the Citizens' Comment Period, the School Board voted 6-1 to pass the transgender restroom policy.

44.     The experience of having the entire community discuss his physical anatomy and debate where he should use the restroom and has been profoundly disturbing for G.G..  He feels that he has been stripped of his privacy and turned into a public spectacle.

45.     The day after the School Board adopted the transgender restroom policy, Mr. Collins informed G.G. that he would no longer be allowed to use the boys' restrooms and that there would be disciplinary consequences if he tried to do so.

46.     Using the girls' restroom is not possible for G.G.  Even before he began treatment for Gender Dysphoria, girls and women who encountered G.G. in female restrooms reacted negatively because they perceived G.G. to be a boy.  For example, when G.G. was in eighth and ninth grade, girls would tell him "this is the girls' room" and ask tell him to leave.  G.G.'s appearance now is even more masculine.  In addition to those practical obstacles, using the girls'

restroom would cause severe psychological distress to G.G. and would be incompatible with his medically necessary treatment for Gender Dysphoria.

47.     Since adopting the restroom policy, three unisex, single-stall restrooms have been installed at Gloucester High School. The school also raised the doors and walls around the bathroom stalls so that students cannot see into an adjoining stall. Additionally, the high school installed partitions between urinals in the boys' bathrooms. As a result, a person making normal use of the restroom cannot see the genitals of any other person.

48.     G.G. refuses to use the separate single-stall restrooms they make him feel even more stigmatized and isolated than when he used the restroom in the nurse's office. Being required to use the separate restrooms sets him apart from his peers, and serves as a daily reminder that the school views him as "different." Other students do not appear to use the single-stall unisex restrooms. The entire school community knows that they were installed as restrooms for G.G., and any other transgender students, so they would not be in the same restroom as their peers.

49.     Instead of using the separate restrooms, G.G. tries to avoid using the restrooms entirely while at school, and, if that is not possible, he uses the nurse's restroom. As a result of trying to avoid using the restroom, G.G. has repeatedly developed painful urinary tract infections. He limits his beverage intake to try to reduce the discomfort and distraction caused by "holding it" as he tries to focus in class.

50.     Because the powerful stigma attached to the requirement that he use separate restrooms, and because the exclusion from the boys' restrooms undermines his social transition process, the transgender restroom policy inflicts severe and persistent emotional and social harms on G.G. Research indicates that transgender students are at greater risk than their peers of

experiencing severe and long-term negative effects from being stigmatized by and isolated from their peers. The transgender restroom policy compounds that harm and imposes additional stigma on an already vulnerable group of students.

51.     Randi Ettner Ph.D – a psychologist and nationally recognized expert in the treatment of Gender Dysphoria in children and adolescents – recently conducted an independent clinical assessment of G.G. and concluded that "the shame of being singled out and stigmatized in his daily life every time he needs to use the restroom is a devastating blow to G.G. and places him at extreme risk for immediate and long-term psychological harm."

52.     By contrast, allowing G.G. to use the boys' restroom would not harm any other student at Gloucester High School in any way. There is no indication that any student was harmed during the seven weeks that G.G. used the boys' restrooms. The privacy modifications made to the restrooms address the already far-fetched concern that G.G. might see the genitals of another boy while using the restroom. Any boy who still feels uncomfortable with using the restroom at the same time as G.G. may avail himself of the recently installed single stall bathrooms. But the School Board may not place the burden solely on transgender students to use separate restroom facilities to address the alleged discomfort of others.

## CLAIMS FOR RELIEF

### COUNT I
### Fourteenth Amendment to the United States Constitution

53.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on gender is presumptively unconstitutional and subject to heightened scrutiny. The Fourteenth Amendment's protections from discrimination based on gender encompass both discrimination based on the biological differences between men and women and discrimination based on gender nonconformity.

54. The School Board is the final policymaker for Gloucester County Public Schools.

55. By requiring G.G. – a transgender boy – to use separate restrooms because of his "gender identity issues," the School Board, under color of state law, has treated and continues to treat G.G. differently from similarly situated students based on his gender.

56. By excluding G.G. – a transgender boy – from the boys' restrooms because the School Board does not deem him to be "biologically" male, the School Board, under color of state law, has treated and continues to treat G.G. differently from similarly situated students based on his gender.

57. The School Board's discrimination against G.G. based on his gender is not substantially related to any important government interest.

58. The School Board's discrimination against G.G. based on his gender is not rationally related to any legitimate government interest.

59. The School Board's discrimination against G.G. based on his gender denies him the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution.

60. The School Board is liable for its violation of G.G.'s Fourteenth Amendment rights under 42 U.S.C. § 1983.

**COUNT II**
**Title IX of the Education Amendments of 1972**
**20 U.S.C. § 1681 *et seq*.**

61. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

62.     Under Title IX, discrimination "on the basis of sex" encompasses both discrimination based on biological differences between men and women and discrimination based on gender nonconformity.

63.     Gloucester County Public Schools and Gloucester High School are education programs receiving Federal financial assistance.

64.     By requiring G.G. – a transgender boy – to use separate restrooms because of his "gender identity issues," the School Board has and continues to exclude G.G. from participation in, deny him the benefits of, and subject him to discrimination in educational programs and activities at Gloucester County Public Schools and Gloucester High School "on the basis of sex," which violates G.G.'s rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

65.     By excluding G.G. – a transgender boy – from the boys' restrooms because the School Board does not deem him to be "biologically" male, the School Board has and continues to exclude G.G. from participation in, deny him the benefits of, and subject him to discrimination in educational programs and activities at Gloucester County Public Schools and Gloucester High School "on the basis of sex," which violates G.G.'s rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

## REQUEST FOR RELIEF

For the foregoing reasons, the plaintiffs respectfully request that the Court grant the following relief:

A.     A declaration that the School Board's transgender restroom policy violates G.G.'s rights under the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*;

15

      B.       Preliminary and permanent injunctions requiring the School Board to allow G.G.

to use the boys' restrooms at school;

      C.       Damages in an amount determined by the Court;

      D.       Plaintiffs' reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

      E.       Such other relief as the Court deems just and proper.

Dated: June 11, 2015

Respectfully submitted,


AMERICAN CIVIL LIBERTIES UNION          AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.            FOUNDATION

_____/s/_____                     Joshua A. Block*
Rebecca K. Glenberg (VSB No. 44099)     Leslie Cooper*
Gail Deady (VSB No. 82035)              125 Broad Street, 18th Floor
701 E. Franklin Street, Suite 1412      New York, New York 10004
Richmond, Virginia 23219                Phone: (212) 549-2500
Phone: (804) 644-8080                   Fax:  (212) 549-2650
Fax: (804) 649-2733                     jblock@aclu.org
rglenberg@acluva.org                    lcooper@aclu.org
gdeady@acluva.org

*Pro hac vice motion to follow