IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| G.G., by his next friend and mother, DEIRDRE GRIMM, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| GLOUCESTER COUNTY SCHOOL BOARD, | ) ) ) |
| Defendant. | ) |

Civil No. 4:15cv54

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

   G.G. ........................................................................................................................ 1

   Gender Dysphoria ................................................................................................... 1

   Medical Necessity of Social Role Transition, Including Access to Restrooms. ...................... 3

   G.G.'s Gender Dysphoria ........................................................................................ 6

   School Response and School Board Response ........................................................ 7

   Aftermath of the policy .......................................................................................... 13

   Need for Preliminary Injunction Before New School Year ................................... 15

ARGUMENT ............................................................................................................... 15

   I.  Preliminary Injunction Standard .................................................................... 15

   II.  Plaintiff Has Established a Likelihood of Success on the Merits on His Equal Protection Claim. ........................................................................................... 17

      A.  Relegating G.G. to Separate Single-Stall Restrooms Because of "Gender Identity Issues" Discriminates Against Him on the Basis of Sex. ........................................... 18

        i.  Discrimination Based on Gender Nonconformity or Incongruence Is Discrimination on the Basis of Sex. ....................................................... 18

        ii.  The Transgender Restroom Policy Relegates G.G. to Separate and Unequal Facilities Based on His Gender Nonconformity and Incongruence. .................... 23

      B.  Excluding G.G. from the Boys' Restroom Based on His "Biological Gender" Discriminates Against Him on the Basis of Sex. ....................................... 25

      C.  The Transgender Restroom Policy Is Not Substantially Related to an Important Governmental Interest in Protecting Student Privacy. ................................ 31

   III.  Plaintiff Has Established A Likelihood of Success on His Title IX Claim. ..................... 36

   IV.  Plaintiff Has Satisfied the Other Preliminary Injunction Factors ..................... 39

      A.  An Injunction Is Necessary to Avoid Irreparable Harm. ........................... 39

      B.  The Balance of Hardships Weights in Favor of An Injunction ................. 40

      C.  An Injunction Is In the Public Interest ...................................................... 41

**CONCLUSION** ...................................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore County, MD,*
  515 F.3d 356 (4th Cir. 2008) ............................................................... 33

*Aggarao v. MOL Ship Mgmt. Co.,*
  675 F.3d 355 (4th Cir. 2012) ............................................................... 16

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ............................................................. 16

*Auer v.Robbins,*
  519 U.S. 452 (1997)............................................................................. 38

*Back v. Hastings On Hudson Union Free Sch. Dist.,*
  365 F.3d 107 (2d Cir. 2004) ................................................................ 18

*Barnes v. City of Cincinnati,*
  401 F.3d 729 (6th Cir. 2005) ............................................................... 20

*Bd. of Trustees of Univ. of Ala. v. Garrett,*
  531 U.S. 356 (2001)............................................................................. 35

*Biediger v. Quinnipiac Univ.,*
  691 F.3d 85 (2d Cir. 2012) ............................................................ 36, 38

*Causey v. Ford Motor Co.,*
  516 F.2d 416 (5th Cir. 1975) .......................................................... 28, 29

*Centro Tepeyac v. Montgomery County,*
  722 F.3d 184 (4th Cir. 2013) ............................................................... 41

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
  598 F.3d 30 (2d Cir. 2010) .................................................................. 16

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)............................................................................. 27

*Cohen v. Brown Univ.,*
  991 F.2d 888 (1st Cir. 1993)................................................................ 41

*Cruzan v. Special Sch. Dist. No. 1,*
  294 F.3d 981 (8th Cir. 2002) ............................................................... 35

*D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs,*
  706 F.3d 256 (4th Cir. 2013) ............................................................... 38

iv

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)............................................................................................ 38

*De'lonta v. Johnson*,
   708 F.3d 520 (4th Cir. 2013) ................................................................... 2, 3, 30

*DeClue v. Cent. Ill. Light Co.*,
   223 F.3d 434 (7th Cir. 2000) ....................................................................... 28, 29

*Doe v. Clark County Sch. Dist.*,
   206-CV-1074-JCM-RJJ, 2008 WL 4372872 (D. Nev. Sept. 17, 2008) ................... 37

*Doe v. Reg'l Sch. Unit 26*,
   86 A.3d 600 (Me. 2014)........................................................................ 31, 37, 39

*Doe v. Wood County Bd. of Educ.*,
   888 F. Supp. 2d 771 (S.D. W. Va. 2012).......................................... 17, 40, 41

*EEOC v. Flasher Co.*,
   986 F.2d 1312 (10th Cir.1992) ...................................................................... 28

*Equity In Athletics, Inc. v. Dep't of Educ.*,
   639 F.3d 91 (4th Cir. 2011) ........................................................................... 41

*Etsitty v. Utah Transit Auth.*,
   502 F.3d 1215 (10th Cir. 2007) ............................................................ 20, 22, 28

*Faulkner v. Jones (Faulkner I)*,
   10 F.3d 226 (4th Cir. 1993) .................................................................. 27, 28, 40

*Finkle v. Howard County*,
   12 F. Supp. 3d 780 (D. Md. 2014).......................................................... 20, 21, 23

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ............................................................... passim

*Hart v. Lew*,
   973 F. Supp. 2d 561 (D. Md. 2013) ............................................................ 20, 22

*Heckler v. Mathews*,
   465 U.S. 728 (1984)..................................................................................... 28

*Holloway v. Arthur Andersen & Co.*,
   566 F.2d 659 (9th Cir. 1977) ........................................................................ 19

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
   582 F.3d 721 (7th Cir. 2009) ....................................................................... 16

*Hunter v. United Parcel Serv., Inc.*,
  697 F.3d 697 (8th Cir. 2012) ................................................................. 20

*In Re Lovo-Lara*,
  23 I. & N. Dec. 746 (BIA 2005) ............................................................ 17

*J.E.B. v. Ala. ex rel. T.B.*,
  511 U.S. 127 (1994)................................................................... 18, 29

*Jennings v. Univ. of N.C.*,
  482 F.3d 686 (4th Cir. 2007) ................................................................. 18

*Johnson v. Fresh Mark, Inc. ("Fresh Mark")*,
  337 F. Supp. 2d 996 (N.D. Ohio 2003)................................................... 23

*Johnson v. Fresh Mark, Inc.*,
  98 F. App'x 461 (6th. Cir. 2004) ........................................................... 23

*Johnson v. U.S. O.P.M.*,
  783 F.3d 655 (7th Cir. 2015) ................................................................. 28

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
  No. 13-213, 2015 WL 1497753 (W.D. Pa. Mar. 31, 2015)......................... 26, 28, 33

*Kastl v. Maricopa Cty. Cmty. Coll. Dist.*,
  No. CIV.02-1531PHX-SRB, 2004 WL 2008954 (D. Ariz. June 3, 2004) ............ 22

*Kelley v. Bd. of Trustees*,
  35 F.3d 265 (7th Cir. 1994) ................................................................. 41

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ................................................................. 16

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) ................................................................. 41

*Lewis v. High Point Reg'l Health Sys.*,
  No. 5:13-CV-838-BO, 2015 WL 221615 (E.D.N.C. Jan. 15, 2015) ................ 20

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)............................................................................ 28

*Mercer v. Duke Univ.*,
  190 F.3d 643 (4th Cir. 1999) ................................................................. 37

*Miss. Univ. for Women*,
  458 U.S. 718 (1982)................................................................... 27, 31, 32

vi

*Muir v. Applied Integrated Tech., Inc.*,
  No. 13-0808, 2013 WL 6200178 (D. Md. Nov. 26, 2013) ..................................................... 20

*Orr v. Orr*,
  440 U.S. 268 (1979) ............................................................................................................ 33

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ............................................................................................................ 27

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) .............................................................................................. 16

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ...................................................................................................... 18, 19

*Real Truth About Obama, Inc. v. FEC*,
  575 F.3d 342 (4th Cir. 2009) .............................................................................................. 16

*Real Truth About Obama, Inc. v. FEC*,
  607 F.3d 355 (4th Cir. 2010) .............................................................................................. 16

*Rinaldi v. Yeager*,
  384 U.S. 305 (1966) ............................................................................................................ 30

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ............................................................................................................ 41

*Rosa v. Park W. Bank & Trust Co.*,
  214 F.3d 213 (1st Cir. 2000) ......................................................................................... 18, 20

*Rumble v. Fairview Health Servs.*,
  No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ........................... 21

*Schroer v. Billington (Schroer I)*,
  424 F. Supp. 2d 203 (D.D.C. 2006) ..................................................................................... 17

*Schroer v. Billington (Schroer II)*,
  577 F. Supp. 2d 293 (D.D.C. 2008) ............................................................................... 21, 23

*Schwenk v. Hartford*,
  204 F.3d 1187 (9th Cir. 2000) .................................................................................. 18, 19, 20

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ....................................................................................... passim

*Snyder ex rel. R.P. v. Frankfort-Elberta Area School Dist.*,
  No. 1:05-CV-824, 2006 WL 3613673 (W.D. Mich. Dec. 11, 2006) ....................................... 37

*Sommers v. Budget Mktg., Inc.*,
  667 F.2d 748 (8th Cir.1982) .......................................................................... 19

*Sweatt v. Painter*,
  339 U.S. 629 (1950)....................................................................................... 27

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001)..................................................................................... 18, 31

*Ulane v. E. Airlines, Inc.*,
  742 F.2d 1081 (7th Cir. 1984) ...................................................................... 19

*United States v. Virginia*,
  518 U.S. 515 (1996)................................................................................. passim

*Wengler v. Druggists Mut. Ins. Co.*,
  446 U.S. 142 (1980).................................................................................. 32, 33

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................................................... 16

**Statutes**

20 U.S.C. § 1681(a) ............................................................................................ 36

28 C.F.R. § 54.400(b) ........................................................................................ 37

34 C.F.R § 106.31(b) ......................................................................................... 37

34 C.F.R. § 106.33 ......................................................................................... 37, 39

**Administrative Decisions and Guidance**

*Lusardi v. McHugh*,
  EEOC DOC 0120133395, 2015 WL 1607756 (Apr. 1, 2015) .............................. 22, 23, 24, 35

*Macy v. Holder*,
  EEOC DOC 0120120821, 2012 WL 1435995 (Apr. 20, 2012) ................................................ 21

*Mathis v. Fountain-Ft. Carson Sch. Dist. No. 8*,
  Colo. Civ. Rts. Div. Determination, Charge No. P20130034X (June 17, 2013)............... 24, 34

