2015 WL 1497753
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Seamus JOHNSTON, Plaintiff,
v.
UNIVERSITY OF PITTSBURGH OF the
COMMONWEALTH SYSTEM OF HIGHER
EDUCATION d/b/a University of Pittsburgh,
Eric Kinsey, Mark A. Nordenberg, Jem Spectar,
Matthew Updyke, Nancy Turner, Daniel W. Dunn,
Paul J. Eash, Does 1 Through 10, Defendants.

Civil Action No. 3:13–
213.    |    Filed March 31, 2015.

**Synopsis**
**Background:** Transgender university student brought action against university and its employees following his expulsion, alleging that he was discriminated against based on his sex and his transgender status in violation of Title IX and the Equal Protection Clause. Defendants moved to dismiss.

**Holdings:** The District Court, Kim R. Gibson, J., held that:

[1] student failed to state equal protection claim based on his transgender status ;

[2] student failed to state equal protection claim based on his sex;

[3] student could not state Title IX discrimination claim based on his transgender status;

[4] student failed to state Title IX sex stereotyping claim; and

[5] student failed to establish a prima facie case of retaliation.

Motion granted.

**Attorneys and Law Firms**

Howard H. Stahl, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, Ilona M. Turner, Sasha Jean Buchert, Oakland, CA, Jesse R. Loffler, Mark Siegmund, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY, for Plaintiff.

Martha Hartle Munsch, Kim M. Watterson, Reed Smith, Patrick T. Noonan, Pittsburgh, PA, for Defendants.

*MEMORANDUM OPINION*

KIM R. GIBSON, District Judge.

**I. Introduction**
 **\*1** This case arises from Plaintiff Seamus Johnston's allegations that Defendants discriminated against him based on his sex and his transgender status [1] by prohibiting him from using sex-segregated locker rooms and restrooms that were designated for men. Although the parties have submitted lengthy briefs and have advanced numerous arguments, this case presents one central question: whether a university, receiving federal funds, engages in unlawful discrimination, in violation of the United States Constitution and federal and state statutes, when it prohibits a transgender male student from using sex-segregated restrooms and locker rooms designated for men on a university campus. The simple answer is no.

Pending before the Court in this matter is Defendants' motion to dismiss (ECF No. 9) the second amended complaint (ECF No. 7) pursuant to Federal Rule of Civil Procedure 12(b)(6). Thus, the issue this Court must decide is whether Plaintiff has stated a cognizable claim of discrimination on the basis of sex under the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments. [2] The Court finds that Plaintiff has failed to allege a plausible claim for relief as a matter of law. Accordingly, and for the reasons explained below, the Court will **GRANT** Defendants' motion to dismiss.

**II. Jurisdiction**
The Court has jurisdiction over the federal constitutional and statutory claims pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in the Western District of Pennsylvania.

**III. Background**

EXHIBIT 2

Plaintiff alleges the following facts in his second amended complaint, which the Court will accept as true for the purpose of deciding the pending motion to dismiss. Plaintiff identifies as a transgender male. (ECF No. 7 ¶¶ 1, 18). According to Plaintiff, "although he was assigned the sex of female at birth, he is legally, socially, and medically recognized as a man." (*Id.* ¶¶ 1, 18). Plaintiff understood his male gender identity [3] at a very early age, informing his parents that he was a boy at age 9. (*Id.* ¶ 20). In May 2009, Plaintiff transitioned to living in accordance with his male gender identity and began holding himself out as a male in all aspects of life. (*Id.* ¶ 21).

Beginning in August 2010, Plaintiff underwent counseling related to his gender identity and was diagnosed by his psychotherapist with Gender Identity Disorder ("GID"). [4] (*Id.* ¶ 22). In August 2011, Plaintiff began hormone treatment for his GID in the form of testosterone injections. [5] (*Id.* ¶ 26).

Beginning in 2009, as part of Plaintiff's transition to living as a male, he "amended his identity documents and records to reflect his male gender identity." (*Id.* ¶ 27). In 2010, Plaintiff obtained a common law name change to "Seamus Samuel Padraig Johnston." (*Id.* ¶ 28). In October 2011, Plaintiff amended the gender marker to male on his Pennsylvania driver's license. (*Id.* ¶ 29). In July 2011, Plaintiff registered with the Selective Service. (*Id.* ¶ 30). In February 2012, Plaintiff amended the gender marker to male on his United States passport. (*Id.* ¶ 31). In November 2013, Plaintiff amended the gender marker to male in his Social Security record. (*Id.* ¶ 32).

**\*2** Plaintiff attended the University of Pittsburgh at Johnstown ("UPJ" or "University") as an undergraduate Computer Science major for five semesters from 2009 to 2011. (*Id.* ¶ 7). Plaintiff received an REB Commuter Scholarship, a four-year scholarship covering full tuition, fees, and books, which he maintained for the entire time he was enrolled at UPJ. (*Id.* ¶¶ 35–36).

When Plaintiff applied for admission to UPJ in March 2009, he listed his sex as "female" on his application form. (*Id.* ¶¶ 33–34). However, when Plaintiff began attending classes at UPJ in August 2009, and at all times thereafter, Plaintiff "consistently lived as male." (*Id.* ¶¶ 37–38). In August 2011, Plaintiff requested that UPJ change the gender marker to male in his school records. [6] (*Id.* ¶ 39). In the fall of 2011, Plaintiff presented UPJ with a notarized affidavit regarding his name change, and UPJ changed the name on his student records to "Seamus Samuel Padraig Johnston." (*Id.* ¶¶ 40–41).

While enrolled as a student at UPJ, Plaintiff consistently used the men's restrooms on campus. (*Id.* ¶ 42). During the spring 2011 semester, Plaintiff enrolled in a men's weight training class, which was attended only by men. (*Id.* ¶ 43). Plaintiff used the men's locker room for the men's weight training class throughout the spring 2011 semester. (*Id.* ¶ 44). Plaintiff again enrolled in a men's weight training class for the fall 2011 semester, and again began using the men's locker room. (*Id.* ¶ 45). Plaintiff used the locker room approximately five times between the end of August and mid-September without incident. (*Id.*).

However, on September 19, 2011, Plaintiff met with Teresa Horner, Executive Director of Health and Wellness Services at UPJ, who informed Plaintiff that he could no longer use the men's locker room. (*Id.* ¶¶ 46–47). Instead, Plaintiff agreed to use a unisex locker room at the Sports Center normally reserved for referees. (*Id.* ¶ 47). On September 26, 2011, Jonathan Wescott, UPJ Vice President of Student Affairs, informed Plaintiff that "he would be allowed to use the men's locker room if his student records were updated from female to male." (*Id.* ¶ 50). On September 29, 2011, Marylin Alberter, UPJ Registrar, informed Plaintiff that, in order to change the sex designation on his student records, Plaintiff must provide either a court order or a new birth certificate reflecting Plaintiff's current gender. (*Id.* ¶¶ 51–52). On October 19, 2011, Plaintiff registered a complaint with Jem Spectar, UPJ President, to protest his exclusion from the men's locker room. (*Id.* ¶ 57). Spectar responded by a letter dated October 21, 2011, confirming that, in order for Plaintiff to have access to the men's locker room, he must officially change his gender in UPJ's records by presenting a court order or birth certificate. (*Id.* ¶ 58).

In October 2011, Plaintiff began reusing the men's locker room, using the locker room six times between October 24, 2011, and November 14, 2011, without incident. (*Id.* ¶ 59). On November 16, 2011, the campus police issued a citation to Plaintiff for disorderly conduct because he used the men's locker room. (*Id.* ¶ 60). Despite receiving this citation, Plaintiff continued to use the men's locker room. (*Id.* ¶ 61). On November 21, 2011, Plaintiff received a second citation for disorderly conduct for using the men's locker room. (*Id.* ¶ 62). During this confrontation, Campus Police Chief Kevin Grady informed Plaintiff that, if he continued to use the men's locker room, he would be arrested and taken

into custody. (*Id.* ¶ 62). On November 28, 2011, Jacob W. Harper, Coordinator for the UPJ Office of Student Conduct and Conflict Resolution, issued an interim persona non grata against Plaintiff, barring him from the Sports Center due to his continued use of the men's locker room. (*Id.* ¶¶ 63, 65). Additionally, on November 21, 2011, Harper notified Plaintiff that disciplinary charges had been filed against him and that he was required to attend a disciplinary hearing on November 23, 2011, which was subsequently rescheduled for December 2, 2011. (*Id.* ¶ 64).

**\*3** On November 28, 2011, Plaintiff again used the men's locker room, and Campus Police took Plaintiff into custody and issued another disorderly conduct citation. (*Id.* ¶ 66). On December 2, 2011, at a disciplinary hearing, Plaintiff was found guilty of three charges resulting from alleged violations of the Student Code of Conduct, and was instructed that he was not to use any male locker rooms or restroom facilities on campus. (*Id.* ¶ 68). As a result of the findings at the disciplinary hearing, several sanctions were imposed against Plaintiff, including a required counseling assessment, disciplinary probation for approximately one year, and exclusion from all male-designated campus facilities until Plaintiff graduated from UPJ. (*Id.* ¶ 69).

