IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| G.G., by his next friend and mother, DEIRDRE GRIMM, ) ) ) | |
| Plaintiffs, ) | |
| ) | Civil No. 4:15-cv-00054-RGD-TEM |
| v. ) | |
| ) | |
| GLOUCESTER COUNTY SCHOOL BOARD, ) ) | |
| ) | |
| Defendant. ) | |

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

   I.   The Standard for "Mandatory" Injunctions Does Not Apply to G.G.'s Motion...........2

   II.  Providing Sex-Segregated Restrooms Is Not the Same Thing as Providing Restrooms Based on "Biological" Sex...........................................................................................3

   III. Plaintiff Is Likely to Prevail on the Merits of His Claim That the Transgender Restroom Policy Violates the Fourteenth Amendment. ...................................................5

       A.  The Transgender Restroom Policy Discriminates Based on Sex............................5

       B.  The Transgender Restroom Policy Fails Heightened Scrutiny..............................9

   IV. Plaintiff Is Likely to Prevail on the Merits of His Claim That the Transgender Restroom Policy Violates Title IX...........................................................................................14

       A.  The Transgender Restroom Policy Conflicts with OCR's "Controlling" Interpretation of Title IX's Implementing Regulations. ........................................14

       B.  The Transgender Restroom Policy Conflicts with the Plain Text of Title IX. .......16

   V.  Plaintiff Satisfies the Other Preliminary Injunction Requirements ...........................19

CONCLUSION....................................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cty., Md.*,
  515 F.3d 356 (4th Cir. 2008) ......................................................... 6

*Aggarao v. MOL Ship Mgmt. Co.*,
  675 F.3d 355 (4th Cir. 2012) ......................................................... 2

*Ameur v. Gates*,
  759 F.3d 317 (4th Cir. 2014) ....................................................... 19

*Auer v. Robbins*,
  519 U.S. 452 (1997) ...................................................................... 14

*Back v. Hastings On Hudson Union Free Sch. Dist.*,
  365 F.3d 107 (2d Cir. 2004) ......................................................... 11

*Barnes v. City of Cincinnati*,
  401 F.3d 729 (6th Cir. 2005) ......................................................... 7

*Califano v. Goldfarb*,
  430 U.S. 199 (1977) ........................................................................ 9

*Califano v. Westcott*,
  443 U.S. 76 (1979) .......................................................................... 9

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ...................................................................... 14

*City of L.A. v. Patel*,
  No. 13-1175, 2015 WL 2473445 (U.S. June 22, 2015) ............... 10

*Craig v. Boren*,
  429 U.S. 190 (1976) ........................................................................ 9

*D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*,
  706 F.3d 256 (4th Cir. 2013) ................................................... 14, 15

*Decker v. Nw. Envtl. Def. Ctr.*,
  133 S. Ct. 1326 (2013) .................................................................. 16

*Doe v. Reg'l Sch. Unit 26*,
  86 A.3d 600 (Me. 2014) ................................................................ 13

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
  135 S. Ct. 2028 (2015) .................................................................. 17

*Faulkner v. Jones*,
  51 F.3d 440 (4th Cir. 1995) ................................................................................ 6

*Finkle v. Howard Cty., Md.*,
  12 F. Supp. 3d 780 (D. Md. 2014) ...................................................................... 8

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ...................................................................... 7, 16

*In Re Lovo-Lara*,
  23 I. & N. Dec. 746 (BIA 2005) ......................................................................... 3

*Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*,
  No. 13-213, 2015 WL 1497753 (W.D. Pa. Mar. 31, 2015) ....................... 1, 3, 7, 16

*Kastl v. Maricopa Cty. Cmty. Coll. Dist.*,
  No. CIV.02-1531, 2004 WL 2008954 (D. Ariz. June 3, 2004) .............................. 8

*Lewis v. High Point Reg'l Health Sys.*,
  No. 5:13-CV-838, 2015 WL 221615 (E.D.N.C. Jan. 15, 2015) .............................. 6

*Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*,
  542 F. Supp. 2d 653 (S.D. Tex. 2008) ................................................................ 18

*Mercer v. Duke Univ.*,
  190 F.3d 643 (4th Cir. 1999) ............................................................................ 14

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ........................................................................................... 17

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) .................................................................................. 5, 9, 19

*Nev. Dep't of Human Res. v. Hibbs*,
  538 U.S. 721 (2003) ........................................................................................ 7, 9

*Norsworthy v. Beard*,
  No. 14-CV-00695, 2015 WL 1478264 (N.D. Cal. Mar. 31, 2015) ......................... 6

*Obergefell v. Hodges*,
  No. 14-556, 2015 WL 2473451 (U.S. June 26, 2015) ......................................... 19

*Oncale v. Sunflower Offshore Servs., Inc.*,
  523 U.S. 75 (1988) .................................................................................... 17, 18

*Pauley v. BethEnergy Mines, Inc.*,
  501 U.S. 680 (1991) ........................................................................................ 16

iii

*Pension Ben. Guar. Corp. v. LTV Corp.*,
      496 U.S. 633 (1990) ............................................................................ 18

*Price Waterhouse v. Hopkins*,
      490 U.S. 228 (1989) ............................................................................ 16

*Rosa v. Park West Bank & Trust Co.*,
      214 F.3d 213 (1st Cir. 2000) .............................................................. 16

*Rumble v. Fairview Health Servs.*,
      No. 14-CV-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ............................................. 8

*Schroer v. Billington (Schroer II)*,
      577 F. Supp. 2d 293 (D.D.C. 2008) .................................................. 8, 17

