**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

FILED

SEP 1 7 2015

CLERK, US DISTRICT COURT
NORFOLK, VA

G.G., by his next friend and mother,
DEIRDRE GRIMM,

      Plaintiffs,

                                      **CIVIL NO. 4:15cv54**

      v.

GLOUCESTER COUNTY SCHOOL
BOARD,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff G.G.'s challenge to a recent resolution (the "Resolution") passed by the Gloucester County School Board (the "School Board") on December 9, 2014. This Resolution addresses the restroom and locker room policy for all students in Gloucester County Public Schools. Specifically, G.G. brings claims under both the Equal Protection Clause of the Fourteenth Amendment (the "Equal Protection Clause") and Title IX of the Education Amendments of 1972 ("Title IX"), seeking to contest the School Board's restroom policy under the Resolution.

On June 11, 2015, G.G. filed a Motion for Preliminary Injunction, ECF No. 11, and on July 7, 2015, the School Board filed a Motion to Dismiss, ECF No. 31. On July 27, 2015, the parties appeared before the Court and argued their respective positions as to both motions. ECF No. 47. At that hearing, the Court took both motions under advisement. From the bench, the Court **GRANTED** the Motion to Dismiss as to Count II, G.G.'s claim under Title IX. On September 4, 2015, the Court **DENIED** the Motion for Preliminary Injunction. ECF No. 53. This opinion memorializes the reasons for these orders.

1

## I.    FACTUAL AND PROCEDURAL HISTORY

The following summary is taken from the factual allegations contained in Plaintiff's Complaint, which, for purposes of ruling on the Motion to Dismiss as to Count II, the Court accepts as true. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

This case arises from a student's challenge to a recent restroom policy passed by the School Board. Plaintiff G.G. was born in Gloucester County on     , 1999 and designated female.[1] Compl. ¶¶ 12, 14. However, at a very young age, G.G. did not feel like a girl. Id. ¶ 16. Before age six, Plaintiff "refused to wear girl clothes." Id. ¶ 17. Starting at approximately age twelve, "G.G acknowledged his male gender identity to himself."[2] Id. ¶ 18. In 2013–14, during G.G.'s freshman year of high school, most of his friends were aware that he identified as male. Id. ¶¶ 18–19. Furthermore, away from home and school, G.G. presented himself as a male. Id. ¶ 19.

During G.G.'s freshman year of high school, which began in September 2013, he experienced severe depression and anxiety related to the stress of concealing his gender identity from his family. Id. ¶ 20. This is the reason he alleges that he did not attend school during the spring semester of his freshman year, from January 2014 to June 2014, and instead took classes through a home-bound program. Id. In April 2014, G.G. first informed his parents that he is

---

[1] For the sake of brevity occasionally in this opinion the term "birth sex" may be used to describe the sex assigned to individuals at their birth. "Natal female" will be used to describe the gender assigned to G.G. at birth.

[2] The American Psychiatric Association ("APA") defines "gender identity" as "an individual's identification as male, female, or, occasionally, some category other than male or female." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013) ("DSM"). The DSM is "a classification of mental disorders with associated criteria designed to facilitate more reliable diagnoses of these disorders." Id. at xli. Although the DSM was included in G.G.'s briefs, it was not alleged in the Complaint and will consequently not be considered for the purpose of the Motion to Dismiss. However, the Court finds it instructive for definitional purposes.

transgender, that is, he believed that he was a man.[3] Id. ¶ 21. Sometime after informing his parents that he is transgender in April 2014, G.G., at his own request, began to see a psychologist, who subsequently diagnosed him with Gender Dysphoria.[4] Id. ¶ 21. As part of G.G.'s treatment, his psychologist recommended that G.G. begin living in accordance with his male gender identity in all respects. Id. ¶ 23. The psychologist provided G.G. with a "Treatment Documentation Letter" that confirmed that "he was receiving treatment for Gender Dysphoria and that, as part of that treatment, he should be treated as a boy in all respects, including with respect to his use of the restroom." Id. The psychologist also recommended that G.G. "see an endocrinologist and begin hormone treatment." Id. ¶ 26.

Subsequently, G.G. sought to implement his psychologist's recommendation. Id. ¶ 25. In July 2014, G.G. petitioned the Circuit Court of Gloucester County to change his legal name to his present masculine name and, the court granted his petition. Id. At his own request, G.G.'s new name is used for all purposes, and his friends and family refer to him using male pronouns. Id. Additionally, when out in public, G.G. uses the boys' restroom. Id.

G.G. also sought to implement his lifestyle transition at school. In August 2014, G.G. and his mother notified officials at Gloucester High School that G.G. is transgender and that he had changed his name. Id. ¶ 27. Consequently, officials changed school records to reflect G.G.'s new masculine name. Id. Furthermore, before the beginning of the 2014–15 school year, G.G. and his mother met with the school principal and guidance counselor to discuss his social transition. Id. ¶ 28. The school representatives allowed G.G. to email teachers and inform them that he preferred to be addressed using his new name and male pronouns. Id. Being unsure how students

---

[3] The APA defines "transgender" as "the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender." Id.

[4] The APA defines "gender dysphoria" as "the distress that may accompany the incongruence between one's experienced and expressed gender and one's assigned gender." Id.

would react to his transition, G.G. initially agreed to use a separate bathroom in the nurse's office. Id. ¶ 30. G.G. was also permitted to continue his physical education requirement through his home school program. Id. ¶ 29. Consequently, G.G. "has not and does not intend to use a locker room at school." Id.

