**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-2056**

---

G. G., by his next friend and mother, Deirdre Grimm,

      Plaintiff - Appellant,

    v.

GLOUCESTER COUNTY SCHOOL BOARD,

      Defendant - Appellee.

------------------------

JUDY CHIASSON, Ph. D., School Administrator California;
DAVID VANNASDALL, School Administrator California; DIANA K.
BRUCE, School Administrator District of Columbia; DENISE
PALAZZO, School Administrator Florida; JEREMY MAJESKI,
School Administrator Illinois; THOMAS A ABERLI, School
Administrator Kentucky; ROBERT BOURGEOIS, School
Administrator Massachusetts; MARY DORAN, School
Administrator Minnesota; VALERIA SILVA, School Administrator
Minnesota; RUDY RUDOLPH, School Administrator Oregon; JOHN
O'REILLY, School Administrator New York; LISA LOVE, School
Administrator Washington; DYLAN PAULY, School Administrator
Wisconsin; SHERIE HOHS, School Administrator Wisconsin; THE
NATIONAL WOMEN'S LAW CENTER; LEGAL MOMENTUM; THE ASSOCIATION
OF TITLE IV ADMINISTRATORS; EQUAL RIGHTS ADVOCATES; GENDER
JUSTICE; THE WOMEN'S LAW PROJECT; LEGAL VOICE; LEGAL AID
SOCIETY - EMPLOYMENT LAW CENTER; SOUTHWEST WOMEN'S LAW
CENTER; CALIFORNIA WOMEN'S LAW CENTER; THE WORLD
PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH; PEDIATRIC
ENDOCRINE SOCIETY; CHILD AND ADOLESCENT GENDER CENTER CLINIC
AT UCSF BENIOFF CHILDREN'S HOSPITAL; CENTER FOR TRANSYOUTH
HEALTH AND DEVELOPMENT AT CHILDREN'S HOSPITAL LOS ANGELES;
GENDER & SEX DEVELOPMENT PROGRAM AT ANN & ROBERT H. LURIE
CHILDREN'S HOSPITAL OF CHICAGO; FAN FREE CLINIC; WHITMAN-
WALKER CLINIC, INC., d/b/a Whitman-Walker Health; GLMA:
HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY; TRANSGENDER
LAW & POLICY INSTITUTE; GENDER BENDERS; GAY, LESBIAN &

STRAIGHT EDUCATION NETWORK; GAY-STRAIGHT ALLIANCE NETWORK; INSIDEOUT; EVIE PRIESTMAN; ROSMY; TIME OUT YOUTH; WE ARE FAMILY; UNITED STATES OF AMERICA; MICHELLE FORCIER, M.D.; NORMAN SPACK, M.D.,

                     Amici Supporting Appellant,

STATE OF SOUTH CAROLINA; PAUL R. LEPAGE, In his official capacity as Governor State of Maine; STATE OF ARIZONA; THE FAMILY FOUNDATION OF VIRGINIA; STATE OF MISSISSIPPI; JOHN WALSH; STATE OF WEST VIRGINIA; LORRAINE WALSH; PATRICK L. MCCRORY, In his official capacity as Governor State of North Carolina; MARK FRECHETTE; JUDITH REISMAN, Ph.D.; JON LYNSKY; LIBERTY CENTER FOR CHILD PROTECTION; BRADLY FRIEDLIN; LISA TERRY; LEE TERRY; DONALD CAULDER; WENDY CAULDER; KIM WARD; ALICE MAY; JIM RUTAN; ISSAC RUTAN; DORETHA GUJU; DOCTOR RODNEY AUTRY; PASTOR JAMES LARSEN; DAVID THORNTON; KATHY THORNTON; JOSHUA CUBA; CLAUDIA CLIFTON; ILONA GAMBILL; TIM BYRD; EAGLE FORUM EDUCATION AND LEGAL DEFENSE FUND,

                     Amici Supporting Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Robert G. Doumar, Senior District Judge.  (4:15-cv-00054-RGD-DEM)

---

Argued:  January 27, 2016             Decided:  April 19, 2016

---

Before NIEMEYER and FLOYD, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Reversed in part, vacated in part, and remanded by published opinion.  Judge Floyd wrote the opinion, in which Senior Judge Davis joined.  Senior Judge Davis wrote a separate concurring opinion.  Judge Niemeyer wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Joshua A. Block, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellant.  David Patrick Corrigan, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Richmond, Virginia, for Appellee.  **ON BRIEF:** Rebecca K. Glenberg, Gail

Deady, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia; Leslie Cooper, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellant. Jeremy D. Capps, M. Scott Fisher, Jr., HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Richmond, Virginia, for Appellee. Cynthia Cook Robertson, Washington, D.C., Narumi Ito, Amy L. Pierce, Los Angeles, California, Alexander P. Hardiman, Shawn P. Thomas, New York, New York, Richard M. Segal, Nathaniel R. Smith, PILLSBURY WINTHROP SHAW PITTMAN LLP, San Diego, California; Tara L. Borelli, Atlanta, Georgia, Kyle A. Palazzolo, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Chicago, Illinois; Alison Pennington, TRANSGENDER LAW CENTER, Oakland, California, for Amici School Administrators Judy Chiasson, David Vannasdall, Diana K. Bruce, Denise Palazzo, Jeremy Majeski, Thomas A. Aberli, Robert Bourgeois, Mary Doran, Valeria Silva, Rudy Rudolph, John O'Reilly, Lisa Love, Dylan Pauly, and Sherie Hohs. Suzanne B. Goldberg, Sexuality and Gender Law Clinic, COLUMBIA LAW SCHOOL, New York, New York; Erin E. Buzuvis, WESTERN NEW ENGLAND UNIVERSITY SCHOOL OF LAW, Springfield, Massachusetts, for Amici The National Women's Law Center, Legal Momentum, The Association of Title IX Administrators, Equal Rights Advocates, Gender Justice, The Women's Law Project, Legal Voice, Legal Aid Society-Employment Law Center, Southwest Women's Law Center, and California Women's Law Center. Jennifer Levi, GAY & LESBIAN ADVOCATES & DEFENDERS, Boston, Massachusetts; Thomas M. Hefferon, Washington, D.C., Mary K. Dulka, New York, New York, Christine Dieter, Jaime A. Santos, GOODWIN PROCTER LLP, Boston, Massachusetts; Shannon Minter, Asaf Orr, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California, for Amici The World Professional Association for Transgender Health, Pediatric Endocrine Society, Child and Adolescent Gender Center Clinic at UCSF Benioff Children's Hospital, Center for Transyouth Health and Development at Children's Hospital Los Angeles, Gender & Sex Development Program at Ann & Robert H. Lurie Children's Hospital of Chicago, Fan Free Clinic, Whitman-Walker Clinic, Inc., GLMA: Health Professionals Advancing LGBT Equality, Transgender Law & Policy Institute, Michelle Forcier, M.D. and Norman Spack, M.D. David Dinielli, Rick Mula, SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama, for Amici Gender Benders, Gay, Lesbian & Straight Education Network, Gay-Straight Alliance Network, iNSIDEoUT, Evie Priestman, ROSMY, Time Out Youth, and We Are Family. James Cole, Jr., General Counsel, Francisco Lopez, Vanessa Santos, Michelle Tucker, Attorneys, Office of the General Counsel, UNITED STATES DEPARTMENT OF EDUCATION, Washington, D.C.; Gregory B. Friel, Deputy Assistant Attorney General, Diana K. Flynn, Sharon M. McGowan, Christine A. Monta, Attorneys, Civil Rights Division, Appellate Section, UNITED

STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America. Alan Wilson, Attorney General, Robert D. Cook, Solicitor General, James Emory Smith, Jr., Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina; Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona; Jim Hood, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi; Patrick Morrisey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia; Amicus Paul R. LePage, Governor, State of Maine, Augusta, Maine; Robert C. Stephens, Jr., Jonathan R. Harris, COUNSEL FOR THE GOVERNOR OF NORTH CAROLINA, Raleigh, North Carolina, for Amicus Patrick L. Mccrory, Governor of North Carolina. Mary E. McAlister, Lynchburg, Virginia, Mathew D. Staver, Anita L. Staver, Horatio G. Mihet, LIBERTY COUNSEL, Orlando, Florida, for Amici Liberty Center for Child Protection and Judith Reisman, PhD. Jeremy D. Tedesco, Scottsdale, Arizona, Jordan Lorence, Washington, D.C., David A. Cortman, J. Matthew Sharp, Rory T. Gray, ALLIANCE DEFENDING FREEDOM, Lawrenceville, Georgia, for Amici The Family Foundation of Virginia, John Walsh, Lorraine Walsh, Mark Frechette, Jon Lynsky, Bradly Friedlin, Lisa Terry, Lee Terry, Donald Caulder, Wendy Caulder, Kim Ward, Alice May, Jim Rutan, Issac Rutan, Doretha Guju, Rodney Autry, James Larsen, David Thornton, Kathy Thornton, Joshua Cuba, Claudia Clifton, Ilona Gambill, and Tim Byrd. Lawrence J. Joseph, Washington, D.C., for Amicus Eagle Forum Education and Legal Defense Fund.

