IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

   Plaintiff,

v.                                   Case No. 4:15-cv-00054

GLOUCESTER COUNTY SCHOOL
BOARD,

   Defendant.

## BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

## INTRODUCTION

Defendant Gloucester County School Board ("School Board") returns to this Court to once again test the claim by Plaintiff Gavin Grimm ("Grimm") that the School Board's restroom and locker room policy violates Title IX and the Equal Protection Clause of the United States Constitution. In the long history of this litigation, the fundamental question has always been: Is the School Board's policy lawful? The answer is, and always has been, yes.

At the outset of this litigation, this Court properly dismissed Grimm's Title IX claim as foreclosed by the text of Title IX and its implementing regulations. There are no allegations in the Amended Complaint that should change that outcome. Moreover, separating students in accordance with their physiological characteristics for restroom and locker room use does not violate the Equal Protection Clause. Finally, Grimm's claims that he will be subject to the School Board's policy as an alumnus do not present a justiciable controversy since the policy only applies to current students. Accordingly, the Amended Complaint should be dismissed.

## ALLEGATIONS

Grimm is now 18 years old.  See Amended Complaint at ¶1 (ECF Doc. 113).  On June 10, 2017, Grimm graduated from Gloucester High School in Gloucester County, Virginia.  Id. at ¶ 79.  Grimm was born a female, but now identifies as a male.  Id. at ¶¶1, 17.  Grimm enrolled in high school as a girl and started ninth grade as a girl.  Id. at 36.

Near the end of his freshman year of high school, Grimm informed his parents that he identified as a boy and began seeing a psychologist.  Id. at ¶ 36.   At the beginning of Grimm's sophomore year in August 2014, Grimm and his mother met with the school principal and guidance counselor and explained that Grimm was a transgender boy and wanted to attend school as boy.  Id. at ¶ 39.  Grimm and his mother provided the principal and guidance counselor a letter from Grimm's psychologist, which confirmed that Grimm was receiving treatment for gender dysphoria and stated that Grimm should be treated as a boy in all respects, including when using the restroom.  Id. at ¶ 40.  Indeed, School officials agreed to refer to Grimm using his new name and by using male pronouns.  See Original Complaint at ¶ 28 (ECF Doc. 8).[1]

Grimm initially requested to use the restroom in the nurse's office, but he soon felt stigmatized and isolated using a different restroom from everyone else.  Id. at ¶ 42.  Additionally, the nurse's office was inconvenient for him to use due to its location relative to his classes.  Id.  After a few weeks of using the restroom in the nurse's office, Grimm sought permission to use the boys' restroom.  Id. at ¶ 43.  On October 20, 2014, Grimm began using the boys' restroom

---

[1] This allegation from the original Complaint is absent from the Amended Complaint; however, this Court may still consider it.  It is appropriate to consider this prior admission because pleadings "superseded by amended pleadings are admissions against the pleader in the action in which they were filed."  Pennsylvania R. Co. v. City of Girard, 210 F.2d 437, 440 (6th Cir. 1954).  A court is entitled to take judicial notice of the records of the proceedings, and facts subject to judicial notice may be considered by the Court on a motion to dismiss.  Briggs v. Newberry County Sch. Dist., 838 F. Supp. 232, 233-34 (D.S.C. 1992), aff'd 989 F.2d 491 (4th Cir. 1993).

with the principal's support and allegedly did so for seven weeks without incident.  Id. at ¶ 44.
Grimm also was granted permission to complete his physical education requirements through a
home-bound program, and, as a result, never needed to use the locker rooms at the school.  Id. at
¶ 45.

The principal and the superintendent of Gloucester County Public Schools informed the
School Board that they had authorized Grimm to use boys' restrooms, but otherwise kept the
matter confidential.  Id. at ¶ 46.  Nonetheless, parents of students in the community learned that a
transgender boy was using the boys' restrooms and contacted the School Board to demand that
the transgender student (who was not publicly identified as Grimm until later) be barred from the
boys' restrooms.  Id. at ¶ 47.

The School Board considered the matter at a private meeting and took no action for
weeks.  Id. at ¶ 50.  A School Board member proposed the following policy for public debate at a
November 11, 2014 School Board meeting:

> Whereas the GCPS recognizes that some students question their gender identities,
> and
>
> Whereas the GCPS encourages such students to seek support, advice, and
> guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students
> and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and
> locker room facilities in its schools, and the use of said facilities shall be limited
> to the corresponding biological genders, and students with gender identity issues
> shall be provided an alternative appropriate private facility.

Id. at ¶ 51.

A public discussion about the use of restrooms and locker rooms by transgender students ensued with students and parents of students expressing concern,[2] and Grimm spoke out against the policy at the meeting.  Id. at ¶ 53.  By a vote of 4-3, the School Board deferred a vote on the policy until its meeting on December 9, 2014.  Id. at ¶ 56.

Before the December 9, 2014 meeting, the School Board issued a press release announcing plans for "adding or expanding partitions between urinals in male restrooms, and adding privacy strips to the doors of stalls in all restrooms."  Id. at ¶ 57.  In addition, the press release announced "plans to designate single stall, unisex restrooms . . . to give all students the option for even greater privacy."  Id.  On December 9, 2014, the School Board passed the policy by a 6-1 vote.  Id. at ¶ 61.

The School Board subsequently installed three single-stall restrooms.  Id. at ¶ 64.  Any student was allowed to use the single-stall restrooms.  Id. at ¶ 66.  Grimm claims the restrooms were not located near his classes and that everyone knew they were created for Grimm.  Id. at ¶¶ 65, 66.  Grimm never used the single-stall restrooms.  Id. at ¶ 69.

When Grimm attended school football games, there was no restroom for him to use at all. Id. at ¶ 71.  The Gloucester High School building was locked after school, and there are no single-stall restroom facilities in the stadium.  Id.  When he had to use the restroom, Grimm's only option was to call his mother to pick him up and take him home early.  Id.

In December 2014, Grimm began hormone therapy, which, over time, altered his bone and muscle structure, deepened his voice, and caused him to grow facial hair.  Id. at ¶ 73.  In June 2015, the Virginia Department of Motor Vehicles issued Grimm a state I.D. card identifying him as male.  Id. at ¶ 74.  In June 2016, Grimm underwent chest-reconstruction

---

[2] http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id=1065

surgery.  Id. at ¶ 75.  On September 9, 2016, the Gloucester County Circuit Court issued an order directing the State Registrar to amend Grimm's birth certificate to show the change of sex from female to male.  Id. at ¶ 76.  On October 27, 2016, the Virginia Department of Health issued a birth certificate listing Grimm's sex as male.

Grimm was not permitted to use the boys' restroom throughout the remainder of his time in high school.  Id. at ¶ 78.  Grimm claims that he will continue to be on school grounds when attending football games, alumni activities, or social events with friends who are still in high school.  Id. at ¶ 80.

Grimm seeks the following relief:

(1)     A declaration that the Board's policy violated Gavin's rights under the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, on the day the policy was first issued and throughout the remainder of his time as a student at Gloucester High School;

(2)     Nominal damages in an amount determined by the Court;

(3)     A declaration that the Board's policy continues to violate Gavin's rights under the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*;

(4)     A permanent injunction requiring the Board to allow Gavin to use the same restrooms as other male alumni;

(5)     Plaintiff's reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(6)     Such other relief as the Court deems just and proper.

Id. at p. 16-17.

