IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| GAVIN GRIMM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 4:15-cv-54-AWA-DEM |
| | ) | |
| GLOUCESTER COUNTY SCHOOL | ) | |
| BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMIS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

    Gender dysphoria and transgender youth ...................................................................... 4

    Gavin's experience at Gloucester High School ............................................................ 8

    Enforcement of the policy .............................................................................................. 13

    Procedural history ......................................................................................................... 14

ARGUMENT ..................................................................................................................... 14

  I.  Legal Standard. ............................................................................................................ 14

  II.  Gavin Has Stated a Valid Claim that the Board's Policy Violates Title IX. .................... 15

    A.  The Board Discriminated Against Gavin "On the Basis of Sex." ........................... 15

        1. Discrimination Based on a Person's Transgender Status Is Discrimination "On
the Basis of Sex" Under Title IX. ........................................................................ 15

        2. The Board's Narrow Interpretation of Title IX Conflicts with the Statute's Plain
Text and Settled Principles of Statutory Interpretation. ....................................... 19

    B.  Excluding Boys and Girls Who Are Transgender from Using the Same Restrooms as
Other Boys and Girls Subjects Them to Discrimination in Violation of Title IX.......... 23

    C.  The Restroom Regulation Does Not Authorize the Board's Discriminatory Policy. 27

    D.  This Court Is Not Bound by Judge Doumar's Dismissal of the Original Title IX
Claim. ........................................................................................................................ 32

    E.  Pennhurst Provides No Defense to Claims of Intentional Sex Discrimination. ....... 35

  III.  Gavin Has Stated A Claim Under the Equal Protection Clause........................................ 36

    A.  The Board's Discriminatory Policy Triggers Heightened Scrutiny......................... 36

    B.  The Board's Policy Is Not Substantially Related to Protecting Student Privacy. .... 39

    C.  The Board's Policy Is Not Substantially Related to Avoiding Discrimination Against
Non-transgender Students. ......................................................................................... 40

    D.  The Board's Policy Is Not Substantially Related to Avoiding "Practical
Problems."…………………………………………………………………………………...42

  IV.  Gavin's Claims for Injunctive Relief Should Not Be Dismissed As Moot Unless the
Board Definitively States that He Can Now Use the Men's Restrooms on Campus......... 44

CONCLUSION.................................................................................................................... 45

CERTIFICATE OF SERVICE .......................................................................................... 46

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015)..................................................................... 37

*American Canoe Association v. Murphy Farms, Inc.*,
326 F.3d 505 (4th Cir. 2003) ................................................................................. 32

*Barr v. United States*,
324 U.S. 83 (1945)................................................................................................. 20

*Bauer v. Lynch*,
812 F.3d 340 (4th Cir. 2016) ................................................................................. 30

*Bennett v. Kentucky Department of Education*,
470 U.S. 656 (1985)............................................................................................... 36

*Board of Education of the Highland Local School District v. U.S. Department of Education*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) .......................................................... passim

*Board of Trustees of the University of Alabama v. Garrett*,
531 U.S. 356 (2001)............................................................................................... 42

*Bilski v. Kappos*,
561 U.S. 593 (2010)............................................................................................... 22

*Bostic v. Rainey*,
No. 2:13CV395, 2014 WL 10022686, at *22 (E.D. Va. Feb. 14, 2014) ................................37

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) ................................................................................. 42

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993)............................................................................................... 24

*Bridger Coal Company v. U.S. Department of Labor*,
669 F.3d 1183 (10th Cir. 2012) ............................................................................. 33

*Brown v. Board of Education*,
347 U.S. 483 (1954)............................................................................................... 25

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)............................................................................................... 22

*California Federal Savings & Loan Association v. Guerra*,
   479 U.S. 272 (1987) .................................................................................... 30

*Cannon v. University of Chicago*,
   441 U.S. 677 (1979) .................................................................................... 36

*Carlson v. Boston Scientific Corporation*,
   856 F.3d 320 (4th Cir. 2017) ................................................................. 33, 34

*City of Los Angeles v. Patel*,
   135 S. Ct. 2443 (2015) ................................................................................ 23

*City of Los Angeles Department of Water & Power v. Manhart*,
   435 U.S. 702 (1978) .................................................................................... 18

*Cohen v. Brown University*,
   991 F.2d 888 (1st Cir. 1993) ....................................................................... 34

*Cruzan v. Special School District No. 1*,
   294 F.3d 981 (8th Cir. 2002) ....................................................................... 40

*Daniel v. Paul*,
   395 U.S. 298 (1969) .................................................................................... 24

*Davis v. Monroe County Board of Education*,
   526 U.S. 629 (1999) .......................................................................... 21, 24, 35

*Dawson v. H&H Electric, Inc.*,
   No. 4:14-CV-00583-SWW, 2015 WL 5437101 (E.D. Ark. Sept. 15, 2015) .......................... 16

*DeClue v. Central Illinois Light Co.*,
   223 F.3d 434 (7th Cir. 2000) ....................................................................... 27

*De Lima v. Bidwell*,
   182 U.S. 1 (1901) ....................................................................................... 20

*Diamond v. Chakrabarty*,
   447 U.S. 303 (1983) ……………………….......………………………………...…..20

*Dodds v. U.S. Department of Education*,
   845 F.3d 217 (6th Cir. 2016) .............................................................. passim

*Doe v. Boyertown Area School District*,
   No. 17-1249, 2017 WL 3675418 (E.D. Pa. Aug. 25, 2017) ........................... passim

*Doe v. Regional School Unit 26*,
   86 A.3d 600 (Me. 2014) ......................................................................... 26, 44

*Elwell v. Oklahoma*,
   693 F.3d 1303 (10th Cir. 2012) ................................................................ 45

*EEOC v. Lockheed Martin Corporation, Aero & Naval Services*,
   116 F.3d 110 (4th Cir 1997) ..................................................................... 34

*Etsitty v. Utah Transit Authority*,
   502 F.3d 1215 (10th Cir. 2007) ................................................................ 18

*Evancho v. Pine Richland School District*,
   37 F. Supp. 267 (W.D. Pa.2017).......................................................... passim

*Fabian v. Hospital of Central Connecticut*,
   172 F. Supp. 3d 509 (D. Conn. 2016)................................................... 16, 19

*Fayetteville Investors v. Commercial Builders, Inc.*,
   936 F.2d 1462 (4th Cir. 1991) ................................................................... 32

*Franklin v. Gwinnett County Public Schools*,
   503 U.S. 60 (1992)..................................................................................... 35

*G.G. v. Gloucester County School Board*,
   822 F.3d 709 (4th Cir. 2016) ............................................................... passim

*G.G. v. Gloucester County School Board*,
   853 F.3d 729 (4th Cir. 2017) ............................................................... passim

*Gebster v. Lago Vista Independent School District*,
   524 U.S. 274 (1998)................................................................................... 35

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir.2011) ............................................... 15, 16, 17, 22

*Gloucester County School Board v. G.G.*,
   137 S. Ct. 1239 (2017)............................................................................... 34

*Grimm v. Gloucester County School Board*,
   869 F.3d 286 (4th Cir. 2017) ..................................................................... 14

*Harrell v. DCS Equipment Leasing Corporation*,
   951 F.2d 1453 (5th Cir. 1992) ................................................................... 33

*Heckler v. Mathews*,
   465 U.S. 728 (1984)................................................................................... 24

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003)....................................................................... 36

iv

*Hill v. BASF Wyandotte Corporation*,
 696 F.2d 287 (4th Cir. 1982) .................................................................................. 33

*Hively v. Ivy Tech. Community College of Indiana*,
 853 F.3d 339 (7th Cir. 2017) ............................................................................. 18, 21

*Hobbie v. Unemployment Appeals Commission*,
 480 U.S. 136 (1987) ............................................................................................... 16

*J.E.B. v. Alabama*,
 511 U.S. 127 (1994) ............................................................................................... 24

*Jackson v. Birmingham Board of Education*,
 544 U.S. 167 (2005) ..................................................................................... 20, 35, 36

*Johnston v. University of Pittsburgh of the Commonwealth System of Higher Education*,
 97 F. Supp. 3d 657 (W.D. Pa. 2015) .................................................................. 18, 33

*Kitchen v. Herbert*,
 961 F. Supp. 2d 1181 (D. Utah 2013), *aff'd*, 755 F.3d 1193 (10th Cir. 2014) ....................... 21

*Lewis v. City of Chicago*,
 560 U.S. 205 (2010) ............................................................................................... 21

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) ......................................................................................... 20, 22

*McCleary-Evans v. Maryland Department of Transportation State Highway Administration*,
 780 F.3d 582 (4th Cir. 2015) ................................................................................. 14

*McWilliams v. Fairfax County Board of Supervisors*,
 72 F.3d 1191 (4th Cir. 1996) ................................................................................. 21

*Mercer v. Duke University*,
 190 F.2d 643 (4th Cir. 1999) ................................................................................. 28

*Mickens v. General Electric Company*,
 No. 3:16-CV-00603-JHM, 2016 WL 7015665 (W.D. Ky. Nov. 29, 2016) ............................ 23

*Mississippi University for Women v. Hogan*,
 458 U.S. 718 (1982) ............................................................................................... 37

*Norsworthy v. Beard*,
 87 F. Supp. 3d 1104 (N.D. Cal. 2015) .................................................................... 37

*North Haven Board of Education v. Bell*,
    456 U.S. 512 (1982) ................................................................................... 20, 45

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ......................................................................................... 27

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ................................................................................. 38, 42

*Oncale v. Sundowner Offshore Services, Inc.*,
    523 U.S. 75 (1998) ............................................................................... 19, 20, 21

*Pennhurst State School & Hospital v. Halderman*
    451 U.S. 1 (1981) ........................................................................................ 35, 36

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) ......................................................................................... 25

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) .......................................................................... 16, 17, 18, 19

*Radtke v. Misc. Drivers & Helpers Union Local No. 638 Health, Welfare,*
*Eye & Dental Fund*,
    867 F. Supp. 2d 1023 (D. Minn. 2012) ............................................................. 11

*Roberts v. Clark County School District*,
    No. 2:15-CV-00388-JAD-PAL, 2016 WL 5843046 (D. Nev. Oct. 4, 2016) ......................... 23

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ......................................................................................... 24

*Romer v. Evans*,
    517 U.S. 620 (1996) ......................................................................................... 39

*Rosa v. Park West Bank & Trust Co.*,
    214 F.3d 213 (1st Cir. 2000) ............................................................................. 16

*Rumble v. Fairview Health Services*,
    No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ......................... 17

*School Board of Nassau County v. Arline*,
    480 U.S. 273 (1987) ......................................................................................... 42

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) ........................................................ 16, 17, 22

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ..................................................................... 16, 17

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017) ........................................................................................... 37

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) ................................................................................ 17

*Snyder ex rel. R.P. v. Frankfort-Elberta Area School District*,
   No. 1:05-CV-824, 2006 WL 3613673 (W.D. Mich. Dec. 11, 2006) ..................... 24

*Solid Waste Agency v. U.S. Army Corps of Engineers*,
   531 U.S. 159 (2001) ............................................................................................. 22

*Stoffels ex rel. SBC Telephone Concession Plan v. SBC Communications, Inc.*,
   677 F.3d 720 (5th Cir. 2012) ................................................................................ 32

*Students & Parents for Privacy v. U.S. Department of Education*,
   No. 16-cv-4945, 2016 WL 6134121 (N.D. Ill. Oct. 18, 2016) ............................. 3, 40, 43, 44

*Sturgeon v. Frost*,
   136 S. Ct. 1061 (2016) ......................................................................................... 30

*Talk America, Inc. v. Michigan Bell Telephone Co.*,
   564 U.S. 50 (2011) ............................................................................................... 28

