IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

   Plaintiff,

v.                                                    Case No. 4:15-cv-00054

GLOUCESTER COUNTY SCHOOL
BOARD,

   Defendant.

## REPLY BRIEF IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT

### INTRODUCTION

From the outset, the School Board's goal has been to accommodate Gavin Grimm while balancing the legitimate interests of all of its students from kindergarten through twelfth grade. The School Board's policy treats all students the same. Students are to use restroom and locker room facilities that correspond with their physiology or use one of three single-stall restrooms available for any student. The School Board's policy complies with Title IX. It also fulfills the requirements of the Equal Protection Clause. Simply put, the School Board's policy does not discriminate.

With respect to Grimm's Title IX claim, the question posed is answered by the straightforward text of the Title IX provisions permitting sex-separated restrooms, locker rooms, and showers. The issue raised by the Equal Protection Clause is resolved by looking at how all students are treated the same under the School Board's policy. The School Board, when faced with the difficult task of trying to accommodate the interests of all concerned, enacted a policy

1

that treated all individuals the same while also protecting the interests of all concerned. Grimm's lawsuit should be dismissed with prejudice.

## LAW AND ARGUMENT

I. **The School Board's Restroom and Locker Room Policy is Plainly Permitted by Title IX and Section 106.33.**

   A. **The Fourth Circuit found that Section 106.33 permits the School Board's policy.**

Section 106.33 permits the Board's policy. Indeed, the Fourth Circuit previously found Section 106.33 "susceptible to more than one plausible reading" regarding how to determine a transgender person's sex. G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 720 (4th Cir.), cert. granted in part, 137 S. Ct. 369, 196 L. Ed. 2d 283 (2016), and vacated and remanded, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017). One of those "plausible reading[s]" validates the *School Board's* policy: "[T]he regulation," the Fourth Circuit explained, "*permits both the Board's reading … and the Department's interpretation*[.]" 822 F.3d 720 (emphasis added). Now that the Department of Education's interpretation has been rescinded (and deference to it is no longer an issue), the outcome is plain: Because Section 106.33 "permits … the Board's reading," the Board's policy must be valid under Title IX. Id.

Grimm claims the regulation requires schools to provide "access to 'comparable' restrooms for all students." But Grimm misstates Section 106.33, which requires only that separate facilities "for *students of one sex* shall be comparable … for *students of the other sex*," 34 C.F.R. § 106.33 (emphasis added). Grimm has never alleged that the facilities for males are not "comparable" to those for females. The fact that the School Board has gone beyond what the regulation requires by providing *additional* single-stall restrooms hardly means the School Board has engaged in sex discrimination or failed to provide "comparable" facilities. Indeed, under

Grimm's reading of Title IX, the Board would apparently have to provide at least *three* comparable sets of restrooms and locker rooms: one for physiological males, one for physiological females, and another for transgender students. Title IX requires no such thing.

In short, as the Fourth Circuit correctly concluded, Section 106.33 by its terms permits the School Board's restroom and locker room policy; therefore, the School Board's policy does not violate Title IX.

> **B.    Title IX does not require treating transgender boys and girls exactly like other boys and girls for purposes of restroom and locker room access.**

The Title IX term "sex" is a binary concept referring to the physiological differences between males and females, and no evidence suggests the term turned on gender identity. See Brief in Support of Motion to Dismiss Amended Complaint (ECF Doc. 119, pp. 6-20). The legislative history shows that Title IX's prohibition on "sex" discrimination does not require equating "boys" with "transgender boys" or "girls" with "transgender girls." That is, there is nothing to suggest that a "boy" for Title IX purposes must include someone born female but whose gender dysphoria led her to masculinize her appearance or physiology. This conclusion is reinforced by the fact that transgender persons may identify as *neither* male nor female, may shift between the two, may identify as having *no* sex, and frequently desist from gender dysphoria after childhood. In short, the Title IX term "sex" does not encompass the multi-faceted and fluid concept of "transgender" as Grimm suggests.

