UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

        Plaintiff,

      v.

GLOUCESTER COUNTY SCHOOL
BOARD,

        Defendant.

Civil No. 4:15cv54

## ORDER

Pending before the Court is an Amended Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 135) filed by Defendant Gloucester County School Board ("Defendant" or "the Board"). For reasons set forth herein, the Motion is DENIED.

I.     FACTUAL AND PROCEDURAL BACKGROUND

When ruling on a motion to dismiss for failure to state a claim, courts accept a complaint's well-pled factual allegations as true, and draw any reasonable inferences in favor of the plaintiff. *See Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). Accordingly, the Court reviews the facts as alleged by Plaintiff Gavin Grimm ("Plaintiff" or "Mr. Grimm"). *See* Am. Compl., ECF No. 113.

Mr. Grimm is an eighteen-year-old man who attended Gloucester High School, a public school in Gloucester County, Virginia, from September 2013 through his graduation in June 2017. *Id.* ¶¶ 1, 79. When Mr. Grimm was born, hospital staff identified him as female. *Id.* ¶ 17. However, Mr. Grimm has known from a young age that he has a male gender identity—that is, he has a "deeply felt, inherent sense of being a boy, a man, or male," rather than a sense of being

"a girl, a woman, or a female." *Id.* ¶ 18. Because his gender identity differs from the sex assigned to him at birth, he is transgender. *Id.* ¶¶ 17–19.

Like many of his transgender peers, after the onset of puberty, Mr. Grimm began suffering from "debilitating levels of distress" as the result of gender dysphoria, "a condition in which transgender individuals experience persistent and clinically significant distress caused by the incongruence between their gender identity and the sex assigned to them at birth." *Id.* ¶ 19. There is a medical and scientific consensus that treatment for gender dysphoria includes allowing transgender individuals to live in accordance with their gender identity, including "use of names and pronouns consistent with their identity, grooming and dressing in a manner typically associated with that gender, and using restrooms and other sex-separated facilities that match their gender identity."[1] *Id.* ¶¶ 20–21. Furthermore, when medically appropriate, treatment also includes hormone therapy and surgery so that transgender individuals "may develop physical sex characteristics typical of their gender identity."[2] *Id.* ¶¶ 20, 25. In addition, under widely accepted standards of care, "boys who are transgender may undergo medically necessary chest-reconstruction surgery after they turn [sixteen years old]." *Id.* ¶ 27.

In 2014, by the end of his freshman year of high school, Mr. Grimm experienced such distress from his untreated gender dysphoria that he was unable to attend class. *Id.* ¶ 36. At this

---

[1] The consensus within medical and mental health communities is that excluding transgender individuals from using restrooms consistent with their gender identity "is harmful to their health and wellbeing. When excluded from the common restrooms, transgender [individuals] often avoid using the restroom entirely, either because the separate restrooms are too stigmatizing or too difficult to access." *Id.* ¶ 28. As a result, they suffer from physical consequences, and their risk of depression and self-harm is increased. *Id*; *see also id.* ¶ 29.

[2] "Hormone therapy affects bone and muscle structure, alters the appearance of a person's genitals, and produces secondary sex characteristics such as facial and body hair in boys and breasts in girls." *Id.* ¶ 25; *see also* Tim C. van de Grift et al., *Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study*, 79:7 PSYCHOSOMATIC MED. 815 (2017) ("Overall, the levels of gender dysphoria . . . were significantly lower at follow-up [after medical intervention such as hormone therapy and genital or chest surgery] compared with clinical entry.").

time, he informed his parents of his male gender identity. *Id.* He began treatment with a psychologist experienced in counseling transgender youth and, as part of the medically-necessary treatment for his gender dysphoria, commenced the process of transitioning to live in accordance with his male identity. *Id.* ¶¶ 1, 36–37. By the time he began his sophomore year, Mr. Grimm had legally changed his first name to Gavin and had begun using male pronouns. He wore clothing and a hairstyle in a manner consistent with other males, and used men's restrooms in public venues without incident. *Id.* ¶¶ 2, 38. He also obtained a treatment documentation letter from his medical providers confirming that he was receiving treatment for gender dysphoria and was to be treated as a male in all respects—including restroom use. *Id.* ¶ 2.

In August 2014, prior to the beginning of his sophomore year, Mr. Grimm and his mother met with the Gloucester High School Principal and the Guidance Counselor, explaining that Mr. Grimm is a transgender boy and would be attending school as a boy. Mr. Grimm and his mother also provided the Principal and Counselor with the treatment documentation letter. *Id.* ¶ 39. At the time of the meeting, the Board lacked a policy addressing the restrooms that transgender students would use. *Id.* ¶ 41. Mr. Grimm initially requested the use of the restroom in the nurse's office. However, that restroom was located remotely, and using it left Mr. Grimm feeling stigmatized and isolated. That restroom was also far from many of his classrooms, causing Mr. Grimm to be late for class when he used it. After a few weeks, Mr. Grimm sought permission to use the boys' restrooms. With the Principal's support, he began using the boys' restrooms on October 20, 2014, and did so without incident for approximately seven weeks.[3] *Id.* ¶¶ 42–47.

---

[3] He also requested permission to complete his physical education requirements through a homebound program, bypassing any need to use the locker rooms at the school. *Id.* ¶ 45.

The Principal and Superintendent informed the Board that they had authorized Mr. Grimm to use the boys' restrooms, but otherwise kept the matter confidential. *Id.* ¶ 47. However, several adults in the community learned of a transgender student's use of the boys' restrooms. They contacted the Board, demanding that the transgender student be barred from the boys' restrooms. *Id.* The Board considered the matter in a private meeting and took no action for several weeks. However, one Board member proposed a policy regarding the use of restrooms by transgender students and submitted the policy for public debate at a Board meeting scheduled for November 11, 2014. In pertinent part, the policy proposed that "[i]t shall be the practice of the [Gloucester County Public Schools ("GCPS")] to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility."[4] *Id.* ¶ 51.

