IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| GAVIN GRIMM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 4:15-cv-54-AWA-DEM |
| | ) |
| GLOUCESTER COUNTY SCHOOL | ) |
| BOARD, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS .......................................................................... 3

    Gavin's Experience Before Tenth Grade ............................................................................ 3

    School Administrators' Response to Gavin's Transition...................................................... 7

    The School Board Intervenes................................................................................................ 11

    The "Alternative Private Facilities"..................................................................................... 16

    Impact of the Policy on Gavin ............................................................................................. 18

    The Board Declares Gavin's Court Order and New Birth Certificate Not "Relevant" .......... 20

    The Board Publicly Rejects a Settlement Proposal.............................................................. 25

    The Board Asserts for the First Time that "Biological Gender" Refers to the Gender
        Marker on a Student's Current Birth Certificate.............................................................. 27

ARGUMENT ...................................................................................................................... 31

    I.   Legal Standard. .......................................................................................................... 31

    II.  The Board's Policy Violates Title IX. ....................................................................... 31

        A.      The Board's Policy Discriminated Against Gavin "On the Basis of Sex." .......... 32

        B.      The Board's Policy Harmed Gavin. ................................................................... 35

    III. The Board's Policy Violated the Equal Protection Clause. ............................................ 38

    IV. The Board's Refusal to Update Gavin's Transcript to Match His Birth Certificate
        Violates Title IX and the Equal Protection Clause. ......................................................... 44

CONCLUSION.................................................................................................................... 47

CERTIFICATE OF SERVICE ............................................................................................. 48

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cty., MD*, 515 F.3d 356 (4th Cir. 2008).............................. 45

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*,
    318 F. Supp. 3d 1293 (M.D. Fla. 2018) ......................................................................... passim

*Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ................................................ 47

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)........................................................................ 47

*Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013) ........................................... 50

*Church of Our Lord & Savior Jesus Christ v. City of Markham*,
    913 F.3d 670 (7th Cir. 2019) ...................................................................................... 41

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985). ......................................... 46

*Cohen v. Brown  Univ.*, 991 F.2d 888 (1st Cir. 1993). ................................................................ 50

*Daniel v. Paul*, 395 U.S. 298 (1969)........................................................................................... 39

*Davis ex rel. LaShonda v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999). .............................. 37

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018).......................................................................................... 35

*Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771 (S.D.W.Va. 2012).................................... 49

*Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp. 3d 267 (W.D. Pa). ....................................... 46

*G.G. v. Gloucester Cnty. Sch. Bd.*,822 F.3d 709 (4th Cir. 2016)................................................ 33

*G.G. v. Gloucester Cty. Sch. Bd.*, 853 F.3d 729, (4th Cir. 2017)....................................... 2, 39, 47

*Heckler v. Mathews*, 465 U.S. 728 (1984)................................................................................... 39

*Henry v. Greenville Airport Comm'n*, 284 F.2d 631 (4th Cir. 1960) ........................................... 49

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,286 F. Supp. 3d 704 (D. Md. 2018) .................................. 34

*Marks v. City of Chesapeake, Va.*, 883 F.2d 308 (4th Cir. 1989)................................................ 45

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........................................................ 49

*Norwood v. Harrison*, 413 U.S. 455 (1973) ................................................................. 38

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ....................................................... 46, 47, 50

*Parents for Privacy v. Dallas Sch. Dist. No. 2*,
    326 F. Supp. 3d 1075 (D. Or. 2018) ...................................................................... 35

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,
    262 F.3d 260 (4th Cir. 2001) ............................................................................... 41

*Raub v. Campbell*, 785 F.3d 876, (4th Cir. 2015) ......................................................... 49

*Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471 (4th Cir. 2017) ................... 33

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................................... 39

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................... 42

*Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273 (1987) .............................................. 47

*Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*,
    No. 1:05-CV-824, 2006 WL 3613673 (W.D. Mich. Dec. 11, 2006) ............................ 38

*United States v. Virginia*, 518 U.S. 515 (1996). ......................................................... 42

*United States v. Windsor*, 133 S. Ct. 2675 (2013) ...................................................... 50

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir.) ................................................................................. 34, 43

**Statutes**

20 U.S.C. § 1681(a) ............................................................................................. 1, 32

20 U.S.C.§ 1681 ...................................................................................................... 1

Va. Code § 32.1-270 ............................................................................................... 30

**Other Authorities**

Am. Psychological Ass'n & Nat'l Ass'n of Sch. Psychologists, *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools* (2015) ...................... 11

Amicus Br. of Am. Acad. of Pediatrics, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 244 (4th Cir.) ............................................................................. passim

Amicus Br. of NAACP LDF, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 146-1 (4th Cir.) .................................................................................. 47

Amicus Br. of Nat'l PTA, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 145-1 (4th Cir.) ................................................................................. 9

Amicus Br. of Sch. Adm'r from Thirty-Three States and D.C., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 155 (4th Cir.) ...................................................................... 11

Bd. Supp. Br., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 11 (4th Cir.) ................................................................................ 25, 36

Bd. Supp. Reply Br., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 224 (4th Cir.) .............................................................................. 25, 36

Board Br. in Support of Mot. to Dismiss, *Grimm v. Gloucester Cty. Sch. Bd.*, No. 4:15-cv-00054 (E.D. Va.), ECF No. 136 ......................................................................... 36

Board Supp. Br., *Grimm v. Gloucester Cty. Sch. Bd.*, No. 15-2056 (4th Cir.), ECF No. 119 ...................................................................................... 36

*G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 117 (4th Cir.) ..................................... 25

Gender Spectrum, *Transgender Students and School Bathrooms: Frequently Asked Questions* (2016) ................................................................................................................. 11

Mot. to Expedite, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 102 (4th Cir.). ................................................................................. 25

Nat'l Ass'n of Secondary Sch. Principals, *Position Statement on Transgender Students* (2016) ................................................................................................................. 11

Petitioner's Br., *Gloucester Cty. Sch. Bd. v. G.G.*, No. 16-273 (U.S) .......................................... 36

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56, Plaintiff Gavin Grimm ("Gavin") respectfully submits this Memorandum of Law in Support of Summary Judgment.

For almost three years, the Gloucester County School Board (the "Board") prohibited Gavin from using the same restrooms as other boys because he is transgender. That degrading and stigmatizing policy singled Gavin out as unfit to use the same restrooms as every other student. This Court already resolved the core legal questions in this case when it denied the Board's Motion to Dismiss the First Amended Complaint and granted permission for Plaintiff to file his Second Amended Complaint. *See* ECF Nos. 148, 178. The parties have now completed discovery, and there are no disputed material facts. Gavin has presented undisputed evidence recounting the many ways in which he was harmed by the Board's policy, and the Board has presented no evidence to support the contention that its decision to banish Gavin from the same restrooms as other boys actually served its asserted interest in protecting privacy rights related to nudity. Gavin is entitled to judgement on his claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and the Equal Protection Clause as a matter of law.

Indeed, the Board's conduct during discovery has only confirmed the irrationality and cruelty of its policy. The Board has spent years arguing to this Court, the Fourth Circuit, and the Supreme Court that Gavin's court order and birth certificate designating him as "male" are irrelevant under the "biological gender" restroom policy. But on the final day of discovery the Board reversed its position and produced a 30(b)(6) witness who asserted for the first time that

the policy defines "biological gender" based on a student's birth certificate after all—not based on an assessment of the student's physiology. According to the witness, the policy allows transgender students to use restrooms that align with their gender identity if they obtain a valid birth certificate changing their gender marker.

If the Board's last-minute assertions are to be believed, then Gavin should have been allowed to use the boys' restroom for most of his senior year. Gavin has a Virginia court order and Virginia birth certificate declaring his sex is male, which was issued on October 27, 2016, when Gavin was still in twelfth grade. But—according to the 30(b)(6) witness—the Board refuses to accept the validity of Gavin's birth certificate because of purported doubts about its authenticity that the Board never communicated to Gavin, his family, or his attorneys. The Board admits it has never made any attempt to verify the authenticity of Gavin's birth certificate with the Virginia Department of Vital Records. If they had ever expressed these alleged concerns, they could have been easily resolved. *See* Decl. of Virginia Registrar Janet Rainey ¶ 3 (confirming authenticity of Gavin's birth certificate). Even crediting the Board's last-minute assertions and drawing all inferences in the Board's favor, the undisputed evidence shows—at a minimum—that the Board deviated from its normal practice by rejecting Gavin's birth certificate and court order without ever explaining the basis for its decision. Instead, the Board continued to tell the Supreme Court and the Fourth Circuit that Gavin's court order and birth certificate were not "relevant," as it opposed his repeated requests to use the boys' restrooms before he graduated. In doing so, the Board ensured that Gavin's "banishment from the boys' restroom bec[ame] an enduring feature of his high school experience." *G.G. v. Gloucester Cty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017), *as amended* (Apr. 18, 2017) (Davis, J., concurring, joined by Floyd, J.).

2

"[S]ome entities will not protect the rights of others unless compelled to do so." *Id.*
Gavin's motion for summary judgment should be granted.

## STATEMENT OF UNDISPUTED FACTS

### Gavin's Experience Before Tenth Grade

1.  When Gavin was born, the hospital staff designated him as female, but from a young age, Gavin knew that he was a boy. *See* Gavin Grimm Decl. ¶¶ 6-7. "I always saw myself as a boy," explains Gavin. *Id.* ¶ 6. "[I] identified with male cartoons, and related to male characters. During imaginary play as a young child, I always cast myself in a male role." *Id.* He recalls, "I had an understanding that the female physical and social role I was assigned were inaccurate. However, I did not have the language at the time to vocalize those feelings." *Id.* ¶ 7.

2.  Everyone has a gender identity. It is an established medical concept, referring to a person's deeply felt, inherent sense of belonging to a particular gender. *See* Penn Expert Rep. & Decl. ¶ 17 (Medley-Warsoff Decl. Ex. 3); *accord* Amicus Br. of Am. Acad. of Pediatrics, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 244 (4th Cir.) ("AAP Amicus"), at 21 (Medley-Warsoff Decl. Ex. 38).[1] Most people have a gender identity that matches the sex they

---

[1] In support of summary judgment, Gavin has submitted the expert report and declaration of Dr. Melinda Penn, a pediatric endocrinologist at the Children's Hospital of the King's Daughters in Norfolk, Virginia, who specializes in treating transgender youth. Penn Expert Rep. & Decl. ¶ 3. Dr. Penn previously practiced at Virginia Commonwealth University ("VCU") in Richmond, where she founded and co-directed VCU's Pediatric and Adolescent Transgender Clinic. *Id.* ¶ 5. Over the past five years, she has treated over 100 transgender youth in Virginia in accordance with the recommendations of the American Academy of Pediatrics and the Endocrine Society. *Id.* ¶ 9. The statements in her expert declaration are also consistent with an amicus brief in support of Gavin that was submitted by the American Academy of Pediatrics and other major medical organizations. *See* AAP Amicus.

