IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

    Plaintiff,

v.                           Case No. 4:15-cv-54

GLOUCESTER COUNTY SCHOOL
BOARD,

    Defendant.

**BRIEF IN SUPPORT OF GLOUCESTER COUNTY
<u>SCHOOL BOARD'S MOTION FOR SUMMARY JUDGMENT</u>**

David P. Corrigan (VSB 26341)
Jeremy D. Capps (VSB No. 43909)
George A. Somerville (VSB No. 22419)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
gsomerville@hccw.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ALLEGATIONS .................................................................................................................. 2

LAW AND ARGUMENT .................................................................................................. 8

I.     Standard of Review. ................................................................................................. 8

II.    The School Board's Policy Separating Restrooms by Physiological Sex Is Plainly Valid Under Title IX And Section 106.33. ...................................................................... 10

    A.    This Court Need Not Re-Examine Grimm's Title IX Claim in the Amended Complaint, as it is Identical to the Title IX Claim Dismissed by the Honorable Robert G. Doumar. ..................................................................................................................

    B.    The School Board's Policy Does Not Violate Title IX. ............................................ 10

    C.    The Text And History Of Title IX And Section 106.33 Refute The Notion That "Sex" Must Be Equated With "Gender Identity." .......................................................... 14

    D.    Equating "Sex" With Gender Identity Would Undermine Title IX's Structure. ........ 26

    E.    If "Sex" Were Equated With "Gender Identity," Title IX And Its Regulations Would Be Invalid For Lack Of Clear Notice. ................................................................... 29

III.    The School Board Has Not Violated the Equal Protection Clause of the Fourteenth Amendment. ................................................................................................................. 30

    A.    Grimm's Claim Fails, Because All Students Are Treated the Same Under the School Board's Policy. ...................................................................................................... 31

    B.    Transgender is Not a Suspect Class Entitled to Heightened Scrutiny. ...................... 32

    C.    The School Board's Policy is Presumptively Constitutional Under Rational Basis Review. ................................................................................................................... 34

    D.    The School Board's Policy is Also Constitutional Under Intermediate Scrutiny. ..... 38

IV.    Grimm's Claims Against the School Board are Moot. .................................................. 47

CONCLUSION .................................................................................................................... 48

## INTRODUCTION

In the long history of this litigation, the fundamental question remains the same: Is the Gloucester County School Board's ("School Board") restroom and locker room policy lawful? The answer is, and always has been, yes. From the outset, the School Board's goal has been to accommodate Plaintiff Gavin Grimm ("Grimm") while simultaneously balancing the legitimate interests of all of its students, from kindergarten through twelfth grade. The School Board's policy treats all students the same. All students may use either the restroom and locker room facilities that correspond with their anatomy and physiology or one of three single-stall restrooms available for any student. The School Board's policy complies with Title IX. It also fulfills the requirements of the Equal Protection Clause. Simply put, the School Board's policy does not discriminate.

The School Board is entitled to summary judgment on Grimm's claims under both Title IX and the Equal Protection Clause, notwithstanding the additional issues presented for the first time in the Second Amended Complaint ("Complaint"). This Court should reject Grimm's Title IX claim as foreclosed by the text of Title IX and its implementing regulations, and it should hold that separating students for restroom and locker room use in accordance with their anatomical and physiological characteristics does not violate the Equal Protection Clause. Importantly, the Fourth Circuit has never found a Title IX or an Equal Protection Clause violation under the facts alleged in Grimm's Complaint, and the foreign cases that Grimm relies upon do not adequately address the fundamental reasons why both claims are not actionable under this operative set of facts.

It also is important to recognize what is and is not at issue in this case. This Court may address only a judicial question—is the School Board's policy consistent with Title IX and the

Equal Protection Clause?  Questions of policy, on the other hand, are the province of legislative bodies, not the judiciary.  Grimm's reliance on assertions that other school districts have successfully adopted policies consistent with those that he advocates is not material to the claims at issue here.  Instead, the question is whether the School Board's policy violates federal *law*, not whether it is the best or even a desirable *policy* in the judgment of a federal court.

## UNDISPUTED MATERIAL FACTS

1.      Grimm was born a female.  Grimm was born with female genitalia and fully functioning female reproductive organs.  Grimm was issued a birth certificate that stated Grimm's sex as female.  <u>Grimm</u>, 112:19-20; 113:3-8; 117:17-118:12; <u>Penn</u>, 48:4-12[1].

2.      At conception, a fetus is determined to be either a male (XY) or female (XX). Sex is determined or recognized at birth by external genitalia and internal reproductive organs. <u>Van Meter</u>, 7:18-8:11, <u>Van Meter expert report</u>; <u>Penn</u>, 48:4-49:7; 49:19-22.

3.      Grimm enrolled in Gloucester County School system as a girl.  Grimm began high school and started ninth grade as a girl.  <u>Andersen Declaration</u>; GCSB 1086, 1117, 1118, 1127, 1151-1154.

4.      At the beginning of Grimm's sophomore year in August 2014, Grimm and Grimm's mother met with the school principal and guidance counselor and explained that Grimm was transitioning from female to male.  <u>Collins</u>, 24:3-22; <u>Grimm</u>, 34:18-19; 35:13-36:1.

5.      School officials agreed to refer to Grimm using Grimm's new name and by using male pronouns.  <u>See</u> Original Complaint, ¶ 28 (ECF Doc. 8)[2]; <u>Andersen</u>, 90:21-91:7; <u>Grimm</u>, 36:13-20; <u>Collins</u>, 24:18-22.

---

[1]  Plaintiff identified Dr. Melinda Penn, a Pediatric Endocrinologist, as an expert in this case.

6.      Grimm initially used the restroom in the nurse's office.  <u>Grimm</u>, 38:8-10; 47:7-11.

7.      On October 20, 2014, Grimm began using the boys' restroom with the principal's support.  <u>Collins</u>, 59:17-22; <u>School Board Supplemental Answer to Interrogatory No. 1</u>.  Grimm also was granted permission to complete his physical education requirements through a home-bound program, and, as a result, never needed to use the locker rooms at the school.  <u>Grimm</u>, 96:14-97:9.

8.      Within two days, parents of students in the community learned that a transgender boy was using the boys' restrooms and complained.  <u>Collins</u>, 67:8-22. Additionally, a student complained about the lack of privacy in the bathroom.  <u>Collins</u>, 67:17-22; <u>School Board Supplemental Answer to Interrogatory No. 1</u>.  Grimm was also involved in an altercation with a fellow student concerning Grimm's use of the male restroom.  <u>Grimm</u>, 90:20-93:17; GCSB 03541.

The School Board received 39 emails and several oral communications, mostly from parents of students in Gloucester County, in opposition to a transgender student using the restroom that was inconsistent with the student's biological sex and expressing concerns about student privacy. <u>School Board Supplemental Answer to Interrogatory No. 1</u>.

---

[2]    This allegation from the original Complaint is absent from the Amended Complaint; however, this Court may still consider it.  It is appropriate to consider this prior admission because pleadings "superseded by amended pleadings are admissions against the pleader in the action in which they were filed." <u>Pennsylvania R. Co. v. City of Girard</u>, 210 F.2d 437, 440 (6th Cir. 1954).  A court is entitled to take judicial notice of the records of the proceedings, and facts subject to judicial notice may be considered by the Court on a motion to dismiss—and *a fortiori* on a motion for summary judgment. <u>Briggs v. Newberry County Sch. Dist.</u>, 838 F. Supp. 232, 233-34 (D.S.C. 1992), <u>aff'd</u> 989 F.2d 491 (4th Cir. 1993).

For example, one parent wrote:

"I respectfully ask that you act to protect the rights and privacy of students who are not transgender … I have a son who attends … School, and cannot imagine how he would feel if a transgender student began to utilize the boys restroom … All students, not just one, should have their privacy upheld … Please act on behalf of the entire student population, not just one student. This is not a discrimination issue, it is a privacy issue." GCSB 02630.

Another concerned family of Gloucester students wrote,

"[t]he decision regarding any transgender student using the restroom they assign to themselves should be considered based on the needs and privacy of ALL STUDENTS in the school ... Our boys … are mortified by the idea that any female, including their mother or sister, would be in a bathroom with them while they are using it. Our daughter is concerned that a decision to allow [transgender boys] into the men's restrooms will lead to a male student assigning himself as a female and being allowed in the women's restrooms … Surely there is a place somewhere in the school that can be remodeled to include two to three stalls and designated as a unisex bathroom and used by anyone who feels the need." GCSB 04189-90.

Indeed, the School Board was advised on the afternoon of December 9, 2014, by another citizen that the ACLU website noted with approval that "some school administrations offer [transgender] students the use of the employee single stall restroom." GCSB 04165-66.

9.     A School Board member proposed the following policy for public debate at a November 11, 2014, School Board meeting:

Whereas the GCPS recognizes that some students question their gender identities, and

Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and

Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore

It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

GCSB 1277; 11/14/14 School Board Meeting Minutes.

A public discussion about the use of restrooms and locker rooms by transgender students ensued with students and parents of students expressing their opposition and privacy concerns.[3]

10.     Grimm voluntarily addressed the School Board in a public meeting, on November 11, 2014. Grimm, 103:3-7. The School Board did not identify Grimm as the transgender student. Grimm, 105:13-106:20. By a vote of 4-3, the School Board deferred a vote on the policy until its meeting on December 9, 2014. 11/14/14 School Board Meeting Minutes.

11.     Before the December 9, 2014 meeting, the School Board issued a press release announcing "plans to designate single stall, unisex restrooms … to give all students the option for even greater privacy." At the December 9, 2014 public meeting, parents and students again expressed their privacy concerns concerning the use of restrooms and locker rooms.[4] On December 9, 2014, the School Board passed the policy by a 6-1 vote. 12/9/14 School Board Meeting Minutes.

