```
 1         IN THE UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF VIRGINIA
 3                 Newport News Division
 4
 5    - - - - - - - - - - - - x
 6    GAVIN GRIMM,              :
 7         Plaintiff,           :
 8      v.                      :  Civil Action No.
 9    GLOUCESTER COUNTY         :  4:15-cv-00054-AWA-DEM
10    SCHOOL BOARD,             :
11         Defendant.           :
12    - - - - - - - - - - - - x
13
14            Deposition of TROY ANDERSEN
15                Glen Allen, Virginia
16             Tuesday, March 12, 2019
17                    10:00 a.m.
18
19
20    Job No.: 232148
21    Pages:  1 - 98
22    Reported By:  Scott D. Gregg, RPR
```

EXHIBIT H

  Q  So what are the government -- what are the governmental interests served by the Board's restroom policy?

  A  So that would be entirely focused on the privacy of all students in Gloucester County Public Schools system.

  Q  So privacy is the only governmental interest the Board is relying on; is that correct?

  A  That's what our policy is focused on, privacy of all students in the Gloucester County Public Schools system.

  Q  And is there any other governmental interest that the policy advances?

  A  No.

  Q  Does the policy -- is the policy designed to serve a governmental interest in student safety?

  A  I would say there's a secondary -- potentially secondary depending on how you look at it. That's more of a subjective thing that each individual board member may feel differently about. But from a policy perspective, it was

1  our updated attendance policy.
2       Q   What is your updated attendance policy?
3       A   I mean, that's a long -- I would have to
4  get out my policy manual, but this changed the
5  number of days a person can be absent before they
6  are not able to pass the class regardless of what
7  their grade is.
8       Q   So let's talk about the governmental
9  interest in protecting student privacy.
10          So what are they being protected from?  Is
11 it from being seen naked?
12          MR. CORRIGAN:  Object to form.
13          Go ahead.
14          THE WITNESS:  It's -- in short, it's to
15 ensure their privacy of not having to share a
16 restroom with someone from an opposite
17 physiological sex.
18 BY MR. BLOCK:
19      Q   So it doesn't matter whether or not
20 there's any risk of anyone being in a state of
21 undress; is that right?
22          MR. CORRIGAN:  Object to form.

1              THE WITNESS:  I would say that's a part of
2     it.
3     BY MR. BLOCK:
4         Q  Okay.  So in terms of protecting their
5     privacy, is it privacy from being seen naked?  Is
6     that one of the things the policy is supposed to
7     protect?
8         A  Correct.
9         Q  And is it privacy from seeing someone else
10    naked?  Is that something else that the policy is
11    supposed to protect?
12        A  Correct, maintain privacy of all involved.
13        Q  Okay.  So if everyone is fully clothed at
14    all times and there's no risk of anyone being
15    naked, are there any other privacy interests that
16    the policy is designed to protect?
17             MR. CORRIGAN:  Object to form, foundation,
18    legal conclusion.
19             Go ahead.
20             THE WITNESS:  No.  What I described and
21    what we described together was the primary focus
22    of the privacy.

BY MR. BLOCK:

Q So it's exclusively privacy interest related to either being seen naked or seeing someone else naked?

A Correct.

Q So if there's no state of undress involved, then there's no privacy interest for the policy to serve; is that right?

MR. CORRIGAN: Object to form.

THE WITNESS: If that were to be true, yes, but I don't -- using the restroom while not -- I guess depends on how you define the word "undress." There's partial undress when you use a restroom.

BY MR. BLOCK:

Q So is simply being in the same restroom with someone of a different biological gender an invasion of someone's privacy?

A It could be viewed that way. And, again, I say it, the policy is protecting the privacy of all students.

