IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

    Plaintiff,

v.                                 Case No. 4:15-cv-54

GLOUCESTER COUNTY SCHOOL
BOARD,

    Defendant.

**BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**I.  Introduction**

      The Parties have filed cross-Motions for Summary Judgment.  Gloucester County School Board ("School Board") supported its Motion with undisputed material facts.  Grimm's Motion, on the other hand, is essentially a recitation of the allegations in the Second Amended Complaint without admissible evidentiary support, sprinkled with hearsay and conclusory legal arguments. Almost all of the "material" facts that Grimm relies on are disputed.

      Even more glaring is Grimm's failure to provide proof to support summary judgment. Grimm has not presented expert testimony to support his assertion of gender dysphoria, emotional distress, his medical treatment plan, the necessity to use the boys' restroom, or his damages.  Instead, the brief in support of Grimm's Motion for Summary Judgment amounts to a breathless criticism on the School Board's policy without the necessary foundation or factual support to permit Grimm to meet his burden of proof at trial, let alone on summary judgment, under either his Title IX or Equal Protection claim.

Indeed, the premise of Plaintiff's Motion for Summary Judgment – that the "Board reversed its position … on the final day of discovery" to define biological gender on the basis of a student's birth certificate – is nothing more than an inaccurate narrative unsupported by actual fact.  The School Board's policy allowing all students the right to use the restroom consistent with their physiological sex or one of three alternative single stall restrooms, or other available restrooms in the Nurse's office, or the faculty restroom on D Hall is not a violation of either Title IX or the Equal Protection Clause.  Grimm's Motion for Summary Judgment must be denied.

## II.  Standard of Review and Burden of Proof

Where parties file cross-motions for summary judgment, courts consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 687 (E.D. Va. 2017), *aff'd,* No. 17-1789, 2018 WL 6600219 (4th Cir. Dec. 14, 2018), citing *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392–93 (4th Cir. 2014) (citation and internal quotation marks omitted).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  **"A plaintiff seeking summary judgment on an issue ... bears the burden of establishing a prima facie case that would entitle the movant to a directed verdict if the issue was uncontested at trial."**  *Orozco v. County of Yolo,* 814 F. Supp. 885, 890 (E.D. Ca.

1993), *citing* 8 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE, § 2727 (1991). Summary judgment is not appropriate if a plaintiff does not produce sufficient evidence:

> A plaintiff who seeks summary judgment and who fails to produce sufficient evidence on one or more essential elements of the claim is "no more entitled to a judgment ... than is a plaintiff who has fully tried the case and who has neglected to offer evidence sufficient to support a finding on a material issue upon which [the plaintiff] bears the burden of proof." *Watts v. United States,* 703 F.2d 346, 347 (9th Cir.1983), *quoting United States v. Dibble,* 429 F.2d 598, 601 (9th Cir. 1970).

*Gray v. Metts*, 203 F. Supp. 2d 426, 431 (D. Md. 2002)

Further, conclusory recapitulations of the complaint, without additional supporting evidence, are insufficient on summary judgment. *See e.g., Turner v. Vincent*, No. 1:12CV431 TSE/TCB, 2014 WL 1304998, at *3 (E.D. Va. Mar. 31, 2014), *aff'd sub nom. Turner v. Porter*, 582 F. App'x 211 (4th Cir. 2014). In ruling upon a Rule 56 motion, "where the fact in question is the one put in issue by the § 702 challenge … It will not do to 'presume' the missing facts." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*; *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (citations omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 686 (E.D. Va. 2017), aff'd, No. 17-1789, 2018 WL 6600219 (4th Cir. Dec. 14, 2018).

### III. Disputed Material Facts[1]

1. Paragraph 1. Disputed. Grimm was not "designated" female by hospital staff. Grimm was born a female. Grimm was born with female genitalia and fully functioning female reproductive organs. Grimm, 112:19-20; 113:3-8; 117:17-118:12; Penn, 48:4-12. At conception, a fetus is determined to be either a male (XY) or female (XX). Sex is determined or recognized at birth by external genitalia and internal reproductive organs. Van Meter, 7:18-8:11, Van Meter Report; Penn, 48:4-49:7; 49:19-22.

2. Paragraph 2. Disputed. Grimm states that everyone has a gender identity. "It is an established medical concept", relying on Penn's Report & Decl. ¶ 17. Penn does not opine gender identity "is an established medical concept." Furthermore, statements made in Amicus briefs, including those submitted by the American Academy of Pediatrics, are not evidence. Amicus briefs, filed in this or any other case, are not competent evidence for proof of what is represented as "undisputed facts." The Court may consider such briefs if it sees fit to do so, but only as legal argument and not as proof of facts. Absent medical proof, Grimm merely asserts the nonspecific interpretation of "transgender" that can be found "from the internet."

3. Paragraph 3. Not a genuine material fact. Self-serving.

4. Paragraph 4. Not a genuine material fact. Self-serving.

5. Paragraph 5. Disputed. Gender Dysphoria is a mental health condition that requires a diagnosis from a mental health professional. Diagnostic and Statistical Manual Of Mental Disorders, Fifth Ed. ("DSM-V"); Van Meter Report; Penn, 53:3-54:6. There is not an

---

[1] For purposes of judicial economy and brevity, the School Board relies on and incorporates its Brief in Support of its Motion for Summary Judgment, along with the evidentiary exhibits, in opposition to Grimm's Motion for Summary Judgment as if fully set forth in this brief. See, ECF Doc. 196. The School Board specifically incorporates its statement of undisputed fact in opposition to Grimm's Motion for Summary Judgment.

objective test to diagnose gender dysphoria.  Van Meter Report; Penn, 55:15-17.  Grimm has not presented an expert, treating or retained, to testify that Grimm was diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.  Further, Grimm has not presented expert testimony that relates his inability to attend class to gender dysphoria.  Plaintiff's Expert Witness Identification.

Dr. Penn's report and declaration describe the condition of gender dysphoria as set out in the DSM-V, but she says nothing about Grimm or his alleged symptoms or diagnosis.  Grimm's quoted statement is unsupported.  (Paragraph 24 of Plaintiff's declaration states that "a psychologist who had experience with working with transgender patients … diagnosed me with gender dysphoria.")  The statement Grimm relies on is hearsay, and Grimm has laid no foundation for admission of a psychologist's diagnosis.  That statement, therefore, is incompetent evidence of the purported diagnosis on two separate grounds.

6.     Paragraph 7.  Disputed.  Grimm has not presented an expert, treating or retained, to testify that Grimm was diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.  Moreover, Grimm's expert, Dr. Penn, is not a mental health care provider, has never diagnosed anyone with gender dysphoria, and does not have the foundation or qualifications to support the asserted expert opinion in paragraph 7.  Further, Dr. Penn does not express any opinions specific to Grimm. Penn, 11:4-11.

7.     Paragraph 8.  Disputed.  Grimm's citation to Penn Expert Report & Decl. ¶ 23, purports to describe "[t]he standard of care for the treatment for gender dysphoria that is recognized by the American Academy of Pediatrics and every major medical and mental health professional organization in the United States …."  Dr. Penn, however, states only that "WPATH

and the National Endocrine Society have published widely accepted standards of care for treating gender dysphoria," describes their recommendations, and states that "[t]he American Academy of Pediatrics agrees that this care is safe, effective, and medically necessary."  Those three entities do not comprise "every major medical and mental health professional organization in the United States."  In fact, the American College of Pediatricians disagrees with the WPATH and National Endocrine Society recommendations.  Van Meter, 50:18-22, 150:7-151:2, 155:6-18 & Ex. 5.

