IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| GAVIN GRIMM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 4:15-cv-54-AWA-DEM |
| | ) |
| GLOUCESTER COUNTY SCHOOL | ) |
| BOARD, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................... 2

ARGUMENT .................................................................................................................... 8

I.    Legal Standard. ........................................................................................................ 8

II.   The Board's Policy Violates Title IX. ....................................................................... 9

      A.   Discrimination Based on a Person's Transgender Status Is Inherently
           Discrimination "On the Basis of Sex" Under Title IX. ................................... 9

      B.   The Board's Policy Discriminated Against Gavin Because He Is Transgender. ......... 15

      C.   The Board's Policy Cannot Be Justified Based on Physiology. ................................ 17

      D.   The Board Continued to Discriminate Against Gavin By Disregarding His Court
           Order and Birth Certificate. ..................................................................... 19

      E.   The Restroom Regulation Does Not—and Cannot—Authorize Schools to
           Discriminate in Violation of the Statutory Text. ......................................... 22

      F.   *Pennhurst* Provides No Defense to Claims of Intentional Sex Discrimination. .......... 26

III.  The Board's Policy Violates the Equal Protection Clause. ........................................... 27

      A.   The Board's Policy Is Subject to Heightened Scrutiny. ................................................ 27

      B.   A Reasonable Factfinder Could Conclude that the Board's Discrimination Against
           Gavin Is Motivated By Irrational Animus or Moral Disapproval. ............................ 34

IV.   The Board's Refusal to Update Gavin's Transcript to Match His Birth Certificate Violates
      Title IX and the Equal Protection Clause. ..................................................................... 35

V.    Gavin's Claims for Nominal Damages Are Not "Moot." ................................................. 36

CONCLUSION ................................................................................................................ 37

CERTIFICATE OF SERVICE ............................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*,
318 F. Supp. 3d 1293 (M.D. Fla. 2018) ................................................. 15, 16, 33

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ......................................................................................... 13

*Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*,
405 F.3d 764 (9th Cir. 2005) ....................................................................... 17, 37

*Barr v. United States*, 324 U.S. 83 (1945) ........................................................ 12

*Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016) .................................................. 18

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ................................................ 13

*California Fed. Sav. & Loan Ass'n v. Guerra*,
479 U.S. 272 (1987) ......................................................................................... 19

*Campbell v. CGI Techs. & Solutions, Inc.*,
No. 118CV707AJTMSN, 2019 WL 1375583 (E.D. Va. Mar. 27, 2019)........................... 34

*Cannon v. University of Chicago*,
441 U.S. 677 (1979) ......................................................................................... 27

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ......................................................................................... 13

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ......................................................................................... 35

*City of L.A., Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978) ...................................................................................... 9, 19

*City of Los Angeles. v. Patel*,
135 S. Ct. 2443 (2015) ..................................................................................... 16

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999) ......................................................................................... 11

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018) ...................................................................... 15, 31, 33

*EEOC v. R.G. & G.R. Harris Funeral Homes,
Inc.*, 884 F.3d 560 (6th Cir. 2018)........................................................ 9, 11, 13, 15

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) .................................. 34

*Fabian v. Hosp. of Cent. Conn.*,
   172 F. Supp. 3d 509 (D. Conn. 2016) ........................................................................ 11

*Finkle v. Howard Cty., Md.*,
   12 F. Supp. 3d 780 (D. Md. 2014) ............................................................................... 9

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ...................................................................... 11

*Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*,
   868 F.3d 1248 (11th Cir. 2017) ................................................................................. 36

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
   822 F.3d 709 (4th Cir. 2016) ......................................................................... 10, 24, 25

*Glenn v Brumby*, 663 F.3d 1312 (11th Cir. 2011) ............................................................ 9, 14

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ................................................................ 36

*Henson v. Santander Consumer USA Inc.*,
   137 S. Ct. 1718 (2017) .............................................................................................. 26

*Hicks ex rel. Hicks v. Mellis*, 275 Va. 213 (2008) ............................................................. 21

*Hively v. Ivy Tech Cmty. Coll. of Ind.*,
   853 F.3d 339 (7th Cir. 2017) ............................................................................... 12, 13

*In re Brown*, 289 Va. 343, 349 (2015) ............................................................................... 21

*Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*,
   966 F.2d 847 (4th Cir. 1992) ..................................................................................... 17

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ........................................................................................ 10, 11, 27

*Johnston v. University of Pittsburgh of the Com. Sys. of Higher Educ.*,
   97 F. Supp. 3d 657 (W.D. Pa. 2015) .......................................................................... 15

*Lewis v. City of Chi.*, 560 U.S. 205 (2010) ......................................................................... 12

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
   286 F. Supp. 3d 704 (D. Md. 2018) ..................................................................... passim

*Marks v. City of Chesapeake, Va.*,
   883 F.2d 308 (4th Cir. 1989) ..................................................................................... 34

*Marvin M. Brandt Revocable Tr. v. United States*,
   572 U.S. 93 (2014) .................................................................................................... 13

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................. 12, 14

*McWilliams v. Fairfax Cty. Bd. of Supervisors*,
  72 F.3d 1191 (4th Cir. 1996) ................................................................. 12

*Mercer v. Duke Univ.*,
  190 F.3d 643 (4th Cir. 1999) ................................................................. 23

*Minn. Lawyers Mut. Ins. Co. v. Batzli*,
  442 F. App'x 40 (4th Cir. 2011) ............................................................ 37

*Oncale v. Sundowner Offshore Services, Inc.*,
  523 U.S. 75 (1998) ......................................................................... 11, 12

*Parents for Privacy v. Dallas Sch. Dist. No. 2*,
  326 F. Supp. 3d 1075 (D. Or. 2018) ...................................................... 33

*Penn. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998) ............................................................................. 27

*Pennhurst State School & Hospital v. Halderman*,
  451 U.S. 1 (1981) ................................................................................ 26

*Price v. City of Charlotte, N.C.*,
  93 F.3d 1241 (4th Cir. 1996) ................................................................. 16

*Ret. Comm. of DAK Americas LLC v. Brewer*,
  867 F.3d 471 (4th Cir. 2017) .................................................................. 8

*Robbins v. Bentsen*, 41 F.3d 1195 (7th Cir. 1994) ................................... 23

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ....................................... 16

*Schroer v. Billington*,
  577 F. Supp. 2d 293 (D.D.C. 2008) ....................................................... 15

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017) .................................................................... 27, 28

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ............................................................................. 14

*Suesz v. Med-1 Sols., LLC*,
  757 F.3d 636 (7th Cir. 2014) ................................................................. 24

*Talk Am., Inc. v. Mich. Bell Tel. Co.*,
  564 U.S. 50 (2011) ............................................................................... 23

*Time Warner Ent. Co. v. Everest Midwest Licensee, LLC*,
  381 F.3d 1039 (10th Cir. 2004) ............................................................. 23

*Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001) ....................................... 27

*Union Bank v. Wolas*, 502 U.S. 151 (1991) ........................................... 12

*United States v. Biocic*, 928 F.2d 112 (4th Cir. 1991) ............................................................ 30

*United States v. Craft*, 535 U.S. 274 (2002) ........................................................................ 14

*United States v. Marte*, 356 F.3d 1336 (11th Cir. 2004) ...................................................... 25

*United States v. Virginia*, 518 U.S. 515 (1996). ............................................................ passim

*Wengler v. Druggists Mut. Ins. Co.*,
    446 U.S. 142 (1980) ............................................................................................................ 28

*West v. Gibson*, 527 U.S. 212 (1999) ..................................................................................... 12

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...................................................................................... passim

*Wisconsin. Cent. Ltd. v. United States*,
    138 S. Ct. 2067 (2018) ........................................................................................................ 12

*Zarda v. Altitude Express, Inc.*,
    883 F.3d 100 (2d Cir. 2018) ................................................................................... 12, 13, 23

**Statutes**

18 U.S.C. § 249(a)(2) ................................................................................................................ 13

20 U.S.C. § 1221(d) ................................................................................................................. 35

20 U.S.C. § 1681(a) ................................................................................................. 10, 22, 23, 26

20 U.S.C. § 1681(a)(2)-(9) ................................................................................................. 22, 23

20 U.S.C. § 1686 ...................................................................................................................... 23

28 U.S.C. § 1738 ...................................................................................................................... 21

42 U.S.C. § 13925(b)(13)(A) ................................................................................................... 13

Va. Code Ann. § 32.1-269(E) .................................................................................................. 21

**Other Authorities**

34 C.F.R. § 106.33 ........................................................................................................ 22, 23, 26

Civil Rights Uniformity Act of 2017,
    H.R. 2796, 115th Cong. § 3(b) ........................................................................................... 14

OED Online, Oxford University Press ..................................................................................... 10

Title IX Clarification Act of 2016,
    H.R. 5307, 114th Cong. § 2 ................................................................................................ 14

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56, Plaintiff Gavin Grimm ("Gavin") respectfully submits this Memorandum of Law in Opposition to the Gloucester County School Board's (the "Board's") Motion for Summary Judgment, ECF No. 191.

