IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

    Plaintiff,

v.                                   Case No. 4:15-cv-54

GLOUCESTER COUNTY SCHOOL
BOARD,

    Defendant.

**REPLY BRIEF IN SUPPORT OF GLOUCESTER COUNTY
<u>SCHOOL BOARD'S MOTION FOR SUMMARY JUDGMENT</u>**

David P. Corrigan (VSB 26341)
Jeremy D. Capps (VSB No. 43909)
George A. Somerville (VSB No. 22419)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
gsomerville@hccw.com

**<u>Table of Contents</u>**

I.   Introduction ................................................................................................... 1

II.   Law and Argument ........................................................................................ 2

   A.   With the absence of expert and medical evidence, Grimm cannot prove a sex stereotype theory of liability under Title IX or the Equal Protection Clause. ............................................... 2

   B.   The School Board's Policy does not discriminate on the basis of sex ............................... 5

      1.   The School Board's Policy complies with Title IX. ....................................................... 5

      2.   The legislative history and other evidence of legislative intent confirm the straightforward, plain language, "binary" meaning of the statutory language, "on the basis of sex." ....................................................... 6

      3.   The Department of Education's implementing regulations are consistent with the statute. ........................................................................ 8

   C.   The School Board's Policy does not violate the Equal Protection Clause. .................... 10

   D.   Grimm's new birth certificate does not establish a Title IX or Equal Protection claim. 12

   E.   Grimm's "pretext" argument and numerous others are based on distortions of arguments presented by the Board. ........................................................... 15

   F.   If "sex" were equated with "gender identity," Title IX and its regulations would be invalid for lack of clear notice. .................................................... 17

III.   Conclusion ................................................................................................... 18

## I. Introduction

From the beginning, the Gloucester County School Board ("School Board") has treated Gavin Grimm ("Grimm") with respect and attempted to accommodate Grimm's gender identity based on Grimm's assertions to School staff. Grimm's bare *allegations*, however, are no longer sufficient to *prove* that the School Board violated his rights under Title IX and the Equal Protection Clause. The School Board enacted a restroom policy that is consistent with Title IX and the Constitution to address the interests and privacy concerns of all students.

Grimm's opposition to the School Board's motion for summary judgment conflates whether school districts, as a matter of social policy, should permit transgender students to use the restroom consistent with their expressed gender identity with whether the School Board has violated Grimm's rights under Title IX and the Equal Protection Clause by providing separate restrooms based on physiological and anatomical differences between boys and girls, along with single stall restrooms for every student. In doing so, Grimm ignores the underlying allegations and basis for his legal challenge to the School Board's policy – that the use of the boys' restrooms at school was part of "medically necessary treatment" for gender dysphoria. ECF Doc. 1 ¶ 2; ECF Doc. 113 ¶ 1-2; ECF Doc. 177 ¶¶ 1, 2, 21, 38. That is because Grimm did not present expert evidence in this case that he was diagnosed with gender dysphoria, that it was medically necessary for him to use the boys' restroom, that being provided with a single-stall restroom that was available for all students to use adversely impacted his gender dysphoria, or that he is a boy. Grimm's opposition brief confirms that there is no genuine issue of fact in this case that precludes summary judgment in the School Board's favor.

## II.  Law and Argument

A.    **With the absence of expert and medical evidence, Grimm cannot prove a sex stereotype theory of liability under Title IX or the Equal Protection Clause.**

Grimm contends that the School Board's restroom policy discriminates against him "because he is transgender."  ECF Doc. 201, p. 15.  Grimm asserts that summary judgment should be denied, because his claims of discrimination on the basis of transgender status are actionable under a gender stereotyping theory.  ECF Doc. 201, p. 9.  Yet, to prove a gender stereotyping theory, Grimm must establish that he is a boy and that the School Board discriminated based on discriminatory stereotypes.  Grimm, however, now ignores the allegations in his Complaint, Amended Complaint and Second Amended Complaint in an effort to shoehorn his claims into case law largely decided at the motion to dismiss stage.

