UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

GAVIN GRIMM,

              Plaintiff,

      v.

GLOUCESTER COUNTY SCHOOL
BOARD,

              Defendant.

Civil No. 4:15cv54

## ORDER

Pending before the Court are a Motion to Strike Exhibits (ECF No. 213) and Cross-Motions

for Summary Judgment filed by Plaintiff Gavin Grimm (ECF No. 184) and Defendant Gloucester

County School Board ("the Board") (ECF No 191). For the following reasons, the Board's Motion

to Strike is **GRANTED IN PART** and **DENIED IN PART**, Mr. Grimm's Motion for Summary

Judgment is **GRANTED**, and the Board's Motion for Summary Judgment is **DENIED**.

## I. FACTUAL BACKGROUND

Gavin Grimm is a twenty-year-old man who attended Gloucester High School, a public

high school in Gloucester County, Virginia, from September 2013 until his graduation in June

2017. *See* Gavin Grimm Decl. ¶¶ 3, 5, ECF No. 186. When Mr. Grimm was born, hospital staff

identified him as female. *Id.* ¶ 7. Despite this designation, Mr. Grimm has always "related to male

characters" and "ha[s] always known that [he is] a boy." *Id.* ¶ 6.

When Mr. Grimm enrolled in the Gloucester County School System, he was listed as a girl.

He began his freshman year in 2013 at Gloucester High School with a female birth certificate.

Andersen Decl., ECF No. 196-6.

1

In April 2014, Mr. Grimm disclosed to his parents that he was transgender. Gavin Grimm Decl. ¶ 20; Deirdre Grimm Decl. ¶ 7, ECF No. 187. According to Dr. Melinda Penn, M.D.,[1] "gender identity" refers to "a person's innate sense of belonging to a particular gender." Penn Expert Rep. and Decl. ¶ 17, ECF No. 192-3. She opines that people's gender identity usually matches the sex consistent with their external genitalia possessed at birth, but that transgender individuals have a gender identity different from the one assigned to them at birth. *Id.* ¶¶ 18–19.

At Mr. Grimm's request, he began therapy in May 2014 with Dr. Lisa Griffin, Ph.D., a psychologist with experience counseling transgender youth. Gavin Grimm Decl. ¶ 24. Dr. Griffin diagnosed Mr. Grimm with gender dysphoria. *Id.* Dr. Griffin prepared a treatment documentation letter stating that Mr. Grimm has gender dysphoria, that he should present as a male in his daily life, that he should be considered and treated as a male, and that he should be allowed to use restrooms consistent with that identity. ECF No. 186-1 at 1.

The American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM V") defines "gender dysphoria" as a condition experienced by some transgender people that inflicts clinically significant stress because their gender identity differs from the sex assigned to them at birth. Penn Expert Rep. and Decl. ¶ 21. Dr. Penn's report explains that "to be diagnosed with gender dysphoria, the incongruence [between gender identity and assigned sex] must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.*

---

[1] Mr. Grimm retained Dr. Penn to "provide expert testimony on the applicable standards of care and treatment guidelines for transgender youth." ECF No. 214-2 at 1. Dr. Penn is a pediatric endocrinologist with the Children's Hospital of the King's Daughters in Norfolk, Virginia, holds a medical degree from Eastern Virginia Medical School, and is board certified in pediatric endocrinology by the American Board of Pediatrics. ECF No. 192-3 ¶¶ 3–4. One of her specialties is transgender health. *Id.*

During the course of his treatment for gender dysphoria, Mr. Grimm changed his first name legally to Gavin and began using male pronouns to describe himself. Gavin Grimm Decl. ¶¶ 23, 25. He also began using men's restrooms in public venues. *Id.* ¶¶ 37, 38. Dr. Griffin referred Mr. Grimm to an endocrinologist for hormone treatment around this time. *Id.* ¶ 24.

In August 2014, before the beginning of Mr. Grimm's sophomore year, Mr. Grimm and his mother met with Ms. Tiffany Durr, a school guidance counselor. *Id.* ¶¶ 26–27. They gave Ms. Durr a copy of Dr. Griffin's treatment documentation letter and requested that Mr. Grimm be treated as a boy at school. *Id.* Mr. Grimm and Ms. Durr agreed that Mr. Grimm would use the restroom in the nurse's office. *Id.* ¶ 29.

Mr. Grimm "soon found it stigmatizing to use a separate restroom," however, and "began to feel anxiety and shame surrounding [his] travel to the nurse's office." *Id.* He also found that the distance to this bathroom caused him to be late to class. *Id.*

After a few weeks of using the restroom in the nurse's office, Mr. Grimm met with Ms. Durr and sought permission to use the school's male restrooms. *Id.* ¶ 33; Durr Dep. 23:6–17, ECF No. 192-11. Ms. Durr relayed Mr. Grimm's request to Principal Nate Collins. Durr Dep. 24:1–17. Principal Collins spoke with Superintendent Walter Clemons, who offered to support Principal Collins' ultimate decision. Collins Dep. 49:7–50:1, ECF No. 192-9; Clemons Dep. 24:4–20, ECF No. 192-10. Principal Collins allowed Mr. Grimm to use the male restrooms. Collins Dep. 50:22–51:13.

Mr. Grimm used the male restrooms at Gloucester High School for seven weeks. Gavin Grimm Decl. ¶ 36. During this time, there were no incidents in the restrooms involving Mr. Grimm and other students. *Id.* Mr. Grimm was given permission to complete his physical education

courses online and never needed to use the locker rooms at school.  Gavin Grimm Dep. 96:14–97:9.