U.S. Attorney General, *Attorney General Memorandum re Treatment of Transgender
  Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (Dec.
  15, 2014) ............................................................................................................... 21

U.S. Dep't of Educ., Office for Civil Rights, *Questions & Answers on Title IX and Sexual
  Violence* (Apr. 29, 2014).......................................................................................... 21

U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities* (Dec. 1, 2014) .......... 38

Va. Dep't of Educ. Guidelines for Sch. Facilities in Va. Public Schools (2013) ........................ 34

**Other Authorities**

Dominic Holden, *Virginia School Board Bans Trans Students From Using Restrooms Based On Gender Identity*, BuzzFeed (Dec. 10, 2014) ................................................................ 12, 13

Frances Hubbard, *Gloucester: School Cannot Grant Transgender Student Access to Boys Restroom*, Daily Press (Apr. 29, 2015) ..................................................................................... 26

Gloucester (Va.) County School Board, Press Release, *Gloucester School Board Prepares to Discuss, Likely Vote at Dec. 9 Meeting on Restroom/Locker Room Use for Transgender Students* (Dec. 3, 2014) ("Dec. 3 Press Release") ................................................... 9, 11, 12, 32

Gloucester County Public Schools, 2014-15 School Calendar ...................................................... 15

Gloucester County Public Schools, 2015-16 School Calendar ...................................................... 15

Gloucester County School Board Monthly Meeting, Nov. 11, 2014, Revised Agenda ................ 9

Gloucester Public School Board Meeting, Dec. 9, 2014, Video Transcript ("Dec. 9 Video Tr.") ........................................................ passim

Gloucester Public School Board Meeting, Nov. 11, 2014, Video Transcript ("Nov. 11 Video Tr.") ...................................................... passim

Recorded Minutes of the Gloucester County School Board, November 11, 2014 ("Nov. 11 Minutes") .......................................................................... 10, 11

Recorded Minutes of the Gloucester County School Board, December 9, 2014 ("Dec. 9 Minutes") .................................................................................... 12

Statement of Interest of the United States in *Tooley v. Van Buren Public Schools*, No. 2:14-cv-13466 (E.D. Mich. Feb. 20, 2015) ............................................................................. 22, 38

Terry S. Kogan, *Sex-Separation in Public Restrooms: Law, Architecture, and Gender*, 14 Mich. J. Gender & L. 1 (2007) ............................................................................................ 27

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff respectfully submits the following memorandum of law[1] in support of his motion for a preliminary injunction requiring that Defendant allow him to resume using the boys' restrooms at Gloucester High School when he returns to school for the first day of classes on September 8, 2015, until this Court renders a final judgment on the merits.

## BACKGROUND

G.G.

Plaintiff G.G. is a 16-year-old boy who has just completed his sophomore year at Gloucester High School.  *See* Declaration of G.G. (G.G. Decl.) ¶ 5.  He was born in Gloucester County on May 4, 1999, and has lived in Gloucester County his entire life.  *Id.* ¶ 4.  G.G. is a typical teenager who is articulate and intelligent, reads broadly, loves his dog and cats, and enjoys hanging out with his friends.  Photographs of G.G. are attached to his declaration.  *Id.* ¶ 3, Ex. A.

G.G. is also transgender.  That is, his assigned sex at birth was female, but that designation is not consistent with his male gender identity.  G.G. has been diagnosed with Gender Dysphoria, the medical diagnosis for individuals whose gender identity—their innate sense of being male or female—differs from the sex they were assigned at birth, which causes distress.  *Id.* ¶ 11; Expert Declaration of Randi Ettner, Ph.D. (Ettner Decl.) ¶ 12, 29.

Gender Dysphoria

The term "gender identity" is a well-established concept in medicine, referring to one's sense of oneself as male or female.  Ettner Decl. ¶ 3.  All human beings develop this elemental

---

[1] This Memorandum in Support is substantively identical to Plaintiff's Proposed Memorandum in Support of Motion for Preliminary Injunction (ECF No. 13-1), which was included as an exhibit to Plaintiff's Motion to File Brief in Excess of 30 Pages (ECF No. 13), but has been amended to correct minor formatting and typographical errors.

internal view: the conviction of belonging to a particular gender.  *Id.*  Gender identity is an innate and immutable aspect of personality that is firmly established by age four, although individuals vary in the age at which they come to understand and express their gender identity.  *Id.*

Typically, people born with female anatomical features identify as girls or women, and experience themselves as female.  *Id.* ¶ 11.  Conversely, those persons born with male characteristics ordinarily identify as males.  For transgender individuals, however, the sense of one's self—one's gender identity—differs from the natal, or birth-assigned sex, giving rise to a sense of being "wrongly embodied."  *Id.*  The medical diagnosis for that feeling of incongruence is Gender Dysphoria.  *Id.* ¶ 12.  Gender Dysphoria is a serious medical condition codified in the Diagnostic and Statistical manual of Mental Disorders (DSM-V) (American Psychiatric Association) and the International Classification of Diseases-10 (World Health Organization).  *Id.*  The condition is manifested by symptoms such as preoccupation with ridding oneself of primary and secondary sex characteristics. Untreated Gender Dysphoria can result in significant clinical distress, debilitating depression, and often suicidal thoughts and acts.  *Id.*; *see also De'lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) (recognizing treatment for Gender Dysphoria as a serious medical need under the Eighth Amendment).  The criteria for establishing a diagnosis of Gender Dysphoria in adolescents and adults are set forth in the DSM-V (302.85).  Ettner Decl. ¶ 13.

The World Professional Association for Transgender Health (WPATH) has established internationally accepted Standards of Care (SOC) for the treatment of people with Gender Dysphoria.  *Id.* ¶ 14.  The SOC have been endorsed as the authoritative standards of care by leading medical and mental health organizations, including the American Medical Association, the Endocrine Society, and the American Psychological Association.  *Id.*; *see De'lonta*, 708 F.3d

at 522-23 (recognizing that "[t]he Standards of Care, published by the World Professional Association for Transgender Health, are the generally accepted protocols for the treatment of" Gender Dysphoria).  In accordance with the SOC, individuals undergo medically-recommended transition in order to live in alignment with their gender identity.  Ettner Decl. ¶ 15.  Treatment of the condition is multi-dimensional and varies according to individual need, but can consist of social role transition, hormone therapy, and surgery to alter primary and/or secondary sex characteristics to help a transgender person live congruently with his or her gender identity and eliminate the clinically significant distress caused by Gender Dysphoria.  *Id.*  As with adults, treatment for Gender Dysphoria in adolescents frequently includes social transition and hormone therapy, but genital surgery is not available under the WPATH Standards of Care for persons who are under the legal age of majority.  *Id.* ¶ 18.

In prior decades before Gender Dysphoria was well-studied and understood, some considered it to be a condition that should be treated by psychotherapy aimed at changing the patient's sense of gender identity to match assigned sex at birth.  *Id.* ¶ 17.  There is now a medical consensus, however, that such treatment is not effective and can, in fact, cause great harm to the patient.  *Id.*

Medical Necessity of Social Role Transition, Including Access to Restrooms.

Social role transition is a critical component of the treatment for Gender Dysphoria.  Social role transition is living one's life fully in accordance with one's gender identity.  *Id.* ¶ 16.  That typically includes, for a transgender male, for example, dressing and grooming as a male, adopting a male name, and presenting oneself to the community as a boy or man.  *Id.*  Social transition is important to the individual's consolidation of his or her gender identity.  *Id.*  The social transition takes place at home, at work or school, and in the broader community.  *Id.*  It is

3

important that the individual is able to transition in all aspects of his or her life.  *Id.*  If any aspect of social role transition is impeded, it undermines the entirety of a person's transition.  *Id.*

For teenagers as for adults, social transition is an important part of treatment for Gender Dysphoria.  *Id.* ¶ 19.  And as with adults, it is important that the social transition occur in all aspects of the individual's life.  *Id.*  For a gender dysphoric teen to be considered male in one situation but not in another is inconsistent with evidence-based medical practice, and detrimental to the health and well-being of the child.  *Id.*  The integration of a consolidated identity into the daily activities of life is the aim of treatment.  *Id.*  Thus, it is critical that the social transition include full transition at school—including with respect to restrooms.  *Id.*

Access to a restroom available to other boys is an undeniable necessity for transgender male adolescents.  *Id.* ¶ 20.  To deny admission to such a facility, or to insist that one use a separate restroom, communicates that such a person is "not male" but some undifferentiated "other," interferes with the person's ability to consolidate identity, and undermines the social transition process.  *Id.*  For transgender adolescents who are not permitted to use restrooms that match their gender identities, going to the restroom can easily become a source of anxiety.  *Id.* ¶ 21.  These teenagers often avoid drinking fluids during the day and hold their urine for the entire school day, making them prone to developing urinary tract infections, dehydration, and constipation.  *Id.*  Anxiety regarding use of the restroom also makes it difficult for students to concentrate on learning and school activities.  *Id.*

Transgender adolescents like G.G. are particularly vulnerable during middle adolescence when they are approximately 15-16 years old.  *Id.* ¶ 22.  "Fitting in" is the overarching motivation at this stage of life.  *Id.*  While peers are developing along a "normal" and predictable trajectory, however, transgender teens feel betrayed by their bodies, anxious about relationships,

and frustrated by the challenges of a "non-normative" existence.  *Id.*  At the very time of life

when nothing is more important than being part of a peer group, fitting in, and belonging, they

may conspicuously stand out.  *Id.*  Research shows that transgender students are at far greater

risk for severe health consequences—including suicide—than the rest of the student population,

and more than 50% of transgender youth will have had at least one suicide attempt by age 20.

*Id.*

Developing and integrating a positive sense of self—identity formation—is a

developmental task for all adolescents.  *Id.* ¶ 24.  For transgender adolescents, this is more

complex, as the "self" violates society's norms and expectations.  *Id.*  When adults—authority

figures—deny an adolescent access to the restroom consistent with his lived gender, they shame

him—negating the legitimacy of his identity and decimating confidence.  *Id.*  In effect, they

revoke membership from the peer group.  *Id.*  Attempts to negate a person's gender identity—

such as excluding a transgender male adolescent from the restrooms used by other boys—

challenge the individual's sense of self and pose health risks, including depression, post-

traumatic stress disorder, hypertension, and self-harm.  *Id.*  Stigmatization also causes many

transgender youth to experience academic difficulties and to drop out of school.  *Id.* ¶ 26.