Nevertheless, on December 7, 2011, Plaintiff used a men's restroom in the Wellness Center to change his clothes, and Campus Police confronted Plaintiff, informing him that he was not to use any men's restrooms on campus. (*Id.* ¶ 67). Then, on December 15, 2011, Plaintiff used a men's restroom in Biddle Hall, an academic building on the UPJ campus. (*Id.* ¶ 70). Officer Matthew Updyke confronted Plaintiff, reminded Plaintiff that he was not permitted to enter any men's restrooms on campus, and informed Plaintiff that he intended to file a complaint with the University Hearing Board. (*Id.* ¶ 70). On December 20, 2011, Harper informed Plaintiff that, due to his use of the men's restrooms on December 7 and December 15, Plaintiff would be placed on interim disciplinary suspension and barred under an interim persona non grata from all UPJ property pending an adjudicatory hearing. (*Id.* ¶ 71). A disciplinary hearing was held on January 24, 2012, before a panel of students, who found Plaintiff guilty of exhibiting disorderly, lewd, or indecent behavior; failing to comply with lawful directions of a University official; and entering University facilities without authorization. (*Id.* ¶ 72). As a result, Plaintiff was expelled from UPJ and prohibited from accessing all UPJ property. (*Id.* ¶ 72). Following a "sanction justification review," Dr. Gyure upheld Plaintiff's expulsion. (*Id.* ¶ 73).

Similarly, the University Appeals Board reviewed the case and upheld the disciplinary sanctions against Plaintiff. (*Id.* ¶¶ 74–75).

Due to his expulsion from UPJ, Plaintiff lost his scholarship. (*Id.* ¶ 76). Additionally, on December 2, 2011, the UPJ Campus Police filed a criminal complaint with the District Attorney's office, which charged Plaintiff with indecent exposure, criminal trespass, and disorderly conduct. (*Id.* ¶ 77). On May 30, 2013, Plaintiff pled guilty to the reduced charges of trespass and disorderly conduct and was sentenced to six months' probation and a fine of approximately $600. (*Id.* ¶ 78).

Following Plaintiff's expulsion, the FBI investigated Plaintiff related to a series of bomb threats made against the University of Pittsburgh. (*Id.* ¶ 83). Plaintiff alleges that "the University gave [Plaintiff]'s name to the FBI in retaliation for exercising his right to complain about the University's discriminatory conduct." (*Id.* ¶ 84). Plaintiff also alleges that he suffers significant emotional distress as a result of Defendants' discriminatory conduct, including humiliation, stress, depression, and anxiety. (*Id.* ¶ 85). Further, and among other things, Plaintiff alleges that he suffers from Post–Traumatic Stress Disorder, requiring counseling treatment, as a result of Defendants' conduct. (*Id.* ¶ 86).

**\*4** Plaintiff filed a four-count *pro se* complaint in this Court on October 29, 2013. (ECF No. 2). The matter was referred to United States Magistrate Judge Pesto, who screened the complaint pursuant to 28 U.S.C. § 1915A. Magistrate Judge Pesto filed a report and recommendation (ECF No. 3), recommending that the federal count of Plaintiff's complaint [7] be dismissed for failure to state a claim upon which relief can be granted and that the Court should decline to exercise jurisdiction over the remaining state law claims. On November 26, 2013, this Court entered an order adopting the report and recommendation and dismissing the case without prejudice to Plaintiff filing an amended complaint. (ECF No. 5).

Plaintiff then filed an amended complaint (ECF No. 6) on January 8, 2014, and a second amended complaint (ECF No. 7) on January 14, 2014.[8] Thereafter, Defendants filed the instant motion to dismiss (ECF No. 9) along with a brief in support. Plaintiff filed a brief in opposition (ECF No. 19), and the parties filed responsive briefs (ECF Nos. 20, 23) and supplemental authority (ECF Nos. 35, 40, 41, 42). On August 18, 2014, Magistrate Judge Pesto recused himself

from the case (ECF No. 24), after which this Court held a status conference (*see* ECF Nos. 30, 34). On October 28, 2014, the Court held oral argument on the motion to dismiss. (ECF Nos. 33, 38). The parties having completed extensive briefing and argument, this matter is now ripe for disposition by this Court.

**IV. Standard of Review**

Defendants have moved to dismiss Plaintiff's second amended complaint pursuant to Rule 12(b)(6). The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 12(b)(6) allows a party to seek dismissal of a complaint or any portion of a complaint for failure to state a claim upon which relief can be granted. Although the federal pleading standard has been "in the forefront of jurisprudence in recent years," the standard of review for a Rule 12(b)(6) challenge is now well established. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 209 (3d Cir.2009).

In determining the sufficiency of a complaint, a district court must conduct a two-part analysis. First, the court must separate the factual matters averred from the legal conclusions asserted. *See Fowler,* 578 F.3d at 210. Second, the court must determine whether the factual matters averred are sufficient to show that plaintiff has a "plausible claim for relief." *Id.* at 211 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). The complaint need not include "detailed factual allegations." *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Moreover, the court must construe the alleged facts, and draw all inferences gleaned therefrom, in the light most favorable to the non-moving party. *See id.* at 228 (citing *Worldcom, Inc. v. Graphnet, Inc.,* 343 F.3d 651, 653 (3d Cir.2003)). However, "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action ... do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Rather, the complaint must present sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sheridan v. NGK Metals Corp.,* 609 F.3d 239, 263 n. 27 (3d Cir.2010) (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

**\*5** Ultimately, whether a plaintiff has shown a "plausible claim for relief" is a "context specific" inquiry that requires the district court to "draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. The relevant record under consideration includes the complaint and any "document integral or explicitly relied on in the complaint." *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)). If a complaint is vulnerable to dismissal pursuant to Rule 12(b)(6), the district court must permit a curative amendment, irrespective of whether a plaintiff seeks leave to amend, unless such amendment would be inequitable or futile. *Phillips,* 515 F.3d at 236; *see also Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir.2000).

**V. Discussion**

Plaintiff has asserted five claims for relief in his second amended complaint. Count One asserts a claim against all Defendants pursuant to 42 U.S.C. § 1983, alleging discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (ECF No. 7 ¶¶ 92–98). Specifically, Plaintiff alleges that "Defendants, without justification, treated Plaintiff differently from other similarly situated students on the basis of sex, including his transgender status and perceived failure to conform to gender stereotypes," and that Defendants retaliated against Plaintiff for asserting his constitutional right to be free from discrimination based on sex. (*Id.* ¶¶ 93, 96). Count Two asserts a claim against all Defendants pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* alleging discrimination and retaliation on the basis of sex in an education program or activity receiving federal funds. (*Id.* at 16–17, ¶¶ 1–10). [9] Count Three asserts a state law claim against all Defendants for discrimination and retaliation on the basis of sex under the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat. § 995. (*Id.* at 17–18, ¶¶ 11–19). Count Four asserts a state law claim against all Defendants for discrimination and retaliation on the basis of sex under the Pennsylvania Fair Educational Opportunities Act, 24 Pa. Cons.Stat. § 5001 *et seq.* (*Id.* at 18–19, ¶¶ 20–27). Count Five asserts a state law claim against the Defendant University for a common law breach of contract, alleging that UPJ breached its nondiscrimination policy. (*Id.* at 19–20, ¶¶ 28–33). The Court will separately evaluate Plaintiff's claims for relief according to the Rule 12(b)(6) standard of review as set forth above. [10]

**A. Equal Protection Claim**

 [1]   Plaintiff asserts his first claim for relief, a Fourteenth Amendment Equal Protection claim, under 42 U.S.C. § 1983, which provides a remedy for the deprivation of a person's constitutional rights. *See Dipippa v. Union Sch. Dist.,* 819 F.Supp.2d 435, 439–40 (W.D.Pa.2011). To state a claim for relief under § 1983, a plaintiff must allege both the violation of a right secured by the Constitution or laws of the United States and that the alleged violation was committed by a person acting under color of state law. *See Davis v. Holder,* 994 F.Supp.2d 719, 726 (W.D.Pa.2014); *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, the inquiry in dispute is whether Plaintiff has plausibly alleged that Defendants' conduct violated a constitutional or federal right. In his second amended complaint, Plaintiff alleges that Defendants deprived him of his constitutional right to be free from discrimination on the basis of sex under the Equal Protection Clause of the Fourteenth Amendment to the Constitution when they prohibited him from using men's restrooms and locker rooms on the University's campus.