*Schwenk v. Hartford*,
      204 F.3d 1187 (9th Cir. 2000) ............................................................ 16

*Smith v. City of Salem, Ohio*,
      378 F.3d 566 (6th Cir. 2014) .............................................................. 16

*Sommers v. Budget Mktg., Inc.*,
      667 F.2d 748 (8th Cir. 1982) .......................................................... 16, 18

*Tenneco Inc. v. Pub. Serv. Comm'n of W. Va.*,
      489 F.2d 334 (4th Cir. 1973) .............................................................. 19

*Tuan Anh Nguyen v. INS*,
      533 U.S. 53  (2001) ........................................................................... 5, 9

*Ulane v. E. Airlines, Inc.*,
      742 F.2d 1081 (7th Cir. 1984) ........................................................ 16, 18

*United States v. Craft*,
      535 U.S. 274 (2002) ............................................................................ 19

*United States v. Virginia*,
      518 U.S. 515 (1996) .............................................................. 5, 9, 10, 13

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*,
      836 F.2d 6 (1st Cir. 1987) .................................................................... 2

*Wrightson v. Pizza Hut of Am., Inc.*,
      99 F.3d 138 (4th Cir. 1996) ................................................................ 18

**Statutes**

20 U.S.C. § 1681 ............................................................................ 1, 14, 16

**Regulations**

34 C.F.R. § 106.33 ...................................................................................................... 14

**Administrative Decisions and Guidance**

*Macy v. Holder*,
    EEOC DOC 0120120821, 2012 WL 1435995 (Apr. 20, 2012) ................................................. 8

**Other Authorities**

OCR, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes
    and Extracurricular Activities* (Dec. 1, 2014) ........................................................................ 15

Press Release, Gloucester (Va.) Cty. Sch. Bd., *Gloucester School Board Prepares to Discuss,
    Likely Vote at Dec. 9 Meeting on Restroom/Locker Room Use for Transgender Students*
    (Dec. 3, 2014) ............................................................................................................................. 2

Statement of Interest the United States filed in *Tooley v. Van Buren Public Schools*, No.
    2:14-cv-13466 (E.D. Mich. Feb. 20, 2015) ........................................................................... 15

## INTRODUCTION

The parties agree on many of the legal principles in this case.  Most critically, the Gloucester County School Board (the "School Board") does not dispute that the protections against sex discrimination in the Equal Protection Clause and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* protect all students—including transgender students—from discrimination based on their failure to act according to socially prescribed gender roles.  The School Board instead asks the Court to carve out an exception to this general principle for socially prescribed gender roles related to restrooms.  In essence, the School Board argues that because it is permissible to provide non-stigmatizing "sex-segregated" restrooms as a general matter, it must also be permissible to effectively exclude transgender people from using communal restrooms by limiting access to restrooms based on "biological sex," no matter how much physical and psychological harm the exclusion inflicts on students whose gender identity does not conform to their sex assigned at birth.  In support of its argument, the School Board almost exclusively relies on a recent district court decision, *Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, No. 13-213, 2015 WL 1497753 (W.D. Pa. Mar. 31, 2015), *appeal docketed* No. 15-2022 (3d Cir. Apr. 22, 2015), a decision that is riddled with glaring errors and conflicts with the vast majority of federal court decisions as well as the interpretations of the Department of Education, the Department of Justice, the Department of Labor, the Equal Employment Opportunity Commission, and other agencies that enforce statutory protections against sex discrimination.  *See* United States Statement of Interest 15, ECF No. 28 (hereinafter, "SOI").

The question at the heart of this case is whether a public school can exclude G.G. from the communal restrooms and knowingly place him at extreme risk for immediate and long-term psychological harm based on nothing more than some students' alleged discomfort with simply

being in the same restroom as him.  Under the Equal Protection Clause and Title IX, the answer to that question is "no," and this Court should grant G.G.'s Motion for a Preliminary Injunction.

## I.      The Standard for "Mandatory" Injunctions Does Not Apply to G.G.'s Motion.

The School Board attempts to ratchet up the standard for obtaining a preliminary injunction by mischaracterizing the requested injunction as "mandatory" instead of "prohibitory."  Def.'s Mem. Opp'n. 3-4, ECF No. 30.  A "prohibitory" injunction is one that seeks to preserve the "status quo," defined as the "last uncontested status between the parties which preceded the controversy."  *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (*citing United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (internal quotation marks omitted).  In this case, the "last uncontested status" is the status that existed immediately before the School Board enacted the restroom policy challenged in this lawsuit.

Before it enacted the transgender restroom policy, the School Board had a "practice" of maintaining sex-segregated boys' and girls' restrooms, Andersen Decl. ¶ 3, ECF No. 30-1, but it did not have a policy specifically limiting access to restrooms based on "biological gender" to the exclusion of transgender students.  Indeed, in the press release the School Board issued a few days before adopting the transgender restroom policy, the School Board stated that it "currently does not have guidelines specifically addressing gender identity and the use of restrooms and locker rooms."  Press Release, Gloucester (Va.) Cty. Sch. Bd., *Gloucester School Board Prepares to Discuss, Likely Vote at Dec. 9 Meeting on Restroom/Locker Room Use for Transgender Students* 2 (Dec. 3, 2014).[1]

---

[1]Available at
http://gets.gc.k12.va.us/Portals/Gloucester/District/docs/SB/GlouSBPressRelease120314.pdf
(last visited July 13, 2015).