However, after 2014–15 school year began, G.G. found it stigmatizing to use a separate restroom. Id. ¶ 31. G.G. requested to use the male restroom. Id. On or around October 20, 2014, the school principal agreed to G.G.'s request. Id. ¶ 32. For the next seven weeks, G.G. used the boys' restroom. Id.

Some members of the community disapproved of G.G.'s use of the men's bathroom when they learned of it. Id. ¶ 33. Some of these individuals contacted members of the School Board and asked that G.G. be prohibited from using the men's restroom. Id. Shortly before the School Board's meeting on November 11, 2014, one of its members added an item to the agenda, titled "Discussion of Use of Restrooms/Locker Room Facilities," along with a proposed resolution. Id. ¶ 34. This proposed resolution stated as follows:

> Whereas the [Gloucester County Public Schools] recognizes that some students question their gender identities, and
>
> Whereas the [Gloucester County Public Schools] encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the [Gloucester County Public Schools] seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the [Gloucester County Public Schools] to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Id. ¶ 34. At the meeting, a majority of the twenty-seven people who spoke were in favor of the proposal. Id. ¶ 37. Some proponents argued that transgender students' use of the restrooms would violate the privacy of other students and might "lead to sexual assault in the bathrooms." Id. It was suggested that a non-transgender boy could come to the school in a dress and demand to use the girls' restroom. Id. G.G. addressed the group and spoke against the proposed resolution and thus identified himself to the entire community. Id. ¶ 38. At the end of the meeting, the School Board voted 4-3 to defer a vote on the policy until its meeting on December 9, 2014. Id. ¶ 39.

On December 3, 2014, the School Board issued a news release stating that regardless of the outcome, it intended to take measures to increase privacy for all students using school restrooms, including "expanding partitions between urinals in male restrooms"; "adding privacy strips to the doors of stalls in all restrooms"; and "designat[ing] single-stall, unisex restrooms, similar to what's in many other public spaces." Id. ¶ 41. On December 9, 2014, the School Board held a meeting to vote on the proposed resolution. Id. Before the vote was conducted, a Citizens' Comments Period was held to allow a discussion on the proposed resolution. Id. Again, a majority of the speakers supported the resolution. Id. ¶ 42. Speakers again raised concerns about the privacy of other students. Id. After thirty-seven people spoke during the Citizens' Comment Period, the School Board voted 6-1 to pass the Resolution. Id. ¶ 43.

On December 10, 2015, the day after the School Board passed the Resolution, the school principal informed G.G. that he could no longer use the boys' restroom and would be disciplined if he did. Id. ¶ 45.

Since the adoption of the restroom policy, certain physical improvements have been made to the school restrooms at Gloucester High School. The school has installed three unisex

single-stall restrooms. Id. ¶ 47. The school has also raised the doors and walls around the bathroom stalls so that students cannot see into an adjoining stall. Id. Additionally, partitions were installed between the urinals in the boys' restrooms. Id.

Sometime after the actions of the School Board, G.G. began receiving hormone treatment in December 2014. Id. ¶ 26 These treatments have deepened his voice, increased the growth of his facial hair, and given him a more masculine appearance. Id.

It is alleged that "[u]sing the girls' restroom is not possible for G.G." Id. ¶ 46. G.G. alleges that prior to his treatment for Gender Dysphoria, girls and women who encountered G.G. in female restrooms would react negatively because of his masculine appearance; that in eighth and ninth grade, the period from September 2012 to June 2014, girls at school would ask him to leave the female restroom; and that use of the girls' restroom would also cause G.G. "severe psychological stress" and would be "incompatible with his medically necessary treatment for Gender Dysphoria." Id.

G.G. further alleges that he refuses to use the separate single-stall restrooms installed by the school because the use of them would stigmatize and isolate him; that the use of these restrooms would serve as a reminder that the school views him as "different"; and that the school community knows that the restrooms were installed for him. Id.

From these alleged facts, on June 11, 2015, G.G. brought the present challenge to the School Board's restroom policy under the Equal Protection Clause and Title IX. ECF No. 8. On that same day, G.G. filed the instant Motion for Preliminary Injunction, requesting that the Court issue an injunction allowing G.G. to use the boys' bathroom at Gloucester High School until this case is decided at trial. ECF No. 11. On June 29, 2015, the United States ("the Government"), through the Department of Justice, filed a Statement of Interest, asserting that the School Board's

bathroom policy violated Title IX. ECF No. 28. The School Board filed an Opposition to the Motion for Preliminary Injunction on July 7, 2015, ECF No. 30, along with a Motion to Dismiss, ECF No. 31. On July 27, 2015, the parties appeared before the Court and argued their respective positions as to both motions. ECF No. 47. At that hearing, the Court took both motions under advisement. From the bench, the Court granted the Motion to Dismiss as to Count II, G.G.'s claim under Title IX. On September 4, 2015, the Court denied the Motion for Preliminary Injunction. ECF No. 53. This opinion memorializes the reasons for these orders.

## II.   MOTION TO DISMISS

### A.   STANDARD OF REVIEW

The function of a motion to dismiss under Rule 12(b)(6) is to test "the sufficiency of a complaint." Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013). "[I]mportantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive such a motion, the complaint must allege facts sufficient 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" Haley, 738 F.3d at 116. When reviewing the legal sufficiency of a complaint, the Court must accept "all well-pleaded allegations in the plaintiff's complaint as true" and draw "all reasonable factual inferences from those facts in the plaintiff's favor." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). Legal conclusions, on the other hand, are not entitled to the assumption of truth if they are not supported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, a motion to dismiss should be granted only in "very limited circumstances." Rogers v. Jefferson–Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989).