---

FLOYD, Circuit Judge:

G.G., a transgender boy, seeks to use the boys' restrooms at his high school.  After G.G. began to use the boys' restrooms with the approval of the school administration, the local school board passed a policy banning G.G. from the boys' restroom. G.G. alleges that the school board impermissibly discriminated against him in violation of Title IX and the Equal Protection Clause of the Constitution.  The district court dismissed G.G.'s Title IX claim and denied his request for a preliminary injunction.  This appeal followed.  Because we conclude the district court did not accord appropriate deference to the relevant Department of Education regulations, we reverse its dismissal of G.G.'s Title IX claim.  Because we conclude that the district court used the wrong evidentiary standard in assessing G.G.'s motion for a preliminary injunction, we vacate its denial and remand for consideration under the correct standard.  We therefore reverse in part, vacate in part, and remand the case for further proceedings consistent with this opinion.

I.

At the heart of this appeal is whether Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity.  Title IX provides: "[n]o

5

person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Department of Education's (the Department) regulations implementing Title IX permit the provision of "separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities for students of the other sex." 34 C.F.R. § 106.33. In an opinion letter dated January 7, 2015, the Department's Office for Civil Rights (OCR) interpreted how this regulation should apply to transgender individuals: "When a school elects to separate or treat students differently on the basis of sex . . . a school generally must treat transgender students consistent with their gender identity." J.A. 55. Because this case comes to us after dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), the facts below are generally as stated in G.G.'s complaint.

A.

G.G. is a transgender boy now in his junior year at Gloucester High School. G.G.'s birth-assigned sex, or so-called "biological sex," is female, but G.G.'s gender identity is male. G.G. has been diagnosed with gender dysphoria, a medical

condition characterized by clinically significant distress caused by an incongruence between a person's gender identity and the person's birth-assigned sex. Since the end of his freshman year, G.G. has undergone hormone therapy and has legally changed his name to G., a traditionally male name. G.G. lives all aspects of his life as a boy. G.G. has not, however, had sex reassignment surgery.[1]

Before beginning his sophomore year, G.G. and his mother told school officials that G.G. was a transgender boy. The officials were supportive and took steps to ensure that he would be treated as a boy by teachers and staff. Later, at G.G.'s request, school officials allowed G.G. to use the boys' restroom.[2] G.G. used this restroom without incident for about seven weeks. G.G.'s use of the boys' restroom, however, excited the interest of others in the community, some of whom contacted

---

[1] The World Professional Association for Transgender Health (WPATH) has established Standards of Care for individuals with gender dysphoria. J.A. 37. These Standards of Care are accepted as authoritative by organizations such as the American Medical Association and the American Psychological Association. Id. The WPATH Standards of Care do not permit sex reassignment surgery for persons who are under the legal age of majority. J.A. 38.

[2] G.G. does not participate in the school's physical education programs. He does not seek here, and never has sought, use of the boys' locker room. Only restroom use is at issue in this case.

the Gloucester County School Board (the Board) seeking to bar G.G. from continuing to use the boys' restroom.

Board Member Carla B. Hook (Hook) added an item to the agenda for the November 11, 2014 board meeting titled "Discussion of Use of Restrooms/Locker Room Facilities." J.A. 15. Hook proposed the following resolution (hereinafter the "transgender restroom policy" or "the policy"):

> Whereas the GCPS [i.e., Gloucester County Public Schools] recognizes that some students question their gender identities, and
>
> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

J.A. 15-16; 58.

At the November 11, 2014 meeting twenty-seven people spoke during the Citizens' Comment Period, a majority of whom supported Hook's proposed resolution. Many of the speakers displayed hostility to G.G., including by referring pointedly to

8

him as a "young lady." J.A. 16. Others claimed that permitting G.G. to use the boys' restroom would violate the privacy of other students and would lead to sexual assault in restrooms. One commenter suggested that if the proposed policy were not adopted, non-transgender boys would come to school wearing dresses in order to gain access to the girls' restrooms. G.G. and his parents spoke against the proposed policy. Ultimately, the Board postponed a vote on the policy until its next meeting on December 9, 2014.

At the December 9 meeting, approximately thirty-seven people spoke during the Citizens' Comment Period. Again, most of those who spoke were in favor of the proposed resolution. Some speakers threatened to vote the Board members out of office if the Board members voted against the proposed policy. Speakers again referred to G.G. as a "girl" or "young lady." J.A. 18. One speaker called G.G. a "freak" and compared him to a person who thinks he is a "dog" and wants to urinate on fire hydrants. Id. Following this second comment period, the Board voted 6-1 to adopt the proposed policy, thereby barring G.G. from using the boys' restroom at school.

G.G. alleges that he cannot use the girls' restroom because women and girls in those facilities "react[] negatively because they perceive[] G.G. to be a boy." Id. Further, using the girls' restroom would "cause severe psychological distress" to

9

G.G. and would be incompatible with his treatment for gender dysphoria. J.A. 19. As a corollary to the policy, the Board announced a series of updates to the school's restrooms to improve general privacy for all students, including adding or expanding partitions between urinals in male restrooms, adding privacy strips to the doors of stalls in all restrooms, and constructing single-stall unisex restrooms available to all students. G.G. alleges that he cannot use these new unisex restrooms because they "make him feel even more stigmatized . . . . Being required to use the separate restrooms sets him apart from his peers, and serves as a daily reminder that the school views him as 'different.'" Id. G.G. further alleges that, because of this stigma and exclusion, his social transition is undermined and he experiences "severe and persistent emotional and social harms." Id. G.G. avoids using the restroom while at school and has, as a result of this avoidance, developed multiple urinary tract infections.

B.

G.G. sued the Board on June 11, 2015. G.G. seeks an injunction allowing him to use the boys' restroom and brings underlying claims that the Board impermissibly discriminated against him in violation of Title IX of the Education Amendments Act of 1972 and the Equal Protection Clause of the Constitution.

On July 27, 2015, the district court held a hearing on G.G.'s motion for a preliminary injunction and on the Board's motion to dismiss G.G.'s lawsuit.   At the hearing, the district court orally dismissed G.G.'s Title IX claim and denied his request for a preliminary injunction, but withheld ruling on the motion to dismiss G.G.'s equal protection claim.   The district court followed its ruling from the bench with a written order dated September 4, 2015 denying the injunction and a second written order dated September 17, 2015 dismissing G.G.'s Title IX claim and expanding on its rationale for denying the injunction.

In its September 17, 2015 order, the district court reasoned that Title IX prohibits discrimination on the basis of sex and not on the basis of other concepts such as gender, gender identity, or sexual orientation.   The district court observed that the regulations implementing Title IX specifically allow schools to provide separate restrooms on the basis of sex. The district court concluded that G.G.'s sex was female and that requiring him to use the female restroom facilities did not impermissibly discriminate against him on the basis of sex in violation of Title IX.   With respect to G.G.'s request for an injunction, the district court found that G.G. had not made the required showing that the balance of equities was in his favor. The district court found that requiring G.G. to use the unisex restrooms during the pendency of this lawsuit was not unduly

burdensome and would result in less hardship than requiring
other students made uncomfortable by G.G.'s presence in the
boys' restroom to themselves use the unisex restrooms.

This appeal followed. G.G. asks us to reverse the district
court's dismissal of his Title IX claim, grant the injunction he
seeks, and, because of comments made by the district judge
during the motion hearing, to assign the case to a different
district judge on remand. The Board, on the other hand, asks us
to affirm the district court's rulings and also asks us to
dismiss G.G.'s equal protection claim—on which the district
court has yet to rule—as without merit. The United States, as
it did below, has filed an <u>amicus</u> brief supporting G.G.'s Title
IX claim in order to defend the government's interpretation of
Title IX as requiring schools to provide transgender students
access to restrooms congruent with their gender identity.

II.

We turn first to the district court's dismissal of G.G.'s
Title IX claim.[3] We review <u>de novo</u> the district court's grant of

_____

[3] We decline the Board's invitation to preemptively dismiss
G.G.'s equal protection claim before it has been fully
considered by the district court. "[W]e are a court of review,
not of first view." <u>Decker v. Nw. Envtl. Def. Ctr.</u>, 133 S. Ct.
1326, 1335 (2013) (citation and quotation marks omitted). We
will not proceed to the merits of G.G.'s equal protection claim
(Continued)

a motion to dismiss.  Cruz v. Maypa, 773 F.3d 138, 143 (4th Cir. 2014).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotations omitted).

As noted earlier, Title IX provides: "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681(a).   To allege a violation of Title IX, G.G. must allege (1) that he was excluded from participation in an education program because of his sex; (2) that the educational institution was receiving federal financial assistance at the time of his exclusion; and (3) that the improper discrimination caused G.G. harm.[4]   See Preston v.

---

on appeal without the benefit of the district court's prior consideration.