## LAW AND ARGUMENT

### I.     Standard of Review.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

Edwards v. City of Goldsboro, 178 F.3d 231, 243-244 (4th Cir. 1999).  While the Court must accept as true all factual allegations contained in the complaint, it is not bound to accept as true the complaint's legal conclusions.  See Ashcraft v. Iqbal, 556 U.S. 662, 678 (2009).

To survive a 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  It is not sufficient that a complaint provide "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555.  Nor is it sufficient that a complaint tenders naked assertions devoid of further factual enhancement.  Id. at 557.  Instead, a plaintiff has an obligation to provide the "grounds of his entitlement to relief."  Id. at 555.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief."  Iqbal, 556 U.S. at 679 (internal quotations omitted).

When deciding a motion to dismiss, "a court may consider public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed."  Witthohn v. Federal Ins. Co., 164 F. App'x 395, 396 (4th Cir. 2006); see also, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

## II.     The School Board's Policy Separating Restrooms by Physiological Sex Is Plainly Valid Under Title IX And Section 106.33.

Grimm's Title IX claim is barred by the plain language of the statute and its implementing regulation.  Throughout this litigation, Grimm continues to press an interpretation

of Title IX that determines "sex" solely according to "gender identity," meaning the internal perception of oneself as male or female. The text, history, and structure of Title IX and the plain language of its implementing regulation foreclose that view.   Although the Fourth Circuit accepted an *agency* interpretation adopting Grimm's position, even then the Court acknowledged that such an interpretation is "not the intuitive one." G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 722 (4th Cir.), cert. granted in part, 137 S. Ct. 369, 196 L. Ed. 2d 283 (2016), and vacated and remanded, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017).   The better interpretation—which is reflected in the School Board's policy—is that when separating boys and girls on the basis of sex in restrooms and similar facilities, schools may rely on the physiological differences between males and females rather than students' gender identity.

### A.    Statutory and Regulatory Background

In the words of its principal sponsor, Senator Birch Bayh of Indiana, Title IX aimed "a death blow" at "one of the great failings of the American educational system"—namely, "corrosive and unjustified discrimination against women." 118 Cong. Rec. 5809, 5803. Congress did so by enacting in Title IX a straightforward ban on discrimination in federally funded educational programs on the basis of "sex." 20 U.S.C. § 1681(a).   At the same time, Title IX preserved settled expectations of privacy between males and females by permitting "separate living facilities for the different sexes," 20 U.S.C. § 1686, and "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33 ("section 106.33").   Such exceptions were "designed," as Bayh explained, "to allow discrimination only in instances where personal privacy must be preserved." 121 Cong. Rec. 16060.

### 1.    Title IX prohibited sex discrimination as a means of ending educational discrimination against women.

Title IX's ban on sex discrimination emerged from Congress's multifaceted efforts in the early 1970's to address discrimination against women. <u>See</u> <u>generally</u> Paul C. Sweeney, *Abuse, Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41, 50–54 (1997). Frustrated with lack of progress on the Equal Rights Amendment ("ERA"), Senator Bayh decided to pursue its goals through other means. Birch Bayh, *Personal Insights and Experiences Regarding the Passage of Title IX*, 55 Clev. St. L. Rev. 463, 467 (2007). Believing that the worst discrimination against women was in "the educational area," <u>id.</u> at 468, Bayh focused on the Higher Education Act of 1965, which granted money to universities. Sweeney, *supra*, at 51. In 1972, while that Act was being amended, floor amendments added the text that is now Title IX. <u>See</u> 117 Cong. Rec. 39098; 118 Cong. Rec. 5802–03.

Those amendments were designed principally to end discrimination against women in university admissions and appointments. <u>See</u> 117 Cong. Rec. 39250, 39253, 39258; 118 Cong. Rec. 5104–06. Title IX's architects viewed such discrimination as rooted in pernicious stereotypes about women. As Bayh vividly put it, "[w]e are all familiar with the stereotype of women as pretty things who go to college to find a husband, go on to graduate school because they want a more interesting husband, and finally marry, have children, and never work again." 118 Cong. Rec. 5804.

### 2.      Title IX allows certain facilities and programs to be separated by sex.

At the same time, Congress understood that not all distinctions between men and women are based on stereotypes. Foremost among those are distinctions needed to preserve privacy. As ERA proponents had grasped, "disrobing in front of the other sex is usually associated with sexual relationships," Barbara A. Brown, Thomas I. Emerson, Gail Falk, Ann E. Freedman, *The*

*Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 Yale L.J. 871, 901 (1971), and thus implicated the recently-recognized right to privacy. See id. at 900–01 (citing Griswold v. Connecticut, 381 U.S. 479 (1965)). That privacy right, the proponents believed, "would permit the separation of the sexes" in intimate facilities such as "public rest rooms[.]" Id.

Both the Senate and House likewise grasped this commonsense principle. For instance, Senator Bayh noted that sex separation would be justified where "absolutely necessary to the success of the program" such as "in classes for pregnant girls," and "in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807.[3] Representative Thompson—"disturbed" by suggestions that banning sex discrimination would prohibit all sex-separated facilities— proposed an amendment stating that "nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex." 117 Cong. Rec. 39260. The language was introduced that day and adopted by the House without debate. 117 Cong. Rec. 39263. Although Bayh's version lacked a similar proviso, the conference committee included Thompson's language without further discussion. H.R. Conf. Rep. No. 92-1085 at 222.

Subsequently, the Department of Health, Education, and Welfare ("HEW") proposed a Title IX regulation providing that sex separation would be permitted for "toilet, locker room and shower facilities." HEW, 39 Fed. Reg. 22228, 22230 (June 20, 1974). The final regulations

---

[3] When unsuccessfully introducing similar legislation the year before, Bayh observed that, by "provid[ing] equal [educational] access for women and men students … [w]e are not requiring that intercollegiate football be desegregated, *nor that the men's locker room be desegregated.*" 117 Cong. Rec. 30407 (emphasis added).

retained HEW's clarification. HEW, 40 Fed. Reg. 24128, 24141 (June 4, 1975); 34 C.F.R. § 106.33.[4]  HEW's regulations continued to use the statutory term "sex," without elaboration.

When Congress considered the HEW regulation, Senator Bayh again linked the issue to privacy.  He introduced into the record a scholarly article explaining that Title IX "was designed to allow discrimination only in instances where personal privacy must be preserved. For example, the privacy exception lies behind the exemption from the Act of campus living facilities. The proposed regulations preserve this exception, as well as permit 'separate toilet, locker room, and shower facilities on the basis of sex.'" 121 Cong. Rec. 16060.

Title IX regulations contain another relevant provision for separating male and female students, one also based on physical differences. Funding recipients are prohibited from discriminating on the basis of sex in athletic activities and must provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(a), (c); HEW, 40 Fed. Reg. 24128 (June 4, 1975). Nonetheless, recipients are permitted to establish "separate teams for members of each sex where selection … is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

### B.   The Text And History Of Title IX And Section 106.33 Refute The Notion That "Sex" Must Be Equated With "Gender Identity."