*Time Warner Entertainment Co. v. Everest Midwest Licensee, LLC*,
   381 F.3d 1039 (10th Cir. 2004) ........................................................................... 28

*Tuan Anh Nguyen v. INS*,
   533 U.S. 53 (2001) ............................................................................................... 38

*Ulane v. Eastern Airlines, Inc.*,
   742 F.2d 1081 (7th Cir. 1984) ............................................................................. 18

*United States v. Craft*,
   535 U.S. 274 (2002) ............................................................................................. 22

*United States v. Marte*,
   356 F.3d 1336 (11th Cir. 2004) ........................................................................... 28

*United States v. O'Keefe*,
   128 F.3d 885 (5th Cir. 1997) ............................................................................... 34

*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................................................... 18, 29, 31

*United States v. Windsor*,
   133 S. Ct. 2675 (2013) ......................................................................................... 25

*West v. Gibson*,
527 U.S. 212 (1999) ............................................................... 20

*West Virginia Department of Health & Human Resources v. Sebelius*,
649 F.3d 217 (4th Cir. 2011) .................................................. 35

*Whitaker v. Kenosha Unified School District No. 1 Board of Education*,
858 F.3d 1034 (7th Cir. 2017) ........................................... passim

## **Statutes**

18 U.S.C. § 249(a)(2) ................................................................. 22

34 C.F.R. § 106.33…………………………………………………………………...2, 27, 29

20 U.S.C. § 1681(a) ............................................................ passim

42 U.S.C. § 13925(b)(13)(A) ....................................................... 22

## **Other Authorities**

American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders
(5th Ed.) ................................................................................ 5

American Psychological Association & National Association of School Psychologists,
*Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in
Schools* (2015) ........................................................................ 7

Amicus Brief of American Academy of Pediatrics, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*,
No. 15-2056, ECF No. 244 (4th Cir.) ................................. passim

Amicus Brief of interACT, *et al.*, *Gloucester Cty. Sch. Bd. v. Grimm*,
No. 15-2056, ECF 138-1 (4th Cir.) ................................... 11, 30

Amicus Brief of NAACP LDF, *et al.*, *Gloucester Cty. Sch. Bd. v. G.G.*,
No. 16-273, 2017 WL 956145, https://goo.gl/MLjLxC ............... 41

Amicus Brief of New York, *et al*., *G.G. v. Gloucester Cty. Sch. Bd.*,
No. 15-2056, ECF 148-1 (4th Cir.) ............................... 8, 40, 43

Amicus Brief of PFLAG, *et al*., *G.G. v. Gloucester Cty. Sch. Bd.*,
No. 15-2056, ECF 139-1 (4th Cir.) ........................................ 8

Amicus Brief of School Administrators, *Gloucester Cty. Sch. Bd. v. G.G.*,
No. 16-273, 2017 WL 930055, https://goo.gl/7JV6Jx ........ 8, 40, 41, 43

Amicus Brief of Transgender Students & Allies, *Gloucester Cty. Sch. Bd. v. G.G.*,
     No. 16-273, 2017 WL 836840, https://goo.gl/w6RGWZ ................................................... 8, 40

Boy Scouts of America, *BSA Addresses Gender Identity* (Jan. 30, 2017),
     https://goo.gl/WxNoGY ........................................................................................................8

Deborah L. Rhode, *Midcourse Corrections: Women in Legal Education*,
     53 J. Legal Educ. 475 (2003) .................................................................................... 27

Gender Spectrum, *Transgender Students and School Bathrooms:*
     *Frequently Asked Questions* (2016)...................................................................... 7

Girl Scouts, *Frequently Asked Questions: Social Issues,* https://goo.gl/364fXI ........................... 8

Student Non-Discrimination Act, H.R. 4530, 111th Cong. (2010) ............................................. 22

Justice Sandra Day O'Connor, "'Out Of Order' At The Court: O'Connor On Being The First
     Female Justice." NPR (March 5, 2013), https://goo.gl/4llXNV ............................................. 27

Moriah Balingit, *Gavin Grimm just wanted to use the bathroom. He didn't think the nation*
     *would debate it.*, Wash. Post. (Aug. 30, 2016) ...................................................... 10

National Association of Secondary School Principals, *Position Statement on Transgender*
     *Students* (2016) ........................................................................................................ 7

National Collegiate Athletic Association, *NCAA Inclusion of Transgender Student-Athletes*
     (2011), https://goo.gl/V2Oxb2 ......................................................................................... 8

OED Online, Oxford University Press.......................................................................................... 19

Susan Svrluga, *Barnard will admit transgender students. Now all 'Seven Sisters' colleges do.*,
     Wash. Post (June 4, 2015), https://goo.gl/g0rALA................................................................8

Va. High Sch. League, *Criteria for VHSL, Transgender Rule Appeals*, https://goo.gl/fgQe2l...... 8

Wright & Miller, *Law of the Case—Trial Courts*, 18B Federal Practice & Procedure
     Jurisprudence § 4478.1 (2d ed.) ...................................................................... 32, 34

Wylie C. Hembree, *et al.*, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent*
     *Persons: An Endocrine Society Clinical Practice Guideline*,
     J. Clinical Endocrinology & Metabolism (Sept. 2017)........................................................... 6

## INTRODUCTION

Gavin Grimm ("Gavin") is an 18-year-old young man who is transgender. When Gavin was 15, he came out to his family as a boy and, with the help of his medical providers, transitioned to living in accordance with his male identity as part of medically necessary treatment for gender dysphoria. By the time Gavin began his sophomore year at Gloucester High School, he had legally changed his name to Gavin and begun using male pronouns. Gavin wore his clothing and hairstyles in a manner typical of other boys and used the men's restrooms in public venues—including restaurants, libraries, and shopping centers—without encountering any problems. Gavin's medical providers also gave him a "treatment documentation letter," which confirmed that Gavin was receiving treatment for gender dysphoria and stated that he should be treated as a boy in all respects, including when using the restroom.

With the support of the school principal and superintendent, Gavin used the boys' restrooms at Gloucester High School for approximately seven weeks without incident. But in response to complaints from some adults in the community, the Gloucester County School Board (the "Board") overruled its own administrators and enacted a new policy prohibiting boys and girls "with gender identity issues" from using the same common restrooms as other boys and girls. The new policy directed transgender students to an "alternative appropriate private facility" instead. Throughout the rest of high school, Gavin was forced to use separate restrooms that no other student was required to use. That degrading and stigmatizing policy singled Gavin out as unfit to use the same restrooms as every other student.[1]

---

[1] The Board continued to exclude Gavin from using the same restrooms as other boys, even after he began receiving hormone therapy, obtained a Virginia state I.D. card listing his sex as male, underwent chest reconstruction surgery, obtained a court order legally changing his sex to male under Virginia law, and received a new Virginia birth certificate reflecting that his sex is male.

The Board's discriminatory policy violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, which prohibits schools from engaging in sex-based discrimination. Discriminating against individuals because they are transgender inherently constitutes discrimination "on the basis of sex." 20 U.S.C. § 1681(a). And by singling out Gavin and forcing him into separate single-stall facilities because he is transgender, the Board's policy "exclude[s] [him] from participation in," "denie[s] [him] the benefits of," and "subject[s] [him] to discrimination" at school "on the basis of sex." *Id.* The Board's policy thus violates the statute's plain text. The regulation authorizing schools to provide separate restrooms for boys and girls, 34 C.F.R. § 106.33, does not authorize a school to enact whatever sex-based restroom policy it chooses—no matter how discriminatory or harmful. When a school provides separate restrooms on the basis of sex pursuant to 34 C.F.R. § 106.33, it must do so in a manner that complies with the statute's unambiguous prohibition on sex-based "discrimination."

The discriminatory policy also violates the Equal Protection Clause. The Board's policy is subject to heightened scrutiny as a form of sex discrimination and as discrimination based on transgender status. Moreover, regardless of what standard of scrutiny applies, the policy rests on unfounded stereotypes and generalized fears, which are not legitimate grounds for imposing unequal or stigmatizing treatment under any standard of scrutiny.

In seeking to dismiss Gavin's claims, the Board does not address Gavin's actual arguments. The Board spends page after page arguing that the term "sex" includes reference to physiological characteristics (Def.'s Mem. 10-20), even though Gavin has never argued otherwise. The Board asserts that its policy is based on objective physiology (Def's Mem. 17-20), even though Gavin and many other boys and girls who are transgender have developed physiological sex characteristics typical of their gender identity—not the sex they were assigned

2

at birth—as a result of medical treatment. The Board stubbornly insists that there is no objective

way to differentiate between a girl and a transgender boy (or between a boy and a transgender

girl) (Def.'s Mem. 21-22), even though Gavin's status as a boy who is transgender has never

been in doubt. And the Board claims that it must banish Gavin from using the same restrooms as

other boys in order to forestall imaginary scenarios that have nothing to do with Gavin, nothing

to do with restrooms, and nothing to do with the experiences of actual transgender students.

The Board's legal arguments conflict with the decisions of the overwhelming majority of

courts to consider the question.[2] And the Board's baseless speculation conflicts with the

experience of every major medical organization, school counselors and psychologists, and

teachers and administrators across the country working with real transgender students as opposed

to hypothetical ones. While the Board speculates about imaginary scenarios, it willfully blinds

itself to the reality that already exists in Virginia and throughout the country: Boys and girls who

are transgender already use sex-separated facilities at school, participate in interscholastic

athletic teams in both high school and college, and join girl-scout and boy-scout troops. The

Board's continued refusal to acknowledge that reality "demonstrate[s] that some entities will not

protect the rights of others unless compelled to do so." *G.G. v. Gloucester Cty. Sch. Bd.*, 853

---

[2] *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046-47 (7th Cir. 2017) (affirming preliminary injunction), *pet'n for cert filed*, No.17-301 (Aug. 25, 2017); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (denying motion to stay preliminary injunction); *Evancho v. Pine Richland Sch. Dist.*, 237 F. Supp. 267, 288 (W.D. Pa. 2017) (granting preliminary injunction); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't. of Educ.*, 208 F. Supp. 3d 850, 856-58 (S.D. Ohio 2016) (same); *see also Doe by and through Doe v. Boyertown Area Sch. Dist.*, No. 17-1249, 2017 WL 3675418, at *52-53 (E.D. Pa. Aug. 25, 2017) (concluding after evidentiary hearing that allowing boys and girls who are transgender to use sex-separated restrooms and locker rooms did not violate privacy); *Students & Parents for Privacy v. U.S. Dep't of Educ.*, No. 16-cv-4945, 2016 WL 6134121, at *28-29 (N.D. Ill. Oct. 18, 2016) (same).

F.3d 729, 730 (4th Cir. 2017) (mem.) (Davis, J., concurring, joined by Floyd, J.). Gavin thus continues to look to this Court to "vindicate [his] claim[] to human dignity." *Id.*

By segregating Gavin from his peers, excluding him from using the same restrooms that every other boy is allowed to use, and relegating him to separate restroom facilities, the Board's policy discriminates on the basis of sex, in violation of Title IX and the Fourteenth Amendment.

## FACTUAL BACKGROUND

### Gender dysphoria and transgender youth

When Gavin was born, the hospital staff designated him as female, but from a young age, Gavin knew that he was a boy. Am. Compl. (ECF 113) ¶ 17. Although the sex assigned to Gavin at birth was female, Gavin has a male gender identity. *Id.*

Everyone has a gender identity. It is an established medical concept, referring to a person's deeply felt, inherent sense of being a boy, a man, or male; a girl, a woman, or female. Most people have a gender identity that matches the sex they are designated as at birth. *Id.* ¶ 18. But people who are transgender have a gender identity that differs from the sex they are assigned at birth. *Id.* Boys and girls who are transgender are people who consistently, persistently, and insistently do not identify with the sex assigned to them at birth. *Id.* ¶ 12. The gender identity of these adolescents is stable and fixed. *Id.*; *see also* Amicus Br. of Am. Acad. of Pediatrics, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 244, at 17-18 (4th Cir.) ("AAP Amicus"), https://goo.gl/ZeTXz3.