The Fourth Circuit previously quoted two 1970s-era definitions of "sex" referring to the "anatomical and physiological differences" between males and females and to "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction." G.G., 822 F.3d at 721 (quoting *American College Dictionary* 1109 (1970) and *Webster's Third New International Dictionary* 2081 (1971)). It found on that basis

3

that the term "sex" was ambiguous as applied to transgender persons, and thus deferred to the Department of Education's now-rescinded guidance documents, G.G., 822 F.3d at 722–23. It hardly held, however, that the "plain meaning" of the term includes other "cultural" differences as claimed by Grimm.

Grimm points to one other definition of "sex" — from the online Oxford English Dictionary—to claim that the "plain meaning" of "sex" includes "cultural" differences between men and women. Grimm Supp. Br. at 38 (quoting OED Online, Oxford Univ. Press, "sex, n., 4a"). But Grimm only refers to a subpart of one definition of "sex" — which merely considers the term as "a social or cultural phenomenon"—while disregarding another definition that "sex" is "[e]ither of the two main categories (male and female) into which humans and many other living things are divided on the basis of their reproductive functions." OED Online, sex, n, 1a. These definitions do not support that the term "sex", as used in Title IX, hinges on gender identity or the fluid "transgender" concept. Cherry-picking definitions is no way to interpret statutory and regulatory text. See, e.g., MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 227–28 (1994).

In sum, Title IX's use of the term "sex" does not plausibly include persons of one birth sex who, given their gender dysphoria, have altered their appearance or physiology. To read into Title IX some definitive answer to the question of which "sex" a "transgender" person should be considered for purposes of sex-separated facilities—even assuming a single answer is possible— would be to legislate a version of Title IX that does not exist.

### C. The School Board's policy does not engage in "transgender status" discrimination or in "sex stereotyping."

Relying on out-of-circuit precedent, Grimm asks this Court to recognize a Title IX claim for "transgender status" discrimination. Relatedly, Grimm argues that the School Board's policy is "sex stereotyping" under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Id. at 23.

Grimm's cases do not recognize a claim for "transgender status" discrimination.[1] Instead, those cases—arising largely under Title VII—involve adverse action (such as firing) taken *because* a transgender person's appearance does not conform to birth sex. See, e.g., Finkle v. Howard Cnty., 12 F. Supp. 3d 780, 781, 789 (D. Md. 2014) (Title VII claim based on allegations that male-to-female transgender was not hired due to masculine appearance). In those situations, some courts have recognized a sex stereotyping claim. See, e.g., Smith v. City of Salem, 378 F.3d 566, 572 (6th Cir. 2004) (recognizing Title VII claim when male-to-female transgender was allegedly fired for "conduct and mannerisms … [that] did not conform with his employer's and co-workers' sex stereotypes of how a man should look and behave").

Just last week, the United States Attorney General issued a memorandum calling into question the legitimacy of using sex-stereotyping claims as a way to litigate transgender rights. The Attorney General's October 4, 2017 memorandum states, "Although federal law, including Title VII, provides various protections to transgender individuals, Title VII does not prohibit discrimination based on gender identity *per se*." It goes on to state:

---

[1] See, e.g., Schroer v. Billington, 577 F. Supp. 2d 293, 305 (D.D.C. 2008) (observing that "transsexuality itself … [is] a characteristic that, in and of itself, nearly all federal courts have said is unprotected by Title VII"); see also, e.g., Johnston v. Univ. of Pittsburgh Univ. of the Com. Sys. of Higher Educ., 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015) (observing that "nearly every federal court that has considered the question in the Title VII context has found that transgendered individuals are not a protected class under Title VII"); Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1221 (10th Cir. 2007) (joining "vast majority of federal courts … and conclud[ing] that discrimination against a transsexual based on that person's status as a transsexual is not discrimination because of sex under Title VII").