At the meeting, Mr. Grimm decided to address the issue publicly, describing how he sought to use the restrooms "in peace" and had experienced "no problems from students" when using the boys' restrooms, "only from adults." *Id.* ¶ 55. The School Board deferred a vote on the proposed policy until its December 9, 2014 meeting. *Id.* ¶ 56. Before the next meeting, the

---

[4] The entirety of the policy stated:

Whereas the GCPS recognizes that some students question their gender identities, and

Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and

Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore

It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

*Id.* ¶ 51.

4

Board announced plans to add or expand partitions between urinals in the male restrooms, add privacy strips to the doors of stalls in all restrooms, and to designate single-stall, unisex restrooms "to give all students the option for even greater privacy." *Id.* ¶ 57.

Despite the announced plans, speakers at the December 9, 2014 meeting continued to demand that Mr. Grimm be excluded from using the boys' restrooms immediately. *Id.* ¶ 59. The Board then passed the policy at the meeting by a six-to-one vote. The following day, Mr. Grimm was informed by the principal that he could no longer use the boys' restrooms. *Id.* ¶¶ 61–62. The Board then installed three single-user restrooms, none of which was located near Mr. Grimm's classes. Although any student was allowed to use them, no student besides Mr. Grimm did. *Id.* ¶¶ 65–66.

Because using the single-user restrooms underscored his exclusion and left him physically isolated, Mr. Grimm refrained from using any restroom at school. He developed a painful urinary tract infection and had difficulty concentrating in class because of his physical discomfort. *Id.* ¶¶ 67–70. When he attended school football games, no restroom was available for Mr. Grimm's use. As a result, Mr. Grimm was forced to have his mother pick him up from games early. *Id.* ¶ 71.

Throughout his sophomore, junior, and senior years of high school, Mr. Grimm continued the process of transitioning to live in accordance with his male identity. In December 2014, the middle of his sophomore year, he had begun hormone therapy, which altered his bone and muscle structure, deepened his voice, and caused him to grow facial hair. *Id.* ¶¶ 72–73. In June 2015, prior to the beginning of his junior year, the Virginia Department of Motor Vehicles issued Mr. Grimm a state identification card designating his gender as male. *Id.* ¶ 74. A year later, prior to the beginning of his senior year, Mr. Grimm underwent chest-reconstruction

surgery, in accordance with the medical standards of care for treating gender dysphoria. *Id.* ¶ 75; *see id.* ¶ 27. Later that year, in September 2016, the Gloucester County Circuit Court issued an order changing his sex under Virginia state law and directing the Virginia Department of Health to issue Mr. Grimm a birth certificate listing his sex as male; this certificate was issued in October 2016. *Id.* ¶¶ 76–77. Throughout the process of these changes—up through Mr. Grimm's graduation in June 2017—the School Board maintained that Mr. Grimm's "biological gender" was female and prohibited administrators from permitting Mr. Grimm to use the boys' restrooms. *Id.* ¶¶ 78–79.

Mr. Grimm commenced this action against the Gloucester County School Board in July 2015, alleging that the Board's policy of assigning students to restrooms based on their biological sex violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In September 2015, another judge of this Court issued a Memorandum Opinion and Order (1) dismissing Mr. Grimm's claim under Title IX for failure to state a claim and (2) denying his Motion for a Preliminary Injunction based on the alleged Title IX and Equal Protection Clause violations. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 132 F. Supp. 3d 736, 753 (E.D. Va. 2015), *rev'd in part and vacated in part*, 822 F.3d 709 (4th Cir. 2016). An interlocutory appeal of those decisions followed, leading to appellate review by the United States Court of Appeals for the Fourth Circuit and by the United States Supreme Court. *See infra* III.A; *see also* ECF No. at 132 at 1–2. During this time, the district court suit was re-assigned to the undersigned. The case was remanded to this Court for consideration of the Title IX claim. The Equal Protection Claim also remains pending before this Court.

6

Following the filing of Mr. Grimm's Amended Complaint (ECF No. 113), the School Board filed the instant Motion to Dismiss (ECF No. 135). With respect to the Title IX claim (Count II, ECF No. 113 ¶¶ 90–92), the School Board argues that its policy of separating restrooms by physiological sex is valid under Title IX because (1) Title IX only allows for claims on the basis of sex, rather than gender identity, and (2) gender identity and sex, as addressed in Title IX, are not equivalent. *See* ECF No. 136 at 6, 12–26. With respect to the Equal Protection claim (Count I, ECF No. 113 ¶¶ 81–89), the School Board argues that its policy does not violate the Equal Protection Clause because transgender individuals are not members of a suspect class entitled to heightened scrutiny, and the Policy should be viewed as presumptively constitutional under both rational basis review and intermediate scrutiny. *Id.* at 28–36.

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. "To survive a Rule 12(b)(6) motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Facts that are 'merely consistent with' liability do not establish a plausible claim to relief." *Takeda Pharm.*, 707 F.3d at 455 (quoting *Iqbal*, 556 U.S. at 678). Rather, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] [the plaintiff's] claims across the line from conceivable to

7

plausible.'" *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (quoting *Twombly*, 550 U.S. at 555) (first and second alteration in original).

At this stage, "(1) the complaint is construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader." 5B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1357 & n.11 (3d ed.) (collecting cases); *accord Wag More Dogs*, 680 F.3d at 365.

However, courts "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.'" *Takeda Pharm.*, 707 F.3d at 455 (quoting *Wag More Dogs*, 680 F.3d at 365). Additionally, a threadbare recitation of the "elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *Iqbal*, 556 U.S. at 678 (noting that "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements").

III.   ANALYSIS

   A.   Reconsideration of the Interlocutory Order

As a preliminary matter, this Court must consider whether it is bound by the previous dismissal of the Title IX claim. *See* ECF No. 57. Following Mr. Grimm's interlocutory appeal of the dismissal, the Fourth Circuit reversed the dismissal. The reversal was based on the Fourth Circuit's conclusion that deference should be given to a guidance letter issued by the Department of Education's Office of Civil Rights that construed a Title IX regulation as generally requiring schools to treat transgender students consistent with their gender identity when electing to separate students on the basis of sex. *G.G. ex rel. Grimm v. Gloucester County Sch. Bd.* (*Grimm*

8

*I*), 822 F.3d 709, 718–22 (4th Cir. 2016) (citing *Auer v. Robbins*, 519 U.S. 452 (1997)), *vacated and remanded*, 137 S. Ct. 1239 (2017).  The United States Supreme Court granted a stay of the Fourth Circuit's mandate and granted the Board's writ of certiorari.  After the guidance letter was rescinded as the result of a change in administration, the Supreme Court vacated the Fourth Circuit's decision and remanded for reconsideration of the Title IX claim.  ECF No. 91.  The Fourth Circuit dismissed the appeal, and Mr. Grimm filed an Amended Complaint with this Court.  ECF Nos. 113, 114.