The Board's designated expert, Dr. Quentin Van Meter, does not dispute that Dr. Penn's expert declaration is consistent with the recommendations of the American Academy of Pediatrics and the

are designated as at birth. *See* Penn Expert Rep. & Decl. ¶ 18. But people who are transgender have a gender identity that differs from their birth-assigned sex. *Id.* ¶ 19. Boys and girls who are transgender are people who consistently, persistently, and insistently do not identify with the sex assigned to them at birth. *Id.*

3.     By around age twelve, once Gavin was able to exercise more autonomy about how he dressed and groomed, he wore clothing exclusively from the boys' section of stores and cut his hair short in a style traditionally associated with boys. *See* Gavin Grimm Decl. ¶ 11. "Everyone who knew me still assumed that I was a girl because I had not at that time discovered the word transgender and how that related to who I was," explains Gavin. "But, outwardly, I presented very masculine, and that was not something that was unnoticed by peers and friends." *Id.* ¶ 13. Gavin presented in such a masculine manner that on several occasions when he attempted to use women's restrooms in public, women who did not know him would confront him and tell him to leave. *Id.*

4.     Eventually, Gavin learned about the term "transgender" from the internet, and he realized that there was a word for the feelings he had felt all his life. *Id.* ¶ 14. Gavin had very few friends when he was younger, but once he acknowledged his male gender identity and felt more comfortable with himself, he began to form a group of close friends. *Id.* ¶ 15. He gradually began disclosing to friends that he was a boy. *Id.* ¶ 16. Since his friends were generally positive and supportive, he disclosed his gender identity to more friends. By ninth grade, most of Gavin's

---

Endocrine Society. Van Meter Expert Rep. ¶¶ 34-35 (Medley-Warsoff Decl. Ex. 7). Dr. Van Meter simply disagrees with those recommendations and accuses the American Academy of Pediatrics of promoting an "ideology of transgenderism." *Id.* ¶ 34.

friends were aware of his gender identity, and he lived openly as a boy when socializing with friends away from home and school. *Id.*

5.      But with the onset of puberty, Gavin began to suffer debilitating levels of distress from gender dysphoria, a condition in which transgender individuals experience clinically significant distress caused by the incongruence between their gender identity and the sex assigned to them at birth. *See* Penn Expert Rep. & Decl. ¶ 21.[2] By the time Gavin neared the end of his freshman year at Gloucester High School in the spring of 2014, the distress caused by his untreated gender dysphoria became so great that he was unable to attend class. *See* Gavin Grimm Decl. ¶ 19. Gavin explains, "My social anxiety related to being gendered incorrectly was so bad that I was afraid to go outside, where I might encounter other people. I was miserable, and as a result, could not focus academically." *Id.*

6.      In April of 2014, Gavin came out to his parents as a boy. *See* Deirdre Grimm Decl. ¶ 7; Gavin Grimm Decl. ¶ 20.

7.      At Gavin's request, he began seeing a psychologist with experience counseling transgender youth, who diagnosed Gavin with gender dysphoria. *See* Gavin Grimm Decl. ¶ 24. To be diagnosed with gender dysphoria, the incongruence between a person's gender identity and sex assigned at birth must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. *See* Penn Expert Rep. & Decl. ¶ 21.

8.      The standard of care for the treatment for gender dysphoria that is recognized by the American Academy of Pediatrics and every major medical and mental health professional

---

[2] For many transgender adolescents, this distress can become more extreme if they go through puberty in accordance with their sex assigned at birth. Penn Expert Rep. & Decl. ¶ 27.

organization in the United States is to eliminate the clinically significant distress by helping boys who are transgender to live as boys and girls who are transgender to live as girls. *Id.* ¶ 23; AAP Amicus at 12-15. Before puberty, this treatment—often referred to as gender transition—does not involve drugs or surgical intervention and is limited to "social transition," which means allowing transgender children to live and be socially recognized in accordance with their gender identity. *See* Penn Expert Rep. & Decl. ¶ 25. This includes permitting children to dress, cut or grow their hair, and use names and pronouns and restrooms and other sex-separated facilities consistent with their gender identity. *Id.*; AAP Amicus at 14.

9. Under guidelines from the Endocrine Society, transgender adolescents may be eligible for puberty-blocking hormone therapy if a qualified mental health professional confirms certain diagnostic criteria, including that the adolescent has had a long-lasting and intense pattern of gender dysphoria, and that the dysphoria worsened with the onset of puberty. *See* Penn Expert Rep. & Decl. ¶ 26. Once the transgender young person establishes maturity and competence to make decisions about treatment, they may receive gender-affirming hormone therapy to allow them to go through puberty consistently with their gender identity. *Id.* ¶ 29. Under current standards of care, transgender adolescents may receive medically necessary chest reconstructive surgeries once they turn sixteen, and genital surgery once they reach the age of majority. *Id.* ¶ 33.

10. With the help of his medical providers, Gavin transitioned to living in accordance with his male identity as part of medically necessary treatment for gender dysphoria. *See* Gavin Grimm Decl. ¶ 24. Gavin legally changed his name to Gavin and began using male pronouns. *Id.* ¶¶ 23, 25. Gavin also began using the men's restrooms in public venues—including restaurants, libraries, and shopping centers—without encountering any problems. *Id.* ¶¶ 37, 38. His medical providers also referred Gavin to an endocrinologist for hormone therapy. *Id.* ¶ 24.

11.     Gavin's mother saw a dramatic change in Gavin. She had "understood for most of Gavin's early life that he struggled with something[.]" Deirdre Grimm Decl. ¶ 5. According to Gavin's mother, Gavin "never felt fully comfortable around people, and he had trouble being around big crowds at parties and events. Gavin's demeanor changed noticeably when he transitioned and started to live authentically as a boy. He is now confident and comfortable with himself. He is not that shy, anxious kid anymore." *Id.* ¶ 6.

**School Administrators' Response to Gavin's Transition**

12.     In August 2014, before the beginning of his sophomore year, Gavin and his mother met with a school guidance counselor, Tiffany Durr, to explain that Gavin is a boy who is transgender and would be attending school as a boy. *See* Gavin Grimm Decl. ¶¶ 26-27; Durr Dep. 9:8-10:9 (Medley-Warsoff Decl. Ex. 11). Gavin and his mother also gave Ms. Durr a treatment documentation letter from his psychologist, which confirmed that Gavin was receiving treatment for gender dysphoria and stated that he should be treated as a boy in all respects. *See* Gavin Grimm Decl. ¶ 24, Ex. A; Deirdre Grimm Decl. ¶ 11.

13.     Ms. Durr assured Gavin and his mother that Gavin would be called by his new legal name and be referred to with male pronouns by teachers and staff. *See* Gavin Grimm Decl. ¶ 27; Deirdre Grimm Decl. ¶¶ 11-12; Durr Dep.15:17-16:4.

14.     With respect to restrooms, Gavin and his mother agreed to a plan with Ms. Durr where Gavin would use the restroom in the nurse's office or teacher's lounge. *See* Durr Dep. 16:13-17:2.

15.     Once school started, however, Gavin soon began to feel it was "stigmatizing to use a separate restroom" and felt "anxiety and shame" from traveling to a different restroom from everyone else. Gavin Grimm Decl. ¶ 29. The restroom in the nurse's office was also located

far away from many of his school classes, and Gavin was often unable to use the restroom without being late for class. *Id.* Gavin recalls one time when he had to go the restroom, and when he returned from making the trip to the nurse's restroom and had missed some class time, his teacher "made a big public point about how long I had been gone in a way that I felt was humiliating." *Id.* ¶ 30. Other times, students would say things like, "what took you so long[?]" and make other snide remarks. *Id.*

16.     After a few weeks of using the restroom in the nurse's office, Gavin met with Ms. Durr and asked for permission to use the boys' restrooms. *Id.* ¶ 33; Durr Dep. 23:6-17.

17.     Ms. Durr brought the request to Principal Nate Collins. She told Principal Collins that allowing Gavin to use the boys' restroom would be in Gavin's best interest. *See* Durr Dep. 27:7-21, 37:10-15.

18.     The Director of Counseling, Matt Lord, also recommended that Gavin be allowed to use the boys' restrooms and said it would be in Gavin's best interest. *See* Collins Dep. 47:1-4 (Medley Warsoff Decl. Ex. 9); Lord Dep. 29:8-19 (Medley-Warsoff Decl. Ex. 12). Mr. Lord also provided Principal Collins with guidance and best practices regarding the treatment of transgender students in schools. *See* Collins Dep. 47:1-4.

19.     Ms. Durr and Mr. Lord's recommendations were consistent with the recommendations of the American School Counselor Association, National Association of School Psychologists, American Academy of Pediatrics, American Medical Association, American Psychiatric Association, and American Psychological Association. All of these organizations agree that excluding boys and girls who are transgender from the same restrooms as other boys and girls is harmful to their health and well-being. *See* AAP Amicus at 19-28;

*accord* Amicus Br. of Nat'l PTA, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 145-1 (4th Cir.) ("Nat'l PTA Amicus"), at 16-19 (Medley-Warsoff Decl. Ex. 40).

20.    Principal Collins also spoke with Superintendent Walter Clemons about Gavin's request. *See* Collins Dep. 46:6-12. Superintendent Clemons consulted with legal counsel at Reed Smith LLP and an attorney from the Virginia School Board Association. *See* Hook e-mail dated October 27, 2014 (GCSB 0853) (Medley-Warsoff Decl. Ex. 18); Clemons Dep. 21:10-11 (Medley-Warsoff Decl. Ex. 10).