12.     The School Board subsequently installed three single-stall unisex restrooms that were available for use beginning on December 15, 2014. GCSB 1261, 1267, 1272, 4286. Any student was allowed to use the single-stall restrooms. They are not just for transgender students. Andersen, 44:20-45:3; 49:11-13, Anderson Declaration.

13.     The School Board enacted the policy to protect the privacy interests of all students in the Gloucester County school system. Andersen, 22:1-11. The policy is focused to ensure student's privacy of not having to share a restroom with someone from an opposite

---

[3] The complete November 14, 2014 public discussion can be found at:
http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id=1065.
[4] The complete December 9, 2014 public discussion can be found at:
http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id=1090

physiological sex, including not being exposed to or having to be in a state of undress before another student of the opposite physiological sex. <u>Andersen</u>, 25:15-17; 25:19-26:12; 27:22-28:5. A secondary governmental interest was student safety. <u>Andersen</u>, 22:15-23:1.

14.    Pursuant to the Diagnostic and Statistical Manual Of Mental Disorders, Fifth Edition ("DSM-V"), gender dysphoria is a diagnosis to describe the distress that a patient or person experiences when their gender identity does not align with their sex. <u>Van Meter expert report</u>; <u>Penn</u>, 53:3-54:6; <u>DSM-V</u> p. 451. The term "sex" refers to the biological indicators of male and female such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal or external genitalia. <u>Penn</u>, 54:8-15; DSM-V p. 451. There is not an objective test to diagnose gender dysphoria. <u>Van Meter expert report</u>; <u>Penn</u>, 55:15-17.

15.    Choosing gender identity does not cause chromosomal changes in the body. <u>Penn</u>, 51:14-17. A person's innate sense of belonging to a particular gender does not cause biological changes in the body. <u>Penn</u>, 51:18-21. Transgender individuals generally do not have intersex conditions. Transgender individuals remain biologically men or biologically women. <u>Van Meter expert report</u>; <u>Penn</u>, 52:14-21.

16.    The use of restrooms that are in line with a transgender patient's gender identity instead of the sex designated at birth is one component of an overall mental health social transition plan or "gender affirming care" plan to treat gender dysphoria. The premise of gender affirming care can be managed through other methods without requiring school systems to permit transgender students to use the bathroom that is inconsistent with their biological sex. If a transgender student is not permitted to use the bathroom consistent with his gender identity in school, there are other methods of social transition that can be used to help treat gender dysphoria. <u>Van Meter expert report</u>; <u>Penn</u>, 62:15-63:7; 70:18-71:4.

17.     In June 2016, before Grimm's senior year of high school, Grimm underwent chest-reconstruction (double mastectomy) surgery.  Grimm, 152:3-5, 16-18.  This procedure does not create any biological changes in the transgender individual.  Instead, it is only a physical change.  Penn, 78:8-12.  Surgical gender reassignment procedures cannot be completed until the transgender individual is at least 18 years of age.  Van Meter, 109:18-21; Penn, 78:19-79:15. To that extent, Grimm remains biologically and anatomically female.  Penn, 78:8-12; 79:19-80:1; Grimm, 118:7-12.

18.     During Grimm's senior year in high school, Grimm provided a different Virginia birth certificate to the high school in November of 2016 listing Grimm's sex as male.  Lord, 46:21-47:12.  The birth certificate Grimm provided was not issued in conformity with Virginia law based upon the School Board's understanding of the Code of Virginia and applicable administrative regulations. The School Board declined to revise Grimm's official school transcript, because the information that Grimm provided was at odds with the process and procedures outlined by Virginia law and the Virginia Administrative Code to amend a birth certificate, and the birth certificate provided was stamped void and not "amended."  Andersen, 65:8-66:1; GCSB 04247.  The School Board has a governmental interest is to ensure that student's educational records are maintained in accordance with all applicable federal and state laws. Andersen, 76:19-77:5.

19.     The School Board informed Grimm that he had a right to a hearing related to the School Board's decision not to amend Grimm's official transcript and educational records pursuant to School Board policy JO and Family Educational Rights and Privacy Act.  Grimm did not request a hearing on the School Board's denial of his request to have his transcript changed,

either while he was a student at Gloucester High School or after his graduation in the spring of

2017.  ECF Doc. 171-1; Andersen Declaration.

20.     Grimm was permitted to use the single user restrooms at the high school.

Andersen, 44:20-45:3, 49:11-13; Andersen Declaration.  On June 10, 2017, Grimm graduated

from Gloucester High School in Gloucester County, Virginia.  Grimm is now 19 years old.

Grimm, 9:4-5.

21.     Grimm now seeks the following relief:

A.  A declaration that the Board's policy violated Gavin's rights under the
    Fourteenth Amendment to the United States Constitution and Title IX of the
    Education Amendments of 1972, 20 U.S.C. § 1681, et seq., on the day the
    policy was first issued and throughout the remainder of his time as a student at
    Gloucester High School;

B.  A declaration that the Board's refusal to update Gavin's official school
    transcript to match the "male" designation on his updated birth certificate
    violated—and continues to violate—Gavin's rights under the Fourteenth
    Amendment to the United States Constitution and Title IX of the Education
    Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

C.  Nominal damages in an amount determined by the Court;

D.  A permanent injunction requiring the Board to update Gavin's official school
    records to match the male designation on his updated birth certificate;

E.  Plaintiff's reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988;
    and

F.  Such other relief as the Court deems just and proper.

ECF Doc. 177, pp. 17-18.

## LAW AND ARGUMENT

### I.     Standard of Review.

Under Rule 56, Fed.R.Civ.P., a moving party is entitled to summary judgment if the

evidence shows that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law.  The facts "must be viewed in the light most favorable to

the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550

U.S. 372, 380 (2007), quoting Rule 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986), quoting Fed.R.Civ.P. 1. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks and citations omitted).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. at 380, quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (additional quotation marks omitted). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex, 477 U.S. at 322-23.

II.     **The School Board's Policy of separating restrooms by anatomical and physiological sex is valid under Title IX and 34 C.F.R. § 106.33.**

A.      **The School Board's Policy complies with Title IX.**

Grimm's Title IX claim is barred by the plain language of Title IX and its implementing regulation, 34 C.F.R. § 106.33. Throughout this litigation, Grimm has pressed an interpretation of Title IX that "sex" is determined solely according to "gender identity," meaning "a person's deeply felt, inherent sense of one's gender." ECF Doc. 177, ¶ 20. The text, history, and structure of Title IX, and the plain language of its implementing regulation, foreclose that view. Although the Fourth Circuit originally accepted an *agency interpretation* adopting Grimm's position, relying on the doctrine of Auer v. Robbins, 519 U.S. 452 (1997), even then the Court acknowledged that such an interpretation is "not the intuitive one." G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 722 (4th Cir.), cert. granted in part, 137 S. Ct. 369, 196 L. Ed. 2d 283 (2016), vacated and remanded, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017). See also id., 822 F.3d at 720 (holding that "the Board's reading—determining maleness or femaleness with reference exclusively to genitalia—" is one of multiple "plausible reading[s]" of 34 C.F.R. § 106.33."

The better interpretation—which is reflected in the School Board's policy—is that when separating boys and girls on the basis of sex in restrooms and similar facilities, schools may rely on the anatomical and physiological differences between males and females rather than students' gender identity.

1.  **Statutory and Regulatory Background.**

In the words of its principal sponsor, the late Senator Birch Bayh of Indiana, Title IX aimed "a death blow" at "one of the great failings of the American educational system"—

namely, "corrosive and unjustified discrimination against women." 118 Cong. Rec. 5809, 5803.[5]

Congress did so by enacting in Title IX a straightforward ban on discrimination in federally funded educational programs on the basis of "sex." 20 U.S.C. § 1681(a). At the same time, Title IX preserved settled expectations of privacy between males and females by permitting "separate living facilities for the different sexes," 20 U.S.C. § 1686, and "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33 ("section 106.33"). Such exceptions were "designed," as Senator Bayh explained, "to allow discrimination only in instances where personal privacy must be preserved." 121 Cong. Rec. 16060.

> **2. Title IX prohibits sex discrimination as a means of ending educational discrimination against women.**

Title IX's ban on sex discrimination emerged from Congress's multifaceted efforts in the early 1970's to address discrimination against women. See generally Paul C. Sweeney, *Abuse, Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41, 50–54 (1997). Frustrated with lack of progress on the Equal Rights Amendment ("ERA"), Senator Bayh decided to pursue its goals through other means. Birch Bayh, *Personal Insights and Experiences Regarding the Passage of Title IX*, 55 Clev. St. L. Rev. 463, 467 (2007). Believing that the worst discrimination against women was in "the educational area," id. at 468, Bayh focused on the Higher Education Act of 1965, which granted money to universities. Sweeney, *supra*, at 51. In 1972, while that Act was being amended, floor amendments added the text that is now Title IX. See 117 Cong. Rec. 39098; 118 Cong. Rec. 5802–03.

---

[5]   "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted" as Title IX, have been considered "an authoritative guide to the statute's construction." N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 526–27 (1982).

Those amendments were designed principally to end discrimination against women in university admissions and appointments. See 117 Cong. Rec. 39250, 39253, 39258; 118 Cong. Rec. 5104–06. Title IX's architects viewed such discrimination as rooted in pernicious stereotypes about women. 118 Cong. Rec. 5804.

### 3. Title IX allows certain facilities and programs to be separated by sex.

Congress understood that not all distinctions between men and women are based on stereotypes. Foremost among those are distinctions needed to preserve privacy. As ERA proponents had grasped, "disrobing in front of the other sex is usually associated with sexual relationships," Barbara A. Brown, Thomas I. Emerson, Gail Falk, Ann E. Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 Yale L.J. 871, 901 (1971), and thus implicated the recently-recognized right to privacy. See id. at 900–01 (citing Griswold v. Connecticut, 381 U.S. 479 (1965)). That privacy right, the proponents believed, "would permit the separation of the sexes" in intimate facilities such as "public restrooms[.]" Id.