Q So the privacy that the policy is designed

1　to protect, is that a privacy from being in the
2　same restroom as someone with a different
3　biological gender?
4　　A　Yes, it's from having to share a restroom
5　with someone from the opposite physiological sex.
6　　Q　So when you said that in the restrooms
7　there's a state of partial undress, are you
8　talking about in front of a urinal or in front of
9　a toilet?  Is that the partial state of undress
10　you're referring to?
11　　A　Correct, both.
12　　Q　Is there any other partial state of
13　undress that you're referring to?
14　　A　I would say I tuck my shirt in a weird way
15　when I was a kid, so outside of the stall I was in
16　a state of partial undress, so that would be
17　another one that popped into my head.
18　　Q　You would -- you would open your pants in
19　order to tuck in your shirt and then button up
20　your pants?
21　　A　You got it.
22　　Q　Is that what you're --

1  because that person is a transgender boy; is that
2  right?
3          MR. CORRIGAN:  Object to form, foundation,
4  speculation, inadequate opinion testimony.
5          Go ahead.
6          THE WITNESS:  I'm not sure -- the
7  hypotheticals are kind of getting me a little
8  flustered.
9  BY MR. BLOCK:
10     Q  Sorry.  So the policy doesn't provide any
11 protection for a girl who does not want to share a
12 restroom with someone who is a transgender boy,
13 meaning that they were assigned a female sex at
14 birth but live as a boy and have facial hair and
15 a lot of muscles?
16         MR. CORRIGAN:  Object to form, foundation.
17         Go ahead.
18         THE WITNESS:  Let's take it back since the
19 focus of this is at the high school.  Yes, the
20 policy -- well, the implications of the policy do
21 allow an alternate which is the single-stall
22 restrooms we added, so that's the relief there.

So they can be used by anybody. Those single-stall unisex restrooms are available for all students use.

BY MR. BLOCK:

Q So the girl who is uncomfortable using the girls restroom with a transgender boy has the option of using one of those single-stall restrooms instead; is that right?

A Absolutely.

Q And so a boy who is uncomfortable using the boys restroom with a transgender girl who has fully developed breasts can use the single-user restrooms instead; is that right?

A Correct.

Q And those single-user restrooms provide, you know, adequate protection for students in that situation; is that right?

MR. CORRIGAN: Object to form, foundation, vague.

Go ahead.

THE WITNESS: Can you further define "adequate protection"? You walk in, you're the

1   let me rephrase that question.
2          So what if she says that she doesn't want
3   to use the single-stall restroom because that just
4   draws attention to her and it's going to raise
5   questions in people's minds about why she is using
6   a different restroom than everyone else?
7          MR. CORRIGAN:  Object to form, foundation,
8   incomplete hypothetical, calls for speculation.
9          Go ahead.
10         THE WITNESS:  I don't understand the
11  question.  The single-stall restrooms are open to
12  any student at Gloucester High School who wants to
13  use them.  It's not just for transgender students.
14  BY MR. BLOCK:
15    Q   What restroom is she supposed to use if
16  she's attending a football game and there aren't
17  any single-user restrooms available?
18    A   Not a scenario I've considered or we
19  considered as a board.
20    Q   So now that you're considering it now
21  under the policy, what restroom should she be
22  using at a football game?

1   administrative person for the school, consulted
2   with legal counsel, reviewed the documentation
3   provided, and made the decision.
4       Q   But the superintendent had authority on
5   behalf of the Board to make that decision; is that
6   right?
7       A   Correct.
8       Q   So why did Gloucester County Public
9   Schools not update the gender marker on Gavin's
10  school records to update his birth certificate?
11      MR. CORRIGAN:  To the extent the question
12  has anything to do with anything not provided as
13  legal counsel, he can answer.
14      THE WITNESS:  Sure.  So that was going to
15  be my first one, input from legal counsel.  The
16  second was the information provided seemed to be
17  at odds with the process and procedures outlined
18  in Virginia law and the Virginia Administrative
19  Code as far as what an amended birth certificate
20  looks like.  And also because the birth
21  certificate provided as part of the request was
22  stamped void, so it was those three reasons that

1 resulted in the denial of the change.
2 BY MR. BLOCK:
3    Q How was the process apparently at odds
4 with Virginia Code and regulations?
5    A I would have to pull out the Code, but my
6 recollection is if you look in the Code, it says
7 that amended birth certificates will have the
8 issue scratched out with the correct one written
9 next to it. And also somewhere on the document
10 the word "amended" is added to it.
11    Q So the Board -- so the concern is that
12 this could not -- could be a non authentic birth
13 certificate?
14    A Correct.
15    Q Have you seen the copy of the birth
16 certificate that was filed in this litigation?
17    A I've seen a version in a packet somewhere,
18 yes.
19    Q And does that copy have the same features
20 that you think call into question its
21 authenticity?
22    A I would have to look at it again. It's