Moreover, Grimm has not designated a qualified expert or offered qualified expert testimony or evidence on the "standard of care for the treatment of gender dysphoria."  Grimm's expert, Dr. Penn, is not a mental health care provider, has never diagnosed anyone with gender dysphoria, and does not have the foundation or qualifications to support the asserted expert opinion in paragraph 8.  Penn, 14:20-19:1, 20:2-13, 21:20-22:5, 28:19-29:5, 31:13-32:18.  Penn has never served as an expert in a case involving appropriate psychological treatment for a transgender adolescent.  Penn, 13:3-6.

Further, the "standard of care" that Grimm claims is recognized by "every major medical and mental health professional," and which Penn relies on, is the WPATH proposed standards of care.  Penn, however, does not know whether these standards of care were peer reviewed by endocrine professionals, nor does she know who authored the standards of care.  Penn, 35:21-36:5.  **Penn does, however, opine that under these standards of care, the precise treatment for gender dysphoria depends on each person's individualized need, and the medical standards of care differ depending on whether the treatment is for a pre-pubertal child, an adolescent, or an adult.  Penn Expert Rep. & Decl. ¶ 23.  Moreover, the WPATH standards of care provide that what helps one person alleviate gender dysphoria might be very**

**different from what helps another person.** Penn, 37:18-38:6. **Yet, Grimm does not present any expert testimony to state what Grimm's particular medical treatment needs required.**

      **Finally, neither the WPATH standards of care nor the Endocrine Society guidelines that Penn relies on has a standard of care related to the use of restrooms at school by transgender students**. Penn, 66:21-67:2, 68:15-21; see also Penn, 63:8-65:19.

      8.     Paragraph 10.  Disputed.  Grimm does not present any expert testimony to state what Grimm's particular medical treatment needs required, what his medical providers recommended, nor is he qualified to offer medical opinion testimony.  Paragraph 24 of Grimm's declaration is nothing more than unsupported hearsay.

      9.     Paragraph 11.  Not a genuine material fact.  Self-serving.

      10.    Paragraph 12.  Disputed.  Grimm and his mother did not tell Tiffany Durr that Grimm was a boy or that he "would be attending school as a boy." Durr, 9:8-10:14, 14:6-15:5.  Furthermore, the "treatment letter" is unsupported hearsay.  Grimm has not presented expert testimony to support the hearsay statements in the treatment letter.

      11.    Paragraph 15.  Disputed.  Grimm does not present expert testimony to support his mental health assertions related to the use of the restroom in the nurse's office.  Further, Grimm has not presented an expert, treating or retained, to testify that Grimm was diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.  Further, Grimm told Durr he wanted to use the boys' restroom when he began to undergo hormone therapy. Durr, 23:6-17.

      12.    Paragraph 17. Disputed.  Durr did not tell Principal Collins that "allowing Gavin to use the boys' restroom would be in Gavin's best interest," and Grimm's citation to the record does not support this statement. Durr, 25:11-26:3; Collins, 45:13-20.

13.     Paragraph 18.  Disputed.  Grimm's record citations do not support the statement that Matt Lord said to Principal Collins that "it would be in Gavin's best interest" to use the boys' restrooms.  <u>Collins</u>, 47:1-10; <u>Lord</u>, 28:15-30:19.

14.     Paragraph 19.  Disputed.  This paragraph is not evidence, nor is it supported by admissible evidence or expert testimony.  Statements made in Amicus briefs are not evidence, but inadmissible hearsay.

15.     Paragraph 22.  Not material.  Grimm does not provide evidence or a record citation to support the assertion that "Principal Collins decided that allowing Gavin to use the same restrooms as other boys would be in his best interest."  The remaining assertions were answers to general questions not related to Grimm and are not material to Grimm's motion for summary judgment.

16.     Paragraph 23.  Disputed.  This paragraph is not evidence, nor is it supported by admissible evidence or expert testimony.  It is inadmissible hearsay.

17.     Paragraph 24.  Disputed. This assertion is without proper foundation and expert support.  The declarants supporting the assertions in paragraph 24 are not mental health providers.  The precise treatment for gender dysphoria depends on each person's individualized need, and the medical standards of care differ depending on whether the treatment is for a pre-pubertal child, an adolescent, or an adult.  <u>Penn Expert Report & Decl</u>. ¶ 23.  Moreover, those standards of care provide that what helps one person alleviate gender dysphoria might be very different from what helps another person.  <u>Penn</u>, 37:18-38:6.  Further, statements made in Amicus briefs are inadmissible hearsay.

18.     Paragraph 25. Grimm does not accurately describe the initial agreement to allow him to use the boys' restroom at the high school.  At Grimm's request, he was permitted to

choose the boys' restroom he would use as long as the restroom stall was equipped with a door. Collins, 55:14-57:21 ("Gavin had made it clear that he wanted a stall with a door.")

19.     Paragraph 27.   Disputed.   Grimm did not use the restroom for seven weeks without incident.  Within two days, parents of students in the community learned that a transgender boy was using the boys' restrooms and complained.  Collins, 67:8-22.  Additionally, a student complained about the lack of privacy in the bathroom.  Collins, 67:17-22; School Board Supplemental Answer to Interrogatory No. 1.  Grimm was also involved in an altercation with a fellow student concerning Grimm's use of the male restroom.  Grimm, 90:20-93:17; GCSB 3541.  See further, ECF Doc. 196 ¶ 8.

20.     Paragraph 28.   Disputed.   Parents of students expressed concern with a transgender boy using the boy's restroom.  See further, ECF Doc. 196 ¶ 8.

21.     Paragraph 34.  Disputed.  Grimm misrepresents the contents of the emails, which are inadmissible hearsay.  In context, Hook explains that the majority of the Board wanted to seek legal consultation before addressing the restroom issue. GCSB 0853-855, 0844.

22.     Paragraph 35.  Disputed.  There is no evidence to support Grimm's statement that Carla Hook was "unsatisfied with the results of the private work session" and Grimm again mischaracterizes Carla Hook's email.  GCSB 0513 ("I think we need to add appropriate use of restroom/locker room facilities to the agenda, discuss and vote and be done with this issue for now.")

23.     Paragraph 40.  Disputed.  Grimm was not "forced to reveal himself to the entire community and the local media" and, instead, chose to attend the meeting voluntarily.  Moreover, Grimm claims that he had already revealed his new gender identity to his friends, classmates and the school.

24.     Paragraph 41.  Disputed.  Grimm did not continue to use the restroom at school without incident. See ECF Doc. 196 ¶ 8.

25.     Paragraphs 43-44.  Grimm mischaracterizes the tenor of the public meeting, which was largely a respectful public discussion.  The complete discussion can be heard at http://gloucester.granicus.com/MediaPlayer.php?view_id=10&clip_id=1065.

26.     Paragraph 47.  Disputed.  Under the policy, the School Board installed three single-stall unisex restrooms that were available for use beginning on December 15, 2014. GCSB 1261, 1267, 1272, 4286.  Any student was allowed to use the single-stall restrooms.  The single-stall restrooms were not just for Grimm.  Andersen, 44:20-45:3; 49:11-13, Andersen Declaration.