The Board not only fails to demonstrate that it is entitled to judgment as a matter of law, it fails to create even a triable question of fact. The Board relies on legal arguments that this Court previously rejected, and the Board fails to introduce any evidence to support its assertions that banning Gavin from using the same restrooms as other boys was substantially related to its asserted governmental interest in protecting student privacy related to nudity.

Even worse, the Board's arguments in support of summary judgment blatantly contradict prior assertions of counsel and the sworn testimony provided by its 30(b)(6) witness just a few weeks ago. The Board indulges in speculation about locker rooms, directly contradicting counsel's representations during the 30(b)(6) deposition when he objected to questions about locker rooms as irrelevant and directed the witness not to answer any questions on the topic. The Board speculates about the effect of Gavin's claims on sex-separated sports teams, even though the Board is well aware that the Virginia High School League already has a policy in place allowing transgender students to participate on teams consistent with their gender identity. And the Board asserts that there is no objective way for schools to evaluate a student's sincerity in claiming to be transgender, even though the proposal that arose out of the settlement conference with Magistrate Judge Miller—and was then publicly rejected by the Board—had provisions to address this very issue.

The Board's reasons for disregarding Gavin's legal documents have also continued to evolve. In addition to challenging the authenticity of Gavin's birth certificate, the Board now

seeks to collaterally attack Gavin's legal court order by arguing that Gavin's chest reconstruction surgery should not legally qualify as a "gender reassignment surgery" under Virginia law. At its 30(b)(6) deposition the Board explicitly disavowed this argument, which is both wrong as a matter of Virginia law and foreclosed by the Full Faith and Credit Clause. But the Board nevertheless seeks to override the decisions of Gavin's medical providers, the Virginia State Registrar, and the Circuit Court for Gloucester County based on the Board's own beliefs about what a boy should look like.

Enough is enough. The Board's motion for summary judgment should be denied in its entirety, and Plaintiff's motion for summary judgment should be granted.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Disputed as phrased, with respect to the terminology that Gavin was "born a female." It is undisputed that Gavin was born with genitalia and reproductive organs typically associated with females. It is undisputed that Gavin was issued a birth certificate listing his sex as female.

2.      Disputed as phrased and not supported by the proffered evidence. It is undisputed that *in most cases* males have XY chromosomes and females have XX chromosomes. But both parties' expert witnesses testified that chromosomes do not always determine a person's sex. The Board's expert witness, Dr. Van Meter, states, "From the moment of conception, a fetus is determined to be either a male (XY), female (XX), or in rare cases, to have a combination of sex determining chromosomes[.]" Van Meter Rep. ¶ 12, ECF No. 192-7. Dr. Van Meter also stated that some individuals have intersex conditions that can create the "appearance of female external genitalia in an XY male" and the "appearance of male external genitalia in an XX female." *Id.* ¶ 16. Gavin's expert witness, Dr. Penn, also testified that there are "times when you can have a

portion of the Y be present in an XX individual," and "times that you have an XY individual who won't respond to testosterone and therefore would look very feminine on the outside." Penn Dep. 49:13-18 (Medley-Warsoff Decl. 4/9/19 Ex. A).

It is undisputed that *in most cases* a person's sex assigned at birth is determined by external genitalia. But Dr. Van Meter stated that "there are variations of the degree of hormonally driven changes that… prevent assigning of a specific classification as either male or female at birth." Van Meter Rep. ¶ 16, ECF No. 192-7. Dr. Penn also testified that "the appearance of the genitalia are not always aligned" and "internal reproductive organs" are also "not always" determinative of sex. Penn Dep. 50:10-17.

3.      Disputed as phrased, with respect to the terminology that Gavin "enrolled [in school]… as a girl." It is undisputed that Gavin enrolled in the Gloucester County school system with a female gender marker on his birth certificate. It is undisputed that Gavin was not yet out as transgender at the beginning of ninth grade. Gavin Grimm Decl. ¶¶ 17-18, ECF No. 186 at 4.

4.      Disputed that Principal Collins was at the August 2014 meeting with Gavin, his mother, and his guidance counselor. Collins Dep. 26:15-18, ECF No. 192-9; Durr Dep. 9:10-19, ECF No. 192-11; Gavin Grimm Decl. ¶ 26. The remainder of the paragraph is undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed except for the assertion that Gavin was involved in an "altercation," which is disputed and not supported by admissible evidence. In support of that assertion, the Board relies on an email to Principals Collins from one of Gavin's teachers, Amy Bergh. The statements in the email are hearsay and not admissible for the truth of the matter asserted.

3

The text of the email also does not support the assertion that the incident was an "altercation." According to the email, Gavin and another student were "yelling." Amy Bergh email to Nate Collins dated 10/28/2014 (Medley-Warsoff Decl. 4/9/19 Ex. E). The teacher's statement that she thought they were "ready to physically fight" is inadmissible hearsay, and Gavin testified that he had no intention of physically fighting. According to Gavin's undisputed testimony, the yelling began because the other student was loudly talking about Gavin's genitals and calling him "disgusting" and "freaky." Grimm Dep. 91:12-92:11, 93:3-17 (Medley-Warsoff Decl. 4/9/19 Ex. B).

It is undisputed that the Board received the emails and oral communications referenced in School Board Supplemental Answer to Interrogatory No. 1, but the content of those emails is hearsay and not admissible for the truth of the matter asserted.

9.      Undisputed.

10.     Undisputed.

11.     Undisputed.

12.     Undisputed except for the assertion that the single-stall restrooms were "not just for transgender students," which is disputed as phrased. It is undisputed that any student is *allowed* to use the single-stall restrooms, but only transgender students are *required* to use them.

13.     Disputed that "a secondary governmental interest" for the Board's policy "was student safety," which is not supported by the proffered evidence. When asked whether the Board's policy was being justified based on a governmental interest in student safety, the Board's 30(b)(6) witnesses stated: "That's more of a subjective thing that each individual board member may feel differently about. But from a policy perspective, it was focused on privacy." Anderson Dep. 22:18-23:1, ECF No. 192-13. It is undisputed that the Board seeks to justify the

4

policy based on an asserted governmental interest in protecting privacy, but Plaintiff disputes that the policy is actually "focused to ensure" that students do "not hav[e] to share a restroom with someone from an opposite physiological sex." The Board's 30(b)(6) witness testified that the policy defines "biological sex" as the gender marker on a student's current birth certificate, not based on their physiology. Anderson Dep. 21:8-12, ECF No. 192-13.

There is also a disputed question of fact with respect to whether that asserted governmental interest is a pretext for discrimination based irrational fear and moral disapproval. A reasonable finder of fact could infer that the Board acted with an invidious motive based on its shifting and internally inconsistent arguments regarding Gavin's birth certificate. *See* Pl's Statement of Undisputed Facts ("SUMF") ¶¶ 64-68, 71-72, 82-84, 86-92, ECF No. 185. A reasonable finder of fact could also infer that the Board acted based on the fears and moral disapproval of some of its constituents. *See* Pl's SUMF ¶¶ 28, 43-44, 79-81. And a reasonable finder of fact could also infer animus from the testimony of the Board's designated expert, who testified that a *benefit* of excluding a transgender student from the restroom that aligns with their identity is that it sends the message to the student's peers that gender transition is not normal and prevents the spread of a "social contagion" that would cause other students to become transgender. Van Meter Dep. 150:6-18, 156:17-22, ECF No. 192-14.

14.     Disputed as phrased. The DSM-V states that: "Individuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as their *natal gender*) and their experienced/expressed gender," and, "[t]here must also be evidence of distress about this incongruence." DSM-V at 453 (Medley-Warsoff Decl. 4/9/19 Ex. D).

It is also disputed that the DSM-V purports to "define" sex. The DSM-V notes that there

are "a proliferation of terms whose meanings vary over time and within and between disciplines." DSM-V at 451 (Medley-Warsoff Decl. 4/9/19 Ex. C). It is undisputed that the DSM-V states that "[i]n this chapter, *sex* and *sexual* refer to the biological indicators of male and female . . . such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia." *Id.*

It is also disputed that there is "no objective test to diagnose gender dysphoria." There are standardized "guidelines and criteria that you have to meet for the diagnosis of gender dysphoria." Penn Dep. 54:20-22. "In order to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning." Penn Expert Rep. & Decl. ¶ 21, ECF No. 192-7.

15.     Disputed as phrased, with respect to the terminology that transgender people "[c]hoos[e] [a] gender identity." Gender identity "refers to a person's innate sense of belonging to a particular gender" and is "deeply rooted early in life." Penn Expert Rep. & Decl. ¶¶ 17, 20. It is undisputed that one's gender identity does not, on its own, cause physical changes. It is disputed, as phrased, that transgender people "generally do not have intersex conditions." It is disputed, as phrased, that "[t]ransgender individuals remain biologically men or biologically women." "[T]he Endocrine Society warns practitioners that the terms 'biological sex' and 'biological male or female' are imprecise and should be avoided." Penn Expert Rep. & Decl. ¶ 18.