Grimm has premised his discrimination claims on the *allegations* that he was "diagnosed by medical professionals as having Gender Dysphoria, which is a serious medical condition characterized by clinically significant distress," and  that a "critical element" of "medically necessary treatment" for gender dysphoria is the need to use the boys' restroom at school.  ECF Doc. 8, ¶ 2-3; ECF Doc. 113, ¶¶ 1-2, 37, 40, ECF Doc. 177, ¶¶ 1, 2, 21, 38, 42.  According to Grimm, he requested to use the boys' restroom to alleviate his distress associated with gender dysphoria.  ECF Doc. 8, ¶¶ 15, 20, 22-24; ECF Doc. 113, ¶¶ 20-21, ECF Doc. 177, ¶¶ 22-23, 25.  Grimm alleged that using the girls' restroom would cause severe psychological distress and be incompatible with his medically necessary treatment for gender dysphoria. ECF Doc. 8, ¶ 46; ECF Doc. 113, ¶ 28.

 Grimm, however, has not offered medical, mental health, or expert testimony to prove that Grimm is a boy or that he has been diagnosed with gender dysphoria.  Grimm also has not designated a mental health expert, treating or retained, to offer testimony that the use of the boys'

2

restroom was a medical necessity for Grimm.  See e.g., <u>Plaintiff's Expert Witness Identification</u>. Additionally, Grimm has not offered medical or expert testimony to prove the effects of gender dysphoria on Grimm or that the use of a single-stall restroom, restroom in the nurse's office, or a staff restroom adversely affected his alleged gender dysphoria.[1]  Indeed, the expert that Grimm did proffer, Dr. Penn, is not a mental health provider, has never diagnosed anyone with gender dysphoria, and does not express any opinions specific to Grimm.  <u>Penn</u>, 11:4-11.

Grimm's expert did testify, however, that using the boys' restroom at school is just one component of an overall social transitioning care plan.  Even where a transgender student is not permitted to use the restroom consistent with his expressed gender identity, there are other methods of social transition that can be used to help treat gender dysphoria.  <u>Penn</u>, 70:18-71:4. **Moreover, the "standards of care" that Grimm's expert, and "every major medical and mental health professional organization," relies on "to eliminate the clinically significant distress by helping boys who are transgender to live as boys," <u>do not address the use of a transgender student's use of restrooms at school.</u>**

**Neither the WPATH standards of care nor the Endocrine Society guidelines has a standard of care related to the use of restrooms by transgender students at school.**  <u>Penn</u>, 66:21-67:2, 68:15-21; see also <u>Penn</u>, 63:8-65:19.  Simply stated, Grimm does not present expert testimony to support his claims of gender identity, gender dysphoria, or the medical necessity to use the boys' restroom at school.  See also ECF Doc. 200, pp. 19-22.

---

[1] On brief, Grimm disavows the allegations in his Complaints and now claims that his request for relief is "not based on the Board's refusal to facilitate his treatment plan or on the Board's exacerbation of his gender dysphoria … His claims are based on the physical pain and discomfort of being unable to use the restroom and "the deprivation of personal dignity…"  ECF Doc. 201, p. 16.  Not only does this directly contradict his pleadings, this theory is not supported by expert testimony either.

Despite the allegations in this case, after the close of discovery, Grimm is left with his bare assertion that he was born a girl and now identifies as a boy.  Grimm admits on brief that there is no factual dispute that he was born with female genital and reproductive organs, issued a birth certificate listing his sex as female, and enrolled in high school as a girl.  Grimm does not have intersex characteristics.[2]  Grimm, 112:19-20.  Indeed, Grimm used the female restrooms during his freshman year in high school.  Grimm, 89:14-20.  The fact that Grimm underwent chest-reconstruction surgery does not change the underlying issue with his case – Grimm has not offered sufficient expert evidence to prove that he is a boy for purposes of Title IX or the Equal Protection Clause.  The surgery did not create any biological changes in Grimm, nor did it complete gender reassignment.  Penn, 78:8-80:1.

Grimm can no longer rely on his allegations in his pleadings, nor can he rely on this Court's opinion based on those allegations.  Grimm had to come forward with admissible evidence to support his gender stereotyping theory.  Yet, Grimm has not offered expert testimony to establish that he is a boy or that he was subject to sex stereotyping discrimination on the basis of his sex in violation of Title IX and the Equal Protection Clause.  Instead, the evidence shows that the School Board's policy rejects classifying students based on whether they meet *any* stereotypical notion of maleness or femaleness.  The policy designates multiple-stall restrooms based on *physiology*, period—regardless of how "masculine" or "feminine" a boy or girl looks, acts, talks, dresses, or styles their hair.  Far from violating Price Waterhouse, the Board's policy is the *opposite* of the kind of sex stereotyping prohibited by that decision.  See, e.g., Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1224 (10th Cir. 2007) (concluding that Price Waterhouse

---

[2] Thus, this ends the speculation as to how the School Board's policy might apply to individuals with intersex characteristics.  That concern is not a factual issue in this case.

does not require "employers to allow biological males to use women's restrooms," because "[u]se of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes").