Subsequently, however, Dr. Clemons, Principal Collins, and Board members began receiving complaints from adult members of the community who had learned that a transgender boy was using male restrooms at the high school.  *See* Collins Dep. 66:1–22; Clemons Dep. 32:16–33:6; Def.'s Response to First Set of Interrogatories ¶ 1, ECF No. 192-1.  Some members of the community demanded that the transgender student be barred from the male restrooms.  *Id.*  One student personally complained to Principal Collins.  ECF No. 192-1 ¶ 1.

Following these complaints, Board member Carla Hook proposed the following policy at the Board's public meeting on November 11, 2014:

> Whereas the GCPS recognizes that some students question their gender identities, and
>
> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Hook Nov. 9, 2014 Email, ECF No. 192-21.

Mr. Grimm and his parents spoke against the proposed policy at the November 11, 2014 meeting.  Gavin Grimm Decl. ¶ 40.  The Board voted 4-3 to defer a decision regarding the policy until the next Board meeting on December 9, 2014.  Recorded Minutes of the Board, Nov. 11, 2014 at 4, ECF No. 192-37.

The Board passed the proposed policy on December 9, 2014 by a 6-1 vote. Recorded Minutes of the Board, Dec. 9, 2014, at 3, ECF No. 192-23. The Board also announced that it would construct single-stall, unisex restrooms for all students to use. *Id.* The following day, Principal Collins told Mr. Grimm that his further use of the male restrooms at Gloucester High School would result in disciplinary consequences. Collins Dec. 10, 2014 Memo to Deirdre and David Grimm, ECF No. 192-24; Gavin Grimm Decl. ¶ 44.

In December 2014, Mr. Grimm began hormone therapy. This "deepened [his] voice, increased [his] growth of facial hair, and [gave him] a more masculine appearance." Gavin Grimm Decl. ¶ 60.

Single-user restrooms had not yet been constructed when the Board enacted the policy. Gavin Grimm Decl. ¶ 46. Mr. Grimm has recounted an incident when he stayed after school for an event, realized the nurse's office was locked, and broke down in tears because there was no restroom he could use comfortably. *Id.* A librarian witnessed this and drove him home. *Id.*

Mr. Grimm also declared that when the single-user restrooms were built, they were located far from classes that he attended. *Id.* ¶ 49. A map of the school confirms that no single-user restrooms were located in Hall D, where Mr. Grimm attended most classes. ECF Nos. 192-28, 192-29. There was also no single-user restroom at the school's stadium, limiting Mr. Grimm's ability to attend events there. Gavin Grimm Decl. ¶ 52.

The single-stall restrooms made Mr. Grimm feel "stigmatized and isolated." *Id.* ¶ 47. He never saw any other student use these restrooms. *Id.* ¶ 48. Principal Collins testified at his deposition that he never saw a student use the single-user restrooms, but that he assumed that they were used because they were cleaned daily. Collins Dep. 132:7–20.

Mr. Grimm avoided using restrooms at school and later developed urinary tract infections. Gavin Grimm Decl. ¶¶ 51–52. This caused him to become distracted and uncomfortable in class. *Id.* Mr. Grimm's mother kept medication for urinary tract infections "always stocked at home." Deirdre Grimm Decl. ¶ 26.

In June 2015, the Virginia Department of Motor Vehicles issued Mr. Grimm a state identification card identifying him as male. Gavin Grimm Decl. ¶ 61; ECF No. 41-2.

During his junior year of high school, Mr. Grimm was admitted to the boys' ward at the hospital at Virginia Commonwealth University "because he was having thoughts of suicide." Deirdre Grimm Decl. ¶ 24.

In June 2016, Mr. Grimm underwent chest-reconstruction surgery. Grimm Decl. ¶ 62.

On September 9, 2016, the Gloucester County Circuit Court issued an order declaring Mr. Grimm's sex to be male and directing the Virginia Department of Health to issue him a birth certificate listing his sex as male. *Id.* ¶ 63; ECF No. 41-3. The order referred to Mr. Grimm's chest reconstruction surgery as "gender reassignment surgery" and concluded that Mr. Grimm is "now functioning fully as a male." ECF No. 41-3.

On October 27, 2016, the Virginia Department of Health issued a birth certificate listing Mr. Grimm's sex as male. Gavin Grimm Decl. ¶ 64; ECF No. 41-4. After receiving an updated birth certificate, Mr. Grimm and his mother provided Gloucester High School with a photocopy of it and asked that his school records be updated. Gavin Grimm Decl. ¶ 66. The school has declined to correct Mr. Grimm's transcript, which still reflects his sex as female. ECF No. 41-5.

Troy Andersen, the Board's 30(b)(6) witness,[2] testified that the Board has declined to update Mr. Grimm's transcripts because it believes that the amended birth certificate does not accord with Virginia law and because the photocopy presented was marked "void." Andersen Dep. 65:8–66:1, ECF No. 192-13.

On January 18, 2017, the Board informed Mr. Grimm that he had a right to a hearing related to the Board's decision not to amend his official transcript and educational records. ECF No. 171-1. Mr. Grimm did not request a hearing.

Mr. Grimm graduated high school on June 10, 2017. Gavin Grimm Decl. ¶ 57. He is now attending Berkeley City College in California and intends to transfer to a four-year college. *Id.* ¶ 69.

## II.   PROCEDURAL BACKGROUND

Mr. Grimm commenced this action against the Board on June 11, 2015, at the end of his sophomore school year, alleging that the Board's policy of assigning students to restrooms based on their biological sex violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. ECF No. 1. This Court considered the Board's motion to dismiss Mr. Grimm's Amended Complaint. On May 22, 2018, this Court denied the motion to dismiss. ECF No. 148.