Until recently, it was not fully understood that these experiences of shame and

discrimination could have serious and enduring consequences.  *Id.* ¶ 27.  But it is now known

that stigmatization and victimization are some of the most powerful predictors of current and

future mental health problems, including the development of psychiatric disorders.  *Id.*  The

social problems these transgender teens face at school actually create the blueprint for future

mental health, life satisfaction, and even physical health.  *Id.*  Stress and victimization at school

is associated with a greater risk for post-traumatic stress disorder, depression, life dissatisfaction, anxiety, and suicidality in adulthood.  *Id.*

G.G.'s Gender Dysphoria

At a very young age, G.G. was aware that he did not feel like a girl.  G.G. Decl. ¶ 6.  He has always felt uncomfortable wearing "girl" clothes, and, by the age of six, he adamantly refused to do so.  He soon insisted upon buying all of his clothes in the boys' department.  *Id.*  At approximately age twelve, G.G. acknowledged his male gender identity to himself.  He gradually began disclosing this fact to close friends.  *Id.* ¶ 7.  Since the reactions of his friends were generally positive and supportive, he disclosed his gender identity to more friends.  *Id.*  In approximately ninth grade, most of G.G.'s friends were aware of his gender identity, and G.G. presented himself as a boy when he socialized with them away from home and school.  *Id.* ¶ 8.

G.G. experienced severe depression and anxiety related to his untreated Gender Dysphoria and the stress of concealing his gender identity from his family.  *Id.* ¶ 9.  For this reason, he did not attend school during the spring semester of his freshman year.  *Id.*  Instead, he took classes through a home-bound program that follows the public high school curriculum.  *Id.*  In April 2014, G.G. told his parents that he is transgender.  *Id.* ¶ 10.  At his request, he began to see a psychologist who had experience working with transgender patients.  *Id.*  The psychologist diagnosed him with Gender Dysphoria.  *Id.* ¶ 11.  Randi Ettner, Ph.D.—a psychologist and nationally recognized expert in the treatment of Gender Dysphoria in children and adolescents—recently conducted an independent clinical assessment of G.G. and confirmed that he has severe Gender Dysphoria that meets the criteria for Gender Dysphoria in adolescents and adults under the DSM V.  Ettner Decl. ¶ 28.

G.G.'s psychologist recommended a course of treatment consistent with the WPATH Standards of Care, a critical component of which is social transition.  G.G. Decl.¶ 11; Ettner Decl. ¶ 29.  Accordingly, G.G.'s psychologist recommended that he immediately begin living as a boy in all respects.  G.G. Decl.¶ 11.  That included using a male name and pronouns and using boys' restrooms.  *Id.* ¶ 11; Ettner Decl.¶ 30.  G.G.'s psychologist also provided him a "Treatment Documentation Letter" confirming that he was receiving treatment for Gender Dysphoria and that, as part of that treatment, he should be treated as a boy in all respects, including with respect to his use of the restroom.  G.G. Decl. ¶ 11.

Based on his psychologist's recommendation, in July 2014, G.G. petitioned the Circuit Court of Gloucester County to change his legal name to G.G. (a traditionally male name), and the court granted the petition.  *Id.* ¶ 12.  G.G. now uses that name for all purposes, and at his request, his friends and family refer to him using male pronouns.  *Id.*  G.G. also uses the boys' restrooms when out in public, e.g., at restaurants, libraries, shopping centers.  *Id.* ¶ 13.

Also consistent with the WPATH standards of care, G.G.'s psychologist recommended that he see an endocrinologist to begin hormone treatment.  *Id.* ¶ 11.  G.G. has been receiving hormone treatment since December 2014.  *Id.* ¶ 14.  Among other therapeutic benefits, the hormone treatment has deepened G.G.'s voice, increased his growth of facial hair, and given him a more masculine appearance.  *Id.*; Ettner Decl. ¶ 18.

School Response and School Board Response

In August 2014, G.G. and his mother informed officials at Gloucester High School that G.G. is transgender and that he changed his name to G.G.  The high school changed G.G.'s name in his official school records to match his legal name change.  G.G. Decl. ¶ 15.  Before the beginning of the 2014-15 school year, G.G. and his mother also met with principal T. Nathan

Collins and guidance counselor Tiffany Durr to discuss G.G.'s treatment for Gender Dysphoria and the need for him to socially transition at school as part of his medical treatment. *Id.* ¶ 16. Mr. Collins and Ms. Durr both expressed support for G.G. and a willingness to ensure a welcoming environment for him at school. *Id.* Ms. Durr and G.G. agreed that G.G. would send an email to teachers explaining that G.G. was to be addressed using the name G.G. and to be referred to using male pronouns. *Id.* ¶ 17. To the best of G.G.'s knowledge, no teachers, administrators, or staff at Gloucester High School expressed any resistance to these instructions. *Id.*[2]

G.G. initially agreed to use a separate restroom in the nurse's office because he was unsure how other students would react to his transition. *Id.* ¶ 19. When the 2014-15 school year began, G.G. was pleased to discover that his teachers and the vast majority of his peers respected the fact that he is a boy and treated him accordingly. *Id.* G.G. quickly determined that it was not necessary for his safety to continue to use the nurse's restroom, and he found it stigmatizing to have to use a separate restroom. *Id.* The nurse's restroom was also very inconvenient to reach from G.G.'s classrooms, making it difficult to use the restroom between classes. *Id.* For these reasons, G.G. asked Mr. Collins to be allowed to use the boys' restrooms. *Id.*

On or about October 20, 2014, Mr. Collins agreed that G.G. could use the boys' restrooms. *Id.* ¶ 20. For approximately the next seven weeks, G.G. used the boys' restrooms without incident. *Id.*

Nevertheless, some adults in the community were angered when they came to learn that a transgender student had been allowed to use the restroom corresponding to the student's gender

---

[2] G.G. requested, and was permitted, to continue with the home-bound program only for his physical education requirement, while returning to school for the rest of his classes. *Id.* ¶ 18. For this reason, he has not used—and does not intend to use—a locker room at school. *Id.*

identity. Those adults contacted members of the School Board to demand that the transgender student be barred from continuing to use the boys' restrooms. *See* Gloucester (Va.) County School Board, Press Release, *Gloucester School Board Prepares to Discuss, Likely Vote at Dec. 9 Meeting on Restroom/Locker Room Use for Transgender Students*, at 1 (Dec. 3, 2014) ("Dec. 3 Press Release") (describing receipt of numerous phone calls and emails);[3] Gloucester Public School Board Meeting, Nov. 11, 2014, Video Transcript ("Nov. 11 Video Tr.") 41:02 (describing how speaker and other "concerned parents and citizens" contacted the School Board).[4]

Shortly before the School Board's meeting on November 11, 2014, Board member Carla B. Hook added an item to the agenda titled "Discussion of Use of Restrooms/Locker Room Facilities." *See* Gloucester County School Board Monthly Meeting, Nov. 11, 2014, Revised Agenda § XII.B.[5] Ms. Hook also planned to introduce the following proposed resolution (hereinafter referred to as the "transgender restroom policy") at the November 11 School Board meeting:

> Whereas the GCPS recognizes that some students question their gender identities, and
>
> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore

---

[3] Available at
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SB/GlouSBPressRelease120314.pdf

[4] Available at
http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id=1065

[5] Available at
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SBAgenda2014/Agenda2014/AG-11-11-2014.R.pdf

> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Recorded Minutes of the Gloucester County School Board, November 11, 2014 ("Nov. 11 Minutes"), at 4.[6]

Through emails and online message boards, news circulated among certain Gloucester County residents that they should attend the School Board meeting on November 11, 2014, and speak in favor of Ms. Hook's proposed restroom policy. G.G. Decl. ¶ 21. Neither G.G. nor his parents were informed by the School Board or any other school official that the School Board would be considering a policy that would bar G.G. from using the boys' restroom. *Id.* G.G. and his parents learned about the proposal for the first time on November 10—the day before the School Board meeting was scheduled to take place—when they saw one of the messages posted by supporters of Ms. Hook's proposed restroom policy. *Id.*

Twenty-seven people spoke during the Citizens' Comment Period of the School Board meeting, the majority of whom opposed the school's decision to allow G.G. to use the boys' restrooms. *See* Nov. 11 Minutes at 3. The commenters displayed many misperceptions about transgender people and imagined dire consequences from allowing G.G. to use the boys' restrooms. Some speakers referred to G.G. as a "young lady." *See* Nov. 11 Video Tr. 14:55; 18:07; 20:36; 1:06:48. Some speakers claimed that transgender students' use of restrooms that match their gender identity would violate the privacy of other students and would lead to sexual

---

[6] Available at
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SBAgenda2014/Minutes2014/MIN-11-11-2014.pdf

assault in restrooms.  *Id.* 20:33; 34:41; 1:06:38.  Another suggested that boys who are not transgender would come to school wearing a dress and demand to use the girls' restroom for nefarious purposes.  *Id.* 20:55.

G.G. and his parents also attended the meeting to speak against the policy.  In doing so, G.G. was forced to identify himself to the entire community, including local press covering the meeting, as the transgender student whose restroom use was at issue.  *See* Nov. 11 Video Tr. 23:54.  "All I want to do is be a normal child and use the restroom in peace," G.G. said.  *Id.* 25:47.  "I did not ask to be this way, and it's one of the most difficult things anyone can face." *Id.* 26:14.  "This could be your child . . . . I'm just a human. I'm just a boy."  *Id.* 27:02.

The School Board deferred a vote on the policy until its meeting on December 9, 2014. *See* Nov. 11 Minutes at 4.  Between November 11, 2014, and December 9, 2014, the School Board was informed by many legal sources that the proposed restroom policy conflicted with guidance of the Department of Education's Office of Civil Rights (OCR) regarding Title IX and that adopting the policy would place the district's Title IX funding at risk.  *See* Dec. 3 Press Release at 1.

On December 3, 2014, the School Board issued a news release stating that regardless of the outcome of the upcoming meeting, the School Board intended to take gender-neutral measures to increase privacy in student restrooms. According to the release:

> One positive outcome of all the discussion is that the District is planning to increase the privacy options for all students using school restrooms . . . Plans include adding or expanding partitions between urinals in male restrooms, and adding privacy strips to the doors of stalls in all restrooms.  The District also plans to designate single-stall, unisex restrooms, similar to what's in many other public spaces, to give all students the option for even greater privacy.