 **\*6** [2] [3] [4] [5]  The Equal Protection Clause prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a claim for sex discrimination under the Equal Protection Clause pursuant to § 1983, a plaintiff must allege the existence of purposeful discrimination because of his sex. *See Epps v. City of Pittsburgh,* 33 F.Supp.2d 409, 414 (W.D.Pa.1998) (citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1293 (3d Cir.1997)). Thus, to establish a gender discrimination claim under the Equal Protection Clause, a plaintiff must allege: (1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990); *Wolfe v. Horn,* 130 F.Supp.2d 648, 654 (E.D.Pa.2001); *Hiester v. Fischer,* 113 F.Supp.2d 742, 746 (E.D.Pa.2000). "Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects." *Startzell v. City of Philadelphia,* 533 F.3d 183, 203 (3d Cir.2008) (internal citations and quotation marks omitted); *Etheredge v. Henry,* No. 3:11–CV–2330, 2014 WL 59996, at \*4 (M.D.Pa. Jan. 6, 2014). Nevertheless, "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

 [6] [7] [8]  "When reviewing a claim that [state] action violates the Equal Protection Clause, the Court must first determine the correct standard of review." *Hunters United for Sunday Hunting v. Pennsylvania Game Comm'n,* No. 1:13–cv–01939, 2014 WL 2770228, at \*4 (M.D.Pa. June 18, 2014) (citing *Donatelli v. Mitchell,* 2 F.3d 508, 513 (3d Cir.1993)). State action that does not burden a fundamental right or target a suspect class will be upheld if it bears a rational relation to some legitimate end. *Ramsgate Court Townhome Ass'n v. W. Chester Borough,* 313 F.3d 157, 160 (3d Cir.2002); *Doe v. Pennsylvania Bd. of Prob. & Parole,* 513 F.3d 95, 107 (3d Cir.2008) ("If state action does not burden a fundamental Constitutional right or target a suspect class, the challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). On the other hand, "gender-based discriminations must serve important governmental objectives and ... the discriminatory means employed must be substantially related to the achievement of those objectives." *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980). In short, gender classifications are subject to intermediate scrutiny. *See United States v. Virginia,* 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action.").

 **\*7** Plaintiff alleges that Defendants violated the Equal Protection Clause by "treat[ing] Plaintiff differently from other similarly situated students on the basis of his sex, including his transgender status and perceived failure to conform to gender stereotypes." (ECF No. 7 ¶ 93). Specifically, the complaint avers that "non-transgender male students ... were permitted to use the men's locker room and restroom facilities on campus" while Plaintiff "was denied access to the men's locker rooms and restrooms." (*Id.* ¶¶ 94, 95). Additionally, the complaint alleges that Defendants retaliated against Plaintiff for asserting his constitutional right to be free from discrimination based on sex. (*Id.* ¶ 96).

Defendants argue that Plaintiff's complaint fails to state a cognizable Equal Protection Claim as a matter of law. (ECF No. 10 at 7). First, Defendants contend that "transgender" is not a suspect classification under the Equal Protection Clause and that rational basis review therefore applies. (*Id.*). According to Defendants, UPJ had a rational basis in refusing to permit Plaintiff to use male locker rooms, showers, and bathrooms-namely, to protect the privacy rights of students at UPJ. (*Id.*). Defendants assert that students

have a constitutional right to privacy, which includes "the right to disrobe and perform personal bodily functions out of the presence of members of the opposite biological sex." (*Id.* at 7–8). Defendants also argue that, even if an intermediate standard of review applies to the alleged sex-based discrimination in this case, UPJ's conduct would still pass constitutional muster. (*Id.* at 8). Specifically, Defendants assert that UPJ's conduct in refusing to permit Plaintiff, "a biological female, to disrobe and shower with male students advance[s] an important purpose." (*Id.*).

At the outset, the Court notes that society's views of gender, gender identity, sex, and sexual orientation have significantly evolved in recent years. Likewise, the Court is mindful that the legal landscape is transforming as it relates to gender identify, sexual orientation, and similar issues, especially in the context of providing expanded legal rights. Within the context of these expanding rights and protections arises the profound question of self-identify, as exemplified by this case. But, while this case arises out of a climate of changing legal and social perceptions related to sex and gender, the question presented is relatively narrow and the applicable legal principles are well-settled. At the heart of this case are two important but competing interests. On the one hand is Plaintiff's interest in performing some of life's most basic and routine functions, which take place in restrooms and locker rooms, in an environment consistent with his male gender identity. On the other hand is the University's related interest in providing its students with a safe and comfortable environment for performing these same life functions consistent with society's long-held tradition of performing such functions in sex-segregated spaces based on biological or birth sex. Additionally, the Court finds controlling the unique contours under which this case arises. Namely, the context is a public university, whose mission is primarily pedagogical, but which is also tasked with providing safe and appropriate facilities for all of its students. With these considerations in mind, the Court will apply the appropriate legal principles to the alleged facts of this case.

 **\*8**  **[9]**   First, neither the United States Supreme Court nor the Third Circuit Court of Appeals has recognized transgender as a suspect classification under the Equal Protection Clause. Accordingly, Plaintiff's discrimination claim is reviewed under the rational basis standard. This finding is consistent with numerous other courts that have considered allegations of discrimination by transgender individuals. *See, e.g., Etsitty v. Utah Transit Auth.,* 502 F.3d 1215, 1228 (10th Cir.2007); *Brown v. Zavaras,* 63 F.3d 967, 971 (10th Cir.1995) (but cautioning that recent research concluding that sexual identity may be biological suggests reevaluating the rule); *Braninburg v. Coalinga State Hosp.,* No. 1:08–cv–01457–MHM, 2012 WL 3911910, at \*8 (E.D.Cal. Sept. 7, 2012) ("it is not apparent that transgender individuals constitute a 'suspect' class"); *Jamison v. Davue,* No. S–11–cv–2056 WBS, 2012 WL 996383, at \*3 (E.D.Cal. Mar. 23, 2012) ("transgender individuals do not constitute a 'suspect' class, so allegations that defendants discriminated against him based on his transgender status are subject to a mere rational basis review"); *Kaeo–Tomaselli v. Butts,* No. 11–cv–00670 LEK, 2013 WL 399184, at \*5 (D.Haw. Jan. 31, 2013) (noting the plaintiff's status as a transgender female did not qualify her as a member of a protected class and explaining the court could find no "cases in which transgendered individuals constitute a 'suspect' class"); *Lopez v. City of New York,* No. 05–cv–1032–NRB, 2009 WL 229956, \*13 (S.D.N.Y. Jan. 30, 2009) (explaining that because transgender individuals are not a protected class for the purpose of Fourteenth Amendment analysis, claims that a plaintiff was subjected to discrimination based on her status as transgender are subject to rational basis review). [11]

 **[10]**  Nevertheless, even if a heightened standard of review were to apply, the result would be the same as under rational basis review. Here, UPJ's policy of segregating its bathroom and locker room facilities on the basis of birth sex is "substantially related to a sufficiently important government interest." *Glenn v. Brumby,* 663 F.3d 1312, 1316 (11th Cir.2011) (quoting *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 446–47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Specifically, UPJ explained that its policy is based on the need to ensure the privacy of its students to disrobe and shower outside of the presence of members of the opposite sex. This justification has been repeatedly upheld by courts. *See, e.g., Etsitty v. Utah Transit Auth.,* 502 F.3d 1215, 1224 (10th Cir.2007) (the use of women's public restrooms by a biological, transgender male could result in liability for employer, and such a motivation constitutes a legitimate, nondiscriminatory reason); *Causey v. Ford Motor Co.,* 516 F.2d 416 (5th Cir.1975). [12]

The Supreme Court has acknowledged that not all classifications based on sex are constitutionally impermissible: "The heightened review standard our precedent establishes does not make sex a proscribed classification ... Physical difference between men and women, however, are enduring: '[t]he two sexes are not fungible; a community made up exclusively of one [sex] is

different from a community composed of both.' " *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Ballard v. United States,* 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181 (1946)); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("[T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny..."). As such, separating students by sex based on biological considerations—which involves the physical differences between men and women—for restroom and locker room use simply does not violate the Equal Protection Clause. Thus, "while detrimental gender classifications by government often violate the Constitution, they do not always do so, for the reason that there are differences between males and females that the Constitution necessarily recognizes." *Michael M. v. Superior Court of Sonoma Cnty.,* 450 U.S. 464, 478, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (Stewart, J., concurring). It is within this legal framework that the facts of this case must be evaluated.

**\*9** **[11]** Plaintiff also appears to argue that he was discriminated on the basis of his "male" sex, not simply on his status as a transgender male. Plaintiff contends, the "complaint alleges *sex* discrimination by Defendants." (ECF No. 19 at 11). Plaintiff asserts that the complaint alleges "acts of discrimination 'because of his sex' ... [including] the University's refusal to permit [Plaintiff], a male transgender individual, access to facilities consistent with his male gender." (*Id.*). However, these allegations do not state a cognizable claim for sex discrimination.

Many courts have defined the term "sex" in the context of the Equal Protection Clause, as well as anti-discrimination statutes such as Title VII, as the biological sex assigned to a person at birth. [13] *See, e.g., Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) ("sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"). The Seventh Circuit Court of Appeals has provided the following definition for "discrimination based on sex" under Title VII, which this Court finds instructive in defining sex discrimination under the Equal Protection Clause:

> The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder, *i.e.,* a person born with a male body who believes himself to be female, or a person born with a female body who believes herself to be male; a prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's sexual identity disorder or discontent with the sex into which they were born.

*Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984). [14]

While Plaintiff alleges that he is a "male," the complaint also alleges that Plaintiff was assigned the sex of "female" at birth. Importantly, Plaintiff has not alleged that he has undergone a sex change. Thus, while Plaintiff might identify his ***gender*** as male, his ***birth sex*** is female. It is this fact—that Plaintiff was born a biological female, as alleged in the complaint—that is fatal to Plaintiff's sex discrimination claim. Regardless of how gender and gender identity are defined, the law recognizes certain distinctions between male and female on the basis of birth sex. Thus, even though Plaintiff is a transgender male, his sex is female, a fact alleged in Plaintiff's complaint and a fact that has legal significance in light of Plaintiff's discrimination claim. Plaintiff alleges that he is "medically" a male, but provides no further averments to support that assertion. Nevertheless, the complaint alleges two facts that belie his assertion that his sex—as distinct from his gender —is male. First, Plaintiff alleges that he was assigned the sex of female at birth. To further this point, Plaintiff alleges that he did not become aware of his male gender identity until he was 9, and he did not start presenting as a male until sometime later, around the time he matriculated as a student at UPJ. Similarly, based on the allegations in the complaint, it is reasonable to infer that Plaintiff's birth certificate indicates that he is a female. Likewise, the complaint does not allege that Plaintiff has undergone any kind of sex reassignment surgery.

**\*10** Second, according to the complaint, when plaintiff applied to UPJ, he stated that he was a female. Likewise, the

complaint alleges that Plaintiff did not comply with UPJ's procedures to update his school records to reflect that his sex is male rather than female. Thus, while Plaintiff alleges that he has held himself out as "male" at all relevant times, he also alleges that, when he applied to UPJ, he stated that he was a female and that he has failed to provide the school with requested documentation, consistent with UPJ's policy, to change the school records to reflect that his sex is male rather than female. For these reasons, Plaintiff has failed to allege that he was discriminated against because of his sex. Accordingly, Plaintiff has failed to state a cognizable claim for relief under the Equal Protection Clause of the Fourteenth Amendment, and Count I of his complaint will therefore be dismissed.

**B. Title IX Claim**

Next, the Court will address Plaintiff's claim for discrimination and retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). According to the complaint, Defendants discriminated against Plaintiff in violation of Title IX "because of his sex, including his transgender status and his perceived failure to conform to gender stereotypes." (ECF No. 7 at 17, ¶ 7; ECF No. 19 at 11). Thus, the complaint alleges that Defendants discriminated against Plaintiff both on the basis of his transgender status and on his perceived gender nonconformity, and that such discrimination violates Title IX's prohibition of discrimination on the basis of sex. (ECF No. 19 at 26). Specifically, the complaint avers that, while "non-transgender male students ... were permitted to use the men's locker room and restroom facilities on campus," Plaintiff "was singled out and denied access to the men's locker rooms and restrooms." (ECF No. 7 at 17, ¶¶ 5–6). Additionally, the complaint alleges that Defendants retaliated against Plaintiff for asserting his statutory right to be free from discrimination based on sex. (*Id.* at 17, ¶ 8).

Defendants argue that Plaintiff's complaint fails to state a cognizable claim for relief under Title IX as a matter of law. (ECF No. 10 at 9). Defendants first argue that Plaintiff cannot assert a transgender status claim because the plain language of Title IX does not prohibit discrimination on the basis of gender identity. (*Id.*). Defendants contend that, while Title IX prohibits discrimination in education programs on the basis of sex, the statute does not mention gender identity, gender expression, or gender transition. (*Id.*). Additionally, Defendants point to the legislative history of the statute, arguing that "the intent of Congress in enacting Title IX was to open up educational opportunities for girls and women in education," and asserting that "[g]ender identification, of whatever description, is not equivalent to 'sex' as that term is used in the statute or the regulations." (*Id.* at 9–10). Second, Defendants argue that Plaintiff's allegations do not constitute "sex stereotyping" under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

**\*11** Having carefully reviewed the relevant language of Title IX and the applicable case law, and having considered the erudite arguments of counsel, the Court finds that Plaintiff has failed to state a cognizable claim for discrimination under Title IX. Simply stated, Plaintiff has not alleged facts showing that Defendants unlawfully discriminated against him on the basis of sex in violation of Title IX. Specifically, the University's policy of requiring students to use sex-segregated bathroom and locker room facilities based on students' natal or birth sex, [15] rather than their gender identity, does not violate Title IX's prohibition of sex discrimination.

**[12] [13] [14]** Title IX prohibits sex discrimination in educational programs that receive federal funding:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a); *see Grove City Coll. v. Bell,* 687 F.2d 684, 687 (3d Cir.1982) *aff'd,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). While Title IX's "only express enforcement mechanism, § 1682, is an administrative procedure resulting in the withdrawal of federal funding from institutions that are not in compliance ... [the Supreme Court] has recognized an implied private right of action." *Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 255, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009). Thus, "Title IX provides a cause of action to battle discrimination based upon gender by educational institutions which receive federal funding, and was intended to prevent the use of federal resources to support gender discrimination." *Favia v. Indiana Univ. of Pennsylvania,* 812 F.Supp. 578, 584 (W.D.Pa.1993) *aff'd,* 7 F.3d 332 (3d Cir.1993) (citing *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) and *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). In addition to proscribing discrimination on the basis of sex, the statute prohibits retaliation against a person who has complained

of sex discrimination. *See Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). To establish a prima facie case of discrimination under Title IX, a plaintiff must allege (1) that he was subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the discrimination was on the basis of sex. *See Bougher v. Univ. of Pittsburgh,* 713 F.Supp. 139, 143–44 (W.D.Pa.1989) *aff'd,* 882 F.2d 74 (3d Cir.1989).

As stated above, Title IX prohibits discrimination "on the basis of sex." The parties dispute whether discrimination "on the basis of sex" applies to claims of discrimination by transgender students. This issue is one of first impression in the Third Circuit, and it does not appear that any federal courts have addressed the precise question of whether a student can assert a claim for discrimination on the basis of his transgender status under Title IX. Thus, the parties understandably resort to relying on cases in the Title VII context to construct the appropriate framework to answer this question. Defendants cite several cases holding that discrimination based on transgender status is not discrimination "on the basis of sex" under Title VII. Plaintiff, on the other hand, cites several cases holding that transgender individuals can allege a cognizable Title VII claim for discrimination under a sex stereotyping theory.

**1. Transgender Status Claim**

**\*12** **[15]** First, Title IX does not prohibit discrimination on the basis of transgender itself because transgender is not a protected characteristic under the statute. The Court has found no federal court case that has squarely decided this issue in the Title IX context. [16] However, nearly every federal court that has considered the question in the Title VII context has found that transgendered individuals are not a protected class under Title VII. *See, e.g., Etsitty v. Utah Transit Auth.,* 502 F.3d 1215, 1221–22 (10th Cir.2007); *Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1084 (7th Cir.1984); *Sommers v. Budget Mktg., Inc.,* 667 F.2d 748, 750 (8th Cir.1982); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.,* 542 F.Supp.2d 653, 658 (S.D.Tex.2008) (collecting cases); *Sweet v. Mulberry Lutheran Home,* No. IP02–0320–C–H/K, 2003 WL 21525058, at \*2 (S.D.Ind. June 17, 2003) ("discrimination on the basis of sex means discrimination on the basis of the plaintiff's biological sex, not sexual orientation or sexual identity, including an intention to change sex"); *but see Schroer v. Billington,* 577 F.Supp.2d 293,

305 (D.D.C.2008) (explaining that "discrimination based on transsexuality ... [is] a characteristic that, in and of itself, nearly all federal courts have said is unprotected by Title VII," but holding that the revocation of a job offer by an employer because the applicant had transitioned from male to female constituted discrimination "because of sex" in violation of Title VII). [17] The Third Circuit has not addressed the issue. The Court will briefly review the relevant Title VII cases.

In one of the first cases considering whether Title VII protects transgender individuals, the Seventh Circuit, in *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1087 (7th Cir.1984), concluded that "Title VII is not so expansive in scope as to prohibit discrimination against transsexuals." Reviewing the plain language of the statute, the court reasoned,

> The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder, *i.e.,* a person born with a male body who believes himself to be female, or a person born with a female body who believes herself to be male; a prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination on an individual's sexual identity disorder or discontent with the sex into which they were born.

*Ulane,* 742 F.2d at 1085. The court reviewed the legislative history to discern the intent of Congress. Also, the Court noted that Congress had considered, but rejected, several later attempts to amend Title VII to prohibit discrimination on the basis of sexual orientation. As such, the court explained, Congress's "rejection strongly indicates that the phrase ... prohibiting discrimination on the basis of sex should be given a narrow, traditional interpretation, which would also exclude transsexuals." *Id.* at 1086. Thus, the court concluded, "if the term 'sex' as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress." *Id.* at 1087.

**\*13** Similarly, the Eighth Circuit has concluded that "the word 'sex' in Title VII is to be given its traditional definition, rather than an expansive interpretation. Because Congress has not shown an intention to protect transsexuals, we hold that discrimination based on one's transsexualism does not fall within the protective purview of the Act." *Sommers v. Budget Marketing, Inc.,* 667 F.2d 748, 750 (8th Cir.1982) (noting that it was not unmindful of the problem facing the transgender plaintiff, but noting, on the other hand, the equally important problems facing plaintiff's employer in "protecting the privacy interests of its female employees" particularly in regard to restroom usage).