In the absence of such guidelines, "school administrators made the decision to allow [G.G.] to use the boys' restroom," and he "did so for approximately seven weeks."  Def.'s  Mem. Opp'n. 4 n.2.  By adopting the transgender restroom policy, the School Board overrode the decision of school administrators and changed the status quo by preventing G.G. from using the boys' restrooms he had previously been allowed to use.

## II.     Providing Sex-Segregated Restrooms Is Not the Same Thing as Providing Restrooms Based on "Biological" Sex.

A central theme of the School Board's opposition memorandum is the repeated—and mistaken—assertion that a policy of providing "sex-segregated restrooms" is the same as the School Board's new policy of limiting access to restrooms based on "biological gender"[2] to the exclusion of transgender students.  Def.'s Mem. Opp'n. 5, 11-15.  There is in fact no "'long-held tradition of performing [restroom] functions in sex-segregated spaces based on biological or birth sex.'"  *Id.* at 11 (quoting *Johnston*, 2015 WL 1497753, at *7).  Until relatively recently, the assumption has been that separate restrooms corresponded both to a person's external anatomy *and* gender identity, which in most restroom interactions will be a far more salient feature than the person's genitals.  And for the vast majority of people, that assumption remains true.  For G.G. and other transgender people, however, it is impossible to provide a sex-segregated

---

[2] Despite its protestations to the contrary, the School Board has still not explained what "biological gender" means.  At times, the School Board appears to refer to external anatomy, Def.'s Mem. Opp'n. 1, 12, and at the other times refers to chromosomes, *id.* at 1, 10 n.7.  The School Board attempts to explain the term by pointing to an informal online resource from the American Psychological Association that uses the term "biological sex."  *Id.* at 10 n.7.  But the School Board policy does not say "biological sex"; it says "biological gender."  *See* Pl.'s Mem. Supp. PI 9-10.  Moreover, the APA document explains that "[t]here are a number of indicators of biological sex, ***including*** sex chromosomes, gonads, internal reproductive organs, and external genitalia." Def.'s Mem. Opp'n. Ex. C, ECF No. 30-3 (emphasis added).  In addition to those four indicators, the other four components from a medical perspective are hormones, secondary sex features, assigned sex at birth, and gender identity.  *See In Re Lovo-Lara*, 23 I. & N. Dec. 746, 752 (BIA 2005).

3

restroom that corresponds to both his gender identity and his sex assigned at birth.  Confronted

with that reality, the School Board had to choose between (a) allowing G.G. to use the boys'

restroom in accordance with his gender identity or (b) excluding him from the boys' room and

relegating him to the girls' restroom or single-stall facilities.  According to unrebutted expert

opinion, the latter option conflicts with G.G.'s medically necessary treatment for severe Gender

Dysphoria and places him at extreme risk for immediate and long-term psychological harm.  *See*

Ettner Decl. ¶¶ 19-21, 28-29, ECF No. 10.

Most non-transgender boys would feel humiliated if they were forced to use either the

girls' restroom or a separate restroom from the rest of their peers.  G.G. feels that way too.  The

undisputed facts are that G.G. has the gender identity of a boy and has been living in accordance

with his male gender identity in all aspects of his life, including with respect to using the

restrooms in public places.  G.G. Decl. ¶¶ 11-13, ECF No. 9.  It is undisputed that G.G. used the

boys' restroom at Gloucester High School for seven weeks without incident.  *Id.* ¶ 20.  And it is

undisputed that when G.G. has used the girls' restroom in the past, girls and women who

encountered G.G. in female restrooms reacted negatively because they perceived G.G. to be a

boy.  *Id.* ¶ 25.  Moreover, as noted in G.G.'s supplemental declaration, the Virginia Department

of Motor Vehicles has recently approved his use of a male gender marker on his state-issued

photo identification.  G.G. Supp. Decl. (Ex. A).

There is a world of difference between a restroom policy that excludes a girl from the

boys' restroom and a policy that excludes a transgender boy—who lives as a boy in all aspects of

his life—from the boys' restroom.  Pl.'s Mem. Supp. Mot. for Prelim. Inj. 25-31, ECF No. 18.

As a general matter, separate restrooms for boys and girls do not stigmatize and humiliate

students.  Separate restrooms for boys and girls do not usually isolate students from the rest of

their peers or imply that they are not worthy of equal treatment. And separate restrooms for boys and girls do not usually place individual students at severe risk for immediate and long-term psychological harm.

### III. Plaintiff Is Likely to Prevail on the Merits of His Claim That the Transgender Restroom Policy Violates the Fourteenth Amendment.

#### A. The Transgender Restroom Policy Discriminates Based on Sex.

Because the School Board's transgender restroom policy explicitly discriminates based on "biological gender" and "gender identity issues," it must be subjected to heightened scrutiny under the Equal Protection Clause. The Supreme Court has made clear that "all gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (internal quotation marks omitted). Heightened scrutiny applies even when the discrimination is based on physical or anatomical differences. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 60 (2001). And heightened scrutiny applies whether the asserted justification for the discrimination is benign or invidious. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The "analysis and level of scrutiny applied to determine the validity of the classification do not vary simply because the objective appears acceptable." *Id.*

It is difficult to imagine a more obvious sex-based classification than a classification based on "biological gender." The School Board nevertheless argues that this explicit classification based on "biological gender" should somehow escape heightened scrutiny because it is allegedly not motivated by "a perception that Plaintiff does not conform to gender norms, or in an attempt to stigmatize, embarrass or otherwise reject Plaintiff." Def.'s Mem. Opp'n. 5. For purposes of triggering heightened scrutiny, however, the School Board's motivations for using a sex-based classification are irrelevant. "Although *facially neutral* [policies] which have a discriminatory impact do not violate the Equal Protection Clause unless discriminatory intent can

be demonstrated, discriminatory intent need not be established independently when the classification is explicit, as in this case." *Faulkner v. Jones*, 51 F.3d 440, 444 (4th Cir. 1995) (citation omitted) (emphasis in original).