### B.   COUNT II - TITLE IX

G.G. also alleges that the School Board's bathroom policy violates Title IX. Under Title

7

IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program . . . ." 20 U.S.C. § 1681(a). "Under Title IX, a prima facie case is established by a plaintiff showing (1) that [he or] she was excluded from participation in (or denied the benefits of, or subjected to discrimination in) an educational program; (2) that the program receives federal assistance; and (3) that the exclusion was on the basis of sex." Manolov v. Borough of Manhattan Comm. Coll., 952 F. Supp. 2d 522, 532 (S.D.N.Y. 2013) (quoting Murray v. N.Y. Univ. Coll. of Dentistry, No. 93 Civ. 8771, 1994 WL 533411, at *5 (S.D.N.Y. Sept. 29, 1994)); Bougher v. Univ. of Pittsburgh, 713 F. Supp. 139, 143–44 (W.D. Pa. 1989), aff'd, 882 F.2d 74 (3d Cir. 1989)).

The School Board Resolution expressly differentiates between students who have a gender identity congruent with their birth sex and those who do not. Compl. ¶ 34. G.G. alleges that this exclusion from the boys' bathroom based on his gender identity constitutes sex discrimination under Title IX. Compl. ¶¶ 64, 65.

### 1. Arguments

The parties contest whether discrimination based on gender identity is barred under Title IX. To support their respective contentions, both parties cite to cases interpreting Title VII, upon which courts have routinely relied in determining the breadth of Title IX. See Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

The School Board argues that sex discrimination does not include discrimination based on gender identity. For support, the School Board cites Johnston v. University of Pittsburgh of Commonwealth System of Higher Education, --- F. Supp. 3d ---- , 2015 WL 1497753 (W.D. Pa. Mar. 31, 2015). In Johnston, the Western District of Pennsylvania found that a policy separating the bathrooms by birth sex at the University of Pittsburgh did not violate Title IX because sex

discrimination does not include discrimination against transgender individuals. 2015 WL 1497753, at *12–19. The School Board asserts that <u>Johnston</u> establishes that Title IX does not incorporate discrimination based on gender or transgender status.

In response, G.G. maintains that sex discrimination includes discrimination based on gender. G.G. cites to a number of Title VII cases in which courts have found sex discrimination to include gender discrimination. <u>See</u>, <u>e.g.</u>, <u>Glenn v. Brumby</u>, 663 F.3d 1312, 1317 (11th Cir. 2011); <u>Smith v. City of Salem</u>, 378 F.3d 566, 574–75 (6th Cir. 2004); <u>Finkle v. Howard Cnty.</u>, <u>Md.</u>, 12 F. Supp. 3d 780, 788 (D. Md. 2014); <u>Lopez v. River Oaks Imaging & Diagnostic Grp.</u>, <u>Inc.</u>, 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008); <u>see also</u> <u>Schwenk v. Hartford</u>, 204 F.3d 1187, 1201 (9th Cir. 2000) ("'[S]ex' under Title VII encompasses both sex—that is, the biological differences between men and women—and gender.").

In addition, G.G. contends that the cases <u>Johnston</u> cited to support its proposition, <u>Ulane v. E. Airlines, Inc.</u>, 742 F.2d 1081 (7th Cir. 1984), and, <u>Sommers v. Budget Mktg., Inc.</u>, 667 F.2d 748 (8th Cir. 1982), <u>cert. denied</u>, 471 U.S. 1017 (1985),[5] are no longer good law. In both <u>Ulane</u> and <u>Sommers</u>, the courts refused to extend sex discrimination to include discrimination against transgender individuals or those with nonconforming gender types. However, G.G. asserts that <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), overruled these cases. In <u>Price Waterhouse</u>, the Supreme Court considered a Title VII claim based on allegations that an employee at Price Waterhouse was denied partnership because she was considered "macho" and "overcompensated for being a woman." 490 U.S. at 235. She had been advised to "walk more femininely, talk more

---

[5] The more recent case <u>Johnston</u> cites is a Tenth Circuit case, in which the court avoided deciding the issue. <u>Etsitty v. Utah Transit Auth.</u>, 502 F.3d 1215, 1224 (10th Cir. 2007) ("This court need not decide whether discrimination based on an employee's failure to conform to sex stereotypes always constitutes discrimination 'because of sex' and we need not decide whether such a claim may extend Title VII protection to transsexuals who act and appear as a member of the opposite sex.").

femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." Id.
The Court found that such comments were indicative of gender stereotyping, which Title VII
prohibited as sex discrimination. The Court explained that

> we are beyond the day when an employer could evaluate
> employees by assuming or insisting that they matched the
> stereotype associated with their group, for '[i]n forbidding
> employers to discriminate against individuals because of their sex,
> Congress intended to strike at the entire spectrum of disparate
> treatment of men and women resulting from sex stereotypes.'

Id. at 251 (quoting L.A. Dept. of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)).
Accordingly, the Court found that "an employer who acts on the basis of a belief that a woman
cannot be aggressive, or that she must not be" has acted on the basis of sex. Id. at 251.