[4] The Board suggests that a restroom may not be educational in nature and thus is not an educational program covered by Title IX.   Appellee's Br. 35 (quoting Johnston v. Univ. of Pittsburgh, 97 F. Supp. 3d 657, 682 (W.D. Pa. 2015)).   The Department's regulation pertaining to "Education programs or activities" provides:

> Except as provided in this subpart, in providing any aid, benefit, or service to a

(Continued)

Virginia ex rel. New River Cmty. Coll., 31 F.3d 203, 206 (4th
Cir. 1994) (citing Cannon v. Univ. of Chi., 441 U.S. 677, 680
(1979)).  We look to case law interpreting Title VII of the
Civil Rights Act of 1964 for guidance in evaluating a claim
brought under Title IX.  Jennings v. Univ. of N.C., 482 F.3d
686, 695 (4th Cir. 2007).

    Not all distinctions on the basis of sex are impermissible
under Title IX.  For example, Title IX permits the provision of

_____

        student, a recipient shall not, on the basis
        of sex:

        (1) Treat one person differently from
        another in determining whether such person
        satisfies any requirement or condition for
        the provision of such aid, benefit, or
        service;

        (2) Provide different aid, benefits, or
        services or provide aid, benefits, or
        services in a different manner;

        (3) Deny any person any such aid, benefit,
        or service;

        . . .

        (7) Otherwise limit any person in the
        enjoyment of any right, privilege,
        advantage, or opportunity.

34 C.F.R. § 106.31(b).  We have little difficulty concluding
that access to a restroom at a school, under this regulation,
can be considered either an "aid, benefit, or service" or a
"right, privilege, advantage, or opportunity," which, when
offered by a recipient institution, falls within the meaning of
"educational program" as used in Title IX and defined by the
Department's implementing regulations.

separate living facilities on the basis of sex: "nothing contained [in Title IX] shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.   The Department's regulations implementing Title IX permit the provision of "separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."   34 C.F.R. § 106.33.   The Department recently delineated how this regulation should be applied to transgender individuals.   In an opinion letter dated January 7, 2015, the Department's Office for Civil Rights (OCR) wrote: "When a school elects to separate or treat students differently on the basis of sex . . . a school generally must treat transgender students consistent with their gender identity."[5]   J.A. 55.

_____

[5] The opinion letter cites to OCR's December 2014 "Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities."   This document, denoted a "significant guidance document" per Office of Management and Budget regulations, states: "All students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX.   Under Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes."   Office of Civil Rights, Dept. of Educ., Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities 25 (2014) (Continued)

A.

G.G., and the United States as amicus curiae, ask us to give the Department's interpretation of its own regulation controlling weight pursuant to Auer v. Robbins, 519 U.S. 452 (1997). Auer requires that an agency's interpretation of its own ambiguous regulation be given controlling weight unless the interpretation is plainly erroneous or inconsistent with the regulation or statute. Id. at 461. Agency interpretations need not be well-settled or long-standing to be entitled to deference. They must, however, "reflect the agency's fair and considered judgment on the matter in question." Id. at 462. An interpretation may not be the result of the agency's fair and considered judgment, and will not be accorded Auer deference, when the interpretation conflicts with a prior interpretation, when it appears that the interpretation is no more than a

_____

available at http://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-201412.pdf.

The dissent suggests that we ignore the part of OCR's opinion letter in which the agency "also encourages schools to offer the use of gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities," as the Board did here. Post at 66. However, because G.G. does want to use shared sex-segregated facilities, the agency's suggestion regarding students who do not want to use such shared sex-segregated facilities is immaterial to the resolution of G.G.'s claim. Nothing in today's opinion restricts any school's ability to provide individual-user facilities.

convenient litigating position, or when the interpretation is a post hoc rationalization. Christopher v. Smithkline Beecham Corp., 132 S. Ct. 2156, 2166 (2012) (citations omitted).

The district court declined to afford deference to the Department's interpretation of 34 C.F.R. § 106.33. The district court found the regulation to be unambiguous because "[i]t clearly allows the School Board to limit bathroom access 'on the basis of sex,' including birth or biological sex." G.G. v. Gloucester Cty. Sch. Bd., No. 4:15cv54, 2015 WL 5560190, at *8 (E.D. Va. Sept. 17, 2015). The district court also found, alternatively, that the interpretation advanced by the Department was clearly erroneous and inconsistent with the regulation. The district court reasoned that, because "on the basis of sex" means, at most, on the basis of sex and gender together, it cannot mean on the basis of gender alone. Id.

The United States contends that the regulation clarifies statutory ambiguity by making clear that schools may provide separate restrooms for boys and girls "without running afoul of Title IX." Br. for the United States as Amicus Curiae 24-25 (hereinafter "U.S. Br."). However, the Department also considers § 106.33 itself to be ambiguous as to transgender students because "the regulation is silent on what the phrases 'students of one sex' and 'students of the other sex' mean in the context of transgender students." Id. at 25. The United

States contends that the interpretation contained in OCR's January 7, 2015 letter resolves the ambiguity in § 106.33 as that regulation applies to transgender individuals.

B.

We will not accord an agency's interpretation of an unambiguous regulation _Auer_ deference. Thus, our analysis begins with a determination of whether 34 C.F.R. § 106.33 contains an ambiguity. Section 106.33 permits schools to provide "separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

"[D]etermining whether a regulation or statute is ambiguous presents a legal question, which we determine _de novo_." _Humanoids Grp. v. Rogan_, 375 F.3d 301, 306 (4th Cir. 2004). We determine ambiguity by analyzing the language under the three-part framework set forth in _Robinson v. Shell Oil Co._, 519 U.S. 337 (1997). The plainness or ambiguity of language is determined by reference to (1) the language itself, (2) the specific context in which that language is used, and (3) the broader context of the statute or regulation as a whole. _Id._ at 341.

First, we have little difficulty concluding that the language itself—"of one sex" and "of the other sex"—refers to male and female students.   Second, in the specific context of § 106.33, the plain meaning of the regulatory language is best stated by the United States: "the mere act of providing separate restroom facilities for males and females does not violate Title IX . . . ."  U.S. Br. 22 n.8.   Third, the language "of one sex" and "of the other sex" appears repeatedly in the broader context of 34 C.F.R. § 106 Subpart D, titled "Discrimination on the Basis of Sex in Education Programs or Activities Prohibited."[6] This repeated formulation indicates two sexes ("one sex" and "the other sex"), and the only reasonable reading of the language used throughout the relevant regulatory section is that it references male and female.   Read plainly then, § 106.33 permits schools to provide separate toilet, locker room, and shower facilities for its male and female students.   By

---

[6] For example, § 106.32(b)(2) provides that "[h]ousing provided . . . to students of one sex, when compared to that provided to students of the other sex, shall be as a whole: proportionate in quantity . . . and [c]omparable in quality and cost to the student"; § 106.37(a)(3) provides that an institution generally cannot "[a]pply any rule . . . concerning eligibility [for financial assistance] which treats persons of one sex differently from persons of the other sex with regard to marital or parental status"; and § 106.41(b) provides that "where [an institution] operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex . . . members of the excluded sex must be allowed to try-out for the team offered . . . . ."

implication, the regulation also permits schools to exclude males from the female facilities and vice-versa.

Our inquiry is not ended, however, by this straightforward conclusion. Although the regulation may refer unambiguously to males and females, it is silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms. We conclude that the regulation is susceptible to more than one plausible reading because it permits both the Board's reading—determining maleness or femaleness with reference exclusively to genitalia—and the Department's interpretation—determining maleness or femaleness with reference to gender identity. Cf. Dickenson-Russell Coal Co. v. Sec'y of Labor, 747 F.3d 251, 258 (4th Cir. 2014) (refusing to afford Auer deference where the language of the regulation at issue was "not susceptible to more than one plausible reading" (citation and quotation marks omitted)). It is not clear to us how the regulation would apply in a number of situations—even under the Board's own "biological gender" formulation. For example, which restroom would a transgender individual who had undergone sex-reassignment surgery use? What about an intersex individual? What about an individual born with X-X-Y sex chromosomes? What about an individual who lost external genitalia in an accident? The Department's interpretation resolves ambiguity by providing that

20

in the case of a transgender individual using a sex-segregated facility, the individual's sex as male or female is to be generally determined by reference to the student's gender identity.

C.

Because we conclude that the regulation is ambiguous as applied to transgender individuals, the Department's interpretation is entitled to <u>Auer</u> deference unless the Board demonstrates that the interpretation is plainly erroneous or inconsistent with the regulation or statute. <u>Auer</u>, 519 U.S. at 461. "Our review of the agency's interpretation in this context is therefore highly deferential." <u>Dickenson-Russell Coal</u>, 747 F.3d at 257 (citation and quotation marks omitted). "It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." <u>Decker v. Nw. Envtl. Def. Ctr.</u>, 133 S. Ct. 1326, 1337 (2013). An agency's view need only be reasonable to warrant deference. <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 702 (1991) ("[I]t is axiomatic that the [agency's] interpretation need not be the best or most natural one by grammatical or other standards. Rather, the [agency's] view need be only reasonable to warrant deference.").

21

Title IX regulations were promulgated by the Department of Health, Education, and Welfare in 1975 and were adopted unchanged by the Department in 1980.  45 Fed. Reg. 30802, 30955 (May 9, 1980).  Two dictionaries from the drafting era inform our analysis of how the term "sex" was understood at that time. The first defines "sex" as "the character of being either male or female" or "the sum of those anatomical and physiological differences with reference to which the male and female are distinguished . . . ."  American College Dictionary 1109 (1970). The second defines "sex" as:

> the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu[ally] genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness . . . .

Webster's Third New International Dictionary 2081 (1971).

Although these definitions suggest that the word "sex" was understood at the time the regulation was adopted to connote male and female and that maleness and femaleness were determined primarily by reference to the factors the district court termed "biological sex," namely reproductive organs, the definitions also suggest that a hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not

universally descriptive.[7]   The dictionaries, therefore, used qualifiers such as reference to the "sum of" various factors, "typical dichotomous occurrence," and "typically manifested as maleness and femaleness."   Section 106.33 assumes a student population composed of individuals of what has traditionally been understood as the usual "dichotomous occurrence" of male and female where the various indicators of sex all point in the same direction.   It sheds little light on how exactly to determine the "character of being either male or female" where those indicators diverge.   We conclude that the Department's interpretation of how § 106.33 and its underlying assumptions should apply to transgender individuals is not plainly erroneous or inconsistent with the text of the regulation.   The regulation is silent as to which restroom transgender individuals are to use when a school elects to provide sex-segregated restrooms, and the Department's interpretation, although perhaps not the intuitive one, is permitted by the varying physical, psychological, and social aspects—or, in the words of an older

---

[7] Modern definitions of "sex" also implicitly recognize the limitations of a nonmalleable, binary conception of sex.   For example, Black's Law Dictionary defines "sex" as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; gender."   Black's Law Dictionary 1583 (10th ed. 2014).   The American Heritage Dictionary includes in the definition of "sex" "[o]ne's identity as either female or male."   American Heritage Dictionary 1605 (5th ed. 2011).

dictionary, "the morphological, physiological, and behavioral peculiarities"—included in the term "sex."

D.

Finally, we consider whether the Department's interpretation of § 106.33 is the result of the agency's fair and considered judgment.  Even a valid interpretation will not be accorded <u>Auer</u> deference where it conflicts with a prior interpretation, where it appears that the interpretation is no more than a convenient litigating position, or where the interpretation is a <u>post hoc</u> rationalization.  <u>Christopher</u>, 132 S. Ct. at 2166 (citations omitted).

Although the Department's interpretation is novel because there was no interpretation as to how § 106.33 applied to transgender individuals before January 2015, "novelty alone is no reason to refuse deference" and does not render the current interpretation inconsistent with prior agency practice.  <u>See Talk Am., Inc. v. Mich. Bell Tel. Co.</u>, 131 S. Ct. 2254, 2263 (2011).  As the United States explains, the issue in this case "did not arise until recently," <u>see id.</u>, because schools have only recently begun citing § 106.33 as justification for enacting new policies restricting transgender students' access to restroom facilities.  The Department contends that "[i]t is to those 'newfound' policies that [the Department's]

24

interpretation of the regulation responds." U.S. Br. 29. We see no reason to doubt this explanation. See Talk Am., Inc., 131 S. Ct. at 2264.

Nor is the interpretation merely a convenient litigating position. The Department has consistently enforced this position since 2014. See J.A. 55 n.5 & n.6 (providing examples of OCR enforcement actions to secure transgender students access to restrooms congruent with their gender identities). Finally, this interpretation cannot properly be considered a post hoc rationalization because it is in line with the existing guidances and regulations of a number of federal agencies—all of which provide that transgender individuals should be permitted access to the restroom that corresponds with their gender identities.[8] U.S. Br. 17 n.5 & n.6 (citing publications by the Occupational Safety and Health Administration, the Equal Employment Opportunity Commission, the Department of Housing and

---

[8] We disagree with the dissent's suggestion that the result we reach today renders the enforcement of separate restroom facilities impossible because it "would require schools to assume gender identity based on appearances, social expectations, or explicit declarations of identity." Post at 65. Accepting the Board's position would equally require the school to assume "biological sex" based on "appearances, social expectations, or explicit declarations of [biological sex]." Certainly, no one is suggesting mandatory verification of the "correct" genitalia before admittance to a restroom. The Department's vision of sex-segregated restrooms which takes account of gender identity presents no greater "impossibility of enforcement" problem than does the Board's "biological gender" vision of sex-segregated restrooms.

Urban Development, and the Office of Personnel Management).
None of the Christopher grounds for withholding Auer deference
are present in this case.


                              E.

     We conclude that the Department's interpretation of its own
regulation, § 106.33, as it relates to restroom access by
transgender individuals, is entitled to Auer deference and is to
be accorded controlling weight in this case.[9]   We reverse the
district court's contrary conclusion and its resultant dismissal
of G.G.'s Title IX claim.


                              F.

     In many respects, we are in agreement with the dissent.   We
agree that "sex" should be construed uniformly throughout Title
IX and its implementing regulations.   We agree that it has
indeed been commonplace and widely accepted to separate public

---

     [9] The Board urges us to reach a contrary conclusion
regarding the validity of the Department's interpretation,
citing Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher
Educ., 97 F. Supp. 657 (W.D. Pa. 2015).   Although we recognize
that the Johnston court confronted a case similar in most
material facts to the one before us, that court did not consider
the Department's interpretation of § 106.33.   Because the
Johnston court did not grapple with the questions of
administrative law implicated here, we find the Title IX
analysis in Johnston to be unpersuasive.

restrooms, locker rooms, and shower facilities on the basis of sex. We agree that "an individual has a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts" are not involuntarily exposed.[10]  Post at 56.  It is not apparent to us, however, that the truth of these propositions undermines the conclusion we reach regarding the level of deference due to the Department's interpretation of its own regulations.

The Supreme Court commands the use of particular analytical frameworks when courts review the actions of the executive agencies. G.G. claims that he is entitled to use the boys' restroom pursuant to the Department's interpretation of its regulations implementing Title IX. We have carefully followed the Supreme Court's guidance in <u>Chevron</u>, <u>Auer</u>, and <u>Christopher</u> and have determined that the interpretation contained in the OCR letter is to be accorded controlling weight.  In a case such as

---

[10] We doubt that G.G.'s use of the communal restroom of his choice threatens the type of constitutional abuses present in the cases cited by the dissent. For example, G.G.'s use—or for that matter any individual's appropriate use—of a restroom will not involve the type of intrusion present in <u>Brannum v. Overton Cty. Sch. Bd.</u>, 516 F.3d 489, 494 (6th Cir. 2008) (involving the videotaping of students dressing and undressing in school locker rooms), <u>Beard v. Whitmore Lake Sch. Dist.</u>, 402 F.3d 598, 604 (6th Cir. 2005) (involving the indiscriminate strip searching of twenty male and five female students), or <u>Supelveda v. Ramirez</u>, 967 F.2d 1413, 1416 (9th Cir. 1992) (involving a male parole officer forcibly entering a bathroom stall with a female parolee to supervise the provision of a urine sample).

this, where there is no constitutional challenge to the regulation or agency interpretation, the weighing of privacy interests or safety concerns[11]—fundamentally questions of policy— is a task committed to the agency, not to the courts.

The Supreme Court's admonition in <u>Chevron</u> points to the balance courts must strike:

> Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests

---

[11] The dissent accepts the Board's invocation of amorphous safety concerns as a reason for refusing deference to the Department's interpretation. We note that the record is devoid of any evidence tending to show that G.G.'s use of the boys' restroom creates a safety issue. We also note that the Board has been, perhaps deliberately, vague as to the nature of the safety concerns it has—whether it fears that it cannot ensure G.G.'s safety while in the restroom or whether it fears G.G. himself is a threat to the safety of others in the restroom. We are unconvinced of the existence of danger caused by "sexual responses prompted by students' exposure to the private body parts of students of the other biological sex." Post at 58. The same safety concern would seem to require segregated restrooms for gay boys and girls who would, under the dissent's formulation, present a safety risk because of the "sexual responses prompted" by their exposure to the private body parts of other students of the same sex in sex-segregated restrooms.

> which Congress itself either inadvertently
> did not resolve, or intentionally left to be
> resolved by the agency charged with the
> administration of the statute in light of
> everyday realities.

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 865-66 (1984).   Not only may a subsequent administration choose to implement a different policy, but Congress may also, of course, revise Title IX explicitly to prohibit or authorize the course charted here by the Department regarding the use of restrooms by transgender students.   To the extent the dissent critiques the result we reach today on policy grounds, we reply that, our Auer analysis complete, we leave policy formulation to the political branches.


                                    III.

     G.G. also asks us to reverse the district court's denial of the preliminary injunction he sought which would have allowed him to use the boys' restroom during the pendency of this lawsuit.   "To win such a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest."   League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th

Cir. 2014) (citation omitted).  We review a district court's denial of a preliminary injunction for abuse of discretion.  <u>Id.</u> at 235.  "A district court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding."  <u>Morris v. Wachovia Sec., Inc.</u>, 448 F.3d 268, 277 (4th Cir. 2006) (citation and quotations omitted).  "We do not ask whether we would have come to the same conclusion as the district court if we were examining the matter <u>de novo</u>."  <u>Id.</u> (citation omitted).  Instead, "we reverse for abuse of discretion if we form a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  <u>Id.</u> (citations and quotations omitted).