The most straightforward way to resolve the Title IX claim is the one previously taken by this Court. (ECF Doc. 57 at p. 10). This Court correctly explained, Title IX regulations "specifically allow[ ] schools to maintain separate bathrooms based on sex as long as the

---

[4] HEW's regulations were recodified in their present form after the reorganization that created the Department of Education in 1980. *See* United States Dep't of Educ., 45 Fed. Reg. 30802, 30960 (May 9, 1980). Additionally, because multiple agencies issue Title IX regulations, the section 106.33 exception appears verbatim in 25 other regulations. *See, e.g.*, 7 C.F.R. § 15a.33 (Agriculture); 24 C.F.R. § 3.410 (Housing & Urban Development); 29 C.F.R. § 36.410 (Labor); 38 C.F.R. § 23.410 (Veterans Affairs); 40 C.F.R. § 5.410 (EPA).

bathrooms for each sex are comparable." (ECF Doc. 57 at p. 12). It is beyond dispute that in the 1970s—when Congress enacted Title IX and HEW adopted section 106.33—the term "sex" at least *included* physiological distinctions between men and women.[5] It follows that when schools establish separate restrooms, locker rooms, and showers for boys and girls, Title IX and section 106.33 affirmatively permit them to rely on physiological sex to distinguish those facilities, regardless of whether the term "sex" could also theoretically include some notion of "gender identity." (ECF Doc. 57 at p. 12). (concluding that, because the School Board's policy is permitted by the regulation, "the Court need not decide whether 'sex' in … [s]ection 106.33 also includes 'gender identity'"). As this Court previously, and correctly, explained, as a straightforward matter of interpretation, nothing more is necessary to dismiss Grimm's Title IX claim. (ECF Doc. 57 at p. 12-13).

Grimm's contrary position depends on a reading of Title IX incompatible with the plain meaning of the term "sex": namely, that for Title IX purposes one's internal, perceived sense of gender identity is *determinative* of one's sex. See, e.g., G.G. S. Ct. Br. at 2 (asserting that Grimm "knew that he was a boy" because "[l]ike other boys, Gavin has a male gender identity"). Practically speaking, Grimm's position means that physiology is not only irrelevant but *invalid* under Title IX as a basis for separating boys and girls in restrooms. Grimm's interpretation thus forbids something the statute and regulation affirmatively permit: use of the physiological distinctions between males and females to separate boys and girls in restrooms, locker rooms, and showers. Grimm's view is incorrect as a matter of law.

---

[5] Indeed, as discussed below, all relevant indicia of meaning show that the understanding of "sex" shared by Title IX's architects was determined *wholly* by those physiological distinctions. The same is true, in common parlance, up to the present day. *See* JA150 (observing, "[u]nder any fair reading, 'sex' in [s]ection 106.33 clearly includes biological sex").

     1.     **The term "sex" at a minimum *includes* the physiological distinctions between men and women.**

As the Supreme Court and the Fourth Circuit have long held, "[i]t is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" as of "the era of [the statute's] enactment[.]" Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 876 (2014) (quotes omitted); see also United States v. Abdelshafi, 592 F.3d 602, 607 (4th Cir. 2010) ("A statute's plain meaning is determined by reference to its words' 'ordinary meaning at the time of the statute's enactment.'") (quoting United States v. Simmons, 247 F.3d 118, 122 (4th Cir. 2001)). All available linguistic evidence confirms that the term "sex" deployed in Title IX and section 106.33 referred overwhelmingly to the physiological differences between men and women. The use of that term thus provides no support for the radical notion espoused by Grimm that one's "sex" for Title IX purposes should be determined, not by physiological characteristics, but instead (and entirely) by one's internal "gender identity."

This conclusion plainly follows from the linguistic evidence considered by *both* the majority and dissenting opinions in the Fourth Circuit's decision on this matter.  Those opinions cited nine dictionaries between them, covering a period from before the enactment of Title IX to the present. Every single one referred to *physiological* characteristics as a criterion for distinguishing men from women.[6] For instance, the definitions relied on by the panel majority in

---

[6] See G.G., 822 F.3d at 721–22 & n.7 (majority) (citing *American College Dictionary* 1109 (1970), *Webster's Third New International  Dictionary* 2081 (1971), *Black's Law Dictionary* 1583 (10th ed. 2014), and *American Heritage Dictionary* 1605 (5th ed. 2011)); *id.* at 736–37 (dissent) (citing *The Random House College Dictionary* 1206 (rev. ed. 1980), *Webster's New Collegiate Dictionary* 1054 (1979), *American Heritage Dictionary* 1187 (1976), *Webster's Third New International Dictionary* 2081 (1971), *The American College Dictionary* 1109 (1970), *Webster's New World College Dictionary* 1331 (5th ed. 2014), *The American Heritage*

the Fourth Circuit referred to "anatomical," "physiological," and "morphological" differences; "biparental reproduction"; and "sex chromosomes." G.G., 822 F.3d at 721–22. Similarly, the dissent's definitions looked to "structural" differences, "reproductive functions," and "reproductive organs." Id. at 736–37. Thus, all of those Title IX-era definitions explicitly referred to physiological characteristics as a central determinant of one's "sex." None even hinted that "sex" includes—much less *turns on*—one's internal gender identity.

To be sure, in determining whether to defer to the Department under the doctrine of Auer v. Robbins, 519 U.S. 452 (1997), the majority found ambiguity in certain definitions of "sex." G.G., 822 F.3d at 721–22. Because Auer is no longer at issue, however, the relevant inquiry is not whether there are any ambiguities for an agency to resolve. Now the key question is what the term "sex" *means* in Title IX, and no putative ambiguities in certain definitions can overcome the weight of linguistic evidence that physiology is at least a critical factor in the term "sex" as deployed in Title IX. See, e.g., MCI Telecommunications Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 226–28 (1994) (rejecting reliance on outlier dictionary definitions "whose suggested meaning contradicts virtually all others"). Furthermore, even the allegedly ambiguous definitions the panel majority identified *still* referred overwhelmingly to "anatomical and physiological differences" between the sexes, as well as characteristics that "subserve[ ] biparental reproduction." See G.G., 822 F.3d at 721 (quoting *American College Dictionary* (1970) and *Webster's Third New International Dictionary* (1971)). And *none* referred to "gender identity," or anything like it, as a constitutive part of one's sex—much less the sole, determinative factor.

Consequently, Grimm has no linguistic basis to contend that the term "sex" in Title IX could ever have been understood to refer to gender identity *at all*, and certainly not to the

---

*Dictionary* 1605 (5th ed. 2011), and *Merriam-Webster's Collegiate Dictionary* 1140 (11th ed. 2011)).

exclusion of objective physiological characteristics distinguishing men from women. It is true, as Grimm has previously argued, that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998), and that Title IX thus prohibits genuine sex-based discrimination "of any kind," id. at 80. See G.G. S. Ct. Br. at 38. But that general principle does not begin to explain why the concept of "sex" discrimination enacted by Congress in 1972 is so elastic that, today, someone born physiologically male could be considered a female for purposes of Title IX based on internal perceptions. That re-imagination of the term "sex" does not merely broaden the "comparable evils" at which the framers of Title IX were aiming. Cf. Oncale, 523 U.S. at 79. Rather, it entirely subverts the basis of Title IX's anti-discrimination provision.

Instead of joining Grimm in rewriting Title IX, this Court should simply adopt the intuitive interpretation that the School Board is permitted by Title IX to separate the sexes in restrooms and locker rooms based on the physiological distinctions between males and females, as school districts around the nation have been doing in reliance on Title IX for the past five decades. Again, that straightforward conclusion is enough to resolve Grimm's claim.