Like many transgender students, Gavin succeeded at school until the onset of puberty, when he began to suffer debilitating levels of distress from gender dysphoria, a condition in which transgender individuals experience persistent and clinically significant distress caused by the incongruence between their gender identity and the sex assigned to them at birth. Am.

4

Compl. ¶ 19. Although gender dysphoria is a serious medical condition recognized by the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013), being transgender is not a mental disorder and "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender & Gender Variant Individuals (2012), at https://goo.gl/iXBM0S; Am. Compl. ¶ 19.

There is a medical and scientific consensus that the treatment for gender dysphoria is for boys who are transgender to live as boys and for girls who are transgender to live as girls. *Id.* ¶ 20. When medically appropriate, treatment can also include hormone therapy or surgery. *Id.* This medical consensus is embraced by the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the National Endocrine Society, and every other major medical and mental health organization in the United States. *Id.*; *see also* AAP Amicus at 12-16.

The ability of transgender individuals to live consistently with their identity is critical to their health and well-being. Am. Compl. ¶ 21. That includes using names and pronouns consistent with their identity, grooming and dressing in a manner typically associated with that gender, and using restrooms and other sex-separated facilities that match their gender identity. *Id.* Preventing transgender students from living in a manner that is consistent with their gender identity puts them at increased risk of debilitating depression and suicide. *Id.* By contrast, when gender dysphoria is properly treated, transgender individuals experience profound relief and can lead healthy, happy, and successful lives. *Id.*; *see also* AAP Amicus at 11-16.

Boys and girls who are transgender are attending schools across the country. Am. Compl. ¶ 23. While transgender students have long been part of school communities, it is only in the last

couple decades that they have had more widespread access to the medical and psychological support they need. *Id.* Beginning in the early 2000s, as a result of advances in medical and psychological treatment for transgender youth, transgender students finally began to receive the treatment necessary to alleviate the devastating pain of gender dysphoria and live their lives in accordance with who they really are. *Id.*; *see also* AAP Amicus at 5-6.

Many transgender students attend school without classmates and peers knowing they are transgender. For example, many students transition before beginning school; many others transfer to a new school after transitioning. Am. Compl. ¶ 24. With hormone therapy, transgender students develop physical sex characteristics typical of their gender identity—not the sex designated for them at birth. Hormone therapy affects bone and muscle structure, alters the appearance of a person's genitals, and produces secondary sex characteristics such as facial and body hair in boys and breasts in girls. *Id.* ¶ 25; *see* Wylie C. Hembree, *et al.*, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. Clinical Endocrinology & Metabolism, 17-20 (Sept. 2017) ("Endocrine Society Guidelines"), https://goo.gl/1TgnN7. In addition, transgender children who receive puberty blockers never go through puberty as their birth-designated sex. *Id.* ¶ 26; *see* Endocrine Society Guidelines at 13-14.[3] They are instead exposed to the same levels of testosterone or estrogen as other boys and girls during puberty. *Id.*

According to every major medical and mental health organization, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric

---

[3] Under widely accepted standards of care developed by the World Professional Association of Transgender Health ("WPATH"), genital surgery is not recommended for minors, but boys who are transgender may undergo medically necessary chest-reconstruction surgery after they turn 16. *Id.* ¶ 27.

Association, and the American Psychological Association, excluding boys and girls who are transgender from using the same restrooms as other boys and girls is harmful to their health and well-being. *Id.* ¶ 28; *see* AAP Amicus at 1. When excluded from the common restrooms, transgender students often avoid using the restroom entirely, either because the separate restrooms are too stigmatizing or too difficult to access. Am. Compl. ¶ 28; *see* AAP Amicus at 4. They suffer infections and other negative health consequences as a result of avoiding restroom use. *Id.*; *see* AAP Amicus at 26-27. The exclusion also increases their risk of depression and self-harm. Am Compl. ¶ 28; *see* AAP Amicus at 28.

Educators and school administrators across the country also recognize that excluding boys and girls who are transgender from using the common restrooms interferes with their ability to learn and thrive at school. Am Compl. ¶ 29. It impairs their ability to develop a healthy sense of self, peer relationships, and the cognitive skills necessary to succeed in adult life. *Id.*; *see* AAP Amicus at 28-29. In light of these harms, the National Association of School Psychologists, National Association of Secondary School Principals, National Association of Elementary School Principals, and the American School Counselor Association have all called upon schools to allow boys and girls who are transgender to use the same restrooms as other boys and girls. Am Compl. ¶ 29.[4]

---

[4] *See* Am. Psychological Ass'n & Nat'l Ass'n Sch. Psychologists, *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools* (2015), https://goo.gl/AcXES2; Gender Spectrum, *Transgender Students and School Bathrooms: Frequently Asked Questions* (2016), https://goo.gl/Z4xejp (endorsed and supported by the American School Counselor Association, the National Association of Elementary School Principals, the National Association of School Psychologists, and the National Association of Secondary School Principals); Nat'l Ass'n of Secondary Sch. Principals, *Position Statement on Transgender Students* (2016), https://goo.gl/kcfImn.

In schools across the country, including Virginia, boys and girls who are transgender already use the same restrooms and locker rooms as other boys and girls. Am Compl. ¶ 32.[5] Institutions ranging from the Girl Scouts and Boy Scouts to the Seven Sisters colleges to the Virginia High School League and the National Collegiate Athletic Association already recognize boys who are transgender as boys and girls who are transgender as girls. *Id.* ¶ 34.[6] Treating boys who are transgender as boys and treating girls who are transgender as girls is the only way they can equally participate in school, work, or society at large. *Id.* ¶ 35.

**Gavin's experience at Gloucester High School**

In 2014, near the end of his first year of high school, the distress caused by Gavin's untreated gender dysphoria became so great that he was unable to attend class. Am. Compl. ¶ 36. At that point, Gavin came out to his parents as a boy and, at his request, began seeing a psychologist with experience counseling transgender youth. *Id.* ¶ 36. With the help of his medical providers, Gavin transitioned to living in accordance with his male identity as part of medically necessary treatment for gender dysphoria. *Id.* ¶ 37. Gavin legally changed his name to

---

[5] *See* Amicus Br. of Transgender Students and Allies, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 137-1 (4th Cir.) ("Student Amicus") (describing personal experiences of transgender students in Virginia and Maryland), https://goo.gl/tXMPHN; Amicus Br. of PFLAG, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 139-1 (4th Cir.) ("Parent Amicus") (describing personal experiences of parents of transgender students), https://goo.gl/V1WqfW; Amicus Br. of School Administrators, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 155 (4th Cir.) ("Administrator Amicus") (brief on behalf of school administrators from 33 States and D.C.), https://goo.gl/76ygPC; Amicus Br. of New York, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 148-1 (4th Cir.) ("State Amicus") (brief on behalf of 17 States and D.C.), https://goo.gl/4odxRm.

[6] *See* Girl Scouts, *Frequently Asked Questions: Social Issues*, https://goo.gl/364fXI; Boy Scouts of America, *BSA Addresses Gender Identity* (Jan. 30, 2017), https://goo.gl/WxNoGY; Susan Svrluga, *Barnard will admit transgender students. Now all 'Seven Sisters' colleges do.*, Wash. Post (June 4, 2015), https://goo.gl/g0rALA; Va. High Sch. League, Criteria for VHSL, Transgender Rule Appeals, https://goo.gl/YYHgJP; Nat'l Collegiate Athletic Ass'n, *NCAA Inclusion of Transgender Student-Athletes* (2011), https://goo.gl/V2Oxb2.

Gavin and began using male pronouns. *Id.* ¶ 38. Gavin wore his clothing and hairstyles in a

manner typical of other boys and began using the men's restrooms in public venues—including

restaurants, libraries, and shopping centers—without encountering any problems. *Id.* His medical

providers also referred Gavin to an endocrinologist to begin hormone therapy. *Id.*

Gavin and his mother met with the school principal and guidance counselor in August

2014, before the beginning of his sophomore year, to explain that Gavin is a boy who is

transgender and would be attending school as a boy. *Id.* ¶ 39. Gavin and his mother gave the

school principal and guidance counselor a "treatment documentation letter" from his

psychologist, which confirmed that Gavin was receiving treatment for gender dysphoria and

stated that he should be treated as a boy in all respects, including when using the restroom. *Id.* ¶

40. At the time Gavin and his mother met with the school principal and guidance counselor, the

School Board did not have policies addressing which restrooms transgender students should use.

*Id.* ¶ 41. Gavin initially requested to use the restroom in the nurse's office, but he soon felt

stigmatized and isolated using a different restroom from everyone else. *Id.* ¶ 42. The restroom in

the nurse's office was also located far away from many of his school classes, and Gavin was

often unable to use the restroom without being late for class. *Id.* After a few weeks of using the

restroom in the nurse's office, Gavin sought permission to use the boys' restrooms. *Id.* ¶ 43.

On October 20, 2014, with the principal's support, Gavin began using the boys'

restrooms. *Id.* ¶ 44. He did so for seven weeks without incident. *Id.*. Gavin also requested

permission to complete his physical-education requirements through a home-bound program. *Id.*

¶ 45. As a result, he never needed to use the locker rooms at school. *Id.* The principal of

Gloucester High School and the superintendent of Gloucester County Public Schools informed

the Board that they had authorized Gavin to use the same restrooms as other boys, but otherwise

kept the matter confidential. *Id.* ¶ 46.

Although the principal and superintendent treated the matter as confidential, some adults

in the community learned that a boy who is transgender was using the boys' restrooms at

Gloucester High School. *Id.* ¶ 47. They contacted the Board to demand that the transgender

student (who was not publicly identified as Gavin until later) be barred from the boys' restrooms.

*Id.* The Board has not disclosed the nature or source of the complaints it received. *Id.* ¶ 48.[7]

Unsatisfied with the results of the private meeting, one Board member alerted the broader

community by proposing the following policy for public debate at the Board's meeting on

November 11, 2014:

> Whereas the GCPS recognizes that some students question their gender identities,
> and
>
> Whereas the GCPS encourages such students to seek support, advice, and
> guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students
> and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and
> locker room facilities in its schools, and the use of said facilities shall be limited
> to the corresponding biological genders, and students with gender identity issues
> shall be provided an alternative appropriate private facility.

*Id.* ¶ 51. The policy categorically prohibits administrators from allowing any boy who is

transgender to use any boys' restroom (or allowing any girl who is transgender to use any girls'

---

[7] At least some of the complaints came from a school employee who runs the school
Bible club and is a pastor at a local church. *Id.* ¶ 49. That employee told the Washington Post
that he spoke out against Gavin's use of the boys' restroom because "God puts us on this Earth
as who we are." *See* Moriah Balingit, *Gavin Grimm just wanted to use the bathroom. He didn't
think the nation would debate it.*, Wash. Post. (Aug. 30, 2016), https://goo.gl/WuZCdb.

restroom) in any school within the Gloucester County School District, regardless of the student's individual circumstances. *Id.* ¶ 52.[8]

    After learning about the meeting through social media, Gavin and his parents decided to speak against the proposed policy. In order to speak, Gavin was forced to reveal himself to the entire community and the local media as the boy whose restroom use was at issue. *Id.* ¶ 53. A recording of his remarks can be viewed online at https://goo.gl/CYh4gd 56. *Id.* ¶ 55.