> Although Title VII bars 'sex stereotypes' insofar as that particular sort of 'sex-based consideration[]' causes 'disparate treatment of men and women,' Price Waterhouse v. Hopkins, 490 U.S. 228, 242, 251 (1989) (plurality op.), Title VII is not properly construed to proscribe employment practices (such as sex-specific bathrooms) that take account of the sex of employees but do not impose different burdens on similarly situated members of each sex, see e.g., Jespersen v. Harrah's Operating Co., Inc., 444 F.3d 1104, 1109-10 (9th Cir. 2006) (en banc) . . . Accordingly, Title VII's prohibition on sex discrimination encompasses discrimination between men and women but does not encompass discrimination based on gender identity *per se*, including transgender status.

See October 4, 2017 Memorandum of the Attorney General (Ex. A).

Here, the School Board's policy distinguishes students based on *physiological sex*—not "transgender status" or masculine or feminine appearance. The School Board's policy is thus the *opposite* of sex stereotyping. The Tenth Circuit agrees, explaining that the "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes." Etsitty, 502 F.3d at 1224.[2] Furthermore, far from taking adverse action against persons based on gender-nonconforming appearance, the School Board's policy merely separates students based on phsyiological sex—as has been allowed by Title IX for nearly half a century. See, e.g., Johnston, 97 F. Supp. 3d at 672–82, 678 (rejecting transgender plaintiff's Title IX claim against sex-separated restrooms and "find[ing] particularly compelling that the regulations implementing Title IX explicitly permit … separate toilet, locker room, and shower facilities on the basis of

---

[2] The Seventh Circuit recently became the first to recognize a sex stereotyping claim against sex-separated school restrooms, on the theory that establishing such restrooms "punishes [a transgender] individual for his or her gender non-conformance." Whitaker v. Kenosha Unified Sch. Dist., 858 F.3d 1034, 1049 (7th Cir. May 30, 2017). But that is wrong, as explained in Etsitty, 502 F.3d at 1224, and Johnston, 97 F.Supp.3d at 679–82. To dismiss as a "stereotype" the physiological distinctions between men and women—especially in places like restrooms, locker rooms, and showers—pushes the sex-stereotyping theory into incoherence. See, e.g., Johnston, 97 F. Supp. 3d at 681 (requiring someone to use restroom of his or her biological sex does not allege discrimination based on "preconceived notions of gender stereotypes").

sex"). Accordingly, the School Board's policy does not violate Title IX, and this claim must be dismissed with prejudice.

## II. The School Board's Policy Does Not Violate the Equal Protection Clause.

### A. Grimm does not contest that all students are treated the same under the School Board's policy.

Grimm previously conceded that he is not asking the Court to recognize transgender status as a suspect classification entitled to heightened scrutiny and protection under the Equal Protection clause. See ECF Doc. 41, p. 6. Instead, Grimm argues that the School Board's policy constitutes gender discrimination under the Equal Protection Clause. Regardless, Grimm cannot show that the School Board treated him any differently than other students.

At its most basic level, the School Board's policy provides that if a student is physiologically a female, the student can use the girls' restrooms or a single-stall restroom, but the student cannot use a restroom designated for physiological males. The same in reverse is true with physiological males. See Amended Complaint at ¶¶ 64-66 (ECF Doc. 113). As a result, all students, including female to male transgender and male to female transgender students, are treated the same. Thus, under the School Board's restroom policy, Grimm was treated like every other student in the Gloucester Schools.

Grimm was permitted to use the girls' restroom under the School Board's policy, but would not do so. Id. at ¶ 69. Grimm was permitted to use the single-stall restrooms, but refused to do so. Id. Accordingly, Grimm cannot demonstrate that he was treated differently from others similarly situated, or that he was subject to intentional discrimination in violation of the Equal Protection clause. See Workman v. Mingo County Bd. of Educ., 419 F. App'x 348, 354 (4th Cir. 2011) (no evidence of unequal treatment in application of state mandatory vaccination laws before admission to school); Hanton v. Gilbert, 36 F.3d 4, 8 (4th Cir. 1994) (no evidence

7

that similarly situated males were afforded different treatment). Grimm's Equal Protection claim cannot survive under the facts of the Amended Complaint and should be dismissed with prejudice.