The Board argues that this Court remains bound by the previous dismissal of the Title IX claim.  In support of this position, the Board contends that because Mr. Grimm's "current Title IX claim is virtually identical to the claim that [the previous judge] already dismissed, [Mr. Grimm] is essentially asking the Court to reconsider" the original decision.  ECF No. 136 at 7.  The Board contends that this Court need not reevaluate the previous dismissal of the Title IX claim because the prior decision analyzed the Title IX claim thoroughly without applying *Auer* deference to the letter and instead based its conclusion that Mr. Grimm had failed to state a Title IX claim on "valid precedent." *Id.* at 6–7.

Such reconsiderations are governed by Federal Rule of Civil Procedure 54(b), which provides that:

> any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Both parties acknowledge that district courts retain the discretion to revise an interlocutory order at any time before the entry of a judgment adjudicating all the claims.  *Carlson v. Boston Scientific Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (citing Fed. R. Civ. P. 54(b)).

Although courts have concluded that a successor judge should hesitate to overrule the earlier determination, *id.* (internal citation omitted), "whether rulings by one district judge become binding as 'law of the case' upon subsequent district judges is not a matter of rigid legal rule, but more a matter of proper judicial administration which can vary with the circumstances." *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 n.3 (4th Cir. 1982); *see also Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727 n.3 (5th Cir. 2012) ("When a successor judge is reviewing another judge's interlocutory order, the law of the case doctrine requires only that the successor judge respect principles of comity when considering issues that have already been decided."); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (noting that reconsideration of interlocutory orders "is committed to the discretion of the district court," and that related doctrines such as law of the case "have evolved as a means of guiding that discretion" but "cannot limit the power of a court to reconsider an earlier ruling"). This Court's primary responsibility—the responsibility of all federal courts—"is to reach the correct judgment under law." *Am. Canoe Ass'n*, 326 F.3d at 515.

The Fourth Circuit has "cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *Carlson*, 856 F.3d at 325 (internal citations omitted). Accordingly, a "court may review an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Id.* (internal quotations and citations omitted). The Board argues that none of these requirements has been met, and that this Court should not depart from the previous adjudication of the Title IX claim. ECF No. 136 at 8.

This Court disagrees.  First, there has been a significant change in the applicable law since the Motion to Dismiss the Title IX claim was initially considered in 2015.  *See Carlson*, 856 F.3d at 325; *see also Bridger Coal Co. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 669 F.3d 1183, 1192 (10th Cir. 2012) (noting that the emergence of a circuit split can justify reconsideration).  The Sixth and Seventh Circuits have since held that excluding boys and girls who are transgender from the restrooms that align with their gender identity may subject them to discrimination on the basis of sex under Title IX, the Equal Protection Clause, or both.  *See Whitaker v. Kenosha Unified School Dist. No. 1 Board of Education*, 858 F.3d 1034, 1049–51 (7th Cir. 2017); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016).

A number of district courts have also reached the same conclusion.  *See A.H. by Handling v. Minersville Area Sch. Dist.*, No. 3:17cv391, 2017 WL 5632662, at *1, *3–*7 (M.D. Pa. Nov. 22, 2017) (denying school district's motion to dismiss a transgender student's Title IX and Equal Protection Claims based on school district's bathroom policy "dictating that children must use the bathroom corresponding to the sex listed on the student's birth certificate"); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288, 295 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 865, 869, 871 (S.D. Ohio 2016).

Recently, the District of Maryland denied a strikingly similar Motion to Dismiss a transgender student's Title IX and Equal Protection claims stemming from his school's policy of barring him from using the boys' locker room.  *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 711 (D. Md. 2018).  Although these precedents are not binding upon this Court, the thorough analyses of analogous questions provided by the rulings proves persuasive.

Moreover, to the extent that the Fourth Circuit's consideration of the Title IX claim provides meaningful guidance for this Court's analysis of the Title IX regulation, the earlier dismissal of the Title IX claim lacked such guidance. *See infra* p. 15 and note 6.

Second, a number of factual developments warrant reconsideration of the original decision to dismiss the Title IX claim. When Mr. Grimm filed his initial complaint in 2015, he alleged that the Board's policy violated his rights under Title IX on the day the policy was first issued, which occurred in the middle of his sophomore year. The Amended Complaint alleges that the Board violated his rights under Title IX when the policy was issued, and also throughout the remainder of his time as a student at Gloucester High School. Am. Compl., ECF No. 113 ¶ A. Since the previous dismissal of the Title IX claim, Mr. Grimm has received chest reconstruction surgery, obtained an order from Gloucester County Circuit Court legally changing his sex under Virginia law, and has received a new birth certificate from the Virginia Department of Health listing his sex as male. *Id.* ¶¶ 75–77. The previous decision was rendered without any opportunity to consider whether the Board's policy violated Title IX throughout the remainder of Mr. Grimm's time at Gloucester High School, and in light of these factual developments.

For these reasons, the Court concludes that revisiting the question of whether Mr. Grimm has stated a plausible Title IX claim is warranted. The Court now examines the claim's merits. *See* ECF No. 113 ¶¶ 90–92.

B.     Title IX Claim

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31. A covered institution may not, on the basis of sex, (1)

provide different aid, benefits, or services; (2) deny aid, benefits, or service, or (3) subject any person to separate or different rules, sanctions, or treatment. 34 C.F.R. § 106.31(b)(2)–(4).

However, "[n]ot all distinctions on the basis of sex are impermissible under Title IX." *Grimm I*, 822 F.3d at 718. The statute's regulations permit an institution to provide separate bathroom, shower, and locker facilities by sex, so long as the facilities are comparable. 34 C.F.R. § 106.33; *see also Whitaker*, 858 F.3d at 1047–48.