21.    Superintendent Clemons then told Principal Collins that he would support whatever decision Principal Collins made. *See* Clemons Dep. 24:4-20; Collins Dep. 49:7-50:1. Superintendent Clemons believed Principal Collins to be a good principal, and trusted his judgment to handle day-to-day concerns that came up at Gloucester High School. *See* Clemons Dep. 14:1-16. Based on his decades of experience as a school administrator, Superintendent Clemons believed that principals should "have the authority to work with students on a case-by-case basis to try to do what's in the best interest of the student[.]" *Id.* at 23:3-5.[3]

22.    After meeting with Gavin and his mother, Principal Collins decided that allowing Gavin to use the same restrooms as other boys would be in his best interest. Based on his years of experience and training as a school administrator, Principal Collins believed that it is important as a principal to cultivate a welcoming environment for all students because "students learn best when they feel safe and secure and comfortable in their environment." Collins Dep.

---

[3] Superintendent Clemons received a Ph.D. in Educational Leadership and Policy from Virginia Tech, and a Certificate of Advanced Study in Educational Administration from Old Dominion University. Clemons Dep. 11:11-19. Before working in the Gloucester School District, Superintendent Clemons had over fifteen years of experience as a superintendent, assistant superintendent, and principal. *Id.* at 8:9-10:4.

22:9-11.[4] According to Principal Collins, a welcoming and inclusive environment "has benefits for all students" by "help[ing] students develop connections within the school community" and "help[ing] them better understand students of different backgrounds[,]" which is an important part of the educational process. *Id.* at 22:21-23:1.

23.     Principal Collins' decision was consistent with the views of the National Association of School Psychologists, National Association of Secondary School Principals, National Association of Elementary School Principals, and American School Counselor Association, which have all called upon schools to allow boys and girls who are transgender to use the same restrooms as their peers consistent with their gender identity. *See* Am. Psychological Ass'n & Nat'l Ass'n of Sch. Psychologists, *Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Schools* (2015) ("APA & NASP Resolution") (Medley-Warsoff Decl. Ex. 41); Gender Spectrum, *Transgender Students and School Bathrooms: Frequently Asked Questions* (2016), (Medley-Warsoff Decl. Ex. 42); Nat'l Ass'n of Secondary Sch. Principals, *Position Statement on Transgender Students* (2016) ("NASSP Statement") (Medley-Warsoff Decl. Ex. 43).

24.     Educators and school administrators across the country recognize that excluding boys and girls who are transgender from using the common restrooms interferes with their ability to learn and thrive at school. *See* Bruce Decl. ¶¶ 4-8; Aberli Decl. ¶¶ 20-21; Amicus Br. of Sch.

_____

[4] Principal Collins received a master's degree in Educational Administration and is pursuing a doctoral degree in Educational Leadership from the University of Virginia. Collins Dep. 16:9-16. Before working at Gloucester High School, Principal Collins had over decade of experience as an assistant principal, principal, director of secondary instruction, and executive director of curriculum and instruction. *Id.* at 10:1-11:19.

Adm'r. from Thirty-Three States and D.C., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 155 (4th Cir.) ("School Administrator Amicus") at 25 (Medley-Warsoff Decl. Ex. 39).

25.     After making his decision, Principal Collins met with Gavin and his mother again, and he informed them that Gavin would be able to use the boys' restrooms beginning on October 20, 2014. *See* Collins Dep. 54:16-55:5. Principal Collins documented the discussion in a written memo to Gavin's mother confirming that "Gavin may go to any male student restroom at Gloucester High School." Collins memo dated 10/14/2014 (GCSB 894) (Medley-Warsoff Decl. Ex. 15). The memo also stated that "[i]f Gavin believes a verbal harassment and[/]or threatening language/behavior has been directed toward him, or if there is any other conflict, he will notify Ms. Durr immediately." *Id.*

26.     Principal Collins did not think that by allowing Gavin to use the same restrooms as other boys, he was making a commitment that transgender students would also be allowed to use the same locker rooms as other boys and girls. His decision was "focused on the restroom specifically." Collins Dep. 54:13.

**The School Board Intervenes**

27.     Gavin used the same restrooms as other boys for seven weeks without incident: "Over the course of those seven weeks, I had a single conversation with a student in the restroom," Gavin recalls. "He asked me if I liked his socks, and I said yes." Gavin Grimm Decl. ¶ 36.

28.     Although Gavin never encountered any problems while using the restroom, some adults in the community learned that a boy who is transgender was using the boys' restrooms at Gloucester High School and complained. *See* Collins Dep. 66:1-22; Clemons Dep. 32:16-33:6; Def.'s Response to First Set of Interrogatories at ¶ 1 (Medley-Warsoff Decl. Ex. 1). They

contacted Principal Collins, Superintendent Clemons, and members of the Board to demand that the transgender student (who was not publicly identified as Gavin until later) be barred from the boys' restrooms.

29.     One student also complained to Principal Collins in person. *See* Def.'s Responses to First Set of Interrogatories at ¶ 1.

30.     None of the complaints from students or parents involved any actual instance in which someone was in the restroom when Gavin was present and felt that their privacy had been violated. *Id.*

31.     After receiving some complaints, Superintendent Clemons contacted the Board on October 22, 2014, and told them there were two issues he wanted to discuss "in closed session," including "a transgender issue." *See* Clemons email dated 10/22/14 (WAVYTVFOIA 007) (Medley-Warsoff Decl. Ex. 16).

32.     Superintendent Clemons also told Principal Collins to prepare a memorandum regarding his decision to allow Gavin to use the boys' restrooms, and he asked Principal Collins to be present at the closed work session with the Board to share information about the situation. *See* Collins Dep. 79:16-80:7; Clemons Dep. 34:11-14. Principal Collins prepared a memo summarizing the school counselors' previous interactions with Gavin and the events leading up to Principal Collins' decision to allow Gavin to use the same restrooms as other boys. *See* Collins memo dated 10/23/14 (GCSB 4122) (Medley-Warsoff Decl. Ex. 17).

33.     At the work session, the Board decided not to take any immediate action to overrule Principal Collins. *See* Hook email dated 10/31/14 (GCSB 0844) (Medley-Warsoff Decl. Ex. 19).

34.	Although Board members are not allowed to formally vote in closed sessions, Board member Carla Hook disclosed to a constituent that she "was in the minority" along with Board member Charles Records. *Id.* Ms. Hook told another constituent that she "oppose[s] cross-gendered use of the restroom facilities" and "strongly encourage[d]" the constituent "to attend the next [School Board] meeting during public comment period." Hook email dated 10/24/14 (GCSB-0854) (Medley-Warsoff Decl. Ex. 18).

35.	Unsatisfied with the results of the private work session, Ms. Hook wrote an email to the rest of the Board stating that she wanted "to add appropriate use of restroom/locker room facilities to the agenda" for public debate at the Board's meeting on November 11, 2014. *See* Hook email to Board dated 11/4/14 (GCSB 0513) (Medley-Warsoff Decl. Ex. 20).

36.	Ms. Hook drafted and proposed the following policy two days before the meeting:

Whereas the GCPS recognizes that some students question their gender identities, and

Whereas the GCPS encourages such students to seek support and advice from parents, professionals and other trusted adults, and

Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore

It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Hook email to the Board dated 11/9/14 with attachment (GCSB 0507-08) (Medley-Warsoff Decl. Ex. 21).

37.	Ms. Hook drafted the policy on her own without consulting any medical professionals. *See* Def.'s Responses to First Set of Interrogatories at ¶ 6.

38.     Before the public School Board meeting, no one had ever informed Gavin about any of the complaints received by the Board. *See* Collins Dep. 87:11-88:21. No one spoke with Gavin about potential compromises that could be made privately. *Id.* at 88:16-89:14. No one alerted Gavin that the issue would soon be discussed at a public School Board meeting before the news media and the general public. *See* Gavin Grimm. Decl. ¶ 39. Gavin and his mother learned about the meeting on social media less than 24 hours beforehand through a Facebook post urging people to show up to oppose allowing "a girl to use the boys' restrooms." *Id.*

39.     Gavin and his parents decided to attend the meeting and speak against the proposed policy: "After having the experience of being treated just like other boys, I could not sit on the sidelines and let [them] take it away from me[,]" explains Gavin. "If I did not speak up, the conversation would have been held without me and with no one to support me. Since it was a conversation about my future, I wanted to be included." *Id.* ¶ 40.

40.     In order to speak, Gavin was forced to reveal himself to the entire community and the local media as the boy whose restroom use was at issue. A recording of his remarks can be viewed online at https://goo.gl/CYh4gd.

41.     The School Board voted 4-3 to defer a vote on the policy until its meeting on December 9, 2014. *See* Recorded Minutes of the Gloucester County School Board, November 11, 2014 at 4 (Medley-Warsoff Decl. Ex. 37). During that time, Gavin continued to use the boys' restrooms at school without incident. Gavin Grimm Decl. ¶ 36.

42.     Before the next Board meeting, the Board issued a press release announcing "plans to designate single stall, unisex restrooms … to give all students the option for even greater privacy." Press Release dated 12/3/14 (GCSB 0592) (Medley-Warsoff Decl. Ex. 22). The press release also announced plans for "adding or expanding partitions between urinals in

male restrooms, and adding privacy strips to the doors of stalls in all restrooms." *Id.* Photographs

for the new stalls and partitions are available as attachments to the Declaration of James Loving.[5]

43.     Despite the additional privacy protections announced in the Board's press release,

speakers at the December 9, 2014 Board meeting nonetheless demanded that Gavin be excluded

from the boys' restrooms immediately. Many threatened to vote Board members out of office if

they refused to pass the new policy. *See* Medley-Warsoff Decl. ¶¶ 44-47. With Gavin in

attendance, several speakers pointedly referred to him as a "young lady." *Id.* ¶ 48. One speaker

called Gavin a "freak" and compared him to a person who thinks he is a "dog" and wants to

urinate on fire hydrants. *Id.* ¶¶ 49-50. "Put him in a separate bathroom if that's what it's going to

take," said another. *Id.* ¶ 51.

44.     The Board meetings made Gavin feel that he had been turned into a public

spectacle in front of the entire community. *See* Gavin Grimm Decl. ¶ 43. Gavin's mother says:

> I remember one adult after another getting up there and talking about things that I don't
> even think were appropriate for them to be talking about. These people were talking
> about his private body parts. I just remember how appalled I felt for Gavin and how
> scared it made me that he wouldn't be able to struggle and live through all of this. Based
> on what I had read about transgender youth and the suicide risks, I was already scared for
> Gavin's life. Then we went to this horror show of school board meeting, and it just made
> me even more fearful of the impact on him of his community not accepting him.