Both the Senate and the House grasped this commonsense principle. For instance, Senator Bayh noted that sex separation would be justified where "absolutely necessary to the success of the program" such as "in classes for pregnant girls," and "in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807. Representative Thompson—"disturbed" by suggestions that banning sex discrimination would prohibit all sex-separated facilities—proposed an amendment stating that "nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex." 117 Cong. Rec. 39260. The language was introduced that day and adopted by the House without debate. 117 Cong. Rec. 39263. Although Bayh's version lacked a similar proviso, the

conference committee included Thompson's language without further discussion. H.R. Conf. Rep. No. 92-1085 at 222.

Subsequently, the Department of Health, Education, and Welfare ("HEW") proposed a Title IX regulation providing that sex separation would be permitted for "toilet, locker room and shower facilities." 39 Fed. Reg. 22228, 22230 (June 20, 1974). The final regulations retained HEW's clarification. 40 Fed. Reg. 24128, 24141 (June 4, 1975); 34 C.F.R. § 106.33 ("section 106.33").[6] HEW's regulations continued to use the statutory term "sex," without elaboration.

When Congress considered the HEW regulation, Senator Bayh again linked the issue to privacy. He introduced into the record a scholarly article explaining that Title IX "was designed to allow discrimination only in instances where personal privacy must be preserved. For example, the privacy exception lies behind the exemption from the Act of campus living facilities. The proposed regulations preserve this exception, as well as permit 'separate toilet, locker room, and shower facilities on the basis of sex.'" 121 Cong. Rec. 16060.

Title IX regulations contain another relevant provision for separating male and female students, one also based on physical differences, in athletic activities. Thus, recipients are permitted to establish "separate teams for members of each sex where selection … is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

---

[6] HEW's regulations were recodified in their present form after the reorganization that created the Department of Education in 1980. See 45 Fed. Reg. 30802, 30960 (May 9, 1980). Additionally, because multiple agencies issue Title IX regulations, the section 106.33 exception appears verbatim in 25 other regulations. See, e.g., 7 C.F.R. § 15a.33 (Agriculture); 24 C.F.R. § 3.410 (Housing & Urban Development); 29 C.F.R. § 36.410 (Labor); 38 C.F.R. § 23.410 (Veterans Affairs); 40 C.F.R. § 5.410 (EPA).

**B.** **The text and history of Title IX and Section 106.33 refute the notion that the statutory term "sex" must be equated with (much less limited to) "gender identity."**

The most straightforward way to resolve the Title IX claim is the one previously taken by this Court. <u>See</u> ECF Doc. 57 at p. 10. As the Court correctly explained, Title IX regulations "specifically allow[ ] schools to maintain separate bathrooms based on sex as long as the bathrooms for each sex are comparable." <u>Id</u>. at p. 12. It is beyond dispute that in the 1970s—when Congress enacted Title IX and HEW adopted section 106.33—the term "sex" at least *included* the anatomical and physiological distinctions between men and women.[7] It follows that when schools establish separate restrooms, locker rooms, and showers for boys and girls, Title IX and section 106.33 affirmatively permit them to rely on anatomical and physiological sex to distinguish those facilities, regardless of whether the term "sex" could also theoretically include some notion of "gender identity." ECF Doc. 57 at p. 12 (concluding that, because the School Board's policy is permitted by the regulation, "the Court need not decide whether 'sex' in … [s]ection 106.33 also includes 'gender identity'"). As a straightforward matter of interpretation, nothing more is necessary to dismiss Grimm's Title IX claim on summary judgment. ECF Doc. 57 at pp. 12-13.

Grimm's contrary position depends on a reading of Title IX that is incompatible with the plain meaning of the term "sex": namely, that for Title IX purposes one's internal, perceived sense of gender identity is *determinative* of one's sex. <u>See</u>, <u>e.g.</u>, G.G. S. Ct. Br. at 2 (asserting that Grimm "knew that he was a boy" because "[l]ike other boys, Gavin has a male gender

---

[7]  Indeed, as discussed below, all relevant indicia of meaning show that the understanding of "sex" shared by Title IX's architects was determined *wholly* by those physiological distinctions. The same is true, in common parlance, up to the present day. <u>See</u> Memorandum Opinion, Sept. 17, 2015, ECF Doc. 57, at p. 12 ("under any fair reading, 'sex' in [s]ection 106.33 clearly includes biological sex").

identity"). Practically speaking, Grimm's position means that physiology is not only irrelevant but *invalid* under Title IX as a basis for separating boys and girls in restrooms. Grimm's interpretation thus forbids something the statute and regulation affirmatively permit: use of the anatomical and physiological distinctions between males and females to separate boys and girls in restrooms, locker rooms, and showers. Grimm's view is incorrect as a matter of law.

Indeed, Grimm's own expert agrees that there is a biological, anatomical and physiological component to determining the sex of an individual. Moreover, the undisputed evidence shows that the desired use of a restroom consistent with a transgender individual's gender identity is not because of the transgender individual's "sex." Instead, it is one component of a mental health treatment plan – social transitioning – to address gender dysphoria.[8] It is not an immutable right based on sex. Thus, under these circumstances, a policy of providing segregated same sex restrooms <u>and</u> single-stall unisex restrooms for any student to use does not violate Title IX and is indeed permissible under section 106.33.

1. **The term "sex" at a minimum *includes* the anatomical and physiological distinctions between men and women.**

As the Supreme Court and the Fourth Circuit have long held, "[i]t is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" as of "the era of [the statute's] enactment[.]" <u>Sandifer v. U.S. Steel Corp.</u>, 134 S. Ct. 870, 876 (2014) (quotes omitted); <u>see also</u> <u>United States v. Abdelshafi</u>, 592 F.3d 602, 607 (4th Cir. 2010) ("A statute's plain meaning is determined by reference to its words' 'ordinary meaning at the time of the statute's enactment.'") (quoting

---

[8] Dr. Penn acknowledges that gender dysphoria is diagnosed by a mental health provider and that she does not provide or create a medical treatment plan that includes "social transitioning." <u>Penn</u>, 58:10-59:6; <u>Penn</u>, 62:4-13.

United States v. Simmons, 247 F.3d 118, 122 (4th Cir. 2001)).  All available linguistic evidence confirms that the term "sex" deployed in Title IX and section 106.33 referred solely to the anatomical and physiological differences between men and women.  The use of that term thus provides no support for the radical notion espoused by Grimm that one's "sex" for Title IX purposes should be determined, not by anatomical and physiological characteristics, but instead (and entirely) by an individual's internal "gender identity."

This conclusion plainly follows from the linguistic evidence considered by *both* the majority and dissenting opinions in the Fourth Circuit's decision on this matter.  Those opinions cited nine dictionaries between them, covering a period from before the enactment of Title IX to the present.  Every single one referred to *anatomical and physiological* characteristics as a criterion for distinguishing men from women.[9]  G.G., 822 F.3d at 721–22; 736–37.  Thus, all of those Title IX-era definitions explicitly referred to physiological characteristics as a central determinant of one's "sex."  None even hinted that "sex" even includes—much less *turns on*— one's internal gender identity.

The same is true of the DSM-V, which provides the mental health criteria for diagnosing gender dysphoria in transgender individuals. In doing so, the DSM-V defines "sex" as the biological indicators of male and female such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal or external genitalia.  DSM-V, p. 451.

---

[9]    See G.G., 822 F.3d at 721–22 & n.7 (majority) (citing *American College Dictionary* 1109 (1970), *Webster's Third New International Dictionary* 2081 (1971), *Black's Law Dictionary* 1583 (10th ed. 2014), and *American Heritage Dictionary* 1605 (5th ed. 2011)); id. at 736–37 (dissent) (citing *The Random House College Dictionary* 1206 (rev. ed. 1980), *Webster's New Collegiate Dictionary* 1054 (1979), *American Heritage Dictionary* 1187 (1976), *Webster's Third New International Dictionary* 2081 (1971), *The American College Dictionary* 1109 (1970), *Webster's New World College Dictionary* 1331 (5th ed. 2014), *The American Heritage Dictionary* 1605 (5th ed. 2011), and *Merriam-Webster's Collegiate Dictionary* 1140 (11th ed. 2011)).

No putative ambiguities in a few dictionary definitions can overcome the weight of linguistic evidence that physiology is at least a critical factor in the term "sex" as deployed in Title IX. See, e.g., MCI Telecommunications Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 226–28 (1994) (rejecting reliance on outlier dictionary definitions "whose suggested meaning contradicts virtually all others"). Furthermore, even the allegedly ambiguous definitions of sex still referred overwhelmingly to "anatomical and physiological differences" between the sexes, as well as characteristics that "subserve[ ] biparental reproduction." See G.G., 822 F.3d at 721 (quoting *American College Dictionary* (1970) and *Webster's Third New International Dictionary* (1971)). And *none* referred to "gender identity," or anything like it, as a constitutive part of one's sex—much less the sole, determinative factor.

Consequently, there is not a linguistic basis to contend that the term "sex" in Title IX could ever have been understood to refer to gender identity *at all*, and certainly not to the *exclusion* of objective physiological characteristics distinguishing men from women. Cf., e.g., Doe v. Boyertown Area School District, 897 F.3d 518, 522 (3rd Cir. 2018), *petition for cert. pending*, No. 18-658 ("'Sex' is defined as the 'anatomical and physiological processes that lead to or denote male or female.' Typically, sex is determined at birth based on the appearance of external genitalia. [¶] 'Gender' is a 'broader societal construct' that encompasses how a 'society defines what male or female is within a certain cultural context.'") (citing "testimony of Dr. Scott Leibowitz, an expert in gender dysphoria and gender-identity issues in children and adolescents, and the findings that the District Court made based upon that expert's testimony"); See also Van Meter, 7:18-8:11, Van Meter expert report; Penn, 48:4-49:7; 49:19-22.