1  birth certificate can use the women's restroom; is
2  that right?
3      A   Correct.
4         MR. CORRIGAN:  Object to form, foundation,
5  legal conclusion.
6         Go ahead.
7         THE WITNESS:  Correct.
8  BY MR. BLOCK:
9      Q   Even though their bodies are identical?
10     A   Going back to what we spent the majority
11 of the morning talking about, it's tied back to
12 the gender marker on their records.  So in the
13 hypothetical you just described, one matches and
14 one doesn't.
15     Q   Do you know if the photocopy of the birth
16 certificate that was delivered to the school by
17 hand was produced in discovery in this case?
18     A   I don't know.
19     Q   What governmental interest is served by
20 the Board's refusal to update Gavin's birth
21 certificate?
22        MR. CORRIGAN:  Object to form.

          Go ahead.

          THE WITNESS:  It's our -- the policy JO is in place to ensure that any changes to a student's educational records are done in accordance with all applicable federal and state laws.

BY MR. BLOCK:

     Q  And the Board despite now being aware of the Virginia court order still takes the position that the Gavin's sex was not changed in accordance with Virginia law?

          MR. CORRIGAN:  Object to form, foundation, and legal conclusion.

          Go ahead.

          THE WITNESS:  I don't recall stating that. We have to bring back in -- the question is have the changes been made to the gender marker, and the answer is no.

          And then in addition to the state and federal, there's input from legal counsel.

BY MR. BLOCK:

     Q  Does not updating the gender marker on his birth certificate advance any interest in

1  certificate -- do that again.
2      Has there ever been a previous request to
3  update the student's gender marker on their school
4  records?
5      A   Not to my knowledge.
6      Q   Have there been previous requests to
7  update school records based on any type of change
8  to a student's birth certificate?
9      A   Not to my knowledge.
10     Q   And the only communication given to the
11 Grimms about the reasons for denying their request
12 to update the birth certificate was -- I keep
13 making that mistake.  I'll say it again.
14     The only reason given to the Grimms -- say
15 it one more time.
16     The only communication to the Grimms
17 giving the reasons why the school did not update
18 his school records was the letter sent by the
19 Board's counsel to me; is that correct?
20     A   Correct, to my knowledge.
21     Q   So at school, the school board and school
22 administrators refer -- have honored Gavin's

1  request to refer to him by his name Gavin; is that
2  right?
3      A   Correct.
4      Q   And the school administrators also honored
5  his request to refer to him with male pronouns; is
6  that right?
7      A   Correct.
8      Q   Okay.  Now, why have they done this?
9      A   My understanding is the -- let's start
10 with pronouns because that's not hard.  Pronouns
11 aren't a legal change to some sort of student
12 records.  There's no student record associated
13 with pronoun for the name.  My recollection is
14 that the name was changed based on the process of
15 the same policy JO.
16     Q   Does the school board think that it's
17 harmful to refer to Gavin with male pronouns?
18     A   Harmful to refer to Gavin with male
19 pronouns, no.
20     Q   I'm going to show you a document that's
21 marked -- that the title of is Gloucester County
22 School Board's Rule 26(a)(2) disclosure.

```
 1   CERTIFICATE OF SHORT HAND REPORTER - NOTARY PUBLIC
 2            I, Scott D. Gregg, RPR, a Notary Public,
 3   the officer before whom the foregoing deposition
 4   was taken, do hereby certify that the foregoing
 5   transcript is a true and correct record of the
 6   testimony given; that said testimony was taken by
 7   me stenographically and thereafter reduced to
 8   typewriting under my supervision; that reading and
 9   signing was requested; and that I am neither
10   counsel for or related to, nor employed by any of
11   the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13            IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my notarial seal this day of
15   2019.
16   My commission expires July 31, 2020.
17            [Signature: Scott D. Gregg]
18
19            _____
20            NOTARY PUBLIC IN AND FOR THE
21            COMMONWEALTH OF VIRGINIA
22            Notary Registration No. 215323
```