27.     Paragraph 49.  Disputed.  The single-user restrooms were not located so that they were unavailable for Grimm's use.  Moreover, Grimm acknowledged that at lunch it was closer to use the single-stall restroom.  Grimm, 134:7-11.  Grimm was also given permission to use a staff restroom on the D wing.  Grimm, 76:13-77:2; GCSB 4122.

28.     Paragraph 52.  Disputed.  Grimm was not required to use the single-user restroom as there were other options available to him, including the use of the restroom in the Nurse's office.  Further, Grimm could not say whether the restrooms were used by other students. Grimm, 129:14-16.  Further, Paragraph 53 of Grimm's brief and the record citations contained therein contradict paragraph 52.

29.     Paragraph 55-56.  Disputed.  Grimm does not present expert testimony to support his mental health assertions related to the use of the restroom or the School Board's policy. Further, Grimm has not presented an expert, treating or retained, to testify that Grimm was

diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.

30.     Paragraph 57.  Disputed.  Grimm has not presented admissible medical evidence or testimony to support the assertion that Grimm suffered from "frequent urinary tract infections."  Further, there is no evidence that Grimm was diagnosed with urinary tract infections or that urinary tract infections were related to Grimm's restroom usage at school.  Grimm, 135:2-136:5.

31.     Paragraph 58.  Disputed.  Grimm does not present expert testimony to support his mental health assertions related to the use of the restroom or the School Board's policy.  Further, Grimm has not presented an expert, treating or retained, to testify that Grimm was diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.

32.     Paragraph 61.  Disputed.  Grimm does not present expert testimony to support his mental health assertions related to the use of the restroom or the School Board's policy.  Further, Grimm has not presented an expert, treating or retained, to testify that Grimm was diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.

33.     Paragraph 64.  Disputed.  Grimm does not present expert testimony to support his assertion of continued medical treatment for gender dysphoria, nor has Grimm presented an expert, treating or retained, to testify that Grimm was diagnosed with or suffered from gender dysphoria, nor expert testimony on the severity of the effects of gender dysphoria on Grimm.  It is also disputed that Grimm was issued a new amended birth certificate in accordance with Virginia law.  See ECF Doc 196, ¶ 18.

34.     Paragraphs 64-70.  Disputed.  Grimm mischaracterizes the birth certificate issue and evidence.  Moreover, Grimm does not quote the complete response from the School Board on Grimm's request that the Board change his official school records.  That response stated **"Please feel free to submit additional materials, and, of course, [Grimm] has the right under school policy JO, see page 8 <u>Correction of Education Records</u>, to a hearing to challenge the information believed to be 'inaccurate, misleading or in violation of the student's rights.'  I look forward to hearing further from you."**  Grimm did not request a hearing on the School Board's denial of his request to have his transcript changed, either while he was a student at Gloucester High School or after his graduation in the spring of 2017.  ECF Doc. 171-1; <u>Andersen Declaration</u>.  It is also disputed that Grimm was issued a new amended birth certificate in accordance with Virginia law.  See ECF Doc 196, ¶ 18-19.

35.     Paragraphs 71-74.  Disputed.  Grimm misstates the legal arguments made by the School Board with respect to Grimm's birth certificate.  For example, in the Board's response to Grimm's request to lodge the Court Order and his amended birth certificate with the Supreme Court, Counsel for the School Board responded by stating that the materials were not part of the record.  This was because the case was on appeal on the denial of Grimm's motion for a preliminary injunction and dismissal of his Title IX claim.  Counsel noted that the Supreme Court does not base its decisions on matters outside of the record, and that "*none* of the various legal positions taken below—whether by the Board, the district court, the Fourth Circuit, the Department of Education, or Respondent—turn on Respondent's birth certificate."  ECF Doc. 192-34.  The same is true of the School Board's legal arguments in the Fourth Circuit.

36.     Paragraphs 78-81.  Not material issues of fact.

37.     Paragraph 82.  Disputed.  Grimm has not introduced factual evidence to support the conclusory statement that "the Board refused to explain how it defines 'biological gender' for purposes of its policy."  Further, at conception, a fetus is determined to be either a male (XY) or female (XX).  Sex is determined or recognized at birth by external genitalia and internal reproductive organs.  Van Meter, 7:18-8:11, Van Meter Report; Penn, 48:4-49:7; 49:19-22.  The term "sex" refers to the biological indicators of male and female such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal or external genitalia.  Penn, 54:8-15; DSM-V p. 451.  Choosing gender identity does not cause chromosomal changes in the body.  Penn, 51:14-17.  A person's innate sense of belonging to a particular gender does not cause biological changes in the body.  Penn, 51:18-21. Transgender individuals generally do not have intersex conditions. Transgender individuals remain biologically men or biologically women.  Van Meter Report; Penn, 52:14-21.

38.     Paragraphs 85-86.  Not material issues of fact.  These statements do not involve or pertain to Grimm or the application of the School Board's restroom policy to Grimm.

39.     Paragraph 87.  Grimm does not accurately characterize the School Board's testimony concerning the application of its restroom policy to a student's biological gender.  The School Board testified that although there is not a set process or procedure, the School Board relies on social norms, binary sexes, and students using the restroom that corresponds to their physiological sex.  This case is the only time there has been a conflict between those concepts.  Andersen, 14:8-15:9, 16:15-21.   A student's birth certificate is evidence of a student's physiology when the student enrolls in school.  Andersen, 16:22-17:8.  This is because sex is binary, male or female, and is determined by chromosomal compliment and corresponding reproductive role.  Transgender individuals do not have intersex conditions or other verifiable

physical anomalies. Instead, they remain biologically men or biologically women. Gender discordance is rare. Van Meter Report, ¶¶ 15, 17, 21. In fact, Grimm includes cites to Superintendent Clemons' tesitimony that he believed biological gender was determined by a student's genitalia – i.e. the student's physiological and anatomical characteristics. Clemons, 69:3-8, 70:4-5. Grim does not dispute that when he enrolled in school, and when he began high school, he was physiologically and anatomically a girl.

40. Paragraph 90-95. Not material issues of fact. These paragraphs are nothing more than argument by counsel. Further, in paragraph 93, Grimm states that Virginia Code § 32.1-270 required that his birth certificate be printed on security paper which causes it to be marked void. Virginia Code § 32.1-270 provides that "[a]ny vital record issued by the Department of Motor Vehicles shall be on security paper" (emphasis added), but birth certificates are not issued by the Department of Motor Vehicles. *See* Va. Code §§ 32.1-257, 32.1-251. There is no evidence or testimony in the record to support Grimm's assertion. Further, the declaration submitted by Janet Rainey does not confirm the authenticity of the birth certificate submitted by Grimm to the School Board in 2016, nor does it address the underlying deficiencies surrounding its issuance.

## IV.  Additional Facts

1. From the moment of conception, a fetus is determined to be either a male (XY), female (XX), or in rare cases, to have a combination of sex-determining chromosomes, many of which are not compatible with life and some of which are the cause of identifiable clinical syndromes. Van Meter Report, ¶ 12.

2. Sex is binary, male or female, and is determined by chromosomal complement and corresponding reproductive role. Van Meter Report, ¶ 15.

3.      "Gender" is a term that refers to the psychological and cultural characteristics associated with biological sex.  It is a psychological concept and sociological term, not a biological one.  Van Meter Report, ¶ 18.