16.     Disputed as phrased. It is undisputed that using restrooms consistent with one's gender identity is not the only aspect of social transition that can help treat gender dysphoria, but the ability to socially transition in other ways does not fully mitigate the harm caused by

6

excluding the transgender student from the same restroom as their peers. Rather, "patients who have the most positive outcomes are those who are supported and respected as the gender they identify by their families, peers, and school," including "being able to participate in activities and access facilities consistent with their gender identity." Penn Expert Rep. & Decl. ¶ 38. "[F]orcing transgender students to [use a private restroom] can be harmful to their wellbeing by calling them out as different and rejecting their gender." Penn Expert Rep. & Decl. ¶ 39.

17.     It is undisputed that Gavin underwent chest reconstruction surgery in June 2016. It is disputed as phrased that the physical change resulting from chest-reconstruction surgery is not a "biological change." It is also disputed that "[s]urgical gender reassignment procedures cannot be completed until the transgender individual is at least 18 years of age." Chest-reconstruction surgery is a form of gender affirming surgery that can be completed before a person is 18. The Endocrine Society Guidelines "suggest that clinicians delay gender-affirming genital surgery involving gonadectomy and/or hysterectomy until the patient is at least 18 years old or legal age of majority," Endocrine Society Guidelines at 3872, ECF No. 192-6. *See also* WPATH Standards of Care at 21, ECF No. 192-5; Penn Expert Rep. & Decl. ¶ 33. It is disputed that "Grimm remains biologically and anatomically female." The Endocrine Society advises the term "biological male or female" is "imprecise and should be avoided." Penn Expert Rep. & Decl. ¶ 18. Transgender boys like Gavin who receive gender-affirming hormones "develop the phenotypic features of non-transgender boys such as muscle mass, fat distribution, facial and body hair, along with lower vocal pitch." Penn Expert Rep. & Decl. ¶ 32.

18.     Disputed that Gavin's birth certificate "was not issued in conformity with Virginia law." *See* Rainey Decl. ¶¶ 2-3, ECF No. 195 at 1. It is also disputed that the reason the School Board declined to update Gavin's school records was truly "because the information that

Gavin provided was at odds with the process and procedures outlined by Virginia law and the Virginia Administrative Code." There is a disputed question of fact as to whether that asserted reason was developed post hoc as pretext. There is no evidence that the Board or any school administrator had concerns about the authenticity of Gavin's birth certificate when he presented it to them in November 2016. Both Principal Collins and the head of counseling, Mr. Lord, were aware that Gavin obtained a birth certificate reflecting his sex as male. Collins Dep. 151:14-17, ECF No. 192-9; Lord Dep. 47:5-12, ECF No. 192-12. Principal Collins was also aware Gavin obtained a court order to that effect. Collins Dep. 151:18-152:3, ECF No. 192-9. Neither Collins nor Lord testified to being told that the Board's failure to amend Gavin's records was because it questioned the validity of Gavin's legal documents. The Board made this assertion—for the first time—on the last day of discovery via its 30(b)(6) witness.

19.    Disputed as phrased that "[t]he School Board informed Grimm that he had a right to a hearing related to the School Board's decision not to amend Grimm's official transcript and educational records." The Board provided a response to Gavin's attorneys, but did not respond to Gavin directly.

20.    Undisputed.

21.    Undisputed.

## ARGUMENT

### I.  Legal Standard.

Summary judgment is warranted when "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) (quoting Fed. R. Civ. Pro. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the

nonmoving party, and a fact is material if it might affect the outcome of the suit under the

governing law." *Id.* (internal quotation marks and brackets omitted).

## II.    The Board's Policy Violates Title IX.

### A.  Discrimination Based on a Person's Transgender Status Is Inherently Discrimination "On the Basis of Sex" Under Title IX.

In its May 22, 2018 ruling, "[t]his Court join[ed] the District of Maryland and several

other appellate courts in concluding that 'claims of discrimination on the basis of transgender

status are per se actionable under a gender stereotyping theory' under Title IX." ECF No. 148 at

20 (quoting *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 715 (D. Md. 2018)).

Indeed "a person is defined as transgender precisely because" that person "transgresses gender

stereotypes." *Glenn v Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *accord EEOC v. R.G. &*

*G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018), *petition for cert. filed*, No.

18-107 (U.S. June 24, 2018); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858

F.3d 1034, 1048 (7th Cir. 2017). "[A]ny discrimination against transsexuals (as transsexuals)—

individuals who, by definition, do not conform to gender stereotypes—is [thus] discrimination on

the basis of sex[.]" *Finkle v. Howard Cty., Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014).

To be sure, most boys had a male sex assigned to them at birth and have chromosomal,

anatomical, and hormonal characteristics that are all typically associated with boys. It is only a

small group of boys for whom this is not the case. But protections from sex discrimination are

not limited to "myths and purely habitual assumptions," and extend to generalizations that are

"unquestionably true." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707

(1978). Sex discrimination is prohibited by Title IX and other statutes precisely because

"[p]ractices that classify [students] in terms of … sex tend to preserve traditional assumptions

about groups rather than thoughtful scrutiny of individuals." *Id.* at 709. Generalizations that are

accurate for most boys cannot justify discrimination against boys who fall "outside the average description." *United States v. Virginia*, 518 U.S. 515, 550 (1996).

Instead of engaging with Gavin's actual claims or the Court's prior analysis, the Board begins its legal argument with a falsehood: "Throughout this litigation, Grimm has pressed an interpretation of Title IX that 'sex' is determined solely according to 'gender identity,' meaning 'a person's deeply felt, inherent sense of one's gender.'" Def.'s Mem. at 10. The Board cannot cite any filing in which Gavin has made that legal argument, and Gavin has repeatedly explained that the Board's assertion is incorrect. *See* Pl.'s Mem. in Opp. to Mot. to Dismiss, ECF 139 at 22; Pl.'s Mem. in Opp. to Mot. to Dismiss, ECF 120 at 19; Grimm Supp. Reply Br., No. 15-2056 (4th Cir.), ECF 225 at 8.[1]

This case is not about the definition of "sex" in the abstract. It is about the meaning of "discrimination . . . on the basis of sex." 20 U.S.C. § 1681(a). "'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). "[D]iscrimination on the basis of gender stereotypes, or on the basis of being transgender, or intersex, or sexually indeterminate, constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female—and that discrimination is

---

[1] As the Fourth Circuit previously recognized, the ordinary definition of "sex," both when Title IX was passed in 1972 and today, includes *both* physical attributes of sex, as well as cultural and behavioral ones. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016) (collecting dictionary definitions); *Fabian*, 172 F. Supp. 3d at 526 (same); "sex, n. 4a," OED Online, Oxford University Press (defining sex as "a social or cultural phenomenon, and its manifestations" and collecting definitions dating back to 1651). Far from excluding reference to physiological characteristics, a person's transgender status reflects the *interrelationship* between a person's gender identity and the physiological characteristics that caused that person to be assigned a different sex at birth.

literally discrimination 'because of sex.'" *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016).[2]

Aside from the Board's litany of dictionary definitions demonstrating that the term "sex" includes physiological and anatomical characteristics—a fact that Gavin has never disputed—the Board falls back on its own assumptions about legislative intent. Def.'s Mem. 10-13, 18-20. But the Supreme Court rejected that approach to statutory interpretation long ago. As Justice Scalia explained on behalf of a unanimous Court in *Oncale v. Sundowner Offshore Services, Inc.*: "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." 523 U.S. 75, 79 (1998). Here, too, the legislators who passed Title IX may have been principally motivated "to end discrimination against women in university admissions and appointments," Def.'s Mem. 12, but they wrote a statute that "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" *Jackson*, 544 U.S. at 173. Sex-based discrimination that harms transgender individuals is a "reasonably comparable evil" that falls squarely within the statute's plain text. *Oncale*, 523 U.S. at 79; *see also Harris Funeral Homes*, 884 F.3d at 577; *Whitaker*, 858 F.3d at 1048.

The plain meaning of "discrimination" "on the basis of sex" cannot be narrowed to reach only the particular forms of sex discrimination recognized by Congress in 1972. The statute protects students from sexual harassment even though "the concept of 'sexual harassment' as gender discrimination had not been recognized or considered by the courts" when Congress

---

[2] *See also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949 (W.D. Wis. 2018) ("[D]iscriminating on the basis that an individual was going to, had, or was in the process of changing their sex—or the most pronounced physical characteristics of their sex—is *still* discrimination based on sex.").

enacted the statute. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 664 (1999) (Kennedy, J., dissenting). The statute also extends to harassment between members of the same sex even though many judges have stated they "cannot believe that Congress … could have intended it to reach such situations." *McWilliams v. Fairfax Cty. Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir. 1996), *abrogated by Oncale*, 523 U.S. at 75; *see also Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 114 (2d Cir. 2018) (en banc) (discussing how "sexual harassment and hostile work environment claims" "were initially believed to fall outside the scope of Title VII's prohibition"). "It is quite possible that these interpretations may also have surprised some who served in" Congress when the statute was enacted. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017) (en banc). But "[i]t is not for [the courts] to rewrite the statute so that it covers only what [they] think is necessary to achieve what [they] think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010).