Under these facts, the School Board's restroom policy does not discriminate based upon sex stereotypes and, in fact, does not take sex stereotypes into consideration. The School Board is entitled to summary judgment on Grimm's claims.

**B.      The School Board's Policy does not discriminate on the basis of sex.**

1.      The School Board's Policy complies with Title IX.

Notwithstanding the evidentiary deficiencies, Grimm's case cannot escape that Title IX only prohibits discrimination under an education program or activity "on the basis of sex"– *not* on the basis of "gender" or "gender identity." 20 U.S.C. § 1681(a).  Grimm now asserts on brief that "this case is not about the definition of 'sex,'" but is about the meaning of discrimination "on the basis of sex."  ECF Doc. 201, p. 10.  Grimm's attempt to change the meaning of Title IX cannot be read so narrowly.

Grimm's emphasis on the word "discrimination" does not obscure that the only "discrimination" that falls within the statute is discrimination "on the basis of sex."[3]  Sex has to

---

[3] Grimm cites Fabian v. Hosp. of Cent. Conn., 172 F. Supp. 3d 509, 527 (D. Conn. 2016), a Title VII case, for the proposition that "'discrimination on the basis of gender stereotypes, or on the basis of being transgender, or intersex, or sexually indeterminate, constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female— and that discrimination is literally discrimination 'because of sex.'"  ECF Doc. 201, pp. 10-11.  Fabian is based on interpretation of "Title VII's prohibition of discrimination 'because of sex' to include discrimination on the basis of factors that are sufficiently 'related to sex or [that] ha[ve] something to do with sex.' …   Discrimination against transgender people because they are transgender people, by that reading, is quite literally discrimination 'because of sex.'"  172 F.Supp.3d at 525, quoting Ulane v. Eastern Airlines, Inc., 581 F. Supp. 821, 822 (N.D. Ill.1983), rev'd, 742 F.2d 1081 (7th Cir. 1984).  That interpretation transparently distorts the statutory language in an effort to generate support for a preordained conclusion.

*(footnote continued)*

be defined in order to determine whether there is discrimination on the "basis of sex."  The word "sex" in 2019, no less than in 1972, has a plain, simple, straightforward, and well understood meaning that refers to the anatomical, physiological, and even biological differences between males and females.

> **2.    The legislative history and other evidence of legislative intent confirm the straightforward, plain language, "binary" meaning of the statutory language, "on the basis of sex."**

Grimm does not dispute "the Board's litany of dictionary definitions" of the term "sex." ECF Doc. 201, p. 11.  Further, Grimm does not deny the clear message of the dictionaries – that anatomical and physiological characteristics are a criterion for distinguishing men from women, male from female, one sex from the other.[4]  Indeed, both experts in this case agree that anatomical and physiological differences are appropriate criteria for distinguishing boys and girls.

Yet, Grimm states that the Board relies on "*its own assumptions* about legislative intent" to determine the meaning of "sex" under Title IX.  ECF Doc. 201, p. 11.  That is a curious description of the Board's straightforward presentation of the legislative history of Title IX.  That history unambiguously shows that Congress employed and intended that Title IX be interpreted consistently with what was the universal understanding that "sex" as a binary term encompassing the anatomical and physiological distinctions between men and women.

---

[4] Grimm does argue that the "plain meaning" of the statutory language extends far beyond what Congress intended or any person who was aware of its enactment would have understood.  See ECF Doc. 201, p. 11.  That is simply an unreasoned and unexplained denial of reality, calling to mind Humpty Dumpty's "rather scornful" declaration that "[w]hen I use a word … it means just what I choose it to mean – neither more nor less."  E.g., Rector v. Approved Federal Savings Bank, 265 F.3d 248, 254 n.2 (4th Cir. 2001) (King, J., dissenting) (citation omitted).