In doing so, this Court held that a plaintiff's claim of discrimination on the basis of transgender status constitutes a viable claim of sex discrimination under Title IX. *Id.* at 13–21. Specifically, this Court relied on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which held

---

[2] Under Federal Rule of Civil Procedure 30(b)(6), if an organization is named as a deponent in a civil matter, the organization must designate one or more persons who consent to testify on its behalf. The Board designated Troy Andersen, a Board member, to testify on its behalf.

that Title VII of the Civil Rights Act of 1964 bars discrimination not only based on a person's gender, but also based on whether the person conforms to stereotypes associated with the person's gender.[3]   This Court joined the District of Maryland in concluding that under Title IX "discrimination on the basis of transgender status constitutes gender stereotyping because 'by definition, transgender persons do not conform to gender stereotypes.'" *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 714 (D. Md. 2018) (quoting *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780, 787–88 (D. Md. 2014)).[4]

This Court also held that state action that discriminates against transgender individuals is subject to intermediate scrutiny under the Constitution's Equal Protection Clause for two reasons. ECF No. 148 at 25–28.  First, transgender individuals constitute at least a quasi-suspect class. *See M.A.B.*, 286 F. Supp. 3d at 718–20.  Second, discrimination based on sex stereotypes constitutes a sex-based classification of a type subject to intermediate scrutiny. *Id.* at 718–19.

On February 15, 2019, this Court permitted Mr. Grimm to file a Second Amended Complaint.  This filing added a claim that the Board continues to discriminate against Mr. Grimm in violation of Title IX and the Equal Protection Clause by refusing to update his official school transcripts to reflect his sex as male. ECF No. 177.

---

[3] Courts may, and frequently do, look to case law interpreting Title VII for guidance in evaluating a claim brought under Title IX. *See, e.g., G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.* (*"Grimm I"*), 822 F.3d 709, 718 (4th Cir. 2016), *vacated and remanded,* 853 F.3d 729 (Apr. 17, 2017) (citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)).

[4] The First, Sixth, Ninth, and Eleventh Circuits have all relied on *Price Waterhouse* in holding that claims of discrimination based on transgender status constitute *per se* sex discrimination under Title VII or other civil rights laws. *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574–75 (6th Cir. 2018) *cert. granted* 139 S. Ct. 1599 (2019) (Title VII); *Glenn v. Brumby*, 663 F.3d 1312, 1316–19 (11th Cir. 2011) (Title VII and Equal Protection Clause); *Smith v. City of Salem*, 378 F.3d 566, 573–75 (6th Cir. 2004) (Title VII and Equal Protection Clause); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (Equal Credit Opportunity Act); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–03 (9th Cir. 2000) (Gender Motivated Violence Act).

The parties filed motions for summary judgment. ECF Nos. 184, 191. The Board has also moved to strike certain exhibits relied upon by Mr. Grimm. ECF No. 213. On July 23, 2019, this Court heard argument on these pending motions. ECF No. 228. The motions are now ripe for consideration.

## III.   LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary judgment and directs a court to grant such motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party "seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted). Subsequently, the burden shifts to the non-moving party to present specific facts demonstrating that a genuine dispute of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). For the evidence to present a "genuine" dispute of material fact, it must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, courts must view the facts, and inferences to be drawn from the facts, in the light most favorable to the non-moving party. *Id.* at 255.

> [A] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

When ruling on a summary judgment motion, "a court may also give credence to other facts supporting the movant, regardless of their source, if such facts are not challenged by the non-moving party because a failure to challenge proffered facts may render such facts 'admitted.'" *XVP Sports, LLC v. Bangs*, No. 2:11cv379, 2012 WL 4329258, at *4 (E.D. Va. Sept. 17, 2012).

As specified in Local Civil Rule 56(B), "the Court may assume that facts identified by the moving party in its listing of [undisputed] material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. Civ. R. 56(B).

The applicable standards for resolving the challenges raised by the Board's Motion to Strike are addressed where needed below.

## IV.    ANALYSIS

### A.    Motion to Strike Exhibits

In his Reply in support of his Motion for Summary Judgment, Mr. Grimm submitted the following records: (1) a treatment documentation letter written by Dr. Griffin on May 26, 2014; (2) a hormone documentation letter written by Dr. Griffin on May 26, 2014; (3) a "To Whom It May Concern" letter written by Dr. Griffin on July 1, 2014; (4) a "To Whom It May Concern" letter written by Dr. Eva Abel, Psy.D.; (5) treatment records prepared by Dr. Hope Sherie, M.D. FACS; (6) a "To Whom It May Concern" letter written by Dr. Sherie on June 21, 2016; and (7) treatment records from VCU Medical Center.

The Board has filed a Motion to Strike Exhibits submitted by Mr. Grimm in support of his Motion for Summary Judgment. ECF No. 213. The Board seeks to strike four categories of exhibits: (1) the medical records kept by Dr. Penn, Dr. Griffin, and Dr. Sherie that are referred to above; (2) the "To Whom It May Concern" letters; (3) policy statements and amicus briefs relied upon by Mr. Grimm; and (4) references to a public hearing that was held in February 2019. These challenges are addressed in turn.

1.    **Medical Business Records**

The Board argues that Mr. Grimm's submission of medical records from Dr. Penn, Dr. Griffin, and Dr. Sherie constitute expert testimony and that these records must be stricken because Mr. Grimm did not disclose these experts under Federal Rule of Civil Procedure 26. Federal Rule of Civil Procedure 26 provides that a party must disclose, without awaiting a discovery request, any witness it may use to present evidence under Federal Rule of Evidence 702, 703, or 705 governing expert testimony. Fed. R. Civ. P. 26(a)(2)(A). When a party does not comply with Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37.