*Id.* at 2.

At the Board's December 9, 2014 meeting, approximately 37 people spoke during the Citizens' Comment Period. The majority of speakers opposed G.G.'s use of the boys' restrooms. *See* Recorded Minutes of the Gloucester County School Board, December 9, 2014 ("Dec. 9 Minutes"), at 3.[7] Several speakers threatened to vote the School Board members out of office if they did not adopt the transgender restroom policy. Gloucester Public School Board Meeting, Dec. 9, 2014, Video Transcript ("Dec. 9 Video Tr.") 42:34; 50:53; 59:34; 1:17:56.[8] Speakers again suggested that permitting G.G. to use the boys' restroom would violate the privacy of other students, notwithstanding the School Board's announcement that restrooms would be modified to allow more privacy for all students. *Id.* 38:39; 43:31; 58:26. Some speakers said that allowing G.G. to use the boys' restroom would make the restrooms "coed." *Id.* 39:23; 41:11. Speakers again referred to G.G. as a "girl" or "young lady." *Id.* 38:00; 1:17:40. One speaker called him a "freak" and compared him to a person who thinks he is a "dog" and wants to urinate on fire hydrants. *Id.* 1:22:55; 1:23:19.

Following the Citizens' Comment Period, the School Board voted 6-1 to pass the transgender restroom policy. Dec. 9 Minutes at 4. The dissenting School Board member subsequently told reporters that, as a result of the transgender restroom policy, "I truly believe we are in violation of Title IX and at risk of losing our federal funding." Dominic Holden,

---

[7] Available at
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SBAgenda2014/Minutes2014/MIN-12-09-2014.pdf

[8] Available at
http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id=1090

*Virginia School Board Bans Trans Students From Using Restrooms Based On Gender Identity*, BuzzFeed (Dec. 10, 2014).[9]

<u>Aftermath of the policy</u>

The experience of having the entire community debate where he should use the restroom has been profoundly disturbing for G.G.  G.G. has been stripped of his privacy, and highly personal information about G.G.'s medical status—including his genitals—has now been discussed in a public setting.  G.G. Decl. ¶ 23.  The experience has made him feel "like a walking freak show" and turned his anatomy and gender identity into "a public spectacle."  *Id.*

The day after the School Board adopted the transgender restroom policy, Mr. Collins informed G.G. that he would no longer be allowed to use the boys' restrooms and that there would be disciplinary consequences if he tried to do so.  *Id.* ¶ 24.  Since the School Board adopted the transgender restroom policy, three unisex, single-stall restrooms have been installed at Gloucester High School.  G.G. Decl. ¶ 26.  The school also raised the doors and walls around the restroom stalls so that students cannot see into an adjoining stall.  *Id.*  Additionally, the high school installed partitions between urinals in the boys' restrooms.  *Id.*  As a result, a person making normal use of the restroom cannot see the genitals of any other person.

G.G. refuses to use the separate single-stall restrooms because they make him feel even more stigmatized and isolated than when he used the restroom in the nurse's office.  *Id.* ¶ 27.  The separate restrooms physically and symbolically mark G.G. as some type of "other" and treat him differently than everyone else.  *Id.*  They are also stigmatizing because everyone knows the

---

[9] Available at http://www.buzzfeed.com/dominicholden/virginia-school-board-bans-trans-students-from-bathrooms-of#.kcr7MExPWj

restrooms were installed for G.G. in particular so that other boys would not have to share the same restroom with him.  *Id.*

Instead of using the separate restrooms, G.G. tries to avoid using the restrooms entirely while at school, and, if that is not possible, he uses the nurse's restroom.  *Id.* ¶ 28.  G.G. limits the amount of liquids he drinks and tries to "hold it" when he need to urinate during the school day.  *Id.*  As a result of trying to avoid using the restroom, G.G. has repeatedly developed painful urinary tract infections.  *Id.*  "Holding it" is also uncomfortable and distracting when G.G. is trying to focus in class.  *Id.*

In his declaration, G.G. describes how using the separate restrooms or the nurse's restroom makes him feel embarrassed and humiliated, which increases his feelings of dysphoria, anxiety, and distress.  *Id.* ¶¶ 29-31.  G.G. feels embarrassed that everyone who sees him enter the nurse's office knows he is there because he is transgender and has been prohibited from using the same boys' restrooms that the other boys use.  *Id.* ¶ 30.  He also feels humiliated that, whenever he uses the restroom, he is effectively reminding anyone who sees him go to the nurse's office that, even though he is living and interacting with the world in accordance with his gender identity as a boy, his genitals look different.  *Id.* ¶ 31.

Dr. Randi Ettner, Ph.D.—a psychologist and nationally recognized expert in the treatment of Gender Dysphoria in children and adolescents—recently conducted an independent clinical assessment of G.G. and concluded that "excluding G.G. from the communal restroom used by other boys and effectively banishing him to separate single-stall restroom facilities is currently causing emotional distress to an extremely vulnerable youth and placing G.G. at risk for accruing lifelong psychological harm."  Ettner Decl. ¶ 28.  Dr. Ettner determined that G.G. has *severe* Gender Dysphoria and that medically necessary treatment for G.G. currently includes

14

testosterone therapy and social transition in all aspects of his life—including through the use of the boys' restroom. *Id.* ¶ 29.  Untreated, many adolescents with Gender Dysphoria as severe as G.G.'s commit suicide. *Id.*  Dr. Ettner concluded that the shame of being singled out and stigmatized in his daily life every time he needs to use the restroom "is a devastating blow to G.G. and places him at extreme risk for immediate and long-term psychological harm." *Id.* ¶ 30.

Need for Preliminary Injunction Before New School Year

G.G. seeks a preliminary injunction to ensure that he will be able to begin his junior year of high school using the same restrooms as other boys at Gloucester High School.  The last day of classes for G.G.'s sophomore year was yesterday, June 10, 2014.  *See* Gloucester County Public Schools, 2014-15 School Calendar.[10]  A preliminary injunction is necessary to prevent the irreparable harm that would result if G.G. has to start another new school year under the School Board's stigmatizing, humiliating, and harmful transgender restroom policy.  The first day of classes for the 2015-16 school year is September 8, 2015.  *See* Gloucester County Public Schools, 2015-16 School Calendar.[11]

## ARGUMENT

### I.   Preliminary Injunction Standard

To obtain a preliminary injunction, "[p]laintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014), *cert.*

---

[10] Available at http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/Calendar/currentcalendar.pdf

[11] Available at http://gets.gc.k12.va.us/portals/gloucester/district/docs/calendar/calendarnext.pdf

*denied*, 135 S. Ct. 1735 (2015) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success.'" *Id.* at 247 (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)).[12]

In this case, because G.G. seeks a prohibitory injunction to restore the status quo, the heightened standard for obtaining "mandatory" injunctions does not apply. "Whereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Id.* at 237 (internal quotation marks omitted). "The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (internal quotation marks omitted). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions," but "such an injunction restores, rather than disturbs, the status quo ante." *Id.* (internal quotation marks omitted). In this case, the last uncontested status between the parties was on December 9, 2014, before the School Board passed its new transgender restroom policy.

---

[12] Plaintiff recognizes that this Court is bound by Fourth Circuit precedent interpreting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), to abrogate a more flexible standard that required only "serious questions" on the merits if other preliminary injunction factors weighed heavily in favor of relief. *See The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir.2010) (per curiam) (reaffirming standard articulated in *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009)). For purposes of preserving the issue on appeal, however, Plaintiff notes that the Second, Seventh, and Ninth Circuits have all disagreed with the Fourth Circuit's interpretation of *Winter*. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010); *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

G.G. seeks to restore the status quo ante in which he has been using the boys' restroom with the knowledge and approval of the school principal and superintendent. *Cf. Doe v. Wood County Bd. of Educ.*, 888 F. Supp. 2d 771, 778 (S.D.W.Va. 2012) (preliminary injunction under the Equal Protection Clause and Title IX restored status quo by requiring school district to stop using sex-segregated classes for remainder of school year).

## II.  Plaintiff Has Established a Likelihood of Success on the Merits on His Equal Protection Claim.

On its face, the School Board's transgender restroom policy explicitly classifies G.G. and other students based on (a) their "gender identity issues" and (b) their "biological gender."[13] Each of those classifications—whether examined separately or in combination—subjects G.G. and other transgender students to unequal treatment on the basis of sex and triggers heightened scrutiny under the Equal Protection Clause.

---

[13]The transgender restroom policy does not define the term "biological gender."  From a medical perspective, there is no distinction between an individual's gender identity and his or her "biological" sex or gender.  Rather, an individual's gender identity is one of the components that determine an individual's sex or gender. *In Re Lovo-Lara*, 23 I. & N. Dec. 746, 752 (BIA 2005) (discussing eight components that determine an individual's sex); *Schroer v. Billington (Schroer I)*, 424 F. Supp. 2d 203, 212-13 (D.D.C. 2006) (discussing "real variations in how the different components of biological sexuality—chromosomal, gonadal, hormonal, and neurological— interact with each other").  In contrast, the transgender restroom policy purports to draw a (medically unsupported) distinction between "biological gender" and gender identity.  Based on the repeated references in the School Board meetings to genitals and nudity, it appears that the School Board relies primarily on a person's anatomy—rather than the person's chromosomes, hormones, or other criteria—to define that person's "biological gender" for purposes of its transgender restroom policy.  *See, e.g.*, Dec. 9 Video Tr. 1:04:55 ("[I]t's as simple as *Kindergarten Cop*, if you have a penis, you're a boy, and you go in the boy's restroom, if you have a vagina you're a girl and you go in the girl's restroom").

**A. Relegating G.G. to Separate Single-Stall Restrooms Because of "Gender Identity Issues" Discriminates Against Him on the Basis of Sex.**

    **i. Discrimination Based on Gender Nonconformity or Incongruence Is Discrimination on the Basis of Sex.**

Under the Equal Protection Clause, Title IX, and other federal civil rights statutes,[14] discrimination "on the basis of sex" "encompasses both [discrimination based on] the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004) (ruling based on both Title VII and Equal Protection Clause); *accord Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011) (ruling under Equal Protection Clause). Indeed, Supreme Court precedent has consistently used the terms "sex" and "gender" interchangeably in the discrimination context. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001); *United States v. Virginia*, 518 U.S. 515 (1996); *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127(1994); *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). The Court has adhered to that practice despite efforts by dissenting Justices to separate gender from "biological" sex as distinct legal concepts. *See J.E.B.*, 511 U.S. at 157 n.1 (Scalia, J., dissenting) ("I shall refer to the issue as sex discrimination rather than (as the Court does) gender discrimination" because "gender is to sex as feminine is to female and masculine to male").