In a recent transgender restroom usage case, the Tenth Circuit held that discrimination based on an individual's transgender status is not discrimination "because of sex" under Title VII and that transgender individuals are not members of a protected class under the Fourteenth Amendment's Equal Protection Clause. *Etsitty v. Utah Transit Auth.,* 502 F.3d 1215 (10th Cir.2007). The court explained,

> [D]iscrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex under Title VII. In reaching this conclusion, this court recognizes it is the plain language of the statute and not the primary intent of Congress that guides our interpretation of Title VII.... [T]here is nothing in the [Congressional] record to support the conclusion that the plain meaning of "sex" encompasses anything more than male and female. In light of the traditional binary conception of sex, transsexuals may not claim protection under Title VII from discrimination based solely on their status as a transsexual.

*Id.* at 1221–22 (but noting that "[s]cientific research may someday cause a shift in the plain meaning of the term 'sex' so that it extends beyond the two starkly defined categories of male and female").

**[16]** These cases, along with many others, make clear that Title VII does not provide an avenue for a discrimination claim on the basis of transgender status. Similarly, Title IX's language does not provide a basis for a transgender status claim. [18]. On a plain reading of the statute, the term "on the basis of sex" in Title IX means nothing more than male and female, under the traditional binary conception of sex consistent with one's birth or biological sex. *See Etsitty,* 502 F.3d at 1222. The exclusion of gender identity from the language of Title IX is not an issue for this Court to remedy. It is within the province of Congress [19]—and not this Court—to identify those classifications which are statutorily prohibited. *See Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1086 (7th Cir.1984) ("Although the maxim that remedial statutes should be liberally construed is well recognized, that concept has reasonable bounds beyond which a court cannot go without transgressing the prerogatives of Congress.... For us to now hold that Title VII protects transsexuals would take us out of the realm of interpreting and reviewing and into the realm of legislating."); *see also Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 190, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (Thomas, J., dissenting) (noting that Congress enacted Title IX pursuant to its spending power and that "Congress must speak with a clear voice when it imposes liability on the States through its spending power," thus supporting a narrow interpretation of the statute's language regarding sex discrimination).

**\*14** **[17]** This Court's narrow view of the meaning of the statutory term "sex" is also supported by the legislative history and application of Title IX in this Circuit's case law. Congress's purpose in enacting Title IX was to establish equal educational opportunities for women and men in education. *Lothes v. Butler Cnty. Juvenile Rehab. Ctr.,* 243 Fed.Appx. 950, 955 (6th Cir.2007). The Third Circuit has evaluated Title IX's language related to "sex" and has concluded that sex-segregated schools and programs may be constitutionally permissible under the statute. *See, e.g., Vorchheimer v. Sch. Dist. of Philadelphia,* 532 F.2d 880 (3d Cir.1976) (holding that regulations establishing admission requirements based on gender classification do not offend the Equal Protection Clause of the United States Constitution). Importantly, the Third Circuit explained,

> Race is a suspect classification under the Constitution, but the Supreme Court has declined to so characterize gender. We are committed to the concept that there is no fundamental difference between races and therefore, in justice, there can be no dissimilar treatment. But there are differences between the sexes which may, in limited circumstances, justify disparity in law. As the Supreme Court has said: "(g)ender has never been rejected as an impermissible classification in all instances."

*Vorchheimer,* 532 F.2d at 886–87 (quoting *Kahn v. Shevin,* 416 U.S. 351, 356 n. 10, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974)). Thus, while Title IX was intended to provide equal educational opportunities for both sexes, the statute does not necessarily prohibit sex-segregated spaces in educational settings. As further support, the Third Circuit has recognized that Title IX authorizes single-sex athletic teams in certain circumstances. *See, e.g., Williams v. Sch. Dist. of Bethlehem, Pa.,* 998 F.2d 168, 174 (3d Cir.1993) (importantly noting that a determination of whether equal opportunities are available for boys and girls in an athletic program "may turn on whether there are real and significant physical differences between boys and girls in high school").

Additionally, this interpretation of Title IX is consistent with the application of similar language in Title VII, as explained in the Court's review of the applicable cases above. *See Dawn L. v. Greater Johnstown Sch. Dist.,* 586 F.Supp.2d 332, 381 (W.D.Pa.2008) ("Title IX freely borrows the jurisprudence of Title VII."); *Murray v. New York Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995) ("[I]n a Title IX suit for gender discrimination ... an educational institution may be held liable under standards similar to those applied in cases under Title VII."). *See, e.g., Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1087 (7th Cir.1984) (holding that the term "sex" as it is used in Title VII refers to nothing more than "biological male or biological female").

Finally, the Court finds particularly compelling that the regulations implementing Title IX explicitly permit educational institutions subject to Title IX to provide separate toilet, locker room, and shower facilities on the basis of sex:

> **\*15** A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33. The regulations implementing Title IX also provide that nothing in the regulations "shall prevent a recipient from considering an employee's sex in relation to employment in a locker room or toilet facility used only by members of one sex." 34 C.F.R. § 106.61. Indeed, the statute itself allows for sex-segregated living spaces:

> Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

20 U.S.C. § 1686. Thus, Title IX and its implementing regulations clearly permit schools to provide students with certain sex-segregated spaces, including bathroom and locker room facilities, to perform certain private activities and bodily functions consistent with an individual's birth sex.

The Court finds the conclusion of the Third Circuit in *Vorchheimer*—a case involving both an Equal Protection Claim challenge and a Title IX challenge to sex-segregated schools—pertinent here, as modified to the facts and issues of this case:

> The gravamen of plaintiff's case is [his] desire to [use] a specific [restroom or locker room] based on its particular appeal to [him]. [He] believes that the choice should not be denied [him] because of an educational policy with which [he] does not agree.

> We are not unsympathetic with [his] desire to have an expanded freedom of choice, but its cost should not be overlooked. If [he] were to prevail, then all [sex-segregated restrooms and locker rooms] would have to be abolished. The absence of [sex-segregated spaces] would stifle the ability of the [University] to continue with a respected educational methodology. It follows too that those students and parents who prefer an education [with sex segregated restrooms and locker rooms] would be denied their freedom of choice....

> It is not for us to pass upon the wisdom of segregating boys and girls in [their use of restrooms and locker rooms]. We are concerned not with the desirability of the practice but only its constitutionality. Once that threshold has been passed, it is the [University's] responsibility to determine the best methods of accomplishing its mission.

*Vorchheimer v. Sch. Dist. of Philadelphia,* 532 F.2d 880, 888 (3d Cir.1976). In the case sub judice, the University's policy of separating bathrooms and locker rooms on the basis of birth sex is permissible under Title IX and the United States Constitution.

### 2. Sex Stereotyping Claim

Regarding Plaintiff's sex stereotyping claim, Defendants argue that Plaintiff's claims must be evaluated under the framework of the Third Circuit's precedents in *Bibby v. Coca Cola Bottling Co.,* 260 F.3d 257 (3d Cir.2001) and *Prowel v. Wise Business Forms, Inc.,* 579 F.3d 285 (3d Cir.2009). [20] In *Bibby,* the Court considered whether the plaintiff had presented evidence sufficient to support a claim of same-sex sexual harassment under Title VII. *Bibby,* 260 F.3d at 261. In evaluating the plaintiff's claim for discrimination, the Third Circuit first noted that Title VII does not prohibit discrimination based on sexual orientation, but provides relief "only for discrimination because of sex." *Id.* at 261 (noting that "Congress has repeatedly rejected legislation that would have extended Title VII to cover sexual orientation"). Thus, the court noted, in order to allege a claim for relief under Title VII for same-sex harassment, the plaintiff must allege facts showing that the harassment was because of sex. The court held that, while harassment on the basis of sexual orientation has no place in our society, "Congress has not yet seen fit ... to provide protection against such harassment." *Id.* at 265 (concluding that plaintiff's claims for same-sex harassment failed to state a cognizable claim for discrimination on the basis of sex under Title VII).

**\*16** The court identified a variety of situations where same-sex harassment could be considered discrimination "because of sex," including where the harasser sexually desires the victim, where there is no sexual attraction but where the harasser displays hostility to the presence of a particular sex in the workplace, and where the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender. *Id.* at 262. This third situation—where a harasser is acting to punish the victim's noncompliance with gender stereotypes—is based on the Supreme Court's decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

In *Price Waterhouse,* the Supreme Court held that a woman who was denied a promotion because she failed to conform to gender stereotypes had a cognizable claim for discrimination under Title VII because she was discriminated against "because of sex." The Court explained that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" *Price Waterhouse,* 490 U.S. at 251, 109 S.Ct. 1775 (citations omitted). The Court explained that it was impermissible for the plaintiff's employer to condition her promotion on such stereotypical factors as the plaintiff's ability to "walk more femininely, talk more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 268, 109 S.Ct. 1775.