Moreover, although the School Board insists that it acted with pure motives, the School Board provides no evidentiary support for these unsworn assertions by counsel.  In fact, the School Board concedes that it acted in response to "numerous complaints from parents and students."  Andersen Decl. ¶ 4.  The School Board has not disclosed the substance of the phone calls and emails it received, but the complaints voiced at the public school board meetings pointedly referred to G.G. as a "young lady," compared him to a person who thinks he is a dog, and warned that allowing G.G. to use the same restroom as other boys would mean that boys could wear dresses in order to gain access to the girls' restroom.  *See* Pl.'s Mem. Supp. PI 11-12. The gender stereotypes and discomfort with G.G.'s gender nonconformity embodied in such comments "may be attributed to government bodies when the government acts in response to these views." *A Helping Hand, LLC v. Baltimore Cty., Md.*, 515 F.3d 356, 366 (4th Cir. 2008).

By challenging this discrimination under heightened scrutiny, G.G. does not ask this Court to recognize "transgender status standing alone" as a new suspect classification.  *See* Def.'s Mem. Opp'n. 6-10.[3]  G.G. is simply invoking the same protections against gender classifications and "gender stereotypes" that the Equal Protection Clause provides to everyone

---

[3] The Fourth Circuit has not yet addressed whether discrimination based on transgender status is a suspect or quasi-suspect classification. *Cf. Norsworthy v. Beard*, No. 14-CV-00695, 2015 WL 1478264, at *10 & n.8 (N.D. Cal. Mar. 31, 2015) (concluding that discrimination based on transgender status meets all of the indicia for "suspect" or "quasi-suspect" status identified by the Supreme Court).  The School Board also cites cases holding that "sexual orientation" is not protected classification under Title VII, Def.'s Mem. Opp'n. 6, but "neither the Supreme Court nor the Fourth Circuit's Title VII jurisprudence has addressed transgender[] status, which . . . is different than sexual orientation." *Lewis v. High Point Reg'l Health Sys.*, No. 5:13-CV-838, 2015 WL 221615, at *2 (E.D.N.C. Jan. 15, 2015).

else.  *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730 (2003).  "All persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype" and "cannot be punished because of [their] perceived gender-nonconformity."  *Glenn v. Brumby*, 663 F.3d 1312, 1318-19 (11th Cir. 2011).  "Because these protections are afforded to everyone, they cannot be denied to a transgender individual."  *Id.* at 1319.  "The nature of the discrimination is the same; it may differ in degree but not in kind, and discrimination on this basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause."  *Id.*  In short, a transgender individual who alleges sex discrimination based on gender non-conformity already "is a member of a protected class."  *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005); *see also id.* at 737 (transgender plaintiff "established that he was a member of a protected class by alleging discrimination against the City for his failure to conform to sex stereotypes").[4]

Echoing the district court in *Johnston*, the School Board asserts that transgender students are not protected from discrimination based on gender non-conformity unless the discrimination is related to the students' "failure to act according to socially prescribed gender roles" or the student's "behaviors, mannerisms, or appearance."  Def.'s Mem. Opp'n. 8, 9.  The School Board never explains, however, why G.G.'s failure to act according to "'society's long-held tradition of performing such functions in sex-segregated spaces based on biological or birth sex'" *id.* at 11 (quoting *Johnston*, 2015 WL 1497753, at *7), does not count.  The School Board tries to bolster

---

[4] Disagreeing with these decisions, the district court in *Johnston* attempted to exclude transgender people from the Fourteenth Amendment's protections for sex discrimination by asserting that the plain meaning of "the term 'sex' in the context of the Equal Protection Clause" is defined as a person's "birth sex," not their "gender."  *See Johnston*, 2015 WL 1497753, at *9. But the term "sex" does not actually appear in the text of the Equal Protection Clause.  The relevant texts to interpret are the texts of the opinions of the Supreme Court, and those opinions have consistently used the terms "sex" and "gender" interchangeably.  *See* Pl.'s Mem. Supp. PI. 18.

its arbitrary limitation on which types of discrimination based on gender nonconformity qualify as sex discrimination by creatively rewriting court opinions to narrow their scope while ignoring the reasoning the courts actually used.   *Id.* at 7-10.   None of the decisions G.G. relies upon draw any distinction between gender nonconformity related to dress and mannerisms and other types of gender nonconformity.   *See* Pl.'s Mem. Supp. PI (citing cases).   The School Board provides no response whatsoever to *Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, No. CIV.02-1531, 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004), which expressly rejected attempts to carve out restrooms and anatomy from generally applicable principles regarding discrimination based on gender nonconformity.   Indeed, despite the School Board's attempt to wish those decisions away, several district courts—including a another district court in the Fourth Circuit—have gone even further and recognized that, although transgender status is not a separate protected status, discrimination against a transgender person inherently involves impermissible discrimination based on the person's gender nonconformity.[5]

Moreover, the Supreme Court has never limited the protections of heightened scrutiny to discrimination based on a person's gender-nonconforming speech, mannerisms, or clothing.   To