Other courts have found that Price Waterhouse overruled the cases cited in Johnston.
"[S]ince the decision in Price Waterhouse, federal courts have recognized with near-total
uniformity that 'the approach in . . . Sommers, and Ulane . . . has been eviscerated' by Price
Waterhouse's holding." Glenn, 663 F.3d at 1318 n.5 (quoting City of Salem, 378 F.3d at 573));
see also Schwenk, 204 F.3d at 1201 ("The initial judicial approach taken in cases such as
Holloway has been overruled by the logic and language of Price Waterhouse."); Lopez, 542 F.
Supp. 2d at 660. Based on Price Waterhouse and its progeny, G.G. claims that discrimination
against transgender individuals or other nonconforming gender types is now prohibited as a form
of sex discrimination. Accordingly, G.G. asserts that the Resolution's differentiation between
students who have a gender identity congruent with their birth sex, and those who do not,
amounts to sex discrimination under Title IX.

### 2.     Analysis

Although the primary contention between the parties is whether gender discrimination
fits within the definition of sex discrimination under Title IX, G.G.'s claim does not rest on this

distinction. Rather, the Court concludes that G.G.'s Title IX claim is precluded by Department of Education regulations. As noted above, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681. However, this prohibition on sex-based decision making is not without exceptions. Among the exceptions listed in Title IX is a provision stating that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Although the statute does not expressly state that educational institutions may maintain separate bathrooms for the different sexes, Department of Education regulations stipulate:

> A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33. This regulation (hereinafter, "Section 106.33") expressly allows schools to provide separate bathroom facilities based upon sex, so long as the bathrooms are comparable. When Congress delegates authority to any agency to "elucidate a specific provision of the statute by regulation, any ensuing regulation is binding on the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." United States v. Mead Corp., 533 U.S. 218, 227 (2001). The Department of Education's regulation is not "arbitrary, capricious, or manifestly contrary to the statute."[6] Rather, Section 106.33 seems to effectuate Title IX's provision allowing separate living facilities based on sex.[7] Therefore, Section 106.33

---

[6] It is significant that neither party raised, nor even hinted at raising, a challenge to the validity of Section 106.33 under Title IX.

[7] The term "living facilities" in 20 U.S.C. § 1686 is ambiguous, and legislative history of Title IX does not

is given controlling weight.

In light of Section 106.33, G.G. fails to state a valid claim under Title IX. G.G. alleges that the School Board violated Title IX by preventing him from using the boys' restrooms despite the fact that his gender identity is male. Compl. ¶¶ 64, 65. According to G.G., the School Board's determination was based on the belief that Plaintiff is biologically female, not biologically male.[8] Id. ¶ 65. However, Section 106.33 specifically allows schools to maintain separate bathrooms based on sex as long as the bathrooms for each sex are comparable. Therefore, the School Board did not run afoul of Title IX by limiting G.G. to the bathrooms assigned to his birth sex.

In fact, the only way to square G.G.'s allegations with Section 106.33 is to interpret the use of the term "sex" in Section 106.33 to mean *only* "gender identity." Under this interpretation, Section 106.33 would permit the use of separate bathrooms on the basis of gender identity and *not* on the basis of birth or biological sex. However, under any fair reading, "sex" in Section 106.33 clearly includes biological sex. Because the School Board's policy of providing separate bathrooms on the basis of biological sex is permissible under the regulation, the Court need not decide whether "sex" in the Section 106.33 also includes "gender identity."

Instead, the Court need only decide whether the School Board's bathroom policy satisfies Section 106.33. Section 106.33 states that sex-segregated bathrooms are permissible unless such

---

provide clear guidance as to its meaning. This term could be narrowly interpreted to mean living quarters, such as dormitories, or it could be broadly interpreted to include other facilities, such as bathrooms. See Implementing Title IX: The New Regulations, 124 U. Pa. L. Rev. 806, 811 (1976). Because the Department of Education's inclusion of bathrooms within "living facilities" is reasonable, the Court defers to its interpretation. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–44 (1984).

[8] The Court is sensitive to the fact the G.G. disapproves of the School Board's term "biological gender." See Compl. ¶ 66 (placing biological in dismissive quotation marks). G.G. may also take issue with the Court's phrase biological sex. The Court is guided in its usage by the APA "Definition of Terms: Sex, Gender, Gender Identity, Sexual Orientation" from 2011, which the School Board submitted with its Brief in Opposition to Motion for Preliminary Injunction. Ex. 3, ECF No. 30. The APA defines "sex" as "a person's biological status," and identifies "a number of indicators of biological sex." Id.

facilities are not comparable. G.G. fails to allege that the bathrooms to which he is allowed access by the School Board—the girls' restrooms and the single-stall restrooms—are incomparable to those provided for individuals who are biologically male. In fact, none of the allegations in the Complaint even mention or imply that the facilities in the bathrooms are not comparable. Consequently, G.G. fails to state a claim under Title IX.

Nonetheless, despite Section 106.33, the Government urges the Court to defer to the Department of Education's interpretation of Title IX, which maintains that a policy that segregates bathrooms based on biological sex and without regard for students' gender identities violates Title IX. In support of its position, the Government attaches a letter (the "Letter"), dated January 7, 2015, issued by the Department of Education, through the Office for Civil Rights, apparently clarifying its stance on the treatment of transgender students with regard to sex-segregated restrooms. Statement of Interest 9, ECF No. 28; id. Ex. B, at 2, ECF No. 28-2. In the Letter, the Acting Deputy Assistant Secretary for Policy for the Department of Education's Office of Civil Rights, writes:

> The Department's Title IX regulations permit schools to provide sex-segregated restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes under certain circumstances. When a school elects to separate or treat students differently on the basis of sex in those situations, a school must treat transgender students consistent with their gender identity.

Id. at 9–10, Ex. B, at 2. The Letter cites a Department of Education significant guidance document (the "Guidance Document") published in 2014 in support of this interpretation. According to the Guidance Document:

> Under Title IX, a recipient must generally treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes.