The district court analyzed G.G.'s request only with reference to the third factor—the balance of hardships—and found that the balance of hardships did not weigh in G.G.'s favor.  G.G. submitted two declarations in support of his complaint, one from G.G. himself and one from a medical expert, Dr. Randi Ettner, to explain what harms G.G. will suffer as a result of his exclusion from the boys' restroom. The district court refused to consider this evidence because it was "replete with inadmissible evidence including thoughts of others, hearsay, and suppositions."  <u>G.G.</u>, 2015 WL 5560190, at *11.

The district court misstated the evidentiary standard governing preliminary injunction hearings. The district court stated: "The complaint is no longer the deciding factor, admissible evidence is the deciding factor. Evidence therefore must conform to the rules of evidence." Id. at *9. Preliminary injunctions, however, are governed by less strict rules of evidence:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.

Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); see also Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976) (taking as true the "well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction"); compare Fed. R. Civ. P. 56 (requiring affidavits supporting summary judgment to be "made on personal knowledge, [and to] set out facts that would be admissible in evidence), with Fed R. Civ. P. 65 (providing no such requirement in the preliminary injunction context). Thus, although admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context, it was error for

the district court to summarily reject G.G.'s proffered evidence because it may have been inadmissible at a subsequent trial.

Additionally, the district court completely excluded some of G.G.'s proffered evidence on hearsay grounds. The seven of our sister circuits to have considered the admissibility of hearsay in preliminary injunction proceedings have decided that the nature of evidence as hearsay goes to "weight, not preclusion" and have permitted district courts to "rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction." Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010); see also Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 718 (3d Cir. 2004); Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1171 (7th Cir. 1997); Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." (citation and internal quotations omitted)); Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."); Asseo v.

Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986); Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984). We see no reason for a different rule to govern in this Circuit. Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted.

Because the district court evaluated G.G.'s proffered evidence against a stricter evidentiary standard than is warranted by the nature and purpose of preliminary injunction proceedings to prevent irreparable harm before a full trial on the merits, the district court was "guided by erroneous legal principles." We therefore conclude that the district court abused its discretion when it denied G.G.'s request for a preliminary injunction without considering G.G.'s proffered evidence. We vacate the district court's denial of G.G.'s motion for a preliminary injunction and remand the case to the district court for consideration of G.G.'s evidence in light of the evidentiary standards set forth herein.

IV.

Finally, G.G. requests that we reassign this case to a different district judge on remand. G.G. does not explicitly claim that the district judge is biased. Absent such a claim, reassignment is only appropriate in "unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." United States v. Guglielmi, 929 F.2d 1001, 1007 (4th Cir. 1991) (citation and internal quotation marks omitted). In determining whether such circumstances exist, a court should consider: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. Id. (citation omitted).

G.G. argues that both the first and second Guglielmi factors are satisfied. He contends that the district court has pre-existing views which it would be unwilling to put aside in the face of contrary evidence about medical science generally and about "gender and sexuality in particular." Appellant's Br.

53.    For  example,  the  court  accepted  the  Board's  "mating" concern by noting:

> There    are    only    two    instincts—two.
> Everything   else   is   acquired—everything.
> That  is,  the  brain  only  has  two  instincts.
> One  is  called  self-preservation,  and  the
> other  is  procreation.   And  procreation  is
> the  highest  instinct  in  individuals  who  are
> in  the  latter  part  of  their  teen-age  years.
> All  of  that  is  accepted  by  all  medical
> science,  as  far  as  I  can  determine  in
> reading  information.

J.A. 85-86.

The  district  court  also  expressed  skepticism  that  medical science  supported  the  proposition  that  one  could  develop  a urinary  tract  infection  from  withholding  urine  for  too  long. J.A.  111-12.   The  district  court  characterized  gender  dysphoria as  a  "mental  disorder"  and  resisted  several  attempts  by  counsel for  G.G.  to  clarify  that  it  only  becomes  a  disorder  when  left untreated.   See  J.A.  88-91;  101-02.   The  district  court  also seemed  to  reject  G.G.'s  representation  of  what  it  meant  to  be transgender,  repeatedly  noting  that  G.G.  "wants"  to  be  a  boy  and not  a  girl,  but  that  "he  is  biologically  a  female."   J.A.  103-04;  see also  J.A.  104  ("It's  his  mind.  It's  not  physical  that causes  that,  it's  what  he  believes.").   The  district  court's memorandum  opinion,  however,  included  none  of  the  extraneous remarks  or  suppositions  that  marred  the  hearing.

Reassignment is an unusual step at this early stage of litigation. Although the district court did express opinions about medical facts and skepticism of G.G.'s claims, the record does not clearly indicate that the district judge would refuse to consider and credit sound contrary evidence. Further, although the district court has a distinct way of proceeding in court, the hearing record and the district court's written order in the case do not raise in our minds a question about the fundamental fairness of the proceedings, however idiosyncratic. The conduct of the district judge does not at this point satisfy the Guglielmi standard. We deny G.G.'s request for reassignment to a different district judge on remand.

V.

For the foregoing reasons, the judgment of the district court is

REVERSED IN PART, VACATED IN PART, AND REMANDED.

DAVIS, Senior Circuit Judge, concurring:

I concur in Judge Floyd's fine opinion. I write separately, however, to note that while I am happy to join in the remand of this matter to the district court so that it may consider G.G.'s evidence under proper legal standards in the first instance, this Court would be on sound ground in granting the requested preliminary injunction on the undisputed facts in the record.

## I.

In order to obtain a preliminary injunction, G.G. must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of an injunction, (3) the balance of hardships tips in his favor, and (4) the requested injunction is in the public interest. Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013) (citing Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008)). The record before us establishes that G.G. has done so.

## A.

G.G. alleges that by singling him out for different treatment because he is transgender, the Board's restroom policy discriminates against him "on the basis of sex" in violation of Title IX. In light of the weight of circuit authority concluding that discrimination against transgender individuals constitutes discrimination "on the basis of sex" in the context

of analogous statutes and our holding here that the Department's interpretation of 34 C.F.R. § 106.33 is to be given controlling weight, G.G. has surely demonstrated a likelihood of success on the merits of his Title IX claim.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 250–51 (1989); see also Glenn v. Brumby, 663 F.3d 1312, 1316–19 (11th Cir. 2011); Smith v. City of Salem, 378 F.3d 566, 573–75 (6th Cir. 2004); Rosa v. Park W. Bank & Trust Co., 214 F.3d 213, 215–16 (1st Cir. 2000); Schwenk v. Hartford, 204 F.3d 1187, 1201–02 (9th Cir. 2000).

B.

In support of his claim of irreparable harm, G.G. submitted an affidavit to the district court describing the psychological distress he experiences when he is forced to use the single-stall restrooms or the restroom in the nurse's office.  See J.A. 32–33.  His affidavit also indicates that he has "repeatedly developed painful urinary tract infections" as a result of holding his urine in order to avoid using the restroom at school.  Id.

An expert declaration by Dr. Randi Ettner, a psychologist specializing in working with children and adolescents with gender dysphoria, provides further support for G.G.'s claim of irreparable harm.  In her affidavit, Dr. Ettner indicates that treating a transgender boy as male in some situations but not in others is "inconsistent with evidence-based medical practice and

38

detrimental to the health and well-being of the child" and explains why access to a restroom appropriate to one's gender identity is important for transgender youth. J.A. 39. With respect to G.G. in particular, Dr. Ettner states that in her professional opinion, the Board's restroom policy "is currently causing emotional distress to an extremely vulnerable youth and placing G.G. at risk for accruing lifelong psychological harm." J.A. 41. In particular, Dr. Ettner opines that

> [a]s a result of the School Board's restroom policy, . . . . G.G. is put in the humiliating position of having to use a separate facility, thereby accentuating his 'otherness,' undermining his identity formation, and impeding his medically necessary social transition process. The shame of being singled out and stigmatized in his daily life every time he needs to use the restroom is a devastating blow to G.G. and places him at extreme risk for immediate and long-term psychological harm.

J.A. 42.

The Board offers nothing to contradict any of the assertions concerning irreparable harm in G.G.'s or Dr. Ettner's affidavits. Instead, its arguments focus on what is purportedly lacking from G.G.'s presentation in support of his claim of irreparable harm, such as "evidence that [his feelings of dysphoria, anxiety, and distress] would be lessened by using the boy[s'] restroom," evidence from his treating psychologist, medical evidence, and an opinion from Dr. Ettner "differentiating between the distress that G.G. may suffer by

not using the boy[s'] bathroom during the course of this litigation and the distress that he has apparently been living with since age 12." Br. Appellee 42–43. As to the alleged deficiency concerning Dr. Ettner's opinion, the Board's argument is belied by Dr. Ettner's affidavit itself, which, as quoted above, provides her opinion about the psychological harm that G.G. is experiencing "[a]s a result of the School Board's restroom policy." J.A. 42. With respect to the other purported inadequacies, the absence of such evidence does nothing to undermine the uncontroverted statements concerning the daily psychological harm G.G. experiences as a result of the Board's policy or Dr. Ettner's unchallenged opinion concerning the significant long-term consequences of that harm. Moreover, the Board offers no argument to counter G.G.'s averment that he has repeatedly contracted a urinary tract infection as a result of holding his urine to avoid using the restroom at school.