> **2.      Congress understood Title IX to permit classifications based on physiology.**

Furthermore, to the extent the Court wishes to refer to Title IX's legislative history, that history confirms that "sex" was understood by the framers of Title IX and its regulations to encompass the physiological differences between men and women. See, e.g., St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 612–13 (1987) (confirming textual meaning through legislative history). Congress's manifest purpose in enacting Title IX's ban on "sex" discrimination was to fix the pervasive problem of discrimination against women in educational programs. See, e.g., 118 Cong. Rec. 5803; 117 Cong. Rec. 39251. At the same time, however, Congress sought to

preserve schools' ability to separate males and females to preserve "personal privacy," <u>see</u> 118 Cong. Rec. 5807 (Sen. Bayh), and to protect athletic opportunities for girls and women.[7]

These twin goals of Title IX confirm that Congress and HEW were employing the then-universal understanding of "sex" as a binary term encompassing the physiological distinctions between men and women. Not a shred of legislative history suggests that Congress considered the concept of "gender identity" at all, much less that the concept could supplant physiology in determining one's sex. Nor is there any evidence that in promulgating section 106.33 HEW considered "sex" to include, much less turn on, gender identity. Even Grimm has conceded that the Congress that enacted Title IX and the agency that adopted section 106.33 were focused on physiological sex and never conceived of gender identity as a component of sex, much less its determinant. <u>See</u> G.G. S. Ct. Br. in Opp. at 1; G.G. S. Ct. Br. at 39 ("There is no question that our understanding of transgender people has grown since Congress passed Title IX.").

Other indicators of congressional purpose likewise show that gender identity is outside the scope of Title IX. For example, the subsequently enacted Violence Against Women Act ("VAWA")—a Spending Clause statute, like Title IX—prohibits funded programs or activities from discriminating based on either "sex" or "gender identity." 42 U.S.C. § 13925(b)(13)(A). "Sex" and "gender identity" must have meant distinct things to the Congress that enacted VAWA; otherwise including gender identity with sex would create surplusage. <u>See</u>, <u>e.g.</u>, <u>National Credit Union Admin. v. First Nat'l Bank & Tr. Co.</u>, 522 U.S. 479, 501 (1998) (rejecting agency interpretation under <u>Chevron</u> for this reason). Other statutes enacted after Title IX relate to discriminatory acts based on "gender" and "gender identity," implying Congress distinguished

---

[7] "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted" as Title IX, have been considered "an authoritative guide to the statute's construction." <u>N. Haven Bd. of Educ. v. Bell</u>, 456 U.S. 512, 526–27 (1982).

outward manifestations of sexual identity—akin to sex—from inward, perceived ones. 18 U.S.C. § 249 (federal hate crimes); 42 U.S.C. § 3716(a)(1)(C) (Attorney General authority to assist with State and local investigations and prosecutions); 20 U.S.C. § 1092(f)(1)(F)(ii) (crime reporting by universities); 42 U.S.C. § 294e-1(b)(2) (federal mental health grants). Yet Congress has never supplemented Title IX with an additional gender identity-based standard.

In addition to the absence in Title IX of a distinct prohibition on gender identity discrimination, in other contexts Congress has repeatedly declined to enact statutes forbidding gender identity discrimination in education. The Student Non-Discrimination Act, introduced in 2010, 2011, 2013, and 2015 in both the Senate and the House,[8] would condition school funding on prohibiting gender identity discrimination. Another measure, the "Equality Act," would amend the Civil Rights Act of 1964 to prohibit gender identity discrimination in various contexts, including employment and education. [9]  Neither bill has ever left committee.

In the face of Congress's failure to add the concept of gender identity to Title IX— indeed, its repeated decision *not* to do so—Grimm's position amounts to asking this Court to "update" the law by judicial amendment. But no court has that authority. And in any event, there is no evidence remotely showing that modern Congresses believed that the term "sex" in Title IX *already* included gender identity since the 1970s, and that therefore amending it to cover gender identity was unnecessary. To the contrary, the only plausible explanation for the absence of the term "gender identity" from Title IX is that Title IX has *never* included it, and still does not. If Congress wishes to incorporate that distinct concept into Title IX, it knows how to do so. But a

---

[8] H.R. 4530 (111th Cong. 2010); S. 3390 (111th Cong. 2010); H.R. 998 (112th Cong. 2011); S. 555 (112th Cong. 2011); H.R. 1652 (113th Cong. 2013); S. 1088 (113th Cong. 2013); H.R. 846 (114th Cong. 2015); S. 439 (114th Cong. 2015).
[9] S. 1858 (114th Cong. 2015); H.R. 3185 (114th Cong. 2015).

court lacks the authority to do Congress' work of legislation for it, which is what accepting Grimm's re-interpretation of Title IX would be.

### 3. Supreme Court and Fourth Circuit precedent strongly supports the School Board's interpretation of Title IX.

Supreme Court and Fourth Circuit sex discrimination precedent also offers compelling support for reading the term "sex" in Title IX as referring to (or at least including) the physiological differences between men and women. When determining the nature of prohibitions on sex discrimination, the Supreme Court and this Court have focused on physiological differences, especially in contexts involving the lawful separation of males and females for privacy purposes. That underscores the correctness of interpreting Title IX to rely on physiology and to permit the Board's restroom and locker room policy.

For instance, in United States v. Virginia, the Supreme Court held that the equal protection clause required the Virginia Military Institute to admit women. 518 U.S. 515, 540–46 (1996). Yet even as it rejected stereotypes based on "inherent differences" between the sexes, the Court nonetheless emphasized that "[p]hysical differences between men and women are enduring," and explained that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." Virginia, 518 U.S. at 533, 550 n.19. Thus, the Court's analysis of its "privacy" concerns was grounded in objective, "physical differences" between the sexes, and not in subjective factors like gender identity.

Even more pointedly, in Tuan Anh Nguyen v. INS, the Supreme Court upheld against equal protection challenge a federal immigration standard that made it easier to establish citizenship if a person had an unwed citizen mother, as opposed to an unwed citizen father. 533 U.S. 53, 59–60 (2001). The easier standard for persons with citizen mothers was explicitly

justified on *biological* grounds—namely that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." Id. at 63. In so holding, the Court rejected the argument that this distinction "embodies a gender-based stereotype," explaining that "[t]here is nothing irrational or improper in the recognition that at the moment of birth … the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father." Id. at 68. In its conclusion, the Court added these observations that apply with equal force here:

> To fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it. Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real. … The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each gender.

Id. at 73. Here again, the Court's analysis of these issues was driven by objective, physiological differences between the sexes.

The physiological conception of sex in Virginia and Tuan Anh Nguyen has been deployed recently by the Fourth Circuit. In Bauer v. Lynch, 812 F.3d 340 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 372 (Oct. 31, 2016), the Court rejected the argument that differing FBI fitness standards for men and women—based on their "innate physiological differences"—constituted impermissible sex discrimination under Title VII.  Id. at 343. Relying on Virginia, Bauer held that the different standards were justified because "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs," and, despite Virginia's rejection of sex stereotypes, "some differences between the sexes [are] real, not perceived[.]"  Id. at 350. Indeed, Bauer's reasoning had been foreshadowed by the Fourth Circuit's earlier decision

in Faulkner v. Jones, 10 F.3d 226 (4th Cir. 1993).   In that case, the Court noted that sex separation in intimate facilities is justified by "acknowledged differences" between the sexes. Id. at 233. And the Court observed that "[t]he point is illustrated by society's undisputed approval of separate public rest rooms for men and women based on privacy concerns." Id. at 232.