    The School Board voted 4-3 to defer a vote on the policy until its meeting on December 9, 2014. *Id.* ¶ 56. Before that meeting, the Board issued a press release announcing plans for "adding or expanding partitions between urinals in male restrooms, and adding privacy strips to the doors of stalls in all restrooms." *Id.* ¶ 57. The press release also announced "plans to designate single stall, unisex restrooms … to give all students the option for even greater privacy." *Id.* Speakers at the December 9, 2014 Board meeting nonetheless demanded that Gavin be excluded from the boys' restrooms immediately. *Id.* ¶ 58. Many threatened to vote Board members out of office if they refused to pass the new policy. *Id..* With Gavin in attendance, several speakers pointedly referred to him as a "young lady." *Id.* One speaker called Gavin a "freak" and compared him to a person who thinks he is a "dog" and wants to urinate on fire hydrants. *Id.* "Put him in a separate bathroom if that's what it's going to take," said another. *Id.*

---

    [8] The policy does not define "biological gender," and the term has no common or accepted meaning. *Id.* ¶ 53. There are many biological components of sex, including chromosomal, hormonal, anatomical, hormonal, and reproductive elements, some of which could be ambiguous or in conflict within an individual, either because that individual has intersex traits or because that individual has undergone medical care for gender dysphoria. *Id.*; *see Radtke v. Misc. Drivers & Helpers Union Local No. 638 Health, Welfare, Eye & Dental Fund*, 867 F. Supp. 2d 1023, 1032 (D. Minn. 2012); Amicus Br. of interACT, *et al.*, *Gloucester Cty. Sch. Bd. v. Grimm*, No. 15-2056, ECF 138-1 at 23-28 (4th Cir.) ("interACT Amicus"), https://goo.gl/jvjduK. For these reasons, "the terms biological sex or biological male or female are imprecise and should be avoided." Endocrine Society Guidelines at 7.

The Board meeting made Gavin feel that he had been turned into a public spectacle in front of the entire community. *Id.* ¶ 60.

The Board passed the policy on December 9, 2014, by a 6-1 vote. *Id.* ¶ 61. The following day, the principal told Gavin he could no longer use the same restrooms as other boys. *Id.* ¶ 62. The Board's new policy did not affect the restroom usage of any other student at Gloucester High School. Every other student was allowed to continue using the same restrooms they had been using before the new policy was adopted. The only person who had to use a different restroom was Gavin. *Id.* ¶ 63. The Board subsequently installed three single-user restrooms. *Id.* ¶ 64. One of the restrooms had previously been designated as a restroom for teachers and staff. *Id.* The other two restrooms were converted from old utility closets. *Id.* None of the single-user restrooms was located near Gavin's classes. *Id.* ¶ 65. Although any student was allowed to use the single-user restrooms, no one else did so. *Id.* ¶ 66. Everyone knew they were created for Gavin as part of the policy prohibiting him from using the same restrooms as other boys. *Id.*

Being relegated to the separate restrooms was demeaning and shameful for Gavin. *Id.* ¶ 66. It signaled to Gavin and the entire school community that he is different, and it sent a public message to all his peers that he is not fit to be treated like everyone else. *Id.* ¶ 67. Gavin did everything he could to avoid using the restroom at school. As a result, he developed painful urinary tract infections and was often distracted and uncomfortable in class. *Id.* ¶ 68. When Gavin absolutely had to use the restroom, he used the nurse's restroom, but he still felt ashamed doing so. *Id.* ¶ 69. Every time he had to walk to the other side of school to use the nurse's restroom, Gavin felt like he was taking a "walk of shame." *Id.* It was a constant reminder to Gavin—and to anyone who saw him—that Gavin had been barred from using the same restrooms as other boys because he is transgender. *Id.* Being excluded from the common boys'

restrooms and forced to use separate restroom facilities also physically isolated Gavin from the rest of his peers by requiring him to travel to another part of the school if he had to use the restroom between classes. *Id.* ¶ 70.

When Gavin attended school football games, there was no restroom for him to use at all. *Id.* ¶ 71. The Gloucester High School building was locked after school, and there are no single-user restroom facilities in the stadium. *Id.* When he had to use the restroom, Gavin's only option was to call his mother to pick him up and take him home early. *Id.*

**Enforcement of the policy**

The Board continued to exclude Gavin from using the same restrooms as other boys throughout the remainder of his sophomore, junior, and senior years of high school despite the following developments. Am Compl. ¶ 72.

- In December 2014, Gavin began hormone therapy, which has altered his bone and muscle structure, deepened his voice, and caused him to grow facial hair. *Id.* ¶ 73.

- In June 2015, the Virginia Department of Motor Vehicles issued Gavin a state I.D. card identifying him as male. *Id.* ¶ 74.

- In June 2016, Gavin underwent chest-reconstruction surgery, in accordance with the medical standards of care for treating gender dysphoria. *Id.* ¶ 75.

- On September 9, 2016, the Gloucester County Circuit Court issued an order changing Gavin's sex under Virginia state law and directing the Virginia Department of Health to issue Gavin a birth certificate listing his sex as male. *Id.* ¶ 76.

- On October 27, 2016, the Virginia Department of Health issued Gavin a birth certificate listing his sex as male. *Id.* ¶ 77

Despite all this, the Board maintained that Gavin's "biological gender" remained female and continued to prohibit its administrators from allowing Gavin to use the boys' restrooms. *Id.*

Gavin graduated high school on June 10, 2017. *Id.* ¶ 79. As an alumnus with close ties to the community, Gavin will continue to be on school grounds when attending football games, alumni activities, or social event with friends who are still in high school. *Id.* ¶ 80.

13

**Procedural history**

The day after the 2014-15 school year ended, Gavin filed a Complaint and motion for preliminary injunction against the Board, arguing that the Board's new policy discriminates against him on the basis of sex, in violation of Title IX and the Equal Protection Clause. ECF Nos. 2, 5. The Board filed a motion to dismiss both claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. ECF No. 31.

On July 27, 2015, Senior Judge Doumar heard consolidated argument on both motions. ECF No. 47. At the hearing, Judge Doumar dismissed Gavin's Title IX claim from the bench. *See* Tr. at 57:2-5, ECF No. 50. Judge Doumar subsequently denied Gavin's motion for a preliminary injunction, ECF No. 53, and issued a memorandum opinion explaining both rulings on September 17, 2015, ECF No. 57.

For the past two years, the case has laid dormant while Gavin filed an interlocutory appeal from the denial of the preliminary injunction. *See Grimm v. Gloucester Cty. Sch. Bd.*, 869 F.3d 286, 289-90 (4th Cir. 2017) (recounting procedural history of interlocutory appeal). On August 11, 2017, Gavin voluntarily dismissed the appeal from the denial of the preliminary injunction, ECF No. 249 (4th Cir.), and filed an Amended Complaint, ECF No. 90. The Board responded with a motion to dismiss the Amended Complaint for failure to state a claim. ECF No. 119.

## ARGUMENT

### I.   Legal Standard.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain factual allegations sufficient to raise a right to relief above the speculative level." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (internal

14

quotation marks and brackets omitted). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks, brackets, and citations omitted).

## II.   Gavin Has Stated a Valid Claim that the Board's Policy Violates Title IX.

By singling out Gavin and forcing him into separate single-stall facilities because he is transgender, the Board's policy "exclude[s] [him] from participation in," "denie[s] [him] the benefits of," and "subject[s] [him] to discrimination" at school, in violation of Title IX. 20 U.S.C. § 1681(a). *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046-47 (7th Cir. 2017) (affirming preliminary injunction); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (denying motion to stay preliminary injunction); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't. of Educ.*, 208 F. Supp. 3d 850, 856-58 (S.D. Ohio 2016) (granting preliminary injunction).

### A.   The Board Discriminated Against Gavin "On the Basis of Sex."

#### 1.   Discrimination Based on a Person's Transgender Status Is Discrimination "On the Basis of Sex" Under Title IX.

By targeting Gavin for different treatment because he is transgender, the Board's policy impermissibly discriminates "on the basis of sex" under Title IX. Although the Fourth Circuit has not yet addressed the question, the First, Sixth, Seventh, Ninth, and Eleventh Circuits have recognized that discrimination against a transgender individual is discrimination because of sex under federal civil rights statutes and the Equal Protection Clause of the Constitution. *See Whitaker*, 858 F.3d at 1051; *Dodds*, 845 F.3d at 221; *Glenn v. Brumby*, 663 F.3d 1312, 1316-19

(11th Cir. 2011); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000);

*Schwenk v. Hartford*, 204 F.3d 1187, 1201-03 (9th Cir. 2000).

A person's transgender status is an inherently sex-based characteristic. Gavin is being

treated differently because he is a boy who was designated as female at birth. The incongruence

between his gender identity and the sex designated for him at birth is what makes him

transgender. Treating a person differently because of the relationship between those two sex-

based characteristics is literally discrimination on the basis of "sex." *See Fabian v. Hosp. of*

*Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016).

Discrimination against people because they have undergone a gender transition is also

inherently based on sex. By analogy, religious discrimination includes not just discrimination

against Jews and Christians, but also discrimination against people who convert from Judaism to

Christianity. *Cf. Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 (1987) (refusing

to adopt interpretation of Free Exercise Clause that would "single out the religious convert for

different, less favorable treatment"). Similarly, sex discrimination includes not just

discrimination against boys and girls, but also discrimination against boys who have undergone a

gender transition from the sex designated for them at birth. *See Schroer v. Billington*, 577 F.

Supp. 2d 293, 306-07 (D.D.C. 2008) (making same analogy); *Glenn*, 663 F.3d at 1314 (firing

employee because of her "intended gender transition" is sex discrimination); *Dawson v. H&H*

*Elec., Inc.,* No. 4:14-CV-00583-SWW, 2015 WL 5437101, at *3 (E.D. Ark. Sept. 15, 2015)

(same).

In addition, discrimination against people because they are transgender is sex

discrimination because it inherently rests on sex stereotypes and gender-based assumptions. As

the Supreme Court recognized in *Price Waterhouse v. Hopkins*, "assuming or insisting that

16

[individual men and women] match[] the stereotype associated with their group" is discrimination because of sex. 490 U.S. 228, 251 (1989) (plurality).[9] By definition, transgender people depart from stereotypes and overbroad generalizations about men and women. Indeed "a person is defined as transgender precisely because" that person "transgresses gender stereotypes." *Glenn*, 663 F.3d at 1316; *accord Whitaker*, 858 F.3d at 1048; *Dodds*, 845 F.3d at 221. "[A]ny discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is … discrimination on the basis of sex as interpreted by *Price Waterhouse*." *Finkle v. Howard Cty., Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014); *accord Smith v. City of Salem*, 378 F.3d 566, 574-75 (6th Cir. 2004) (discriminating based on a person's failure to "act and/or identify with" one's sex assigned at birth is discrimination on the basis of sex); *Schwenk*, 204 F.3d at 1201 (transgender individuals are inherently gender nonconforming in their "outward behavior and inward identity"); *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 at *2 (D. Minn. Mar. 16, 2015) ("Because the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping."); *Schroer*, 577 F. Supp. 2d at 305 (discrimination against an "inherently gender-nonconforming transsexual" is sex discrimination). Unlike other boys, Gavin had a different sex designated for him at birth. He does "not conform to some people's idea about who is a boy," and discriminating against Gavin for upsetting those gender-

---

[9] All members of the Court agreed that discrimination on that basis would violate Title VII, although they divided over which party should bear the burden of proving causation. *See id.* at 259 (White, J., concurring); *id.* at 273 (O'Connor, J., concurring); *id.* at 295 (Kennedy, J., dissenting).

based expectations is discrimination on the basis of sex. *G.G.*, 853 F.3d at 729 (Davis, J.,

concurring).[10]

To be sure, most boys are designated as boys at birth. It is only a small group of boys for

whom this is not true. But protections from sex discrimination are not limited to "myths and

purely habitual assumptions," and extend to generalizations that are "unquestionably true." *City

of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978). Generalizations that are

accurate for most boys cannot justify discrimination against boys who fall "outside the average

description." *United States v. Virginia*, 518 U.S. 515, 550 (1996). Sex discrimination is

prohibited by Title IX and other statutes precisely because "[p]ractices that classify [students] in

terms of … sex tend to preserve traditional assumptions about groups rather than thoughtful

scrutiny of individuals." *Manhart*, 435 U.S. at 709.