      **B.    The privacy concerns of other students must be balanced against Grimm's rights.**

Regardless of the level of scrutiny that applies, the School Board's policy is not just rationally related, but substantially related, to the important governmental interest of protecting the privacy of all of its students. Grimm dismisses other students' privacy concerns with the *ipse dixit* that Grimm's "use of the boys' restroom does not infringe on anyone else's privacy." Indeed, Grimm's unconcern applies "even in the context of locker rooms" since, according to Grimm, "[i]n many school locker rooms, students … change [clothes] without fully undressing." See Memorandum in Opposition at n. 21. All this would run afoul of what Justice Ginsburg wrote in United States v. Virginia that admitting women to a previously all-male military school "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements[.]" 518 U.S. 515, 550 n.19 (1996). And it would also surprise members of the Fourth Circuit, which has noted "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns." Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir. 1993).

People legitimately form privacy expectations in public restrooms, locker rooms, or showers not based on whether people might be partially or fully undressed in those facilities, or whether bathroom stalls have "privacy strips," but at the doors marked "M" and "W."[3]

---

[3] This same argument applies to the Title IX analysis, because reading "sex" in Title IX to encompass "gender identity" or "transgender status" results in significant privacy concerns. That is why Title IX regulations have long allowed certain separate "facilities" on the basis of "sex," 34 C.F.R. § 106.33, a policy choice that Grimm does not purport to contest.

Moreover, the issue of privacy is of paramount importance when dealing with school age children.

The School Board's policy takes into consideration the privacy needs of all students, from kindergarten through twelfth grade. The School Board has a responsibility to its students to ensure their privacy while engaging in personal bathroom functions, disrobing, dressing, and showering outside of the presence of members of the opposite sex. This is particularly true in an environment where children are still developing, both emotionally and physically. See, e.g., Burns v. Gagnon, 283 Va. 657, 671, 727 S.E.2d 634, 643 (2012) (school administrators have a responsibility "to supervise and ensure that students could have an education in an atmosphere conducive to learning, free of disruption, and threat to person."); Va. Code § 22.1-254 (compulsory attendance).

As Johnston recognized, the context of this dispute is important. Here, the School Board is balancing the needs, interests and rights of children from age five through age 18. The right to privacy for students strongly supports maintaining sex-segregated restrooms and locker rooms. See Johnston, 97 F. Supp. 3d at 668 (finding "controlling the unique contours under which this case arises," namely a public school which is "tasked with providing safe and appropriate facilities for all of its students.").

### III. Grimm's Claims for Injunctive Relief Should Be Dismissed Since the School Board's Policy Does Not Apply to Grimm as an Alumnus.

Grimm's claim for injunctive relief is founded on his assertion that he will still be required to follow the School Board's policy when attending football games, alumni events, or when he is otherwise on school property as an alumnus. The School Board's policy, however, was only ever intended to apply to its students. The School Board has no policy that deals with the rights of transgender adults on school premises. That does not, however, mean that the

9

School Board's policy as it applies to students is illegitimate or violative of Title IX or the Equal Protection Clause. Indeed, the rights of all of its students while on school grounds and within the custodial control of the School Board has always been, and remains, the School Board's concern.

## CONCLUSION

For all of the foregoing reasons, the Gloucester County School Board respectfully requests that the Court grant the Motion to Dismiss, and dismiss Plaintiff's Amended Complaint in its entirety and with prejudice.

**GLOUCESTER COUNTY SCHOOL SCHOOL BOARD**

By Counsel

/s/
David P. Corrigan
VSB 26341
Jeremy D. Capps
VSB No. 43909
M. Scott Fisher, Jr.
VSB 78485
Attorney for Gloucester County School School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
sfisher@hccw.com

## **C E R T I F I C A T E**

I hereby certify that on the 11th day of October 2017, I filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send a Notice of Electronic Filing to all counsel of record.

/s/
David P. Corrigan
VSB No. 26341
Attorney for Gloucester County School School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com