### 1.  A Plaintiff's Claim of Discrimination on the Basis of Transgender Status Constitutes a Claim of Sex Discrimination Under Title IX

The parties dispute whether a transgender student's allegation of discrimination based on his or her transgender status can constitute a claim of sex discrimination under Title IX. Neither Title IX nor its regulations defines the term "sex." The Fourth Circuit has noted that because 34 C.F.R. § 106.33 permits separate toilets, locker rooms, and shower facilities on the basis of sex, "[b]y implication, the regulation also permits schools to exclude males from the female facilities and vice-versa." *Grimm I*, 822 F.3d at 720.

The Board notes that § 106.33 permits schools to establish separate facilities on the basis of sex. The Board also contends that the term "sex" "at a minimum *includes* the physiological distinction between men and women." ECF No. 136 at 13. Therefore, the Board argues, this Court must interpret Title IX as applying only to discrimination on the basis of physiological sex, rather than gender identity. *See id.* at 12–26.

Before evaluating whether discrimination on the basis of a plaintiff's transgender status constitutes sex discrimination under Title IX, the Court must address the difficulties inherent in the Board's view of "sex" under Title IX. That construction may be an appealingly simple way of interpreting the term "sex." However, the Board argues that the Policy "distinguishes boys and girls based on physical sex characteristics alone," ECF No. 136 at 21, but fails to

acknowledge that there are individuals who possess both male and female physical sex characteristics.  As Mr. Grimm contends, attempting to draw lines based on physiological and anatomical characteristics proves unmanageable: how would the Board's policy apply to individuals who have had genital surgery, individuals whose genitals were injured in an accident, or those with intersex traits who have genital characteristics that are neither typically male nor female?  *See Grimm I*, 822 F.3d at 720–21;[5] *Evancho*, 237 F. Supp. 3d at 279 ("[T]he Board has adopted a student bathroom policy that turns exclusively on the then-existing presence of a determinate external sex organ, no matter what other biological or gender markers may exist . . . .").  In Mr. Grimm's situation, how would the Board have continued to implement the Policy after Mr. Grimm's medical procedures?  Mr. Grimm had attained some secondary male physical sex characteristics after hormone therapy and chest reconstruction surgery.  Accordingly, acts of discrimination on the basis of physiological sex certainly could have occurred.

The Policy in question assigned restrooms based on "biological gender," not physiological characteristics.  This term has not been accepted by the medical community, because "sex"—the "attributes that characterize biological maleness or femaleness" (such as sex-determining genes, sex chromosomes, internal and external genitalia, and secondary sex characteristics)—is distinct from "gender," or the "internal, deeply held sense" of being a man or a woman.  *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) J. CLIN.

---

[5] *Grimm I* specifically noted:

> It is not clear to us how the regulation would apply in a number of situations—even under the Board's own "biological gender" formulation.  For example, which restroom would a transgender individual who had undergone sex reassignment surgery use?  What about an intersex individual?  What about an individual born with X-X-Y sex chromosomes?  What about an individual who lost external genitalia in an accident?

822 F.3d at 720–21.

ENDOCRINOLOGY & METABOLISM 3869, 3875 (2017) (noting that the terms "biological male or female" should be avoided because not all individuals have physical attributes that align perfectly with biological maleness or femaleness, such as individuals with XY chromosomes who may have female-appearing genitalia). Given the Policy's disregard for these distinctions, its use of the term "biological gender" functioned as a proxy for physiological characteristics that a student may or may not have had. The term allowed the Board to isolate, distinguish, and subject to differential treatment any student who deviated from what the Board viewed a male or female student *should* be, and from the physiological characteristics the Board believed that a male or female student *should* have.

The Court next turns to consideration of § 106.33. As the Fourth Circuit noted, the "inquiry is not ended" by § 106.33's reference to males and females. *Grimm I*, 822 F.3d at 720.[6] "Although the regulation may refer unambiguously to males and females, it is silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms." *Id.* The Fourth Circuit initially determined that § 106.33 was ambiguous "as applied to transgender students," and granted *Auer* deference to the guidance letter interpreting § 106.33 to generally require access to sex-segregated facilities on the basis of gender identity. *Id.* at 721–23. Following remand from the Supreme Court as the result of the withdrawal of the letter, the Fourth Circuit vacated its decision. Accordingly, *Grimm I* fails to

---

[6] The District of Maryland recognized that although the Supreme Court vacated the Fourth Circuit's judgment in *Grimm I* in light of the withdrawal of the guidance letter, the remainder of that decision remains binding law because (1) it has not overruled by a subsequent en banc opinion of the Fourth Circuit and (2) there has been no superseding contrary decision from the Supreme Court. *See United States v. Giddens*, 858 F.3d 870, 886 n.12 (4th Cir. 2017) (citing *United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005)). "Thus, the Court will rely on [the Fourth Circuit's previous *Grimm I* judgment] to the extent it offers guidance for deciding the Motions present." *M.A.B.*, 286 F. Supp. 3d at 712 n.5.

inform this Court how § 106.33 is to be interpreted with respect to transgender students. The Fourth Circuit has not addressed this issue or Title IX's application to transgender students since.

The Board asks this Court to resolve this issue by cabining the definition of sex to the "then-universal understanding of 'sex' as a binary term encompassing the physiological distinctions between men and women," as understood during the passage of Title IX and the promulgation of § 106.33. *See* ECF No. 136 at 16. However, as noted above, this fails to address the question of how § 106.33 is to be interpreted regarding transgender students or other individuals with physiological characteristics associated with both sexes.

The Court has some guidance in resolving § 106.33's ambiguity. Courts may "look to case law interpreting Title VII of the Civil Rights Act of 1964," *as amended*, 42 U.S.C. §§ 2000e *et seq.* (2018)—which prohibits employment discrimination on the basis of, among other qualities, sex—"for guidance in evaluating a claim brought under Title IX." *Id.* at 718 (citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)); *see also M.A.B.*, 286 F. Supp. 3d at 713 ("[T]he Court turns to Title VII precedent for guidance [in interpreting a Title IX claim].").