Deirdre Grimm Decl. ¶ 21.

---

[5] The Board's press release also touted that the Board "has received legal guidance from several
sources, both locally and around the state." Press Release dated 12/3/14. The release specifically noted
that several Board members and Superintendent Clemons recently attended at the Virginia School Boards
Association's annual conference, "which had an entire working session, 'Transgender Protections in
Public Schools: Recent Developments,' presented by a law firm." *Id.* The law firm presentation
specifically recommended that transgender students be allowed to use restrooms that align with their
gender identity. VSBA Presentation at 9 (GCSB 04221-31) (Medley-Warsoff Decl. Ex. 27).

45. The Board passed the policy on December 9, 2014, by a 6-1 vote. *See* Recorded Minutes of the Gloucester County School Board, December 9, 2014, at 3 (Medley-Warsoff Decl. Ex. 23).

46. The following day, Principal Collins told Gavin he could no longer use the same restrooms as other boys. *See* Collins Dep. 105:12-106:2. In a letter to Gavin's parents, Principal Collins wrote that, because of the Board's newly adopted policy, "Gavin will no longer be able to use the male restrooms at Gloucester High School effectively immediately." Collins memo to Deirdre and David Grimm dated 12/10/2014 (GCSB 0893) (Medley-Warsoff Decl. Ex. 24).

47. The Board's new policy did not affect the restroom usage of any other student at Gloucester High School. Every other student was allowed to continue using the same restrooms they had been using before the new policy was adopted. The only person who had to use a different restroom was Gavin. *See* Gavin Grimm Decl. ¶ 50.

### The "Alternative Private Facilities"

48. Although the Board's press release touted the availability of new single-user restrooms, there was a period of time after the Board passed its restroom policy before the new single-user restrooms were constructed. Gavin Grimm Decl. ¶ 46. At one point during that time, Gavin stayed after school for an event, and he realized that the nurse's office was locked and it would be several hours before his parents could pick him up. *Id.* ¶ 46. When Gavin realized he had to use the restroom and had nowhere to go, he broke down sobbing in the library. *Id.* A librarian saw him and drove him home so he could use the restroom. *Id.*

49. When the single-user restrooms were installed, they were all located far from Gavin's classes. *Id.* ¶ 49. Classrooms at Gloucester High School are located in four different wings of the school: A Hall, B Hall, C Hall, and D Hall. *See* Map of Gloucester High School

(GCSB 1276) (Medley-Warsoff Decl. Ex. 28); Annotated Map of GHS (Medley-Warsoff Decl. Ex. 29). Every hall has common restrooms for students to use near their classes. *See* List of Restrooms at GHS (GCSB 03944) (Medley-Warsoff Decl. Ex. 30). Most of Gavin's classes were in "D Hall." *See* Collins memo dated 10/23/14 (Medley-Warsoff Decl. Ex. 17). But there were no single-user restrooms there. *See* Annotated Map of GHS. Two of the single-stall restrooms were converted from old locker rooms for the custodial staff near the cafeteria. *See* Collins Dep. 100:6-13. A third restroom was located in A Hall near the nurse's office. *Id.* at 108:9-11.

50.     Photographs of one of the single-stall restrooms near the cafeteria are available as attachments to the Loving Decl.

51.     The school administrators had initially planned to convert a faculty restroom in "C Hall" into one of the single-user restrooms, but faculty who taught in the "C Hall" complained. *Id.* at 92:11-94:5. The teachers explained that they could not use a restroom further away because they have only five minutes between classes. One teacher noted that waiting until lunch would require the teachers to avoid using the restroom from 8:00 a.m. to 12:30 p.m., which "is a very long time for anyone to wait." Collins Dep. 103:16-22; Email to Nate Collins dated 11/19/2014 (GCSB 3932) (Medley-Warsoff Decl. Ex. 25). In response to these faculty concerns, the administration abandoned the plan to install a single-stall restroom on "C Hall." Collins Dep. at 94:8-11.

52.     Being relegated to the separate restrooms was demeaning and shameful for Gavin. Although any student was allowed to use the single-user restrooms, no one else was required to do so, and Gavin never saw any other student use them. *See* Gavin Grimm Decl. ¶ 48. The two restrooms near the lunchroom were visible from where Gavin and his friends ate lunch, but Gavin never saw any student use the restrooms. *Id.*

53.     Principal Collins testified that he thinks the single-stall restrooms were used by students because they had to be cleaned at the end of the day. *See* Collins Dep. 132:7-20. But Principal Collins never saw any student enter or exit the facilities. *Id.*

54.     Gavin felt that the separate restrooms sent a public message to him and all his peers that he is not fit to be treated like everyone else. *See* Gavin Grimm Decl. ¶ 45. Gavin explains, "it was humiliating for the School Board to take the position that there was something wrong with me, and that I should not be allowed to be with my peers in common spaces." *Id.*

**Impact of the Policy on Gavin**

55.     The Board's policy had a devastating impact on Gavin. "He felt so validated when he was allowed to use the boys' bathroom at school, just like a normal boy," explains Gavin's mother. "He had never felt like a normal boy up to that point because he hadn't been validated that way. They gave him that validation, and then they took it away." Deirdre Grimm Decl. ¶ 23.

56.     When the Board's policy first went into effect, Gavin expressed to his counselor, Ms. Durr, that he felt singled out by the Board's policy. *See* Durr Dep. 3:20-44:2. Although they met a couple of times during the remainder of his sophomore year after the policy was passed, Gavin did not feel that raising his concerns with the counseling department would provide any form of relief. *See* Gavin Grimm Decl. ¶ 53. Gavin "realized that talking to school counselors and administrators was pointless because the Board had already decided that it didn't care about my wellbeing. Counselors and administrators could not give me permission to use the boys' restroom[.]" *Id.*

57.     Gavin did everything he could to avoid using the restroom at school. *Id.* ¶¶ 51-52. As a result, he developed painful urinary tract infections and was often distracted and uncomfortable in class. *Id.* Gavin's mother remembers Gavin's frequent urinary tract infections.

*See* Deirdre Grimm. Decl. ¶ 26. The Grimm family "kept boxes of AZO, an over-the-counter medication for urinary tract infections, always stocked at home to in order to give him some relief from the pain." *Id.*

58.     When Gavin absolutely had to use the restroom, he used the nurse's restroom, but he still felt ashamed doing so. *See* Gavin Grimm Decl. ¶ 50. Every time he had to walk to the other side of school to use the nurse's restroom, Gavin felt like he was taking a "walk of shame." *Id.* It was a constant reminder to Gavin—and to anyone who saw him—that Gavin had been barred from using the same restrooms as other boys because he is transgender. *Id.* Being excluded from the common boys' restroom and forced to use separate restroom facilities also physically isolated Gavin from the rest of his peers by requiring him to travel to a separate part of the school if he had to use the restroom between classes. *Id.* ¶ 49.

59.     When Gavin attended school football games, there was no restroom that he could use. *Id.* ¶ 52. The Gloucester High School building was locked after school, and there are no single-user restroom facilities in the stadium. *Id.*

60.     On several occasions, Gavin was forced to leave a football game early because there was no restroom for him. *Id.* On one occasion, Gavin asked a friend to drive him to Lowe's or Home Depot to use the bathroom. *Id.* Another time, he called his mother to pick him up and take him home early. *Id.* Gavin's mom recalls picking him up on that occasion and Gavin saying "[my] bladder was about to burst." Deirdre Grimm Decl. ¶ 25.

61.     By the beginning of his junior year, Gavin's distress was so great that he could no longer attend class. One night, Mrs. Grimm "found him sobbing on the bathroom floor, and he begged [her] to take him somewhere because he was having thoughts of suicide." *Id.* ¶ 24. She took him to the hospital at VCU, where he stayed for several days on the boys' ward. *Id.*

62.     After leaving VCU, Gavin completed eleventh grade in an independent study program at the "T.C. Walker" building, which is a separate location where students can complete course credits online. *See* Gavin Grimm Decl. ¶ 55. All the students in the independent study program used a single-stall restroom that was near the classroom, so Gavin "was able to use this restroom without being singled out and treated differently from everyone else." *Id.*

63.     The independent study program was not offered at "T.C. Walker" the following year. Gavin returned to Gloucester High School for twelfth grade, but he had earned enough academic credits that he was able to take a reduced course load. *Id.* ¶ 56. Gavin continued to use the nurse's restroom when he absolutely had to and stayed away from campus as much as possible. *Id.*

**The Board Declares Gavin's Court Order and New Birth Certificate Not "Relevant"**

64.     Over the course of tenth, eleventh, and twelfth grade, Gavin continued to medically transition and have his male gender recognized in legal documents:

    a.  In December 2014, Gavin began hormone therapy, which has altered his bone and muscle structure, deepened his voice, and caused him to grow facial hair. Gavin Grimm Decl. ¶ 60.

    b.  In June 2015, the Virginia Department of Motor Vehicles issued Gavin a state I.D. card identifying him as male. *Id.* ¶ 61.

    c.  In June 2016, Gavin underwent chest-reconstruction surgery, in accordance with the medical standards of care for treating gender dysphoria. *Id.* ¶ 62.

    d.  On September 9, 2016, the Gloucester County Circuit Court issued an order changing Gavin's sex under Virginia state law and directing the Virginia

Department of Health to issue Gavin a birth certificate listing his sex as male. *Id.* ¶ 63.

e. On October 27, 2016, the Virginia Department of Health issued Gavin a birth certificate listing his sex as male. *Id.* ¶ 64.

65. Despite all of this, the Board continued to prohibit its administrators from allowing Gavin to use the boys' restrooms. *See id.* ¶ 65.

66. In addition to barring Gavin from using the same restrooms as other boys, the Board refused to update the gender marker on Gavin's official school transcript to match the sex designation on his updated birth certificate. Gavin and his mother wanted to update his school records so that Gavin could apply to colleges with an official school transcript that identified him as "male" instead of "female." *See id.* ¶ 66; Deirdre Grimm Decl. ¶ 27. Gavin's mother remembers that "[w]hen Gavin was issued an updated birth certificate listing his gender as male, it was a celebration for us because we thought he could finally get his school records changed too. I personally walked an official copy of that document into the Gloucester High School guidance department, and handed it to the office secretary. They gave me the impression it would be no problem for them to update Gavin's records[.]" Deirdre Grimm Decl. ¶ 27.