The prohibition against "sex" discrimination enacted by Congress in 1972 is not so elastic that, today, someone born anatomically and physiologically female could be considered a

male for purposes of Title IX based on that person's internal perceptions. That re-imagination of the term "sex" does not merely broaden the "comparable evils" at which the framers of Title IX were aiming, rather, it entirely subverts the basis of Title IX's anti-discrimination provision. Cf. Oncale, 523 U.S. at 79.

Instead of joining Grimm in rewriting Title IX, this Court should simply adopt the intuitive interpretation that the School Board is permitted by Title IX to separate the sexes in restrooms and locker rooms based on the anatomical and physiological distinctions between males and females, as school districts around the nation have been doing in reliance on Title IX for the past five decades. That straightforward conclusion is enough to resolve Grimm's claim.

## 2. Congress understood Title IX to permit classifications based on physiology.

Furthermore, to the extent the Court wishes to refer to Title IX's legislative history, that history confirms that "sex" was understood by the framers of Title IX and its regulations to encompass the anatomical and physiological differences between men and women. See, e.g., St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 612–13 (1987) (confirming textual meaning through legislative history). Congress's manifest purpose in enacting Title IX's ban on "sex" discrimination was to fix the pervasive problem of discrimination against women in educational programs. See, e.g., 118 Cong. Rec. 5803; 117 Cong. Rec. 39251. At the same time, however, Congress sought to preserve schools' ability to separate males and females to preserve "personal privacy," see 118 Cong. Rec. 5807 (Sen. Bayh).

These twin goals of Title IX confirm that Congress and HEW were employing the then-universal understanding of "sex" as a binary term encompassing the anatomical and physiological distinctions between men and women. Not a shred of legislative history suggests that Congress considered the concept of "gender identity" at all, much less that the concept could

supplant physiology in determining one's sex. Nor is there any evidence that in promulgating section 106.33 HEW considered "sex" to include, much less turn on, gender identity.

Other indicators of congressional purpose likewise show that gender identity is outside the scope of Title IX. For example, the subsequently enacted Violence Against Women Act ("VAWA")—a Spending Clause statute, like Title IX—prohibits funded programs or activities from discriminating based on either "sex" or "gender identity." 42 U.S.C. § 13925(b)(13)(A). "Sex" and "gender identity" must have meant distinct things to the Congress that enacted VAWA—otherwise including gender identity with sex would create surplusage. See, e.g., National Credit Union Admin. v. First Nat'l Bank & Tr. Co., 522 U.S. 479, 501 (1998) (rejecting agency interpretation under Chevron for this reason). Other statutes enacted after Title IX relate to discriminatory acts based on "gender" and "gender identity," confirming that when it legislates, Congress distinguishes outward manifestations of sexual identity—akin to sex—from inward, perceived ones. See 18 U.S.C. § 249 (federal hate crimes); 42 U.S.C. § 3716(a)(1)(C) (Attorney General authority to assist with State and local investigations and prosecutions); 20 U.S.C. § 1092(f)(1)(F)(ii) (crime reporting by universities); 42 U.S.C. § 294e-1(b)(2) (federal mental health grants). Yet Congress has never supplemented Title IX with an additional gender identity-based standard.

In addition to the absence in Title IX of a distinct prohibition on gender identity discrimination, in other contexts Congress has repeatedly declined to enact statutes forbidding gender identity discrimination in education. The Student Non-Discrimination Act, introduced in

2010, 2011, 2013, and 2015 in both the Senate and the House,[10] would condition school funding on prohibiting gender identity discrimination. Another measure, the "Equality Act," would amend the Civil Rights Act of 1964 to prohibit gender identity discrimination in various contexts, including employment and education.[11] Neither bill has ever left committee.

In the face of Congress's failure to add the concept of gender identity to Title IX—indeed, its repeated decision *not* to do so—Grimm's position amounts to asking this Court to "update" the law by judicial amendment. But no court has that authority. And in any event, there is no evidence that modern Congresses believed that the term "sex" in Title IX *already* included gender identity. To the contrary, the only plausible explanation for the absence of the term "gender identity" from Title IX is that Title IX has *never* included it, and still does not. If Congress wishes to incorporate that distinct concept into Title IX, it knows how to do so. This Court should decline Grimm's invitation to do the work of Congress.

### 3. The implementing regulations confirm this interpretation.

In its Order entered May 22, 2018 (ECF Doc. 148), the Court declined to interpret the statutory term "sex" as referring "to the 'then-universal understanding of "sex" as a binary term encompassing the physiological distinctions between men and women,' as understood during the passage of Title IX and the promulgation of § 106.33," on the ground that "this fails to address the question of how § 106.33 is to be interpreted regarding transgender students or other individuals with physiological characteristics associated with both sexes." Id. at page 16. Examination of the Department of Education's Title IX regulations demonstrates that the

---

[10] H.R. 4530 (111th Cong. 2010); S. 3390 (111th Cong. 2010); H.R. 998 (112th Cong. 2011); S. 555 (112th Cong. 2011); H.R. 1652 (113th Cong. 2013); S. 1088 (113th Cong. 2013); H.R. 846 (114th Cong. 2015); S. 439 (114th Cong. 2015).

[11] S. 1858 (114th Cong. 2015); H.R. 3185 (114th Cong. 2015).

Department has always employed a "binary" interpretation.  Thus, 34 C.F.R. § 106.21 provides that a recipient of federal financial assistance "may make pre-admission inquiry as to the sex of an applicant for admission, but only if such inquiry is made equally of such applicants of *both sexes* …."  (Emphasis added.)  Section 106.60 contains identical language with respect to applicants for employment.

34 C.F.R. § 106.17 provides similarly that to be approved by the Secretary a "transition plan" must, *inter alia*, "(2) State whether the educational institution or administratively separate unit admits students of *both sexes*, as regular students and, if so, when it began to do so."  (Emphasis added.)  (A "transition plan" is "a plan subject to the approval of the Secretary … under which an educational institution operates in making the transition from being an educational institution which admits only students of one sex to being one which admits students of *both sexes* without discrimination."  34 C.F.R. § 106.2 (emphasis added).)  "A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of *both sexes*"; and in determining whether equal opportunities are available, the Department "will consider, among other factors:  (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of *both sexes*."  34 C.F.R. § 106.41 (emphases added).

In short, the Department's regulations consistently employ an unambiguously "binary" understanding of the statutory term "sex"—consistently with the then-universal understanding during the passage of Title IX and the promulgation of § 106.33.  Respectfully, this Court is not at liberty to substitute an interpretation which is at odds with that of the Congress that enacted Title IX and the implementing regulations.

4. **Supreme Court and Fourth Circuit precedent strongly supports the School Board's interpretation of Title IX.**

Supreme Court and Fourth Circuit sex discrimination precedents also offer compelling support for reading the term "sex" in Title IX as referring to (or at least including) the anatomical and physiological differences between men and women. When determining the nature of prohibitions on sex discrimination, the Supreme Court and this Court have focused on anatomical and physiological differences, especially in contexts involving the lawful separation of males and females for privacy purposes. That underscores the correctness of interpreting Title IX to rely on physiology and to permit the School Board's restroom and locker room policy.

For instance, in United States v. Virginia, 518 U.S. 515, 540–46 (1996), the Supreme Court held that the Equal Protection Clause required the Virginia Military Institute to admit women. Yet, even as it rejected stereotypes based on "inherent differences" between the sexes, the Court nonetheless emphasized that "[p]hysical differences between men and women are enduring" and explained that "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." Id. at 533, 550 n.19. Thus, the Court's analysis of its "privacy" concerns was grounded in objective, "physical differences" between the sexes, and not in subjective factors like gender identity.

Even more pointedly, in Tuan Anh Nguyen v. INS, 533 U.S. 53, 59–60 (2001), the Supreme Court upheld against equal protection challenge a federal immigration standard that made it easier to establish citizenship if a person had an unwed citizen mother, as opposed to an unwed citizen father. The easier standard for persons with citizen mothers was explicitly justified on *biological* grounds—namely that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." Id. at 63. In so holding, the Court rejected

the argument that this distinction "embodies a gender-based stereotype," explaining that "[t]here is nothing irrational or improper in the recognition that at the moment of birth … the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father." Id. at 68. In its conclusion, the Court added these observations that apply with equal force here:

> To fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it. Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real. … The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each gender.

Id. at 73. Here again, the Court's analysis of these issues was driven by objective, physiological differences between the sexes.

The physiological conception of sex underlying the Virginia and Tuan Anh Nguyen decisions has been deployed recently by the Fourth Circuit. In Bauer v. Lynch, 812 F.3d 340 (4th Cir. 2016), cert. denied, 137 S. Ct. 372 (Oct. 31, 2016), the Court rejected the argument that differing FBI fitness standards for men and women—based on their "innate physiological differences"—constituted impermissible sex discrimination under Title VII. Id. at 343. Relying on Virginia, Bauer held that the different standards were justified because "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs," and, despite Virginia's rejection of sex stereotypes, "some differences between the sexes [are] real, not perceived[.]" Id. at 350. Indeed, Bauer's reasoning had been foreshadowed by the Fourth Circuit's earlier decision in Faulkner v. Jones, 10 F.3d 226 (4th Cir. 1993). In that case, the Court noted that sex separation in intimate facilities is justified by "acknowledged differences" between the sexes. Id. at 233. And the Court observed that "[t]he point is illustrated by society's

undisputed approval of separate public rest rooms for men and women based on privacy concerns." Id. at 232.