4.      Scientific evidence shows that 80%-95% of pre-pubertal children with gender identity disorder (the mental disorder described as a discordance between natal sex and gender identity) come to identify with their biological sex by late adolescence.  Some will require lifelong supportive counseling, and others will not.  Van Meter Report, ¶ 33.  The vast majority of boys and girls with gender identity disorder identify with their biological sex by the time they emerge from puberty to adulthood, through either watchful waiting or family and individual counseling.  Van Meter Report, ¶¶ 29, 30; Van Meter, 81:4-83:2.  This occurrence is known as "desistance."

5.      The American College of Pediatricians has published statements opposing the provision of hormone therapy to transgender youth.  Van Meter, 50:18-22.  Hormone therapy stops the development of or production of pubertal hormones.  Penn, 24:16-21. Hormone treatment is proven to be harmful.  Van Meter, 51:12-52:17, 80:1-81:3.  If hormone therapy is stopped in a transgender boy, some of the physical changes will revert back to more feminine features.  Penn, 81:13-14.

6.      Medical and surgical transitioning causes an enormous increase in the incidence of mental health morbidity.  The results of a Swedish study demonstrate a 19-fold increase in completed suicides compared to the general Swedish population.  Van Meter, 119:3-121:14.

7.      Recognized experts in the field believe and hold the opinion that the treatment of children and adolescents with gender discordance and accompanying gender dysphoria should include an in-depth evaluation of the child and family dynamics.  This provides a basis on which

to proceed with psychological therapy.  The entire biologic and social family should be involved in psychological therapy designed to assist the patient, if at all possible, to align gender identity with natal sex.  Psychological support by competent counselors with an intent of resolving the gender conflict should be provided as long as the patient continues to suffer emotionally.  Van Meter Report, ¶ 32.

8.    WPATH is an agenda-driven advocacy organization whose membership consists of anyone who has an interest in the transgender social and political agenda.  It has no requirements for specialty training or certification.  Its guidelines and standards of care are not scientifically supported.  Its "peer-reviewed" journal is not reviewed by anyone with an opinion that is not in keeping with the philosophy of the organization.  Van Meter Report, ¶¶ 34, 38.

9.    The Endocrine Society's guidelines regarding treatment of transgender children and adolescents (through age 21) are not supported by any long-term studies of quality.  Van Meter, 97:14-99:3.

10.    The breadth of medical literature does not support the concept, expressed in the Declaration of Dr. Melinda Penn, that affirmation of gender incongruence through counseling and medical and surgical intervention is the only scientifically valid way to proceed.  Van Meter Report, ¶ 39.

11.    There are no scientifically validated gender incongruence training programs at universities in the United States.  Van Meter Report, ¶ 40.

12.    **There are no studies in existence which demonstrate that allowing a student to use a bathroom that matches his or her gender identity, but not his or her anatomical sex, is beneficial.**  Van Meter, 116:13-117:3; Penn, 70:11-17, 71:5-18.

16

## V.  Law and Argument

**A.     The School Board's Policy does not discriminate against Grimm on the basis of sex.**

### 1.     Grimm cannot prove a sex stereotype theory of liability under Title IX or the Equal Protection Clause.

Grimm contends that the School Board's restroom policy discriminates against him "because he is transgender."  ECF Doc. 185, p. 32.  In making this claim, Grimm relies on this Court's opinion on the School Board's Motion to Dismiss that a transgender student can state a "cognizable Title IX sex discrimination claim" and Equal Protection claim based on a gender stereotyping theory.  Id., p. 38; ECF Doc. 148, pp. 25-26; relying on *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).

Grimm's evidence, however, does not establish that there is no genuine issue of material fact that the School Board discriminated against Grimm based on a sex stereotype.  Indeed, the evidence establishes that the School Board has not discriminated based on sex stereotypes.

The School Board distinguishes boys from girls on the basis of *physiological or anatomical characteristics.*  The School Board's policy distinguishes boys and girls based on physical sex characteristics alone, and *not* based on any of the characteristics typically associated with sex stereotyping—such as whether a woman is perceived to be sufficiently "feminine" in the way she dresses or acts.  *Cf., e.g., Price Waterhouse*, 490 U.S. at 235 (finding sex stereotyping where female employee not promoted because her employer thought she was too "macho," "overly aggressive [and] unduly harsh" for a woman, and should have walked, talked, dressed, and styled her hair and make-up "more femininely").

The School Board's policy rejects classifying students based on whether they meet *any* stereotypical notion of maleness or femaleness.  The School Board's policy does not, for instance, allow only "masculine" boys into the boys' restroom, while requiring more

"effeminate" boys to use the girls' restroom.  Instead, the policy designates multiple-stall restrooms and locker rooms based on *physiology*, period—regardless of how "masculine" or "feminine" a boy or girl looks, acts, talks, dresses, or styles their hair.  Far from violating *Price Waterhouse,* the Board's policy is the *opposite* of the kind of sex stereotyping prohibited by that decision.  *See, e.g., Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (concluding that *Price Waterhouse* does not require "employers to allow biological males to use women's restrooms," because "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes").

Here, the evidence establishes that Grimm was born a female with female genitalia and fully functioning female reproductive organs.  Grimm's sex was determined or recognized at birth by external genitalia and internal reproductive organs.  Van Meter, 7:18-8:11, Van Meter Report; Penn, 48:4-49:7; 49:19-22.  Grimm was not born with intersex characteristics.  Grimm was issued a birth certificate that stated Grimm's sex as female.  Grimm, 112:19-20; 113:3-8; 117:17-118:12; Penn, 48:4-12.

Further, Grimm enrolled in Gloucester County School system as a girl and began the ninth grade as a girl.  Andersen Declaration; GCSB 1086, 1117, 1118, 1127, 1151-1154.  While Grimm told the School Board that he was transgender and identified as a boy at the start of his sophomore year, Grimm remains biologically and anatomically female.  Penn, 78:8-12; 79:19-80:1; Grimm, 118:7-12.  This remains the case even though Grimm underwent chest-reconstruction surgery.  This procedure did not create any biological changes in Grimm, nor did it complete sex reassignment surgery.  Penn, 78:8-12; Van Meter, 109:18-21. There is no biological basis for gender identity.  Penn, 46:8-10.

Under these facts, the School Board's restroom policy does not discriminate based upon sex stereotypes and, in fact, does not take sex stereotypes into consideration. The policy is based on the biological and physiological characteristics of students.

### 2. Grimm does not present undisputed material facts to prove that the School Board's restroom policy violated Title IX or the Equal Protection Clause because of Grimm's gender identity.

Because Grimm remains biologically and anatomically female, Grimm has premised his lawsuit, and his right to use the boys' restroom at school, as part of a "medically necessary treatment" plan to treat his gender dysphoria. ECF Doc. 177, ¶¶ 1, 2, 23; ECF Doc. 185, ¶ 10, citing Gavin Grimm Decl. ¶ 24. Grimm, however, has not offered medical, mental health, or expert testimony to prove that Grimm is a boy or that he has been diagnosed with gender dysphoria. Additionally, Grimm has not offered medical or expert testimony to prove the severity of the effects of gender dysphoria on Grimm or whether it was medically necessary for Grimm to use the boys' restroom at school to treat his purported gender dysphoria.

Instead, the record is devoid of medical evidence related to Grimm's transgender status and purported treatment for gender dysphoria. Grimm also has not designated a mental health expert, treating or retained, to offer testimony that the use of the boys' restroom was a medical necessity for Grimm.[2] Plaintiff's Expert Witness Identification. Furthermore, Grimm's expert, Dr. Penn, is not a mental health provider, has never diagnosed anyone with gender dysphoria, and does not express any opinions specific to Grimm. Penn, 11:4-11.