These principles of statutory interpretation are not unique to Title VII and Title IX. "While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018); *accord West v. Gibson*, 527 U.S. 212, 218 (1999). "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991). "[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Barr v. United States*, 324 U.S. 83, 90 (1945); *cf. Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (Clean Air Act covers carbon dioxide emissions even though legislators "might not have appreciated the possibility that burning fossil fuels could lead to global warming").

Unable to find support in the statutory text, the Board contends that sex discrimination against transgender people is implicitly excluded from Title IX because Congress passed unrelated statutes in 2009 and 2013 that explicitly protect individuals based on "gender identity." *See* Def.'s Mem. 19-20 (citing 18 U.S.C. § 249(a)(2) and 42 U.S.C. § 13925(b)(13)(A)). But "presumptions that terms are used consistently and that differences in terminology denote differences in meaning" carry less force when applied to "different statutes passed by different Congresses in different decades." *Zarda*, 883 F.3d at 130. Congress's use of the term "gender identity" in different statutes passed in 2009 and 2013 says nothing about the meaning of "sex" in a statute adopted by Congress in 1972. *Cf. Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 109 134 S. Ct. 1257, 1268 (2014) ("The statutes the Government cites do not purport to define (or redefine) the [terms of an earlier statute].");  *accord Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) ("These later enacted laws . . . do not [purport to] declare the meaning of earlier law."). By using the overlapping terms of "sex" and "gender identity" in statutes passed in 2009 and 2013, Congress simply "cho[se] to use both a belt and suspenders to achieve its objectives." *Harris Funeral Homes, Inc*., 884 F.3d at 578 (quoting *Hively*, 884 F.3d at 578).

The Board also notes that Congress has failed to pass several bills that would have explicitly protected transgender people from discrimination based on gender identity. This "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation," *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011), because "[c]ongressional inaction cannot amend a duly enacted statute." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994). *cf. Massachusetts*, 549 U.S. at

529-30 ("That subsequent Congresses have eschewed enacting binding emissions limitations to combat global warming tells us nothing about what Congress meant . . . in 1970 and 1977.").

Even if it were permissible to interpret an earlier statute based on post-enactment legislative history, "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *United States v. Craft*, 535 U.S. 274, 287 (2002) (internal quotation marks omitted). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). Indeed, at the same time that Congress has failed to act on bills that would explicitly include protections for transgender individuals as part of federal protections from sex discrimination, Congress has also failed to act on bills that would expressly *exclude* transgender individuals from those statutory protections. *See* Civil Rights Uniformity Act of 2017, H.R. 2796, 115th Cong. § 3(b) (proposing that "No Federal civil rights law shall be interpreted to treat gender identity or transgender status as a protected class, unless such law expressly designates 'gender identity' or 'transgender status' as a protected class."); Title IX Clarification Act of 2016, H.R. 5307, 114th Cong. § 2 (proposing an amendment to Title IX stating that "the term 'sex' means with respect to an individual the biological sex of such individual").

By 2010, when Congress first considered the Student Non-Discrimination Act, H.R. 4530, 111th Cong. (2010), which included express protection for "gender identity," lower courts had already held that transgender individuals are protected by existing statutes prohibiting sex discrimination. *See Glenn*, 663 F.3d at 1317-19 (collecting cases). In this context, "another reasonable interpretation of that legislative non-history is that some Members of Congress believe that . . . the statute requires, not amendment, but only correct interpretation." *Schroer v.*

14

*Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008); *see also Harris Funeral Homes, Inc.*, 884 F.3d at 578; *Whitaker*, 858 F.3d at 1047-48.

### B. The Board's Policy Discriminated Against Gavin Because He Is Transgender.

In its order denying the Board's Motion to Dismiss the Amended Complaint this Court concluded "that a policy that requires transgender students to use bathrooms not in conformity with their gender identity subjects 'a transgender student ... to different rules, sanctions, and treatment than non-transgender students,' and amounts to discrimination on the basis of transgender status in violation of Title IX." ECF No. 148 at 22 (quoting *Whitaker*, 858 F.3d at 1049-50). In support of its motion for summary judgment, however, the Board continues to assert that its "biological gender" policy "does not discriminate against any class of students." Def.'s Mem. 31. This Court found that argument to be "resoundingly unpersuasive" when it denied the Board's Motion to Dismiss the Amended Compliant. ECF No. 148 at 30. And it has not grown more persuasive in the interim.[3]

On its face the policy explicitly targets transgender students. The policy begins with the preface, "Whereas the [Board] recognizes that some students question their gender identities." The policy then concludes with the declaration, "therefore," the use of common restrooms "shall be limited to the corresponding biological genders" and students with "gender identity issues" will be provided "an alternative … facility." Pl's SUMF ¶ 36. The change in policy had no effect

---

[3] The Board continues to rely heavily on *Johnston v. University of Pittsburgh of the Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 670, 676 (W.D. Pa. 2015). Def.'s Mem. 35-36. But as this Court explained in denying the Board's Motion to Dismiss the Amended Complaint, the overwhelming majority of courts over the past four years have rejected *Johnston*'s analysis. ECF No. 148 at 10 (collecting cases decided since 2015). And, as the district court in *Adams* explained "the Third Circuit's recent [*Doe by & through Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518 (3d Cir. 2018)] decision (which rejected claims by cisgender students that transgender students in the restrooms violated Title IX and Pennsylvania privacy law), likely eviscerates any persuasive value *Johnston* retained." *Adams*, 318 F. Supp. 3d at 1319.

on other students, all of whom continued to use the same restrooms they used before. The policy's only function was to subject Gavin, "as a transgender student, to different rules, sanctions, and treatment than non-transgender students." *Whitaker*, 858 F.3d at 1049; *accord M.A.B.*, 286 F. Supp. 3d at 723 (explaining that a similar policy "treats M.A.B. differently from the rest of the High School's students"); *cf. City of Los Angeles. v. Patel*, 135 S. Ct. 2443, 2451 (2015) ("The proper focus of the … inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.").

Moreover, despite the Board's arguments to the contrary, Gavin's claims for declaratory relief and nominal damages are not based on the Board's refusal to facilitate his treatment plan or on the Board's exacerbation of his gender dysphoria. Def.'s Mem. 41-43. His claims are based on the physical pain and discomfort of being unable to use the restroom and "the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984) (internal quotation marks omitted). The district court's decision in *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293, 1326–27 (M.D. Fla. 2018), is directly on point. The school board in *Adams* argued that in light of a transgender boy's "pre-exiting medical conditions . . . . it is hard to say that not using the boys' restroom is really the cause of his distress." *Id.* at 1326. The court rejected that argument and awarded $1,000 in compensatory damages, explaining that, even without expert testimony, the evidence established that the student "suffered emotional damage, stigmatization and shame from not being permitted to use the boys' restroom at school." *Id.* at 1327; *accord Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1251-52 (4th Cir. 1996) (clarifying that "a plaintiff's testimony, standing alone, can support an award of compensatory damages" if "the evidence of the emotional distress" is "demonstrable, genuine, and adequately explained").

16

The inquiry in this case is even simpler than in *Adams*. This Court does not have to parse

out the precise amount of incremental harm Gavin experienced as a result of being stigmatized

and humiliated at school because Gavin is not seeking compensatory damages at all. He seeks

only nominal damages, which are "particularly appropriate to vindicate the violation of a right. . .

where injury is shown but damages cannot be proven." *Ins. Servs. of Beaufort, Inc. v. Aetna Cas.

& Sur. Co.*, 966 F.2d 847, 853 (4th Cir. 1992); *see also Bains LLC v. Arco Prod. Co., Div. of Atl.

Richfield Co.*, 405 F.3d 764, 772 (9th Cir. 2005) ("An award of nominal damages does not mean

that there were not actual economic damages, just that the exact amount of damages attributable

to the improper conduct was not proven."). No additional expert testimony is required to

establish that Gavin was, indeed injured by the Board's discriminatory policy. *See* Pl.'s Mem. in

Support of Summary Judgment, ECF No. 185 at 35-38.