Grimm also argues that legislative intent is not relevant to the reach of Title IX and the definition of "sex."  ECF Doc. 201, pp. 11-12.  That, however, is not the law.  "[W]here Congress has made its intent clear, '[courts] must give effect to that intent.'"  Miller v. French, 530 U.S. 327, 336 (2000), quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215 (1962).  Indeed, "[t]he purpose of statutory interpretation is 'to try to determine congressional intent.'"  Federal Energy Regulatory Comm'n v. Powhatan Energy Fund, LLC, 286 F.Supp.3d 751, 758 (E.D. Va. 2017), quoting Dole v. United Steelworkers of America, 494 U.S. 26, 35 (1990).  See also, e.g., Broughman v. Carver, 624 F.3d 670, 674 (4th Cir. 2010) ("Our objective in all cases of statutory interpretation is 'to ascertain and implement the intent of Congress.'") (citation omitted); Sierra Club v. United States Army Corps of Engineers, 909 F.3d 635, 645 (4th Cir. 2018):

> In interpreting a statute, the "cardinal rule ... is that the intent of [Congress] is to be given effect." …  To ascertain congressional intent, we first "determine whether the language at issue has a plain and unambiguous meaning." …  When considering the plain meaning of the statutory language, we also "must consider the context in which the statutory words are used because ... we read statutes as a whole." …  If the statute is unambiguous, "our inquiry into Congress' intent is at an end, for if the language is plain and the statutory scheme is coherent and consistent, we need not inquire further." …  We also look to a statute's legislative history as further evidence of congressional intent.  [Citations omitted.]

And while the plain meaning of statutory language frequently is the best guide to the legislators' intent, as it is here, one of "two extremely narrow exceptions to the Plain Meaning Rule…. applies when literal application of the statutory language at issue produces an outcome that is demonstrably at odds with clearly expressed congressional intent to the contrary." Hillman v. I.R.S., 263 F.3d 338, 342 (4th Cir. 2001) (citation omitted).  The Court need not consider that exception in this case, however, because all indicators of Congress' intent – the plain, unambiguous meaning of the statutory language, its context, and the legislative history – point to the same clear interpretation, that the word "sex" refers to the differences between male

and female, based on the anatomical, physiological, and biological differences between the sexes.

"Gender," on the other hand, is a "'societal construct' that encompasses how a 'society defines what male or female is within a certain cultural context.'"  <u>Doe v. Boyertown Area School District</u>, 897 F.3d 518, 522 (3rd Cir. 2018), *petition for cert. pending*, No. 18-658.  And "gender identity" refers to a person's "deeply felt, inherent sense of one's gender" (ECF Doc. 177, ¶ 20).  As this case illustrates, a person's concept or understanding of his or her gender or gender identity may differ from his or her sex, but it does not alter the statutory language of Title IX, which only prohibits discrimination "on the basis of sex" and not "on the basis of gender identity" or "transgender status."

> **3.**    **The Department of Education's implementing regulations are consistent with the statute.**

The statutory language is unambiguous, so it is not necessary to consult the regulations for purposes of interpreting Title IX.  <u>Cf.</u>, <u>e.g.</u>, <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  But ¨if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.") (<u>see</u>, <u>e.g.</u>, <u>Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC</u>, 883 F.3d 459, 469-70 (4th Cir. 2018)).  Under either a "step one" or a "step two" analysis,

however, the result is the same.  The regulations, like the statute, employ a "binary," two-sex meaning of the words "on the basis of sex" in the statute.[5]

The same interpretation is compelled by what Grimm calls the "Restroom Regulation," 34 C.F.R. § 106.33.  ECF Doc. 201, p. 22.  That regulation provides that "[a] recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of *the other sex*." (Emphasis added.)  Use of the definite article "the" in the highlighted phrase permits no interpretation other than a binary, two-sex reading of the regulation.  Similar language is found in other related regulations.[6]  In short, the Department's regulations consistently employ an unambiguously "binary" understanding of the statutory term "sex" – consistently with "the

---

[5] See 34 C.F.R. § 106.21 (recipient of Federal financial assistance "may make pre-admission inquiry as to the sex of an applicant … only if such inquiry is made equally of such applicants of *both sexes* …."; 34 C.F.R. § 106.17 (a "transition plan" must state "whether the educational institution or administratively separate unit admits students of *both sexes* …"); 34 C.F.R. § 106.2;   34 C.F.R. § 106.41 ("A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of *both sexes*.").