Mr. Grimm is not presenting these exhibits as expert opinion testimony and they are not governed by Rules 702, 703, or 705. Mr. Grimm has established that he is using these records only to demonstrate the fact that Mr. Grimm was diagnosed with gender dysphoria and received treatment pursuant to that diagnosis. ECF No. 216 at 1–6. The Court is not asked to determine whether that diagnosis was medically sound. Nor is the Court asked to determine whether it was medically necessary for Mr. Grimm to use the restrooms consistent with his gender identity. Mr. Grimm does not seek such a ruling and reiterated this at oral argument. Draft Tr. at 11–12.

To support its request to strike, the Board cited cases that excluded documents that differ from the evidence submitted in this case. *See* ECF No. 214 at 6–7. In these decisions, the courts excluded expert reports that were not timely disclosed. *See, e.g., United States ex rel. Lutz, et al. v. Berkeley Heartlab, Inc., et al.*, No. 9:11-CV-1593-RMG, 2017 WL 5957738, at *1 (D.S.C. Dec. 1, 2017) (excluding expert reports opining that certain laboratory tests were medically necessary).

By contrast, Mr. Grimm has submitted documents prepared contemporaneously to his treatment that detail the factual background attendant to his diagnosis and treatment. These documents are permissible. *Morris v. Bland*, 666 F. App'x 233, 239 (4th Cir. 2016) (holding that physicians testifying as fact witnesses may "discuss their examination of [a patient] and their diagnoses or findings," but may not offer expert opinions as to proximate cause).

These records also qualify as hearsay exceptions as defined in Federal Rule of Evidence 803(6). Under Federal Rule of Evidence 803(6), records of an act, event, condition, opinion, or diagnosis are excluded from the bar against hearsay if:

> (A) the record was made at or near the time by–or from information transmitted by–someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with [certain rules or statutes];
>
> and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

Medical records are quintessentially business records, and Mr. Grimm has identified adequate custodians for each record presented.  For these reasons, the Court denies the Board's Motion to Strike Mr. Grimm's medical documentation.

## 2.    "To Whom It May Concern" Letters

The Board also seeks to strike the "To Whom It May Concern" letters on the basis of hearsay.  The Board asserts that such letters "are not the type of records regularly kept in the course of a medical practice . . . ."  ECF No. 214 at 7–8.  The Board also argues that the letters are untrustworthy because they are addressed to unknown recipients.  *Id.* at 8.

The Board offers no support for its assertion that these letters are not the type of records kept regularly in the course of the medical practice.  The fact that three different doctors prepared these types of letters contemporaneously with their treatment of Mr. Grimm suggests otherwise.[5]

Regarding trustworthiness, Rule 803(6) makes clear that the burden of showing untrustworthiness falls on the opponent of the records.  The Board cites *Garrett v. City of Tupelo*, No. 1:16-cv-197, 2018 WL 2994808 (N.D. Miss. June 14, 2018) to assert that letters addressed to unknown recipients are untrustworthy.  However, *Garrett* did not turn on the identity of the recipient of information, but instead turned on the identity of the source of such information.  *Id.* at *4 (recognizing that documents may be untrustworthy when information comes from the patient, not the doctor, or when the "*source* of the information is unknown") (emphasis added).  The Board has not met its burden of showing that these documents are untrustworthy.  Accordingly, the Court declines to strike the "To Whom It May Concern" letters provided by Dr. Griffin, Dr. Abel, and Dr. Sherie.

---

[5] The Court also notes that the World Professional Association for Transgender Health acknowledges that the role of a health professional working with transgender youth encompasses providing referral letters for hormone therapy and includes advocacy on behalf of their patients at school.  WPATH Standards of Care at 13, 31–32, ECF No. 192-5.

3.      **Policy Statements and Amicus Briefs**

The Board seeks to strike evidence submitted by Mr. Grimm that include: (1) the World Professional Association for Transgender Health Standards of Care, (2) amicus briefs from a variety of organizations, including the American Academy of Pediatrics, the National Parent Teacher Association, and school administrators from thirty-three states and the District of Columbia; and (3) other documents reflecting the views of the American Psychological Association and National Association of School Psychologists, Gender Spectrum, and the National Association of Secondary School Principals. *See* ECF No. 214 at 9–13.

The Board does not dispute that the statements presented in these documents reflect the views of these organizations.  Instead, the Board argues that Mr. Grimm cannot use these documents to prove the truth of the matters asserted. Mr. Grimm responds that he is using these documents only as evidence of these organizations' views. Given that there is no dispute regarding the propriety of the intended use of these documents, the Court need not strike them.  The Court has considered these documents as evidence of the views of the organizations that prepared them, and not as substantive evidence of the accuracy of such views.

4.      **Public Hearing References**

On February 19, 2019, the Board announced that it was considering a new policy that would allow transgender students to use restrooms consistent with their gender identity if certain criteria were met.  Feb. 3, 2019 Press Release, ECF No. 192-35. The proposed policy arose out of settlement negotiations between the parties.  Shayna Medley-Warsoff Decl. ¶ 53, ECF No. 192. The policy was ultimately rejected.

The Board argues that the Court should strike any evidence related to the February 2019 hearing under Federal Rule of Evidence 408, which prohibits the use of evidence related to

14

compromise negotiations.  At the summary judgment hearing, counsel for Mr. Grimm stated that the Court need not consider the statements made at the February 2019 hearing.  Draft Tr. at 11. Accordingly, the Court has not considered evidence related to that hearing and **GRANTS** the Board's Motion to Strike any evidence related to it.

**B.       Gavin Grimm's Motion for Summary Judgment**

**1.       Title IX**

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31. To obtain relief for claims alleging a violation of Title IX, a plaintiff must demonstrate that (1) he or she was excluded from participation in an education program because of his or her sex; (2) the educational institution was receiving federal financial assistance at the time of his or her exclusion; and (3) the improper discrimination caused the plaintiff harm. *Grimm I*, 822 F.3d at 718 (citing *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)).  The Board does not dispute that it receives federal financial assistance.  ECF No. 154 ¶ 91.  Accordingly, only the first and third elements are disputed.