---

[14] Federal courts—including the Fourth Circuit—routinely look to Title VII case law in construing the Equal Protection Clause, Title IX, and other statutes that prohibit discrimination based on sex. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."); *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) (looking to Title VII case law to interpret Equal Protection Clause); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (applying Title VII case law in interpreting Equal Credit Opportunity Act); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (applying Title VII case law in interpreting Gender Motivated Violence Act).

In early Title VII cases, some courts erroneously drew a rigid distinction between anatomical "sex" and behavioral "gender" and excluded discrimination against transgender people from the statute's scope. *See Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662 (9th Cir. 1977) (rejecting argument that the term "sex" includes a person's "gender"); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) (per curiam) (agreeing with *Holloway*); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984) (same). "Male-to-female transsexuals, as anatomical males whose outward behavior and inward identity did not meet social definitions of masculinity, were denied the protection of Title VII by these courts because they were the victims of gender, rather than sex, discrimination." *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000).

In *Price Waterhouse*, however, the Supreme Court rejected such distinctions between sex and gendered behavior. The Court held the Price Waterhouse financial firm discriminated against Ann Hopkins on the basis of sex when it denied her a promotion based, in part, on her failure to conform to stereotypes about how women should behave. For example, she was advised that if she wanted to advance in her career she should be less "macho" and learn to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Price Waterhouse*, 490 U.S. at 235. *Price Waterhouse* thus "eviscerated" the reasoning of earlier cases that attempted to draw a distinction between sex and gender nonconformance. *Smith*, 378 F.3d at 573; *accord Glenn*, 663 F.3d at 1318; *Schwenk*, 204 F.3d at 1202.

Since *Price Waterhouse* was decided, every federal circuit that has ruled on the issue has held that statutory and constitutional prohibitions on sex discrimination also protect transgender

people from discrimination based on their gender-nonconformity.[15] As the Sixth Circuit

explained, the government may not "superimpose classifications such as 'transsexual' on a

plaintiff, and then legitimize discrimination based on the plaintiff's gender non-conformity by

formalizing the non-conformity into an ostensibly unprotected classification." *Smith*, 378 F.3d at

574.

      The Fourth Circuit has not yet addressed the issue, but several district courts within the

Fourth Circuit have followed the post-*Price Waterhouse* precedent from other circuits. *See*

*Finkle v. Howard County*,12 F. Supp. 3d 780, 788 (D. Md. 2014); *Muir v. Applied Integrated*

*Tech., Inc.*, No. 13-0808, 2013 WL 6200178, at *10 (D. Md. Nov. 26, 2013) (denying summary

judgment because issue of fact existed with respect to whether Plaintiff was discriminated based

on her "transgender status"); *cf. Hart v. Lew*, 973 F. Supp. 2d 561, 581 (D. Md. 2013) (denying

motion to dismiss because defendant did not contest that Title VII prohibits discrimination

against based on an employee's gender identity); *Lewis v. High Point Reg'l Health Sys.*, No.

5:13-CV-838-BO, 2015 WL 221615, at *2 (E.D.N.C. Jan. 15, 2015) (denying motion to dismiss

Title VII claim for discrimination based on gender identity).

      Indeed, discrimination against a person simply because that person is transgender or

undergoing gender transition is—by definition—discrimination based on that person's gender

nonconformity. "A person is defined as transgender precisely because of the perception that his

---

[15]*See Glenn*, 663 F.3d at 1316; *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir.
2005); *Smith*, 378 F.3d at 573; *Rosa*, 214 F.3d at 215-16; *Schwenk*, 204 F.3d at 1201-02; *see also
Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 704 (8th Cir. 2012) (rejecting Title VII claim
by transgender employee because of lack of proof that employer knew that plaintiff was
transgender or gender non-conforming); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th
Cir. 2007) (assuming but not deciding that Title VII protects trans people from discrimination
based on gender nonconformity).

or her behavior transgresses gender stereotypes." *Glenn*, 663 F.3d at 1316.  Thus, "it would seem that any discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is . . . discrimination on the basis of sex as interpreted by *Price Waterhouse*." *Finkle*, 12 F. Supp. 3d at 788; *see also Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ("Because the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping.  Therefore, Plaintiff's transgender status is necessarily part of his 'sex' or 'gender' identity."); *Schroer v. Billington (Schroer II)*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008) (for purposes of *Price Waterhouse* it does not matter whether an employee is perceived "to be an insufficiently masculine man, an insufficiently feminine woman, or an inherently gender-nonconforming transsexual"); *Smith*, 378 F.3d at 575 (*Price Waterhouse* applies when an individual "fails to act and/or identify with his or her gender").  For these reasons, the Equal Employment Opportunity Commission, the Department of Education and the Department of Justice have determined that discrimination based on someone's gender identity or transgender status is *per se* discrimination based on sex.[16]

---

[16]*See Macy v. Holder*, EEOC DOC 0120120821, 2012 WL 1435995, at *11 (Apr. 20, 2012) ("[I]ntentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex.'"); U.S. Dep't of Educ., Office for Civil Rights, *Questions & Answers on Title IX and Sexual Violence*, at 5 (Apr. 29, 2014), available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ("Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation."); U.S. Attorney General, *Attorney General Memorandum re Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964*, at 2 (Dec. 15, 2014), available at http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf ("The most straightforward reading of Title

*Footnote continued on next page*

Excluding transgender persons from restrooms that correlate with their gender identity and relegating them to separate facilities is sex discrimination because it necessarily subjects them to different treatment based on the lack of congruence between their gender identity and their physical anatomy. *See Lusardi v. McHugh*, EEOC DOC 0120133395, 2015 WL 1607756, at *8 (Apr. 1, 2015) (agency could not limit transgender employee's access to the restroom based on belief she was not "truly female" unless she had undergone genital surgery); *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, No. CIV.02-1531PHX-SRB, 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004) ("[N]either a woman with male genitalia nor a man with stereotypically female anatomy, such as breasts, may be deprived of a benefit or privilege of employment by reason of that nonconforming trait. Application of this rule may not be avoided merely because restroom availability is the benefit at issue."); *cf. Hart*, 973 F. Supp. 2d at 581 (denying motion to dismiss where evidence included allegation that "supervisors repeatedly denied [employee] access to the women's restroom, and in doing so referred to her 'male genitalia'"). The Tenth Circuit's contrary decision in *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007), is an outlier decision that relies on the faulty premise that discrimination against transgender individuals is not inherently related to discrimination based on gender nonconformity. *See Glenn*, 663 F.3d

---

VII is that discrimination 'because of ... sex' includes discrimination because an employee's gender identification is as a member of a particular sex, or because the employee is transitioning, or has transitioned, to another sex."); Statement of Interest of the United States in *Tooley v. Van Buren Public Schools*, No. 2:14-cv-13466 (E.D. Mich. Feb. 20, 2015), available at http://www.justice.gov/crt/about/edu/documents/tooleysoi.pdf (discrimination "'[o]n the basis of sex' includes discrimination based on the fact that an individual is transgender (i.e., has a gender identity different from the person's sex assigned at birth)").

1318 n.5 (disagreeing with *Etsitty*); *Schroer II*, 577 F. Supp. 2d at 307 (same); *Finkle*, 12 F.

Supp. 3d. at 788 (same); *Lusardi*, 2015 WL 1607756, at *9 n.6 (same).[17]

### ii. The Transgender Restroom Policy Relegates G.G. to Separate and Unequal Facilities Based on His Gender Nonconformity and Incongruence.

The School Board's transgender restroom policy was specifically targeted to bar

transgender students from communal restrooms and to relegate them to "an alternative

appropriate private facility."[18]  The School Board's decision to limit access to communal

restrooms based on "biological gender" had no effect whatsoever on the restroom use of the vast

majority of students, whose gender identity is congruent with their assigned sex at birth.  Those

students were *already* using a restroom that accorded with both their gender identity and their

---

[17]In addition to *Etsitty*, a district court in Ohio rejected a Title VII claim related to restroom facilities, which the Sixth Circuit affirmed by summary order in 2004.  *See Johnson v. Fresh Mark, Inc. ("Fresh Mark")*, 337 F. Supp. 2d 996, 1000 (N.D. Ohio 2003), *aff'd*, 98 F. App'x 461 (6th Cir. 2004).  But that summary affirmance was on May 18, 2004—several months *before* the Sixth Circuit issued its precedential decision in *Smith* on Aug. 5, 2004.  The unpublished summary affirmance also relied on the same early decisions that *Smith* subsequently repudiated as having been "eviscerated" by *Price Waterhouse*.  *Compare Johnson*, 98 F. App'x at 462, *with Smith*, 378 F.3d at 573.  Neither the district court decision in *Fresh Mark* nor the summary affirmance can be considered good law in the Sixth Circuit after *Smith*.

[18] To the extent that the School Board argues that G.G. may also use the communal girls' restroom, that is obviously not a viable option.  Even before he began treatment for Gender Dysphoria, girls and women who encountered G.G. in female restrooms reacted negatively because they perceived G.G. to be a boy.  G.G. Decl.¶ 25.  For example, when G.G. was in eighth and ninth grade, girls would tell him "this is the girls' room" and ask him to leave.  G.G.'s appearance now is even more masculine.  *Id.*  In addition to those practical obstacles, using the girls' restroom would cause severe psychological distress to G.G. and would be incompatible with his medically necessary treatment for Gender Dysphoria.  *Id.*; Ettner Decl. ¶¶ 19-21. Indeed, multiple speakers at the School Board meetings—including supporters and opponents of the policy—acknowledged that using the girls' room is not a viable option.  *See* Nov. 11 Video Tr. 1:02:46 (arguing in support of separate restrooms for transgender boys because "they can't go in the girls' bathroom"); Dec. 9 Video Tr. 55:20 ("What I find more concerning would be to force the transgender boy who's possibly receiving medical treatment to become more masculine, and may be sexually interested in women, to continue using the girl's bathrooms and locker room.").