[18] Likewise, in *Prowel v. Wise Business Forms, Inc.,* the Third Circuit considered whether a plaintiff had provided sufficient facts for his claim of gender stereotyping under Title VII. Relying on *Bibby,* the Court again noted that, to bring a claim for discrimination under Title VII, the plaintiff must demonstrate that the discrimination was because of sex and that sexual orientation claims, absent a showing that the harassment was because of sex, are not cognizable under Title VII. *Prowel,* 579 F.3d at 289. But, as explained in *Bibby,* a plaintiff may prevail on a discrimination claim on the basis of sex under a gender stereotyping theory as established in *Price Waterhouse.* To allege a gender stereotyping claim, a plaintiff must show that his harasser was acting to punish his noncompliance with gender stereotypes. *Prowel,* 579 F.3d at 290 (finding evidence of gender stereotyping harassment where plaintiff was harassed because he did not conform to his employer's vision of "how a man should look, speak, and act," rather than harassment based solely on his sexual orientation).

The Court will evaluate the facts alleged by Plaintiff in his complaint under the *Bibby* and *Prowel* cases of this Circuit. [21] Defendants contend that Plaintiff has failed to allege sufficient facts to establish a sex stereotyping claim. The Court agrees. As explained in *Bibby* and *Prowel,* to state a cognizable claim for discrimination under a sex stereotyping claim, a plaintiff must allege that he did not conform to his harasser's vision of how a man should look, speak, and act. *Prowel,* 579 F.3d at 292. Sex stereotyping claims are based on behaviors, mannerisms, and appearances. *See, e.g., Glenn v. Brumby,* 663 F.3d 1312, 1318–19 (11th Cir.2011) (reviewing cases and finding gender stereotypes to include "wearing jewelry that was considered too effeminate, carrying a serving tray too gracefully, or taking too active a role in child-rearing"); *Smith v. City of Salem, Ohio,* 378 F.3d 566, 572 (6th Cir.2004) (explaining that plaintiff's "complaint sets forth the conduct and mannerisms ... [that] did not conform with his employers' and co-workers' sex stereotypes of how a man should look and behave," including plaintiff's mannerisms, appearance, conduct, and behaviors); *Mitchell v.*

*Axcan Scandipharm, Inc.,* No. 05–cv–243, 2006 WL 456173, at *2 (W.D.Pa. Feb. 17, 2006) (finding that plaintiff had alleged facts showing that his failure to conform to sex stereotypes of how a man should look and behave—in other words, his non-conforming behavior and appearance—were the catalyst behind defendant's discriminatory actions).

**\*17**  **[19]**  Here, Plaintiff has not alleged that Defendants discriminated against him because of the way he looked, acted, or spoke. Instead, Plaintiff alleges only that the University refused to permit him to use the bathrooms and locker rooms consistent with his gender identity rather than his birth sex. Such an allegation is insufficient to state a claim for discrimination under a sex stereotyping theory. *See, e.g., Eure v. Sage Corp.,* –––F.Supp.3d ––––, ––––, No. 5:12–cv–1119–DAE, 2014 WL 6611997, at *6 (W.D.Tex. Nov. 19, 2014) ("courts have been reluctant to extend the sex stereotyping theory to cover circumstances where the plaintiff is discriminated against because the plaintiff's status as a transgender man or woman, without any additional evidence related to gender stereotype non-conformity"); *Etsitty v. Utah Transit Auth.,* 502 F.3d 1215, 1224 (10th Cir.2007) (*Price Waterhouse* does not require "employers to allow biological males to use women's restrooms. Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes."); *Johnson v. Fresh Mark, Inc.,* 337 F.Supp.2d 996, 1000 (N.D.Ohio 2003) *aff'd,* 98 Fed.Appx. 461 (6th Cir.2004) (finding no discrimination where employer did not require plaintiff to conform her appearance to a particular gender stereotype, but instead only required plaintiff to conform to the accepted principles established for gender-distinct public restrooms).

Indeed, Plaintiff alleges that the University permitted him to live in conformance with his male gender identity in all material respects, with the one exception of the University's policy regarding bathroom and locker room usage. Plaintiff alleges that he presented as a male, and he does not allege that he was ever harassed or discriminated against by the University because he dressed, spoke, or behaved like a man, or because he did not dress, act, or speak like a woman. Likewise, Plaintiff avers that he was permitted to enroll in a men's weight training course; the University accepted his name change to a traditional male name and updated his student records to reflect the name change; and the University treated him in conformity with his male gender identity in all other respects. Plaintiff simply has not alleged that Defendants discriminated against him because he did not behave, walk, talk, or dress in a manner inconsistent with any preconceived notions of gender stereotypes. *See Price Waterhouse,* 490 U.S. at 235, 109 S.Ct. 1775; *Prowel,* 579 F.3d at 290.

Instead, the University simply classified him based on his birth sex and prohibited him from entering sex-segregated spaces based on that classification, for the sole purpose of enforcing its policy of sex-segregated bathrooms and locker rooms. Plaintiff argues that Defendants treated him differently from other males because he was transgender. This contention is simply inconsistent with his other allegations that the University permitted him, without harassment or discrimination, to dress like a man, act like a man, change his name to reflect his male gender, and enroll in classes designated for males. Plaintiff's sole contention of discrimination is that UPJ forbade him from using University bathrooms and locker rooms consistent with his male gender identity rather than his female birth sex. This allegation simply does not constitute a claim for sex stereotyping.

**\*18** Furthermore, courts that have considered similar claims have consistently concluded that requiring individuals to use bathrooms consistent with their birth or biological sex rather than their gender identity is not discriminatory conduct in violation of federal and state constitutions and statutes. *See, e.g., Johnson v. Fresh Mark, Inc.,* 337 F.Supp.2d 996, 1000 (N.D.Ohio 2003) *aff'd,* 98 Fed.Appx. 461 (6th Cir.2004) (explaining that employer did not transgress Title VII because it "did not require Plaintiff to conform her appearance to a particular gender stereotype, instead, the company only required Plaintiff to conform to the accepted principles established for gender-distinct public restrooms"); *Hispanic Aids Forum v. Bruno,* 16 A.D.3d 294, 792 N.Y.S.2d 43 (2005) (holding complaint failed to allege a claim for relief under New York Human Rights Laws because plaintiff did not allege that transgender individuals were selectively excluded from bathrooms, but that they were excluded from certain bathrooms on the same basis as all biological males and females—biological sexual assignment, which is not impermissible discrimination); *Goins v. West Group,* 635 N.W.2d 717 (Minn.2001) (holding defendant's designation of restroom use, applied uniformly, on the basis of biological gender rather than gender identity was not discrimination under the Minnesota Human Rights Act). Similarly, courts have concluded that sex-segregated bathrooms are not impermissible sex discrimination. *See, e.g., Causey v. Ford Motor Co.,* 516 F.2d 416 (5th Cir.1975). Likewise, at least one court has reasoned that prohibiting a transgender student from using a restroom consistent with his or her gender does not

constitute discrimination under Title IX, because "it would be a stretch to conclude that a 'restroom,' in and of itself, is educational in nature and thus an education program" as required to state a prima facie case under the statute. *See Doe v. Clark Cnty. Sch. Dist.,* No. 206–cv–1074–JCM–RJJ, 2008 WL 4372872, at *3 (D.Nev. Sept. 17, 2008).

For these reasons, the Court finds that Plaintiff has failed to state a plausible claim for relief under Title IX, and will therefore dismiss Count II of Plaintiff's second amended complaint.

## C. Retaliation Claims

[20] [21] [22] [23] [24] [25] [26] [27] Plaintiff's retaliation claims under the Equal Protection Clause and Title IX fare no better than the discrimination claims. In a Title IX discrimination case, a plaintiff may assert a private right of action "where the funding recipient retaliates against an individual because he has complained about sex discrimination." *Dawn L. v. Greater Johnstown Sch. Dist.,* 586 F.Supp.2d 332, 373 (W.D.Pa.2008) (quoting *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 171, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)). To state a claim for retaliation, a plaintiff must allege that (1) he engaged in a protected activity; (2) the funding recipient subjected him to an adverse action after or contemporaneously with the protected activity; and (3) a causal link existed between the protected activity and the adverse action. *Greater Johnstown Sch. Dist.,* 586 F.Supp.2d at 374–75 (citing *Weston v. Pennsylvania,* 251 F.3d 420, 430 (3d Cir.2001)). Protected activities include complaints of sexual discrimination to the courts, government agencies, or the funding recipient. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The adverse action in the second element of the prima facie case must be "materially adverse" such that it "might well have dissuaded a reasonable [person in the plaintiff's position] from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68–70, 126 S.Ct. 2405. "[P]etty slights or minor annoyances" are not material. *Id.* at 68, 126 S.Ct. 2405. Regarding the third prong of the prima facie case of retaliation, a plaintiff must allege that the adverse action was motivated by "retaliatory animus," *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281, 284 (3d Cir.2000), and that this animus had a "determinative effect" on the complained-of decision. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 935 (3d Cir.1997). Further, "[t]o establish the requisite causal connection, Plaintiff must allege facts to demonstrate either: '(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.' " *Frazer v. Temple Univ.,* 25 F.Supp.3d 598, 615 (E.D.Pa.2014) (quoting *Cooper v. Menges,* 541 Fed.Appx. 228, 232 (3d Cir.2013)). Likewise, a plaintiff must allege "facts showing 'actual antagonistic conduct or animus' in 'the intervening period,' between the protected activity and the retaliation." *Frazer,* 25 F.Supp.3d at 616.