---

[5] *See Finkle v. Howard Cty., Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014) ("In light of *Price Waterhouse*, it is unclear what, if any, significance to ascribe to the conclusion that 'transsexuals are not protected under Title VII as transsexuals.' Indeed, it would seem that any discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is proscribed by Title VII's proscription of discrimination on the basis of sex as interpreted by *Price Waterhouse*.") (citations omitted); *Rumble v. Fairview Health Servs.*, No. 14-CV-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ("Because the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping.  Therefore, Plaintiff's transgender status is necessarily part of his 'sex' or 'gender' identity."); *Schroer v. Billington (Schroer II)*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008) (for purposes of *Price Waterhouse* it does not matter whether an employee is perceived "to be an insufficiently masculine man, an insufficiently feminine woman, or an inherently gender-nonconforming transsexual"); *see also Macy v. Holder*, EEOC DOC 0120120821, 2012 WL 1435995, at *11 (Apr. 20, 2012) ("[I]ntentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex.'").

the contrary, heightened scrutiny protects individuals who do not conform to traditional gender norms in a wide range of contexts, including parenting and child care responsibilities, *Hibbs*, 538 U.S. at 736, learning styles, *Virginia*, 518 U.S. at 542, choice of professions, *Miss. Univ. for Women*, 458 U.S. at 729, role as the primary bread-winner, *Califano v. Goldfarb*, 430 U.S. 199, 208-09 (1977), likelihood of deserting the family, *Califano v. Westcott*, 443 U.S. 76, 88-90 (1979), or propensity for drunk driving, *Craig v. Boren*, 429 U.S. 190, 197-200 (1976).  The fact that the School Board allows students to dress in a gender conforming manner does not give the School Board the power to require gender conformity in other aspects of students' lives.

For purposes of triggering heightened scrutiny, there is simply no logical distinction between a policy that only "biological" boys can wear pants and a policy that only "biological" boys can use the boys' restroom.  Both policies impose differential treatment based on gender. The point of heightened scrutiny is to provide a framework for determining which gender-based restrictions are valid and which are not.  *Miss. Univ. for Women*, 458 U.S. at 729.  For example, in *Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001), the Supreme Court applied heightened scrutiny even though the gender-based restriction at issue related to women's physical ability to give birth.  The Court ultimately concluded that the law at issue did not violate the Constitution, but that conclusion was reached only through the application of heightened scrutiny.  *Id.* at 68-69. Determining whether a particular form of gender discrimination is constitutionally permissible occurs during the heightened scrutiny analysis, not before it.

### B.  The Transgender Restroom Policy Fails Heightened Scrutiny.

The School Board has not satisfied the "demanding" burden of demonstrating that the transgender restroom policy substantially furthers an important governmental interest.  *Virginia*, 518 U.S. at 533.  The School Board attempts to reframe the question as whether providing separate restrooms to boys and girls as a general matter serves the governmental interest in

student privacy.  But G.G. is not challenging a policy of providing separate restroom facilities for boys and girls as a general matter.  He is challenging the School Board's decision to override the school administrators by adopting a new policy that limits students' restroom access based on "biological gender" and relegates transgender students to separate single-stall facilities.[6]

To survive heightened scrutiny, the School Board must demonstrate that excluding transgender students from communal restrooms based on their "biological gender" and "gender identity issues" substantially advances an important governmental interest.  As explained in G.G.'s opening submission, the School Board's decision to limit access to communal restrooms based on "biological gender" had no effect whatsoever on the restroom use of the vast majority of students, whose gender identity is congruent with their sex assigned at birth.  The one and only purpose and effect of inserting the word "biological" before gender is to exclude transgender students.  As in other areas of constitutional law, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *City of L.A. v. Patel*, No. 13-1175, 2015 WL 2473445, at *6 (U.S. June 22, 2015) (citation omitted).  *See Virginia*, 518 U.S. at 550 (explaining that constitutionality of exclusion from VMI must be assessed by looking at women who "would want to attend VMI if they had the opportunity," not by looking at women as a group).  The only students affected by a "biological gender" restroom policy are transgender students who would otherwise be permitted to use the communal boys' and girls' restrooms.  G.G. does not have to show that "providing separate restrooms and locker rooms based on biological sex is unconstitutional for all

---

[6] Although the School Board asserts that the policy permits G.G. to use the girls' restroom, it does not dispute that using the girl's room is not possible because it would conflict with G.G.'s medically necessary treatment for Gender Dysphoria and cause him to experience severe mental distress.  *See* G.G. Decl. ¶ 25; Ettner Decl. ¶ 19.  Nor does it dispute that girls have reacted negatively to G.G.'s use of the girls' restroom because girls (correctly) perceive G.G. to be a boy.  *See* G.G. Decl. ¶ 25.

purposes," Def.'s Mem. Opp'n. 11 n.8, just as the plaintiffs in *Virginia* did not have to show that every woman must be admitted into VMI.  In sex-discrimination cases "the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups*."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 121-22 (2d Cir. 2004) (citation omitted) (emphasis in *Back*).