13

See Department of Education, Office for Civil Rights, Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities 25 (Dec. 1, 2014). Despite the fact that Section 106.33 has been in effect since 1975,[9] the Department of Education does not cite any documents published before 2014 to support the interpretation it now adopts.

The Department of Education's interpretation does not stand up to scrutiny. Unlike regulations, interpretations in opinion letters, policy statements, agency manuals, and enforcement guidelines "do not warrant Chevron-style deference" with regard to statutes. Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000). Therefore, the interpretations in the Letter and the Guidance Document cannot supplant Section 106.33. Nonetheless, these documents can inform the meaning of Section 106.33. An agency's interpretation of its own regulation, even one contained in an opinion letter or a guidance document, is given controlling weight if (1) the regulation is ambiguous and (2) the interpretation is not plainly erroneous or inconsistent with the regulation. Id. at 588 ("Auer deference is warranted only when the language of the regulation is ambiguous."); Auer v. Robbins, 519 U.S. 452, 461 (1997) ("[The agency's] interpretation of [its own regulation] is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation.").

Upon review, the Department of Education's interpretation should not be given controlling weight. To begin with, Section 106.33 is not ambiguous. It clearly allows the School Board to limit bathroom access "on the basis of sex," including birth or biological sex. Furthermore, the Department of Education's interpretation of Section 106.33 is plainly erroneous and inconsistent with the regulation. Even under the most liberal reading, "on the basis of sex" in Section 106.33 means both "on the basis of gender" *and* "on the basis of biological sex." It does

---

[9] Title IX regulations were promulgated by the Department of Health, Education, and Welfare in 1975 and adopted by the Department of Education upon its establishment in 1980. 45 Fed. Reg. 30802, 30955 (May, 9 1980) (codified at 34 C.F.R. §§ 106.1–.71).

14

not mean "only on the basis of gender." Indeed, the Government itself states that "under <u>Price Waterhouse</u>, 'sex' . . . encompasses both sex—that is, the biological differences between men and women—*and* gender." Statement of Interest 6–7, ECF No. 28. Thus, at most, Section 106.33 *allows* the separation of bathroom facilities on the basis of gender. It does not, however, require that sex-segregated bathrooms be separated on the basis of gender, rather than on the basis of birth or biological sex. Gender discrimination did not suddenly supplant sex discrimination as a result of <u>Price Waterhouse</u>; it supplemented it.

To defer to the Department of Education's newfound interpretation would be nothing less than to allow the Department of Education to "create *de facto* a new regulation" through the use of a mere letter and guidance document. <u>See Christensen</u>, 529 U.S. at 588. If the Department of Education wishes to amend its regulations, it is of course entitled to do so. However, it must go through notice and comment rulemaking, as required by the Administrative Procedure Act. <u>See</u> 5 U.S.C. § 553. It will not be permitted to disinterpret its own regulations for the purposes of litigation. As the Court noted throughout the hearing, it is concerned about the implications of such rulings. Mot. to Dismiss & Prelim. Inj. Hr'g at Tr. 65:23–66:19; 73:6–74:7. Allowing the Department of Education's Letter to control here would set a precedent that agencies could avoid the process of formal rulemaking by announcing regulations through simple question and answer publications. Such a precedent would be dangerous and could open the door to allow further attempts to circumvent the rule of law—further degrading our well-designed system of checks and balances.

In light of Section 106.33, the Court cannot find that the School Board's bathroom policy violates Title IX.

## III.   MOTION FOR PRELIMINARY INJUNCTION

The Motion for Preliminary Injunction is entirely different. The complaint is no longer

the deciding factor, admissible evidence is the deciding factor. Evidence therefore must conform to the rules of evidence. G.G. has sought a preliminary injunction. This Motion requests that the Court issue an injunction allowing G.G. to resume using the boys' restrooms at Gloucester High School until there is a final judgment on the merits.[10] ECF No. 11. In support of his motion for a preliminary injunction, G.G. has submitted two declarations: one from G.G. and another from an expert in the field of Gender Dysphoria. Decl. of G.G., ECF No. 9 ("G.G. Decl."); The Expert Declaration of Randi Ettner, Ph.D, ECF No. 10 ("Ettner Decl."). The School Board contests the injunction and attaches single a declaration to its Opposition to the Motion for Preliminary Injunction from Troy Andersen, a member of the School Board and the 2014–15 Gloucester Point District Representative for the Gloucester County School Board. Decl. of Troy Andersen, ECF No. 30-1 ("Andersen Decl."). On July 27, 2015, the parties appeared before the Court to argue this Motion, and both parties were given the opportunity to introduce evidence supporting their respective positions. ECF No. 47. At the hearing, neither G.G. nor the School Board introduced additional evidence for support. Id.

As the Court has granted the School Board's motion to dismiss as to Count II, G.G.'s claim under Title IX, it need not discuss reasons for denying the Motion for Preliminary Injunction on this Count. While the Court has not yet ruled on whether G.G. has stated a claim under the Equal Protection Clause, the Court finds that, even if he has stated a claim, G.G. has not submitted enough evidence to establish that the balance of hardships weigh in his favor. Accordingly, the issuance of a preliminary injunction is not warranted.