The uncontroverted facts before the district court demonstrate that as a result of the Board's restroom policy, G.G. experiences daily psychological harm that puts him at risk for long-term psychological harm, and his avoidance of the restroom as a result of the Board's policy puts him at risk for developing a urinary tract infection as he has repeatedly in the past. G.G. has thus demonstrated that he will suffer irreparable harm in the absence of an injunction.

C.

Turning to the balance of the hardships, G.G. has shown that he will suffer irreparable harm without the requested injunction. On the other end of the scale, the Board contends that other students' constitutional right to privacy will be imperiled by G.G.'s presence in the boys' restroom.

As the majority opinion points out, G.G.'s use of the restroom does not implicate the unconstitutional actions involved in the cases cited by the dissent. Moreover, students' unintentional exposure of their genitals to others using the restroom has already been largely, if not entirely, remedied by the alterations to the school's restrooms already undertaken by the Board. To the extent that a student simply objects to using the restroom in the presence of a transgender student even where there is no possibility that either student's genitals will be exposed, all students have access to the single-stall restrooms. For other students, using the single-stall restrooms carries no stigma whatsoever, whereas for G.G., using those same restrooms is tantamount to humiliation and a continuing mark of difference among his fellow students. The minimal or non-existent hardship to other students of using the single-stall restrooms if they object to G.G.'s presence in the communal restroom thus does not tip the scale in the Board's favor. The balance of hardships weighs heavily toward G.G.

41

D.

Finally, consideration of the public interest in granting or denying the preliminary injunction favors G.G. Having concluded that G.G. has demonstrated a likelihood of success on the merits of his Title IX claim, denying the requested injunction would permit the Board to continue violating G.G.'s rights under Title IX for the pendency of this case. Enforcing G.G.'s right to be free from discrimination on the basis of sex in an educational institution is plainly in the public interest. Cf. Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted) (observing that upholding constitutional rights is in the public interest).

The Board contends that the public interest lies in allowing this issue to be determined by the legislature, citing pending legislation before Congress addressing the issue before the Court. But, as discussed above, the weight of authority establishes that discrimination based on transgender status is already prohibited by the language of federal civil rights statutes, as interpreted by the Supreme Court. The existence of proposed legislation that, if passed, would address the question before us does not justify forcing G.G. to suffer irreparable harm when he has demonstrated that he is likely to succeed on the merits of his claims under current federal law.

II.

Based on the evidence presented to the district court, G.G. has satisfied all four prongs of the preliminary injunction inquiry. When the record before us supports entry of a preliminary injunction—as it amply does here—we have not hesitated to act to prevent irreparable injury to a litigant before us. See, e.g., League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 248 (4th Cir. 2014) (expressly observing that appellate courts have the power to vacate a denial of a preliminary injunction and direct entry of an injunction); Eisenberg ex rel. Eisenberg v. Montgomery Cty. Pub. Schs., 197 F.3d 123, 134 (4th Cir. 1999) (directing entry of injunction "because the record clearly establishes the plaintiff's right to an injunction and [an evidentiary] hearing would not have altered the result").

Nevertheless, it is right and proper that we defer to the district court in this instance. It is to be hoped that the district court will turn its attention to this matter with the urgency the case poses. Under the circumstances here, the appropriateness and necessity of such prompt action is plain. By the time the district court issues its decision, G.G. will have suffered the psychological harm the injunction sought to prevent for an entire school year.

With these additional observations, I concur fully in Judge Floyd's thoughtful and thorough opinion for the panel.

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in Part IV of the court's opinion.  With respect to whether G.G. stated a claim under Title IX and whether the district court abused its discretion in denying G.G's motion for a preliminary injunction, I would affirm the ruling of the district court dismissing G.G.'s Title IX claim and denying his motion for a preliminary injunction.  I therefore dissent from the majority's decision on those issues.

G.G., a transgender boy who is 16, challenges as discriminatory, under the Equal Protection Clause and Title IX of the Education Amendments of 1972, his high school's policy for assigning students to restrooms and locker rooms based on biological sex.  The school's policy provides:  (1) that the girls' restrooms and locker rooms are designated for use by students who are biologically female; (2) that the boys' restrooms and locker rooms are designated for use by students who are biologically male; and (3) that all students, regardless of their sex, are authorized to use the school's three single-stall unisex restrooms, which the school created to accommodate transgender students.  Under this policy, G.G., who is biologically female but who identifies as male, is authorized to use the girls' restrooms and locker rooms and the unisex restrooms.  He contends, however, that the policy discriminates

against him because it denies him, as one who identifies as
male, the use of the boys' restrooms, and he seeks an injunction
compelling the high school to allow him to use the boys'
restrooms.

The district court dismissed G.G.'s Title IX claim,
explaining that the school complied with Title IX and its
regulations, which permit schools to provide separate living
facilities, restrooms, locker rooms, and shower facilities "on
the basis of sex," so long as the facilities are "comparable."
20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33.

Strikingly, the majority now reverses the district court's
ruling, without any supporting case law, and concludes that when
Title IX and its regulations provide for separate living
facilities, restrooms, locker rooms, and shower facilities on
the basis of sex, the statute's and regulations' use of the term
"sex" means a person's gender identity, not the person's
biological status as male or female.  To accomplish its goal,
the majority relies entirely on a 2015 letter sent by the
Department of Education's Office for Civil Rights to G.G., in
which the Office for Civil Rights stated, "When a school elects
to separate or treat students differently on the basis of sex
[when providing restrooms, locker rooms, shower facilities,
housing, athletic teams, and single-sex classes], a school
generally must treat transgender students consistent with their

gender identity." (Emphasis added). Accepting that new definition of the statutory term "sex," the majority's opinion, for the first time ever, holds that a public high school may not provide separate restrooms and locker rooms on the basis of biological sex. Rather, it must now allow a biological male student who identifies as female to use the girls' restrooms and locker rooms and, likewise, must allow a biological female student who identifies as male to use the boys' restrooms and locker rooms. This holding completely tramples on all universally accepted protections of privacy and safety that are based on the anatomical differences between the sexes. And, unwittingly, it also tramples on the very concerns expressed by G.G., who said that he should not be forced to go to the girls' restrooms because of the "severe psychological distress" it would inflict on him and because female students had "reacted negatively" to his presence in girls' restrooms. Surely biological males who identify as females would encounter similar reactions in the girls' restroom, just as students physically exposed to students of the opposite biological sex would be likely to experience psychological distress. As a result, schools would no longer be able to protect physiological privacy as between students of the opposite biological sex.

This unprecedented holding overrules custom, culture, and the very demands inherent in human nature for privacy and

safety, which the separation of such facilities is designed to protect.   More particularly, it also misconstrues the clear language of Title IX and its regulations.   And finally, it reaches an unworkable and illogical result.

The recent Office for Civil Rights letter, moreover, which is not law but which is the only authority on which the majority relies, states more than the majority acknowledges.   In the sentence following the sentence on which the majority relies, the letter states that, to accommodate transgender students, schools are encouraged "to offer the use of gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities [as permitted by Title IX's regulations]."   This appears to approve the course that G.G.'s school followed when it created unisex restrooms in addition to the boys' and girls' restrooms it already had.

Title IX and its implementing regulations are not ambiguous.   In recognition of physiological privacy and safety concerns, they allow schools to provide "separate living facilities for the different sexes," 20 U.S.C. § 1686, provided that the facilities are "proportionate" and "comparable," 34 C.F.R. § 106.32(b), and to provide "separate toilet, locker room, and shower facilities on the basis of sex," again provided that the facilities are "comparable," 34 C.F.R. § 106.33. Because the school's policy that G.G. challenges in this action

48

comports with Title IX and its regulations, I would affirm the district court's dismissal of G.G.'s Title IX claim.

I

The relevant facts are not in dispute. G.G. is a 16 year-old who attends Gloucester High School in Gloucester County, Virginia. He is biologically female, but "did not feel like a girl" from an early age. Still, he enrolled at Gloucester High School for his freshman year as a female.

During his freshman year, however, G.G. told his parents that he considered himself to be transgender, and shortly thereafter, at his request, he began therapy with a psychologist, who diagnosed him with gender dysphoria, a condition of distress brought about by the incongruence of one's biological sex and gender identity.

In August 2014, before beginning his sophomore year, G.G. and his mother met with the principal and guidance counselor at Gloucester High School to discuss his need, as part of his treatment, to socially transition at school. The school accommodated all of his requests. Officials changed school records to reflect G.G.'s new male name; the guidance counselor supported G.G.'s sending an email to teachers explaining that he was to be addressed using his new name and to be referred to using male pronouns; G.G. was permitted to fulfill his physical

49

education requirement through a home-bound program, as he preferred not to use the school's locker rooms; and the school allowed G.G. to use a restroom in the nurse's office "because [he] was unsure how other students would react to [his] transition." G.G. was grateful for the school's "welcoming environment." As he stated, "no teachers, administrators, or staff at Gloucester High School expressed any resistance to calling [him] by [his] legal name or referring to [him] using male pronouns." And he was "pleased to discover that [his] teachers and the vast majority of [his] peers respected the fact that [he is] a boy."