Those decisions strongly support interpreting Title IX and its regulations to allow privacy-based separation of men and women on the basis of physiological differences, precisely as the School Board's policy does in multiple-stall restrooms and locker rooms.[10]   That conclusion is driven as much by commonsense and longstanding privacy expectations as anything else. As Justice Kennedy wrote for the Court in Nguyen, "[t]o fail to acknowledge even our most basic biological differences … risks making the guarantee of equal protection superficial, and so disserving it." Nguyen, 533 U.S. at 73. And Justice Stevens captured this point in City of Los Angeles, Department of Water & Power v. Manhart, when he wrote for the Court that "[t]here are both real and fictional differences between women and men." 435 U.S. 702, 707 (1978). Physiological differences between men and women are real ones, especially where they are relied on to safeguard reasonable privacy expectations that have long been part of the fabric of public life. And it is difficult to imagine a more appropriate setting for safeguarding privacy than school restrooms and locker rooms.

In response to this line of reasoning, Grimm has previously pointed to the Supreme Court's recognition that sex stereotyping—namely, "assuming or insisting" that men and women conform to "the stereotype associated with their group," see Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989)—can be a form of sex discrimination. See., e.g., G.G. S. Ct. Br. at 36

---

[10] Lower courts have similarly concluded that federal prohibitions on "sex" discrimination concern physiological distinctions between men and women. See, e.g., Johnston v. Univ. of Pittsburgh of the Com. Sys. of Higher Educ., 97 F. Supp. 3d 657, 670, 676 (W.D. Pa. 2015), appeal dismissed (Mar. 30, 2016) (collecting decisions).

("Unlike other boys, Gavin had a different sex identified for him at birth. He therefore upsets traditional assumptions about boys …. Discriminating against Gavin for upsetting those expectations is sex discrimination."). But it makes no sense to say that distinguishing boys from girls on the basis of *physiological or anatomical characteristics* amounts to prohibited sex "stereotyping," especially where those very characteristics directly relate to the privacy interests the Board's policy seeks to protect.

Furthermore, the School Board's policy distinguishes boys and girls based on physical sex characteristics alone, and *not* based on any of the characteristics typically associated with sex stereotyping—such as whether a woman is perceived to be sufficiently "feminine" in the way she dresses or acts. Cf., e.g., Price Waterhouse, 490 U.S. at 235 (finding sex stereotyping where female employee not promoted because her employer thought she was too "macho," "overly aggressive [and] unduly harsh" for a woman, and should have walked, talked, dressed, and styled her hair and make-up "more femininely"). Indeed, the School Board's standard rejects classifying students based on whether they meet *any* stereotypical notion of maleness or femaleness. The School Board's policy does not, for instance, allow only "masculine" boys into the boys room, while requiring more "effeminate" boys to use the girls room. Instead, the policy designates multiple-stall restrooms and locker rooms based on *physiology*, period—regardless of how "masculine" or "feminine" a boy or girl looks, acts, talks, dresses, or styles their hair. Far from violating Price Waterhouse, then, the Board's policy is the *opposite* of the kind of sex stereotyping prohibited by that decision. See, e.g., Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1224 (10th Cir. 2007) (concluding that Price Waterhouse does not require "employers to allow biological males to use women's restrooms," because "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes").

C.    **Equating "Sex" With Gender Identity Would Undermine Title IX's Structure.**

Not only does Grimm's interpretation find no support in Title IX's text and history or in any analogous sex discrimination precedents, that interpretation—requiring access to sex-separated facilities based on gender identity alone—would also undermine Title IX's structure, obstruct its purposes, and lead to obvious and intractable problems of administration. Because "[i]t is implausible that Congress meant [Title IX] to operate in this manner," King v. Burwell, 135 S. Ct. 2480, 2494 (2015), this is yet another reason to reject Grimm's radical interpretation of Title IX.

1.    **Grimm's interpretation would itself lead to discrimination.**

Grimm's proposed interpretation leads to other contradictions as well, and to discrimination in different forms. Most obviously, persons whose gender identities align with physiological sex would have access only to one facility, but transgender individuals such as Grimm could elect to use *either* the facilities designated for people of their sex *or* the opposite sex's facilities. There would thus be different degrees of access depending on whether a person's gender identity diverges from physiology. That is "sex" discrimination under Grimm's own argument.

Grimm's position also implies that while Grimm's discomfort in the girls' restroom requires relief under Title IX, another boy's discomfort with Grimm's presence in the boys' restroom is legally meaningless—indeed, that it must be stamped out as mercilessly as sentiments favoring racial segregation. See G.G. S. Ct. Br. at 30 (claiming that Grimm must be treated as subject to invidious discrimination, citing Plessy v. Ferguson, 163 U.S. 537 (1896)). For the School Board to provide Grimm with a choice between the girls' room and an alternative unisex restroom open to all students is, in Grimm's view, an affront to Grimm's dignity. Yet

forcing the same choice on Grimm's male classmates—notwithstanding their own adolescent modesty, personal sensitivities, or religious scruples—is simply the price to be paid. The same logic would apply to the feelings of boys sharing locker rooms and showers with a transgender individual like Grimm, and to 14-year old girls sharing facilities with 18-year old physiological males. Title IX should not be interpreted to create so one-sided a regime.

Not only does Grimm's standard impose discriminatory burdens on others, but it would create new legal risks for regulated schools. For instance, a sexual assault victim may understandably feel that the presence of members of the opposite physiological sex in restrooms, lockers, or showers creates a hostile environment. See Jeannie Suk Gersen, *The Transgender Bathroom Debate and the Looming Title IX Crisis*, The New Yorker (May 24, 2016).

Insofar as Grimm proposes solutions to any of these problems, they are unlikely to be of any help. For example, some of Grimm's prior briefs imply that a transgender individual's access to the other physiological sex's facilities turns on gender presentation (*i.e.*, whether someone appears to be relatively more masculine or feminine) and the sincerity of an individual's feelings of discomfort on being required to use a facility consistent with physiological sex. In other words, because Grimm "presents" as a boy, and feels more at home in a boys' restroom, Grimm should have access to boys' restrooms.

That standard does little for privacy concerns, and nothing for girls and women in school sports. Worse, it suggests that schools must evaluate access to restrooms, locker rooms, and showers based on how consistently or comprehensively a student "presents" his or her gender identity. Administrators would inevitably have to evaluate students' access to facilities based on relative masculine or feminine traits. But that is classic sex-stereotyping, see Price Waterhouse, 490 U.S. at 250–51 (forbidding adverse actions against women under Title VII based on

22

stereotypical views of women's appearance or mannerisms), which schools would undertake at their peril.

These and other serious practical problems counsel strongly against an attempt to transform the statutory prohibition on sex discrimination into the distinctly different prohibition on gender identity discrimination, as Grimm's Title IX claim demands.

### 2. Grimm's interpretation would frustrate Title IX's purposes.

Like any statute, Title IX should be interpreted so that its "manifest purpose is furthered, not hindered." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012). And here, one of Title IX's purposes was to maintain schools' ability to separate male and female students in some circumstances—for example, when personal privacy is implicated or where mixed-sex athletic competition would be unfair or unsafe. But this purpose is incompatible with an approach that understands "sex," not by the physiological distinctions between males and females, but instead by "gender identity"— "a person's deeply felt, inherent sense of being a boy, a man, or male; a girl, a woman, or female." See Amended Complaint at ¶18 (ECF Doc. 113).  If access to sex-separated facilities turns on gender identity, then the sex separation contemplated by Title IX and its regulations would effectively cease to exist. Under that regime, although a school might *wish* to keep boys and girls in separate locker rooms (or on separate basketball teams), in practice any given locker room (or basketball team) would be open to members of both sexes. An interpretation of the key term "sex" that frustrates key goals of Title IX should be rejected.