Thus, discriminating against Gavin because he is a boy who is transgender discriminates

against him on the basis of sex. Regardless of whether the discrimination is conceived of as

discrimination based on sexual characteristics, discrimination based on change of sex, or

discrimination based on gender nonconformity, it is impossible to discriminate against a person

for being transgender without taking the impermissible "criterion" of "sex" into account. *Price

Waterhouse*, 490 U.S. at 248 (plurality); *id.* at 262 (O'Connor, J., concurring); *id.* at 282

(Kennedy, J., dissenting).

---

[10] The Board ignores the overwhelming weight of authority and instead cites outdated
cases that rely on *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984). *See* Def.'s
Mem. 19-20, 30-31 (citing *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007)
and *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 674-75
(W.D. Pa. 2015)). But the Seventh Circuit recently repudiated *Ulane*'s interpretive methodology,
*see Hively v. Ivy Tech. Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc), and clarified
that *Ulane* "cannot and does not foreclose . . . transgender students from bringing sex-
discrimination claims based upon a theory of sex-stereotyping," *Whitaker*, 858 F.3d at 1047.

### 2. The Board's Narrow Interpretation of Title IX Conflicts with the Statute's Plain Text and Settled Principles of Statutory Interpretation.

The Board spends page after page arguing that that the term "sex" in Title IX includes physiological and anatomical sex characteristics. Def.'s Mem. 12-14. Gavin has never argued otherwise. Far from excluding reference to physiological characteristics, a person's transgender status reflects the *interrelationship* between a person's gender identity and the physiological characteristics that caused that person to be assigned a different sex at birth. "'[D]iscrimination … on the basis of being transgender, or intersex, or sexually indeterminate, constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female—and that discrimination is literally discrimination 'because of sex.'" *Fabian*, 172 F. Supp. 3d at 527.[11]

Aside from the Board's litany of dictionary definitions, the Board falls back on its own assumptions about legislative intent. Def.'s Mem. 8-9. But the Supreme Court rejected that approach to statutory interpretation long ago. As Justice Scalia explained on behalf of a unanimous Court in *Oncale v. Sundowner Offshore Servs., Inc.*: "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." 523 U.S. 75, 79 (1998); *see also Whitaker*, 858 F.3d at 1048.

Here, too, the legislators who passed Title IX may have been principally motivated "to end discrimination against women in university admissions and appointments," Def.'s Mem. 8,

---

[11] As the Fourth Circuit previously observed, the ordinary definition of "sex," both in 1972 and today, referred to men and women in general, including *both* physical attributes and cultural and behavioral ones. *See G.G.*, 822 F.3d at 722 (collecting dictionary definitions); *Fabian*, 172 F. Supp. 3d at 526 (same); "sex, n., 4a," OED Online, Oxford University Press (defining sex as "a social or cultural phenomenon, and its manifestations" and collecting definitions dating back to 1651).

but they wrote a statute that "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex,'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681(a)). "'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." *Id.* at 175. Sex-based discrimination that harms transgender individuals is a "reasonably comparable evil" that falls squarely within the statute's plain text, *Oncale*, 523 U.S. at 79, and the courts must give the statute "a sweep as broad as its language," *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).

The plain meaning of "discrimination" "on the basis of sex" cannot be narrowed to reach only the particular forms of sex discrimination recognized by Congress in 1972. The Supreme Court has repeatedly warned "that a statute is not to be confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) (internal quotation marks omitted; alterations incorporated). "[C]hanges, in law or in the world," may often "require [a statute's] application to new instances," *West v. Gibson*, 527 U.S. 212, 218 (1999), and a broadly written statute "embraces all such persons or things as subsequently fall within its scope," *De Lima v. Bidwell*, 182 U.S. 1, 217 (1901); *cf. Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (Clean Air Act covers carbon dioxide emissions even though legislators "might not have appreciated the possibility that burning fossil fuels could lead to global warming"). "If Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Barr v. United States*, 324 U.S. 83, 90 (1945).

The same principles apply to Title IX. The statute protects students from sexual harassment even though, when Congress enacted the statute, "the concept of 'sexual harassment'

as gender discrimination had not been recognized or considered by the courts." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 664 (1999) (Kennedy, J., dissenting). The statute also extends to harassment between members of the same sex even though many judges have stated they "cannot believe that Congress … could have intended it to reach such situations." *McWilliams v. Fairfax Cty. Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir. 1996), abrogated by *Oncale*, 523 U.S. 75. "It is quite possible that these interpretations may also have surprised some who served in" Congress when the statute was enacted. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017) (en banc). But "[i]t is not for [the courts] to rewrite the statute so that it covers only what [they] think is necessary to achieve what [they] think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010).

In the years since Title IX was enacted, the plain meaning of the text has not changed, but our understanding of transgender people has grown. While transgender students have long been part of school communities, it is only in the last couple of decades that there has been more widespread access to the medical and psychological support they need. See AAP Amicus Br. at 6. Just as our increased understanding of the '[t]he real social impact of workplace behavior" prompted courts to recognize that sexual harassment is a form of discrimination on the basis of sex, *Oncale*, 523 U.S. at 81-82, our increased understanding of people who are transgender makes clear that discrimination based on transgender status is a form of sex discrimination that violates Title IX's plain terms. *Cf. Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1203 (D. Utah 2013), *aff'd*, 755 F.3d 1193 (10th Cir. 2014) ("Here, it is not the Constitution that has changed, but the knowledge of what it means to be gay or lesbian.").

Finally, in a last-ditch effort, the Board contends that sex discrimination against transgender people is implicitly excluded from Title IX because Congress passed unrelated

statutes in 2009 and 2013 that explicitly protect individuals based on "gender identity." *See* Def.'s. Mem. 15-16 (citing 18 U.S.C. § 249(a)(2) and 42 U.S.C. § 13925(b)(13)(A)). This "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Congress's use of the term "gender identity" in 2009 and 2013 says little about the meaning of a statute adopted by Congress in 1972. "When a later statute is offered as an expression of how the Congress interpreted a statute passed by another Congress a half century before, such interpretation has very little, if any, significance." *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (internal quotation marks and ellipses omitted).

Failed proposals to add the term "gender identity" to Title IX are even less probative. *See United States v. Craft*, 535 U.S. 274, 287 (2002). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001); *cf. Massachusetts*, 549 U.S. at 529-30 ("That subsequent Congresses have eschewed enacting binding emissions limitations to combat global warming tells us nothing about what Congress meant . . . in 1970 and 1977."). By 2010, when Congress first considered the Student Non-Discrimination Act, H.R. 4530, 111th Cong. (2010), which included express protection for "gender identity," lower courts had already held that transgender individuals are protected by existing statutes prohibiting sex discrimination. *See Glenn*, 663 F.3d at 1317-19 (collecting cases). In this context, "another reasonable interpretation of that legislative non-history is that some Members of Congress believe that . . . the statute requires, not amendment, but only correct interpretation." *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008); *see also Whitaker*, 858 F.3d at 1047-48.

**B.  Excluding Boys and Girls Who Are Transgender from Using the Same Restrooms as Other Boys and Girls Subjects Them to Discrimination in Violation of Title IX.**

Gavin is recognized as a boy by his family, his medical providers, and the world at large. He can no more use a girls' restroom than could any other boy. By expelling Gavin from the restrooms that other boys use and forcing him into separate single-stall facilities, the Board's policy "exclude[s] [him] from participation in," "denie[s] [him] the benefits of," and "subject[s] [him] to discrimination" at school. 20 U.S.C. § 1681(a). *See Whitaker*, 858 F.3d at 1049-50; *Dodds*, 845 F.3d at 221; *Highland*, 208 F. Supp. 3d at 865-77; *cf. Mickens v. Gen. Elec. Co*., No. 3:16-CV-00603-JHM, 2016 WL 7015665, at *3 (W.D. Ky. Nov. 29, 2016) (Title VII); *Roberts v. Clark Cty. Sch. Dist.*, No. 2:15-CV-00388-JAD-PAL, 2016 WL 5843046, at *1 (D. Nev. Oct. 4, 2016) (same).

Under the Board's policy, Gavin is singled out for different treatment because he is a boy who is transgender. The express purpose and sole effect of the policy is to regulate the restroom use of transgender students. The preface to the policy recites that "some students question their gender identities," and the only function of the policy is to stop the students it describes as having "gender identity issues" from using the common restrooms and move them to "an alternative … facility." Am. Compl. ¶ 51. The policy was passed as a direct response to Gavin's use of the boys' restrooms, and the goal of the policy was to "[p]ut him in a separate bathroom." Dec. 9 Minutes at 58:56, https://goo.gl/63Vi4Q.

The change in policy had no effect on other students, all of whom continued to use the same restrooms they used before. Transgender students are the only students who are affected. *Cf. City of Los Angeles. v. Patel,* 135 S. Ct. 2443, 2451 (2015) ("The proper focus of the … inquiry is the group for whom the law is a restriction, not the group for whom the law is

irrelevant."); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). The policy's only function is to subject Gavin, "as a transgender student, to different rules, sanctions, and treatment than non-transgender students." *Whitaker*, 858 F.3d at 1049.

Excluding Gavin from using the same common restrooms as other boys subjects him to discrimination. As the Seventh Circuit recently explained: "A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1049. Indeed, "the most obvious example" of a Title IX violation is "the overt, physical deprivation of access to school resources." *Davis*, 526 U.S.at 650; *cf. Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*, No. 1:05-CV-824, 2006 WL 3613673, at *1-2 (W.D. Mich. Dec. 11, 2006) (requiring black elementary school student to use separate restroom in response to harassment from others deprived her of "equal access to restroom facilities").

The physical exclusion carries a powerful stigma that marks Gavin as unfit to use the same facilities as others. "[I]t is humiliating to be segregated from the general population." *G.G.*, 853 F.3d at 729 (Davis, J., concurring). Our laws have long recognized the "daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969); *cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). "[D]iscrimination itself, … by stigmatizing members of the disfavored group[,] … can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984); *cf. J.E.B. v. Alabama*, 511 U.S. 127, 142 (1994) (explaining that when a juror is excluded based on sex "[t]he message it sends to all those in the courtroom, and

all those who may later learn of the discriminatory act, is that certain individuals, for no reason other than gender, are presumed unqualified"); *United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013) (explaining that refusal to recognize marriages of same-sex couples "tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition").