Neither the Fourth Circuit nor the Supreme Court has addressed how Title VII applies to transgender individuals. *See M.A.B.*, 286 F. Supp. 3d at 713. However, the Supreme Court has constructed a framework for addressing sex discrimination claims brought by individuals who fail to conform to social expectations for their gender group. In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989), the Supreme Court considered whether the plaintiff, a woman who was denied partnership in an accounting firm, had an actionable Title VII claim against the firm because the firm had allegedly denied her a promotion because she failed to conform to certain gender stereotypes related to women. *Id.* at 235, 250–53 (summarizing how firm partners

described the plaintiff as "macho" and a "tough-talking somewhat masculine hard-nosed manager"). Firm partners advised the plaintiff that her partnership chances would improve if she were to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235. Six Justices of the *Price Waterhouse* Court agreed that Title VII barred discrimination not only based on the plaintiff's gender, but based on "sex stereotyping" because the plaintiff had failed to act in accordance with gender stereotypes associated with women. *Id.* at 250–51; *id.* at 258–61 (White, J., concurring); *id.* at 272–73 (O'Connor, J., concurring). In noting that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they match[] the stereotype associated with their group," the *Price Waterhouse* Court recognized that Title VII's prohibition on sex discrimination necessarily includes a prohibition on gender stereotyping. *Id.* at 251.

*Price Waterhouse*, by its own terms, took an expansive view as to the forms of sex discrimination that Title VII was meant to reach, expressly leaving open the possibility of other forms of gender stereotyping. "By focusing on [gender stereotypes associated with appearance and behavior], however, we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision . . . ." *Id.* at 251–52.

The Supreme Court's expansion recognizes that the prohibition on sex discrimination pursuant to Title VII also includes same-sex harassment claims. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) (noting that same-sex "sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," but that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable

evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed").[7]

The First, Second, Third, Seventh, and Ninth Circuits have all recognized that based on the logic of *Price Waterhouse*, a gender stereotyping allegation generally is actionable sex discrimination under Title VII. *Hively v. Ivy Tech Cmty. Coll.*, 854 F.3d 339, 351–52 (7th Cir. 2017 (en banc) (holding that a lesbian plaintiff could state a Title VII claim under a sex stereotyping theory); *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 200–01 (2d Cir. 2017) (per curiam) (holding that a plaintiff had stated a plausible Title VII claim based on a gender stereotyping theory); *Prowel v. Wise Bus. Forms., Inc.*, 579 F.3d 285, 290 (3d Cir. 2009); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874–75 (9th Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999).

Although the Fourth Circuit has yet to apply *Price Waterhouse* expressly to Title VII claims brought by transgender individuals,[8] this Court joins the District of Maryland in concluding that "discrimination on the basis of transgender status constitutes gender stereotyping because 'by definition, transgender persons do not conform to gender stereotypes.'" *M.A.B.*, 286 F. Supp. 3d at 714 (quoting *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780, 787–88 (D. Md. 2014)). The Court also concludes that, pursuant to the logic of *Price Waterhouse*, transgender

---

[7] For these reasons, the Court rejects the Board's argument that Title IX should be cabined to its expressed purpose: ending discrimination against women in university admissions and appointments. *See* ECF No. 136 at 9, 24–25. The Court also finds unpersuasive the Board's argument that other students' privacy concerns—mentioned in the legislative history of Title IX regulations, *id.* at 10–12—should prevail in this context. *See infra* pp. 27–30 (rejecting such privacy concerns as a rationale for the Board's Policy).

   Relatedly, the Board also objects to this interpretation of Title IX because of hypothetical privacy concerns (rather than those found in legislative history). ECF No. 136 at 22–24. For the reasons discussed below, the Court finds these concerns—although worthy of consideration—are conjectural and abstract and fail to provide a basis for interpreting Title IX in the manner sought by the Board.

[8] The Fourth Circuit also has not applied *Price Waterhouse* expressly to gender stereotyping claims brought under Title VII. *M.A.B.*, 286 F. Supp. 3d at 714.

discrimination is per se actionable sex discrimination under Title VII. *Id; see also G.G. ex rel. Grimm (Grimm II)*, 654 Fed. App'x 606, 606–07 (4th Cir. 2016) (Davis, J., concurring) (internal citations omitted) (noting that "the Supreme Court has expressly recognized that claims based on an individual's failure to conform to societal expectations based on that person's gender constitute discrimination 'because of sex' under Title VII," and noting that the First, Sixth, Ninth, and Eleventh Circuits have held that based on the logic of *Price Waterhouse*, discrimination against transgender individuals based on their transgender status is discrimination because of sex under federal civil rights statutes and the Equal Protection Clause).

This conclusion comports with decisions from the First, Sixth, Ninth, and Eleventh Circuits, all of which recognize that based on the gender-stereotyping theory from *Price Waterhouse*, claims of discrimination on the basis of transgender status are per se sex discrimination under Title VII or other federal civil rights laws. *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574–75 (6th Cir. 2018) (confirming that claims of discrimination on the basis of transgender status is per se sex discrimination under Title VII);[9] *Glenn v. Brumby*, 663 F.3d 1312, 1316–19 (11th Cir. 2011) (recognizing that a "person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes," and holding that terminating an employee because she is transgender violates the prohibition on sex-based discrimination under the Title VII and the Equal Protection Clause following the reasoning of *Price Waterhouse*);[10] *Smith v. City of Salem, Ohio*, 378 F.3d 566, 573–75 (6th Cir. 2004) (recognizing that discrimination against a transgender individual

---

[9] The Sixth Circuit also reasoned (1) that "it is analytically impossible to fire an employee based on that employee's status as a transgender person without being motivated, at least in part, by the employee's sex," 884 F. 3d at 575, and (2) that "discrimination against transgender persons necessarily implicates Title VII's proscriptions against sex stereotyping," *id.* at 576–77.