67. But, despite Gavin and his mom's repeated requests, the Board refused to update Gavin's transcript. *See* Gavin Grimm Decl. ¶ 68. Gavin "went to the guidance office several times to ask when my school records would be updated, but never received an answer." *Id.* ¶ 67. "Finally, someone from the guidance office told me that they had been instructed to tell me: 'We have received your request. Thank you.'" *Id.*

68. The day after Gavin's birth certificate was issued, the Supreme Court granted a writ of certiorari in Gavin's case. *See* Supreme Ct. Docket for *Gloucester Cty. Sch. Bd. v. G.G.*,

No. 16-273, https://www.supremecourt.gov/search.aspx?filename=/docketfiles/16-273.htm. Principal Collins told the guidance department "that he would have to call the School Board office" regarding Gavin's request to change his school records and instructed the guidance department "to not change anything until [he] heard back." Lord Dep. 48:1-6. Ultimately, the guidance department was "told not to change it," but were offered no reasons why, other than this was an instruction from the School Board. *Id.* at 52:6-7.

69.     Because Gavin had received no response to his repeated requests, Gavin's attorneys wrote to counsel for the Board on December 23, 2016:

> Pursuant to our conversation, I am writing to request that Gavin Grimm's school records be updated so that any school records submitted in connection with Gavin's college applications identify him as male, in accordance with his amended birth certificate. Some college applications are due as early as January 3, 2017.
>
> I make this request in the hopes that we can amicably resolve this discrete issue in time for Gavin's applications to college.

Ltr. from J. Block to D. Corrigan dated 12/23/16 (Medley-Warsoff Decl. Ex. 31).

70.     On January 18, 2017, counsel for the Board provided the following response:

> In considering your request that "G.G.'s school records be updated so that any school records submitted in connection with G.G.'s college applications identify him as a male, in accordance with his amended birth certificate," the School Board considered the following:
>
> (1) The copy of the birth certificate that you provided, (attached);
>
> (2) The relevant school policy JO, (attached);
>
> (3) Virginia Code §32.1-269, (attached); and
>
> (4) Virginia Administrative Codes§ 12VAC5-550-320, § 12VAC5-550-450 and
>
> § 12VAC5-550-460, (attached).

> Based on the School Board's review of these materials, the School Board declines to change the official school records.

Ltr. from D. Corrigan to J. Block dated 1/18/17 (Medley-Warsoff Decl. Ex. 32). The Board and its counsel provided no explanation of how its "review of these materials" supported the Board's decision to "declin[e] to change the official school records" or otherwise identify the reason his birth certificate was not accepted as a basis to change his records.

71.     In legal filings, Gavin's attorneys repeatedly submitted copies of Gavin's court order and birth certificate, and the Board repeatedly told the courts that Gavin's court order and birth certificate were irrelevant to his motion for a preliminary injunction. At the Supreme Court, Gavin's attorneys filed a motion seeking permission to lodge Gavin's court order and updated birth certificate as additional evidence in the case. *See* Ltr. from J. Block to D. McNerney dated 1/18/17 (Medley-Warsoff Decl. Ex. 33). The Board opposed the motion, arguing that Gavin's birth certificate was legally irrelevant because the Board's legal position did not "turn on Respondent's birth certificate." Ltr. from K. Duncan to D. McNerney dated 1/19/17 (Medley-Warsoff Decl. Ex. 34).

72.

73.     On March 8, 2017—after the Supreme Court vacated and remanded the case to the Fourth Circuit for further consideration in light of a change in the Department of Education and Department of Justices' positions—Gavin moved for expedited consideration so his case could be decided before his graduation on June 10, 2017. *See* Mot. to Expedite, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 102 (4th Cir.). In support of that motion, Gavin again attached copies of his court order and birth certificate. *Id.* at 11-13. In supplemental

briefing one month before graduation, Gavin's attorneys argued that in light of Gavin's court order and birth certificate, Gavin's likelihood of success on his motion for a preliminary injunction was "overwhelming." Grimm Supp. Br., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 117 (4th Cir.) at 48. The Board once again contended that Gavin's court order and birth certificate were "not relevant to the resolution of any issue in this appeal." Bd. Supp. Br., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 11 (4th Cir.) at 11 n.5. And in a supplemental reply filed on June 2, 2017—a week before Gavin's graduation—the Board argued that it "was plainly permitted by law to determine Grimm's sex based on birth and physiology" and that his birth certificate "has no relevance here." Bd. Supp. Reply Br., *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 224 (4th Cir.) at 27.

74.     Gavin graduated high school on June 10, 2017. *See* Gavin Grimm Decl. ¶ 57.

75.     He is now 19-years old and attending Berkley City College in California. *Id.* ¶ 69. He hopes to later transfer to a four-year college. *Id.*

76.     Gavin says that "[l]iving through this experience has made me stronger than I ever thought I could be, but I am still deeply hurt and upset about what the School Board put me through for all those years. At the beginning of tenth grade, I finally had a chance to have a normal high school experience just like any other boy. The School Board took that away from me, and I will never get it back." *Id.* ¶ 58.

77.     The Board's refusal to update Gavin's transcript continues to affect Gavin even after graduation. Every time Gavin is required to provide a high school transcript to a college or potential employer, he must provide a transcript that—unlike all his other identification documents—declares that his sex is "female." *Id.* ¶ 69. "Every time I have to provide a copy of my transcript to a new school or employer, I will have to show them a document that negates my

male identity and marks me as different from other boys," he explained. "I think it is unfair that a high school that put me through so much is able to wield that much negative influence over my adult life." *Id*.

**The Board Publicly Rejects a Settlement Proposal**

78.　　Shortly before the close of discovery, the Board publicly announced that it was considering a new policy. In a press release dated February 13, 2019, the Board stated that it would hold a public hearing on February 19, 2019, regarding a proposed policy that "would allow transgender students to use the restroom consistent with the student's asserted gender identity when the following criteria have been met":

> (1) the student has appropriate medical documentation from a licensed, treating healthcare provider who specializes in the treatment of transgender individuals; and
>
> (2) the student has consistently asserted the student's gender identity for a period of at least six months; and
>
> (3) the student has undergone treatment recommended by the student's healthcare provider, which may include social transition or hormonal therapy for at least six months.

Press Release dated 02/13/2019 (Medley-Warsoff Decl. Ex. 35).

79.　　At the public hearing, the Board's attorney publicly stated that the proposed policy rose out of the parties' settlement negotiations with Magistrate Judge Miller. *See* Medley-Warsoff Decl. ¶ 53.[6] The Board's attorney publicly stated that, "[a] significant issue raised

_____

[6] Although the proposed policy arose out of settlement discussions, Federal Rule of Evidence 408 does not prevent the Board's press releases and public statements from being admitted into evidence. The Board's press releases and other public statements were not confidential and were not "made during compromise negotiations" with Plaintiff. Fed. R. Evid. 408(a)(2).

previously was that a student could just, on a whim, decide for a day to use the restroom of the opposite sex. This resolution eliminates that possibility." *Id.* ¶ 54. The Board's attorney also stated that, "[w]ith the changes already made to existing restrooms ensuring greater privacy and the creation of the single-stall restrooms throughout the high school, the issue of individual privacy is also addressed." *Id.* ¶ 55.

80.     But, once again, a large number of adults emphatically opposed allowing transgender boys and girls to use the same restrooms used by other boys and girls. Several speakers explicitly grounded their opposition in their personal disapproval of gender transition. One speaker said, "our sons are being demasculinated by this country. Our daughters are being defeminized. I don't want to see us promote that." *Id.* ¶ 56. Another said "when we talk about social transition and gender identity we're talking about issues that we've created. God didn't create those." *Id.* ¶ 57.[7]

81.     Two days after the public hearing, the Board issued another press release stating that it would not be taking action on the proposed policy at its upcoming meeting and would "not set a time frame for when any action will be taken or when any further discussion will be held

_____

[7] Not everyone opposed the new policy. One student at Gloucester High School urged the Board to pass the new policy so her friends who are transgender can use the restroom at school instead of waiting until they get home. *Id.* ¶ 58. Another student in ninth grade said, "I see every single day people that are afraid to use the bathroom and do not want to due to discrimination, and I just don't think that's right." *Id.* ¶ 59. A transgender boy in ninth grade described how uncomfortable the current policy is for him and asked the Board to pass the new policy "so that I can feel like I belong in my school." *Id.* ¶ 60. A man told the Board that he is the "proud parent of a transgender child" in the Gloucester public schools. He said "I'm quite certain that I will never be able to convince those of you that think that it's a mental disorder. I can tell you there's no medication for it, there's no praying it out of them, and there's no beating it out of them. They are who they are, and they deserve the opportunity to be treated with respect and dignity." *Id.* ¶ 61.

regarding the resolution." Press Release dated February 21, 2019 (Medley-Warsoff Decl. Ex.36).

**The Board Asserts for the First Time that "Biological Gender" Refers to the Gender Marker on a Student's Current Birth Certificate**

82.     From the day the Board first adopted its restroom policy until the last day of discovery, the Board refused to explain how it defines "biological gender" for purposes of its policy. The policy does not define "biological gender," and the term has no common or accepted meaning. There are many biological components of sex, including chromosomal, anatomical, hormonal, and reproductive elements, some of which could be ambiguous or in conflict within an individual, either because that individual has intersex traits or because that individual has undergone medical care for gender dysphoria. *See* Penn Expert Rep. & Decl. ¶ 18. For these reasons, the Endocrine Society has said "the terms 'biological sex' and 'biological male or female' are imprecise and should be avoided." *Id.*

83.     Superintendent Clemons and Principal Collins never received any training or guidance on how to administer the Board's policy or how to define "biological gender." *See* Clemons Dep. 67:17-68:1; Collins Dep. 157:13-158:19.

84.     Principal Collins acknowledged he privately wondered, "How we would come to know that a student was transgender[?]" and, "[I]s this an enforceable policy[?]" Collins Dep. 160:16-18. He concluded "it would be difficult to enforce." *Id.* at 161:5-6.