Those decisions strongly support interpreting Title IX and its regulations to allow privacy-based separation of men and women on the basis of anatomical and physiological differences, precisely as the School Board's policy does in multiple-stall restrooms and locker rooms.[12] That conclusion is driven as much by commonsense and longstanding privacy expectations as anything else. As Justice Kennedy wrote for the Court in Nguyen, "[t]o fail to acknowledge even our most basic biological differences … risks making the guarantee of equal protection superficial, and so disserving it." Nguyen, 533 U.S. at 73. And Justice Stevens captured this point in City of Los Angeles, Department of Water & Power v. Manhart, when he wrote for the Court that "[t]here are both real and fictional differences between women and men." 435 U.S. 702, 707 (1978).

Anatomical and physiological differences between men and women are real ones, especially where they are relied on to safeguard reasonable privacy expectations that have long been part of the fabric of public life. And it is difficult to imagine a more appropriate setting for safeguarding privacy than school restrooms. Indeed, the undisputed facts here establish those anatomical and physiological differences exist in this case, despite Grimm's gender identity assertions and Grimm's chest reconstructive surgery before Grimm's senior year of high school.

In response to this line of reasoning, Grimm has previously pointed to the Supreme Court's recognition that sex stereotyping—namely, "assuming or insisting" that men and women

---

[12] Lower courts have similarly concluded that federal prohibitions on "sex" discrimination concern physiological distinctions between men and women. See, e.g., Johnston v. Univ. of Pittsburgh of the Com. Sys. of Higher Educ., 97 F. Supp. 3d 657, 670, 676 (W.D. Pa. 2015), appeal dismissed (Mar. 30, 2016) (collecting decisions).

conform to "the stereotype associated with their group," see Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989)—can be a form of sex discrimination. See, e.g., G.G. S. Ct. Br. at 36 ("Unlike other boys, Gavin had a different sex identified for him at birth. He therefore upsets traditional assumptions about boys …. Discriminating against Gavin for upsetting those expectations is sex discrimination."). But it makes no sense to say that distinguishing boys from girls on the basis of *physiological or anatomical characteristics* amounts to prohibited sex "stereotyping," especially where those very characteristics directly relate to the privacy interests the Board's policy seeks to protect.

Furthermore, the School Board's policy distinguishes boys and girls based on physical sex characteristics alone, and *not* based on any of the characteristics typically associated with sex stereotyping—such as whether a woman is perceived to be sufficiently "feminine" in the way she dresses or acts. Cf., e.g., Price Waterhouse, 490 U.S. at 235 (finding sex stereotyping where female employee not promoted because her employer thought she was too "macho," "overly aggressive [and] unduly harsh" for a woman, and should have walked, talked, dressed, and styled her hair and make-up "more femininely"). Indeed, the School Board's standard rejects classifying students based on whether they meet *any* stereotypical notion of maleness or femaleness. The School Board's policy does not, for instance, allow only "masculine" boys into the boys room, while requiring more "effeminate" boys to use the girls room. Instead, the policy designates multiple-stall restrooms and locker rooms based on *physiology*, period—regardless of how "masculine" or "feminine" a boy or girl looks, acts, talks, dresses, or styles their hair. Far from violating Price Waterhouse, then, the Board's policy is the *opposite* of the kind of sex stereotyping prohibited by that decision. See, e.g., Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1224 (10th Cir. 2007) (concluding that Price Waterhouse does not require "employers to allow

biological males to use women's restrooms," because "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes").

### C. Equating "sex" with gender identity would undermine Title IX's structure.

Not only does Grimm's interpretation find no support in Title IX's text and history or in any analogous sex discrimination precedents, that interpretation—requiring access to sex-separated facilities based on gender identity alone—would also undermine Title IX's structure, obstruct its purposes, and lead to obvious and intractable problems of administration. Because "[i]t is implausible that Congress meant [Title IX] to operate in this manner," King v. Burwell, 135 S. Ct. 2480, 2494 (2015), this is yet another reason to reject Grimm's radical reinterpretation of Title IX.

### 1. Grimm's interpretation would itself lead to discrimination.

Grimm's proposed interpretation leads to other contradictions as well, and to discrimination in different forms. Most obviously, persons whose gender identities align with physiological sex would have access only to one facility, but transgender individuals such as Grimm could elect to use *either* the facilities designated for people of their sex *or* the opposite sex's facilities. There would thus be different degrees of access depending on whether a person's gender identity diverges from physiology. That is "sex" discrimination under Grimm's own argument.

Grimm's position also implies that while Grimm's discomfort in the girls' restroom requires relief under Title IX, another boy's discomfort with Grimm's presence in the boys' restroom is legally meaningless—indeed, that it must be stamped out as mercilessly as sentiments favoring racial segregation. See G.G. S. Ct. Br. at 30 (claiming that Grimm must be treated as subject to invidious discrimination, citing Plessy v. Ferguson, 163 U.S. 537 (1896)).

For the School Board to provide Grimm with a choice between the girls' room and an alternative unisex restroom open to all students is, in Grimm's view, an affront to Grimm's dignity. Yet forcing the same choice on Grimm's male classmates—notwithstanding their own adolescent modesty, personal sensitivities, or religious scruples—is simply the price to be paid. The same logic would apply to the feelings of boys sharing locker rooms and showers with a transgender individual like Grimm and to 14-year old girls sharing facilities with 18-year old physiological males. Title IX should not be interpreted to create so one-sided a regime.

Insofar as Grimm proposes solutions to any of these problems, they are unlikely to be of any help. For example, some of Grimm's prior briefs imply that a transgender individual's access to the other physiological sex's facilities turns on gender presentation (*i.e.*, whether someone appears to be relatively more masculine or feminine) and the sincerity of an individual's feelings of discomfort on being required to use a facility consistent with anatomical and physiological sex. In other words, because Grimm "presents" as a boy, despite the anatomical and physiological differences that exist, and feels more at home in a boys' restroom, Grimm should have access to boys' restrooms.

That standard does little for privacy concerns and nothing for girls and women in school sports. Worse, it suggests that schools must evaluate access to restrooms, locker rooms, and showers based on the subjective sincerity of a student's desire to adopt an "identity" at odds with his or her anatomy and physiology and how consistently or comprehensively the student "presents" his or her preferred gender identity. Even putting aside the manifest difficulty of discerning adolescent motivations, administrators inevitably would have to evaluate students' access to facilities based on relative masculine or feminine traits. But that is classic sex-stereotyping, see <u>Price Waterhouse</u>, 490 U.S. at 250–51 (forbidding adverse actions against

women under Title VII based on stereotypical views of women's appearance or mannerisms), which schools would undertake at their peril.

These and other serious practical problems counsel strongly against an attempt to transform the statutory prohibition on sex discrimination into the distinctly different prohibition on gender identity discrimination, as Grimm's Title IX claim demands.

### 2. Grimm's interpretation would frustrate Title IX's purposes.

Like any statute, Title IX should be interpreted so that its "manifest purpose is furthered, not hindered." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012). And here, one of Title IX's purposes was to maintain schools' ability to separate male and female students in some circumstances - in particular - when personal privacy is implicated. But this purpose is incompatible with an approach that understands "sex," not by the anatomical and physiological distinctions between males and females, but instead by "gender identity"—"a person's deeply felt, inherent sense of being a boy, a man, or male; a girl, a woman, or female." ECF Doc. 177 ¶20. If access to sex-separated facilities turns on gender identity, then the sex separation contemplated by Title IX and its regulations would effectively cease to exist. Under that regime, a school board might *wish*, as a matter of legislative policy, to keep boys and girls in separate locker rooms; but in practice any given restroom or locker room would be open to members of both sexes. An interpretation of the key term "sex" that frustrates key goals of Title IX should be rejected.

By the same token, there is not the remotest suggestion that Title IX was intended to place school children in the position of using restrooms, lockers rooms, and showers in the presence of individuals with physical sex characteristics of the opposite sex. Grimm's interpretation thus nullifies what the framers of Title IX and its regulations plainly sought to

preserve: spaces available to members of one anatomical and physiological sex and off-limits to the other. That outcome would surprise Title IX's congressional advocates, who authorized separate "living facilities" to ensure that members of different physical sexes would be separable in certain intimate settings. If the law's framers had contemplated that members of one sex could use the opposite sex's facilities, based on their *perception* of having been born in the wrong sex, there would have been no reason for permitting separation of sexes in intimate settings. See G.G., 822 F.3d at 738 (Niemeyer, J. dissenting).

**E.    If "sex" were equated with "gender identity," Title IX and its regulations would be invalid for lack of clear notice.**

Finally, even if Title IX and its regulations were ambiguous as applied to transgender individuals, then under Grimm's interpretation, Title IX violates the Spending Clause for failure to afford funding recipients clear notice of the conditions of funding. This Court should interpret Title IX in a way that does not render it potentially unconstitutional.

Title IX was enacted under the Spending Clause, and the threat of withdrawing federal funding is the main enforcement mechanism. See 20 U.S.C. § 1682. Moreover, "[l]egislation enacted pursuant to the spending power is much in the nature of a contract, and therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly." Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006) (quotes and alteration omitted) (quoting Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)). For that reason, "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously," for "States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain." Id. (quotes and citation omitted).

For more than four decades, States have accepted Title IX funding with the understanding that they could maintain separate facilities based the different physiologies of men and women. Nothing in the text of Title IX or its implementing regulations "even hint[s]" that they would ever have to do anything else—and certainly not that they would be compelled to adopt a new regime of separation based on students' subjective, internal gender identities. <u>Arlington</u>, 548 U.S. at 297. Thus, adopting Grimm's position would set the stage for a funding condition that States never could have anticipated.