The "evidence" that Grimm offers on summary judgment, including a "treatment letter" provided by a psychologist, is nothing more than unsupported hearsay. Grimm is not qualified to

---

[2] Grimm's expert does not prescribe treatment plans that include social transitioning. Penn, 58:10-59:6.

testify to his medical diagnosis or what treatment is medically necessary to treat his alleged gender dysphoria.  Instead, testimony regarding medical diagnoses (such as gender dysphoria, mental stress, urinary tract infections) or medical treatments (such as use of opposite-sex bathrooms as a treatment for gender dysphoria) can only be made by a person possessing "scientific, technical, or other specialized knowledge within the scope of Rule 702."  See, Federal Rule of Evidence 701; *Lane v. District of Columbia*, 887 F.3d 480, 485-86 (D.C. Cir. 2018) (holding that the trial court did not err by excluding testimony of decedent's mother that decedent suffered from ADHD and bipolar disorder.); *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (Rule 701 does "not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness."); *Edwards v. Graham Cty. Jail*, No. 1:16-CV-315-FDW, 2017 WL 5894496, at *5–6 (W.D.N.C. Nov. 29, 2017) (holding plaintiff could not testify to the diagnosis of a heart attack or existence of a heart attack because it required specialized knowledge which the plaintiff lacked, nor could the plaintiff testify that he was told he had been diagnosed with a heart attack as it is inadmissible hearsay.)

Furthermore, Grimm's own expert testified that "gender affirming care" or "social transitioning care" is purportedly part of an overall mental health treatment plan to address gender dysphoria.  Using the boys' restroom at school is just one component of an overall social transitioning care plan.  Thus, even where a transgender student is not permitted to use the restroom consistent with his expressed gender identity, there are other methods of social transition that can be used to help treat gender dysphoria.  Penn, 70:18-71:4.

Additionally, the "standards of care" that Grimm's expert, and "every major medical and mental health professional organization" relies on "to eliminate the clinically significant distress

by helping boys who are transgender to live as boys", do not address the use of a transgender student's use of restrooms at school. **Neither the WPATH standards of care nor the Endocrine Society guidelines has a standard of care related to the use of restrooms by transgender students at school.** Penn, 66:21-67:2, 68:15-21; see also Penn, 63:8-65:19.[3]

Penn does, however, opine that under these standards of care, the precise treatment for gender dysphoria depends on each person's individualized need. The medical standards of care differ depending on whether the treatment is for a pre-pubertal child, an adolescent, or an adult. Penn Expert Report & Decl. ¶ 23. Moreover, the standards of care provide that what helps one person alleviate gender dysphoria might be very different from what helps another person. Penn, 37:18-38:6. The WPATH standards of care that Penn relies on are intended to be a flexible guideline with individualized treatment. Penn, 37:15-22. Yet, Grimm does not present any expert testimony on what medical treatment Grimm needed.

At best, the use of restrooms that are in line with a transgender patient's gender identity, instead of the sex designated at birth, is only one component of an overall mental health social transition plan or "gender affirming care" plan to treat gender dysphoria. Gender affirming care, however, can be managed through other methods without requiring school systems to permit transgender students to use the bathroom that is inconsistent with their biological sex. If a transgender student is not permitted to use the bathroom consistent with his gender identity in school, there are other methods of social transition that can be used to help treat gender dysphoria. Van Meter Report; Penn, 62:15-63:7; 70:18-71:4. Indeed, the School Board

---

[3] Penn also does not know whether the WPATH standards of care were peer reviewed by endocrine professionals, nor does she know who authored the standards of care. Penn, 35:21-36:5

accommodated Grimm in the other aspects of Grimm's social transition, including referring to him by his new name and using male pronouns.

Despite all of the allegations and discovery in this case, Grimm is left with the bare assertion that he is a girl that identifies as a boy.  There is not medical, mental health or expert testimony in the record to support Grimm's assertion that he is a boy or that it was medically necessary for him to use the boys' restroom at school.  Grimm cannot prove that he was subject to sex stereotype discrimination solely on his allegation that he identifies as a boy.  In the end, Grimm cannot carry his burden of proof that the School Board violated his rights under Title IX or the Equal Protection Clause.

### 3. Neither Title IX nor the Equal Protection Clause compels the School Board to cooperate with Grimm's medical treatment plan.

Even if Grimm had evidence to support his allegation that using the boys' restroom was "medically necessary treatment for gender dysphoria", the School Board was not compelled to cooperate and assist with the implementation of this medical treatment to satisfy Title IX and/or the Equal Protection Clause.

Title IX prohibits exclusion of any person from participation in, denial of the benefits of, or discrimination under "any education program or activity receiving Federal financial assistance" **on the basis of sex**.  20 U.S.C. § 1681(a).  It is simply silent on issues relating to medical treatment.  The Department of Education's regulations are nearly so, and nothing in those regulations supports Grimm's case.  See ECF Doc. 196, Section IV, pp. 41-43.

The Equal Protection issue is likewise easily disposed of.  *See, e.g., Harris v. McRae*, 448 U.S. 297, 321-22 (1980) (holding that the "Hyde Amendment" does not violate the equal protection component of the Fifth Amendment Due Process Clause by withholding public funding for certain medically necessary abortions while providing funding for other medically

necessary health services).  "The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity."  *Id.* at 322.  The same analysis applies to the Fourteenth Amendment's Equal Protection Clause. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).  That Clause therefore does not give Grimm a "substantive" right to governmental assistance with his medical treatment, however "necessary" that treatment may be from a medical standpoint.  Simply put, Grimm's desire to use the boys' restroom at school is not a right protected by the Equal Protection Clause.

## 4. Grimm's new birth certificate does not change the Title IX or Equal Protection analysis.

Grimm has created an inaccurate narrative to characterize the School Board's restroom policy.  Contrary to Grimm's assertion on brief, the School Board has not changed its policy and has not asserted that "its 'biological gender' policy is actually a policy based on the student's birth certificate - not based on the student's physiology."  ECF Doc. 185, p. 33.  Instead, Grimm mischaracterized the School Board's testimony to craft this argument based upon a series of incomplete hypothetical questions asked during the 30(b)(6) deposition.

An examination of the 30(b)(6) testimony confirms that the School Board has consistently applied its policy based upon a student's physiology and anatomy.  The School Board testified that although there is not a set process or procedure, the School Board relies on social norms, binary sexes, **and students using the restroom that corresponds to their physiological sex**.  This case is the only time there has been a conflict between those concepts. Andersen, 14:8-15:9, 16:15-21.

Obviously, the School Board does not inspect student's genitals upon enrollment in school.  Andersen, 21:19-22.  Instead, the School Board accepts a student's birth certificate as

evidence of determining a student's physiology when the student enrolls in school. <u>Andersen</u>, 16:22-17:8. The reason for this is that that sex is binary, male or female, and is determined by chromosomal compliment and corresponding reproductive role. Transgender individuals do not have intersex conditions or other verifiable physical anomalies. Instead, they remain biologically men or biologically women. Gender discordance is rare. <u>Van Meter Report</u>, ¶¶ 15, 17, 21. Indeed, Grimm has never disputed in this litigation that he was born with female genitalia, enrolled in Gloucester schools as a girl, and used the girls' restroom, including at Gloucester High School, through the middle of his freshman year of high school. <u>Grimm</u>, 89:14-20.