### C.  The Board's Policy Cannot Be Justified Based on Physiology.

The Board once again attempts to defend its restroom policy by arguing it is permissible

to discriminate based on physiological differences between males and females. Def.'s Mem. 22-

25. The Board made the same argument in support of its Motion to Dismiss the Amended

Complaint, but the Board's 30(b)(6) witness subsequently testified that the restroom policy

defines "biological gender" according to birth certificates, not according to physiology. Pl.'s

SUMF ¶ 87. Thus, an 18-year-old transgender teenage girl who has not obtained an updated birth

certificate would have to use the boys' restroom even if she has fully developed breasts as a

result of hormone therapy and a vagina as a result of genital surgery. Anderson Dep. 96:9-21,

ECF No. 192-13. And a transgender boy who *has* obtained an updated birth certificate (from

Virginia or elsewhere) would be able to use the boys' restroom, regardless of his physiology. *Id.*

at 75:13-76:3. The Board's newfound "reliance upon a birth certificate's sex-marker" as an

17

inaccurate proxy for a transgender student's physiology further "demonstrates the arbitrary nature of the policy." *Whitaker*, 858 F.3d at 1054.

Even before the Board claimed to follow the gender marker on birth certificates, the Board's arguments based on physiology were internally inconsistent. As this Court recognized in its prior opinion, "attempting to draw lines based on physiological and anatomical characteristics proves unmanageable," ECF No. 148 at 14, because for many transgender students, including Gavin, the "physical aspects of maleness and femaleness… may not be in line with each other," Endocrine Society Guidelines at 3875. Gavin himself has a typically male chest, facial hair, and testosterone affecting his bone and muscle structure.  Pl.'s SUMF ¶ 64. Boys and girls who are transgender and who have received puberty blockers and hormone therapy have physiological and anatomical characteristics—including breasts in girls who are transgender, facial and body hair in boys who are transgender, muscle and bone structure—that align with their gender identity, not the sex designated for them at birth. *Id.* at ¶ 85. Forcing transgender boys to use the girls' restroom and forcing transgender girls to use the boys' restroom does not create "spaces available to members of one anatomical and physiological sex and off-limits to the other." Def.'s Mem. 29.

In any event, there is no general exception in Title IX (or other civil rights statutes) for discrimination based on physiological characteristics. "Physical differences between men and women" may be taken into account to promote equality but cannot be used "for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *Virginia*, 518 U.S. at 533. For example, in *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016), the Fourth Circuit held that the Federal Bureau of Investigation could use different physical-fitness standards for male and female employees without violating Title VII because the standards were

designed to treat employees equally by measuring the same overall levels of physical fitness for everyone regardless of sex. Nothing in *Bauer* supports the notion that schools or employers can use physical differences as a basis for unequal and stigmatizing treatment that has no remedial function. *Cf. Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 289 (1987) (finding a California law taking into account physical differences resulting from pregnancy treats employees equally because it "allows women, as well as men, to have families without losing their jobs").[4]

### D. The Board Continued to Discriminate Against Gavin By Disregarding His Court Order and Birth Certificate.

The Board continued to exclude Gavin from the same restrooms as other boys even after he received a Virginia court order and Virginia birth certificate declaring that his sex is male. The Board has offered shifting and contradictory reasons for disregarding Gavin's legal documents, and the Board contradicts itself yet again in its brief in support of summary judgment. The Board initially contended that Gavin's legal documents were "not relevant." Pl.'s SUMF ¶ 73. Then, at its 30(b)(6) deposition, the Board asserted that it had doubts about the validity of Gavin's birth certificate because of how it looked. *Id.* ¶ 88.

Now, the Board argues that the Virginia Circuit Court was wrong to issue an order legally declaring Gavin's sex to be male because the Board thinks that Gavin's chest-reconstruction surgery does not legally qualify as a "surgical gender reassignment procedure." Def.'s Mem. 45 (quoting 12 VAC 5-550-320). *But see* DSM-V at 453 (including "mastectomy" as an example of

---

[4] The Board similarly misrepresents the holding in *Manhart*, which it quotes for the proposition that "[t]here are both real and fictional differences between women and men." Def.'s Mem. 24 (quoting *Manhart*, 435 U.S. at 707). But the Court went on to explain that Title VII nevertheless prohibits sex discrimination even when it is based on a generalization that is "unquestionably true." *Id.* "Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." *Id.* at 708.

19

"gender reassignment surgery"). The Board's latest argument directly contradicts the Board's sworn testimony at the 30(b)(6) deposition when the Board specifically disavowed any claim that Gavin's chest-reconstruction surgery was legally insufficient:

> [Q]: So does the school board contend that the medical procedures that Gavin has undergone are insufficient to change the gender marker on his birth certificate under Virginia law?
>
> A: No, that's not one of our arguments.
>
> Q: Okay. So you're not contending that his chest surgery did not qualify as surgery that warrants changing a birth certificate under Virginia law?
>
> A: No, not one of our arguments and not within our purview as a school board to determine.

Andersen Dep. 73:3-15. If the Board's witness had not explicitly disavowed such an argument, Gavin's counsel would have asked the Board to explain what specific surgeries the Board demands that its students must have before their legal court orders will be respected at Gloucester High School. Hysterectomy? Salpingo-oophorectomy? Vaginectomy? Metoidioplasty? Scrotoplasty? Phalloplasty? Gavin's counsel would also have asked whether the Board also independently reviews the legal basis for students' custody orders and other legal documentation, or are court orders related to gender transition the only ones that the Board attempts to collaterally attack?

The Board has no legal basis for refusing to recognize Gavin's legal court order based on its own beliefs about what "physiological characteristics the Board believe[s] that a male or female student *should* have." ECF No. 148 at 15. The Board cites no legal authority in support of its argument that the Circuit Court misapplied Virginia law.[5] Indeed, the DMS-V specifically

---

[5] The Board cites to the Virginia Administrative Code, which applies to the Department of Vital Records, but does not cite to the statute applied by the Circuit Court, which requires "the sex of an individual" to be "changed by medical procedure and upon request of such person."

includes "mastectomy" as an example of "gender reassignment surgery." DMS-V at 453. But even assuming for the sake of argument that the Circuit Court erred, "[a] challenge to an order based on a trial court's misapplication of a statute generally raises a question of court error, not a question of the court's jurisdiction" and, therefore, is "not subject to collateral attack." *Hicks ex rel. Hicks v. Mellis*, 275 Va. 213, 219-20 (2008). Gavin's order from the Circuit Court of Gloucester County was issued by a court of competent jurisdiction and entitled to full faith and credit in this Court under 28 U.S.C. § 1738.

The Board's attempts to collaterally attack Gavin's birth certificate are similarly baseless. Def.'s Mem. 43-45. The Board falsely asserts that "[t]he certificate that Grimm or his mother presented to Gloucester High School was marked 'void.'" Def.'s Mem. 45 n.18. It was not. Gavin's mother testified that she gave the Gloucester High School counseling department an original copy of the birth certificate with a raised seal. Deirdre Grimm Decl. ¶ 27, ECF No. 187 at 5-6. The *photocopy* of the birth certificate transmitted from Gloucester High School to the Board and its attorney was marked void because birth certificates are printed on security paper.

The Board also argues that Gavin's birth certificate was not marked as "amended" and did not contain other notations the Board contends that amended birth certificates should have. Def.'s Mem. 44-45. The Virginia Registrar and Director of the Department of Vital Records has confirmed that Gavin's birth certificate is authentic. Rainey Decl. ¶ 3. The Board complains that "[n]o person reviewing that certificate would perceive the slightest indication that it is an

---

Va. Code Ann. § 32.1-269(E); *see In re Brown*, 289 Va. 343, 349 (2015) ("[B]y enacting Code § 32.1–269(E), the General Assembly has already recognized that a shift in a person's gender is a valid reason to change one's name and to amend that person's vital records."). Unlike the administrative code, the statute does not require a surgical procedure, further undermining the Board's assertion that some unspecified genital surgery is the only acceptable medical treatment under Virginia law to amend an individual's birth certificate.

amended, altered, or 'corrected' certificate." Def.'s Mem. 45. But as noted at the bottom of every birth certificate issued to the public, the birth certificate document is just "a reproduction *or abstract* of the official record filed with the Virginia Department of Health." Gavin Grimm Decl. Ex. D, ECF No. 186-4 (emphasis added).

The Board apparently disagrees with the Department of Vital Records' interpretation of Virginia law regarding what information should be included on birth certificates issued to the public. But the Board does not explain how the appearance of Gavin's birth certificate has any relevance for which restroom he uses at school. The Board merely offers a list of post hoc *excuses* for its decision to disregard Gavin's birth certificate, not a logical *reason* for doing so.