[6] See 34 C.F.R. § 106.31 (an educational institution may administer … scholarships … restricted to members of *one sex*, … only if it also "makes available reasonable opportunities for similar studies for members of *the other sex*."); 34 C.F.R. § 106.32 (housing provided … provided "to students of *one sex*, when compared to that provided to students of *the other sex* …"); 34 C.F.R. § 106.37 (in providing financial assistance to its students, a recipient shall not treat "persons of *one sex* differently from persons of *the other sex* with regard to marital or parental status."); 34 C.F.R. § 106.41 ("where a recipient operates or sponsors a team in a particular sport for members of *one sex* but operates or sponsors no such team for members of *the other sex*, and athletic opportunities for members of that sex have previously been limited, members of *the excluded sex* must be allowed to try-out for the team offered unless the sport involved is a contact sport."); 34 C.F.R. § 106.58 (state or local law may not impose "prohibitions or limits upon employment of members of *one sex* which are not imposed upon members of *the other sex* …" (All emphases added.)  Cf. ECF Doc. 201, p. 25 ("the regulation must be interpreted within 'the broader context of the statute or regulation as a whole'") (citation omitted).

'then-universal understanding …' during the passage of Title IX and the promulgation of § 106.33." ECF Doc. 148, p. 16.

Grimm argues, however, that the "Restroom Regulation," is ineffective, because it "does not state that the statute's ban on sex-based discrimination 'shall not apply' to restrooms." ECF Doc. 201, pp. 22-23. That argument is circular. It assumes the conclusion – that the "ban on sex-based discrimination" applies to restrooms. Yet, the regulation makes clear that schools such as Gloucester are permitted to have sex segregated restrooms. Grimm's logic would eviscerate the regulation.[7]

## C.   The School Board's Policy does not violate the Equal Protection Clause.

Not only is the School Board entitled to summary judgment as a result of Grimm's failure of proof, the School Board's policy satisfies constitutional scrutiny. Grimm's argument rises or falls on his claim that "discrimination against transgender individuals is subject to heightened scrutiny under the Equal Protection Clause." ECF Doc. 201, p. 27, citing ECF Doc. 148, pp. 25-26. The Board respectfully submits that for the reasons stated in its Brief in Support of its Motion for Summary Judgment at pages 32-33, this Court should reconsider the reasoning and conclusion of its May 22, 2018, Order and hold that heightened scrutiny does not apply. Neither the United States Supreme Court nor the Fourth Circuit has recognized transgender status as a suspect classification under the Equal Protection Clause, and the Supreme Court has admonished

---

[7] This is particularly true where Grimm now attempts to prove his case of discrimination without expert testimony, thus in essence stating that an expression of gender identity is sufficient to invalidate the School Board's provision of sex segregated restrooms. Further, perhaps in an attempt to hedge his bets, Grimm mischaracterizes the "Restroom Regulation" as requiring that a school that "establish[es] sex-separated restrooms" (which of course are well-nigh universal) "must provide access to 'comparable' restrooms *for all students*." Plaintiff's Opposition at 23 (emphasis added). The regulation does not say that. It mandates that "facilities provided for students of one sex shall be comparable to such facilities provided *for students of the other sex*." (emphasis added).

lower courts not to create new suspect classifications.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 441 (1985).

In addition, this Court previously reasoned in part that "'transgender status is immutable." ECF Doc. 148, page 26, quoting M.A.B. v. Bd. of Educ. of Talbot Cty., 286 F.Supp.3d 704, 720-21 (D. Md. 2018). That is at best a disputed material fact. Dr. Van Meter, the School Board's expert, testified that scientific evidence shows that 80%-95% of pre-pubertal children with gender identity disorder come to identify with their biological sex by late adolescence and that the vast majority of boys and girls with gender identity disorder identify with their biological sex by the time they emerge from puberty to adulthood, through either watchful waiting or family and individual counseling. Van Meter Report, ¶¶ 29, 30, 33; Van Meter, 81:4-83:2. At this point, those are undisputed facts, as Grimm has offered nothing to contradict them.  With such a high rate of "desistance," transgender status cannot be characterized as "immutable."

The rational basis standard therefore should be applied.  It is satisfied as discussed in ECF Doc. 196, pp. 34-37.  In fact, Grimm offers no argument to the contrary.