**(a) Gavin Grimm was excluded from participation in an education program on the basis of sex.**

In its May 22, 2018 Order, this Court concluded that claims of discrimination on the basis of transgender status are *per se* actionable under a gender stereotyping theory.  ECF No. 148 at 20. The Board argues that this decision was made in error and that "the plain language of Title IX and its implementing regulation, 34 C.F.R. § 106.33," define sex as a binary term encompassing the physiological distinctions between men and women.  ECF No. 200 at 27–28.

15

The Board presents no intervening case law that compels reconsideration of this decision. To the contrary, every court to consider the issue since May 22, 2018 has agreed with the analysis relied upon by this Court. *See Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) (stating that a policy forcing transgender students to use separate facilities "would very publicly brand all transgender students with a scarlet 'T,' and they should not have to endure that as the price of attending their public school"); *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*, 318 F. Supp. 3d 1293, 1325 (M.D. Fla. 2018) (holding that "the meaning of 'sex' in Title IX includes 'gender identity' for purposes of its application to transgender students" and that the transgender student proved a Title IX violation where a school board denied him from using male restrooms, causing him harm) *appeal docketed*, No. 18-13592 (11th Cir. Aug. 24, 2018); *Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018) ("Forcing transgender students to use facilities inconsistent with their gender identity would undoubtedly harm those students and prevent them from equally accessing educational opportunities and resources. Such a . . . District policy would punish transgender students for their gender noncomformity and constitute a form of sex-stereotyping.") *appeal docketed*, 18-35708 (9th Cir. Aug. 23, 2018). This Court believes that this reasoning is sound and correct and declines to revisit its prior holding.

In sum, there is no question that the Board's policy discriminates against transgender students on the basis of their gender noncomformity. Under the policy, all students except for transgender students may use restrooms corresponding with their gender identity. Transgender students are singled out, subjected to discriminatory treatment, and excluded from spaces where similarly situated students are permitted to go.

The Board responds that its policy treats all students equally on the basis of physiological or anatomical characteristics, and that these characteristics should not be considered sex stereotypes under *Price Waterhouse*. This argument is unpersuasive.

The Board's policy relies on the term "biological gender." *See* ECF No. 192-21. As this Court recognized previously, biological gender is not a medically accepted term. *See* ECF No. 148 at 14–15 (explaining that "sex" refers to biological attributes such as genes, chromosomes, genitalia, and secondary sex characteristics, and "gender" refers to the "'internal, deeply held sense' of being a man or woman'") (citing Wylie C. Hembree *et al.*, *Endocrine Treatment of Gender-dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11), J. CLIN. ENDOCRINOLOGY & METABOLISM 3869, 3875 (2017)). The policy's use of an ambiguous term obscures the basis for excluding transgender students from restrooms that they believe are appropriate and safe for them.

Moreover, the Board has inadequately explained the physiological and anatomical characteristics it relies upon to enforce its policy. For example, Mr. Grimm has had chest reconstruction surgery. The Gloucester County Circuit Court referred to Mr. Grimm's chest reconstruction surgery as "gender reassignment surgery," relying on that surgery in part in determining that Mr. Grimm is a male. However, this surgery is insufficient under the Board's policy. At the summary judgment hearing, counsel for the Board argued that an individual must have "the primary genitals and sex characteristic of a particular gender." Draft Tr. at 26. "Primary genitals" may be sufficiently clear, but "sex characteristic" is troublingly ambiguous. Many aspects of biology determine a person's sex, including genitalia, *and also* including hormones, genes, chromosomes, and other factors that comprise a person's biological makeup. The policy at issue uses some of these factors to define sex and ignores others. In determining the physical

characteristics that define male and female and the characteristics that are disregarded, the Board has crafted a policy that is based on stereotypes about gender. *See Brumby*, 663 F.3d at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms."); *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978) (stating that protections from sex discrimination are not limited to discrimination based on "myths and purely habitual assumptions," but also extend to discrimination based on generalizations that are "unquestionably true").

Additionally, Mr. Grimm has both a valid court order and a state-issued birth certificate identifying him as male. All other students with male birth certificates at Gloucester High School are permitted to use male restrooms. Mr. Grimm was the only student with a male birth certificate excluded from the male restrooms. This constitutes discriminatory treatment by the Board.

Furthermore, the Board has refused to update Mr. Grimm's transcripts and education documents, despite his amended birth certificate. The Board argues that his amended birth certificate does not comply with Virginia law and questions its authenticity. Such questions have been dispelled by the Declaration of Janet M. Rainey. ECF No. 195. Ms. Rainey is the State Registrar and Director of the Division of Vital Records and administers Virginia's system of vital records in accordance with Virginia law. She issued Gavin Grimm an amended birth certificate on October 27, 2016 that identifies him as male. *Id.* Regardless of prior concerns about the amended birth certificate's authenticity,[6] the Board's continued recalcitrance in the face of Ms.

---

[6] It is obvious from the face of the amended birth certificate that the photocopy presented to the Board was marked "void" because it was a copy of a document printed on security paper, not because it was fabricated. *See* ECF No. 184-6 (a copy of Mr. Grimm's birth certificate, stating that it the original is printed on security paper and is void

Rainey's Declaration and the court order from the Gloucester County Circuit Court is egregious. It is also discriminatory. Other students in the Gloucester County School system with male birth certificates also have male transcripts. Undeniably, the Board discriminates against Mr. Grimm in violation of Title IX in refusing to afford him the same dignity.

The Board also argues that Mr. Grimm has not proven that his use of male restrooms was medically necessary. However, the questions presented in this case do not require a finding that Mr. Grimm's use of a male restroom was medically necessary. The Board treated Mr. Grimm differently than other students on the basis of sex and, as established below, he suffered some measure of harm from that treatment. The existence of other methods of social transition for transgender individuals is, for the purposes of resolving the questions presented, irrelevant.