23

"biological gender."  The only students affected by the policy change are transgender students, whose gender identities are not congruent with their sex assigned at birth.  And the only immediately discernable effect of the new policy was to exclude one student—G.G.—from the restroom he had previously been allowed to use.  The intention and effect of the transgender policy were crystalized in the words of one of its supporters:  "[W]e have a thousand students versus one freak."  Dec. 9 Video Tr. 1:22:53.

The new single-stall restrooms for transgender students are not equal in form or substance.  The entire school community knows that these restrooms were created specifically for G.G. because he is not allowed to enter the boys' restrooms.  G.G. Decl. ¶ 27.  The single-stall, unisex restrooms are not widely used by the rest of the students, and only one of the restrooms is located anywhere near the restrooms used by everybody else.  *Id.* ¶ 26.  The transgender restroom policy thus isolates G.G. from the rest of his peers, both literally and figuratively, and brands students with "gender identity issues" as unfit to share the same restrooms that other students use.  *Cf. Mathis v. Fountain-Ft. Carson Sch. Dist. No. 8*, Colo. Civ. Rts. Div. Determination, Charge No. P20130034X, at 13 (June 17, 2013) ("Relegating [transgender student] to a set of restrooms which no other student is likely to use . . . would prove disruptive to her learning environment and overtly demonstrate her separateness from the other students")[19]; *Lusardi*, 2015 WL 1607756, at *9 ("The decision to restrict Complainant to a 'single shot' restroom isolated and segregated her from other persons of her gender.  It perpetuated the sense that she was not worthy of equal treatment and respect.").

As discussed above, under the new transgender restroom policy, using the restroom is a deeply shameful and humiliating experience for G.G.  As a result of the public debate and

---

[19] Available at http://www.transgenderlegal.org/ media/uploads/doc_529.pdf

discussion about G.G.'s genitals and his restroom use, G.G. has been made to feel like a "freak show" and a "public spectacle." *Id.* ¶ 23. Every time he uses the restroom at school, G.G. is reminded that nearly every person in the community knows he is transgender and has been prohibited from using the same boys' restrooms that the other boys use. *Id.* ¶ 30. Moreover, G.G. feels humiliated that whenever he has to use the restroom, anyone who sees him enter the nurse's office is reminded that his genitals look different. *Id.* ¶ 31. Instead of using the separate restrooms, G.G. tries to avoid using the restrooms entirely while at school, and, as a result, has repeatedly developed painful urinary tract infections. *Id.* ¶ 28.

The transgender restroom policy also directly interferes with G.G.'s social role transition, which is a critical component of his treatment for Gender Dysphoria. Ettner Decl. ¶ 29. As explained in Dr. Ettner's expert declaration, G.G. has *severe* Gender Dysphoria, and medically necessary treatment for G.G. includes social transition in all aspects of his life—including use of the restroom. *Id.* For a gender dysphoric teen like G.G. to be told that they will be considered male in one situation but not in another, is inconsistent with evidence-based medical practice, and detrimental to the health and well-being of the child. *Id.* ¶ 19. The shame of being singled out and stigmatized in his daily life every time he needs to use the restroom is a devastating blow to G.G. and places him at extreme risk for immediate and long-term psychological harm. *Id.* ¶ 30.

### B. Excluding G.G. from the Boys' Restroom Based on His "Biological Gender" Discriminates Against Him on the Basis of Sex.

The School Board cannot defend its discrimination against G.G. by arguing that it is excluding G.G. from the restrooms because of his genitals instead of his gender incongruity. Facially classifying students based on their "biological gender" is sex discrimination in the most literal sense. All students whom the school deems to be "biologically" female are categorically

excluded from using the boys' restroom.  G.G. wishes to use the boys' restroom in accordance with his male gender identity, but because the school deems him to be "biologically" female, he is categorically barred from doing so.  Even if the transgender restroom policy's discrimination based on "gender identity issue" did constitute sex discrimination, the policy's explicit classification based on "biological gender" would independently trigger heightened scrutiny.[20]

The School Board has publicly defended its transgender restroom policy by citing a recent district court decision in Pennsylvania, *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, No. 13-213, 2015 WL 1497753 (W.D. Pa. Mar. 31, 2015), *appeal docketed* No. 15-2022 (3d Cir. Apr. 22, 2015), as support for the legality of excluding transgender individuals from the restroom consistent with their gender identity.  *See* Frances Hubbard, *Gloucester: School Cannot Grant Transgender Student Access to Boys Restroom*, Daily Press (Apr. 29, 2015).[21]  The *Johnston* court reasoned that (a) because it is permissible under the Equal Protection Clause to provide separate restrooms for boys and girls as a general matter, (b) it must therefore also be permissible to exclude a transgender boy from the boys' restroom based on his anatomy.  *Johnston*, 2015 WL 1497753, at *8.  That chain of reasoning is faulty.  The

---

[20] As discussed *supra* note 13, the transgender restroom policy appears to draw a scientifically unsupported distinction between an individual's gender identity and that individual's "biological" sex.  From a medical perspective, however, there is no distinction between an individual's gender identity and his or her "biological" sex or gender.  Rather, an individual's gender identity is one of the components that determine an individual's sex or gender.

[21] Available at http://www.dailypress.com/news/gloucester-county/dp-nws-mid-gloucester-schools-doj-response-20150429-story.html

constitutionality of providing separate restrooms for boys and girls as a general matter does not make the new exclusion based on "biological gender" constitutional as applied to G.G.[22]

The Supreme Court has indicated that separate facilities for men and women may in some circumstances be permissible if they provide true equality in tangible benefits and in individual dignity. *Virginia*, 518 U.S. at 533 n.7. In this respect, sex classifications are different than race classifications. Separate facilities based on race are viewed as inherently stigmatizing, even when "tangible factors [are] equal, because government classification and separation on grounds of race themselves denoted inferiority." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 746 (2007). In contrast, the Supreme Court has indicated that it is permissible in certain limited circumstances to provide separate but truly equal facilities for men and women. *See Virginia*, 518 U.S. at 553 (citing *Sweatt v. Painter*, 339 U.S. 629 (1950)). As Justice Marshall has explained, "A sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring); *see also Faulkner v. Jones (Faulkner I)*, 10 F.3d 226, 232 (4th

---

[22]The widely accepted practice of providing separate restroom facilities for boys and girls has not traditionally distinguished between a person's "biological" sex as a male or female and their gender identity as a boy or a girl. Because the vast majority of individuals have a gender identity that is congruent to their sex assigned at birth, a fine-grained distinction between "biological" sex and gender has not generally been seen as necessary—even if such a distinction were possible. As a historical matter, the first state laws requiring sex-segregated restrooms were passed in the late 19th and early 20th Century as a response to women emerging from domestic sphere into the workforce and public life. *See* Terry S. Kogan, *Sex-Separation in Public Restrooms: Law, Architecture, and Gender*, 14 Mich. J. Gender & L. 1, 39 (2007). The laws were not justified solely by privacy and anatomical differences; they were part of the "protective labor laws enacted in the late 19th and early 20th centuries" that "often had as their objective the protection of weaker workers, which the laws assumed meant females." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982). *See* Kogan, *Sex-Separation in Public Restrooms*, at 39.

Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns").

As a doctrinal matter, however, the Supreme Court has never explained whether separate but truly equal facilities for men and women are constitutional because they survive heightened scrutiny or because the lack of inherent stigma or other individual injury ordinarily makes the social practice of separate restrooms for men and women harmless as a constitutional matter. *Cf. Johnson v. U.S. O.P.M.*, 783 F.3d 655, 666 (7th Cir. 2015) ("[A]lthough differential treatment that 'stigmatiz[e] members of the disfavored group' has long been recognized as a cognizable injury in fact, *see Heckler v. Mathews*, 465 U.S. 728, 739 (1984), differential treatment does not by itself create an injury in fact when it does not result in any unconstitutional stigma or tangible harm to the plaintiff."). *Johnston* assumed that separate restrooms for men and women based on privacy concerns had been upheld under heightened scrutiny, but none of the cases cited by the *Johnston* court actually supports that proposition. *See Johnston*, 2015 WL 1497753, at *8 (citing *Etsitty*, 502 F.3d at 1224; *Causey v. Ford Motor Co.*, 516 F.2d 416 (5th Cir. 1975); and *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 436 (7th Cir. 2000)).[23]

---

[23]*Johnston* relied heavily on the Tenth Circuit decision in *Etsitty*, which held that a defendant did not violate Title VII by firing a transgender female employee based, in part, on her use of the women's restroom. *Etsitty* is an outlier decision that has been overwhelmingly rejected by other courts. *See supra* note 17 and accompanying text. But even if *Etsitty* were correct under Title VII, that decision did not analyze the constitutionality of restroom restrictions under heightened scrutiny, and it did not hold that excluding transgender persons from the restroom based on their "biological" sex could survive that standard. The Tenth Circuit in *Etsitty* was applying the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Assuming that the plaintiff made a prima facie case of discrimination based on sex, the Tenth Circuit examined whether the employer had articulated a "legitimate, nondiscriminatory reason" for its actions. *Etsitty*, 502 F.3d at 1224. The court emphasized that, at that stage of the burden-shifting test, the defendant's burden was minimal and the defendant did not "'need to litigate the merits of the reasoning.'" *Id.* (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)). *Etsitty* says nothing about whether a policy that excludes

*Footnote continued on next page*

Regardless of whether separate restrooms for men and women are constitutional because they produce no injury or because they survive heightened scrutiny, the constitutionality of providing separate restrooms for boys and girls as a general matter does not resolve whether the transgender restroom policy—a policy that imposes a powerful stigma with significant health consequences—is also constitutional.  As discussed above, the transgender restroom policy imposes real harm on G.G.  The policy publicly shames G.G., socially and physically isolates him from the rest of his peers, marks him out as unfit to use the same facilities as other students, interferes with his medically necessary treatment for Gender Dysphoria, and places him at even greater risk of depression and other immediate and long-term negative health consequences. Ettner Decl. ¶ 30.

To be sure, the School Board's limitation of access to the restroom based on "biological gender" does not stigmatize or otherwise harm female or male students as a group.  But constitutional protections against sex discrimination are designed to protect individuals who do not fit into generalizations about most women or most men.  "The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups." *J.E.B.*, 511 U.S. at 152-53 (Kennedy, J., concurring).  As the Supreme Court explained in *Virginia*, "estimates of what is appropriate for *most women*, no longer justify

---

transgender people from the restroom that accords with their gender identity could survive the demanding standard of heightened scrutiny.