**\*19** Plaintiff has failed to allege sufficient facts to plausibly establish a claim for retaliation. In his complaint, Plaintiff simply alleges that "following his expulsion," he was "investigated by the FBI for potential involvement in a series of bomb threats against the University" and that "the University gave Mr. Johnston's name to the FBI in retaliation for exercising his right to complain about the University's discriminatory conduct." (ECF No. 7 ¶¶ 83–84). Plaintiff's complaint fails to allege sufficiently that the adverse action was motivated by retaliatory animus or that any animus had a determinative effect on the complained-of decision. As such, Plaintiff's claims for retaliation under both the Equal Protection Clause of the Fourteenth Amendment and Title IX will be dismissed.

## D. State Law Claims

In addition to his federal law claims for discrimination, Plaintiff has asserted three state law claims in his second amended complaint. Count Three asserts a claim for discrimination and retaliation under the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat. § 955. Count Four asserts a claim for discrimination and retaliation under the Pennsylvania Fair Educational Opportunities Act, 24 Pa. Cons.Stat. § 5001 *et seq.* Count Five asserts a common law breach of contract claim related to Plaintiff's REB Commuter Scholarship and UPJ's non-discrimination policy.

Because the Court grants Defendants' motion to dismiss Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and will dismiss those claims without prejudice. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *King v. County of Gloucester,* 302 Fed.Appx. 92, 99 (3d Cir.2008); *Bartow*

*v. Thomas,* No. 3:13–cv–271, 2014 WL 2993786, at *6 (W.D.Pa. July 2, 2014).

**VI. Conclusion**

Plaintiff has failed to state a plausible claim for relief for discrimination or retaliation under either the Equal Protection Clause or Title IX.[22] Accordingly, for the reasons stated above, the Court will grant Defendants' motion to dismiss Plaintiff's second amended complaint. Because Plaintiff has failed to cure the deficiencies of his complaint despite having multiple opportunities, these claims are dismissed with prejudice, and no further amendment will be permitted because it would be futile.

An appropriate order follows.

*ORDER*

**AND NOW,** this 31st day of March 2015, upon consideration of Defendants' motion to dismiss (ECF No. 9), and for the reasons set forth in the accompanying memorandum,

**\*20 IT IS HEREBY ORDERED** that Defendants' motion to dismiss is **GRANTED,** with prejudice. The Clerk of Court shall mark this case closed.

**All Citations**

--- F.Supp.3d ----, 2015 WL 1497753

Footnotes

1     As will be explained below, Plaintiff was born a female but identifies as a transgender male.

2     Because the Court dismisses both of Plaintiff's federal question claims, the Court will decline to exercise jurisdiction over Plaintiff's state law claims and thus will not discuss those claims in this memorandum opinion.

3     Plaintiff avers, "Gender identity is a person's deeply rooted understanding of oneself as male or female. Gender identity is typically established at a very early age and cannot be changed." (ECF No. 7 ¶ 19).

4     "Gender identity disorder is most simply described as an individual's confusion or discomfort about his or her sexual status as a biological male or female." *Farmer v. Hawk–Sawyer,* 69 F.Supp.2d 120, 122 (D.D.C.1999) (discussing clinical definition and diagnosis criteria for GID). In the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM–5) (2013), which was released in May 2013, the American Psychiatric Association replaced the diagnostic name "gender identity disorder" with "gender dysphoria," defining gender dysphoria as a diagnosis for "people whose gender at birth is contrary to the one they identify with." *See* Gender Dysphoria Fact Sheet, American Psychiatric Association, available at http://www.dsm5.org/Documents/Gender% 20Dysphoria% 20Fact% 20Sheet.pdf.

5     As Plaintiff explains in his second amended complaint, "Testosterone causes development of male secondary sex characteristics, including increased muscle mass, deepening of the voice, and facial and body hair growth." (ECF No. 7 ¶ 26).

6     Plaintiff alleges that he "submitted the first of multiple unsuccessful inquiries to ... amend the gender marker on his school records." (ECF No. 7 ¶ 39). It is unclear from the complaint whether UPJ ever changed the gender marker to male in his school records. However, because Plaintiff alleges that his "inquiry" was "unsuccessful," it appears that UPJ did not change the gender marker in his school records.

7     Plaintiff's original complaint (ECF No. 1–1) alleged four counts: discrimination and retaliation under Title IX; discrimination under the Pennsylvania Human Relations Act; discrimination under Pennsylvania Fair Educational Opportunities Act; and common law breach of contract. Magistrate Judge Pesto's report and recommendation addressed only Plaintiff's Title IX claim.

8     In addition to the other claims alleged in the original complaint, the second amended complaint includes an Equal Protection claim under the Fourteenth Amendment.

9     In his second amended complaint, Plaintiff begins to renumber the allegations in his second claim for relief. The Court will attempt to clearly distinguish the paragraphs of the complaint that are redundantly numbered by referring to both the page number and the paragraph number of the relevant allegation in the complaint.

10     Because Plaintiff has failed to allege a plausible federal claim for relief under either the Equal Protection Clause or Title IX, the Court will decline jurisdiction over Plaintiff's state law claims and will not evaluate those claims.

11     Plaintiff argues that *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir.2011) and *Smith v. City of Salem,* 378 F.3d 566 (6th Cir.2004) recognize that discrimination based on gender nonconformity is prohibited sex discrimination under the Equal Protection Clause and is therefore subject to heightened scrutiny. (*See* ECF No. 19 at 27). However, these cases

address gender stereotyping claims under the Supreme Court's *Price Waterhouse* decision. As explained in *Glenn*, "discriminating against someone on the basis of his or her non-conformity constitutes sex-based discrimination under the Equal Protection Clause." *Glenn,* 663 F.3d at 1316. These cases do not treat transgender status, in and of itself, as a suspect classification. Here, as is explained in more detail below under the Court's analysis of Plaintiff's Title IX claim, Plaintiff has failed to allege a gender stereotyping claim under *Price Waterhouse.* Further, as the cases cited above explain, Plaintiff cannot assert a transgender status claim under the Fourteenth Amendment's Equal Protection Clause.

Additionally, Plaintiff relies heavily on recent Title VII employment discrimination cases involving transgender plaintiffs. However, strict reliance on Title VII employment discrimination cases is unwarranted in this case for a number of reasons. *See Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 175, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (explaining that, because Title VII is a vastly different statute from Title IX, certain comparisons between the two are of limited use). First, the context of this case is necessarily different. Plaintiff's claims arise on the basis of a university's alleged discriminatory policy in enforcing sex-segregated spaces on its campus, whereas many of the Title VII cases cited by the parties arise in the context of an employer imposing adverse employment decisions in the workplace. Likewise, this case is distinguishable from many of the cited Title VII cases on the facts alleged. Here, the facts in the complaint present a narrow issue: whether a university receiving federal funds unlawfully discriminates when it enforces the use of sex-segregated bathroom and locker room facilities based solely on a student's birth sex.

12  A Seventh Circuit case, considering claims by a female plaintiff of sexual harassment under Title VII because her employer failed to provide separate restroom facilities for her, provides an interesting contrast to the present case. *DeClue v. Cent. Illinois Light Co.,* 223 F.3d 434, 436 (7th Cir.2000). While not on point with the issues in this case, the opinion is important for its discussion of the "sensitivities" of providing private restroom facilities for women. *Id.* at 436. In a colorful dissent, Judge Rovner briefly discusses the history of providing women with separate bathroom facilities, and clearly explains the rational underpinning separate restroom facilities for men and women. *See id.* at 437–40.

13  In *Michael M. v. Superior Court of Sonoma Cnty.,* Justice Rehnquist opined, "the Court has had some difficulty in agreeing upon the proper approach and analysis in cases involving challenges to gender-based classifications." 450 U.S. 464, 468, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981). He went on to explain that, underlying the Court's decisions in gender discrimination cases, "is the principle that a legislature may not make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class. But because the Equal Protection Clause does not demand that a statute necessarily apply equally to all persons or require things which are different in fact ... to be treated in law as though they were the same, this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances. As the Court has stated, a legislature may 'provide for the special problems of women.' " 450 U.S. 464, 469, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (citations and quotations omitted).

14  The Court recognizes that other courts have declined to follow the definition articulated in *Ulane. See, e.g., Smith v. City of Salem, Ohio,* 378 F.3d 566, 573 (6th Cir.2004) (collecting cases). However, because neither the Supreme Court nor the Third Circuit has addressed the precise issue, this Court will follow the definition embraced by *Ulane* and its progeny.