Relying on *Johnston*,[7] the School Board asserts that its transgender restroom policy substantially furthers an important governmental interest in protecting student privacy "while engaging in personal bathroom functions, disrobing, dressing, and showering outside of the presence of members of the opposite sex."  Def.'s Mem. Opp'n. 11.  As discussed in G.G.'s opening submission, however, excluding G.G. from the boys' restroom has no meaningful relationship to preventing exposure to nudity—especially in light of the additional privacy measures that the school has already put into place, such as dividers between urinals and privacy strips around stalls.  Moreover, as the School Board itself notes, "[a]ny student can use [the new] single-stall bathrooms, regardless of their biological sex, if they are uncomfortable using a communal bathroom, or for any other private, personal reason."  Def.'s Mem. Opp'n. 5.  Excluding students from the restrooms does not substantially advance an interest in preventing exposure to nudity.[8]

---

[7] In arguing that its transgender restroom policy survives heightened scrutiny, the School Board relies exclusively on *Johnston*.  Def.'s Mem. Opp'n. 10-13.  As explained in G.G.'s opening submission, however, that portion of the *Johnston* decision is riddled with glaring errors and misstatements.  Pl.'s Mem. Supp. PI 28 n.23.  None of the cases cited in *Johnston*'s heightened scrutiny analysis remotely supports the propositions for which they were cited.  *See id.* (citing cases).

[8] As noted in G.G.'s opening submission, this case does not involve access to locker rooms.  Pl.'s Mem. Supp. PI 34 n.28.  Even in the context of locker rooms, however, Defendants do not dispute that guidelines from the Virginia Department of Education already require that sex-segregated locker rooms have private showers with enclosed dressing rooms to protect the privacy of all students.  *See id.*; Def. Mem Opp'n. 12 n.11.

The asserted interest in protecting student privacy is further undermined by the School Board's surprising assertion that it has no objection to G.G. using the girls' restroom (which is impossible for G.G. in light of his Gender Dysphoria and the severe health consequences that would result).  Def's Mem. Opp'n 2, 4, 13 n.12.  It is reasonable to anticipate that some girls may be uncomfortable to see a person in the girls' room who is undergoing hormone therapy, growing facial hair, and is recognizably male.  Indeed, even before G.G. came out as transgender, girls' objected to his presence in the girls' room.  G.G. Decl. ¶ 25.  The School Board's apparent indifference to such concerns is powerful evidence that the transgender restroom policy does not truly advance the School Board's asserted interests in protecting students' "legitimate safety and privacy interests."  Def.'s Mem. Opp'n 7.

The School Board also asserts that the context of a public school somehow provides added justification for discriminating against transgender students.  Def.'s Mem. Opp'n. 11-12.  The opposite is true.  The School Board has a responsibility to protect all of its students, including students who are transgender.  Stigmatizing transgender students at school has an especially profound impact on their ability to access an education, and on their long-term psychological health.  Ettner Decl. ¶¶ 20, 24, 26-27; SOI 14 & n.18.  Half of all transgender teenagers have attempted suicide at some point in their lives.  Ettner Decl. ¶ 22.  The School Board's interest in protecting the health safety of all students is not substantially served by a policy that—based on the undisputed facts in this record—places G.G. at extreme risk for immediate and long-term psychological harm.  *Id.* ¶ 29.[9]

---

[9] There is no basis for the School Board's wild speculation that G.G.'s request for an exemption from physical education courses somehow indicates that G.G. "recognizes that there is a privacy interest in separating of the sexes based on their anatomy."  Def.'s Mem. Opp'n. 12, 18.

The School Board also makes a vague allusion to parents' interest in "the safety of their children" without explaining in any way how its transgender restroom policy advances that interest.  Def.'s Mem. Opp'n. 11.  The School Board does not contend that G.G. poses any safety risk to other boys in the boys' restroom, and there is no indication that other boys in the restroom pose any safety risk to G.G.  Far from protecting the safety of G.G. and other transgender students, the School Board's transgender restroom policy makes transgender students dramatically *less* safe.  The policy places G.G. at extreme risk for lifelong psychological harm and other negative health consequences.  Ettner Decl. ¶ 29.  As the United States explains in its Statement of Interest, the transgender restroom policy makes transgender students even more vulnerable to bullying and physical harassment by their peers.  SOI 14 & n.18.

To the extent that the School Board's "safety concerns" are based on the notion that boys will pretend to be transgender girls in order to gain access to the girls' restrooms, such concerns reflect a fundamental misunderstanding of what it means to be transgender or to have a medical diagnosis of Gender Dysphoria.  Allowing a student with a documented diagnosis of Gender Dysphoria to use the appropriate restroom as part of a full social role transition does not mean "that any person could demand access to any school facility or program based solely on a self-declaration of gender identity or confusion without the plans developed in cooperation with the school."  *Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 607 (Me. 2014).  Of course, if any student— whether transgender or not—poses an actual safety risk to other students, that student should be appropriately disciplined.  But far-fetched concerns about hypothetical boogeymen cannot provide an "extremely persuasive" basis for the School Board's categorical ban on all transgender students from using the same restrooms as their non-transgender peers.  *Virginia*, 518 U.S. at 531.  Indeed, they reflect precisely the type of "negative attitudes" or "fear" that are

insufficient to justify discrimination under any standard of scrutiny.  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

**IV.     Plaintiff Is Likely to Prevail on the Merits of His Claim That the Transgender Restroom Policy Violates Title IX.**

**A.   The Transgender Restroom Policy Conflicts with OCR's "Controlling" Interpretation of Title IX's Implementing Regulations.**

Separating students into different restrooms based on their sex or gender unquestionably constitutes disparate treatment "on the basis of sex" under Title IX.  20 U.S.C. § 1681(a).  The plain text of the statute contains exceptions for activities such as boy scouts and girl scouts, *id.* § 1681(a)(6)(B); father-daughter dances, *id.* §1681(a)(8); and scholarships for winners of beauty pageants, *id.* §1681(a)(9).  But the statutory text creates no exemptions for restrooms.  Sex-segregated restrooms are permitted under Title IX only because the Department of Education's implementing regulations—not the statute itself—provide an exception allowing schools to offer "separate toilet, locker room, and shower facilities on the basis of sex."  34 C.F.R. § 106.33.  *Cf. Mercer v. Duke Univ.*, 190 F.3d 643, 646 (4th Cir. 1999) (noting that without a special exemption for contact sports, Title IX and its implementing regulations "would require covered institutions to integrate all of their sports teams").