A.    STANDARD OF REVIEW

"The grant of preliminary injunctions [is] . . . an extraordinary remedy involving the

---

[10] G.G. claims that he does not intend to use the locker room at school. Mem. in Supp. of Mot. for Prelim. Inj., 8 n.2, ECF No. 18 ("Prelim. Inj."). However, the requested injunction allowing him to use the male restrooms would apply to the male restroom in the locker room.

exercise of a very far-reaching power, which is to be applied 'only in the limited circumstances' which clearly demand it." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1992) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989)). A plaintiff must overcome the "uphill battle" of satisfying each of the four factors necessary to obtain a preliminary injunction. Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009) (stating that the four factors must be "satisfied as articulated"), vacated on other grounds, 559 U.S. 1089 (2010). To obtain a preliminary injunction, "[p]laintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014) (citing Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008)). The failure to make a clear showing of any one of these four factors requires the Court to deny the preliminary injunction.[11] Real Truth About Obama, Inc., 575 F.3d at 346.

A plaintiff seeking a preliminary injunction does not benefit from the presumption that the facts contained in the complaint are true. A plaintiff must introduce evidence in support of a Motion for Preliminary Injunction. While oral testimony is not strictly necessary, this Court has never granted a Preliminary Injunction without first hearing oral testimony. Declarations are frequently drafted by lawyers, and the evidence presented within them is not subject to the rigors of cross examination. A plaintiff relying solely on such weak evidence is unlikely to make the clear showing required for the issuance of a preliminary injunction. Additionally, this Court will

---

[11] The parties dispute whether the injunction sought is mandatory or prohibitory in nature. "Whereas mandatory injunctions alter the status quo, prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" League of Women Voters of N.C., 769 F.3d at 236 (quoting Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013)). There is a heightened standard for mandatory injunctions. Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances."). Because the Court finds that G.G. fails to show that a preliminary injunction is warranted even if the injunction sought is prohibitory, the Court does not decide the issue.

not consider evidence that would be inadmissible at trial, such as hearsay, that is contained within affidavits.

**B.    ARGUMENTS OF THE PARTIES AND FACTS IN EVIDENCE**

G.G. characterizes the question of competing hardships as "not a close question." Mem. in Supp. of Mot. for Prelim. Inj., 40, ECF No. 18 ("Prelim. Inj."). He argues that this Court must weigh "the severe, documented, and scientifically supported harms" that the restroom policy continues to inflict upon G.G, who has been diagnosed with Gender Dysphoria, against the "School Board's unfounded speculation about harms that might occur to others at some future date." Id. The School Board by contrast implores this Court to consider the safety and privacy interests of all its students. Br. in Opp'n to Mot. for Prelim. Inj., 18, ECF No. 30. It emphasizes that while litigation is ongoing, G.G. may use the "girls' restroom, the three single-stall restrooms, or the restroom in the nurse's office." Id.

**1.    Facts and Arguments Concerning the Hardship to G.G.**

G.G. relies on two declarations to establish the hardships he would suffer should this Court deny his Motion for Preliminary Injunction. ECF Nos. 9, 10. G.G.'s Declaration largely repeats the material in his complaint. Compare ECF Nos. 8 and 9. The Court recounts only those assertions that concern the effect that G.G.'s Gender Dysphoria has had on his schooling. G.G. alleges other harms he has suffered, such as being humiliated and forced to speak at the School Board hearing, G.G. Decl. ¶ 23, but these harms are not relevant to the issuance of an injunction allowing G.G. to use the male restroom during this litigation. Here the declaration of G.G. is a recital of the allegations in the complaint and is replete with inadmissible evidence including thoughts of others, hearsay, and suppositions. The Court recounts these allegations before analyzing their credibility.

G.G. claims that during his freshman year, which began in September 2013, he

18

"experienced severe depression and anxiety related to his untreated Gender Dysphoria." Id. ¶ 9. The depression and anxiety were so severe that G.G. did not attend school during the spring semester which began in January 2014. Id. There is nothing to corroborate that his "untreated Gender Dysphoria" was the reason for his absence. In April of 2014, weeks before his fifteenth birthday, G.G. first informed his parents that he is transgender. Id. ¶ 10. After his parents learned of his gender identity, G.G. began "therapy with a psychologist who had experience with working with transgender patients." Id. He claims that this psychologist diagnosed him with Gender Dysphoria and recommended that he begin to live as a boy in all respects, including in his use of the restroom. Id. ¶ 11. There is no report or declaration from this psychologist. In August 2014, G.G. and his mother informed officials at Gloucester High School of his gender identity. Id. ¶ 15 At the start of the school year, G.G. agreed to use a separate restroom in the nurse's office. Id. ¶ 19. G.G. then determined that it "was not necessary to continue to use the nurse's restroom." Id. He claims that he "found it stigmatizing to use a separate restroom." Id.

On December 9, 2014, the School Board adopted the restroom policy. Id. ¶ 22. With the new transgender restroom policy, G.G. feels like he has been "stripped of [his] privacy and dignity." Id. ¶ 23. He is unwilling to use the girls' restroom because, he claims, girls and women object to his presence there. Id. ¶ 25. Additionally, use of the girls' restroom would be incompatible with his treatment for Gender Dysphoria. Id. He claims that the new unisex restrooms are not located near his classes and that only one of these restrooms is located near where the single-sex restrooms are located. Id. ¶ 26. He refuses to use these restrooms because "they make him feel even more stigmatized and isolated than when [he] use[d] the restroom in the nurse's office." Id. ¶ 27. He claims that everyone knows that the restrooms were installed for him. Id. Because G.G. refuses to use any of the restrooms permitted for his use, he has held his

urine and developed urinary tract infections. Id. ¶ 28.