As the school year began, however, G.G. found it "stigmatizing" to continue using the nurse's restroom, and he requested to use the boys' restrooms. The principal also accommodated this request. But the very next day, the School Board began receiving "numerous complaints from parents and students about [G.G.'s] use of the boys' restrooms." The School Board thus faced a dilemma. It recognized G.G.'s feelings, as he expressed them, that "[u]sing the girls' restroom[s] [was] not possible" because of the "severe psychological distress" it would inflict on him and because female students had previously "reacted negatively" to his presence in the girls' restrooms. It now also had to recognize that boys had similar feelings caused by G.G.'s use of the boys' restrooms, although G.G.

stated that he continued using the boys' restrooms for some seven weeks without personally receiving complaints from fellow students.

The Gloucester County School Board considered the problem and, after two public meetings, adopted a compromise policy, as follows:

> Whereas the GCPS recognizes that some students question their gender identities, and
>
> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Gloucester High School promptly implemented the policy and created three single-stall unisex restrooms for use by all students, regardless of their biological sex or gender identity.

In December 2014, G.G. sought an opinion letter about his situation from the U.S. Department of Education's Office for Civil Rights, and on January 15, 2015, the Office responded, stating, as relevant here:

> The Department's Title IX regulations permit schools to provide sex-segregated restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes under certain circumstances. When

a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity. [The Office for Civil Rights] also encourages schools to offer the use of gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities.

G.G. commenced this action in June 2015, alleging that the Gloucester County School Board's policy was discriminatory, in violation of the U.S. Constitution's Equal Protection Clause and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. He sought declaratory relief, injunctive relief, and damages. With his complaint, G.G. also filed a motion for a preliminary injunction "requiring the School Board to allow [him] to use the boys' restrooms at school."

The district court dismissed G.G.'s Title IX claim because Title IX's implementing regulations permit schools to provide separate restrooms "on the basis of sex." The court also denied G.G.'s motion for a preliminary injunction. As to the Equal Protection claim, the court has not yet ruled on whether G.G. failed to state a claim, but, at the hearing on the motion for a preliminary injunction, it indicated that it "will hear evidence" and "get a date set" for trial to better assess the claim.

From the district court's order denying G.G.'s motion for a preliminary injunction, G.G. filed this appeal, in which he also

challenges the district court's Title IX ruling as inextricably intertwined with the district court's denial of the motion for a preliminary injunction.

## II

G.G. recognizes that persons who are born biologically female "typically" identify psychologically as female, and likewise, that persons who are born biologically male "typically" identify as male.   Because G.G. was born biologically female but identifies as male, he characterizes himself as a transgender male.   He contends that because he is transgender, the School Board singled him out for "different and unequal treatment," "discriminat[ing] against him based on sex [by denying him use of the boys' restrooms], in violation of Title IX."   He argues, "discrimination against transgender people is necessarily discrimination based on sex because it is impossible to treat people differently based on their transgender status without taking their sex into account."   He concludes that the School Board's policy addressing restrooms and locker rooms thus illegally fails to include transgender persons on the basis of their gender identity.   In particular, he concludes that he is "prevent[ed] . . . from using the same restrooms as other students and relegat[ed] . . . to separate, single-stall facilities."

As noted, the School Board's policy designates the use of restrooms and locker rooms based on the student's biological sex -- biological females are assigned to the girls' restrooms and unisex restrooms; biological males are assigned to the boys' restrooms and unisex restrooms.  G.G. is thus assigned to the girls' restrooms and the unisex restrooms, but is denied the use of the boys' restrooms.  He asserts, however, that because neither he nor the girls would accept his use of the girls' restroom, he is relegated to the unisex restrooms, which is stigmatizing.

The School Board contends that it is treating all students the same way, as it explains:

> The School Board's policy does not discriminate against any class of students.  Instead, the policy was developed to treat all students and situations the same.  To respect the safety and privacy of all students, the School Board has had a long-standing practice of limiting the use of restroom and locker room facilities to the corresponding biological sex of the students.  The School Board also provides three single-stall bathrooms for any student to use regardless of his or her biological sex.  Under the School Board's restroom policy, G.G. is being treated like every other student in the Gloucester Schools.  All students have two choices.  Every student can use a restroom associated with their anatomical sex, whether they are boys or girls.  If students choose not to use the restroom associated with their anatomical sex, the students can use a private, single-stall restroom.  No student is permitted to use the restroom of the opposite sex.  As a result, all students, including female to male transgender and male to female transgender students, are treated the same.

While G.G. has pending a claim under the Equal Protection Clause (on which the district court has not yet ruled), only his preliminary injunction challenge and Title IX claim are before us at this time.

Title IX provides:

No person in the United States shall, <u>on the basis of sex</u>, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a) (emphasis added). The Act, however, provides, "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities <u>for the different sexes</u>." <u>Id.</u> § 1686 (emphasis added); <u>see also</u> 34 C.F.R. § 106.32(b) (permitting schools to provide "separate housing <u>on the basis of sex</u>" as long as the housing is "proportionate" and "comparable" (emphasis added)). Similarly, implementing Regulation 106.33 provides for particular separate facilities, as follows:

A recipient may provide separate toilet, locker room, and shower facilities <u>on the basis of sex</u>, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33 (emphasis added). Thus, although Title IX and its regulations provide generally that a school receiving

federal funds may not discriminate on the basis of sex, they also specify that a school does not violate the Act by providing, on the basis of sex, separate living facilities, restrooms, locker rooms, and shower facilities.

While G.G. only challenges the definition and application of the term "sex" with respect to separate restrooms, acceptance of his argument would necessarily change the definition of "sex" for purposes of assigning separate living facilities, locker rooms, and shower facilities as well. All are based on "sex," a term that must be construed uniformly throughout Title IX and its implementing regulations. See Sullivan v. Stroop, 496 U.S. 478, 484 (1990) ("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks and citations omitted)); In re Total Realty Mgmt., LLC, 706 F.3d 245, 251 (4th Cir. 2013) ("Canons of construction . . . require that, to the extent possible, identical terms or phrases used in different parts of the same statute be interpreted as having the same meaning. This presumption of consistent usage . . . ensure[s] that the statutory scheme is coherent and consistent" (alterations in original) (internal quotation marks and citations omitted)); see also Kentuckians for Commonwealth Inc. v. Riverburgh, 317 F.3d 425, 440 (4th Cir. 2003) ("[B]ecause a regulation must be consistent with the statute it

implements, any interpretation of a regulation naturally must accord with the statute as well" (quoting John F. Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612, 627 n.78 (1996))).

Across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females.  An individual has a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts are not exposed to persons of the opposite biological sex.  Indeed, courts have consistently recognized that the need for such privacy is inherent in the nature and dignity of humankind.  See, e.g., Doe v. Luzerne Cnty., 660 F.3d 169, 176-77 (3d Cir. 2011) (recognizing that an individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); Brannum v. Overton Cnty. Sch. Bd., 516 F.3d 489, 494 (6th Cir. 2008) (explaining that "the constitutional right to privacy . . . includes the right to shield one's body from exposure to

viewing by the opposite sex"); Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies"); Sepulveda v. Ramirez, 967 F.2d 1413, 1416 (9th Cir. 1992) (explaining that "[t]he right to bodily privacy is fundamental" and that "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample); Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1989) (recognizing that, even though inmates in prison "surrender many rights of privacy," their "special sense of privacy in their genitals" should not be violated through exposure unless "reasonably necessary" and explaining that the "involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating").

Moreover, we have explained that separating restrooms based on "acknowledged differences" between the biological sexes serves to protect this important privacy interest. See Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns"). Indeed, the Supreme Court recognized, when ordering an all-male Virginia college to admit female students, that such a remedy "would undoubtedly require alterations necessary to afford members of each sex privacy from

the other sex." United States v. Virginia, 518 U.S. 515, 550 n.19 (1996). Such privacy was and remains necessary because of the inherent "[p]hysical differences between men and women," which, as the Supreme Court explained, are "enduring" and render "the two sexes . . . not fungible," id. at 533 (distinguishing sex from race and national origin), not because of "one's sense of oneself as belonging to a particular gender," as G.G. and the government as amicus contend.

Thus, Title IX's allowance for the separation, based on sex, of living facilities, restrooms, locker rooms, and shower facilities rests on the universally accepted concern for bodily privacy that is founded on the biological differences between the sexes. This privacy concern is also linked to safety concerns that could arise from sexual responses prompted by students' exposure to the private body parts of students of the other biological sex. Indeed, the School Board cited these very reasons for its adoption of the policy, explaining that it separates restrooms and locker rooms to promote the privacy and safety of minor children, pursuant to its "responsibility to its students to ensure their privacy while engaging in personal bathroom functions, disrobing, dressing, and showering outside of the presence of members of the opposite sex. [That the school has this responsibility] is particularly true in an

environment where children are still developing, both emotionally and physically."