By the same token, there is not the remotest suggestion that Title IX was intended to place school children in the position of using restrooms, lockers rooms, and showers in the presence of individuals with physical sex characteristics of the opposite sex. Grimm's

interpretation thus nullifies what the framers of Title IX and its regulations plainly sought to preserve: spaces available to members of one physiological sex and off-limits to the other. That outcome would shock Title IX's congressional advocates, who authorized separate "living facilities" to ensure that members of different physical sexes would be separable in certain intimate settings. If the law's framers had contemplated that members of one sex could use the opposite sex's facilities, based on their *perception* of having been born in the wrong sex, there would have been no reason for permitting separation of sexes in intimate settings. See G.G., 822 F.3d at 738 (Niemeyer, J. dissenting).

### D. If "Sex" Were Equated With "Gender Identity," Title IX And Its Regulations Would Be Invalid For Lack Of Clear Notice.

Finally, even if Title IX and its regulations were ambiguous as applied to transgender individuals, Grimm admits that determining sex exclusively by gender identity was unimaginable at the time Title IX and its regulations were first adopted. See G.G. S. Ct. Br. in Opp. at 1. If that is true—and it is—then under Grimm's interpretation Title IX violates the Spending Clause for failure to afford funding recipients clear notice of the conditions of funding. This Court should interpret Title IX in a way that does not render it potentially unconstitutional.

Title IX was enacted under the Spending Clause, and the threat of withdrawing federal funding is the main enforcement mechanism. See 20 U.S.C. § 1682. Moreover, "[l]egislation enacted pursuant to the spending power is much in the nature of a contract, and therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly." Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006) (quotes and alteration omitted) (quoting Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)). For that reason, "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously," for "States cannot knowingly

24

accept conditions of which they are unaware or which they are unable to ascertain." Id. (quotes and citation omitted).

For more than four decades, States have accepted Title IX funding with the understanding that they could maintain separate facilities based on men and women's different physiologies. And nothing in the text of Title IX or its implementing regulations "even hint[s]" that they would ever have to do anything else—and certainly not adopt a new regime of separation based on students' internal gender identities. *Id.* at 297. Thus, adopting Grimm's position would set the stage for a funding condition that States never could have anticipated.

Accordingly, given the limits on Congress' spending power, that position must be rejected under the rule of constitutional avoidance. See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). That rule supports interpreting Title IX in a way that does not permit courts or agencies to "surpris[e] participating States with post-acceptance or retroactive conditions." NFIB v. Sebelius, 132 S. Ct. 2566, 2606 (2012) (quoting Pennhurst, 451 U.S. at 25). This is yet another reason to reject the interpretation Grimm proposes.

## III.    The School Board Has Not Violated the Equal Protection Clause of the Fourteenth Amendment.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, §1. The equal protection requirement "does not take from the States all power of classification*,"*  Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 271, 99 S.Ct. 2282

(1979), but "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326 (1992).

Thus, "[t]he [Equal Protection] Clause requires that similarly-situated individuals be treated alike." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). In order to make out a claim under the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from others similarly situated and that the unequal treatment was the result of intentional discrimination. Morrison v. Garraghty, 239 F.3d 648, 652 (4th Cir. 2001); Brown v. Wilson, No. 3:13CV599, 2015 WL 3885984, at *6 (E.D. Va. 2015); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).

### A. Grimm's Claim Fails, Because All Students Are Treated the Same Under the School Board's Policy.

The School Board's policy does not discriminate against any class of students. Instead, the policy was developed to treat all students and situations the same. To respect the safety and privacy of all students, the School Board has had a long-standing practice of limiting the use of restroom and locker room facilities to the corresponding physiology of the students. The School Board also provides three single-stall bathrooms for any student to use regardless of his or her physiology.

Under the School Board's restroom policy,[11] Grimm was treated like every other student in the Gloucester Schools. All students have two choices under the policy. Every student can use a restroom associated with their physiology, whether they are boys or girls. If students choose not to use the restroom associated with their physiology, the students can use a private,

---

[11]   The policy that Grimm claims is unconstitutional and violates Title IX also provides that students are to use a locker room associated with their biological sex. Grimm voluntarily chose not to use the boys' locker room, and he is not asserting that this part of the policy is unconstitutional or in violation of Title IX.

single-stall restroom.  No student is permitted to use the restroom of the opposite sex.  As a result, all students, including female to male transgender and male to female transgender students, are treated the same.

Any student, including Grimm, was permitted to use the single-stall restrooms.  See Amended Complaint at ¶¶ 64-66 (ECF Doc. 113).  Grimm was permitted to use the girls' restroom under the School Board's policy, but would not do so.  Id. at ¶ 69.  Grimm was permitted to use the single-stall restrooms, but refused to do so.  Id.  Accordingly, Grimm cannot demonstrate that he was treated differently from others similarly situated, or that he was subject to intentional discrimination in violation of the Equal Protection clause.  See Workman v. Mingo County Bd. of Educ., 419 F. App'x 348, 354 (4th Cir. 2011) (no evidence of unequal treatment in application of state mandatory vaccination laws before admission to school); Hanton v. Gilbert, 36 F.3d 4, 8 (4th Cir. 1994) (no evidence that similarly situated males were afforded different treatment).

### B.       Transgender is Not a Suspect Class Entitled to Heightened Scrutiny.

Neither the United States Supreme Court nor the Fourth Circuit have recognized transgender status as a suspect classification under the Equal Protection Clause.  To the contrary, Courts have rejected the notion that transgender status, or other classifications of sex, is a suspect classification.[12]   See, e.g., Etsitty v. Utah Transit Authority, 502 F.3d 1215, 1222 (10th Cir. 2007) (holding that transsexuals are not a protected class under Title VII); Druley v. Patton, 601

---

[12] Some Courts have recognized a Price Waterhouse theory under Title VII that protects transgendered individuals who can demonstrate that they were subject to discrimination, because their appearance and conduct does not conform to traditional male or female stereotypes. See Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). These cases do not, however, recognize a theory of liability simply because the plaintiff is transgendered.  See, e.g., Etsitty, 502 F.3d at 1222 n. 2.  Grimm's allegations do not support a Price Waterhouse stereotype claim of discrimination in this case.

F. App'x 632, 635 (10th Cir. 2015) (declining to recognize transgender as a suspect class); Wrightson v. Pizza Hut of Am., Inc., 99 F.3d 138, 143 (4th Cir. 1996) (Title VII does not afford a cause of action for discrimination based upon sexual orientation); Williamson v. A.G. Edwards & Sons, Inc., 876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against homosexuals"), *cert. denied,* 493 U.S. 1089, 110 S.Ct. 1158 (1990); Brown v. Zavaras, 63 F.3d 967, 970-71 (10th Cir. 1995) (declining to recognize transsexual as a protected class); Johnston v. University of Pittsburgh of Com. System of Higher Educ., 2015 WL 1497753 (W.D. Pa. Mar. 31, 2015) (holding that transgender status is not a suspect classification, and that providing separate restroom and locker room facilities for college students based on their biological sex did not violate the Equal Protection Clause); Jamison v. Davue, No. CIV S-11-2056 WBS, 2012 WL 996383, at *3 (E.D. Cal. Mar. 23, 2012) ("Plaintiff is cautioned, however, that transgender individuals do not constitute a 'suspect' class, so allegations that defendants discriminated against him based on his transgender status are subject to a mere rational basis review.")[13]

This Court should not step out on its own and recognize transgender as a new suspect classification.  Indeed, the Supreme Court has admonished lower courts not to create new suspect classifications.   See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 441 (1985). Accordingly, Grimm's equal protection claim, if indeed he has one, should be reviewed under the rational basis standard.