The single-stall restrooms are not an accommodation for Gavin, as the Board suggests. Rather, they were designed to separate him from other students. No other student is required to use the separate restrooms, and no other student did so. Everyone who saw Gavin enter the nurse's office knew he was there because he had been barred from the restrooms other boys use. Am. Compl.¶ 69. It made him feel "a public spectacle" before the entire community. *Id.* ¶ 60. The Board's policy sends a message to Gavin and all his peers that Gavin is unacceptable and should not be treated like other boys. *See Whitaker*, 858 F.3d at 1050 (explaining that the "gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates [Title IX]," and the "alternatives were not true alternatives because of their distant location to [plaintiff's] classrooms" and the "increased stigmatization" they caused).[12]

Gavin's injuries are not limited to dignitary harms. The anxiety and humiliation of having to use separate restrooms from everyone else drove Gavin to restrict his fluid intake and avoid using the restrooms at all, which resulted in physical discomfort and painful urinary tract infections. Am. Compl.¶ 68. Transgender students in other cases have experienced similar

---

[12] Courts must take these social realities into account. *Compare Plessy v. Ferguson*, 163 U.S. 537, 551 (1896) (claiming that assumption that racial segregation "stamps the colored race with a badge of inferiority" exists "solely because the colored race chooses to put that construction upon it"), *with Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954) (recognizing that racial segregation of students "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

harms. *See Whitaker*, 858 F.3d at 1040-41 (student limits "his water intake" to avoid using restroom, causing "fainting and dizziness" and "migraines, depression, and anxiety" from lack of hydration); *Highland*, 208 F. Supp. 3d at 871 ("Jane often goes the entire day without using the bathroom because she hates being singled out when she is forced to use a separate bathroom.").[13]

The harm caused to transgender students' physical and psychological well-being necessarily interferes with their ability to thrive at school. It impairs their ability to develop a healthy sense of self, peer relationships, and the cognitive skills necessary to succeed in adult life. *See* AAP Amicus at 27-29; *cf. Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 607 (Me. 2014) (evidence "established that a student's psychological well-being and educational success depend[ed] upon being permitted to use the communal bathroom consistent with her gender identity"); *Boyertown*, 2017 WL 3675418 at *40 (recounting expert testimony that excluding transgender students from the common restrooms "often negatively impacts their self-esteem and self-worth, ability to trust others, and willingness to go out into the world, during a critical aspect of development").

Finally, the limited number of single-stall restrooms at Gloucester High School also had practical consequences for Gavin's access to the school's educational benefits. There are only three single-user facilities in the entire building, and they were located far from Gavin's classes. Am. Compl. ¶ 65. He was physically unable to take a restroom break without missing a significant amount of class time. Am. Compl. ¶70. *Cf. Whitaker*, 858 F.3d at 1041-42

---

[13] Preventing boys and girls who are transgender from using the same restrooms as other boys and girls can sometimes have catastrophic psychological consequences. *See Dodds*, 845 F.3d at 221 ("Highland's exclusion of Doe from the girls' restrooms has already had substantial and immediate adverse effects on the daily life and well-being of an eleven-year-old child (i.e. multiple suicide attempts prior to entry of the injunction). These are not distant or speculative injuries.").

(transgender boy could not use single user restrooms because they "were on the opposite side of campus from where his classes were held" causing him to "miss class time" and be "further stigmatized" by classmates); *Highland*, 208 F. Supp. 3d at 856 (for transgender fourth-grade girl to use staff restroom, "a staff member had to walk her to the restroom, unlock the door, wait outside, and escort her back to class").[14]

At school, at work, or in society at large, limiting a person's ability to use the restroom limits their ability to participate as a full and equal member of the community. *G.G.*, 853 F.3d at 729 (Davis, J., concurring). Here, as elsewhere, "discriminatory treatment exerts a pervasive influence on the entire educational process." *Norwood v. Harrison*, 413 U.S. 455, 469 (1973).

### C.  The Restroom Regulation Does Not Authorize the Board's Discriminatory Policy.

The Board claims that its discriminatory policy is authorized by one of Title IX's implementing regulations, which states that schools may "provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.[15]

---

[14] These harms have been recognized before. "For more than a decade the women of Harvard Law had to sprint across campus to a hastily converted basement janitors' closet." Deborah L. Rhode, *Midcourse Corrections: Women in Legal Education*, 53 J. Legal Educ. 475 (2003). Similarly, women entering previously all-male work environments "often discover[ed] that the facilities for women [were] inadequate, distant, or missing altogether." *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) (Rovner, J., dissenting). This disparity could "affect their ability to do their jobs in concrete and material ways," even if it sometimes struck men as "of secondary, if not trivial, importance." *Id. See also* Justice Sandra Day O'Connor, " 'Out Of Order' At The Court: O'Connor On Being The First Female Justice." NPR (March 5, 2013), https://goo.gl/4llXNV ("In the early days of when I got to the court, there wasn't a restroom I could use that was anywhere near the courtroom.").

[15] The Department of Education previously issued a January 7, 2015 opinion letter and a May 13, 2016 "Dear Colleague" letter interpreting 34 C.F.R. § 106.33, but after a change in administration, the Department rescinded those documents. The Department has abstained from providing any new guidance regarding the interpretation of 34 C.F.R. § 106.33.

But that regulation must be properly construed within the context of the overall statutory scheme and in light of the statute's underlying prohibition on "discrimination." *Cf. United States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004) ("When a regulation implements a statute, the regulation must be construed in light of the statute" it implements).

The restroom regulation allows schools to provide sex-separated restrooms, but it does not authorize them to do so in a discriminatory manner. The main provision of the statutory text, 20 U.S.C. § 1681(a), broadly prohibits all discrimination. When Congress intended to lift that prohibition on discrimination, it did so explicitly in the statutory text. For example, 20 U.S.C. § 1681(a) contains a series of subsections enumerating narrow contexts in which that prohibition on discrimination "shall not apply." *See Mercer v. Duke Univ.*, 190 F.2d 643, 647 (4th Cir. 1999) (contrasting broad statutory exemption with narrow regulation). Unlike those statutory exemptions, the restroom regulation does not state that the statute's ban on sex-based discrimination "shall not apply" to restrooms. The agency would lack authority to create such an exemption because a regulation cannot authorize what its implementing statute prohibits. *See Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 62 (2011); *Time Warner Ent. Co. v. Everest Midwest Licensee, LLC*, 381 F.3d 1039, 1050 (10th Cir. 2004) ("[A] regulation must be interpreted in such a way as to not conflict with the objective of its organic statute."). The restroom regulation authorizes schools to provide separate restrooms for boys and girls—not to *discriminate* against a subset of students on the basis of sex by excluding them from the same restrooms other boys and girls use.

Interpreting the restroom regulation in light of the statute's prohibition on discrimination is also consistent with the regulation's underlying premise that providing separate restrooms for boys and girls reflects a social practice that does not disadvantage or stigmatize any student. *Cf.*

28

*Virginia*, 518 U.S. at 533 ("Physical differences between men and women" may not be used "for denigration of the members of either sex or for artificial constraints on an individual's opportunity."). That premise is reinforced by the regulation's caveat that when schools establish sex-separated restrooms, they must provide access to "comparable" restrooms for all students. 34 C.F.R. § 106.33.[16]

Before it passed its new policy, the Board provided Gavin access to sex-separated restrooms in a manner that was consistent with the statute's prohibition on discrimination. All boys, including Gavin, were allowed to use the boys' restrooms. The Board then abandoned that nondiscriminatory practice and adopted a new policy designed to exclude boys and girls who are transgender from the common restrooms used by other boys and girls. It is not the existence of sex-separated restrooms that harms Gavin, but the Board's new discriminatory policy that is designed solely to place him in an "alternative" facility.

Ignoring the broader context of the statute as a whole, the Board argues that the regulation authorizes schools to assign restrooms to transgender students based on sex assigned at birth, gender identity, or any other criteria that fall within some definition of the word "sex," regardless of whether the chosen policy subjects transgender students to discrimination. Def.'s Mem. 10-11. That interpretation would bring the regulation into conflict with the statutory text. The regulation allows schools to provide sex-separated restrooms, but it does not authorize a

---

[16] Although the Board attempts to draw support from *Virginia*, 518 U.S. at 550 n.19 (*see* Def.'s Mem. 17-18), the case only undermines its argument. The parties in *Virginia* agreed that including women in the Virginia Military Institute would require adjustments such as "locked doors and coverings on windows." *Id.* at 588. The Court nevertheless concluded that these minor changes to provide "privacy from the other sex" would not disrupt the essential nature of the program and could not justify excluding women from admission. *Id.* at 550 n.19. The teaching of the case is not that privacy concerns justify discrimination. It is that privacy interests, where actually implicated, must be accommodated in a manner that does not exclude individuals from equal educational opportunity. *See id.* at 555 n.20.

school to adopt whatever sex-based policy it chooses, no matter how discriminatory or harmful. *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (explaining that the respondent's interpretation of the text "may be plausible in the abstract, but it is ultimately inconsistent with both the text and context of the statute as a whole").

   *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016), provides no support for the Board's argument that Title IX allows schools to discriminate based on physiological characteristics. In that case, the court held that employers may use gender-normed physical-fitness standards without violating Title VII because "the physiological differences between men and women impact their relative abilities to demonstrate *the same* levels of physical fitness." *Id.* at 351 (emphasis added). The gender-normed standards were designed to treat employees equally by measuring *the same* levels of physical fitness for everyone. *Cf. Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 289 (1987) (finding a California law taking into account physical differences resulting from pregnancy treats employees equally because it "allows women, as well as men, to have families without losing their jobs"). Nothing in *Bauer* supports the notion that schools or employers can use physical differences as a basis for unequal and stigmatizing treatment.

   It also bears repeating that, no matter how many times the Board invokes physiological differences, the actual policy does not assign restrooms based on physiological characteristics. It assigns restrooms based on "biological gender," which the Board uses as a proxy for physiological characteristics that may or may not be present in any particular student. *See* interACT Amicus at 23-28; Endocrine Society Guidelines at 7 ("[T]he terms biological sex or biological male or female are imprecise and should be avoided" because "the physical aspects of maleness and femaleness… may not be in line with each other."). Although the Board claims its

30

policy is based on physiology, it does not have a coherent explanation for what aspects of physiology are relevant.[17]

The reality is that placing a boy who is transgender in the girls' restroom (or placing a girl who is transgender in the boys' restroom) would still mean that students would be "in the presence of individuals with physical sex characteristics of the opposite sex." Def.'s Mem. 23. *See Boyertown*, 2017 WL 3675418 at *38. Boys and girls who are transgender and who have received puberty blockers and hormone therapy have physiological and anatomical characteristics—including breasts in girls who are transgender, facial and body hair in boys who are transgender, muscle and bone structure—that do not typically align with the sex designated for them at birth. Gavin has a typically male chest, facial hair, and testosterone affecting his bone and muscle structure. The Board assumes that drafters of Title IX would have wanted Gavin to use the girls' restrooms, but that is hardly self-evident.

In any event, the "dispositive realit[y]" is that Gavin is recognized by his family, his medical providers, the Virginia Department of Health, and the world at large as a boy. *Virginia*, 518 U.S. at 550. Allowing him to use the same restrooms as other boys is the only way to provide access to sex-separated restrooms without discrimination. It is, therefore, the only way to do so that is consistent with the underlying requirements of Title IX.

---

[17] For example, the Board has never explained how it would define the "biological gender" of people who have had genital surgery; people whose genitals were injured in an accident; or people with intersex traits who have genital characteristics that are neither typically male nor female, or that do not align with their chromosomes. *See G.G.*, 822 F.3d at 720-21. In another case with similar facts, a school board took the position that "biological sex" meant the presence or absence of a penis or vagina and that "if, for instance, a boy had lost his penis due to trauma or surgery, he would no longer 'be a boy.'" *Evancho*, 237 F. Supp. 3d at 279.

### D.  This Court Is Not Bound by Judge Doumar's Dismissal of the Original Title IX Claim.

In ruling on the Board's motion to dismiss the amended complaint, this Court is not bound by Judge Doumar's earlier decision to dismiss the Title IX claim in Gavin's original complaint. Under Federal Rule of Civil Procedure 54(b), an interlocutory order can be reconsidered "by the district court, on motion or *sua sponte*, at any time prior to the entry of a final judgment." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 515 (4th Cir. 2003); *see Fayetteville*, 936 F.2d at 1472 (reversing district court for applying strict standards from Rule 59 and 60 instead of more flexible standards from Rule 54).