[10] *Glenn* also held that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." 663 F.3d at 1317.

because of his or her gender non-conformity amounts to gender stereotyping prohibited by Title VII and the Equal Protection Clause, and holding that a transgender employee had stated a claim under Title VII); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (holding that a transgender individual could state a claim for sex discrimination under the Equal Credit Opportunity Act based on *Price Waterhouse*); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–03 (9th Cir. 2000) (holding that a transgender individual could state a claim under the Gender Motivated Violence Act under the reasoning of *Price Waterhouse*).

Numerous district courts have also concluded that a transgender individual can state a claim under Title VII for sex discrimination on the basis of a sex or gender-stereotyping theory. *See Roberts v. Clark Cty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1014 (D. Nev. 2016), *reconsideration denied*, No. 2:15-cv-00388-JAD-PAL, 2016 WL 6986346 (D. Nev. Nov. 28, 2016); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008).

Accordingly, allegations of gender stereotyping are cognizable Title VII sex discrimination claims and, by extension, cognizable Title IX sex discrimination claims.[11] This Court joins the District of Maryland and several other appellate courts in concluding that "claims of discrimination on the basis of transgender status are per se actionable under a gender stereotyping theory" under Title IX, *M.A.B.*, 286 F. Supp. 3d at 715. Mr. Grimm has properly

---

[11] The Board's argument that Title IX must explicitly refer to discrimination against transgender students to fulfill the notice requirements under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), ECF No. 136 at 25–27, is unavailing. Title IX funding recipients "have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979," when the Supreme Court decided *Cannon v. University of Chicago*, 441 U.S. 677, 691 (1979), and "have been put on notice by the fact that . . . cases since *Cannon* . . . have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005); *see also West Virginia Dep't of Health & Human Resources v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011).

brought a Title IX claim of discrimination "on the basis of sex"—that is, based on his transgender status.

2.     Mr. Grimm Has Sufficiently Pled a Title IX Claim

Having concluded that Mr. Grimm may bring a Title IX claim based on his transgender status, this Court next turns to the question of whether he has pled his claim of discrimination on the basis of sex sufficiently.  To state a claim under Title IX, a plaintiff must allege: (1) that he or she was excluded from participation in an education program because of his or her sex; (2) that the educational institution was receiving federal financial assistance at the time of his or exclusion; and (3) that the improper discrimination caused the plaintiff harm.  *Grimm I*, 822 F.3d at 718 (citing *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)); *but cf. M.A.B.*, 286 F. Supp. 3d at 716–17 (finding plaintiff had stated a Title IX claim under a gender stereotyping theory because he had alleged that he was denied access to the boys' locker room on the basis of sex—that is, his transgender status); *Evancho*, 237 F. Supp. at 295 (describing the three requirements for stating a Title IX claim as (1) discrimination in an educational program that (2) receives federal assistance in which (3) such discrimination was on the basis of sex).

Before considering whether Mr. Grimm has stated a plausible Title IX claim, the Court recognizes the similarities between this case and *Whitaker*, in which a transgender male teenager was also subjected to a school policy in which he could use only the girls' restrooms or gender-neutral restrooms that were far from his classrooms.  858 F.3d at 1040, 1041–42.  This limitation was imposed despite the undisputed facts that the plaintiff had begun socially transitioning to life as a male during his freshman year, including changing his legal name and pronouns, and had been diagnosed with gender dysphoria by a therapist.  As a result of the school policy, the plaintiff suffered from depression and anxiety; avoided water intake to avoid needing to use the

21

restroom, thereby exacerbating medical issues; and contemplated suicide. He also attempted to use the boys' restrooms in violation of the administration's decision. In response, administrators removed him from class on several occasions and instructed security guards to monitor his restroom use. *Id.* at 1040–41. Eventually, the school permitted him to use the boys' restrooms after a surgical transition. *Id.* at 1041. In reviewing the facts as alleged by the plaintiff, the Seventh Circuit concluded that the plaintiff had established a likelihood of success on the merits of his Title IX, and affirmed the district court's granting of a preliminary injunction on behalf of the plaintiff. *Id.* at 1050.

The Court now considers the first prong in determining if the Title IX claim is pled sufficiently: whether Mr. Grimm has sufficiently alleged that he was improperly discriminated against on the basis of his sex—that is, his transgender status. The Seventh Circuit concluded that a policy that requires transgender students to use bathrooms not in conformity with their gender identity subjects "a transgender student . . . to different rules, sanctions, and treatment than non-transgender students," and amounts to discrimination on the basis of transgender status in violation of Title IX. *Whitaker*, 858 F.3d at 1049–50. This conclusion is sound. Furthermore, the provision of a gender-neutral alternative is insufficient to relieve a school board of liability, "as it is the policy itself which violates [Title IX]." *See id.* at 1050. Offering restroom alternatives that impose hardships like unreasonable distances to a student's classroom and increased stigma on a student is inadequate. *See id.*

In *M.A.B.*, the District of Maryland recognized that because the plaintiff had alleged that the school board had denied him access to the boys' locker rooms because of his transgender status, the policy subjected him to sex discrimination under a gender stereotyping theory. *M.A.B.* concluded that the plaintiff had sufficiently alleged discrimination under Title IX. 286 F. Supp.

3d at 716. Given the persuasive reasoning in *Whitaker* and *M.A.B.*, the Court concludes that Mr. Grimm has sufficiently pled that the Policy subjected him to sex discrimination under a gender stereotyping theory.

Having concluded that Mr. Grimm has properly alleged discrimination on the basis of sex, and finding the second pleading requirement is met because GCPS and Gloucester High School "are education programs receiving Federal financial assistance," ECF No. 113 ¶ 91, the Court now turns to determining whether Mr. Grimm has sufficiently alleged that the discrimination harmed him. The location of the bathrooms, coupled with the stigmatization and physical and mental anguish inflicted upon Mr. Grimm, caused harm. "A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1049; *see also id.* at 1041 (noting that, among other harms, the plaintiff suffered from depression and anxiety because of the bathroom policy, and restricted his water intake to avoid restroom use, exacerbating his medical problems); *M.A.B.*, 286 F. Supp. 3d at 716–17 (applying *Whitaker* to conclude that the plaintiff had sufficiently pled a Title IX claim based on the school's policy of excluding him from use of the boys' locker room because of his transgender status). After full consideration of the facts presented and the compelling scope of relevant legal analyses, the Court concludes that Mr. Grimm has sufficiently pled a Title IX claim of sex discrimination under a gender stereotyping theory.