85.     Principal Collins' doubts about the policy were well-founded. Transgender students may attend school without classmates and peers knowing they are transgender. For example, some students may transition before beginning school; others may transfer to a new school after transitioning. With hormone therapy, transgender students develop physical sex characteristics typical of their gender identity—not the sex designated for them at birth. *See* Penn

Expert Rep. & Decl. ¶ 32. Hormone therapy affects bone and muscle structure, alters the appearance of a person's genitals, and produces secondary sex characteristics such as facial and body hair in boys and breasts in girls. *Id.* In addition, transgender children who receive puberty blockers never go through puberty as their birth-designated sex. *Id.* ¶ 31. And when they receive hormone therapy, they are exposed to the same levels of testosterone or estrogen as other boys and girls during puberty. *Id.* ¶ 32.

86.     When asked about his understanding of the policy, Superintendent Clemons testified that he thought "biological gender" was determined by a student's "genitalia." Clemons Dep. at 69:3-8. When asked what the "biological gender" would be if someone had genital surgery, Superintendent Clemons said, "I meant male and female organs when I said genitalia." *Id.* at 70:4-5. When asked what the "biological gender" would be for someone who has an androgen-insensitivity condition where they develop external sex organs that do not typically align with their internal organs and chromosomes, Superintendent Clemons said, "I really haven't given that thought." *Id.* at 70:16-17. When asked what restroom a transgender girl would use if—as a result of puberty blockers and hormone therapy—she had typically female breasts and hips, Superintendent Clemons said, "I don't know the answer to that question." *Id.* at 73:11-12. And when asked which restroom a transgender girl should use if she had an amended birth certificate with a female gender marker at the time she registered for school, Superintendent Clemons again said, "I don't know the answer to that question." *Id.* at 75:12-13.

87.     On the final day of discovery, however, the Board produced a School Board member as a Rule 30(b)(6) witness who asserted for the first time the Board defines "biological gender" for purposes of its restroom policy as the gender on a student's current birth certificate—not based on as assessment of the student's physiology. *See* Anderson Dep. 21:8-12.

28

88.     The 30(b)(6) witness also asserted for the first time that the reason why the Board refused to update Gavin's school records or allow him to use the restroom during his senior year was because the Board doubted the validity of his birth certificate. *Id.* at 65:14-66:14. The witness asserted that its decision was based on advice of counsel, based on the fact that the photocopy of Gavin's updated birth certificate was marked as "void," and based on the fact that Gavin's updated birth certificate was not marked as "amended" and did not have information from his original birth certificate crossed out. *Id.*[8]

89.     The witness admitted that that the only explanation the Board ever provided to the Plaintiff for its denial of his request to change his school records was the letter sent by counsel on January 12, 2017. *Id.* at 71:22-72:13.

90.     The witness admitted that Gloucester County Public Schools' usual practice when denying a request to update student records is to identify purported flaws so they can be fixed. *Id.* at 89:11-17.

91.     The witness admitted that they had never had another request to update a student's records based on an amended birth certificate, did not know if a photocopy of a birth certificate typically says 'void,' or if there was a difference between a short form birth certificate and longer records kept by the Virginia Department of Vital Records. *Id.* at 80:1-8, 84:8-11, 90:6-8, 71:5-8.

---

[8] The 30(b)(6) witness asserted that the decision was made by Superintendent Clemons in consultation with legal counsel. Anderson Dep. 64:22-65:3. But Superintendent Clemons testified that he had no recollection of any events concerning Gavin's birth certificate and request to update the gender marker on his student records. Clemons Dep. 93:22-94:4. The letter sent by the Board's attorney on January 18, 2017, also specifically referenced discussing the matter at the recent School Board meeting and attributed the decision to the School Board. *See* Ltr. from D. Corrigan to J. Block dated 1/18/17 (Medley-Warsoff Decl. Ex. 32).

92. The witness also admitted that the Board did not make any effort to contact the Virginia Department of Vital Records to confirm the authenticity of the birth certificate provided by Gavin and his mother. *Id.* at 67:1-5.

93. If the Board had identified any of its purported concerns during Gavin's senior year, Gavin could have provided information that would demonstrate that they are meritless. Like all Virginia birth certificates, the original document is printed on security paper, which causes all photocopies to be marked as void. Va. Code § 32.1-270. Gavin has also submitted a declaration from Janet Rainey, who is the Virginia Registrar and Director of the Office of Vital Records, confirming the authenticity of his birth certificate. *See* Rainey Decl. ¶ 3.

94. The Board's purported concerns about the authenticity of Gavin's birth certificate also do not explain its decision to ignore the legal court order that declared Gavin's sex to be male and ordered the Department of Vital Records to provide Gavin with an updated birth certificate. The Board's 30(b)(6) witness asserted that he was not aware of the court order until late 2018. *See* Anderson Dep. 70:2-9. But Principal Collins testified that he was already aware of Gavin's court order. *See* Collins Dep. 151:11-152:3. And the Board's counsel was aware of the court order because Gavin's attorneys filed copies with the Supreme Court and the Fourth Circuit.

95. Gavin was shocked and angry when he learned about the 30(b)(6) witness's new interpretation of the policy as turning on the current birth certificate. "If the Board really is interpreting its policy this way, then it makes what they did to me even worse," Gavin explains.

> Under what they now say the policy means, I should have been allowed to use the same restrooms as other boys starting in late October 2016 when I provided them with my new birth certificate. I could have had a normal high school experience for most of my senior year. I jumped through hoop after hoop, and I did everything I was supposed to do even under the Board's discriminatory policy. If

the Board really thought something was wrong with my documents, why didn't they just tell me what the problem was so I could address it? It feels like they were playing games with my life, and I do not understand how a group of adults could treat a high school student that way.

Gavin Grimm Decl. ¶ 70.

## ARGUMENT

### I.     Legal Standard.

Summary judgment is warranted when "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) (quoting Fed. R. Civ. Pro. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks and brackets omitted).

### II.    The Board's Policy Violates Title IX.

"To state a claim under Title IX, a plaintiff must allege: (1) that he or she was excluded from participation in an education program because of his or her sex; (2) that the educational institution was receiving federal financial assistance at the time of his or exclusion; and (3) that the improper discrimination caused the plaintiff harm." ECF No. 148 at 21 (citing *G.G. v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 718 (4th Cir. 2016)). The Board does not dispute that it receives federal financial assistance. Def.'s Answer to the Am. Compl. ¶ 91, ECF No. 154.

Because the undisputed facts establish that Gavin was excluded from participation in a federally funded education program because of sex, and that the improper discrimination caused him harm, the Court should grant summary judgement, issue a declaratory judgment that the

Board's policy violated Gavin's rights under Title IX from the day the policy was issued through the remainder of his time as a student at Gloucester High School, and award Gavin nominal damages for the harm he suffered from the Board's violation of his rights under Title IX.

### A. The Board's Policy Discriminated Against Gavin "On the Basis of Sex."

By singling Gavin out and forcing him into separate single-stall facilities because he is transgender, the Board's policy "excluded [him] from participation in," "denied [him] the benefits of," and "subjected [him] to discrimination" at school "on the basis of sex," in violation of Title IX. 20 U.S.C. § 1681(a).

In its May 22, 2018 ruling, "[t]his Court join[ed] the District of Maryland and several other appellate courts in concluding that 'claims of discrimination on the basis of transgender status are per se actionable under a gender stereotyping theory' under Title IX[.]" ECF No. 148 at 20 (quoting *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 715 (D. Md. 2018)). This Court also joined the Seventh Circuit in concluding "that a policy that requires transgender students to use bathrooms not in conformity with their gender identity subjects 'a transgender student . . . to different rules, sanctions, and treatment than non-transgender students,' and amounts to discrimination on the basis of transgender status in violation of Title IX." *Id.* at 22 (quoting *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir.)). As noted in this Court's decision, many other courts have reached the same conclusion. *See id.* at 19-20 (collecting cases).

In the time since the Court issued its decision, there have been no intervening decisions from the Supreme Court, the Fourth Circuit, or any district court within this Circuit conflicting with the Court's ruling. To the contrary, the federal courts addressing similar cases over the past

year have uniformly agreed with this Court's analysis. *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293, 1325 (M.D. Fla. 2018), *appeal docketed,* No. 18-13592 (11th Cir. Aug. 24, 2018) (citing approvingly to *Grimm* and holding that the plaintiff "has proven a Title IX violation because the School Board, a federally funded institution, prohibits [plaintiff], a transgender boy, from using the boys' restroom 'on the basis of sex,' which discrimination caused him harm"); *cf. Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018), *appeal docketed*, 18-35708 (9th Cir. Aug. 23, 2018) (citing approvingly to *Grimm* and concluding that "directing [the] District to require students to use only facilities that match their biological sex or to use gender-neutral alternative facilities would violate Title IX"); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018), *petition for cert. filed*, No. 18-658 (U.S. Nov. 21, 2018) (explaining that a policy forcing transgender students to use separate single-user facilities "would very publicly brand all transgender students with a scarlet 'T,' and they should not have to endure that as the price of attending their public school").

Moreover, the Board's discrimination against Gavin in this case was compounded by its decision to continue excluding Gavin from the same restroom as other boys even after he obtained a court order and birth certificate identifying his sex as male. The Board's 30(b)(6) witness now claims that its "biological gender" policy is actually a policy based on the student's birth certificate—not based on the student's physiology. Anderson Dep. at 21:8-14. That last-minute assertion conflicts with the Board's repeated representations to this Court, the Fourth Circuit, and the Supreme Court that its policy was based on anatomical and physiological sex

characteristics.[9] In all its voluminous briefing, the Board has never previously suggested that the policy defines sex according to birth certificates. To the contrary, it has repeatedly declared that Gavin's birth certificate is not "relevant."[10]

If the assertion that the policy is based on birth certificates is credited as true for purposes of this motion for summary judgment, then the Board's discrimination against Gavin is even more egregious. The Board and its attorneys knew that Gavin desperately wanted to have his school records changed and to use the same restrooms as other boys before he graduated, but— according to the 30(b)(6) witness—the Board still prevented him from doing so based on alleged flaws in his documentation that the Board never told Gavin about and that would have been easily dispelled with a simple phone call to the Department of Vital Records. *See* Rainey Decl. ¶ 3. The Board admits that its treatment of Gavin was a stark departure from its usual practice of actually explaining any issues with documentation so they can be fixed. *See* Anderson Dep. at 89:2-17. The Board thus singled out Gavin—as a boy who is transgender—for different and discriminatory treatment even after he met the Board's "biological gender" requirement.