Accordingly, given the limits on Congress' spending power, that position must be rejected under the rule of constitutional avoidance. <u>See</u>, <u>e.g.</u>, <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). That rule supports interpreting Title IX in a way that does not permit courts or agencies to "surpris[e] participating States with post-acceptance or retroactive conditions." <u>NFIB v. Sebelius</u>, 132 S. Ct. 2566, 2606 (2012) (quoting <u>Pennhurst</u>, 451 U.S. at 25). This is yet another reason to reject the interpretation Grimm proposes.

## III.  The School Board has not violated the Equal Protection Clause.

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The equal protection requirement "does not take from the States all power of classification," <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 271 (1979), but "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992).

Thus, "[t]he [Equal Protection] Clause requires that similarly-situated individuals be treated alike." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). In order to make out a claim under the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from others similarly situated and that the unequal treatment was the result of intentional discrimination. Morrison v. Garraghty, 239 F.3d 648, 652 (4th Cir. 2001); Brown v. Wilson, No. 3:13CV599, 2015 WL 3885984, at *6 (E.D. Va. 2015); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).

### A.    Grimm cannot prevail because all students are treated the same under the School Board's Policy.

The School Board's restrooms policy does not discriminate against any class of students. Instead, the policy was developed to treat all students and situations the same. To protect the safety and respect the privacy of all students, the School Board has had a long-standing practice of limiting the use of restroom and locker room facilities to the corresponding physiology of the students. The School Board also provides three single-stall restrooms for any student to use regardless of his or her physiology.

Under the School Board's restroom policy,[13] Grimm was treated like every other student in the Gloucester Schools. All students have two choices under the policy. Every student can use a restroom associated with their physiology, whether they are boys or girls. If students choose not to use the restroom associated with their physiology, they can use a private, single-stall restroom. No student is permitted to use the restroom of the opposite sex. As a result, all

---

[13]   The policy that Grimm claims is unconstitutional and violates Title IX also provides that students are to use a locker room associated with their biological sex. Grimm voluntarily chose not to use the boys' locker room and is not asserting that this part of the policy is unconstitutional or in violation of Title IX.

students, including female to male transgender and male to female transgender students, are treated the same.

Any student, including Grimm, was permitted to use the single-stall restrooms, but Grimm refused to do so. Grimm also was permitted, but chose not to use the girls' restroom under the School Board's policy. <u>Grimm</u>, 90:12-19; 121:11-17. Grimm, therefore, cannot demonstrate either that he was treated differently from others similarly situated or that he was subject to intentional discrimination in violation of the Equal Protection Clause. <u>See Workman v. Mingo County Bd. of Educ.</u>, 419 F. App'x 348, 354 (4th Cir. 2011) (no evidence of unequal treatment in application of state mandatory vaccination laws before admission to school); <u>Hanton v. Gilbert</u>, 36 F.3d 4, 8 (4th Cir. 1994) (no evidence that similarly situated males were afforded different treatment).

### B. Transgender persons are not a suspect class entitled to heightened scrutiny.

Neither the United States Supreme Court nor the Fourth Circuit has recognized transgender status as a suspect classification under the Equal Protection Clause. Other courts have rejected the notion that transgender status, or other classifications of sex, is a suspect classification.[14] <u>See</u>, <u>e.g.</u>, <u>Etsitty v. Utah Transit Authority</u>, 502 F.3d 1215, 1222 (10th Cir. 2007) (holding that transsexuals are not a protected class under Title VII); <u>Druley v. Patton</u>, 601 F. App'x 632, 635 (10th Cir. 2015) (declining to recognize transgender as a suspect class); <u>Wrightson v. Pizza Hut of Am., Inc.</u>, 99 F.3d 138, 143 (4th Cir. 1996) (Title VII does not afford

---

[14] Some Courts have recognized a <u>Price Waterhouse</u> theory under Title VII that protects transgendered individuals who can demonstrate that they were subject to discrimination, because their appearance and conduct does not conform to traditional male or female stereotypes. <u>See Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989). These cases do not, however, recognize a theory of liability simply because the plaintiff is transgendered. <u>See</u>, <u>e.g.</u>, <u>Etsitty</u>, 502 F.3d at 1222 n.2. Grimm's allegations do not support a <u>Price Waterhouse</u> stereotype claim of discrimination.

a cause of action for discrimination based upon sexual orientation); <u>Williamson v. A.G. Edwards & Sons, Inc.</u>, 876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against homosexuals"), <u>cert. denied,</u> 493 U.S. 1089 (1990); <u>Brown v. Zavaras</u>, 63 F.3d 967, 970-71 (10th Cir. 1995) (declining to recognize transsexuality as a protected class); <u>Schroer v. Billington</u>, 577 F. Supp. 2d 293, 305 (D.D.C. 2008) ("transsexuality itself [is] a characteristic that, in and of itself, nearly all federal courts have said is unprotected by Title VII"); <u>Johnston</u>, 97 F. Supp. 3d 657, (holding that transgender status is not a suspect classification); <u>Jamison v. Davue</u>, No. CIV S-11-2056 WBS, 2012 WL 996383, at *3 (E.D. Cal. Mar. 23, 2012) ("Plaintiff is cautioned, however, that transgender individuals do not constitute a 'suspect' class, so allegations that defendants discriminated against him based on his transgender status are subject to a mere rational basis review.")[15]

This Court should not step out on its own and recognize transgender as a new suspect classification. Indeed, the Supreme Court has admonished lower courts not to create new suspect classifications. <u>See</u> <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 441 (1985). Accordingly, Grimm's equal protection claim should be reviewed under the rational basis standard.

---

[13] <u>See also</u> <u>Doe v. Alexander</u>, 510 F. Supp. 900, 904 (D. Minn. 1981); <u>Braninburg v. Coalinga State Hosp.</u>, No. 1:08-CV-01457-MHM, 2012 WL 3911910, at *8 (E.D. Cal. Sept. 7, 2012); <u>Kaeo-Tomaselli v. Butts</u>, No. CIV. 11-00670 LEK, 2013 WL 399184, at *5 (D. Haw. Jan. 31, 2013); <u>Lopez v. City of New York</u>, No. 05 CIV. 10321(NRB), 2009 WL 229956, at *13 (S.D.N.Y. Jan. 30, 2009); <u>Starr v. Bova</u>, No. 1:15 CV 126, 2015 WL 4138761, at *2 (N.D. Ohio July 8, 2015); <u>Murillo v. Parkinson</u>, No. CV 11-10131-JGB VBK, 2015 WL 3791450, at *12 (C.D. Cal. June 17, 2015); <u>Stevens v. Williams</u>, No. 05-CV-1790-ST, 2008 WL 916991, at *13 (D. Or. Mar. 27, 2008); <u>Rush v. Johnson</u>, 565 F. Supp. 856, 868 (N.D. Ga. 1983).

### C. The School Board's Policy is presumptively constitutional under rational basis review.

Requiring students to use facilities that correspond to their birth sex in order to provide privacy to all students has been recognized as a rational basis by multiple courts. See Johnston, 97 F. Supp. 3d at 669-70 (citing Etsitty, 502 F.3d at 1224; Causey v. Ford Motor Co., 516 F.2d 416 (5th Cir. 1975)). Indeed, the Supreme Court also has recognized (1) that there are inherent "[p]hysical differences between men and women" that are "enduring" and render "the two sexes … not fungible" and (2) that each sex must be afforded privacy from the other sex. United States v. Virginia, 518 U.S. 515, 533, 550 n. 19 (1996).[16] The Fourth Circuit likewise has held that individuals have a right to bodily privacy. See Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating."). In particular, the Fourth Circuit has acknowledged "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns." Faulkner v. Jones, 10 F.3d at 232.

This is not a revolutionary proposition. Other courts also have found that there is a basic need for bodily privacy. See, e.g., Doe v. Luzerne Cty., 660 F.3d 169, 177 (3rd Cir. 2011) (an individual has "a constitutionally protected privacy interest in his or her partially clothed body," and this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); Brannum v. Overton Cty. Sch. Bd., 516 F.3d 489, 498 (6th Cir. 2008) ("the constitutional right to privacy … includes the right to shield one's body from

---

[16] In a 1975 *Washington Post* editorial, then Columbia Law School Professor Ruth Bader Ginsburg wrote that "[s]eparate places to disrobe, sleep, perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21 (emphasis added).

exposure to viewing by the opposite sex"); Sepulveda v. Ramirez, 967 F.2d 1413, 1415-16 (9th Cir. 1992) ("[t]he right to bodily privacy is fundamental," and "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample).

Protecting bodily privacy is of particular concern when it comes to students. Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies"). Indeed, the School Board has a responsibility to ensure students' privacy, which is especially acute when children are still developing, both emotionally and physically. See, e.g., Burns v. Gagnon, 283 Va. 657, 671, 727 S.E.2d 634, 643 (2012); Davis v. Monroe County School Board of Education, 526 U.S. 629, 646-47 (1999). That is exactly the aim of the School Board's restroom policy in this case. Andersen, 22:1-11; 25:15-17; 25:19-26:12; 27:22-28:5.

In Johnston, 97 F. Supp. 3d 657, a case dealing with transgender restroom use in an educational setting, the Court rejected the arguments being made by Grimm. There, the plaintiff was born a biological female, like Grimm. The plaintiff entered college as a female, but later identified as a male. The plaintiff was diagnosed with gender identity disorder, legally changed his name, and began living as a male. The plaintiff used the men's restrooms and locker rooms on campus. The plaintiff, however, remained anatomically a female.

Thereafter, the plaintiff was told that he could not use the men's restrooms or locker rooms. When the plaintiff refused to comply with this policy, he was expelled from the University. The plaintiff filed suit against the University alleging that the school's policy violated the Equal Protection Clause of the Fourteenth Amendment. The District Court, in a detailed analysis and opinion, rejected this claim.