Grimm again sets up a straw man argument by suggesting that the Board's "last minute assertion conflicts with the Board's repeated representations" in this case that its "policy was based on anatomical and physiological sex characteristics" and that Grimm's birth certificate was not relevant. ECF Doc. 185, pp. 33-34. The School Board has always applied its policy based on the anatomical and physiological sex of its students. There are three reasons Grimm's new amended birth certificate is not relevant to these proceedings. First, all of the "representations" in previous court filings were related to Plaintiff's appeal of the denial of his Motion for Preliminary Injunction and the dismissal of his Title IX case. Grimm's amended birth certificate was not at issue, was not part of the record on appeal, and "*none* of the various legal positions taken below—whether by the Board, the district court, the Fourth Circuit, the Department of Education, or Respondent—turn on Respondent's birth certificate." Indeed, there is no dispute that at the time Grimm enrolled in Gloucester County schools, Grimm's original birth certificate at birth designated his sex as female, and Grimm was physiologically and anatomically a female. That remains true even today.

Second, Grimm's amended birth certificate does not change Grimm's physiological and anatomical sex – which remains female.  While Grimm had chest reconstruction surgery, it did not create any biological changes in Grimm.  Instead, it is only a physical change.  <u>Penn</u>, 78:8-12.  Moreover, Grimm did not undergo surgical gender reassignment procedures, as that procedure could not be completed until Grimm was at least 18 years of age.  <u>Van Meter</u>, 109:18-21; <u>Penn</u>, 78:19-79:15.  There is no evidence in the record to suggest that Grimm has completed surgical gender reassignment to date, and to that extent, Grimm remains biologically and anatomically female.  <u>Penn</u>, 78:8-12; 79:19-80:1; <u>Grimm, 118:7-12</u>.  Thus, while Grimm was enrolled in Gloucester High School, the School Board was aware that Grimm remained physiologically and anatomically a female.

Third, while Grimm provided a different Virginia birth certificate to the high school in November of 2016 listing Grimm's sex as male, the birth certificate Grimm provided was not issued in conformity with Virginia law based upon the School Board's understanding of the Code of Virginia and applicable administrative regulations.[4]   Ultimately, the underlying basis for Grimm's amended birth certificate does not comply with Virginia law.  An amended birth certificate can be sought when an individual's sex has been changed by "surgical gender reassignment procedure." 12 VAC 5-550-320.  Yet, the evidence is undisputed that Grimm only had chest reconstructive surgery, not a "surgical gender reassignment procedure." Indeed,

---

[4] The School Board incorporates section IV. A. from its brief in support of summary judgment detailing the reasons that Grimm's amended birth certificate did not comply with Virginia law, notwithstanding the declaration submitted by Janet Rainey.  ECF Doc. 196, pp. 43-45.  Rainey's declaration does not address the underlying deficiencies with the amended birth certificate.  See, ECF Doc. 195.  Moreover, **Rainey was not identified as a witness in this case until after the close of discovery**.  <u>Plaintiff's Second Supplement to Initial Disclosures.</u>

surgical gender reassignment surgery could not be performed until Grimm was at least 18 years old.  <u>Penn</u>, 78:19-79:15; 79:19-80:1. [5]

Contrary to Grimm's suggestion, there was no "stark departure from its usual practice" of explaining concerns about documentation.  Once again, Grimm ignores the actual letter that was sent to his counsel.  In the January 18, 2017, letter to Grimm's counsel, the School Board stated that it declined to change the official school records "[b]ased on [its] review" of the birth certificate, school policy JO, and the Virginia Code and Administrative Code.  Additionally, Grimm's counsel was provided with a copy of the documents referenced in the letter.  The School Board's explanation was transparent, and Grimm's experienced attorneys were quite capable of reviewing these materials and the Virginia Code and Administrative Code to determine the deficiencies to his request.

Furthermore, the letter concluded by stating: "Please feel free to submit additional materials, and, of course, [Grimm] has the right under school policy JO, see page 8 <u>Correction of Education Records</u>, to a hearing to challenge the information believed to be 'inaccurate, misleading or in violation of the student's rights.'  I look forward to hearing further from you."  Grimm did not request a hearing on the School Board's denial of his request to have his transcript changed, either while he was a student at Gloucester High School or after his graduation in the spring of 2017. ECF Doc. 171-1; <u>Andersen Declaration</u>.

Ultimately, Grimm's counsel never closed the loop on his hypothetical questions.  Specifically, counsel did not ask a hypothetical that <u>included facts relevant to this case</u>.  Counsel

---

[5] The School Board was not under an obligation to "make a simple phone call to the Department of Vital Records" to verify the underlying basis for Grimm's birth certificate, nor could the Department of Vital Records have released any information concerning Grimm's birth certificate in a "simple phone call" as suggested in Grimm's brief.  ECF Doc. 185, p. 34; See 12 VAC 5-550-20, 12 VAC 5-550-340, 12 VAC 5-550-470.

did not ask how the Board would apply its policy if a student enrolled in Gloucester High School with a birth certificate designating the student's sex as male, but the School Board later learned through complaints from students that the student was actually physiologically and anatomically female.  If Grimm's counsel had asked that question, it would have been apparent that the School Board's application of its policy did not turn on a "new interpretation of the policy."  ECF Doc. 185, p. 30. Instead, the student would have been required to use the restroom associated with his physiological sex or one of the three single-user restrooms. In fact, Grimm includes in his brief citations to Superintendent Clemons' tesitimony where he confirmed that under the Board's policy, biological gender was determined by a student's genitalia – i.e. the student's physiological and anatomical characteristics.  Clemons, 69:3-8, 70:4-5.

Accordingly, Grimm cannot carry his burden of proof that the School Board violated his rights under Title IX or the Equal Protection Clause.

**B.     The School Board's policy complies with the plain language of Title IX.**

In addition to the disputed fact issues and the reasons set forth above, Grimm cannot prevail on summary judgment as the School Board's policy is consistent with the plain language of Title IX and its implementing regulation, 34 C.F.R. § 106.33.  Throughout this litigation, Grimm has pressed an interpretation of Title IX that "sex" is determined solely according to "gender identity."  ECF Doc. 177, ¶ 20.  As the School Board set out in its Motion for Summary Judgment, the text, history, and structure of Title IX, and the plain language of its implementing regulation, foreclose that view.

The better interpretation—which is reflected in the School Board's policy—is that when separating boys and girls on the basis of sex in restrooms and similar facilities, schools may rely on the anatomical and physiological differences between males and females rather than students'

gender identity.  For purposes of brevity, the School Board adopts and incorporates its argument in support of its Motion for Summary Judgment on Grimm's Title IX claim, and the proper interpretation of "sex", in support of this argument.  ECF Doc. 196, Section II, pp. 12-30.

While this Court declined to interpret the statutory term "sex" as referring "to the 'then-universal understanding of "sex" as a binary term encompassing the physiological distinctions between men and women,' as understood during the passage of Title IX and the promulgation of § 106.33," on the ground that "this fails to address the question of how § 106.33 is to be interpreted regarding transgender students or other individuals with physiological characteristics associated with both sexes" (ECF Doc. 148, p. 16), the evidence on summary judgment now supports the School Board.

Here, Grimm's own expert agrees that there is a biological, anatomical and physiological component to determining the sex of an individual.  Moreover, the evidence shows that the desired use of a restroom consistent with a transgender individual's gender identity is not because of the transgender individual's "sex."  Instead, it is one component of a mental health treatment plan – social transitioning – to address gender dysphoria.  It is not an immutable right based on sex.  Further, Grimm has not put forth expert evidence to support his contention that the term "sex" under Title IX should be interpreted differently as a result of his gender identity or a medical treatment plan.  Additionally, there is no evidence that individuals with physiological characteristics associated with both sexes are implicated in this case.  Grimm testified he does not have intersex characteristics.