### E. The Restroom Regulation Does Not—and Cannot—Authorize Schools to Discriminate in Violation of the Statutory Text.

The Board argues that its discriminatory policy is immunized from review under Title IX because one of the implementing regulations states that schools may "provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. That regulation does not—and cannot—create an exception from the statutory text, which provides that no person shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" at school. 20 U.S.C. § 1681(a). When Congress intended to completely lift that prohibition on discrimination or authorize unequal treatment, it did so explicitly in the statutory text by stating that that the prohibition on discrimination "shall not apply." *See* 20 U.S.C. § 1681(a)(2)-(9). Unlike those statutory exemptions, the restroom regulation does not state that the statute's ban on sex-based discrimination "shall not apply" to

restrooms.[6] *See Mercer v. Duke Univ.*, 190 F.3d 643, 647 (4th Cir. 1999) (contrasting broad statutory exemptions in 20 U.S.C. § 1681(a)(2)-(9) with narrower scope of exemptions in Title IX regulations). The agency would lack authority to create such an exemption because a regulation cannot conflict with its implementing statute. *See Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 62 (2011).[7]

Properly interpreted, the restroom regulation thus allows schools "to provide separate toilet facilities . . . on the basis of sex," 34 C.F.R. § 106.33, as long as they do not do so in a manner that causes students to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" at school, 20 U.S.C. § 1681(a). *Cf. Zarda*, 883 F.3d at 118 (explaining that sex-separated restrooms are compatible with Title VII if they do not create "disadvantageous terms or conditions of employment"). That premise is reinforced by the regulation's caveat that when schools establish sex-separated restrooms, they must provide access to "comparable" restrooms for all students. 34 C.F.R. § 106.33. The regulation does not authorize a school to adopt whatever sex-based restroom policy it chooses, no matter how discriminatory or harmful.[8]

---

[6] Similarly, the statutory provision authorizing schools to "maintain[] separate living facilities for the different sexes," 20 U.S.C. § 1686, does not declare that the prohibition on discrimination "shall not apply."

[7] *See Time Warner Ent. Co. v. Everest Midwest Licensee, LLC*, 381 F.3d 1039, 1050 (10th Cir. 2004) ("[A] regulation must be interpreted in such a way as to not conflict with the objective of its organic statute."); *Robbins v. Bentsen*, 41 F.3d 1195, 1198 (7th Cir. 1994) ("Regulations cannot trump the plain language of statutes, and we will not read the two to conflict where such a reading is unnecessary.").

[8] Although the Board attempts to draw support from *Virginia*, 518 U.S. at 550 n.19 (*see* Def.'s Mem. 22), the case only undermines its argument. The parties in *Virginia* agreed that including women in the Virginia Military Institute would require adjustments such as "locked doors and coverings on windows." *Id.* at 588. The Court nevertheless concluded that these minor changes to provide "privacy from the other sex" would not disrupt the essential nature of the program and could not justify excluding women from admission. *Id.* at 550 n.19. The teaching of

Instead of harmonizing the regulation with the underlying statute, the Board asserts that the "plain meaning" of the regulation allows schools to exclude transgender students from restrooms based on anatomical or physiological characteristics. As the Fourth Circuit previously explained, however, "[t]he plainness or ambiguity of language is determined by reference to (1) the language itself, (2) the specific context in which that language is used, and (3) the broader context of the statute or regulation as a whole." *G.G.*, 822 F.3d at 720. The relevant term in this regulation is not the word "sex" in the abstract, but the phrase "provide separate toilet . . . facilities on the basis of sex." As the Fourth Circuit noted, in the vast majority of cases, that phrase is not complicated to understand and apply. But it does not follow that there was a similarly plain "ordinary, contemporary, common meaning" in 1972 for how to "provide separate toilet . . . facilities on the basis of sex" when a student is transgender. "[T]erms that seem plain and easy to apply to some situations can become ambiguous in other situations." *Suesz v. Med-1 Sols., LLC*, 757 F.3d 636, 639 (7th Cir. 2014) (en banc).

It is impossible to identify the "ordinary, contemporary, common meaning" in 1972 for how to "provide separate toilet . . . facilities on the basis of sex" to a transgender student because transgender individuals inherently fail to conform the "ordinary" or "common" expectation that a person's sex-based characteristics will all align in the same direction. It is hardly self-evident that an ordinary speaker of the English language in 1972 or today would expect that a boy who is transgender who has typically male bone and muscle structure, a typically male chest, and facial hair would use the girls' restroom (or that a transgender girl who has typically female breasts and typically female bone and muscle structure would use the boys' restroom). Nor is it self-evident

---

the case is not that privacy concerns justify discrimination. It is that privacy interests, where actually implicated, must be accommodated in a manner that does not exclude individuals from accessing equal educational opportunities. *See id.* at 555 n.20.

that an ordinary speaker of the English language would think that if a boy who is transgender uses the boys' restroom, then the restrooms are no longer provided "on the basis of sex." After all, when Gavin used women's restrooms before transitioning, people perceived him as a boy who was using the wrong restroom. Gavin Grimm Decl. ¶ 13. Since he transitioned, Gavin has used men's restrooms in public venues wherever he goes without disruption. *Id.* at ¶ 37.

Indeed, the Board's argument that the regulation has an "ordinary, contemporary, common meaning" in the context of transgender students is undermined by its own failure to explain what that plain meaning is. The Board continues to talk about separating students based on "anatomical and physiological" differences with an occasional reference to chromosomes, *see, e.g.*, Def.'s Mem. 37, but its own 30(b)(6) witness testified that the Board's policy is not actually based on an assessment of students' past or present physiology. It is based on their birth certificate. Anderson Dep. 21:8-14, ECF No. 192-13. In its litany of dictionary definitions, the Board has not found one that defines the ordinary meaning of "sex" as the gender marker on a person's birth certificate.

Although the Board accuses Gavin of seeking to "update" the regulation to address new social problems, Gavin simply argues that the regulation does answer the relevant question. Because there is no "ordinary, contemporary, common meaning" for providing restrooms on the basis of sex to transgender students, the regulation must be interpreted within "the broader context of the statute or regulation as a whole," and the statute's underlying prohibition on discrimination. *G.G.*, 822 F.3d at 720; *see United States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004) ("When a regulation implements a statute, the regulation must be construed in light of the statute" it implements). Before the Board passed its new policy, Gloucester High School provided Gavin access to sex-separated restrooms in a manner that was consistent with the

25

statute's prohibition on discrimination. The Board then intervened and adopted a new policy designed to exclude boys and girls who are transgender from the common restrooms used by other boys and girls. Unlike the previous policy, the Board's new policy improperly "excluded [Gavin] from participation in," "denied [Gavin] the benefits of," and subjected [Gavin] to discrimination" at school in violation of Title IX, 20 U.S.C. § 1681(a).

In truth, the Board is the party requesting a judicial "update." As the Board itself argues, "[n]ot a shred of legislative history suggests that Congress" or the drafters of 34 C.F.R. § 106.33 "considered the concept of 'gender identity' at all" as something distinct from physiological and anatomical sex characteristics. There is similarly not a shred of legislative history suggesting that Congress or the drafters of 34 C.F.R. § 106.33 considered how the regulation would apply to transgender students, who often have physiological sex characteristics that do not all align with the sex assigned to them at birth. The Board is asking the Court to update 34 C.F.R. § 106.33 to provide a broad exemption from Title IX's prohibition on "discrimination," but the courts may not "rewrite constitutionally valid statutory [or regulatory] text under the banner of speculation about what Congress [or the administrative agency] might have done had it faced a question that, on everyone's account, it never faced." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017).

### F. *Pennhurst* Provides No Defense to Claims of Intentional Sex Discrimination.

In its decision denying the Board's Motion to Dismiss, this Court rejected the Board's argument "that Title IX must explicitly refer to discrimination against transgender students to fulfill the notice requirements of *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981)." ECF No. 148 at 20 n.11. Although the Board once again invokes *Pennhurst*, the Board gives no reason for revisiting this Court's prior ruling. Def.'s Mem. 29-30. "Title IX funding

recipients 'have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979,' when the Supreme Court decided *Cannon v. University of Chicago*, 441 U.S. 677, 691 (1979), and 'have been put on notice by the fact that . . . cases since *Cannon* . . . have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination.'" ECF No. 148 at 20 n.11 (quoting *Jackson*, 544 U.S. at 183); *cf. Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.") (internal quotation marks omitted).

## III.   The Board's Policy Violates the Equal Protection Clause.

### A.  The Board's Policy Is Subject to Heightened Scrutiny.

In its May 22, 2018 ruling, this Court concluded that discrimination against transgender individuals is subject to heightened scrutiny under the Equal Protection Clause. ECF No. 148 at 25-26. Under heightened scrutiny, the Board must show "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (brackets omitted). "The burden of justification is demanding and it rests entirely on the State." *Virginia*, 518 U.S. at 533.[9]

---

[9] Relying on *Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001), the Board argues that any different treatment based on "biological differences" is not the type of "gender-based stereotype" that violates equal protection. Def.'s Mem. 19-20. But the Court's analysis in *Nguyen* did not begin and end with biology. In *Nguyen*, the Supreme Court upheld a statute that provided different procedures for unmarried mothers and unmarried fathers to transmit U.S. citizenship to their children because mothers, by virtue of having given birth, automatically had a biological connection to the child and an opportunity to form a meaningful relationship. *Nguyen*, 533 U.S. at 73. At the same time, the Court emphasized that the policy was tailored so that it imposed only a "minimal" burden that could be easily met with a written acknowledgement of paternity under oath. *Id.* at 70. The Court also emphasized that the statute was not "marked by misconception and prejudice" or "disrespect." *Id.* at 73.