Even if a higher degree of "scrutiny" applied, the School Board's policy is fully justified and should be upheld.  See ECF Doc. 196, pp. 39-40.  Grimm argues that the Board has not submitted "sufficient evidence to create … a triable issue of fact" with respect to whether its

policy survives intermediate scrutiny.[8]  Yet, Grimm is compelled to go on at great length – pages 28-33 of his Response – in an effort to prove that negative.[9]

Grimm's arguments distort the School Board's arguments and policies.  Indeed, Grimm argues that the School Board has not introduced any evidence to support its conclusion that its policy protects "student privacy related to nudity."  ECF Doc. 201, p. 1.  If there is any room for common sense in this case, the School Board's policy separating children's restroom use based on their most private anatomical features, where they perform what are universally recognized as private biological functions, is clearly substantially related to protection of those children's privacy.  Indeed, Grimm recognized this when he told school administrators that he only wanted to use the boys' restroom if the stall had a door.  Collins, 55:14-57:21.

**D.    Grimm's new birth certificate does not establish a Title IX or Equal Protection claim.**

Grimm has created an inaccurate narrative to characterize the School Board's restroom policy.  Contrary to Grimm's assertion, the School Board's policy of providing separate restrooms for boys and girls is based on students' physiology and anatomy.  The School Board

---

[8] The parties agree to the applicable standard:  a policy survives "heightened" or "intermediate" scrutiny if it serves "important governmental objectives" and the means employed are "substantially related" to the achievement of those objectives.

[9] Grimm asserts on brief that the School Board's arguments in support of summary judgment on Grimm's Equal Protection claim "blatantly contradict prior assertions of counsel" concerning privacy interests in locker rooms, because "the Board once again talks about how allowing Gavin to use the boys' restrooms would threaten students' privacy interests in locker rooms," citing to Def.'s Mem. 27.  ECF Doc. 201, pp. 28-30, 32.  The passage that Grimm refers to in the School Board's brief relates to the School Board's arguments concerning the definition of sex and the implementation of § 106.33 under Title IX – not argument on the privacy interests associated with the restroom policy under Grimm's Equal Protection claim.  The School Board did not invoke privacy issues related to locker room use in response to Grimm's Equal Protection claim.  ECF Doc. 196, pp. 38-40.  Seemingly, Grimm has intentionally mischaracterized the School Board's position on these issues.  The same is true with respect to Grimm's mention of sports and the Virginia High School League.  ECF Doc. 201, p. 31.

testified that although there is not a set process or procedure, the School Board relies on social norms, binary sexes, **and students using the restroom that corresponds to their physiological sex**. Andersen, 14:8-15:9, 16:15-21.

While the School Board accepts a student's birth certificate as evidence of determining a student's physiology when the student enrolls in school, there has never been a conflict between a birth certificate and the student's physiological sex. This case is the only time there has been a conflict between those concepts. Andersen, 14:8-15:9, 16:15-21. Grimm's attempt to establish a Title IX and Equal Protection claim based on the birth certificate that was issued during Grimm's senior year in high school does not change the evidentiary analysis in this case.

Grimm's principal argument appears to be that the state Circuit Court's order directing the State Registrar to amend Grimm's birth certificate is not subject to collateral attack under Virginia law (citing Hicks v. Mellis, 275 Va. 213, 219-20 (2008)) and is entitled to full faith and credit in this Court under 28 U.S.C. § 1738. ECF Doc. 201, p. 21.[10] That argument misses the point.

Grimm's amended birth certificate does not change Grimm's physiological and anatomical sex – which remains female. While Grimm had chest reconstruction surgery, it did not create any biological changes in Grimm. Instead, it is only a physical change. Penn, 78:8-12. There is no evidence in the record to suggest that Grimm has completed surgical gender reassignment, and to that extent, Grimm remains biologically and anatomically female. Penn, 78:8-12; 79:19-80:1; Grimm, 118:7-12. Thus, while Grimm was enrolled in Gloucester High

---

[10]   Grimm also states that his mother "testified that she gave the Gloucester High School counseling department an original copy of the birth certificate with a raised seal." ECF Doc. 2-1, p. 21, citing Deirdre Grimm Decl. ¶ 27, ECF No. 187 at 5-6. Mrs. Grimm's declaration does not say that.

School, the School Board was aware that Grimm remained physiologically and anatomically a female.