The Court concludes that the Board has discriminated against Gavin Grimm on the basis of his transgender status in violation of Title IX. The Court must next determine whether the improper discrimination caused Mr. Grimm harm.

### (b) The Board's policy harmed Gavin Grimm.

In his Declaration, Mr. Grimm described under oath feeling stigmatized and isolated by having to use separate restroom facilities. Gavin Grimm Decl. ¶ 47. His walk to the restroom felt like a "walk of shame." *Id.* ¶ 50. He avoided using the restroom as much as possible and developed painful urinary tract infections that distracted him from his class work. *Id.* ¶ 51. This stress "was unbearable" and the resulting suicidal thoughts he suffered led to his hospitalization at Virginia Commonwealth University Medical Center Critical Care Hospital. *Id.* ¶ 54.

Despite this evidence, the Board contends that Mr. Grimm has suffered no harm. ECF No. 200 at 29–30. The Board has discounted Mr. Grimm's testimony that separate restroom facilities

---

without a watermark). In any event, given Ms. Rainey's Declaration, the Board rationalizes its continuing denial of Mr. Grimm's amended birth certificate on specious grounds: that a photocopy was marked void.

caused him mental distress because he has not identified an expert to testify that he suffered such distress.[7]  *Id.*  Similarly, the Board argues that Mr. Grimm cannot prove that he suffered from painful urinary tract infections because he presented no supporting medical evidence.  *Id.*

The Board's argument that Mr. Grimm's testimony regarding his harm is inadequate because it is not bolstered by expert testimony is untenable.[8]  The Board's argument has no basis in law.  *See Adams*, 318 F. Supp. 3d at 1316 (relying on a transgender student's own testimony to conclude that the student suffered harm in the form of stigma and humiliation).

The Board's assertion that Mr. Grimm has suffered no harm as a result of its policy is strikingly unconvincing.  Mr. Grimm broke down sobbing at school because there was no restroom he could access comfortably.  After one breakdown, Mr. Grimm was hospitalized with suicidal thoughts.  He avoided after-school activities such as football games.  He experienced pain and discomfort as a result of avoiding restrooms while at school.[9]  Further expert testimony is unnecessary to conclude that the Board's policy harmed Mr. Grimm during his high school years.

There is also sufficient evidence to conclude that the Board continues to harm Mr. Grimm by refusing to update his school records to reflect his male identity.  Whenever Mr. Grimm has to provide a copy of his transcript to another entity, such as a new school or employer, he must "show them a document that negates [his] male identity and marks him different from other boys."  Gavin

---

[7] The Board "disputes" Mr. Grimm's statements regarding his harm suffered because the Board labels his Declaration as "self-serving."  Dismissing a party's testimony as self-serving while failing to present contradicting evidence is plainly insufficient to establish a genuine dispute of material fact.

[8] At the hearing, the Court read portions of Mr. Grimm's declaration into the record regarding the humiliation and stigma he suffered as a result of the Board's policy.  The Court asked defense counsel whether that testimony could support a finding of harm, warranting at least an award of nominal damages.  Counsel responded that "I think the answer is yes. . . . I don't think we can say there [are] no nominal damages here."  Draft Tr. at 26.

[9] Medical documentation confirming that his discomfort was caused by urinary tract infections is irrelevant for the purposes presented here.  There is sufficient evidence that Mr. Grimm suffered pain of some measure, for which he requests only injunctive relief and nominal damages.

Grimm Decl. ¶ 69. The Board continues to harm Mr. Grimm every time he is asked to furnish his records. This harm compels at least an award of injunctive relief and nominal damages.

Mr. Grimm has established (1) that he was excluded from the restrooms at Gloucester High School on the basis of gender stereotypes; (2) the educational institution received federal financial assistance at the time of his exclusion; and (3) improper discrimination caused him harm. For these reasons, summary judgment is **GRANTED** in favor of Mr. Grimm regarding his claim asserting a violation of Title IX (Count Two).

## 2.   Equal Protection Clause

Mr. Grimm also alleges that the Board's actions violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Equal Protection Clause "is essentially a directive that all persons similarly situated should be treated alike." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

In its May 22, 2018 ruling, this Court held that intermediate scrutiny must be applied in analyzing claims of discrimination against transgender individuals. ECF No. 148 at 24. Although the Board seeks reconsideration of this holding, it presents no authorities that compel a different result.[10] Other courts that have considered this issue since May 2018 have agreed that heightened scrutiny applies. *See, e.g., Karnoski v. Trump*, 926 F.3d 1180, 1200–02 (9th Cir. 2019) (holding that intermediate scrutiny applies to alleged discrimination against transgender individuals in the

---

[10] Instead, the Board's citations include out-of-circuit cases from the 1980s and 1990s, cases that interpret Title VII instead of the Equal Protection Clause, and cases that pertain to sexual orientation, not gender identity. The Board's citations are unpersuasive.

military); *Adams by & through Kasper*, 318 F. Supp. 3d at 1296, 1312–13 (applying intermediate scrutiny and noting that "federal courts around the country have recognized the right of transgender students to use the bathroom matching their gender identity"). In light of these rulings, this Court rejects defense counsel's argument that it is "step[ping] out on its own." *See* ECF No. 200 at 32.

When applying intermediate scrutiny to a sex-based classification, the Board bears the burden of demonstrating that its proffered justification for its use of the classification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The Board is required to demonstrate that the classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 524.

In response, the Board asserts an interest in protecting the privacy rights of students, specifically privacy interests that students have in protecting their unclothed bodies.[11] ECF No. 200 at 33. There is little doubt that students have a privacy right in avoiding exposure of their unclothed bodies.