The other two cases cited by *Johnston* are even further afield.  *Causey* was another Title VII case in which a female employee argued that she was originally not provided with any women's restroom and that, when she finally was provided with one, the facilities were inadequate.  516 F.2d at 424.  Similarly, *DeClue* was a Title VII case in which an employer that provided no restrooms at all and instead made all employees urinate outdoors on the side of the road.  223 F.3d at 436.  The case had nothing to do with separate restroom facilities with actual toilets and stall dividers.

denying opportunity to women . . . outside the average description." 518 U.S. at 550 (emphasis

in original). For example, when the Supreme Court held that the exclusion of women from the

Virginia Military Institute ("VMI") violated equal protection, the Court conceded that "most

women would not choose VMI's adversative method," rather than the "cooperative method" at

the Virginia Women's Institute for Leadership ("VWIL"). *Id.* at 542, 549-50. But the Court

concluded that the "dispositive realities" are that "some women, at least, would want to attend

VMI if they had the opportunity" and it "is for them that a remedy must be crafted." *Id.* at 550.

The same is true here. As in *Virginia*, the constitutionality of the transgender restroom policy

change must be assessed from the standpoint of the person actually harmed by the new exclusion

– not from the perspective of "biologically" female students who are not affected by it.[24]

Because of the demonstrable harm the restroom policy inflicts upon G.G., allowing him

access to the boys' restroom would not throw open the boys' restroom doors to any girl who

wanted to use it. G.G. has a confirmed diagnosis of Gender Dysphoria by a mental health

professional and – in accordance with "the generally accepted protocols for the treatment of"

Gender Dysphoria – is living in accordance with his gender identity as part of treatment for that

condition. *De'lonta v. Johnson*, 708 F.3d 520, 522-23 (4th Cir. 2013); G.G. Decl. ¶ 11; Ettner

---

[24] Similarly, the sex discrimination against G.G. is not cured by the fact that every other student whom the school deems to be "biologically" female is also excluded from the boys' room. That logic would defeat *any* claim of sex discrimination because the government could respond that it treated a female plaintiff equally with all other women (or treated a male plaintiff equally with all other men). "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes." *Rinaldi v. Yeager*, 384 U.S. 305, 308 (1966). A woman who challenges sex discrimination is seeking equal treatment with men, not simply equal treatment with other women. Similarly a boy who is transgender and who is treated differently than other boys because of his "biological sex" is seeking equal treatment with boys who the School Board views as "biologically" male, not simply equal treatment with other students the School Board views as "biologically" female.

Decl. ¶ 29.  Abiding by those medical protocols does not mean "that any person could demand

access to any school facility or program based solely on a self-declaration of gender identity or

confusion without the plans developed in cooperation with the school and the accepted and

respected diagnosis that are present in this case."  *Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 607

(Me. 2014).[25]

### C. The Transgender Restroom Policy Is Not Substantially Related to an Important Governmental Interest in Protecting Student Privacy.

Because the transgender restroom policy discriminates against G.G. based on sex it is

subject to heightened scrutiny under the Equal Protection Clause.  "When a classification

expressly discriminates on the basis of gender, the analysis and level of scrutiny applied to

determine the validity of the classification do not vary simply because the objective appears

acceptable to" the court.  *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).  All sex

classifications must be evaluated under heightened scrutiny even when they are based on

"biological differences" between men and women.  *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73

(2001).  Under heightened scrutiny, "[t]he burden of justification is demanding and it rests

entirely on the State."  *Virginia*, 518 U.S. at 533.  Moreover, constitutionality is judged based on

the "the actual state purposes, not rationalizations for actions in fact differently grounded."  *Id.* at

535-36."  The State must show at least that the challenged classification serves important

governmental objectives and that the discriminatory means employed are substantially related to

---

[25] Such concerns appear to have motivated many parents at the School Board meetings. *See* Nov. 11 Video Tr. 20:55 ("A young man can come up and say 'I'm a girl, I need to use the ladies rooms now,' and they'd be lyin' through their teeth."); *id.* at 1:19:20 ("So, you know, my concern is, where does it end, you know? Do you allow kids because they feel they want to be malicious and go into the girls' restroom, or, go into the boys' restroom because they decide that day they want to be the opposite sex?").

the achievement of those objectives." *Id.* (internal quotation marks and brackets omitted).  "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions" regarding gender. *Miss. Univ. for Women*, 458 U.S. at 725-26.

In applying heightened scrutiny to this case, the question is not whether providing separate restrooms to boys and girls as a general matter serves the governmental interest in student privacy.  Separate restrooms for boys and girls already existed before the new transgender restroom policy was passed.  The question is whether an interest in privacy is substantially furthered by a new policy that limits access to communal restrooms based solely on "biological gender" and relegates students with "gender identity issues" to separate single-stall facilities. *See Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151 (1980) ("Providing for needy spouses is surely an important governmental objective" but "the question remains whether the discriminatory means employed—discrimination against women wage earners and surviving male spouses—itself substantially serves the statutory end.")

Under these standards, the discriminatory means of expelling transgender students from communal restrooms does not substantially serve the School Board's interest in protecting privacy.  Indeed, just six days before adopting the new transgender restroom policy, the School Board identified alternatives that would protect the privacy of all students.  As the School Board explained, one "outcome of all the discussion is that the District is planning to increase the privacy options for all students using school restrooms." Gloucester (Va.) County School Board, Press Release, *Gloucester School Board Prepares to Discuss, Likely Vote at Dec. 9 Meeting on*

*Restroom/Locker Room Use for Transgender Students*, at 2 (Dec. 3, 2014).[26]  The improvements

implemented include "adding or expanding partitions between urinals in male restrooms,"

"adding privacy strips to the doors of stalls in all restrooms," and "[d]esignat[ing] single-stall,

unisex restrooms, similar to what's in many other public spaces, to give all students the option

for even greater privacy."  *Id.*  Such gender-neutral alternatives demonstrate that excluding

transgender students from the communal restrooms and relegating them to single-stall unisex

restrooms is not substantially related to the asserted interest in protecting student privacy.  *See*

*Wengler*, 446 U.S. at 151 (invalidating a sex-based classification where a sex-neutral approach

would completely serve the needs of both classes); *Orr v. Orr*, 440 U.S. 268, 281 (1979) (same).

The new single-stall, unisex restrooms installed by the School Board can address concerns of any

student—whether transgender or not—who does not want to use a communal restroom.

But six days after announcing plans to implement those gender-neutral measures, the

School Board—at the demand of certain constituents—passed the transgender restroom policy,

which gratuitously expelled G.G. from the boys' restroom and relegated him to the single-stall

unisex facilities.  There is no evidence that G.G.'s use of the boys' room for nearly two months

had been disruptive or that he actually invaded the privacy of any student.  The primary

justification for banning G.G. from using the boys' restroom appears to be speculation about

nudity involving students of different sexes, particularly in locker rooms.[27]  *Cf. Johnston*, 2015

---

[26]Available at
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SB/GlouSBPressRelease120314.pdf

[27] "[I]t is well-established that community views may be attributed to government bodies
when the government acts in response to these views."  *A Helping Hand, LLC v. Baltimore
County, MD*, 515 F.3d 356, 366 (4th Cir. 2008).  The primary concern voiced by parents at the
school board meetings involved nudity and exposure of genitals.  *See, e.g.*, Nov. 11 Video Tr.
46:49 ("Are you prepared for a student with male-born genitalia who identifies as a female

*Footnote continued on next page*

WL 1497753, at *8 (describing governmental interest as "the need to ensure the privacy of its students to disrobe and shower outside of the presence of members of the opposite sex.").

Excluding G.G. from the boys' restroom, however, has no meaningful relationship to that asserted governmental interest in exposure to nudity—especially in light of the additional privacy measures that the school has already put into place, such as dividers between urinals and privacy strips around stalls. The School Board cannot categorically ban all transgender boys from ever using the boys restrooms based on "preoccupation with situations which have not yet occurred or in order to assuage the discomfort of parents." *Mathis*, Charge No. P20130034X at 12. Without any evidence of an actual or impending threat to anyone's privacy, the School Board cannot categorically bar *all* transgender students from using *all* restrooms and locker rooms that correspond to their gender identity in *all* circumstances regardless of nature of the facilities or the facts in any individual situation.[28]

---

student to use the same? Are you prepared for him to be in the locker room undressing with female students between PE class and going back to class?"); *id.* 1:04:00 ("[I]f you allow the restrooms, locker rooms are next"); *id.* 1:04:20 ("It does not matter what you feel on the inside, it matters what's on the outside. That is what's being exposed."); *id.* at 1:37:13 ("This is just the beginning, on many levels, and this decision has huge ramifications. And someone made a good point, are you going to be prepared for the locker rooms?"); Dec. 9 Video Tr. 40:57 (referencing "discomfort" in "seeing people who are biologically different sex undressed in a locker room"); *id.* at 38:43 ("You can't allow people of the opposite gender to see those parts, it makes everyone involved uncomfortable"); *id.* 42:48 ("This isn't a matter of discrimination against a lifestyle, this is physical nudity.").

[28] This case does not involve access to locker rooms. *See supra* note 2. But even in that context, there are many ways to provide privacy with shower curtains and private changing areas. In fact, guidelines from the Virginia Department of Education already require that locker rooms have "private showers with enclosed dressing rooms." Va. Dep't of Educ. Guidelines for Sch. Facilities in Va. Public Schools at 20 (2013), available at http://www.doe.virginia.gov/support/facility_construction/school_construction/regs_guidelines/guidelines.pdf. These private areas apparently already exist at Gloucester High School. *See* Dec. 9 Video Tr. 1:36:38 ("The locker rooms, all locker rooms, female and male, have the shower areas that people go to to shower when they don't feel comfortable."). The reality is that many

*Footnote continued on next page*

The only "privacy" interest substantially served by the School Board's policy is privacy from transgender people.  It is understandable that people often have an "instinctive mechanism to guard against people who appear to be different in some respects from ourselves" or who "might at first seem unsettling to us."  *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring).  But discomfort with transgender people is not a legitimate basis for imposing unequal or stigmatizing treatment.  Ultimately, if other students are not comfortable being in a communal restroom with a transgender person present, they have the option—like any other student—to use one of the new single-stall unisex facilities the School Board has installed.  But the School Board cannot place the burden on transgender students to use separate restroom facilities to address the alleged discomfort of others.  *Cf. Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (noting that non-transgender employee who did not want to use the same restroom as a transgender employee was free to use unisex restroom instead); *Lusardi*, 2015 WL 1607756, at *10 ("Some co-workers may be confused or uncertain about what it means to be transgender, and/or embarrassed or even afraid to share a restroom with a transgender co-worker.  But supervisory or co-worker confusion or anxiety cannot justify discriminatory terms and conditions of employment.").  The School Board's obligation is to protect the privacy of all students equally and evenhandedly.  It cannot enact policies allegedly

students—whether transgender or not—seek privacy and personal space when changing and showering in locker rooms, and many locker rooms do not involve public nudity at all. Additional reasonable accommodations such as a separate changing schedule can be mutually agreed to on an individualized basis.

protecting the privacy of one group of students at the expense of the dignity and wellbeing of others.[29]

### III.    Plaintiff Has Established A Likelihood of Success on His Title IX Claim.

For all the same reasons that the transgender restroom policy discriminates based on sex under the Equal Protection Clause, it also discriminates "on the basis of sex" under Title IX. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). On its face, the School Board's policy discriminates based on sex in at least two different ways because it explicitly classifies G.G. and other students based on their "gender identity issues" and "biological gender." Because the transgender restroom policy facially classifies students based on their sex, "the critical question in this case is thus not whether" the policy subjects students to disparate treatment "based on their sex, but whether the treatment constituted unlawful discrimination under Title IX." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 98 (2d Cir. 2012).