15  This case, like other cases involving alleged discrimination against transgender individuals, raises important, but difficult, questions of what is sex and what is gender, what are the differences between sex and gender, and to what extent are sex and gender synonymous or interchangeable for purposes of federal statutes, such as Title IX. Black's Law Dictionary defines "sex" as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; gender." Black's Law Dictionary, SEX (10th ed.2014). Black's also uses the terms "sex discrimination" and "gender discrimination" interchangeably, defining "sex discrimination" as "[d]iscrimination based on gender," but also noting: "The terminology is gradually shifting. Increasingly in medicine and sociology, *gender* is distinguished from *sex. Gender* refers to the psychological and societal aspects of being male or female; *sex* refers specifically to the physical aspects." Black's Law Dictionary, DISCRIMINATION (10th ed.2014). Nevertheless, the 9th Circuit Court of Appeals has opined, "under *Price Waterhouse,* 'sex' under Title VII encompasses both sex—that is, the biological differences between men and women—*and* gender" and that, for Title VII purposes, "the terms 'sex' and 'gender' have become interchangeable." *Schwenk v. Hartford,* 204 F.3d 1187, 1202 (9th Cir.2000).

The difficulty of linking sex and gender becomes remarkably apparent in a case, such as this one, where an individual's assigned birth sex is different from that individual's gender identity. *See Sommers v. Budget Mktg., Inc.,* 667 F.2d 748, 749, n. 2 (8th Cir.1982) (explaining, "[a] transsexual has been described as an individual who is mentally of one sex but physically of the other, or as one born with the anatomical genitalia of one sex but whose self-identity is of the other sex") (citations omitted). Under such circumstances, the individual is often "diagnosed with a medical condition known as gender identity disorder ("GID"), which arises from a profound divergence between an individual's assigned

birth sex and the person's inner gender identity." *Stacy v. LSI Corp.,* 544 Fed.Appx. 93, 94–95 (3d Cir.2013). Indeed, this gives rise to the generally accepted definition for "transgender" as a person who "has a gender identity (i.e., one's internal sense of gender) that is different from the individual's assigned sex at birth (i.e., the gender designation listed on one's original birth certificate)." *Kimberley Tooley v. Van Buren Public Schools,* No. 2:14–cv–12466, ECF No. 60 at 7 (E.D.Mich. Feb. 20, 2015).

This Court will not attempt to sort out this perplexing difference in definitions. However, the Court notes that, regardless of the interplay between the two concepts, there is a distinction between birth sex and gender identity. For the purposes of this opinion, the Court will refer to "birth sex" as an individual's biological sex in the binary sense—either male or female—that is assigned at birth, as reflected on that individual's birth certificate, and typically assigned on the basis of an individual's genitalia. But, the Court recognizes the importance of numerous other considerations in defining a person's sex such as sex chromosomes, internal reproductive organs, hormone concentrations, and other relevant indicators. Indeed, one district court has evaluated three factors, "[b]ased on the standards of commonly accepted medical science," to determine an individual's biological sex: "(1) phenotypic characteristics; (2) endogenous hormonal characteristics; and (3) chromosomal characteristics." *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.,* No. 02–cv–1531–PHX–SRB, 2006 WL 2460636, at *5 (D.Ariz. Aug. 22, 2006) *aff'd,* 325 Fed.Appx. 492 (9th Cir.2009).

16    One case comes close. In *Kastl v. Maricopa County Community College,* the United States District Court for the District of Arizona evaluated a transgender female's claims of discrimination under Title VII and Title IX and concluded, on a motion for summary judgment by the defendant, that the plaintiff had failed to "meet her burden of establishing a prima facie case of discrimination because she has provided no evidence that she was a biological female and member of a protected class while she was employed by Defendant." *Kastl v. Maricopa Cnty. Cmty. Coll. Dist.,* No. 02–cv–1531–PHX–SRB, 2006 WL 2460636, at *6 (D.Ariz. Aug. 22, 2006) *aff'd,* 325 Fed.Appx. 492 (9th Cir.2009). Importantly, however, while the court found that plaintiff had failed to meet her burden of demonstrating that she belonged to a protected class under either statute, the court did not explicitly hold that transgender individuals are not a protected class under Title IX.

17    In *Smith v. City of Salem, Ohio,* 378 F.3d 566, 568 (6th Cir.2004), the Sixth Circuit presented a unique, though confusing, alternative. The court explained that the plaintiff was "biologically and by birth a male," but that he was also "a transsexual and [had] been diagnosed with Gender Identity Disorder." *Id.* at 568. Thus, in evaluating Smith's claim for discrimination, the court concluded that "Smith is a member of a protected class. His complaint asserts that he is a male with Gender Identity Disorder, and Title VII's prohibition of discrimination 'because of ... sex' protects men as well as women." *Id.* at 570. Ultimately, however, the court rested its decision on the basis that the plaintiff had alleged a claim for discrimination under the *Price Waterhouse* sex stereotyping theory, and concluded that "a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity." *Id.* at 572, 575. Therefore, the court did not conclude that "transgender" is a protected class under Title VII, but only that a male or female who is also transgender can assert a sex stereotyping claim under Title VII for adverse employment actions that result from the individual's conformity to their gender identity rather than their biological or birth sex. Indeed, the same year that the 6th Circuit issued its opinion in *Smith,* it affirmed, in an unpublished opinion, a district court decision holding that "Title VII does not prohibit discrimination based on an individual's status as a transsexual," in an employment discrimination case involving a transgender women's use of a men's restroom. *Johnson v. Fresh Mark, Inc.,* 98 Fed.Appx. 461, 462 (6th Cir.2004).

18    Plaintiff argues that the Court should give little weight to "whatever 'original intent' may be inferred" from the statutory language or legislative history of Title IX. (ECF No. 19 at 25). Plaintiff asserts that, in determining the meaning of Title IX, any "resort to 'plain language' and legislative intent is unavailing." (ECF No. 19 at 11). The Court disagrees. It is true, antidiscrimination statutes are to be liberally construed. *See, Rabzak v. Berks Cnty.,* 815 F.2d 17, 20 (3d Cir.1987) ("an anti-discrimination statute ... should be liberally interpreted to effectuate the congressional purpose of ending discrimination"). Nevertheless, it is well-settled that "every exercise of statutory interpretation begins with an examination of the plain language of the statute.... When the statute's language is plain, the sole function of the courts ... is to enforce it according to its terms." *Murphy v. Millennium Radio Grp. LLC,* 650 F.3d 295, 302 (3d Cir.2011) (quoting *Alston v. Countrywide Fin. Corp.,* 585 F.3d 753, 759 (3d Cir.2009)).

19    The issue of deconstructing sex-segregated bathrooms is a policy matter that is better suited for Congressional consideration and deliberation. This approach has been successful in fighting discrimination in other contexts, including the development of statutory provisions to meet the needs of persons with disabilities under the Americans with Disabilities Act. *See* Jill D. Weinberg, *Transgender Bathroom Usage: A Privileging of Biology and Physical Difference in the Law,* 18 Buff. J. Gender, L. & Soc. Pol'y 147, 153 (2010) ("The most obvious panacea is to create statutory authority in which

| | |
|---|---|
| | emphases of accommodation and equality are moved to the forefront of lawmaking. This framework has been employed in the context of disability antidiscrimination protections."). |
| 20 | While these cases involve sex stereotyping claims under Title VII, courts have also applied the sex stereotyping analysis to Title IX cases. *See, e.g., Rumble v. Fairview Health Servs.,* No. 14–cv–2037 SRN/FLN, 2015 WL 1197415, at *7 (D.Minn. Mar. 16, 2015) ("When analyzing Title IX, courts have interpreted the term 'sex' to include 'individuals who are perceived as not conforming to gender stereotypes and expectations.' "). |
| 21 | Plaintiff cites numerous cases discussing the meaning of "sex" under the framework of Title VII claims and asserts that "on the basis of sex" should be understood to "encompass discrimination based on gender nonconformity and transgender status." (ECF No. 19 at 20) (citing *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir.2011); *Smith v. City of Salem,* 378 F.3d 566 (6th Cir.2004); *Schwenk v. Hartford,* 204 F.3d 1187 (9th Cir.2000); *Schroer v. Billington,* 577 F.Supp.2d 293 (D.D.C.2008); *Mitchell v. Axcan Scandipharm, Inc.,* No. 05–cv–243, 2006 WL 456173 (W.D.Pa. Feb. 17, 2006)). The cases cited by Plaintiff evaluate Title VII transgender discrimination claims under the rubric of the *Price Waterhouse* gender stereotyping analysis. While these cases provide instructive analysis for transgender discrimination claims under a gender stereotyping theory, the Court will apply the Third Circuit analysis developed in *Bibby* and *Prowel,* and finds Plaintiff's cited cases distinguishable from the instant case on their facts. |
| 22 | The Court recognizes the changing perceptions in society concerning transgender individuals. "However, the function of this Court is ... to construe the law in accordance with proper statutory construction and judicial precedent. The Court is constrained by the framework of the remedial statute enacted by Congress ..." *Oiler v. Winn–Dixie Louisiana, Inc.,* No. 00–cv–3114, 2002 WL 31098541, at *6 (E.D.La. Sept. 16, 2002). |

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.