As discussed in the United States' Statement of Interest, the U.S. Department of Education's Office of Civil Rights has authoritatively construed 34 C.F.R. § 106.33 in an opinion letter regarding the very policy at issue in this case.  SOI 9-10.  OCR's interpretation of 34 C.F.R. § 106.33 is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), and is therefore "controlling unless it is plainly erroneous or inconsistent with the regulation."  *D.L. ex rel. K.L. v. Baltimore Bd. of Sch. Comm'rs*, 706 F.3d 256, 259-260 (4th Cir. 2013) (internal quotation marks omitted).  The plain text of 34 C.F.R. § 106.33 permits schools to provide

separate restrooms on the basis of "sex," not "biological sex" or "sex assigned at birth."  In

accordance with the plain text of the regulation, OCR has concluded that "when a school elects

to treat students differently on the basis of sex" for purposes of 34 C.F.R. § 106.33, the school

must still "treat transgender students consistent with their gender identity."   SOI Ex. B, ECF No.

28-2.[10]

Confronted with the OCR opinion letter, the School Board asserts that the letter is not

entitled to *Chevron* deference because it is not a regulation with the force of law.  Def.'s Mem.

Opp'n. 15-16.  That is true, but irrelevant.  The relevant deference in this case is not *Chevron*

deference for an agency's newly promulgated regulations, but *Auer* deference for an agency's

interpretation of its existing regulations.  Under binding and recent Fourth Circuit precedent,

*Auer* deference fully applies to informal opinion letters from OCR like the one at issue in this

case.  *See D.L. ex rel. K.L*, 706 F.3d at 259-260.  Tellingly, the United States' Statement of

Interest attaching the OCR letter was also signed by attorneys at the Department of Education

(including its general counsel), further demonstrating that the arguments therein reflect the

official DOE interpretation of Title IX regulations.[11]

OCR's interpretation of its own regulation necessarily takes precedence over the contrary

interpretation by the district court in *Johnston*, which issued its opinion without the benefit of

OCR's guidance.  Under *Auer* deference, "[i]t is well-established that an agency's interpretation

need not be the only possible reading of a regulation—or even the best one—to prevail."  *Decker*

---

[10] That interpretation is consistent with previous guidance OCR has issued regarding the treatment of transgender students in sex-segregated activities.  OCR, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities* 25 (Dec. 1, 2014), available at http://www.ed.gov/ocr/docs/faqs-title-ix-single-sex-201412.pdf.

[11] The views expressed in the United States' Statement of Interest are also consistent with the views previous expressed in the Statement of Interest the United States filed in *Tooley v. Van Buren Public Schools*, No. 2:14-cv-13466 (E.D. Mich. Feb. 20, 2015), available at http://www.justice.gov/crt/about/edu/documents/tooleysoi.pdf

*v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013); *accord Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991) (agency interpretation "need not be the best or most natural one by grammatical or other standards"). In light of OCR's authoritative interpretation, the question is not whether the text of 34 C.F.R. § 106.33 unambiguously *requires* the School Board to treat students in accordance with their gender identity for purposes of using the restroom. Instead, the question is whether the text of 34 C.F.R. § 106.33 unambiguously *permits* the School Board to exclude transgender students from using the restroom that corresponds with their gender identity. Because 34 C.F.R. § 106.33 does not make any reference to "biological sex" or "sex assigned at birth", it does not unambiguously permit a school district to treat transgender students inconsistently with their gender identity. Therefore, OCR's interpretation controls.

### B.  The Transgender Restroom Policy Conflicts with the Plain Text of Title IX.

Even if OCR had not yet spoken, the School Board's interpretation of Title IX would still be incorrect. As noted above, Title IX prohibits disparate treatment "on the basis of sex." 20 U.S.C. § 1681(a). In concluding that the statutory text does not protect transgender students from discrimination based on their gender incongruity, the *Johnston* court adopted the reasoning of decisions from the early 1980s that interpreted the definition of "sex" in Title VII to be limited to "biological sex" and to exclude gendered behavior. *See Johnston*, 2015 WL 1497753, at *12 (citing *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1086 (7th Cir. 1984), and *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982)). As discussed in G.G.'s opening submission, however, the reasoning of those decisions has been "eviscerated" by the Supreme Court's subsequent decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See Smith v. City of Salem, Ohio*, 378 F.3d 566, 573 (6th Cir. 2004); *accord Glenn*, 663 F.3d at 1318; *Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000).

The early decisions relied upon in *Johnston* not only conflict with *Price Waterhouse*, but rest on an analysis that "is no longer a tenable approach to statutory construction." *Schroer v. Billington (Schroer II)*, 577 F. Supp. 2d 293, 307 (D.D.C. 2008).  Neither the text of Title VII nor the text of Title IX makes any reference to "biological" sex.  Nevertheless, *Ulane* and *Sommers* reasoned that Title VII must be narrowly construed as limited to discrimination based on "biological" sex because there was no legislative history indicating that Congress intended to protect transgender employees from discrimination.  As Justice Scalia explained just a few weeks ago in a similar context, "[t]he problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks [courts] to add words to the law to produce what is thought to be a desirable result." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) (interpreting Title VII provision for religious discrimination).