The Expert Declaration of Randi Ettner, Ph.D, adds little to these factual claims. Ettner is not the psychologist who analyzed G.G. after he first told his parents he was transgender; rather, he was retained by G.G.'s counsel in preparation for this litigation. See Ettner Decl. ¶¶ 1, 7, 9. Ettner met G.G. once before preparing his report. Id. ¶ 7. The bulk of his declaration describes the diagnosis and treatment of Gender Dysphoria. It defines Gender Dysphoria as the feeling of incongruence between one's gender identity and the sex assigned one at birth. Id. ¶¶ 11–12. It notes that Gender Dysphoria is "codified in the Diagnostic and Statistical [M]anual of Mental Disorders (DSM-V) (American Psychiatric Association) and the International Classifications of Diseases-10 (World Health Organization)." Id. ¶ 12. It describes the studies that have looked at transgender youth who could not use restrooms corresponding to their gender identity. Id. ¶¶ 18–27. However, beyond confirming that G.G. has a "*severe* degree of Gender Dysphoria," id. ¶ 29, there are no facts particular to G.G. in the report. See id. ¶¶ 28–30.

The School Board, supported by the declaration of Troy Andersen, emphasizes that any student may use the three unisex restrooms that were installed and open for use by December 16, 2014. Andersen Decl. ¶ 7; Br. in Opp'n to Mot. for Prelim. Inj., 18, ECF No. 30. Any student may also use the restroom in the nurse's office. Andersen Decl. ¶ 7. Moreover, the School Board contends that G.G. may use the female restrooms and locker rooms, Br. in Opp'n to Mot. for Prelim. Inj., 18, ECF No. 30, and G.G. has made no showing that he is not permitted to use them.

### 2.     Facts and Arguments Concerning Student Privacy

The School Board contends that granting the preliminary injunction and allowing G.G. to use the male restroom would endanger the safety and privacy of other students. Br. in Opp'n to Mot. for Prelim. Inj., 18, ECF No. 30. G.G. argues in response, without any independent factual

support, that his presence in the male restroom would not infringe upon the privacy rights of his fellow students. He claims that the student body itself is comfortable with his presence in the restroom because during the seven weeks in which he used the male restroom, he "never encountered any problems from other students." G.G. Decl. ¶ 20. The Andersen Declaration describes a different reaction to G.G.'s use of the male restroom. Andersen Decl. ¶ 4. According to Andersen, the School Board "began receiving numerous complaints from parents and students" the day after G.G. was granted permission to use the boys' bathroom. Id.

G.G. also contends that the improvements that the School Board made to the restrooms alleviated any concerns that parents or students may have had about "nudity involving students of different sexes." Prelim. Inj. at 33. His complaint describes these improvements, which include raising the doors and walls around the bathroom stalls so that students cannot see into an adjoining stall, and adding three unisex, single-stall restrooms. Compl. ¶¶ 47, 52. The School Board disputes the extent to which the improvements have increased privacy and claims that the restrooms, "and specifically the urinals," are "not completely private," although it also does not submit any evidence in support of this contention. Br. in Opp'n to Mot. for Prelim. Inj., 18 n.17, ECF No. 30.

Finally, G.G. argues that any student uncomfortable with his presence in the male restrooms may use the new unisex restrooms. Prelim. Inj. at 35, 39.

### C.   ANALYSIS

G.G.'s Motion for Preliminary Injunction asks this Court to allow him, a natal female, to use the male restroom at Gloucester High School. Mot. for Prelim. Inj., ECF No. 11. Restrooms and locker rooms are designed differently because of the biological differences between the sexes. See Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir. 1993) ("differences between the genders demand a facility for each gender that is different"). Male restrooms, for instance, contain

urinals, while female restrooms do not. Men tend to prefer urinals because of the convenience. Furthermore, society demands that male and female restrooms be separate because of privacy concerns. Id.; see also Virginia v. United States, 518 U.S. 515, 550 n.16 (1996) ("[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements"). The Court must consider G.G.'s claims of stigma and distress against the privacy interests of the other students protected by separate restrooms.

In protecting the privacy of the other students, the School Board is protecting a constitutional right. The Fourth Circuit has recognized that prisoners have a constitutional right to bodily privacy. Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981). Although the Fourth Circuit has never held that the right to bodily privacy applies to all individuals, it would be perverse to suppose that prisoners, who forfeit so many privacy rights, nevertheless gained a constitutional right to bodily privacy. In recognizing the right of prisoners to bodily privacy the court spoke in universal terms: "Most people . . . have a special sense of privacy in their own genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." Id.

Several circuits have recognized the right to bodily privacy outside the context of prisoner litigation. Doe v. Luzerne County, 660 F.3d 169, 177 (3d Cir. 2011) (holding that bodily exposure may meet "the lofty constitutional standard" and constitute a violation of one's reasonable expectation of privacy); Brannum v. Overton County School Bd., 516 F.3d 489, 494 (6th Cir. 2008) (holding that a student's "constitutionally protected right to privacy encompasses the right not to be videotaped while dressing and undressing in school athletic locker rooms"); Poe v. Leonard, 282 F.3d 123, 138–39 (2d Cir. 2002) ("there is a right to privacy in one's

22

unclothed or partially unclothed body"); York v. Story, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of privacy than the naked body."). In these circuits, violations of the right to bodily privacy are most acute when one's body is exposed to a member of the opposite sex. See Doe, 660 F.3d at 177 (considering whether "Doe's body parts were exposed to members of the opposite sex" in deciding whether her reasonable expectation of privacy was violated); Brannum, 516 F.3d at 494 ("the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex"); York, 324 F.2d at 455 (highlighting that the exposed plaintiff was female and the viewing defendant male); Poe, 282 F.3d at 138 (citing with approval the Ninth Circuit's emphasis on the different genders of defendant and plaintiff in York).