The need to protect privacy and safety between the sexes based on physical exposure would not be present in the same quality and degree if the term "sex" were to encompass only a person's gender identity. Indeed, separation on this basis would function nonsensically. A biological male identifying as female could hardly live in a girls' dorm or shower in a girls' shower without invading physiological privacy needs, and the same would hold true for a biological female identifying as male in a boys' dorm or shower. G.G.'s answer, of course, is that he is not challenging the separation, on the basis of sex, of living facilities, locker rooms, and shower facilities, but only of restrooms, where the risks to privacy and safety are far reduced. This effort to limit the scope of the issue apparently sways the majority, as it cabins its entire discussion to "restroom access by transgender individuals." Ante at 26. But this effort to restrict the effect of G.G.'s argument hardly matters when the term "sex" would have to be applied uniformly throughout the statute and regulations, as noted above and, indeed, as agreed to by the majority. See ante at 26.

The realities underpinning Title IX's recognition of separate living facilities, restrooms, locker rooms, and shower facilities are reflected in the plain language of the statute

and regulations, which is not ambiguous.  The text of Title IX and its regulations allowing for separation of each facility "on the basis of sex" employs the term "sex" as was generally understood at the time of enactment.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (explaining that courts should not defer to an agency's interpretation of its own regulation if an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation" (emphasis added) (internal quotation marks and citation omitted)); see also Auer v. Robbins, 519 U.S. 452, 461 (1997) (discussing dictionary definitions of the regulation's "critical phrase" to help determine whether the agency's interpretation was "plainly erroneous or inconsistent with the regulation" (internal quotation marks and citation omitted)).  Title IX was enacted in 1972 and the regulations were promulgated in 1975 and readopted in 1980, and during that time period, virtually every dictionary definition of "sex" referred to the physiological distinctions between males and females, particularly with respect to their reproductive functions.  See, e.g., The Random House College Dictionary 1206 (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); Webster's New Collegiate Dictionary 1054 (1979) ("the sum of the structural,

functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females"); American Heritage Dictionary 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); Webster's Third New International Dictionary 2081 (1971) ("the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . ."); The American College Dictionary 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished . . . "). Indeed, although the contemporaneous meaning controls our analysis, it is notable that, even today, the term "sex" continues to be defined based on the physiological distinctions between males and females. See, e.g., Webster's New World College Dictionary 1331 (5th ed. 2014) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); The American Heritage Dictionary 1605 (5th ed. 2011) ("Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions"); Merriam-Webster's Collegiate Dictionary 1140 (11th

ed. 2011) ("either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures"). Any new definition of sex that excludes reference to physiological differences, as the majority now attempts to introduce, is simply an unsupported reach to rationalize a desired outcome.

Thus, when the School Board assigned restrooms and locker rooms on the basis of biological sex, it was clearly complying precisely with the unambiguous language of Title IX and its regulations.

Despite the fact that the majority offers no case to support the definition of "sex" as advanced by G.G. and supported by the government as amicus, the majority nonetheless accepts that the meaning of the term "sex" in Title IX and its regulations refers to a person's "gender identity" simply to accommodate G.G.'s wish to use the boys' restrooms. But, it is not immediately apparent whether G.G., the government, and the majority contend that the term "sex" as used in Title IX and its regulations refers (1) to <u>both</u> biological sex <u>and</u> gender identity; (2) to <u>either</u> biological sex <u>or</u> gender identity; or (3) to <u>only</u> "gender identity." In his brief, G.G. seems to take the position that the term "sex" <u>at least</u> includes a reference to gender identity. This is the position taken in his complaint

when he alleges, "Under Title IX, discrimination 'on the basis of sex' encompasses both discrimination based on biological differences between men and women and discrimination based on gender nonconformity." The government seems to be taking the same position, contending that the term "sex" "encompasses both sex -- that is, the biological differences between men and women -- and gender [identity]." (Emphasis in original). The majority, however, seems to suggest that the term "sex" refers only to gender identity, as it relies solely on the statement in the Office for Civil Rights' letter of January 7, 2015, which said, "When a school elects to separate or treat students differently on the basis of sex [for the purpose of providing restrooms, locker rooms, and other facilities], a school generally must treat transgender students consistent with their gender identity." (Emphasis added). But, regardless of where G.G., the government, and the majority purport to stand on this question, the clear effect of their new definition of sex not only tramples the relevant statutory and regulatory language and disregards the privacy concerns animating that text, it is also illogical and unworkable.

If the term "sex" as used in the statute and regulations refers to both biological sex and gender identity, then, while the School Board's policy is in compliance with respect to most students, whose biological sex aligns with their gender

identity, for students whose biological sex and gender identity do not align, no restroom or locker room separation could ever be accomplished consistent with the regulation because a transgender student's use of a boys' or girls' restroom or locker room could not satisfy the conjunctive criteria. Given that G.G. and the government do not challenge schools' ability to separate restrooms and locker rooms for male and female students, surely they cannot be advocating an interpretation that places schools in an impossible position. Moreover, such an interpretation would deny G.G. the right to use either the boys' or girls' restrooms, a position that G.G. does not advocate.

If the position of G.G., the government, and the majority is that the term "sex" means <u>either</u> biological sex <u>or</u> gender identity, then the School Board's policy is in compliance because it segregates the facilities on the basis of biological sex, a satisfactory component of the disjunctive.

Therefore, when asserting that G.G. must be allowed to use the boys' restrooms and locker rooms as consistent with his gender identity, G.G., the government, and the majority must be arguing that "sex" as used in Title IX and its regulations means <u>only</u> gender identity. But this construction would, in the end, mean that a school could never meaningfully provide separate restrooms and locker rooms on the basis of sex. Biological

males and females whose gender identity aligned would be required to use the same restrooms and locker rooms as persons of the opposite biological sex whose gender identity did not align. With such mixed use of separate facilities, no purpose would be gained by designating a <u>separate</u> use "on the basis of sex," and privacy concerns would be left unaddressed.

Moreover, enforcement of any separation would be virtually impossible. Basing restroom access on gender identity would require schools to assume gender identity based on appearances, social expectations, or explicit declarations of identity, which the government concedes would render Title IX and its regulations nonsensical:

> Certainly a school that has created separate restrooms for boys and girls could not decide that only students who dress, speak, and act sufficiently masculine count as boys entitled to use the boys' restroom, or that only students who wear dresses, have long hair, and act sufficiently feminine may use the girls' restroom.

Yet, by interpreting Title IX and the regulations as "requiring schools to treat students consistent with their gender identity," and by disallowing schools from treating students based on their biological sex, the government's position would have precisely the effect the government finds to be at odds with common sense.

Finally, in arguing that he should not be assigned to the girls' restrooms, G.G. states that "it makes no sense to place a

transgender boy in the girls' restroom in the name of protecting student privacy" because "girls objected to his presence in the girls' restrooms because they perceived him as male."  But the same argument applies to his use of the boys' restrooms, where boys felt uncomfortable because they perceived him as female. In any scenario based on gender identity, moreover, there would be no accommodation for the recognized need for physiological privacy.

In short, it is impossible to determine how G.G., the government, and the majority would apply the provisions of Title IX and the implementing regulations that allow for the separation of living facilities, restrooms, locker rooms, and shower facilities "on the basis of sex" if "sex" means gender identity.

The Office for Civil Rights letter, on which the majority exclusively relies, hardly provides an answer.  In one sentence it states that schools "generally must treat transgender students consistent with their gender identity," whatever that means, and in the next sentence, it encourages schools to provide "gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities."  While the first sentence might be impossible to enforce without destroying all privacy-serving separation, the second sentence encourages schools, such as Gloucester High

School, to provide unisex single-stall restrooms for any students who are uncomfortable with sex-separated facilities, as the school in fact provided.

As it stands, Title IX and its implementing regulations authorize schools to separate, on the basis of sex, living facilities, restrooms, locker rooms, and shower facilities, which must allow for separation on the basis of biological sex. Gloucester High School thus clearly complied with the statute and regulations. But, as it did so, it was nonetheless sensitive to G.G.'s gender transition, accommodating virtually every wish that he had. Indeed, he initially requested and was granted the use of the nurse's restroom. And, after both girls and boys objected to his using the girls' and boys' restrooms, the school provided individual unisex restrooms, as encouraged by the letter from the Office for Civil Rights. Thus, while Gloucester High School made a good-faith effort to accommodate G.G. and help him in his transition, balancing its concern for him with its responsibilities to all students, it still acted legally in maintaining a policy that provided all students with physiological privacy and safety in restrooms and locker rooms.

Because the Gloucester County School Board did not violate Title IX and Regulation 106.33 in adopting the policy for separate restrooms and locker rooms, I would affirm the district

court's decision dismissing G.G.'s Title IX claim and therefore dissent.

I also dissent from the majority's decision to vacate the district court's denial of G.G.'s motion for a preliminary injunction. As the Supreme Court has consistently explained, "[a] preliminary injunction is an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," and "'[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy.'" Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22-24 (2008) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Given the facts that the district court fully and fairly summarized in its opinion, including the hardships expressed both by G.G. and by other students, I cannot conclude that we can "form a definite and firm conviction that the court below committed a clear error of judgment," Morris v. Wachovia Sec., Inc., 448 F.3d 268, 277 (4th Cir. 2006) (quotation marks and citation omitted), particularly when we are only now expressing as binding law an evidentiary standard that the majority asserts the district court violated.

As noted, however, I concur in Part IV of the court's opinion.