---

[12] See also Doe v. Alexander, 510 F. Supp. 900, 904 (D. Minn. 1981); Braninburg v. Coalinga State Hosp., No. 1:08-CV-01457-MHM, 2012 WL 3911910, at *8 (E.D. Cal. Sept. 7, 2012); Kaeo-Tomaselli v. Butts, No. CIV. 11-00670 LEK, 2013 WL 399184, at *5 (D. Haw. Jan. 31, 2013); Lopez v. City of New York, No. 05 CIV. 10321(NRB), 2009 WL 229956, at *13 (S.D.N.Y. Jan. 30, 2009); Starr v. Bova, No. 1:15 CV 126, 2015 WL 4138761, at *2 (N.D. Ohio July 8, 2015); Murillo v. Parkinson, No. CV 11-10131-JGB VBK, 2015 WL 3791450, at *12 (C.D. Cal. June 17, 2015); Stevens v. Williams, No. 05-CV-1790-ST, 2008 WL 916991, at *13 (D. Or. Mar. 27, 2008); Rush v. Johnson, 565 F. Supp. 856, 868 (N.D. Ga. 1983).

**C.      The School Board's Policy is Presumptively Constitutional Under Rational Basis Review.**

Requiring students to use facilities that correspond to their birth sex in order to provide privacy to all students has been recognized as a rational basis by multiple courts. See Johnston, 97 F. Supp. 3d at 669-70 (citing Etsitty, 502 F.3d at 1224; Causey v. Ford Motor Co., 516 F.2d 416 (5th Cir. 1975)).  Indeed, the Supreme Court also has recognized that there (1) are inherent "[p]hysical differences between men and women" that are "enduring" and render "the two sexes . . . not fungible" and (2) that each sex must be afforded privacy from the other sex.  United States v. Virginia, 518 U.S. 515, 533, 550 n. 19 (1996).[14]  The Fourth Circuit likewise has held that individuals have a right to bodily privacy.  See Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.").   In particular, the Fourth Circuit has acknowledged "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns." Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir. 1993).

This is not a revolutionary proposition.  Other courts also have found that there is a basic need for bodily privacy.  See, e.g.  Doe v. Luzerne Cty., 660 F.3d 169, 177 (3rd Cir. 2011) (individuals have "a constitutionally protected privacy interest in his or her partially clothed body," and this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); Brannum v. Overton Cty. Sch. Bd., 516 F.3d 489, 498 (6th Cir. 2008) ("the constitutional right to privacy . . . includes the right to shield one's body from

---

[14] In a 1975 *Washington Post* editorial, then Columbia Law School Professor Ruth Bader Ginsburg wrote that "[s]eparate places to disrobe, sleep, perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21. (emphasis added).

exposure to viewing by the opposite sex"); Sepulveda v. Ramirez, 967 F.2d 1413, 1415-16 (9th Cir. 1992) ("[t]he right to bodily privacy is fundamental," and "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample).

Protecting bodily privacy is of particular concern when it comes to students. Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies"). Indeed, the School Board has a responsibility, particularly where children are still developing, both emotionally and physically, to ensure students' privacy. See, e.g., Burns v. Gagnon, 283 Va. 657, 671, 727 S.E.2d 634, 643 (2012); Davis v. Monroe County School Board of Education, 526 U.S. 629, 646-47 (1999).

In Johnston, 2015 WL 1497753, a case dealing with transgender restroom use in an educational setting, the Western District of Pennsylvania held that transgender is not a suspect class. The plaintiff in Johnston was born a biological female. The plaintiff entered college as a female, but later identified as a male. The plaintiff was diagnosed with Gender Identity Disorder, legally changed his name, and began living as a male. The plaintiff used the men's restrooms and locker rooms on campus. The plaintiff, however, remained anatomically a female.

Thereafter, the plaintiff was told that he could not use the men's restrooms or locker rooms. When the plaintiff refused to comply with this policy, he was expelled from the University. The plaintiff filed suit against the University alleging that the school's policy violated the Equal Protection Clause of the Fourteenth Amendment and Title IX. The District Court, in a detailed analysis and opinion, rejected these claims.

Johnston held that transgender status is not a suspect classification and that providing separate restroom and locker room facilities for college students based on their biological sex did

not violate the Equal Protection Clause.  Johnston, 2015 WL 1497753, at *8-10.  As the Court noted, this holding is consistent with the holdings of numerous other courts that have considered allegations of discrimination by transgender individuals, whether under the Fourteenth Amendment or Title VII.  See, e.g., Johnston, 2015 WL 1497753, at *8; Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764 (1973); Etsitty v. Utah Transit Auth., 502 F.3d at 1221-22; Ulane v. Eastern Airlines, Inc., 742 F.2d 1081, 1084 (7th Cir. 1984); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982).

The same result should be reached here.  The School Board's policy is rationally related to protecting students' privacy rights, and it is not just rationally related, but substantially related, to the important governmental interest of protecting the privacy of all of its students.  The School Board has a responsibility to its students – ages 6 to 18 – to ensure their privacy while engaging in personal bathroom functions, disrobing, dressing, and showering outside of the presence of members of the opposite sex.  This is particularly true in an environment where children are still developing, both emotionally and physically.  See, e.g., Burns v. Gagnon, 283 Va. 657, 671, 727 S.E.2d 634, 643 (2012) (school administrators have a responsibility "to supervise and ensure that students could have an education in an atmosphere conducive to learning, free of disruption, and threat to person."); Va. Code § 22.1-254 (compulsory attendance).

As Johnston recognized, the context of this dispute is important.  Here, the School Board is balancing the needs, interests and rights of children in kindergarten through twelfth grade. The right to privacy for young, dependent students strongly supports maintaining sex-segregated bathrooms and locker rooms.  See Johnston, 2015 WL 1497753, at *7 (finding "controlling the

unique contours under which this case arises," namely a public school which is "tasked with providing safe and appropriate facilities for all of its students.")[15]

Furthermore, the School Board's interest in protecting students' safety and privacy rights based on their physiology has been recognized by the Department of Education. The regulations implementing Title IX specifically allow schools to provide "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. Grimm's suggestion that the School Board does not have a substantial interest in providing separate restroom and locker room facilities based on physiology is unfounded.

Grimm's identification as a male does not alter the physiological differences between Grimm and other male students, nor does it erase the physiological differences between a male student who identifies as a female and other female students. And even Grimm must concede that student privacy is a legitimate interest for the School Board to consider.

The School Board took both Grimm's interests and the interests of its other students into consideration and developed a policy that seeks to accommodate the best interests of all of its students. In doing so, the School Board bolstered these privacy rights by providing single-stall restrooms for any student to use. Accordingly, there is not only a rational basis, but a substantially related basis for the School Board's policy requiring students to use the restroom and locker room associated with their physiology, or to use a single-stall restroom of their choice. Johnston, 2015 WL 1497753, at *8; United States v. Biocic, 928 F.2d 112, 115-16 (4th

---

[15] Grimm previously attempted to distinguish Johnston in this Court by incorrectly interpreting the court's reasoning, which is directly on point. Grimm contended that "Johnston assumed that separate restrooms for men and women based on privacy concerns had been upheld under heightened scrutiny, but none of the cases cited by Johnston court actually supports that proposition." This is not Johnston's holding. Instead, Johnston cited to those cases to show that the need to ensure the privacy of students outside the presence of members of the opposite sex is a justification that has been upheld by courts. Id., *8.