The power to reconsider interlocutory orders "is committed to the discretion of the district court, and doctrines such as law of the case . . . have evolved as a means of guiding that discretion" in light of "concerns of finality and judicial economy." *Am. Canoe Ass'n*, 326 F.3d at 515 (citation omitted). "When a successor judge is reviewing another judge's interlocutory order, the law of the case doctrine requires only that the successor judge respect principles of comity when considering issues that have already been decided." *Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 728 (5th Cir. 2012); *see* Wright & Miller, *Law of the Case—Trial Courts*, 18B Fed. Prac. & Proc. Juris. § 4478.1 (2d ed.). "The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." *Am. Canoe Ass'n*, 326 F.3d at 515.[18]

---

[18] The Fourth Circuit has noted that when "'the order was entered by one judge and then reviewed by another,' courts have held that the latter judge should be hesitant to overrule the

Under the traditional factors guiding courts' discretion under Rule 54(b), Judge Doumar's earlier decision should not bind this Court as law of the case. First, there has been a substantial "change in applicable law." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *see Bridger Coal Co. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 669 F.3d 1183, 1192 (10th Cir. 2012) (recognizing that emergence of a circuit split can justify reconsideration). When Judge Doumar ruled on the motion to dismiss, the only decision squarely on point was *Johnston v. University of Pittsburgh of Commonwealth System of Higher Education*, 97 F. Supp. 3d 657 (W.D. Pa. 2015). Since then, courts across the country have disagreed with *Johnston* and held that excluding boys and girls who are transgender from the same restrooms as other boys and girls subjects them to discrimination on the basis of sex under Title IX, the Equal Protection Clause, or both. *See Whitaker*, 858 F.3d at 1049-51; *Dodds*, 845 F.3d at 221; *Evancho*, 237 F. Supp. 3d at 289; *Highland*, 208 F. Supp. 3d at 856-58. Moreover, Senior Judge Davis and Judge Floyd made clear in their concurring opinion that—in their view—the Board's policy constituted "invidious discrimination" based on Gavin's failure to "conform to some people's idea about who is a boy." *G.G.*, 853 F.3d at 730 (Davis, J., concurring, joined by Floyd, J.). These precedents were not available to Judge Doumar when he ruled in 2015.

---

earlier determination." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (quoting *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1460 n.24 (5th Cir. 1992)). "As with all rules of thumb however, this one should give way to the interests of justice and economy when those interests conflict with rigid adherence to the rule." *Harrell*, 951 F.2d at 1460 (internal quotation marks and brackets omitted). "[W]hether rulings by one district judge become binding as 'law of the case' upon subsequent district judges is not a matter of rigid legal rule, but more a matter of proper judicial administration which can vary with the circumstances." *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 n.3 (4th Cir. 1982).

Second, reconsideration is necessary to avoid "clear error causing manifest injustice." *Carlson*, 856 F.3d at 325; *see EEOC v. Lockheed Martin Corp., Aero & Naval Services*, 116 F.3d 110, 112 (4th Cir. 1997). Errors are easier to correct at the early stages of a case because "[s]tability becomes increasingly important as the proceeding nears final disposition."18B Fed. Prac. & Proc. Juris. § 4478.1. When a case is still in its early stages, "[s]elf-correction is manifestly important if the alternative is the greater delay and expense that would result from persisting in the error and eventual appellate reversal." *Id.* Failing to correct the clearly erroneous dismissal of Gavin's Title IX claim also would create manifest injustice in light of "the overriding public interest . . . in the firm enforcement of Title IX." *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993).

Reconsideration is also necessary to prevent manifest injustice stemming from several of Judge Doumar's "extraneous remarks or suppositions that marred the hearing." *G.G. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016), *vacated on other grounds,* 137 S. Ct. 1239 (2017) (recounting Judge Doumar's statements). Although the Fourth Circuit ultimately concluded that the remarks did not require the drastic remedy of reassignment on remand, they provide another reason for this Court to revisit the earlier decision with a clean slate. *Id.*; *cf. United States v. O'Keefe*, 128 F.3d 885, 891 n.6 (5th Cir. 1997) (explaining that when a case has been reassigned after recusal, reconsideration protects "the public's perception of the integrity of the judicial process").

Finally, reconsideration is warranted because of factual developments over the past two years. During his junior and senior years of high school Gavin (a) received chest-reconstruction surgery, in accordance with the medical standards of care for treating gender dysphoria; (b) obtained an order from the Gloucester County Circuit Court legally changing his sex under

34

Virginia state law; and (c) received a new birth certificate from the Virginia Department of Health listing his sex as male. ECF Nos. 117, 119, 224, 225 (4th Cir.). The Board's actions during Gavin's senior year shed new light on the irrational and discriminatory nature of the underlying policy.

 For all these reasons, this Court is not bound by Judge Doumar's earlier ruling.

### E.  Pennhurst Provides No Defense to Claims of Intentional Sex Discrimination.

 Finally, the Board resorts to *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), and the doctrine of constitutional avoidance (Def.'s Mem. 25), but its argument is foreclosed by an unbroken line of precedent. The Supreme Court has consistently applied *Pennhurst* to Title IX by restricting the damages remedy to acts of intentional discrimination, as opposed to negligence or vicarious liability. It has never applied *Pennhurst* to Title IX by restricting the scope of the definition of sex. *See Jackson*, 544 U.S. at 182-83; *Davis*, 526 U.S. at 639; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 74-75 (1992). As the Supreme Court has reaffirmed multiple times: "The *Pennhurst* notice problem does not arise in a case . . . in which intentional discrimination is alleged." *Jackson*, 544 U.S. at 182-83 (alterations incorporated). Because the discrimination here is indisputably intentional and violates the statute's plain terms, *Pennhurst* poses no barrier.

 In arguing that Title IX must explicitly refer to discrimination against transgender students, the Board repeats the same argument the Fourth Circuit rejected in *West Virginia Department of Health & Human Resources v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011). In that case, the court held that West Virginia's "'super-clear statement' rule . . . misreads *Pennhurst* and its progeny." *Id*. *Pennhurst* does not require Congress to "prospectively resolve every

possible ambiguity concerning particular applications" of a statute. *Id*. at 224 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985)).

That is particularly true in the context of Title IX, which has an implied cause of action and does "not list any specific discriminatory practices" that are prohibited. *Jackson*, 544 U.S. at 175. "[A] State that accepts funds under [a statute with an implied cause of action] does so with the knowledge that the rules for . . . liability will be subject to judicial determination." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003). Thus, "funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when [the Supreme Court] decided *Cannon*[ *v. University of Chicago*, 441 U.S. 677, 691 (1979)]," and "have been put on notice by the fact that [Supreme Court] cases since *Cannon* . . . have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 182. A recipient who accepts federal funding does so with the knowledge that disagreements over whether a particular practice constitutes "discrimination" "on the basis of sex" will be resolved by the courts in accordance with these precedents.

## III.   Gavin Has Stated A Claim Under the Equal Protection Clause.

### A.  The Board's Discriminatory Policy Triggers Heightened Scrutiny.

For the same reasons that the Board's policy subjects Gavin to discrimination under Title IX, it also subjects him to discrimination under the Equal Protection Clause.[19] And for the same

---

[19] The Board's assertion that its discriminatory policy "treat[s] all students . . . the same" regardless of whether they are transgender (Def.'s Mem. 26-27) is reminiscent of the argument that laws prohibiting same-sex couples from marrying treated everyone equally because all persons, whether gay or straight, were prohibited from marrying a different-sex partner. Just as the only function of those marriage bans was to single out same-sex couples for different treatment, the only function of the Board's policy is to exclude boys and girls who are transgender from using the same restrooms as everyone else.

reasons that the Board's policy constitutes sex discrimination under Title IX, it also constitutes gender discrimination under the Equal Protection Clause and triggers heightened scrutiny. *Whitaker*, 858 F.3d at 1051; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 873-74. Indeed, even if the Board's sex discrimination were not prohibited by Title IX, it would still violate equal protection. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 732 (1982).

In addition to constituting discrimination on the basis of sex, courts have recognized that discrimination based on transgender status is a quasi-suspect classification in its own right because "transgender people as a class have historically been subject to discrimination or differentiation"; "they have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society"; "as a class they exhibit immutable or distinguishing characteristics that define them as a discrete group"; and "as a class, they are a minority with relatively little political power." *Evancho*, 237 F. Supp. 3d at 288; *accord Highland*, 208 F. Supp. 3d at 873-74; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 n.8 (N.D. Cal. 2015); *see also G.G.*, 853 F.3d at 730 (Davis, J., concurring) (recognizing that transgender individuals are "a vulnerable group that has traditionally been unrecognized, unrepresented, and unprotected").[20]

Under heightened scrutiny, the Board must show "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (brackets omitted). Moreover, the policy must

---

[20] In light of this robust and growing body of precedent, the Court need not "step out on its own" to recognize transgender status as a suspect or quasi-suspect classification. Def.'s Mem. 28. *Cf. Bostic v. Rainey*, No. 2:13CV395, 2014 WL 10022686, at *22 (E.D. Va. Feb. 14, 2014) (noting the "compelling arguments" that discrimination based on sexual orientation should be subject to heightened scrutiny).

"substantially serve an important governmental interest *today*, for in interpreting the equal protection guarantee, [the Supreme Court has] recognized that 'new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged.'" *Id.* (quoting *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015)) (alterations incorporated) (emphasis in *Morales-Santana*). The Court must, therefore, determine whether the Board's policy substantially serves its asserted interests in light of current insights and understandings regarding transgender students.

Relying on *Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001), the Board argues that any different treatment based on biological differences is not the type of "gender-based stereotype" that violates equal protection. Def.'s Mem. 17-19. But the Court's analysis in *Nguyen* did not begin and end with biology.  In *Nguyen*, the Supreme Court upheld a statute that provided different procedures for unmarried mothers and unmarried fathers to transmit U.S. citizenship to their children because mothers, by virtue of having given birth, automatically had a biological connection to the child and an opportunity to form a meaningful relationship. *Nguyen*, 533 U.S. at 73. At the same time, the Court emphasized that the policy was tailored so that it imposed only a "minimal" burden that could be easily met with a written acknowledgement of paternity under oath. *Id.* at 70. The Court also emphasized that the statute was not "marked by misconception and prejudice" or "disrespect." *Id*. at 73.

The Board's policy bears no resemblance to the tailored statute that survived heightened scrutiny in *Nguyen*.  It inflicts physical and psychological harm. It is "marked by misconception."  *Id.* at 73. It stigmatizes and "disrespect[s]" boys and girls who are transgender as unfit to use the same restrooms as their peers. *Id.* And its categorical ban lacks any tailoring whatsoever. Indeed, even under rational-basis review, "[t]he breadth of the [policy] is so far

removed from [the] particular justifications" advanced by the Board, that it is "impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996). The Board's irrational and stigmatizing policy cannot satisfy any standard of scrutiny.

### B. The Board's Policy Is Not Substantially Related to Protecting Student Privacy.

Gavin's use of the boys' restrooms does not infringe on anyone else's privacy. "A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of . . . any other student who uses the bathroom at the same time." *Whitaker*, 858 F.3d at 1052. To the extent that privacy concerns are based on potential exposure to nudity, those concerns simply do not apply to Gavin's "use—or for that matter any individual's appropriate use—of a restroom." *G.G.*, 822 F.3d at 723 n.10; *accord Highland*, 208 F. Supp. 3d at 874-75 (rejecting argument that transgender student's use of restroom would violate privacy of others); *Evancho*, 237 F. Supp. 3d at 289-90 (same).