C.    Equal Protection Claim

Mr. Grimm also brings a claim under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (ECF No. 113 ¶¶ 81–89), which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. As *Whitaker* recognized, the Equal Protection Clause "is

23

essentially a directive that all persons similarly situated should be treated alike." 858 F.3d at 1050 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Under "rational basis review," state action will generally be presumed to be lawful and upheld if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440. However, a state must not distinguish between classes of people in an "arbitrary or irrational" manner or out of a "bare . . . desire to harm a politically unpopular group." *Id.* at 446–47 (internal citation omitted).

Under "rational basis review," if a state classification of a group of people is rationally related to a legitimate state interest, courts will uphold the classifications. *Id.* at 440. However, when a state classifies a "suspect" or "quasi-suspect" group of people, courts will apply "heightened scrutiny." *Id.* at 440–41.

Sex-based classifications are subject to heightened scrutiny. The state bears the burden of demonstrating that its proffered justification for the use of a sex-based classification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996). That is, the state is required to demonstrate that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 524 (internal citation omitted). Hypothesized or *post hoc* justifications created in response to litigation are insufficient to meet this burden, as are justifications based on overbroad generalizations about sex. *Id.* at 533. Furthermore, "[i[f a state actor cannot defend a sex-based classification by relying upon overbroad generalizations, it follows that sex-based stereotypes are also insufficient sustain a classification." *Kenosha*, 858 F.3d at 1051 (internal citation omitted).

1.    The Board's Policy Warrants Intermediate Scrutiny

The parties dispute which level of scrutiny is warranted. The Board contends that rational basis review should apply because transgender individuals do not constitute a quasi-suspect class under the Equal Protection Clause. ECF No. 136 at 28. Mr. Grimm contends that classification based upon transgender status amounts to classification based on sex, and so warrants heightened scrutiny. ECF No. 139 at 37–38.

The Fourth Circuit has not considered the question of whether transgender classifications are sex-based. *See M.A.B.*, 286 F. Supp. 3d at 718. The Seventh and Eleventh Circuits have considered the issue and have concluded that heightened scrutiny applies. *See Whitaker*, 858 F.3d at 1051; *Glenn*, 663 F.3d at 1321. This Court agrees and concludes that intermediate scrutiny is warranted for at least two reasons.

First, transgender individuals constitute at least a quasi-suspect class, and the Policy classified Mr. Grimm on the basis of his transgender status. *See M.A.B.*, 286 F. Supp. 3d at 718–20. Four factors are used to determine whether a group of people who have been classified by a state amount to a suspect or quasi-suspect class: (1) whether the class has historically been subject to discrimination, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (2) whether the class has a defining characteristic that bears a relation to ability to perform or contribute to society, *Cleburne*, 473 U.S. at 440–41; (3) whether the class exhibits obvious, immutable, or distinguishing characteristics that define the class as a discrete group, *Bowen*, 483 U.S. at 602; and (4) whether the class is a minority or politically powerless. *Id.* This Court joins the District of Maryland in concluding that transgender individuals meet all four factors and constitute at least a quasi-suspect class.

As to the first factor, there is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence

and discrimination in education, employment, housing, and healthcare access. *See Whitaker*, 858 F.3d at 1051; *M.A.B.*, 286 F. Supp. 3d at 720; *see also Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

The second factor is also met because transgender status has no bearing on a transgender individual's ability to contribute to society. *See M.A.B.*, 286 F. Supp. 3d at 720.

As to the third factor, "transgender status is immutable." *Id.* at 720–21. Furthermore, transgender individuals have distinguishing characteristics—the disparity between the gender they were assigned at birth and the gender they identify with—that define them as a discrete group. *Id.* at 721.

As to the fourth factor, there can be no doubt that transgender individuals are a minority and are politically powerless, comprising just a fraction of the population and frequently subjected to discriminatory federal policies and state laws. *Id.* at 721. This Court joins the District of Maryland, as well as a host of other district courts, in concluding that because transgender individuals are part of a quasi-suspect class, classifications based on transgender status are per se entitled to heightened scrutiny. *Id.* at 720–22; *see also Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017); *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139–40; *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

Second, intermediate scrutiny is also warranted because, as Mr. Grimm has pled the matter, the Board Policy at issue relies on sex stereotypes. Accordingly, Mr. Grimm's claims amount to an allegation of a sex-based classification and, therefore, an allegation of sex-based

discrimination in violation of the Equal Protection Clause. *See M.A.B.*, 286 F. Supp. 3d at 718–19.

In *Whitaker*, the Seventh Circuit declined to conclude whether "transgender status is per se entitled to heightened scrutiny," but recognized that "it is enough to say that, just as in *Price Waterhouse*," that the record demonstrated that the plaintiff had been subject to sex stereotyping and therefore had experienced sex discrimination. *Whitaker*, 858 F.3d at 1051. The court reasoned that because "the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate," the policy could not be stated without referencing sex. *Id.* Accordingly, *Whitaker* concluded, "[t]his policy is inherently based upon a sex-classification," and "heightened review applies." *Id.*; *see also Glenn*, 663 F.3d at 1319–20 (recognizing that the consistent purpose of applying intermediate scrutiny to sex-based classifications has been to eliminate discrimination on the basis of gender stereotypes, and concluding that discrimination against a transgender individual because of his or her gender non-conformity constitutes sex discrimination under the Equal Protection Clause).

This Court joins other courts that have concluded that because the Policy relies on sex-based stereotypes, it is a sex-based classification. *See M.A.B.*, 286 F. Supp. 3d at 718–19. The Policy classified Mr. Grimm differently on the basis of his transgender status and, accordingly, subjected him to sex stereotyping. The Equal Protection Clause protects Mr. Grimm from impermissible sex stereotypes—just as Title IX does, for the reasons articulated previously—and the Court need only find that the Board's Policy demonstrated sex stereotyping under the Equal Protection Clause. *Cf. Price Waterhouse*, 490 U.S. 250–52. Mr. Grimm was subjected to sex discrimination because he was viewed as failing to conform to the sex stereotype propagated by

the Policy. Because the Policy relies on sex-based stereotypes, the Court finds that review of the Policy is subject to intermediate scrutiny.