---

[9] *See* Petitioner's Br., *Gloucester Cty. Sch. Bd. v. G.G.*, No. 16-273 (U.S.), at 39 (asserting that the Board "understand[s] 'sex' . . . as referring to objective physiological criteria"); Board Supp. Br., *Grimm v. Gloucester Cty. Sch. Bd.*, No. 15-2056 (4th Cir.), ECF No. 119 at 37 ("[T]he Board's policy distinguishes boys and girls based on physical sex characteristics alone."); Board Br. in Support of Mot. to Dismiss, *Grimm v. Gloucester Cty. Sch. Bd.*, No. 4:15-cv-00054 (E.D. Va.), ECF No. 136 at 27 ("To respect the safety and privacy of all students, the School Board has had a long-standing practice of limiting the use of restroom and locker room facilities to the corresponding physiology of the students.").

[10] *See* Bd. Supp. Br. at 11 n.5, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 11 (4th Cir.); Bd. Supp. Reply Br. at 27, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF No. 224 (4th Cir.).

**B. The Board's Policy Harmed Gavin.**

In its May 22, 2018 ruling, this Court also concluded that Gavin had sufficiently alleged that "[t]he location of the [single-stall] bathrooms, coupled with the stigmatization and physical and mental anguish inflicted upon Mr. Grimm, caused harm." ECF No. 148 at 23. With the benefit of discovery, the undisputed facts in the summary judgment record illustrate those harms in rich detail.

On its face, prohibiting Gavin from using the same restrooms as other boys was an "overt, physical deprivation of access to school resources," which is "[t]he most obvious example" of a Title IX violation. *Davis ex rel. LaShonda v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).[11] But, as discussed below, the undisputed evidence shows the physical exclusion was not limited to the restrooms themselves. The policy physically excluded Gavin from class by requiring him to travel long distances to use the restroom and miss valuable class time. The policy physically excluded Gavin from attending football games because there were no restrooms for him to use at all. And the policy physically excluded Gavin from the entire Gloucester High School campus by driving him to complete many of his course credits on an off-site facility. Here, as elsewhere, "discriminatory treatment exerts a pervasive influence on the entire educational process." *Norwood v. Harrison*, 413 U.S. 455, 469 (1973).

---

[11] *See G.G.* at 718 n.4 ("We have little difficulty concluding that access to a restroom at a school . . . falls within the meaning of 'educational program' as used in Title IX and defined by the Department's implementing regulations."); *cf. Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*, No. 1:05-CV-824, 2006 WL 3613673, at *1-2 (W.D. Mich. Dec. 11, 2006) (requiring black elementary school student to use separate restroom in response to harassment from others deprived her of "equal access to restroom facilities").

Gavin has provided unrebutted testimony about how the Board's policy humiliated him and made him feel stigmatized. *See* Gavin Grimm Decl. ¶¶ 29-31. That testimony is corroborated by the testimony of Gavin's mother. *See* Deirdre Grimm Decl. ¶¶ 22-25. It is corroborated by Principal Collins, who testified that he believed Gavin felt the policy sent a message "that Gavin wasn't welcome" and that he "understood [Gavin's] perception." *See* Collins Dep. at 164:5-165:7. It is corroborated by major medical organizations and professional school administrator associations, who acknowledge that transgender students experience worse outcomes when their identities are not supported in school and feel singled out as different when forced to use separate restrooms from their peers. *See* Penn Expert Rep. & Decl. ¶¶ 38-39; AAP Amicus at 19-25; School Administrators Amicus at 25. And it is corroborated by our common knowledge that "it is humiliating to be segregated from the general population." *G.G.*, 853 F.3d at 730 (Davis, J., concurring, joined by Floyd, J.). Our nation's civil rights laws have long recognized the "daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969); *cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). "[D]iscrimination itself, … by stigmatizing members of the disfavored group[,] … can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984).[12]

---

[12] Although the Board contends that its policy does not stigmatize transgender students, the Board's own designated expert witness testified that one of the *benefits* of excluding a transgender student from using restrooms that align with their gender identity is that it communicates a message to the student's peers that gender transition is not normal. *See* Van Meter Dep. 150:6-18. The Board's designated expert believes that allowing Gavin to use the

Gavin has also provided undisputed testimony that the anxiety and humiliation of having to use separate restrooms drove him to restrict his fluid intake and avoid using the restrooms altogether, which resulted in physical discomfort and painful urinary tract infections. *See* Gavin Grimm Decl. ¶ 51. Gavin's testimony is corroborated by his mother who remembers that the family had to keep boxes of over-the-counter medication in the house to provide treatment. Deirdre Grimm Decl. ¶ 26. And his testimony is corroborated by major medical organizations, which report that "avoidance [of the restroom] can have medical consequences, including recurrent urinary tract infections." AAP Amicus at 26.

Finally, although the inherent stigma of being forced to use separate facilities would be sufficient to establish a Title IX violation, the undisputed evidence shows that the single-stall restrooms at Gloucester High School were not equally accessible as a practical matter. Two of the single-stall restrooms were clustered together near the cafeteria, and the third restroom was located on "A Hall" near the nurse's office. Medley-Warsoff Decl. Ex. 29. There was no single-stall restroom for Gavin to use near classrooms on "B Hall," "C Hall," and "D Hall." *Id.* Gavin testified that the single-stall restrooms were too far away for him to use between classes and that he would have to miss an inordinate amount of class time to use them during class. Gavin Grimm. Decl. ¶ 49. That testimony is corroborated by Gloucester High School teachers on "C Hall," who told school administrators not to convert the faculty restroom on "C Hall" into a single-user restroom because there was not sufficient time between classes to walk from "C Hall" to a different restroom. Medley-Warsoff Decl. Ex. 25.

---

same restrooms as other boys could spread a "social contagion" that causes other students to question their own gender identity. *See id.* at 156:17-22.

The undisputed facts thus show that the Board's policy harmed Gavin. "Damages for emotional distress or mental anguish are at best difficult to measure." *Adams*, 318 F. Supp. 3d at 1326. But because Gavin seeks only nominal damages, the Court can enter summary judgment in his favor without resolving any potential factual disputes about how to quantify the precise amount of that harm to Gavin in financial terms. *See Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001) (explaining that where "*some* amount of damage likely is present . . . a nominal amount of damage is adequate to support liability"); *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 680 (7th Cir. 2019) ) ("[N]ominal damages… [are] an appropriate means of vindicating rights whose deprivation is difficult to quantify.").

## III.    The Board's Policy Violated the Equal Protection Clause.

The Court should grant summary judgement, issue a declaratory judgment that the Board's policy violated Gavin's rights under the Equal Protection Clause from the day the policy was issued through the remainder of his time as a student at Gloucester High School, and award Gavin nominal damages for the harm he suffered from the Board's violation of his rights under the Equal Protection Clause.

In its May 22, 2018 ruling, this Court concluded that discrimination against transgender individuals is subject to heightened scrutiny under the Equal Protection Clause "for at least two reasons." ECF No. 148 at 25. "First, transgender individuals constitute at least a quasi-suspect class." *Id.* "Second, intermediate scrutiny is also warranted because" discrimination against transgender individuals "relies on sex stereotypes" and thus amounts to "a sex-based classification." *Id.* at 26. To survive heightened scrutiny, "[t]he burden of justification is

demanding and it rests entirely on the [government]." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Applying heightened scrutiny, this Court previously concluded that "as pled by Mr. Grimm, the policy at issue was not substantially related to protecting other students' privacy rights" because "[t]here were many other ways to protect privacy interests in a non-discriminatory and more effective manner than barring Mr. Grimm from using the boys' restrooms." ECF No. 148 at 29.

With the benefit of discovery, the uncontested evidence confirms that the Board has not satisfied the "demanding burden" of showing that the policy is "substantially related" to protecting student privacy. Indeed, the evidence shows that the policy fails even rational basis review. "The breadth of the [policy] is so far removed from [the] particular justifications" advanced by the Board, that it is "impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996).[13]

Gavin's use of the boys' restrooms did not infringe on anyone else's privacy. The undisputed evidence also shows that the Board did not receive any complaints—from students or parents—related to any actual encounter with Gavin in the restroom. Anderson Dep. at 13:20-14:5. The Board's 30(b)(6) witness testified that Board's policy is based solely on protecting privacy interests related to nudity. Anderson Dep. at 27:2-5. But those concerns simply do not apply to Gavin's "use—or for that matter any individual's appropriate use—of a restroom." *G.G.*, 822 F.3d at n.10. Excluding Gavin from using the restroom "ignores the practical reality

---

[13] Far from supporting its argument that it acted for non-discriminatory reasons, the Board's designated expert witness explicitly argued that schools have an important interest in sending a message to students that gender transition is not normal and in preventing the spread of a "social contagion." *See* Van Meter Dep. 156:17-22.

of how [Gavin], as a transgender boy, uses the bathroom: by entering a stall and closing the door." *Whitaker*, 858 F.3d at 1052; *accord Adams*, 318 F. Supp. 3d at 1314. The new dividers between urinals and the expanded walls in the toilet stalls provide even greater privacy protections for everyone. *See* Loving Decl. Exhibits. And any students who want greater privacy for any reason may also use one of the new single-stall restrooms. *See* ECF No. 148 at 29; *G.G.*, 822 F.3d at 728-29 (Davis, J., concurring).[14]

Even if there were an actual risk of exposure to nudity, the reality is that placing a boy who is transgender in the girls' restroom (or placing a girl who is transgender in the boys' restroom) would still mean that students would be "in the presence of individuals with physical sex characteristics of the opposite sex." Def.'s Mot. to Dismiss Mem. ECF No. 119 at 23. Boys and girls who are transgender and who have received puberty blockers and hormone therapy have physiological and anatomical characteristics—including muscle and bone structure, breasts in girls who are transgender, and facial and body hair in boys who are transgender—that do not typically align with the sex designated for them at birth. Penn Report & Decl. ¶ 32. For example, as a result of hormone therapy and surgery, Gavin has a typically male chest, facial hair, and testosterone affecting his bone and muscle structure. Placing him in the girls' restroom would place him in the presence of individuals with sex characteristics of the opposite sex.