Johnston held that transgender status is not a suspect classification and that providing separate restroom and locker room facilities for college students based on their biological sex did not violate the Equal Protection Clause. Johnston, 97 F. Supp. 3d at 671-72. As the Court noted, this holding is consistent with the holdings of numerous other courts that have considered allegations of discrimination by transgender individuals, whether under the Fourteenth Amendment or Title VII. See, e.g., Frontiero v. Richardson, 411 U.S. 677, 686 (1973); Etsitty v. Utah Transit Auth., 502 F.3d at 1221-22; Ulane v. Eastern Airlines, Inc., 742 F.2d 1081, 1084 (7th Cir. 1984); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982).

The same result should be reached here. The School Board's policy is rationally related to protecting students' privacy rights; and it is not just rationally related, but substantially related, to the important governmental interest of protecting the privacy of all of its students. The School Board has a responsibility to its students—ages 6 to 18—to ensure their privacy while engaging in personal bathroom functions. This is particularly true in an environment where children are still developing, both emotionally and physically. See, e.g., Burns v. Gagnon, 283 Va. at 671, 727 S.E.2d at 643 (school administrators have a responsibility "to supervise and ensure that students could have an education in an atmosphere conducive to learning, free of disruption, and threat to person."); Va. Code § 22.1-254 (compulsory attendance). This legitimate privacy interest of students and parents was expressed in the many emails and communications the Board received when the issue came to light, including during the public School Board hearings on November 14, 2014 and December 9, 2014 where privacy was the emphasis. The School Board policy was enacted to protect that right.

As Johnston recognized, the context of this dispute is important. Here, the School Board is balancing the needs, interests and rights of children in kindergarten through twelfth grade.

The right to privacy for young, dependent students strongly supports maintaining sex-segregated bathrooms and locker rooms. See Johnston, 97 F. Supp. 3d at 668 (finding "controlling the unique contours under which this case arises," namely a public school which is "tasked with providing safe and appropriate facilities for all of its students.")

Furthermore, the School Board's interest in protecting students' privacy rights based on their physiology has been recognized by the Department of Education. The regulations implementing Title IX specifically allow schools to provide "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. Grimm's suggestion that the School Board does not have a substantial interest in providing separate restroom and locker room facilities based on physiology is unfounded.

Grimm's identification as a male does not alter the anatomical and physiological differences between Grimm and other male students, nor does it erase the anatomical and physiological differences between a male student who identifies as a female and other female students. And even Grimm must concede that student privacy is a legitimate interest for the School Board to consider.

The School Board took both Grimm's interests and the interests of its other students into consideration and developed a policy that seeks to accommodate the best interests of all of its students. In doing so, the School Board bolstered these privacy rights by providing single-stall restrooms for any student to use. Accordingly, there is not only a rational basis, but a substantial basis for the School Board's policy requiring students either to use the restroom and locker room associated with their physiology or to use a single-stall restroom of their choice. Johnston, 97 F. Supp. 3d at 671-72; United States v. Biocic, 928 F.2d 112, 115-16 (4th Cir. 1991) (recognizing anatomical differences between men and women for purposes of equal protection analysis.)

### D.     The School Board's Policy is constitutional under intermediate scrutiny.

Grimm may argue that the School Board's policy creates a sex based classification that is subject to intermediate scrutiny.  There is no disputing that classifications based on sex are subject to intermediate scrutiny.  <u>See</u> <u>United States v. Virginia</u>, 518 U.S. 515, 532–33 (1996). Intermediate scrutiny, however, does not apply in the context of this case.  Unlike laws that differentiate between fathers and mothers, widows and widowers, unwed fathers and unwed mothers, <u>see</u> <u>Sessions v. Morales-Santana</u>, 137 S. Ct. 1678, 1688-89 (2017), separating boys and girls into different bathrooms based on their physiology is not sex-based discrimination that is prohibited by the Equal Protection Clause.  A claim such as Grimm's that attempts to insert "gender identity" as a component of "sex" fails to state an Equal Protection Clause claim as a matter of law.

The equal protection question surrounds Grimm's sex at birth.  <u>Johnston</u>, 97 F. Supp. 3d at 671 ("While Plaintiff alleges that he is a 'male,' ... Plaintiff was assigned the sex of "female" at birth ... Thus, while Plaintiff might identify his ***gender*** as male, his ***birth sex*** is female. It is this fact … that is fatal to Plaintiff's sex discrimination claim. Regardless of how gender and gender identity are defined, the law recognizes certain distinctions between male and female on the basis of birth sex.").  The evidence in this case establishes that Grimm's birth sex is female. Grimm's choice of gender identity did not cause chromosomal or biological changes in his body, and Grimm remains biologically female.  <u>Van Meter expert report</u>; <u>Penn</u>, 51:14-17; 51:18-21; 52:14-21.  While, Grimm had chest reconstruction surgery in June of 2016, this procedure did not create any biological changes in Grimm, but instead, it was only a physical change.  <u>Penn</u>, 78:8-12.  Further, while Grimm asserts that he had a new birth certificate issued during his senior year in high school as a result of this procedure, the evidence nevertheless establishes that

38

Grimm still was anatomically and physiologically female. As such, Grimm cannot state a sex discrimination claim under the Equal Protection clause.

Yet, even if intermediate scrutiny applied, the School Board's policy meets that threshold. Intermediate scrutiny requires the government to demonstrate that a challenged policy serves "important governmental objectives" and that the purportedly discriminatory means employed are "substantially related" to the achievement of those objectives. Id. at 533. The government is not, however, required to show that the policy is the "least intrusive means of achieving the relevant government objective." See United States v. Staten, 666 F.3d 154, 159-60 (4th Cir. 2011) (citations and internal quotation marks omitted). "In other words, the fit needs to be reasonable; a perfect fit is not required." Id. at 162.

Again, the School Board has an interest in protecting the privacy rights of its students. See, e.g., Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies."); Doe v. Renfrow, 631 F.2d 91, 92–93 (7th Cir. 1980) ("[i]t does not require a constitutional scholar" to conclude that a strip search invades a student's privacy rights). As recently as January 2016, the Fourth Circuit cited Virginia approvingly while concluding that physiological differences justified treating men and women differently in some contexts. See Bauer v. Lynch, 812 F.3d 340, 350 (4th Cir. 2016).

Bauer found that different standards for men and women arose from the FBI's efforts to "normalize testing standards between men and women in order to account for their innate physiological differences." Id. at 343. In light of this purpose, the Fourth Circuit explained:

> Men and women simply are not physiologically the same for the purposes of physical fitness programs.... The Court [in Virginia] recognized that … some differences between the sexes were real, not perceived, and therefore could require accommodations.

Id. at 350.

The School Board's interests in student privacy that justify segregation of restroom and locker rooms arise from the physiological differences between boys and girls and not from differences in gender identity. See Faulkner v. Jones, 10 F.3d at 232 (finding that "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns.")

Even though the law allows the School Board to do so, the School Board did not tell Grimm that his only choice was to use the girls' restroom. Instead, the School Board addressed, in a uniform, nondiscriminatory manner, the possibility that students, including Grimm, may not be comfortable using the restroom that corresponds with their anatomical and physiological sex for whatever reason. In an effort to protect the privacy of all of its students, the School Board offers sex segregated bathrooms and three single-stall restrooms. Any student, including Grimm, could use these single-stall restrooms, regardless of their biological sex or gender identity, if they are uncomfortable using a communal restroom, or for any other private or personal reason.

The School Board's restroom policy does not discriminate against any class of individuals. The policy treats all students and situations the same. Under this policy, all students, including female to male transgender and male to female transgender students, are treated the same. The School Board did not develop the restroom and locker room policy to single out Grimm or anyone else on the basis of gender identity. Instead, the policy reflects the anatomical and physiological differences between boys and girls. It is nondiscriminatory in implementation and substantially related to a legitimate governmental interest. Accordingly, Grimm is not able to demonstrate an Equal Protection violation.

**IV.    Neither Title IX nor the Equal Protection Clause compels the School Board to cooperate with Grimm's medical treatment plan.**

Grimm's entire case is built around his "medically necessary treatment for gender dysphoria." ECF Doc. 177, ¶ 1. "There is a medical and scientific consensus that the treatment for gender dysphoria is for boys who are transgender to live as boys and for girls who are transgender to live as girls." Id., ¶ 22. "With the help of his medical providers, Gavin transitioned to living in accordance with his male identity as part of medically necessary treatment for gender dysphoria." Id., ¶ 39. The School Board "disregarded Gavin's medical treatment …. and … prohibit[ed] its administrators from allowing Gavin to use the boys' restrooms." Id., ¶ 79.

Grimm's unspoken premise is that Title IX and/or the Equal Protection Clause compel the School Board to cooperate and assist with the implementation of his medical treatment. The premise is flawed. Title IX prohibits exclusion of any person from participation in, denial of the benefits of, or discrimination under "any education program or activity receiving Federal financial assistance" **on the basis of sex**. 20 U.S.C. § 1681(a). It is simply silent on issues relating to medical treatment. The Department of Education's regulations are nearly so, and nothing in those regulations supports Grimm's case. The regulations do address medical issues to a limited extent, however, and the inclusion of those limited provisions implies the exclusion of other matters. E.g., United States v. Wheeler, 886 F.3d 415, 428 (4th Cir. 2018), quoting Russello v. United States, 464 U.S. 16, 23 (1983). See 34 C.F.R. § 106.40 (Marital or parental status), subsection (b) (Pregnancy and related conditions), subsections (4) and (5):

> (4) A recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom in the same manner and under the same policies as any other temporary disability with respect to any medical or hospital benefit, service, plan or policy which such recipient administers, operates, offers,

or participates in with respect to students admitted to the recipient's educational program or activity.

(5) In the case of a recipient which does not maintain a leave policy for its students, or in the case of a student who does not otherwise qualify for leave under such a policy, a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom as a justification for a leave of absence for so long a period of time as is deemed medically necessary by the student's physician, at the conclusion of which the student shall be reinstated to the status which she held when the leave began.