Thus, under these circumstances, a policy of providing segregated same sex restrooms and single-stall unisex restrooms for any student to use does not violate Title IX and is indeed permissible under section 106.33.

28

### 1.   Grimm does not present undisputed evidence that the policy harmed Grimm.

Grimm asserts on brief that the location of the single-stall restrooms, along with the physical and mental anguish in using those restrooms, caused harm to Grimm.  Yet, the evidence does not support this assertion and certainly is not undisputed.

Further, there are no medical scientific or medical research studies into the effect of not permitting a transgender student to use the bathroom consistent with his gender identity in school.  Van Meter, 116:13-117:3; Penn, 70:11-17, 71:5-18, 73:3-8.  Indeed, Penn has treated transgender students who were not permitted to use the restroom that aligned with their gender identity at school and still saw improvement in their gender dysphoria.  Penn, 71:19-72:18. Here, while Grimm points to an increase in anxiety related to the restroom policy, Grimm has not identified an expert, treating or retained, to testify that Grimm suffered from mental distress or that Grimm's mental distress was associated with the use of the restrooms at Gloucester High School.   Additionally, Grimm also points to the distance to the single-stall restrooms, but does not offer expert testimony on how this distance effected his gender dysphoria. Indeed, Grimm acknowledged that at lunch it was closer for him to use the single-stall restroom.  Grimm, 134:7-11.  Grimm was also given permission to use a staff restroom on the D wing. Grimm, 76:13-77:2. Moreover, there is evidence that other students were using the single-stall restrooms.  Collins, 132:7-20.[6]

---

[6] Grimm's statement that the policy "physically excluded [him] from class by requiring him to travel long distances to use the restroom and miss valuable class time" is not supported by the evidence.  Grimm's argument that the distance to the single stall restroom prevented him from using the restroom is a red-herring.  Grimm testified that, after consultation with the ACLU, it was clear from the start that he was simply not going to use the single-stall restrooms.  Grimm, 121:11-122:17; 124:4-9; 125:11-13.

While Grimm also points to urinary tract infections which is "corroborated by major medical organizations", his testimony is not corroborated by medical testimony in this case. Grimm has not submitted evidence that he was diagnosed with urinary tract infections or that any urinary tract infection was related to the School Board's restroom policy. Similarly, Grimm does not offer an expert, retained or treating, to support the assertion that the restroom policy "physically excluded [him] from the entire Gloucester High School campus by driving him to complete many of his course credits on an off-site facility." These unsupported statements cannot establish a Title IX claim, nor are they sufficient to support a motion for summary judgment. The same is true with regard to Grimm's citation to the hearsay statements contained in amicus briefs.

**C.     The School Board's restroom policy did not violate the Equal Protection Clause.**

The "[t]he [Equal Protection] Clause requires that similarly-situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). In order to make out a claim under the Equal Protection Clause, Grimm must demonstrate that he has been treated differently from others similarly situated and that the unequal treatment was the result of intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 652 (4th Cir. 2001); *Brown v. Wilson*, No. 3:13CV599, 2015 WL 3885984, at *6 (E.D. Va. 2015); *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

**1.     Grimm cannot prevail because all students are treated the same under the School Board's Policy.**

The School Board's restrooms policy does not discriminate against any class of students. Instead, the policy was developed to treat all students and situations the same. To protect the safety and respect the privacy of all students, the School Board has had a long-standing practice of limiting the use of restroom and locker room facilities to the corresponding physiology of the

students. The School Board also provides three single-stall restrooms for any student to use regardless of his or her physiology.

Under the School Board's restroom policy, Grimm was treated like every other student in the Gloucester Schools. All students have two choices under the policy. Every student can use a restroom associated with their physiology, whether they are boys or girls. If students choose not to use the restroom associated with their physiology, they can use a private, single-stall restroom. No student is permitted to use the restroom of the opposite sex. As a result, all students, including female to male transgender and male to female transgender students, are treated the same.

Grimm, therefore, cannot demonstrate either that he was treated differently from others similarly situated or that he was subject to intentional discrimination in violation of the Equal Protection Clause. *See Workman v. Mingo County Bd. of Educ.*, 419 F. App'x 348, 354 (4th Cir. 2011) (no evidence of unequal treatment in application of state mandatory vaccination laws before admission to school); *Hanton v. Gilbert*, 36 F.3d 4, 8 (4th Cir. 1994) (no evidence that similarly situated males were afforded different treatment).

### 2. Transgender persons are not entitled to heightened scrutiny.

In the Court's May 22, 2018, opinion denying the School Board's motion to dismiss, the Court concluded that the School Board's policy should be analyzed under heightened scrutiny because transgender individuals constitute a "quasi-suspect class" and because Grimm relies on a sex stereotype theory of liability. ECF Doc. 148, pp. 25-26. However, neither the United States Supreme Court nor the Fourth Circuit has recognized transgender status as a suspect classification under the Equal Protection Clause. Other courts have rejected the notion that transgender status, or other classifications of sex, is a suspect classification. *See, e.g.,* Etsitty v.

Utah Transit Authority, 502 F.3d 1215, 1222 (10th Cir. 2007) (holding that transsexuals are not a protected class under Title VII); *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (declining to recognize transgender as a suspect class); *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996) (Title VII does not afford a cause of action for discrimination based upon sexual orientation); *Williamson v. A.G. Edwards & Sons, Inc.,* 876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against homosexuals"), *cert. denied,* 493 U.S. 1089 (1990); *Brown v. Zavaras*, 63 F.3d 967, 970-71 (10th Cir. 1995) (declining to recognize transsexuality as a protected class); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008) ("transsexuality itself [is] a characteristic that, in and of itself, nearly all federal courts have said is unprotected by Title VII"); *Johnston v. Univ. of Pittsburgh of com. Sys. Of Higher Educ.*, 97 F. Supp. 3d 657, (holding that transgender status is not a suspect classification); *Jamison v. Davue*, No. CIV S-11-2056 WBS, 2012 WL 996383, at *3 (E.D. Cal. Mar. 23, 2012) ("Plaintiff is cautioned, however, that transgender individuals do not constitute a 'suspect' class, so allegations that defendants discriminated against him based on his transgender status are subject to a mere rational basis review.")

This Court should not step out on its own and recognize transgender as a new suspect classification. Indeed, the Supreme Court has admonished lower courts not to create new suspect classifications. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985).

Furthermore, intermediate scrutiny does not apply based on the facts of this case. Unlike laws that differentiate between fathers and mothers, widows and widowers, unwed fathers and unwed mothers, *see Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1688-89 (2017), separating boys and girls into different bathrooms based on their physiology is not sex-based discrimination that is prohibited by the Equal Protection Clause.

The equal protection question surrounds Grimm's sex at birth.  *Johnston*, 97 F. Supp. 3d at 671.  The evidence in this case establishes that Grimm's birth sex is female. Grimm's choice of gender identity did not cause chromosomal or biological changes in his body, and Grimm remains biologically female.  Van Meter Report; Penn, 51:14-17; 51:18-21; 52:14-21.  While Grimm had chest reconstruction surgery in June of 2016, this procedure did not create any biological changes in Grimm, but instead, only a physical change.  Penn, 78:8-12.  Further, while Grimm asserts that he had a new birth certificate issued during his senior year in high school as a result of this procedure, the evidence nevertheless establishes that Grimm still was anatomically and physiologically female.  Accordingly, Grimm's equal protection claim should be reviewed under the rational basis standard.