In its brief in support of summary judgment, the Board not only fails to prove as a matter of law that its policy satisfies heightened scrutiny, but it fails to submit sufficient evidence to create even a triable issue of fact. The Board's 30(b)(6) witness testified that the Board was relying *solely* on an asserted governmental interest in protecting privacy related to nudity. Anderson Dep. 22:1-14, 27:2-5, ECF No. 192-13. The Board fails to present any evidence or explanation for how those interests are not fully addressed by the added privacy protections in the restrooms and the availability of single-stall restrooms for anyone who wants greater privacy. *See M.A.B.*, 286 F. Supp. 3d at 725 ("Defendants do not provide any explanation for why completely barring M.A.B. from the boys' locker room protects the privacy of other boys changing there, while the availability of single-use restrooms or locker room stalls does not."); *cf. Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151 (1980) (invalidating a sex-based classification where a sex-neutral approach would completely serve the needs of both classes). Protecting bodily privacy related to nudity is an important governmental interest, but the Board has not even attempted to show "that the discriminatory means employed" of banishing boys and girls who are transgender from the same restrooms used by other boys and girls "are substantially related to the achievement of those objectives." *Morales-Santana*, 137 S. Ct. at 1690.

Even worse, the Board's arguments in support of summary judgment blatantly contradict prior assertions of counsel and the sworn testimony provided by its 30(b)(6) witness just a few weeks ago. The Board once again talks about how allowing Gavin to use the boys' restrooms would threaten students' privacy interests in locker rooms. Def.'s Mem. 27. But when Gavin's attorneys attempted to ask the 30(b)(6) witness about how its "biological gender" policy actually

28

protected privacy in locker rooms, the Board's counsel declared the questions to be irrelevant

and instructed the witness not to answer:

> Q How about in the locker room, if [a transgender girl is] using the boys' locker room and has to change clothes, you know, and expose her breasts in the process, does that violate the privacy of boys in the boys' locker room?

> MR. CORRIGAN: Let me object further on this one that this case is not about locker rooms. In fact, it's expressly not about locker rooms, so I'm not going to have him answer any locker room questions. He's not prepared, it's not part of the 30(b)(6) designation, and he's not going to answer questions about locker rooms.

> MR. BLOCK: David, the policy applies to restrooms and locker rooms, and locker rooms have been repeatedly brought up in legal briefs. So if there is a relevancy objection, I don't think that's grounds for instructing the witness not to answer.

> MR. CORRIGAN: Did you put it in your 30(b)(6) designation that we were going to talk about locker rooms?

> MR. BLOCK: I asked about the biological gender under the policy, and the policy applies to locker --

> MR. CORRIGAN: I understand. But you have made a vivid point of not including locker rooms in the case. It's not part of the case. You've said so, talk about on brief and every other way, so I don't think we should talk about locker rooms.

> MR. BLOCK: So are we stipulating here that the Board will not rely on implications for locker rooms as part of its defense of the policy?

> MR. CORRIGAN: Yeah, I think the case is about -- this is a case, a specific case about Gavin Grimm and this policy and restrooms. And you've made it that, and I don't think we have any choice but to say that's what the case is about.

> MR. BLOCK: Okay. So, yes, you're stipulating that the Board is not relying on implications that this case would have for locker rooms as one of the bases for defending its policy?

> MR. CORRIGAN: I'm stipulating that this case is only about restrooms, that's what I'm stipulating.

Anderson Dep. 39:9-41:10, ECF No. 192-13. As a result, the 30(b)(6) witness never explained

how having a transgender teenage girl change her shirt in the boys' locker room could possibly

advance a governmental privacy interest related to preventing the exposure of physiological and

anatomical sex characteristics.[10] In any event, even in the context of locker rooms, courts have found that there are many non-discriminatory ways to enhance student privacy without banishing transgender students from the facilities. *See M.A.B.*, 286 F. Supp. 3d at 724.

Similarly, the Board argues that non-transgender students would experience discrimination if they have to use separate single-stall facilities to protect their "adolescent modesty, personal sensitivities, or religious scruples" about using the same restroom as a transgender student. Def.'s Mem. 26-27. But the Board's 30(b)(6) witness testified that the separate single-stall restrooms provided an acceptable alternative for the "adolescent modesty, personal sensitivities, or religious scruples" of girls who do not want to be in the same restrooms as boys who are transgender (and for boys who do not want to be in the same restrooms as girls who are transgender):

> [Q:] So the policy doesn't provide any protection for a girl who does not want to share a restroom with someone who is a transgender boy, meaning that they were assigned a female sex at birth but live as a boy and have facial hair and a lot of muscles?
>
> MR. CORRIGAN: Object to form, foundation. Go ahead.
>
> THE WITNESS: Let's take it back since the focus of this is at the high school. Yes, the policy -- well, the implications of the policy do allow an alternate which is the single-stall restrooms we added, so that's the relief there. So they can be used by anybody. Those single-stall unisex restrooms are available for all students use.
>
> BY MR. BLOCK:
>
> Q So the girl who is uncomfortable using the girls restroom with a transgender boy has the option of using one of those single-stall restrooms instead; is that right?

---

[10] Indeed, one of the cases cited by Board as "recognizing anatomical differences between men and women, for purposes of equal protection analysis" Def.'s Mem. 37, is a case about a public indecency ordinance that required women but not men to cover their breasts in public, *United States v. Biocic*, 928 F.2d 112, 115-16 (4th Cir. 1991). Does the Board think that the ordinance does not apply to women with breasts who are transgender?

A Absolutely.

Q And so a boy who is uncomfortable using the boys restroom with a transgender girl who has fully developed breasts can use the single-user restrooms instead; is that right?

A Correct.

Andersen Dep. 44:10-45:14. The Board provides no explanation for why the single-user restrooms provide sufficient privacy accommodations for boys who are uncomfortable sharing a restroom with a transgender girl but are insufficient for boys who are uncomfortable sharing a restroom with another boy who is transgender. As the Court already recognized when it denied the Board's Motion to Dismiss the Amended Complaint, providing all students an option to use separate restrooms to enhance their own privacy is not the same thing as forcing a transgender student to use separate restrooms because someone else objects to their presence. *See* ECF No. 148 at 29 n.12 (citing *M.A.B.*, 286 F. Supp. 3d at 724-25); *accord Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) ("Nothing in the record suggests that cisgender students who voluntarily elect to use single-user facilities to avoid transgender students face the same extraordinary consequences as transgender students would if they were forced to use them.").

The Board also continues to speculate that transgender students will threaten "girls and women in school sports." Def.'s Mem. 27. But, as the Board is well aware, Gloucester County Public Schools already follow the Virginia High School League's policy for including transgender students in sports. Collins Dep. 133:11-22, ECF No. 192-9; Video recording of the Feb. 19, 2019 Gloucester County School Board meeting (Medley-Warsoff Decl. 4/9/19 ¶ 6). The Virginia High School League policy demonstrates that actual or perceived physiological differences between most girls and most boys can be addressed without categorically excluding transgender students from sports teams.

31

Worst of all, the Board once again asserts that there is no objective way to confirm that a student is transgender without encountering "serious practical problems." Def.'s Mem. 28. According to the Board, school administrators would have to "evaluate access to restrooms, locker rooms, and showers based on the subjective sincerity of a student's desire to adopt an 'identity' at odds with his or her anatomy and physiology" or based on sex stereotypes about how masculine or feminine the student looks. Id. at 27. As a result, the Board warns, "although a school might wish to keep boys and girls in separate [facilities], in practice any given [facility] would be open to members of both sexes." Id. at 28.

The Board thus continues to "misrepresent[] [Gavin's] claims and dismiss[] his transgender status." Whitaker, 858 F.3d at 1050. Gavin did not seek to use the boys' restrooms based on his subjective, internal perception of being a boy. He sought to use the boys' restrooms because he transitioned and was living in accordance with his identity. At the time the Board's policy was passed, Gavin had supplied school administrators with a "treatment documentation letter" from his psychologist, he had legally changed his name, and he was preparing to undergo hormone therapy. By the time Gavin graduated, he had undergone hormone therapy and chest reconstruction surgery, and he had received a state I.D. card and birth certificate stating that he is male. But the Board has bent over backwards to ignore these "objective" forms of proof in favor of its own unscientific (and constantly changing) definition of "biological gender."[11]

---

[11] The district court in Adams similarly explained:

> The evidence has established that Drew Adams is a transgender boy. Adams has undergone social, medical, and legal transitions to present himself as a boy. Adams wears his hair short; he dresses like a boy; his voice is deeper than a girl's; his family, peers, classmates and teachers use male pronouns to refer to him; he takes hormones which suppress menstruation and make his body more masculine, including the development of facial hair and typical male muscle development; he has had a double mastectomy so his body looks more like a boy; the state of Florida has provided him with a birth certificate and driver's license

32

The Board is well aware that its speculation about "practical problems" has no basis in fact because the Board held a public hearing on a proposed policy that would have addressed this very issue. Under the proposed policy that arose out of settlement discussions with Magistrate Judge Miller, transgender students would have been able to use the restrooms aligning with their identity if

(1)  the student has appropriate medical documentation from a licensed, treating healthcare provider who specializes in the treatment of transgender individuals; and

(2) the student has consistently asserted the student's gender identity for a period of at least six months; and

(3) the student has undergone treatment recommended by the student's healthcare provider, which may include social transition or hormonal therapy for at least six months.