Moreover, the undisputed facts establish that the birth certificate Grimm provided was not issued in conformity with Virginia law.  See ECF Doc. 196, pp. 43-45.  According to Grimm's expert, Grimm did not have a "surgical gender reassignment procedure" and Grimm still has female genitalia and reproductive organs in place.  Penn, 78:19-79:15; 79:19-80:1.  The School Board declined to revise Grimm's official school transcript, because the information that Grimm provided was at odds with the process and procedures outlined by Virginia law and the Virginia Administrative Code to amend a birth certificate.  Additionally, the birth certificate provided was stamped void and not "amended."  Andersen, 65:8-66:1; GCSB 04247.[11]

Grimm relies on this Court's holding that the language of 20 U.S.C. § 1221(d) "makes clear that FERPA does not preclude a suit pursuant to Title IX."  ECF Doc. 176, p. 2.  Respectfully, that does not address the School Board's argument.  The question is not whether FERPA provides the sole remedy for a student seeking an amendment of his records or precludes a suit pursuant to Title IX.  The question is whether a student may bypass an available administrative remedy and proceed directly to a federal court with a challenge to a school board's refusal to grant such an amendment.

The School Board offered Grimm the opportunity to submit additional materials and have a hearing on whether his records should be changed.  Indeed, Grimm's counsel received a letter stating, **"Please feel free to submit additional materials, and, of course, [Grimm] has the right under school policy JO, see page 8 Correction of Education Records, to a hearing to**

---

[11] For purposes of brevity, the School Board incorporates its arguments set out in its opposition to Grimm's motion for summary judgment at ECF Doc. 200, pp. 23-27.

challenge the information believed to be 'inaccurate, misleading or in violation of the **student's rights.'  I look forward to hearing further from you."**  Grimm did not request a

hearing on the School Board's denial of his request to have his transcript changed, either while

he was a student at Gloucester High School or after his graduation in the spring of 2017.  ECF

Doc. 171-1; <u>Andersen Declaration</u>.

The decision of an educational agency or institution, after a hearing upholding a refusal

to amend a record, is reviewable, as stated in the Board's Summary Judgment Brief at 46.  A

student presumably may assert that the refusal constitutes a Title IX violation, if that argument is

preserved in the administrative proceeding.  Grimm cites <u>Gonzaga University v. Doe</u>, 536 U.S.

273, 287 (2002), as contradicting the authorities cited in the Board's Summary Judgment Brief,

but <u>Gonzaga</u> does no such thing.  The Supreme Court held only that FERPA's *nondisclosure*

provisions create no rights enforceable in a suit for damages under 42 U.S.C. § 1983.  <u>Id</u>. at

287-90.  That holding does not speak in any way to the reviewability of an administrative

agency's decision not to grant a request for amendment of a student's records.

**E.     Grimm's "pretext" argument and numerous others are based on distortions of
         arguments presented by the Board.**

Grimm argues that a trier of fact could conclude that the Board's stated reasons for its

restroom policy are pretextual, "based on its shifting and internally inconsistent arguments

regarding Gavin's birth certificate," ECF Doc. 201, p. 5, and more generally that "[a] reasonable

finder of fact could infer that the Board acted with an invidious motive based on its shifting and

internally inconsistent arguments."  <u>Id</u>., p 34.  Those numerous arguments are diverse and, at

best, misleading.

As set out above, the School Board's 30(b)(6) witness did <u>not</u> testify "that the restroom

policy defines 'biological gender' according to birth certificates, not according to physiology," as

stated by Grimm on brief.  ECF Doc. 201, p. 17.  The School Board has consistently applied its restroom policy on the basis of physiological and anatomical sex.  Andersen, 14:8-15:9, 16:15-21; Clemons, 69:3-8, 70:4-5. Grimm's arguments are a distortion of the record.  The School Board incorporates its response to Grimm's motion for summary judgment to address this point. ECF Doc. 200, pp. 23-24.

Similarly, the School Board's arguments "based on physiology" are not "internally inconsistent" as Grimm asserts.  ECF Doc. 201, p. 18.  The evidence in this case establishes that Grimm has not been diagnosed with intersex characteristics, was born with female genitalia, and has not completed gender reassignment surgery.  Grimm has not put forth expert testimony to establish that he is a boy, the extent of his medical treatment, or that he suffers from gender dysphoria.  Grimm cannot rely on general assertions concerning transgender individuals to prove a case of discrimination against him by the School Board.[12]

Further, the Board has neither "offered shifting [nor] contradictory reasons" for declining to accept Grimm's revised birth certificate nor "contradict[ed] itself … in its brief in support of summary judgment."  ECF Doc. 201, pp. 19-20.  The School Board has explained why it has not changed Grimm's school records in counsel's letter of January 18, 2017, in the Rule 30(b)(6) deposition, in its Summary Judgment Brief at pp. 7-8, 43-45, and in its opposition to Grimm's