Defendant makes no showing, however, that the challenged policy is "substantially related" to protecting student privacy. First, it is undisputed that the Board received no complaints regarding any encounter with Mr. Grimm in a restroom. Andersen Dep. 13:20–14:5. The fact that Mr. Grimm used male restrooms for seven weeks without incident is evidence suggesting that the Board's privacy concerns are unwarranted. *Cf. Whitaker*, 858 F.3d at 1052 (noting that the school district's privacy argument was undermined by the fact that a transgender boy used male restrooms for six months without incident).

---

[11] The Board cites a case involving strip searches of students. *See* ECF No. 200 at 33 (citing *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir. 1980)). Those situations are starkly distinct from transgender students seeking to use a restroom.

The Board's privacy argument also ignores the practical realities of how transgender individuals use a restroom. *See Grimm I*, 822 F.3d at 723 n.10 (expressing doubt that "G.G.'s use . . . or for that matter any individual's appropriate use of a restroom" would involve the types of intrusions present in other cases where privacy abuses were found); *Whitaker*, 858 F.3d at 1052 (holding that a similar policy "ignores the practical reality of how [the plaintiff], as a transgender boy, uses the bathroom: by entering a stall and closing the door"); *Adams*, 318 F. Supp. 3d at 1296, 1314 ("When he goes into a restroom, [the transgender student] enters a stall, closes the door, relieves himself, comes out of the stall, washes his hands, and leaves.").

At the summary judgment hearing, defense counsel conceded that there is no privacy concern for other students when a transgender student walks into a stall and shuts the door. Draft Tr. at 38. However, the Board's 30(b)(6) witness, Troy Andersen, testified that privacy concerns are implicated when students use the urinal, use the toilet, or open their pants to tuck in their shirts. Andersen Dep. 30:10–20. When asked why the expanded stalls and urinal dividers could not fully address those situations, Mr. Andersen responded that he "was sure" the policy also protected privacy interests in other ways, but that he "[couldn't] think of any other off the top of [his] head." *Id.* This Court is compelled to conclude that the Board's privacy argument "is based upon sheer conjecture and abstraction." *See Whitaker*, 858 F.3d at 1052.

Even if there were a plausible risk of exposure to nudity, transgender individuals often undergo a variety of procedures and treatments that result in anatomical and physiological changes, such as puberty blockers and hormone therapy. Such treatments can result in transgender girls developing breasts or transgender boys developing facial hair. If exposure to nudity were a real concern, forcing such a transgender girl to use the male restrooms could likely expose boys to

viewing physical characteristics of the opposite sex. From this perspective, the Board's privacy concerns fail to support the policy it implemented.

When asked why transgender students present a greater risk of invasion of privacy to students than the risk from someone of the same physiological sex, Mr. Andersen answered "I would say that it just goes back to [bathroom] use relying on the social norms of binary sexes." Andersen Dep. 31:4–10. However, "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . are not permissible bases" for discrimination. *Cleburne Living Ctr.*, 473 U.S. at 448. The Board has failed to meet its burden to provide an "exceedingly persuasive justification" for its policy. Accordingly, its policy must be found unconstitutional under the Equal Protection Clause.

Moreover, the Board's continued refusal to update Mr. Grimm's school records implicates no privacy concerns. The Board has put forward no justification for refusing to correct these records other than alleged concerns about his amended birth certificate's compliance with law and authenticity. These unsubstantiated doubts are easily dispelled by Janet Rainey's Declaration.

For these reasons, summary judgment must be **GRANTED** in favor of Gavin Grimm on his claim for a violation of the Equal Protection Clause (Count One).

## 3.    Mr. Grimm's request for a permanent injunction

Mr. Grimm seeks an injunction requiring the Board to update his school records to reflect his male identity. To obtain a permanent injunction, a plaintiff must show: "(1) irreparable injury, (2) remedies at law are inadequate to compensate for that injury, (3) the balance of hardships between the plaintiff and defendant warrants a remedy, and (4) an injunction would not disserve the public interest." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (internal quotations

omitted).   "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotations omitted).

The Court has already determined that Mr. Grimm has suffered injury that is ongoing and thus cannot be compensated by mere monetary damages.  The balance of hardships also weighs in Mr. Grimm's favor.  The Board has not identified any difficulty in altering Mr. Grimm's records. Nor has it identified any other governmental interest in refusing to update Mr. Grimm's records other than those already addressed in this Order.  By contrast, Mr. Grimm suffers great hardship when he presents school records that negate his male identity.  Finally, an injunction would serve the public's interest in upholding constitutional rights.  *See Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (internal quotations omitted).  For these reasons, a permanent injunction requiring the Board to update Mr. Grimm's school records is warranted.

C.   **Gloucester County School Board's Motion for Summary Judgment**

The Board also moves for summary judgment.  ECF No. 195.  The Board first argues that Title IX's prohibition of discrimination "on the basis of sex" does not encompass the Board's policy and that the definition of sex in the statute and its implementing regulation do not account for gender identity.  ECF No. 196 at 10–30.  The Court rejected this argument on May 22, 2018 and it reaffirms that holding today.[12]

Regarding the Equal Protection Clause, the Board argues that its policy should not be subjected to heightened scrutiny but should be subjected to a lower level of scrutiny: rational basis review.[13]  *Id.* at 32–37.  The Board argues that its policy survives such review.  *Id.*  The Court

---

[12] Much of the Board's Summary Judgment Motion is an attempt to relitigate this Court's prior holdings.  For example, the Board argues that if "sex" were equated with "gender identity," Title IX and its regulations would be invalid for lack of clear notice. ECF No. 196 at 29–30 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). This Court found this exact argument "unavailing." ECF No. 148 at 20 n.11.