There is no categorical "restroom exemption" from Title IX. The statute's implementing regulations specifically prohibit recipients from using a student's sex as a basis for "[p]rovid[ing] different aid, benefits, or services or provid[ing] aid, benefits, or services in a different manner," or "[s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment." 34 C.F.R § 106.3(b); 28 C.F.R. § 54.400(b). Against the backdrop of these general

---

[29] To the extent that the School Board argues that the transgender restroom policy allows G.G. to use the girls' restroom, the policy actually undermines the claimed interest in protecting student privacy. In restrooms, another person's outward appearance as a boy or a girl will be far more visible than the person's anatomy. As noted above, even before G.G. began hormone therapy for Gender Dysphoria, girls and women who encountered G.G. in female restrooms reacted negatively because they perceived G.G. to be a boy. G.G. Decl. ¶ 25.

prohibitions, the implementing regulations contain a narrow exception regarding separate

restroom facilities for students:  "A recipient may provide separate toilet, locker room, and

shower facilities on the basis of sex, but such facilities provided for students of one sex shall be

comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33.  The

existence of regulations providing limited exceptions for separate restrooms and locker rooms

confirms that without such an exception, Title IX would prohibit the different treatment.  *Cf.*

*Mercer v. Duke Univ.*, 190 F.3d 643, 646 (4th Cir. 1999) (without limited exception for contact

sports, the general prohibitions in Title IX regulation "would require covered institutions to

integrate all of their sports team").  Restroom policies that discriminate on the basis of sex

violate Title IX if they do not fall within that limited exception.[30]

The limited exception in 34 C.F.R. § 106.33 does not apply to this case because the

ability to assign separate restrooms "on the basis of sex" does not automatically include the

ability to expel transgender students from communal restrooms or to assign transgender boys to

the girls' room.  *Cf. Doe*, 86 A.3d at 606 ("Although school buildings must . . . contain separate

restrooms for each sex . . . school officials cannot . . . dictate the use of the restrooms in a way

that discriminates against students."); *Mercer*, 190 F.3d at 646 (limited exception for "contact

sports" did not "exempt contact sports entirely from the coverage of Title IX").  To the contrary,

the Department of Education's Office of Civil Rights ("OCR") has made clear that the

---

[30]The assertion in *Doe v. Clark County Sch. Dist.*, 206-CV-1074-JCM-RJJ, 2008 WL
4372872, at *3 (D. Nev. Sept. 17, 2008), that "it would be a stretch to conclude that a
'restroom'" is covered by Title IX is entirely unsupported.  *Cf. Snyder ex rel. R.P. v. Frankfort-
Elberta Area School Dist.*, No. 1:05-CV-824, 2006 WL 3613673, at *1 (W.D. Mich. Dec. 11,
2006) (requiring black elementary school student to use separate unisex restroom in response to
harassment from other students deprived her of "equal access to restroom facilities" in violation
of the Equal Education Opportunity Act).

regulations require schools to allow transgender students access to sex-segregated facilities and programs that are consistent with their gender identity.  *See* U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities* (Dec. 1, 2014) ("Under Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes.")[31]; Statement of Interest of the United States in *Tooley v. Van Buren Public Schools*, No. 2:14-cv-13466 (E.D. Mich. Feb. 20, 2015) (preventing transgender boy from using the boys' restroom violates Title IX).[32]

The Department of Education's interpretation of its own regulations regarding sex-segregated programming is entitled to deference under *Auer v. Robbins* and is "controlling unless plainly erroneous or inconsistent with the regulation."  519 U.S. 452, 461 (1997) (internal quotation marks omitted); *see Biediger*, 691 F.3d at 97-98 (deferring to OCR's interpretation of its own regulation regarding sex-segregated programs); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 647-48 (1999) (turning to OCR guidance in construing Title IX).  Moreover, the Fourth Circuit applies "*Auer* deference even when the agency interpreting its regulation issues its interpretation through an informal process."  *D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*, 706 F.3d 256, 259 (4th Cir. 2013) (deferring to OCR interpretation of its own regulations).  Because the School Board's transgender restroom policy does not fall within

---

[31] Available at http://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-201412.pdf

[32] Available at available at http://www.justice.gov/crt/about/edu/documents/tooleysoi.pdf

the 34 C.F.R. § 106.33 exception as interpreted by the Department of Education, the sex-based policy necessarily violates Title IX.

Denying transgender students equal access to restrooms also deprives them of equal educational opportunities more generally. *See Doe*, 86 A.3d at 607 (evidence "established that a student's psychological well-being and educational success depend[ed] upon being permitted to use the communal bathroom consistent with her gender identity"). Anxiety regarding the use of restrooms frequently causes transgender students, including G.G., to avoid using the restroom during the school day, which interferes with their abilities to focus on learning. G.G. Decl. ¶ 28; Ettner Decl. ¶ 21. And the stigma and isolation transgender students are exposed to at school frequently causes them to drop out of school entirely. Ettner Decl. ¶ 26. Recipients of Title IX funds have a duty to provide equal educational opportunities to all students regardless of their sex. Denying a transgender student the use of an appropriate restroom directly impairs those opportunities.

## IV. Plaintiff Has Satisfied the Other Preliminary Injunction Factors

### A. An Injunction Is Necessary to Avoid Irreparable Harm.

As discussed at length above, the transgender restroom policy causes G.G. severe and irreparable harm in multiple ways. It interferes with the course of treatment for Gender Dysphoria prescribed by a treating psychologist in accordance with internationally recognized standards of care. It increases his risk of depression, anxiety, and self-harm. It impairs his ability to perform well academically. It subjects him to physical pain associated with avoiding going to the restroom. And, at a time of life when fitting in with peers is all-important, it publicly labels him as different from every other student in his school. As Dr. Ettner concluded, the transgender restroom policy "is currently causing emotional distress to an extremely

vulnerable youth and placing G.G. at risk for accruing lifelong psychological harm." Ettner Decl. ¶ 28.

### B.  The Balance of Hardships Weights in Favor of An Injunction

The balance of hardships weighs strongly in favor of granting a preliminary injunction. As explained earlier, allowing G.G. to use the boys' restroom would not impair the privacy of any other student, especially in light of the modifications made to the communal restrooms to increase privacy.  Any student with additional privacy concerns may also use one of the new single-stall restrooms.  Moreover, under an injunction, restrooms at Gloucester High School would remain sex-segregated.  The one and only thing that would change as a result of the preliminary injunction is that G.G. would be able to use the boys' restroom again, as he had already been doing for nearly two months without incident.  Granting narrow preliminary injunctive relief to G.G. will not harm the School Board in any significant way.

In contrast, G.G. will never be able to get back his junior and senior years in high school. Without a preliminary injunction, he will have to spend each school day trying to avoid the need to use the restroom, and he will be stigmatized and isolated from his peers during those critical years for social development.  *Cf. Doe v. Wood County Bd. of Educ.*, 888 F. Supp. 2d. 771, 778 (S.D.W.Va. 2012) (balance of harms for Title IX violation tilts in favor of preliminary injunction because "the plaintiffs Anne Doe, Beth Doe, and Carol Doe will experience their middle school years only once during their life"); *Faulkner I*, 10 F.3d at 233 (granting preliminary injunction for Shannon Faulkner to attend The Citadel because "[d]enying Faulkner's access . . . might likely become permanent for her, due to the extended time necessary to complete the litigation").

In short, this Court must balance (a) the severe, documented, and scientifically supported harms that the School Board's transgender restroom policy has caused and continues to cause

G.G. against (b) the School Board's unfounded speculation about harms that might occur to others at some future date, although such harms did not occur during the approximately seven weeks that G.G. previously used the boys' restrooms.  The balance of harms weighs decidedly in favor of G.G.  It is not a close question.

### C.  An Injunction Is In the Public Interest

An injunction in favor of G.G. would be in the public interest.  It is always in the public interest to "uphold[] constitutional rights."  *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191(4th Cir. 2013) (en banc) (internal quotation marks omitted); *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011).  Similarly, the "public interest is certainly served by promoting compliance with Title IX."  *Doe*, 888 F. Supp. 2d at 778; *accord Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) ("[T]he overriding public interestl[ies] in the firm enforcement of Title IX.").  Moreover, "[t]here is no doubt but that removing the legacy of sexual discrimination . . . from our nation's educational institutions is an important governmental objective."  *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104(4th Cir. 2011) (quoting *Kelley v. Bd. of Trustees*, 35 F.3d 265, 271-73 (7th Cir. 1994)).  Indeed, antidiscrimination laws prohibiting sex discrimination serve "compelling state interests of the highest order."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984).  A preliminary injunction enforcing those protections is necessarily in the public interest.

### CONCLUSION

For the foregoing reasons, this Court should grant the motion for preliminary injunction and require that Defendant allow G.G. to resume using the boys' restrooms at Gloucester High School until this Court renders a final judgment on the merits.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.

_____/s/_____

Rebecca K. Glenberg (VSB No. 44099)
Gail Deady (VSB No. 82035)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org
gdeady@acluva.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block*
Leslie Cooper*
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax:  (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

*Pro hac vice motion to follow

Dated: June 18, 2015