In the decades since *Ulane* and *Sommers* were issued, the Supreme Court has repeatedly refused to limit Title VII in this manner based on suppositions about legislators' intent.  *See Oncale v. Sunflower Offshore Servs., Inc.*, 523 U.S. 75, 79 (1988) (rejecting the argument that Title VII does not protect against harassment by members of the same sex because "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted [Title VII]."); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (rejecting the argument that the plain text of Title VII does not cover sexual harassment because Congress was concerned with "'tangible loss' of 'an economic character'").  As Justice Scalia explained on behalf of a unanimous court in *Oncale*, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions

of our laws rather than the principal concerns of our legislators by which we are governed."

*Oncale*, 523 U.S. at 79.[12]

The same is true here.  By their plain language, Title VII and *Price Waterhouse* "do not make any distinction between a transgender[] litigant who fails to conform to traditional gender stereotypes and an 'effeminate' male or 'macho' female who, while not necessarily believing himself or herself to be of the opposite gender, nonetheless is perceived by others to be in nonconformity with traditional gender stereotypes."  *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008).  While such discrimination may *also* constitute discrimination based on gender identity or other characteristics not enumerated in Title IX, that fact does not somehow deprive the individual of the protections from sex discrimination provided in the plain language of the statute.[13]

---

[12] In a case anticipating the result in *Oncale*, the Fourth Circuit was even more emphatic in rejecting attempts to limit the text of Title VII based on presumed legislative intent.  *See Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 144 (4th Cir. 1996).  The defendant in *Wrightson* argued that Title VII could not be interpreted to protect employees from sexual harassment by a member of the same sex because doing so would effectively expand the scope of Title VII to protect against discrimination based on sexual orientation.  *See id.* at 143.  The Fourth Circuit nevertheless held that Title VII protects all discrimination based on a person's sex—even when the discrimination is also based on his or sexual orientation.  *See id.* at 144.  The court explained that "where Congress has unmistakably provided a cause of action, as it has through the plain language of Title VII, we are without authority in the guise of interpretation to deny that such exists, whatever the practical consequences."  *Id.*

[13] *Ulane* and *Sommers* also reasoned that Congress could not possibly have intended for Title VII to protect transgender people from discrimination because Congress has rejected legislation that would explicitly provide discrimination protections to lesbian and gay people.  *Ulane*, 742 F.2d at 1085-86; *Sommers*, 667 F.2d at 750.  That conclusion does not logically follow.  The Supreme Court has repeatedly cautioned that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress.  It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law."  *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (internal citations and quotation marks omitted).  In such circumstances, "'Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the

## V.    Plaintiff Satisfies the Other Preliminary Injunction Requirements

The other preliminary injunction factors also weigh in G.G.'s favor.  First, G.G. has submitted undisputed evidence that without a preliminary injunction, he will be at extreme risk for immediate and long-term psychological harm.  Ettner Decl. ¶ 29.

Second, in arguing that the balance of hardships weighs against an injunction, the School Board alludes to the rights of students from kindergarten to twelfth grade, but the pending motion seeks a preliminary injunction for G.G., who attends Gloucester High School.  Def.'s Mem. Opp'n. 18.  Moreover, as explained above, the requested preliminary injunction would have no impact on the School Board's putative concerns for the "safety" and "privacy" of students of any age.

Finally, the School Board asserts that the public interest counsels in favor of change through the political process.  *Id.* at 19.  But the political process has already resulted in protections for sex discrimination, which G.G. simply seeks to enforce.  Moreover, even if Title IX did not already protect transgender students from sex discrimination, they would still be protected by the Constitution.  *Cf. Miss. Univ. for Women*, 458 U.S. at 732 (holding that a school violated the Fourteenth Amendment even though it was exempted from Title IX).  Last month, the Supreme Court forcefully rejected similar arguments, explaining that "individuals need not await legislative action before asserting" constitutional rights.  *Obergefell v. Hodges*, No. 14-556, 2015 WL 2473451, at *20 (U.S. June 26, 2015).  "An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act."  *Id.*  A preference for change through the political process does

---

offered change.'"  *Ameur v. Gates*, 759 F.3d 317, 331 (4th Cir. 2014) (quoting *United States v. Craft*, 535 U.S. 274, 287 (2002)); *see also Tenneco Inc. v. Pub. Serv. Comm'n of W. Va.*, 489 F.2d 334, 338 (4th Cir. 1973) (refusing to draw an adverse inference from Congress's refusal to enact a particular legislative provision).

not displace a court's obligation to protect the constitutional rights of individual students like

G.G. now.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in G.G.'s opening submission, this

Court should grant G.G.'s Motion for Preliminary Injunction and require that Defendant allow

him to resume using the boys' restrooms at Gloucester High School until this Court renders a

final judgment on the merits.


                                                                    Respectfully submitted,


AMERICAN CIVIL LIBERTIES UNION                    AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.                      FOUNDATION
_____/s/_____             Joshua A. Block*
Rebecca K. Glenberg (VSB No. 44099)              Leslie Cooper*
Gail Deady (VSB No. 82035)                        125 Broad Street, 18th Floor
701 E. Franklin Street, Suite 1412                New York, New York 10004
Richmond, Virginia 23219                          Phone: (212) 549-2500
Phone: (804) 644-8080                             Fax:  (212) 549-2650
Fax: (804) 649-2733                               jblock@aclu.org
rglenberg@acluva.org                              lcooper@aclu.org
gdeady@acluva.org


* Admitted *pro hac vice*

Dated: July 13, 2015