Not only is bodily privacy a constitutional right, the need for privacy is even more pronounced in the state educational system. The students are almost all minors, and public school education is a protective environment. Furthermore, the School Board is tasked with providing safe and appropriate facilities for these students. Linnon v. Commonwealth, 752 S.E.2d 822, 826 (Va. 2014) (finding that "school administrators have a responsibility 'to supervise and ensure that students could have an education in an atmosphere conducive to learning, free of disruption, and threat to person.'" (quoting Burns v. Gagnon, 727 S.E.2d 634, 643 (Va. 2012)).

G.G.'s unsupported claims, which are mostly inadmissible hearsay, fail to show that his presence in the male restroom would not infringe upon the privacy of other students. G.G.'s claim that he "never encountered any problems from other students," G.G. Decl. ¶ 20, is directly contradicted by the Andersen Declaration. Andersen Decl. ¶ 4. Moreover, even if the Court accepted G.G.'s self-serving assertion, it would still not find that there was no discomfort among the students. It would not be surprising if students, rather than confronting G.G. himself,

23

expressed their discomfort to their parents who then went to the School Board.

G.G. further contends that the improvements that the School Board made to the restrooms minimize any privacy concerns. Prelim. Inj. at 33. However, G.G. does not introduce any evidence that would help the Court understand the extent of the improvements. He fails to recognize that no amount of improvements to the urinals can make them completely private because people sometimes turn while closing their pants. He does not submit any evidence that would show that other students would be comfortable with his presence in the male restroom because of the improvements. Finally, he fails to recognize that the School Board's interests go beyond preventing most exposures of genitalia. The mere presence of a member of the opposite sex in the restroom may embarrass many students and be felt a violation of their privacy. Accordingly, the privacy concerns of the School Board do not diminish in proportion to the size of the stall doors.

G.G.'s argument that other students may use the unisex restrooms if they are uncomfortable with his presence in the male restroom unintentionally reveals the hardship that the injunction he seeks would impose on other students. It does not occur to G.G. that other students may experience feelings of exclusion when they can no longer use the restrooms they were accustomed to using because they feel that G.G.'s presence in the male restroom violates their privacy. He would have any number of students use the unisex restrooms rather than use them himself while this Court resolves his novel constitutional challenge.

G.G.'s dismissal of the School Board's privacy concerns only makes sense if assumes that there are fewer or no privacy concerns when a student shares a restroom with another student of different birth sex but the same gender identity. If there were no privacy concerns in this situation, there would be no hardship if G.G. used the male restroom while this litigation

24

proceeds. Of course, this litigation is proof that not everyone—certainly not the Gloucester County School Board—shares in this belief. The Court gives great weight to the concerns of the School Board—which represents the students and parents in the community—on the question of the privacy concerns of students, especially at this early stage of litigation and in the complete absence of credible evidence to the contrary.

Against the School Board's strong interest in protecting student privacy, the Court must consider G.G.'s largely unsubstantiated claims of hardship. G.G. acknowledges that he may use the unisex restrooms or the nurse's restroom. His declaration fails to articulate the specific harms that would occur to him if he uses those restrooms while this litigation proceeds; it simply says that using these restrooms would cause him distress and make him feel stigmatized. It is telling to the Court that his declaration mirrors his complaint, a sign that it was drafted by his lawyers and not by him. G.G. attempts to support his claims of distress by describing the diagnosis of the first psychologist who saw him, but these allegations are hearsay and will not be considered.

Similarly, G.G. makes several claims about the thoughts and feelings of other students for which he has not submitted any admissible evidence or corroboration. He has nothing to substantiate his claims that other students view the unisex restrooms as designed solely for him. Nor has he submitted a layout of the school that would confirm his claim that the unisex restrooms are inconvenient for him to use.

The declaration of Dr. Ettner is almost completely devoid of facts specific to G.G. Dr. Ettner is not the psychologist who allegedly first diagnosed G.G. with Gender Dysphoria. Rather, he has been retained for this litigation. Having met G.G. only once, he has little to say about the harm that would occur to G.G. specifically if G.G. is not allowed to use the male restrooms during this litigation.

G.G. has been given an option of using a restroom in addition to the female restroom that corresponds to his biological sex. He has not described his hardship in concrete terms and has supported his claims with nothing more than his own declaration and that of a psychologist who met him only once, for the purpose of litigation and not for treatment. The School Board seeks to protect an interest in bodily privacy that the Fourth Circuit has recognized as a constitutional right while G.G. seeks to overturn a long tradition of segregating bathrooms based on biological differences between the sexes. Because G.G. has failed to show that the balance of hardships weighs in his favor, an injunction is not warranted while the Court considers this claim.

Having found that G.G. has not shown that the balance of the hardships are in his favor, the Court does not need to consider the other showings required for a preliminary injunction. However, the Court notes that just as G.G. has failed to provide adequate proof of the hardship that would occur if the injunction is not granted, he has also failed to make a clear showing of irreparable injury.

IV.     **CONCLUSION**

For the foregoing reasons, the Court **GRANTED** the Motion to Dismiss as to Count II, Plaintiff's claim under Title IX, and **DENIED** the Plaintiff's Motion for a Preliminary Injunction. The Clerk is **DIRECTED** to forward a copy of this Opinion to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Newport News, VA
September _17_, 2015

26