Cir. 1991) (recognizing anatomical differences between men and women for purposes of equal protection analysis.)

### D.   The School Board's Policy is Also Constitutional Under Intermediate Scrutiny.

Grimm may argue that the School Board's policy creates a sex based classification that is subject to intermediate scrutiny.  There is no disputing that classifications based on sex are subject to intermediate scrutiny. See United States v. Virginia, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).  Intermediate scrutiny, however, does not apply in the context of this case.  Unlike laws that differentiate between fathers and mothers, widows and widowers, unwed fathers and unwed mothers, See Sessions v. Morales-Santana, 137 S. Ct. 1678, 1688-89 (2017), separating boys and girls into different bathrooms based on their physiology is not sex-based discrimination that is prohibited by the Equal Protection Clause.  A claim such as Grimm's that attempts to insert "gender identity" as a component of "sex" fails to state an Equal Protection Clause claim as a matter of law.

Even if intermediate scrutiny applied, the School Board's policy meets that threshold. Intermediate scrutiny requires the government to demonstrate that a challenged policy serves "important governmental objectives" and that the purportedly discriminatory means employed are "substantially related" to the achievement of those objectives.  Id. at 533.  The government is not, however, required to show that the policy is the "least intrusive means of achieving the relevant government objective."   See United States v. Staten, 666 F.3d 154, 159-160 (4th Cir.2011) (citations and internal quotation marks omitted). "In other words, the fit needs to be reasonable; a perfect fit is not required." Id. at 162.

Once again, the School Board has an interest in protecting the privacy rights of its students. See, e.g., Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir.2005)

("Students of course have a significant privacy interest in their unclothed bodies."); Doe v. Renfrow, 631 F.2d 91, 92–93 (7th Cir.1980) (stating that it "does not take a constitutional scholar" to conclude that a strip search invades a student's privacy rights).   As recently as January 2016, the Fourth Circuit cited Virginia approvingly while concluding that physiological differences justified treating men and women differently in some contexts. See Bauer v. Lynch, 812 F.3d 340, 350 (4th Cir.2016).

In Bauer, a male applicant "flunked out of the FBI Academy after falling a single push-up short of the thirty required of male Trainees." Id. at 342. The applicant sued under Title VII, noting that his performance would have qualified him under the different physical fitness standards applied to female applicants. Id.   While Bauer involved a Title VII claim rather than a claim under the Equal Protection Clause, the Fourth Circuit, relying on Virginia, stated that the same principles "inform [its] analysis" of both types of claims.   Id. at 350.

The Fourth Circuit found that different standards for men and women arose from the FBI's efforts to "normalize testing standards between men and women in order to account for their innate physiological differences," such that an approximately equal number of men and women would pass the tests. Id. at 343. In light of this, the Fourth Circuit concluded that the FBI's policy was permissible because "equally fit men and women demonstrate their fitness differently." Id. at 351. In concluding that the FBI could distinguish between men and women on the basis of physiology, the court explained:

> Men and women simply are not physiologically the same
> for the purposes of physical fitness programs. ... The Court
> recognized [in Virginia] that, although Virginia's use of
> 'generalizations about women' could not be used to
> exclude them from VMI, some differences between the
> sexes were real, not perceived, and therefore could require
> accommodations.

Id. at 350.

The School Board's interests in student privacy that justify segregation of bathroom and locker rooms arise from the physiological differences between boys and girls and not from differences in gender identity.  See Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir. 1993) (finding that "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns" illustrates the point that gender classification can be justified by acknowledged differences between men and women.).  Even though the law allows the School Board to do so, the School Board did not limit its restroom policy to requiring students to use only a bathroom that corresponds to their physiology.  Instead, the School Board addressed in a uniform, nondiscriminatory manner, the possibility that students, including Grimm, may not be comfortable using the restroom that corresponds with their physiological sex for whatever reason.  In an effort to protect the privacy of all of its students, the School Board maintains both sex segregated bathrooms and three single-stall restrooms.  Any student, including Grimm, could use these single-stall bathrooms, regardless of their biological sex, if they are uncomfortable using a communal bathroom, or for any other private or personal reason.

The School Board's restroom policy does not discriminate against any one class of individuals.  The policy treats all students and situations the same.  Under this policy, all students, including female to male transgender and male to female transgender students, are treated the same.  The School Board did not develop the restroom and locker room policy to single out Grimm or anyone else on the basis of gender identity.  Instead, the policy reflects the physiological differences between boys and girls.  It is nondiscriminatory in implementation and substantially related to a legitimate governmental interest.  Accordingly, Grimm is not able to demonstrate an Equal Protection violation.

IV.     **Grimm's Claims That He Will Be Subject to the School Board's Policy As an Alumnus Do Not Present a Justiciable Controversy Since the Policy Only Applies to Current Students.**

Grimm alleges that he will continue to be subject to the School Board's policy as an alumnus since he "will continue to be on school grounds when attending football games, alumni activities, or social event[s] with friends who are still in high school." See Amended Complaint ¶1 (ECF Doc. 113). It is unclear whether Grimm anchors this part of his claim on Title IX, the Equal Protection Clause, or both. Grimm, however, cannot pursue this aspect of his claim on Title IX grounds since Title IX prohibits discrimination in "any education program or activity" and does not concern non-student alumni. See 20 U.S.C. § 1681.

Regardless of what Grimm's theory of recovery may be, he does not have a justiciable claim. On its face, the School Board's policy only applies to "students." Id. at ¶ 51. The policy does not apply to alumni. Thus, there is no justiciable controversy concerning the School Board's policy as it pertains to Grimm's restroom use on school grounds as an alumnus. See Coffman v. Breeze Corp., 323 U.S. 316, 324 (1945) ("The declaratory judgment procedure is available in the federal courts only in cases involving an actual case or controversy, where the issue is actual and adversary, and it may not be made the medium for securing an advisory opinion in a controversy which has not arisen."). Moreover, Grimm has not alleged that he has actually been barred from using the restroom of his choice as an alumnus. As such, Grimm's requests for a declaration that the School Board's policy continues to violate his rights and for a permanent injunction requiring the School Board to allow Grimm to use the same restrooms as other male alumni do not present an actual controversy for this Court and should be dismissed.

## V. **CONCLUSION**

For all of the foregoing reasons, the Gloucester County School Board respectfully requests that the Court grant the Motion to Dismiss, and dismiss Plaintiff's Amended Complaint in its entirety and with prejudice.

**GLOUCESTER COUNTY SCHOOL
SCHOOL BOARD**

By Counsel

/s/
David P. Corrigan
VSB 26341
Jeremy D. Capps
VSB No. 43909
M. Scott Fisher, Jr.
VSB 78485
Attorney for Gloucester County School School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com

# **C E R T I F I C A T E**

I hereby certify that on the 22nd day of September 2017, I filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send a Notice of Electronic Filing to all counsel of record.

/s/_____
David P. Corrigan
VSB No. 26341
Attorney for Gloucester County School School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com