There are many other ways to protect privacy interests related to nudity in a nondiscriminatory and more effective manner. For example, the Board has taken steps "to give all students the option for even greater privacy" by installing partitions between urinals and privacy strips for stall doors. Am. Compl. ¶ 57. All students who want greater privacy for any reason may also use one of the new single-stall restrooms. *See G.G.*, 822 F.3d at 728-29 (Davis, J., concurring); *see Boyertown*, 2017 WL 3675418 at *55 (noting that "any cisgender student concerned with running into a transgender student in the bathroom and who does not think that urinal dividers or toilet stalls provide the requisite protection of their privacy can access one of the single-user facilities").[21]

---

[21] This case does not involve locker rooms. But even in that context, courts reviewing evidentiary records have found that privacy accommodations, such as privacy curtains and

Instead of being tailored to address privacy interests related to nudity, the policy rests on generalized fears and discomfort that are not a legitimate basis for imposing unequal or stigmatizing treatment under any standard of scrutiny. *See Evancho*, 237 F. Supp. 3d at 293 n.42; *Highland*, 208 F. Supp. 3d at 877.

### C.  The Board's Policy Is Not Substantially Related to Avoiding Discrimination Against Non-transgender Students.

The Board argues that any harms inflicted on Gavin are outweighed by the hypothetical harms that would be inflicted on other students if Gavin uses the boys' restrooms. Def.'s Mem. 21-22. But according to the American Academy of Pediatrics and other medical organizations, "there is no evidence of any harm to the physical or mental health of other children and adolescents when transgender students use facilities that match their gender identity." AAP Amicus Br. 19-20. There is also no evidence that Gavin's use of the restrooms is a safety threat to himself or others. *See G.G.*, 822 F.3d at 723 n.11.[22]

---

private changing areas, prevented any risk of "involuntary exposure of a student's body to or by a transgender person assigned a different sex at birth." *Students & Parents for Privacy*, 2016 WL 6134121, at *29; *accord Boyertown*, 2017 WL 3675418, at *41, *67 (same); *see also* State Amicus at 21-25; Student Amicus at 11-16, 28-30. In many school locker rooms, students preparing for gym class change into a t-shirt and gym shorts without fully undressing. *See* Student Amicus at 28-30. They often do not shower. *See Boyertown*, 2017 WL 3675418, at *12. Transgender students also have their own sense of modesty and often go to great lengths to prevent exposure of any anatomical differences between themselves and other students. *See Boyertown*, 2017 WL 3675418 at *41; Administrator Amicus at 18-19.

[22] There is no legal basis for the Board's assertion that the presence of a transgender student in the restroom creates a hostile environment for non-transgender students. Def.'s Mem. 22. Such claims have been uniformly rejected. *Cruzan v. Special Sch. Dist, No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting claim that allowing transgender woman to use women's restroom created hostile work environment for non-transgender woman in the absence of an allegation of "any inappropriate conduct other than merely being present"); *Boyertown*, 2017 WL 3675418 at *67 (rejecting argument that sharing restrooms and locker rooms with transgender students creates hostile environment for non-transgender students); *Students & Parents for Privacy*, 2016 WL 6134121, at *31-35 (same).

If the Board's goal is to alleviate the hypothetical discomfort of non-transgender students, that goal is not advanced by placing Gavin (who has a male chest, facial hair, and other male secondary-sex characteristics) in the girls' restroom. Many students transition before entering a particular school and are not known to be transgender. And even when they are known by their friends to be transgender, students at large high schools, colleges, or universities will often use restrooms in which no one else knows them, much less their transgender status. A boy who is transgender will be far more disruptive if he is forced to use the girls' restrooms than if he uses the same restrooms as other boys. *Cf. Boyertown*, 2017 WL 3675418 at *62 n.61; Administrator Amicus at 26-28.

Moreover, all students are free to use one of the single-stall restrooms if they are uncomfortable with Gavin's presence, or the presence of anyone else, in the common restroom. "For other students, using the single-stall restrooms carries no stigma whatsoever, whereas for [Gavin] using those same restrooms is tantamount to humiliation and a continuing mark of difference among his fellow students." *G.G.*, 822 F.3d at 729 (Davis, J., concurring).

The Board argues that hypothetical classmates should not have to use the single-stall restrooms in order to protect "their own adolescent modesty, personal sensitivities, or religious scruples." Def.'s Mem. 22. As the Fourth Court previously noted, the same arguments would seem to apply to sharing restrooms with lesbian and gay students. *G.G.*, 822 F.3d at 723 n.11. And, as the NAACP Legal Defense Fund points out, the same arguments have been used to exclude black people, gay people, and people with disabilities from swimming pools, restrooms, and other common spaces. *See* Amicus Br. of NAACP LDF, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 146-1 (4th Cir.), https://goo.gl/Ksrg8P. Impermissible discrimination often stems from an almost "instinctive mechanism to guard against people who appear to be

different in some respects from ourselves" or who "might at first seem unsettling." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring); *cf. Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 282 n.9 (1987) (recounting how students with disabilities were excluded from school because their appearance allegedly "produced a nauseating effect" on classmates).

Difference can be discomfiting, but there are ways to respond to that discomfort without discrimination. Schools can provide options for students to enhance *their own* modesty (however broadly defined), but the "sincere, personal opposition" of some people cannot justify a policy that "demeans or stigmatizes those whose own liberty is then denied." *Obergefell*, 135 S. Ct. at 2602. Excluding transgender people from using the same restrooms as everyone else prevents them "from participating fully in our society, which is precisely the type of segregation that the Fourteenth Amendment cannot countenance." *Bostic v. Schaefer*, 760 F.3d 352, 384 (4th Cir. 2014).

> ### D.  The Board's Policy Is Not Substantially Related to Avoiding "Practical Problems."

The Board stubbornly insists that there is no objective way to differentiate between a girl and a transgender boy (or between a boy and a transgender girl) without "serious practical difficulties." Def.'s Mem. 23. According to the Board, "although a school might wish to keep boys and girls in separate [facilities], in practice any given [facility] would be open to members of both sexes," unless the school relies on sex stereotypes to judge whether a student is really transgender. *Id.* at 22-23.

The Board's assertions are contradicted by the actual experiences of school districts and administrators across the country.[23] Acknowledging the reality of a student's gender transition does not require schools to use sex stereotypes. If a school has a legitimate concern that a student is falsely claiming to be transgender, a letter from a doctor or parent can easily provide corroboration.

Gavin's status as a transgender boy is not—and has never been—in dispute. At the time the Board's policy was passed, Gavin had supplied school administrators with a "treatment documentation letter" from his psychologist, had legally changed his name, and was preparing to undergo hormone therapy. By the time Gavin graduated, he had undergone hormone therapy and chest reconstruction surgery, and he had received a state I.D. card and birth certificate stating that he is male. The Board has bent over backwards to ignore these "objective" forms of proof in favor of its own unscientific definition of "biological gender."

In light of the all the documentation provided by Gavin, the Board's argument appears to be based on a willful misunderstanding of what it means to be transgender. The Board's repeated assertions that Gavin is seeking to access restrooms based on his subjective, internal perception of being a boy "misrepresents [Gavin's] claims and dismisses his transgender status." *Whitaker*, 858 F.3d at 1039. Gavin and other transgender students do not merely "feel" that their gender identity is different than the sex designated for them at birth. They are people who have transitioned and are living as the boys and girls that they are. They frequently have voluminous documentation reflecting their gender dysphoria diagnosis and treatment. Allowing them to use

---

[23] *See* Administrator Amicus at 8-28; State Amicus at 14-25; *cf. Evancho*, 237 F. Supp. 3d at 294 (transgender students had been using restrooms "for several years without incident"); *Students & Parents for Privacy*, 2016 WL 6134121, at *39 (transgender students used restrooms for three years without other students noticing or complaining).

the same restrooms as other boys and girls does not mean "that any person could demand access to any school facility or program based solely on a self-declaration of gender identity or confusion." *Doe*, 86 A.3d at 607; *accord Boyertown*, 2017 WL 3675418, at *55; *Students & Parents for Privacy*, 2016 WL 6134121, at *26; *Evancho*, 237 F. Supp. 3d at 291 n.39.[24]

In truth, it is the Board's policy that raises intractable problems. How will the policy apply when students' transgender status is not known to the school community, either because they transitioned before entering school or moved from another district? Will the Board disregard all birth certificates and inquire into whether students' sex assigned at birth matches their legal documents? Without "mandatory verification of the 'correct' genitalia," the Board must "assume 'biological sex' based on appearances, social expectations, or explicit declarations." *G.G.*, 822 F.3d at 722 n.8 (internal quotation marks omitted).[25]

## IV.   Gavin's Claims for Injunctive Relief Should Not Be Dismissed As Moot Unless the Board Definitively States that He Can Now Use the Men's Restrooms on Campus.

Although Gavin has graduated from high school, he will continue to be on school grounds when attending football games, alumni activities, or social events with friends who are

---

[24] In all of the cases pending across the country, there has never been any dispute about the transgender status of any student. *See Whitaker*, 858 F.3d at 1039; *Boyertown*, 2017 WL 3675418, at *55; *Evancho*, 237 F. Supp. 3d at 272-73; *Students & Parents for Privacy*, 2017 WL 3675418, at *26; *Highland*, 208 F. Supp. 3d at 855.

[25] The Board also alludes to sports teams, implying that it must exclude Gavin from the restrooms in order to keep hypothetical girls who are transgender from joining the women's basketball team. Def.'s Mem. 10, 22-23. Even if athletic teams were relevant to this case, the Board's invocation of women's sports only demonstrates its willful blindness to the reality that the Virginia High School League and the NCAA already allow boys and girls who are transgender to play on sex-separated teams that match their gender identity. These organizations' policies look at whether a student is undergoing hormone therapy for a sufficient period of time to eliminate any concerns about competitive advantages. As these policies demonstrate, physiological differences between boys and girls who are transgender and other boys and girls— where those differences are actually relevant—can be addressed without categorically excluding transgender students from sports teams.

still in high school. Am. Compl. ¶ 80. [26]  Until now, the Board has been coy about whether its restroom policy would continue to apply to Gavin when he is on school grounds as an alumnus. *See Grimm*, 2017 WL 3699241, at *1 (summarizing Board's argument that the policy "does not necessarily apply to alumni").

In its motion to dismiss, however, the Board for the first time clearly states that "[t]he policy does not apply to alumni." Def.'s Mem. 36. After fighting tooth and nail to prevent Gavin from using the boys' restrooms until his last day of school, it is difficult to understand why the Board's alleged concerns about physiology, privacy, and practical difficulties are no longer operative now that Gavin has graduated. If the Board's position is indeed that Gavin can now use the men's restrooms on campus, the Board should make that position clear and unequivocal before Gavin's claims for injunctive relief can be dismissed as moot.

## CONCLUSION

For the foregoing reasons, the Board's motion to dismiss should be denied.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC.

  /s/   Gail M. Deady
Gail M. Deady (VSB No. 82035)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
gdeady@acluva.org

*Counsel for Plaintiff*

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Joshua A. Block*
Leslie Cooper*
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax: (212) 549-2650
jblock@aclu.org
lcooper@aclu.org

* Admitted pro hac vice

---

[26] The Board asserts that Title IX does not apply to "non-student alumni." Def.'s Mem. 35. But Title IX protects all "person[s]," not merely current students. 20 U.S.C. § 1681(a); *see N. Haven Bd. of Educ.* 456 U.S. at 520; *Elwell v. Oklahoma*, 693 F.3d 1303, 1311 (10th Cir. 2012).

45

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of September, 2017, I filed the foregoing

Memorandum Of Law In Opposition to Defendant's Motion To Dismiss with the Clerk of the

Court using the CM/ECF system, which will automatically serve electronic copies upon all

counsel of record.

       /s/ Gail M. Deady

Gail M. Deady (VSB No. 82035)
AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
gdeady@acluva.org
*Counsel for Plaintiff*

46