> 2. As Pled by Mr. Grimm, the Policy was Not Substantially Related to Achieving an Important Governmental Objective

The Court next turns to whether the Policy survives review under heightened scrutiny. To survive, the Board must demonstrate that the classification serves an important governmental objective, and that the discriminatory means employed are substantially related to the achievement of those objectives. *Virginia*, 518 U.S. at 533 (internal citation omitted).

The Board argues that the Policy is substantially related to an important governmental objective: protecting the privacy rights of its students. *See* ECF No. 136 at 35–37. The Board expands this argument by contending that concerns over student privacy extend to protecting students like Mr. Grimm who, for whatever reason, may be uncomfortable using a restroom corresponding with their physiological sex. The Board argues that by permitting such students to use a single-user restroom, the Board is also protecting the privacy of students like Mr. Grimm. *Id.* at 36.

The Board's argument rings hollow. In *Whitaker*, the Seventh Circuit concluded that although the school's privacy justification may be a legitimate and important interest, the policy was not genuine because it is "based upon sheer conjecture and abstraction." *Whitaker*, 858 F.3d at 1052; *see also Grimm I*, 822 F.3d at 723.

Such conjecture is obvious. First, the plaintiff in *Whitaker*—like Mr. Grimm—used the boys' bathrooms for *weeks* without incident before *other adults in the community—not students*—complained of this use. Second, as the Seventh Circuit observed, a "transgender student's presence in a restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak

glances at his or her classmates performing their bodily functions." *Whitaker*, 858 F.3d at 1052. Third, if school districts were genuinely concerned with protecting the privacy of students who have different-looking anatomies, "then it would seem that separate bathrooms also would be appropriate for pre-pubescent and post-pubescent children who do not look alike anatomically," which the school district had not provided. *Id.* at 1052–53. This Court declines to further evaluate the legitimacy of the purported privacy concerns. The record here is less developed than it was in *Whitaker*. However, the Court underscores that, as pled by Mr. Grimm, Mr. Grimm used the boys' bathrooms for weeks without incident.

The Court concludes that, as pled by Mr. Grimm, the policy at issue was not substantially related to protecting other students' privacy rights. *See M.A.B.*, 286 F. Supp. 3d at 724–26.[12] There were many other ways to protect privacy interests in a non-discriminatory and more effective manner than barring Mr. Grimm from using the boys' restrooms. For example, the Board had taken steps "to give all students the option for even greater privacy" by installing partitions between urinals and privacy strips for stall doors. ECF No. 113 ¶ 57. Additionally, students who wanted greater privacy for any reason could have used one of the new single-stall restrooms made available upon implementation of the policy. *See Grimm I*, 822 F.3d at 728–29 (Davis, J., concurring). Furthermore, as the *M.A.B.* court recognized, it is significant when a

---

[12] The Court emphasizes that *M.A.B.* rejected the defendants' argument that single-use restrooms and stalls in the boys' locker room would be insufficient to assuage privacy concerns, because "if M.A.B. changing clothes in the designated restrooms makes him feel humiliated and embarrassed . . . then students who use those restrooms for greater privacy will feel the same way." 286 F. Supp. 3d at 724.

*M.A.B.* rejected that argument for four reasons: (1) the policy interfered with M.A.B.'s health and well-being because it prevented him from social transitioning, as required for treating his gender dysphoria; (2) M.A.B. was *required* to use the designated restrooms, unlike the students who had the *option* to do so if they desired greater privacy; (3) the policy singled out M.A.B. "and marks him as different for being transgender," again in contrast to students for whom using a single-stall restroom carried no stigma; and (4) "even if some boys feel humiliated, embarrassed, or alienated for deciding to change clothes in a single-use restroom or stall, changing there still serves [the defendants'] privacy concerns because those boys still enjoy greater privacy." *Id.* at 724–25. The Court agrees with *M.A.B.*'s reasoning.

school board fails to provide "any explanation for why completely barring [the transgender student] from the boys' [segregated facility] protects the privacy of other boys," "while the availability of single-use restrooms or locker stalls does not." *M.A.B.*, 286 F. Supp. 3d at 725. As in *Whitaker* and *M.A.B.*, preventing Mr. Grimm from using the boys' restrooms did nothing to protect the privacy rights of other students, but certainly singled out and stigmatized Mr. Grimm. *Id.*

Similarly, the Board's argument that the policy should not be construed as violating the Equal Protection Clause because the policy treated all boys and girls the same is unavailing. ECF No. 136 at 26–37. The Policy singled out Mr. Grimm for differing treatment because it "treat[ed] transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth[] differently," whereas a boy making the personal choice to change clothes in or use a single-stall restroom would not have been singled out by the school policy. *Whitaker*, 858 F.3d at 1051; *see also Grimm I*, 822 F.3d at 729 (Davis, J., concurring) ("For other students, using the single-stall restrooms carries no stigma whatsoever, whereas for G.G., using those same restrooms is tantamount to humiliation and a continuing mark of difference among his fellow students.").

For these reasons, the Court concludes that Mr. Grimm has sufficiently pled that the Policy was not substantially related to protecting other students' privacy rights, because there were many other ways to protect privacy interests in a non-discriminatory and more effective manner than barring Mr. Grimm from using the boys' restrooms. The Board's argument that the policy did not discriminate against any one class of students is resoundingly unpersuasive. Accordingly, the Court declines to dismiss his Equal Protection Claim.

IV.    CONCLUSION

For the reasons set forth herein, the Amended Motion to Dismiss (ECF No. 135) is DENIED.  The Motion to Dismiss (ECF No. 118) is DISMISSED as moot.

Counsel for the parties are DIRECTED to contact the Courtroom Deputy for the United States Magistrate Judges at (757) 222-7222 within thirty days of entry of this Order to schedule a settlement conference.

IT IS SO ORDERED.

 

/s/

Arenda L. Wright Allen
United States District Judge

May 22nd, 2018
Norfolk, Virginia