---

[14] The only contexts involving nudity identified by the Board's 30(b)(6) witness were when students use a toilet, use a urinal, or open their pants to tuck in their shirts. Anderson Dep. 30:10-20. When asked why the expanded stalls and urinal dividers did not fully address those situations, the Board's 30(b)(6) witness stated he "was sure" there are other ways the policy protects student privacy related to nudity but "I can't think of any other off the top of my head." *Id.*

The Board's last-minute assertion that a student's "biological gender" is based on a student's current birth certificate—not based on an assessment of their physiology—further undermines its asserted interest in preventing exposure to nudity "in the presence of individuals with physical sex characteristics of the opposite sex." According to the Board's 30(b)(6) witness, an 18-year-old transgender teenage girl who has not obtained an updated birth certificate would have to use the boys' restroom even if she has fully developed breasts as a result of hormone therapy and a vagina as a result of genital surgery. Anderson Dep. at 96:9-21. And a transgender boy who *has* obtained an updated birth certificate would be able to use the boys' restroom, regardless of his physiology. *Id.* at 75:13-76:3. When asked what non-transgender girls should do if they are uncomfortable using the same restroom with a transgender boy who has a female birth certificate, the Board's 30(b)(6) witness said that the non-transgender girl has the option of using one of the single-user facilities. *Id.* at 45:5-9. But if the Board now admits that the single-user facilities provide adequate protection for student privacy, then there is no reason to exclude transgender students from the restrooms—whether or not they have an amended birth certificate.

Gavin's case illustrates the irrationality of the Board's new position that its policy protects privacy interests related to physiology. According to the Board, Gavin had to be excluded from the same restroom as other boys even though he had a typically male chest, facial hair, and testosterone affecting his bone and muscle structure. But, according to the Board, once Gavin obtained a new birth certificate, he should have been allowed to use the boys' restrooms even though his physiology remained exactly the same. And, according to the Board, the asserted privacy interests that justified banishing Gavin from using the same restrooms as other boys somehow evaporated once he received a new birth certificate.

Regardless of what position the Board has decided to belatedly adopt as a legal strategy, when the Board was actually confronted with Gavin's new birth certificate in October 2016, it did not begin permitting him use the boys' restrooms. The Board rejected Gavin's legal documents based on purported concerns that it never disclosed to Gavin and that would have easily been dispelled by a call to the Department of Vital Records. *See* Rainey Decl. ¶ 3. And the Board continued to tell the Supreme Court and the Fourth Circuit that allowing Gavin to be in the same restrooms as other boys would violate other students' privacy rights related to physiology. No matter what Gavin's legal documents showed, the Board continued to "isolate, distinguish, and subject [Gavin] to differential treatment" because he "deviated from what the Board viewed a male or female student *should* be, and from the physiological characteristics the Board believed that a male or female student *should* have." ECF No. 148 at 15.

Especially in light of the Board's recent actions in rejecting the proposed policy that emerged from settlement discussions with the magistrate judge, the undisputed evidence leads to the inescapable conclusion that the Board has simply chosen to defer to the wishes of the majority of its constituents.[15] Under any standard of scrutiny, however, deferring to generalized fear, discomfort, and moral disapproval is not legitimate governmental interest that can justify discriminatory treatment. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). "If adopting and implementing a school policy or practice based on [the] individual determinations or preferences of parents—no matter how sincerely held—runs counter to the

---

[15] "[I]it is well-established that community views may be attributed to government bodies when the government acts in response to these views." *A Helping Hand, LLC v. Baltimore Cty., MD*, 515 F.3d 356, 366 (4th Cir. 2008); *see Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 313 (4th Cir. 1989).

legal obligations of the [School] District, then the District's and the Board's legal obligations must prevail." *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp. 3d 267, 292 (W.D. Pa). "[W]hile the School Board must take into account the concerns of [non-transgender] students and their parents, it may not do so at the expense of [Gavin's] right to equal protection under the law." *Adams*, 318 F. Supp. 3d at 1320.

Difference can be discomfiting, but there are ways to respond to that discomfort without discrimination. Students are free to use one of the single-stall restrooms if they are uncomfortable with the presence of anyone else in the common restroom. But the "sincere, personal opposition" of some people cannot justify a policy that "demeans or stigmatizes those whose own liberty is then denied." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015). Excluding transgender people from using the same restrooms as everyone else prevents them "from participating fully in our society, which is precisely the type of segregation that the Fourteenth Amendment cannot countenance." *Bostic v. Schaefer*, 760 F.3d 352, 384 (4th Cir. 2014).[16]

---

[16] Impermissible discrimination often stems from an almost "instinctive mechanism to guard against people who appear to be different in some respects from ourselves" or who "might at first seem unsettling." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring); *cf. Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 282 n.9 (1987) (recounting how students with disabilities were excluded from school because their appearance allegedly "produced a nauseating effect" on classmates). As the NAACP Legal Defense Fund points out, the same arguments have been used to exclude Black people, gay people, and people with disabilities from swimming pools, restrooms, and other common spaces. *See* Amicus Br. of NAACP LDF, *et al.*, *G.G. v. Gloucester Cty. Sch. Bd.*, No. 15-2056, ECF 146-1 (4th Cir.) ("NAACP LDF Amicus"), https://goo.gl/Ksrg8P.

"An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act." *Obergefell*, 135 S. Ct. at 2605. The Board's recent actions "demonstrated that some entities will not protect the rights of others unless compelled to do so." *G.G*, 853 F.3d at 731 (Davis, J., concurring, joined by Floyd, J.). Gavin and other transgender students in Gloucester County must, therefore, "look to the courts to vindicate their claims to human dignity." *Id.*

## IV. The Board's Refusal to Update Gavin's Transcript to Match His Birth Certificate Violates Title IX and the Equal Protection Clause.

The Court should grant summary judgment on Gavin's claims relating to his transcript, issue a declaratory judgment that the Board's refusal to update Gavin's transcript violates his rights under Title IX and the Equal Protection Clause, award him nominal damages for each of those violations, and enter a permanent injunction requiring the Board to update Gavin's school transcript to match the male gender marker on his birth certificate.

In its February 15, 2019 order granting leave to file a Second Amended Complaint, this Court held that Gavin's proposed Second Amended Complaint stated valid claims that the Board violated Title IX and the Equal Protection Clause by refusing to update his transcript to match the male gender marker on his birth certificate. ECF No. 176 at 4. The Court explained that "if the Board decided to treat Mr. Grimm differently than similarly situated students, that could be evidence of a violation of federal law." *Id.* at 3.

The undisputed evidence shows that the Board has, indeed, treated Gavin differently from similarly situated students. It is doubtful that any reasonable finder of fact could actually credit the Board's claim that it had questions about the authenticity of Gavin's birth certificate. But

even if the current assertions of the 30(b)(6) witness are credited, the 30(b)(6) witness admitted that its "typical practice" when denying a request to change school records is to explain the basis for the denial, including any "easily identified" errors that could be fixed. Anderson Dep. 89:11-17. But instead of following that typical practice, the Board rejected Gavin's repeated requests without ever identifying the reasons for its decision. The Board has failed to provide any justification for this disparate treatment.

In addition to issuing a declaratory judgment and awarding nominal damages, this Court should also issue a permanent injunction requiring the Board to update Gavin's transcript to match the male gender marker on his birth certificate. To obtain a permanent injunction, a plaintiff must show: "(1) irreparable injury, (2) remedies at law are inadequate to compensate for that injury, (3) the balance of hardships between the plaintiff and defendant warrants a remedy, and (4) an injunction would not disserve the public interest." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (internal quotation marks omitted).

Because Gavin has established success on the merits of his claims under Title IX and the Fourteenth Amendment, he has also established irreparable harm that cannot be compensated by monetary damages. "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); *accord Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960). The violation of Gavin's rights under Title IX also constitutes irreparable harm that cannot be compensated by monetary damages. *Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771, 777 (S.D.W.Va. 2012) (collecting cases).

Gavin has also provided undisputed testimony explaining how presenting a transcript that identifies him as "female" is humiliating. "Every time I have to provide a copy of my transcript to a new school or employer, I will have to show them a document that negates my male identity and marks me as different from other boys." Gavin Grimm Decl. ¶ 69; *cf. United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013) (explaining that refusal to recognize marriages of same-sex couples "tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition"). These harms are irreparable because "[d]amages for emotional distress or mental anguish are at best difficult to measure." *Adams*, 318 F. Supp. 3d at 1326; *cf. Obergefell*, 135 S. Ct. at 2606 ("Dignitary wounds cannot always be healed with the stroke of a pen.")

The balance of hardships also weighs strongly in Gavin's favor. The Board has identified no governmental interest that is served by refusing to update Gavin's transcript. Whatever purported concerns the Board claims to have about the validity of Gavin's birth certificate have been fully addressed by the declaration of Janet Rainey, the State Registrar and Director of the Department of Vital Records.

Finally, an injunction in favor of Gavin is in the public interest because it is always in the public interest to "uphold[] constitutional rights." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (internal quotation marks omitted). Similarly, "the overriding public interest l[ies] in the firm enforcement of Title IX." *Cohen v. Brown  Univ.*, 991 F.2d 888, 906 (1st Cir. 1993).

**CONCLUSION**

For the foregoing reasons, Gavin's motion for summary judgment should be granted.

Respectfully submitted,

Counsel for Plaintiff Gavin Grimm

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA


/s/ Eden B. Heilman
Eden B. Heilman (VSB No. 93554)
Jennifer Safstrom (VSB No. 93746)
Nicole Tortoriello (VSB No. 91129)
701E. Franklin Street, Suite 1412
Richmond, VA 23219
(804) 644-8022 (Phone)
(804) 649-2733 (Fax)
eheilman@acluva.org
jsafstrom@acluva.org
ntortoriello@acluva.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Joshua A. Block*
Leslie Cooper*
Shayna Medley-Warsoff*
125 Broad Street
18th Floor
New York, NY 10004
(212) 549-2627 (Phone)
(212) 549-2650 (Fax)
jblock@aclu.org
lcooper@aclu.org
smedley@aclu.org

* Admitted *pro hac vice*

Dated: March 26, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of March 2019, I filed the foregoing Memorandum

Of Law In Support of Plaintiff's Motion for Summary Judgment with the Clerk of the Court

using the CM/ECF system, which will automatically serve electronic copies upon all counsel of

record.


/s/ Eden Heilman


Eden Heilman (VSB No. 93554)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA, INC.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
eheilman@acluva.org