Another example is 34 C.F.R. § 106.41 (Athletics), which provides that in determining whether equal opportunities are available for members of "both sexes" in interscholastic, intercollegiate, club or intramural athletics, the Director will consider, among other factors, provision of medical and training facilities and services.[17]

The Equal Protection issue is likewise easily disposed of. See, e.g., Harris v. McRae, 448 U.S. 297, 321-22 (1980) (holding that the "Hyde Amendment" does not violate the equal protection component of the Fifth Amendment Due Process Clause by withholding public funding for certain medically necessary abortions while providing funding for other medically necessary health services). "The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." Id. at 322. The same analysis applies to the Fourteenth Amendment's Equal Protection Clause. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 217 (1995). That Clause therefore does not give Grimm a "substantive" right to governmental assistance with his medical treatment, however "necessary" that treatment may be from a medical standpoint.

---

[17] See also 34 C.F.R. § 106.39 (Health and insurance benefits and services): "In providing a medical, hospital, accident, or life insurance benefit, service, policy, or plan to any of its students, a recipient shall not discriminate on the basis of sex …."); 34 C.F.R. § 106.56 (Fringe benefits).

Furthermore, Grimm is not able to present evidence that using the male restroom at school is "medically necessary." Gender affirming care or social transitioning care is purportedly part of an overall mental health treatment plan to address gender dysphoria. Using the male restroom at school is just one component of an overall social transitioning care plan. Thus, even where a transgender student is not permitted to use the restroom consistent with his expressed gender identity, there are other methods of social transition that can be used to help treat gender dysphoria. Penn, 70:18-71:4. Indeed, the School Board accommodated Grimm in the other aspects of Grimm's social transition, including referring to him by his new name and using male pronouns. Moreover, Grimm has not designated a mental health expert, treating or retained, to offer testimony that the use of the boys' restroom was a medical necessity for Grimm that somehow could rise to a substantive right protected by the Equal Protection clause of the Constitution. Simply put, Grimm's desire to use the boys' restroom at school is not a right protected by the Equal Protection clause.

## IV. Issuance of a new birth certificate does not compel revision of Grimm's school records.

### A. The School Board is under no obligation to conform Grimm's school records to a new birth certificate that was not issued consistently with Virginia law.

Grimm asks the Court to declare that by declining to "update" his official school transcript "to match the 'male' designation on his updated birth certificate," the School Board "violated—and continues to violate—[his] rights under the Fourteenth Amendment … and Title IX." ECF Doc. 177, page 18. That request should be denied for all of the reasons discussed in previous sections of this Brief and for the additional reason that Grimm's new birth certificate and its issuance do not comply with Virginia law and therefore are ineffective and void.

Va. Code § 32.1-269 governs amendments of vital records, including "change of sex." It provides, in part, that "[a] vital record registered under this chapter, with the exception of a death

certificate, may be amended only in accordance with this section and such regulations as may be adopted by the [State Board of Health] to protect the integrity and accuracy of such vital records." (Subsection A.) Subsection B provides (with an exception that applies only to children born out of wedlock) that "a vital record that is amended under this section **shall be marked 'amended'** and the date of amendment and a summary description of the evidence submitted in support of the amendment shall be endorsed on or made a part of the vital record." <u>See</u> <u>also</u> <u>id.</u>, Subsection E: "Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating that the sex of an individual has been changed by medical procedure and upon request of such person, the State Registrar shall **<u>amend</u>** such person's certificate of birth to show the change of sex …." (Emphasis added.)

12 VAC 5-550-460 (Methods of correcting or altering certificates) also applies to amendments of birth certificates. It provides in part that **"corrections or alterations shall be made by drawing a single line through the incorrect item, if listed, and by inserting the correct or missing data immediately above it or to the side of it**, or by completing the blank item, as the case may be." And similarly to Subsection B of Va. Code § 32.1-269, it provides that "there shall be inserted on the certificate a statement identifying the affidavit and documentary evidence used as proof of the correct facts and the date the correction was made."

Grimm's new birth certificate is deficient in four respects: (1) it is <u>not</u> marked "amended"; (2) it indicates a "date issued" but does not indicate in any way that that is a date of an <u>amendment;</u> (3) it provides <u>no</u> description of evidence submitted in support of the

amendment; and (4) the "correction" or "alteration" is not indicated by a line drawn through the "incorrect item." See Exhibit N.[18]

No person reviewing that certificate would perceive the slightest indication that it is an amended, altered, or "corrected" certificate, which is contrary to the manifest legislative policy as well as the letter of the law. The certificate, therefore, was not issued in compliance with Virginia law, which controls.

Moreover, the underlying basis for the amended birth certificate does not comply with Virginia law. An amended birth certificate can be sought when an individual's sex has been changed by "surgical gender reassignment procedure." 12 VAC 5-550-320. Yet, the evidence is undisputed that Grimm only had chest reconstructive surgery, not a "surgical gender reassignment procedure." Indeed, surgical gender reassignment surgery could not be performed until Grimm was at least 18 years old, and Grimm still had female genitalia and reproductive organs in place. Penn, 78:19-79:15; 79:19-80:1.

As such, under either circumstance, the School Board has no duty to "update" Grimm's transcript "to match the 'male' designation on his updated birth certificate," as demanded by his Second Amended Complaint.

**B.    Grimm's school records claim should be rejected for failure to exhaust available administrative remedies.**

The Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, provides that "[n]o funds shall be made available … to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution … the right to inspect

---

[18]   The certificate that Grimm or his mother presented to Gloucester High School was marked "void."  Exhibit O.

and review the education records of their children." The Department of Education's implementing regulations, at 34 C.F.R. Part 99, Subpart C, provide a procedure by which a parent or student may request an amendment to such records. Under 34 C.F.R. § 99.20(a), "[i]f a parent or eligible student believes the education records relating to the student contain information that is inaccurate, misleading, or in violation of the student's rights of privacy, he or she may ask the educational agency or institution to amend the record." Id. Then, "[t]he educational agency or institution shall decide whether to amend the record as requested within a reasonable time after the agency or institution receives the request." 34 C.F.R. § 99.20(b). "If the educational agency or institution decides not to amend the record as requested, it shall inform the parent or eligible student of its decision and of his or her right to a hearing under § 99.21." 34 C.F.R. § 99.20(c). Finally, "[i]f, as a result of the hearing, the educational agency or institution decides that the information in the education record is not inaccurate, misleading, or otherwise in violation of the privacy rights of the student, it shall inform the parent or eligible student of the right to place a statement in the record commenting on the contested information in the record or stating why he or she disagrees with the decision of the agency or institution, or both." 34 C.F.R. § 99.21(b)(1)(ii)(2). A federal court may review a refusal to amend education records pursuant to § 99.21. See Lewin v. Medical College of Hampton Roads, 931 F.Supp. 443, 444 (E.D. Va. 1996), aff'd, 1997 WL 436168 (4th Cir. 1997).[19]

FERPA thus provides a framework by which a student may request an amendment to his education records. The School Board met FERPA's requirements by informing Grimm of his

---

[19] Lewin holds that FERPA does not "permit disappointed students to federalize disputes over the academic accuracy of their professors' grading methods and substantive test answers." 931 F. Supp. at 445, citing Tarka v. Cunningham, 917 F.2d 890, 892 (5th Cir. 1990). No similar issues are presented here.

right to a hearing on the issue.  See Andersen Declaration.  Grimm has not requested a hearing

(or otherwise sought relief under that Act).  His school records claim therefore must be dismissed

for failure to exhaust an available administrative remedy.  See e.g., Johnston, 97 F. Supp. 3d at

671–72 (dismissing Equal Protection claim for not updating school records because the plaintiff

did not comply school policy in requesting the change); See e.g., Cavalier Telephone v. Virginia

Elec. and Power, 303 F.3d 316 (4th Cir. 2002).  See id. at 322:

> It is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  Myers v. Bethlehem Shipbldg. Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459,  82 L.Ed. 638 (1938).  In other words, "[w]here relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed." Reiter v. Cooper, 507 U.S. 258, 269, 113 S.Ct. 1213,  122 L.Ed.2d 604 (1993).

## V.      Grimm's claims against the School Board are moot.

It is the School Board's position that Grimm's claims against it are moot.  In August of

this year, the Eleventh Circuit thoroughly analyzed this issue and held that a claim for nominal

damages only does not save a claim from mootness when accompanying claims for declaratory

and injunctive relief are moot.  Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs,

Georgia, 868 F.3d 1248, 1263 (11th Cir. 2017).  The cases in this Circuit have not undertaken a

similarly thorough analysis.  The School Board set forth its position in its Brief in Opposition to

Motion to Vacate Order for Supplemental Briefing (ECF Doc.129), which it incorporates by

reference.[20]

---

[20]   The School Board acknowledges this Court's December 12, 2017 Order (ECF Doc. 132), which holds that Grimm's claims are not moot.  The School Board hereby preserves all of its appellate rights.

## CONCLUSION

For all of the foregoing reasons, the Gloucester County School Board respectfully requests that the Court grant the Motion for Summary Judgment, and dismiss Plaintiff's Second Amended Complaint in its entirety and with prejudice.

**GLOUCESTER COUNTY SCHOOL BOARD**

By Counsel

/s/
David P. Corrigan
VSB 26341
Jeremy D. Capps
VSB No. 43909
George A. Somerville
VSB No. 22419
Attorney for Gloucester County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
gsomerville@hccw.com

**C E R T I F I C A T E**

I hereby certify that on the 26th day of March 2019, I filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send a Notice of Electronic Filing to all counsel of record.

/s/_____
David P. Corrigan
VSB No. 26341
Attorney for Gloucester County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com