### 3.      The School Board's Policy is presumptively constitutional under rational basis review.

Grimm's identification as a male does not supersede the legitimate privacy rights the School Board considered in enacting the restroom policy.   Accordingly, the School Board incorporates section III. C. of its Brief in Support of the School Board's Motion for Summary Judgment in opposition to Grimm's Equal Protection claim.  See, ECF Doc. 196, pp. 34-37.

### 4.      The School Board's Policy is constitutional under intermediate scrutiny.

Even if intermediate scrutiny applied, the School Board has an interest in protecting the privacy rights of its students.  *See, e.g., Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies."); *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir. 1980) ("[i]t does not require a constitutional scholar" to conclude that a strip search invades a student's privacy rights).  As recently as January 2016, the Fourth Circuit cited *United States v. Virginia,* 518 U.S. 515 (1996),

approvingly while concluding that physiological differences justified treating men and women differently in some contexts.  *See Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016).

Grimm's bald statement that his "use of the boys' restrooms did not infringe on anyone else's privacy" because there is not evidence a student actually encountered Grimm in the restroom misses the mark.  The School Board does not have to wait for another student's constitutional privacy rights to be actually violated before it takes those privacy rights into consideration in enacting a policy to protect all students' privacy rights.

> Perhaps it is merely an abundance of common experience that leads inexorably to the conclusion that there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex when not reasonably necessary for some legitimate, overriding reason, for the obverse would be repugnant to notions of human decency and personal integrity.

*Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987); *see also, Doe v. Luzerne Cty.*, 660 F.3d 169, 176 (3rd Cir. 2011) (we are not aware of any court of appeals that has adopted … a requirement that certain anatomical areas of one's body, such as genitalia, must have been exposed for that person to maintain a privacy claim under the Fourteenth Amendment ….")

Moreover, Grimm explicitly acknowledged that there were privacy rights and concerns with his use of the boys' restroom.  In fact, Grimm sought to protect his privacy rights by making it clear to school administrators that he only wanted to use the boys' restroom if the restroom stall was equipped with a door.  Collins, 55:14-57:21.  The School Board's interests in student privacy satisfies the Equal Protection Clause.[7]

---

[7] Grimm creates another strawman argument in asserting that "even if there were an actual risk of exposure to nudity, the reality is that placing a boy who is transgender in the girls' restroom … would still mean that students would be 'in the presence of individuals with physical sex characteristics of the opposite sex.'"  ECF Doc. 185, p. 40.  Of course, this is not what the School Board's policy does.  Instead, the School Board's policy provides for a single-user restroom to eliminate this concern.

In further opposition to Grimm's Motion for Summary Judgment on the Equal Protection claim, the School Board incorporates section III. D from its Brief in Support of the School Board's Motion for Summary Judgment.  See, ECF Doc. 196, pp. 38-40.

5.      **Settlement negotiations in February 2019 are irrelevant, and discussion of those negotiations should be disregarded and stricken from Grimm's Brief.**

Grimm graduated from Gloucester High School on June 10, 2017.  In February 2019, nearly two years later, the School Board held a public hearing "regarding a proposed policy that 'would allow <u>transgender students</u> to use the restroom consistent with the <u>student's</u> asserted gender identity when [certain specified] criteria have been met."  ECF Doc. 185, p. 25 (emphasis added).  The School Board's decision not to adopt that proposed policy – which "rose out of the parties' settlement negotiations with Magistrate Judge Miller" – has absolutely nothing to do with the merits of Grimm's case, because Grimm's interests would not have been affected by its adoption and have not been affected by the failure to adopt the policy.  Grimm no longer is a student at Gloucester High School.  In fact, he now lives in California.

While Grimm argues that Federal Rule of Evidence 408 does not preclude admission of "the Board's press releases and public statements" because they "were not confidential and were not 'made during compromise negotiations' with Plaintiff", this argument does not acknowledge that the statements are not relevant nor appreciate the context in which the policy was considered.  ECF Doc. 185, p. 25 n. 6.

Grimm's argument is contrary to the policies underlying Rule 408.  As stated in the 1972 Advisory Committee Notes, exclusion of compromise discussions may be based on two grounds.  First, "[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position."  The second and "more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of

disputes."  Both grounds support exclusion of Grimm's evidence of settlement negotiations in this case.

**D.      The issuance of a new birth certificate does not compel revision of Grimm's school records, and the School Board's actions did not violate Title IX or the Equal Protection Clause**

Grimm asks the Court to issue a declaratory judgment that the Board's decision declining to "update" his official school transcript violates Grimm's rights under Title IX and the Equal Protection Clause.   Grimm also requests a permanent injunction requiring the School Board to update Grimm's school transcript to match the male gender marker on his birth certificate.   This relief should be denied for all of the reasons discussed in previous sections of this Brief.

Grimm's brief does not accurately describe the facts nor are there undisputed facts that permit summary judgment to be entered in Grimm's favor on these issues.  Indeed, Grimm's statement that "*it is doubtful* that any reasonable finder of fact could actually credit the Board's claim that it had questions about the authenticity of Gavin's birth certificate" is enough to defeat Grimm's motion for summary judgment on this issue.  ECF Doc. 185, p. 44 (emphasis added). The evidence must be undisputed.  The School Board incorporates section IV A and B in its Brief in Support of the School Board's Motion for Summary Judgment in opposition to Grimm's motion.  ECF Doc. 196, pp. 43-47.

Moreover, the balance of hardships does not weigh in Grimm's favor.  As set out above, the amended birth certificate issued to Grimm not only does not comply with Virginia law, it does not comport with the medical and other factual evidence in this case.  Furthermore, the School Board offered Grimm the opportunity for a hearing on this issue **in January 2017,** but Grimm never requested the hearing to update his school records.  Additionally, Grimm has not offered an expert, retained or treating, to offer evidence concerning Grimm's diagnosis, medical

or mental health condition, or a purported gender reassignment surgery.  Grimm's reliance on inadmissible hearsay does not support the conclusion that the balance of hardships weigh in his favor or that an injunction is in the public interest.

An injunction should not be entered based on the evidence in this record.

## VI.  Conclusion

Far from offering undisputed material facts to support summary judgment, Grimm has not offered medical, mental health, or expert testimony to prove that Grimm is a boy or that he has been diagnosed with gender dysphoria.  Additionally, Grimm has not offered medical or expert testimony to prove the severity of the effects of gender dysphoria on Grimm or whether it was medically necessary for Grimm to use the boys' restroom at school to treat his purported gender dysphoria.  The record is devoid of medical or mental health evidence related to Grimm's transgender status and purported treatment for gender dysphoria.  Grimm cannot establish a violation of Title IX or the Equal Protection Clause on this record.

Grimm's Motion for Summary Judgment should be denied.

**GLOUCESTER COUNTY SCHOOL BOARD**

By Counsel

/s/
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Attorneys for Gloucester County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com

# C E R T I F I C A T E

I hereby certify that on the 9th day of April 2019, I filed a copy of the foregoing document

with the Clerk of the Court using the CM/ECF system, which will automatically send a Notice of

Electronic Filing to all counsel of record.


/s/
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
Attorneys for Gloucester County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com