Pl's SUMF ¶ 78. The Board's attorney told the audience that "[a] significant issue raised previously was that a student could just, on a whim, decide for a day to use the restroom of the opposite sex. This resolution eliminates that possibility." *Id.* at ¶ 79.

The proposed policy would have fully addressed any alleged "practical difficulties." Indeed, the policy was far more restrictive than the policies of many other schools. *See* Pl's SUMF ¶ 24.[12] But the Board abandoned the settlement proposal after hearing opposition from

---

which state he is a male; and when out in public, Adams uses the men's restroom. As a transgender boy, Adams must be permitted to use the boys' restroom at school.

*Adams*, 318 F. Supp. 3d at 1326.

[12] *See also Boyertown*, 897 F.3d at 524 (involving a school policy permitting transgender students to use restrooms and locker rooms consistent with their gender identity after a meeting with a school counselor); *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1084 (D. Or. 2018) (involving a school plan that permitted a transgender boy to "use any of the bathrooms in the building to which he identifies"); School Administrators Amicus at 19-21, ECF No. 192-39 (stating concerns that transgender students would "change their minds" or that "non-transgender students might falsely claim to be transgender" "have not materialized," and it is

constituents at the February 19th hearing. Pl's SUMF ¶¶ 80-81. On this evidentiary record, the

only "practical problems" are political ones.

### B. A Reasonable Factfinder Could Conclude that the Board's Discrimination Against Gavin Is Motivated By Irrational Animus or Moral Disapproval.

Because the Board's policy is discriminatory on its face, and because the Board's various

justifications for its policy are facially insufficient, the Court can and should grant summary

judgment for Gavin without making factual findings about the Board's true motives in enacting

and perpetuating its discriminatory policy. But if summary judgment is denied and the Court

holds a bench trial, a reasonable finder of fact could conclude that the Board's arguments are not

just meritless, but also pretexts to justify a course of conduct against Gavin rooted in animus or

moral disapproval.

A reasonable finder of fact could infer that the Board acted with an invidious motive

based on its shifting and internally inconsistent arguments. *Cf. Campbell v. CGI Techs. &*

*Solutions, Inc.*, No. 118CV707AJTMSN, 2019 WL 1375583, at *4 (E.D. Va. Mar. 27, 2019)

(when an "employer offer[s] differing explanations for the adverse employment actions at

different times . . . such shifting explanations are 'in and of itself, probative of pretext.'" (quoting

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001)).

A reasonable finder of fact could also infer that the Board acted based on fears and moral

disapproval of some of its constituents. *See Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 313

(4th Cir. 1989) ("The necessary and obvious inference—given the Council members' explicit

---

"easy to identify genuine requests" with "reasonable assessments of individual requests for
accommodation" rather than rigid criteria); Amicus Brief of Fairfax Cty. Sch. Bd. et al., ECF
No. 199 (E.D. Va.) at 7-15 (explaining that administrators across Virginia have successfully
"address[ed] requests by transgender students [to use restrooms consistent with their gender
identity] on a case-by-case basis").

concessions at trial that they were in fact influenced by the public's expressions of concern—is that their deliberations were impermissibly tainted by 'irrational neighborhood pressure' manifestly founded in religious prejudice."); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (explaining that government "may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic").

And a reasonable finder of fact could infer animus from the testimony of the Board's designated expert who testified that schools that affirm transgender students' identities are contributing to "a social contagion" that causes other students to question their gender identity. Van Meter Dep. 156:17-22, ECF No. 192-14. Dr. Van Meter thinks it is schools' responsibility to send a message that being transgender is not normal. *Id.* at 150:15-151:2. He likewise opposes schools "promoting homosexuality as normal." *Id.* at 172:6-20; 142:6-15.

## IV. The Board's Refusal to Update Gavin's Transcript to Match His Birth Certificate Violates Title IX and the Equal Protection Clause.

The Board also fails to present any argument or evidence justifying its refusal to update the gender marker on Gavin's official school records to match his birth certificate. As discussed above, the Board's attempt to collaterally attack the legality of Gavin's court order and birth certificate are meritless. The Board's argument that Gavin must exhaust administrative remedies under the Family Educational Rights and Privacy Act ("FERPA") fares no better. Def.'s Mem. 45-46. This Court already rejected the same argument when it granted Gavin permission to file his Second Amended Complaint. The Court explained that "FERPA explicitly provides that '[n]othing in this chapter shall be construed to affect the applicability of. . . [T]itle IX of the Education Amendments of 1972… or other statutes prohibiting discrimination.'" ECF No. 176 at 3 (quoting 20 U.S.C. § 1221(d)). The Court also explained that the procedural protections in

35

FERPA diverge from the Equal Protection Clause's substantive protections from discrimination. *See id.* at 4.

Moreover, in light of the Board's current position that Gavin must have some unspecified additional surgery before the Board is willing to accept the rulings of the Virginia Circuit Court, any further request for a FERPA hearing would have been futile. The Board asserts that FERPA would allow Gavin to subsequently challenge the Board's decisions in federal court, *see* Def.'s Mem. 46, but the decisions cited by the Board were all issued before the Supreme Court held in *Gonzaga University v. Doe*, 536 U.S. 273, 287 (2002), that FERPA does not provide a private right of action.

### V.    Gavin's Claims for Nominal Damages Are Not "Moot."

Finally, the Board reasserts that Gavin's claims related to the restroom policy are "moot" because Gavin seeks only nominal damages and declaratory relief for those claims. Def.'s Mem. 47. As the Board acknowledges, this Court has already rejected that argument as foreclosed by binding Fourth Circuit precedent. ECF No. 132.

But even if this Court were free to disregard Fourth Circuit precedent in favor of the Eleventh Circuit's decision in *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 868 F.3d 1248, 1263 (11th Cir. 2017) (en banc), Gavin's claims would not be moot under the *Flanigan's* standard either. The *Flanigan's* court noted that its decision "does not foreclose the exercise of jurisdiction in all cases where a plaintiff claims only nominal damages." *Id.* at 1264 n.12. Rather, the court determined that because the plaintiffs were challenging an ordinance that was repealed before it was ever actually applied to them, the plaintiffs "have already won," and nominal damages "would serve no purpose other than to affix a judicial seal of approval to an outcome that has already been realized." *Id.* at 1264.

The posture of this case is obviously different. The Board enforced its policy against Gavin for almost three years of high school, and the Board has still not repealed it. The Board inflicted real harm on Gavin, and nominal damages are an appropriate way of redressing that injury. As the Fourth Circuit has recognized:

> "The term 'nominal damages' describes two types of awards: (1) those damages recoverable where a legal right is to be vindicated against an invasion that has produced no actual, present loss of any kind; and (2) the very different allowance made when actual loss or injury is shown, but the plaintiff fails to prove the amount of damages."

*Minn. Lawyers Mut. Ins. Co. v. Batzli*, 442 F. App'x 40, 51 (4th Cir. 2011) (quoting 22 Am. Jur. 2d Damages § 8 (2003)); *see also Bains LLC.*, 405 F.3d at 772. Gavin's claim for nominal damages falls into the second category, and those types of nominal damages cannot be deemed "moot" even under the position adopted by the Eleventh Circuit.

## CONCLUSION

For all these reasons, Defendant's Motion for Summary Judgment should be denied, and Plaintiff's Motion for Summary Judgment should be granted.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of April 2019, I filed the foregoing Memorandum of

Law In Opposition to Defendant's Motion for Summary Judgment with the Clerk of the Court

using the CM/ECF system, which will automatically serve electronic copies upon all counsel of

record.


        <u>       /s/      Eden Heilman  </u>

        Eden Heilman (VSB No. 93554)
        AMERICAN CIVIL LIBERTIES UNION
        FOUNDATION OF VIRGINIA, INC.
        701 E. Franklin Street, Suite 1412
        Richmond, Virginia 23219
        Phone: (804) 644-8080
        Fax: (804) 649-2733
        eheilman@acluva.org
        *Counsel for Plaintiff*