---

[12] Grimm's assertion that a fact finder could infer discriminatory animus on the part of the School Board based on the testimony of the School Board's expert witness, Dr. Van Meter, as supporting a possible inference of "animus" is remarkable.  ECF Doc. 21, p. 5.  Even assuming, for the purpose of argument, that Dr. Van Meter's expert opinions with respect to the medical and social undesirability of encouraging children and adolescents to claim a gender identity at odds with their natural (anatomical, chromosomal, biological) sex are somehow tainted, Grimm has not articulated any mechanism by which those opinions can be attributed to the School Board itself.  That is especially true when it is recognized that the School Board adopted the policy challenged in this case in December 2014, that it declined Grimm's request for an amended transcript in February 2019, and Dr. Van Meter's deposition was taken in March 2019.

motion for summary judgment at pp. 12, 13, 14, and 23-27.  While the School Board's 30(b)(6)

witness testified that it was not within the "purview" of the School Board to determine whether

the medical procedures that Grimm had undergone were sufficient to change his gender marker

on his birth certificate **under Virginia law,** that does not foreclose the argument that Grimm has

not satisfied the requirements of Virginia law sufficient to impose liability on the School Board

under Title IX or the Equal Protection Clause, nor does it foreclose the argument that the School

Board is aware that Grimm remained physiologically and anatomically a female.  Indeed, Grimm

has not offered expert testimony, retained or treating, to satisfy his burden.

**F.     If "sex" were equated with "gender identity," Title IX and its regulations would be invalid for lack of clear notice.**

Title IX is a Spending Clause statute.  Davis v. Monroe County Bd. of Ed., 526 U. S. 629,

640 (1999).  Respectfully, this Court has not yet fully considered the implications of that fact.  It

has made only a summary ruling, in its Order entered May 22, 2018, at page 20 n.11 (ECF Doc.

148), that the statute need not "explicitly refer to discrimination against transgender students to

fulfill the notice requirements under Pennhurst State School & Hospital v. Halderman, 451 U.S.

1 (1981)," because

> Title IX funding recipients "have been on notice that they could be subjected to
> private suits for intentional sex discrimination under Title IX since 1979," when
> the Supreme Court decided Cannon v. University of Chicago, 441 U.S. 677, 691
> (1979), and "have been put on notice by the fact that … cases since Cannon …
> have consistently interpreted Title IX's private cause of action broadly to
> encompass diverse forms of intentional sex discrimination."

Id.

That analysis does not confront the fact that this is a Spending Clause argument.  But

more importantly, it disregards the thrust of the Board's position – that at the time the Board both

accepted federal funds and enacted the policy that is challenged in this case, it could not possibly

have known or anticipated that Title IX or its regulations might somehow be interpreted as treating "gender identity" or "transgender status" as synonymous with the statutory term "sex," and therefore it could not possibly have voluntarily and knowingly accepted federal funds with that condition attached. See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" Id. (citation omitted). The Court therefore

> must view [Title IX] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [Title IX] funds and the obligations that go with those funds. We must ask whether such a state official would clearly understand that one of the obligations of the Act is the obligation to [admit transgender students to the restrooms of their choice]. In other words, we must ask *whether [Title IX] furnishes clear notice* regarding the liability at issue in this case.

Id. (emphasis added). Here, Title IX does not provide such notice; and respectfully, the fact that an implied right of action was recognized in 1979 and that subsequent cases have interpreted Title IX "broadly to encompass diverse forms of intentional sex discrimination" (ECF Doc. 148 at page 20 n.11) does not compel or even support a contrary answer.

### III. Conclusion

For all of the foregoing reasons, the Gloucester County School Board respectfully requests that the Court grant the School Board's Motion for Summary Judgment.

**GLOUCESTER COUNTY SCHOOL BOARD**

By Counsel

/s/_____
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
George A. Somerville (VSB No. 22419)
Attorneys for Gloucester County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
gsomerville@hccw.com

## C E R T I F I C A T E

I hereby certify that on the 15th day of April 2019, I filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send a Notice of Electronic Filing to all counsel of record.

/s/_____
David P. Corrigan (VSB No. 26341)
Jeremy D. Capps (VSB No. 43909)
George A. Somerville (VSB No. 22419)
Attorneys for Gloucester County School Board
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
jcapps@hccw.com
gsomerville@hccw.com