[13] Under rational basis review, a court analyzes whether a law is "rationally related to a legitimate governmental interest." *U.S. Dep't. of Agric. v. Moreno*, 413 U.S. 528, 533 (1973).

again rejects this argument. The Board also reasserts that its policy survives intermediate scrutiny for the same reasons advanced in opposition to Mr. Grimm's Motion for Summary Judgment, as addressed above. Those arguments remain unavailing. Accordingly, the Gloucester County School Board's Motion for Summary Judgment, ECF No. 195, is **DENIED**.

## V.   CONCLUSION

Parents, teachers and administrators share "a solemn obligation to guard the well-being of the children in their charge." *Adams*, 318 F. Supp. 3d at 1296.

> As recent events from around the country have tragically demonstrated, this is a very challenging job. Recognizing the difficulty of this task and that local school boards, answerable to the citizens of their community, are best situated to set school policy, federal courts are reluctant to interfere. Nevertheless, the federal court also has a solemn obligation: to uphold the Constitution and laws of the United States. That is why federal courts around the country have recognized the right of transgender students to use the bathroom matching their gender identity.

*Id.*

Nelson Mandela said that "[h]istory will judge us by the difference we make in the everyday lives of children." One need only trace the arduous journey that this litigation has followed since its inception over four years ago to understand that passion and conviction have infused the arguments and appeals along the way.[14] The Board undertook the unenviable

---

[14] A cursory collection of salient events docketed in this matter include the following: the initial Complaint, June 11, 2015; a Motion to Dismiss Complaint argued, July 27, 2015, and partially granted; Order denying Plaintiff's Motion for Preliminary Injunction, September 4, 2015; Order denying an injunction appealed to the United States Court of Appeals for the Fourth Circuit, September 8, 2015; the Memorandum Opinion granting dismissal and denying motion for injunction, September 17, 2015; the Fourth Circuit's partial reversal of dismissal Order, April 19, 2016; the Order permitting Plaintiff's use of male restrooms at Gloucester County High School, June 23, 2016; Defendant's appeal of the June 23, 2016 Order, June 27, 2016; the Order denying a stay pending appeal, July 6, 2016; the United States Supreme Court's stay of the injunction pending resolution of an anticipated petition for writ of certiorari, August 3, 2016; the Fourth Circuit vacating the preliminary injunction, April 7, 2017; reassignment of the case to the undersigned, June 6, 2017; an Amended Complaint, August 22, 2017; a Motion to Dismiss Amended Complaint, September 22, 2017; supplemental briefing ordered, October 26, 2017; an Amended Motion to Dismiss, January 5, 2018; an Order denying the Amended Motion to Dismiss, May 22, 2018; Order granting a Motion for Leave to take Interlocutory Appeal, June 5, 2018; a Second Amended Complaint, February 15, 2019; cross-motions for summary judgment, March 26, 2019; Defendant's Motion to Exclude and Strike Exhibits, April 30, 2019; and oral argument on cross-motions for summary judgment and on the Motion to Strike, July 23, 2019.

responsibility of trying to honor expressions of concern advanced by its constituency as it navigated the challenges presented by issues that barely could have been imagined or anticipated a generation ago. This Court acknowledges the many expressions of concern arising from genuine love for our children and the fierce instinct to protect and raise our children safely in a society that is growing ever more complex. There can be no doubt that all involved in this case have the best interests of the students at heart.[15]

At the same time, the Court acknowledges that for seven weeks, the student body at Gloucester High School accommodated Mr. Grimm without incident as he—assisted by compassionate school and medical representatives—took new paths in his everyday life. This Court is compelled to acknowledge too that some of the external challenges seeking to reroute these new paths inflicted grief, pain, and suicidal thoughts on a child.

However well-intentioned some external challenges may have been and however sincere worries were about possible unknown consequences arising from a new school restroom protocol, the perpetuation of harm to a child stemming from unconstitutional conduct cannot be allowed to stand. These acknowledgements are made in the hopes of making a positive difference to Mr. Grimm and to the everyday lives of our children who rely upon us to protect them compassionately and in ways that more perfectly respect the dignity of every person.

Therefore, the Board's Motion to Strike, ECF No. 213, is **GRANTED IN PART** and **DENIED IN PART**. Gavin Grimm's Motion for Summary Judgment, ECF No. 184, is **GRANTED**. The Board's Motion for Summary Judgment, ECF No. 191, is **DENIED**.

---

[15] "When confronted with something affecting our children that is new, outside of our experience, and contrary to gender norms we thought we understood, it is natural that parents want to protect their children. But the evidence is that [the plaintiff] poses no threat to the privacy or safety of any of his fellow students. Rather, [the plaintiff] is just like every other student . . . , a teenager coming of age in a complicated, uncertain and changing world." *Adams*, 318 F. Supp. 3d at 1297.

The Court **ORDERS** the following relief:

- The Court **DECLARES** that the Board's policy violated Mr. Grimm's rights under the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, on the day the policy was first issued and throughout the remainder of his time as a student at Gloucester High School;

- The Court **DECLARES** that the Board's refusal to update Mr. Grimm's official school transcript to conform to the "male" designation on his birth certificate violated and continues to violate his rights under the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972;

- Nominal damages are awarded to Mr. Grimm in the amount of one dollar;

- The Court issues a permanent injunction requiring the Board to update Mr. Grimm's official school records to conform to the male designation on his updated birth certificate and to provide legitimate copies of such records to Mr. Grimm within ten days of the date of this Order;

- The Board shall pay Mr. Grimm's reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

The Clerk is **REQUESTED** to forward a copy of this Order to all parties and counsel of record.

    **IT IS SO ORDERED.**

 

_____
Arenda L. Wright Allen
United States District Judge

August 9th, 2019
Norfolk, Virginia